1  LEONARD TACHNER, A PROFESSIONAL LAW CORPORATION
   Leonard Tachner, Esq. (State Bar No. 058436)
2  17961 Sky Park Circle, Suite 38-E
   Irvine, California 92614-6364
3  (949) 752-8525 Telephone
   (949) 955-2415 Telefax
4
   Attorney for Plaintiff
5

6              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
7

8  _____

9  JAMES R. GLIDEWELL DENTAL          )   Case No. SACV11-01309-DOC(ANx)
   CERAMICS, INC. DBA                 )
10 GLIDEWELL LABORATORIES, a          )
   California corporation,            )   **PLAINTIFF'S OPPOSITION TO**
11                                    )   **DEFENDANT'S MOTION FOR**
                                      )   **PARTIAL SUMMARY JUDGMENT**
12           Plaintiff                )   **OF NON-INFRINGEMENT OF**
                                      )   **TRADEMARK BRUXZIR, AND**
13      vs.                           )   **IN DEFENDANT'S FAVOR ON**
                                      )   **ALL CAUSES OF ACTION IN**
14 KEATING DENTAL ARTS, INC., a       )   **THE COMPLAINT**
   California corporation,            )
15                                    )   Hearing Date: March 26, 2012
                                      )   Hearing Time: 8:30 A.M.
16           Defendant.               )
                                      )
17 _____)

18

19         PLAINTIFF hereby opposes the above-captioned Motion For Partial

20 Summary Judgment on the grounds that it is not appropriate under the law, it

21 is not supported by the evidence of record, there are numerous controverted

22 facts yet to be determined and such judgment would deny PLAINTIFF its day

23 in court.

24

25

26

27

28

1

# **TABLE OF CONTENTS**

2

3

BACKGROUND…………………………………………………………………5

LEGAL STANDARDS APPLICABLE TO DEFENDANT'S MOTION…….7

ARGUMENT IN OPPOSITION TO DEFENDANT'S MOTION…………..12

CONCLUSION……………………………………………………………17

4

5

6

7

TABLE OF CASES:

8

9

10

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)…………………8

Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 702, 131

U.S.P.Q. 55, 62 (2d Cir. 1961)…………………………………………………10

Burger King Corp. v. Pilgrim's Pride Corp., 705 F. Supp 1522, 2525-26, 12

U.S.P.Q.2d 1526, 1529-30 (S.D. Fla. 1988), aff'd without op., 894 F.2d 412

(11th Cir. 1990)…………………………………………………………………10

Cal. Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455-56, 227

U.S.P.Q. 808, 811 (9th Cir. 1985)……………………………………………10

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)………….…………..7, 8

Dan Robbins & Assocs., Inc. v. Questor Corp., 599 F.2d 1009, 1014, 202

U.S.P.Q. 100, 106 (C.C.P.A. 1979)…………………………………….…10

Dictaphone Corp. v. Dictamatic Corp., 199 U.S.P.Q. 437, 445-47 (D. Or.

1978) (copy attached)……..…………………………………………….10

Door Sys., Inc. v. Pro-Line Door Sys., 83 F.3d 169, 171, 38 U.S.P.Q.2d

1771, 1773 (7th Cir. 1996)…………………………………………………11

Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451,

456 (1992)…………………………………………………………………8

H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc. 782 F.2d 987

(FED. CIR. 1986)…………………………………………………………8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  In re AM. Online, Inc., 77 U.S.P.Q.2d 1618, 1623 (T.T.A.B. 2006)

2  (copy attached)…………………………………………...………..10

3  In re Homes & Land Publ'g Corp., 24 U.S.P.Q.2d 1717, 1718

4  (T.T.A.B. 1992) (copy attached)…..…………………………………10

5  In re Minnetonka Inc., 3 U.S.P.Q.2d 1711, 1713 (T.T.A.B. 1987)

6  (copy attached)…………………………………………...………..11

7  In re Minnetonka, Inc., 212 U.S.P.Q. 772 (T.T.A.B. 1981)

8  (copy attached)……………………………………………………11

9  In re Steelbuilding.com 415 F.3d 1293, 1297, 75 U.S.P.Q.2d 1420,

10  1421 (Fed. Cir. 2005)…………………………………………….9

11  In re Trek 2000, 97 U.S.P.Q.2d 1106 at 1112-13 (copy attached)…………...11

12  J & J Snack Foods Corp. v. Earthgrains Co., 220 F. Supp. 2nd 358, 376, 65

13  U.S.P.Q.2d 1897, 1910-11 (D.N.J. 2002)………………………………9

14  Lloyd's Food Prods. Inc. v. Eli's Inc., 987 F.2d 766, 767, 25 U.S.P.Q.2d

15  2027, 2029 (Fed. Cir. 1993)……………………………………..9

16  Olde Tyme Foods Inc. v. Roundy's, Inc., 961 F.2d 200,202, 22 U.S.P.Q.2d

17  1542, 1544 (Fed. Cir. 1992)……………………………………..9

18  Opryland USA, Inc. v. Great Am. Music Show, Inc., 970 F.2d 847, 850, 23

19  U.S.P.Q.2d 1471, 1472-73 (Fed. Cir. 1992)………………………..9

20  Park 'N Fly, Inc. v. Park & Fly, Inc., 489 F. Supp. 422, 427, 204 U.S.P.Q.

21  204, 209 (D. Mass. 1979)…………………………………………10

22  Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482,

23  487 (1st Cir. 1981)………………………………………………12

24  Schmidt v. Quigg, 609 F. Supp 2227, 230, 226 U.S.P.Q. 518, 521

25  (E.D. Mich. 1985)………………………………………………10

26  Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 907, 94 U.S.P.Q. 363, 366

27  (3d Cir. 1952)……………………………………………………10

28

T.S. Elec. Serv., Inc. v. Pac. Elec. Contactors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987)……………………………………………………………8

Union Carbide Corp. v. Ever-Ready, Inc., 531F.2d 366, 379 188 U.S.P.Q. 623, 635 (7th Cir. 1976)……………………………………………………..9

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)…………………..8

Visa Int'l Serv. Ass'n v. Life-Code Sys. Inc., 220 U.S.P.Q. 740, 742 (T.T.A.B. 1983) (copy attached)……...……………………………………9

Vision Center v. Opticks, Inc., 596 f.2d 111, 116, 202 U.S.P.Q. 333, 339-40 (5th Cir. 1979)………………………………………………...10


Statutes

FED. R. CIV. P. 56(c)…………………………………………………………………7,8

## **BACKGROUND**

This Motion relates primarily to the issue of trademark infringement of PLAINTIFF'S federally registered mark BRUXZIR® for various dental restoration products including crowns and the like.  The trademark BRUXZIR® was registered by the U.S. Patent and Trademark Office on January 19, 2010 in class 010 and awarded registration No. 3,739,663 to PLAINTIFF Glidewell Labs, based on first use in interstate commerce on June 6, 2009.  Glidewell Labs is the largest dental laboratory in the United States.  Glidewell's BRUXZIR® products have become over the past two and one-half years, its most successful restoration products in the company's forty-two year history.  Since beginning sales of those products in June, 2009, Glidewell Lab's gross sales of BRUXZIR® restorations has exceeded 67 million dollars in the United States and around the world.  That mark has since been registered by Glidewell Labs in numerous other countries.  Its primary consumers for these products are dentists for use on patients in their dental offices.  In November, 2009 Glidewell Labs began offering and selling ceramic blocks under the BRUXZIR® trademark to other dental laboratories under a program where such laboratories use and prominently display the BRUXZIR® trademark under license from Glidewell Labs.  On May 27, 2011 Glidewell Labs applied for registration of the BRUXZIR® trademark in the U.S. Patent and Trademark Office in a different class of goods, namely class 005 for dental ceramics and has also filed corresponding applications for trademark registration in other countries.  The U.S. application for the BRUXZIR mark for dental ceramics has been approved by the U.S. Trademark Examiner, but it is not yet issued as a registration because of an opposition filed by the DEFENDANT in this Action.  That opposition is currently in suspension awaiting the outcome of this Action.  In the meantime,

Glidewell Labs has signed up approximately 165 dental laboratories under its BRUXZIR® ceramic materials program and sold about 5 million dollars of such blocks.

The term BRUXZIR is a coined word that is made up from the portions BRUX and ZIR.  BRUX is taken from the word BRUXISM which is a condition of nocturnal grinding of teeth known to cause extreme wear of posterior teeth.  Use of the word portion BRUX is suggestive of hardness, durability and toughness that is capable of resisting even such extreme wear. Use of the word portion ZIR is suggestive of the ceramic known as Zirconia or Zirconium oxide.  It is PLAINTIFF'S position in this Action that its trademark BRUXZIR® when used on dental restoration products and on its ceramic material products, is neither generic nor descriptive.  Issuance of the trademark registration is evidence that the United States Patent and Trademark Office agreed with this position.  Such issuance creates a legal presumption that PLAINTIFF'S BRUXZIR® trademark is valid, not generic and not descriptive. It also implies that "BRUXZIR®" when used on Glidewell Lab's products, is at most suggestive.  However, even if a jury should find that PLAINTIFF'S trademark is descriptive, PLAINTIFF will prove that its mark has acquired secondary meaning and is therefore a valid and enforceable mark when used on Glidewell Lab's restoration and ceramic material products.

On or about  March, 2011, PLAINTIFF discovered that Keating Dental Arts had begun offering and selling competing zirconia dental restoration products under the mark KDZBRUXER.  There are actually two such marks that are accused in this Action.  One such mark consists of the plain letters KDZBRUXER as seen in an ad of Keating attached as an exhibit to the

1  Complaint.  The other is a combined design and word mark.  DEFENDANT

2  has admitted that this combination is considered to be a Keating trademark as

3  made evident by its attempt to obtain federal registration of this mark.

4  DEFENDANT filed an application for registration on April 5, 2011, a

5  registration which has been opposed by PLAINTIFF in a proceeding currently

6  in suspension also awaiting the outcome of this Action.  As an aside, the Court

7  will now observe that if it grants DEFENDANT'S Motion, such decision will

8  be determinative of PLAINTIFF'S trademark rights herein as well as in two

9  trademark opposition proceedings currently pending (in suspension) in the

10  United States Patent and Trademark Office.

11

12          During the scheduling conference of December 16, 2011,

13  DEFENDANT'S counsel persuaded the Court that it should be permitted to

14  bring this Motion before Discovery in order to terminate PLAINTIFF'S case

15  at this early stage in the Action.  In the meantime, DEFENDANT has sought

16  leave to amend its Answer to add Counterclaims against PLAINTIFF alleging

17  misuse of its trademark rights.

18

19  **LEGAL STANDARDS APPLICABLE TO DEFENDANT'S MOTION**

20

21          Summary judgment is proper if the evidence before the court "show[s]

22  that there is no genuine issue as to any material fact and that the moving party

23  is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see also

24  **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A factual issue is

25  "genuine" when there is sufficient evidence such that a reasonable trier of fact

26  could resolve the issue in the non-movant's favor, and an issue is "material"

27  when its resolution might affect the outcome of the suit under the governing

28

1  law.  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986).  The

2  moving party bears the initial burden of demonstrating that there are no

3  genuine material issues, and that it is entitled to judgment as a matter of law.

4  **T.S. Elec. Serv., Inc. v. Pac. Elec. Contactors Ass'n**, 809 F.2d 626, 630-31

5  (9th Cir. 1987).  Once this burden has been met, the party resisting the motion

6  "must set forth specific facts showing that there is a genuine issue for trial."

7  **Anderson**, 477 U.S. at 256.  In considering a motion for summary judgment,

8  the court must examine all the evidence in the light most favorable to the non-

9  moving party.  **United States v. Diebold, Inc.**, 369 U.S. 654, 655 (1962).  The

10  court does not make credibility determinations, nor does it weigh conflicting

11  evidence.  **Eastman Kodak Co. v. Image Technical Servs., Inc.**, 504 U.S.

12  451, 456 (1992).

13

14        Summary judgment is only appropriate where there are no genuine

15  issues of material fact in dispute, thus leaving the case to be resolved as a

16  matter of law.  See Fed. R. Civ. P. 56(c).  DEFENDANT, as the party moving

17  for summary judgment, has the burden of demonstrating the absence of any

18  genuine issue of material fact.  See **Celotex Corp. v. Catrett**, 477 U.S. 317,

19  322-37 (1986).

20

21        DEFENDANT, in order to prevail on its motion, must establish by

22  clear and convincing evidence that there is no genuine issue of fact regarding

23  the genus of the goods or services at issue and that the relevant consuming

24  public understands PLAINTIFF'S mark to refer primarily to that genus of

25  goods or services.  See **H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs,**

26  **Inc.**  782 F.2d 987 (FED. CIR. 1986).

27

28

GLIDEWELL, in order to have the opportunity to submit proofs at trial, need only show that, on the evidence of record, a reasonable fact finder could resolve the matter in its favor.  See **Opryland USA, Inc. v. Great Am. Music Show, Inc.**, 970 F.2d 847, 850, 23 U.S.P.Q.2d 1471, 1472-73 (Fed. Cir. 1992); **Olde Tyme Foods Inc. v. Roundy's, Inc.**, 961 F.2d 200,202, 22 U.S.P.Q.2d 1542, 1544 (Fed. Cir. 1992); see also **Visa Int'l Serv. Ass'n v. Life-Code Sys. Inc.**, 220 U.S.P.Q. 740, 742 (T.T.A.B. 1983).

The evidence should be viewed in a light most favorable to PLAINTIFF as the non-movant, and all justifiable inferences should be drawn in PLAINTIFF'S favor.  See **Lloyd's Food Prods. Inc. v. Eli's Inc.**, 987 F.2d 766, 767, 25 U.S.P.Q.2d 2027, 2029 (Fed. Cir. 1993); **Opryland USA**, 970 F.2d at 850, 23 U.S.P.Q.2d at 1472.

As one court explained, so long as "facts are at issue that could cause a reasonable jury to decide the mark is a descriptive mark with secondary meaning or a suggestive mark, then the mark would be protected by trademark law and summary judgment for DEFENDANT [on the issue of genericness'] would be improper." **J & J Snack Foods Corp. v. Earthgrains Co.**, 220 F. Supp. 2nd 358, 376, 65 U.S.P.Q.2d 1897, 1910-11 (D.N.J. 2002) (finding insufficient evidence to show that BREAK & BAKE is generic as a matter of law).  It is well established that the focus in evaluating genericness is on the mark as a whole.  **Union Carbide Corp. v. Ever-Ready, Inc.**, 531F.2d 366, 379 188 U.S.P.Q. 623, 635 (7th Cir. 1976); See also **In re Steelbuilding.com** 415 F.3d 1293, 1297, 75 U.S.P.Q.2d 1420, 1421 (Fed. Cir. 2005).

1    Thus, the courts have long recognized that compound terms can serve as

2  valid trademarks even when each of the constituent terms forming the

3  compound has a generic meaning.  See Cal**. Cooler, Inc. v. Loretto Winery,**

4  **Ltd.**, 774 F.2d 1451, 1455-56, 227 U.S.P.Q. 808, 811 (9th Cir. 1985)

5  (CALIFORNIA COOLER not generic for a beverage of wine, sparkling water

6  and fruit juice produced in California); **Vision Center v. Opticks, Inc.**, 596

7  f.2d 111, 116, 202 U.S.P.Q. 333, 339-40 (5th Cir. 1979) (VISION CENTER

8  not generic for a business dealing in optical goods and related services);

9  **Blisscraft of Hollywood v. United Plastics Co.**, 294 F.2d 694, 702, 131

10  U.S.P.Q. 55, 62 (2d Cir. 1961) (POLY PITCHER not generic of a

11  polyethylene pitcher); **Telechron, Inc. v. Telicon Corp.**, 198 F.2d 903, 907,

12  94 U.S.P.Q. 363, 366 (3d Cir. 1952) (TELECHRON not generic for electric

13  clocks); **Dan Robbins & Assocs., Inc. v. Questor Corp.**, 599 F.2d 1009,

14  1014, 202 U.S.P.Q. 100, 106 (C.C.P.A. 1979) (TINKERTOY not generic for

15  construction set toys); **Burger King Corp. v. Pilgrim's Pride Corp.**, 705 F.

16  Supp 1522, 2525-26, 12 U.S.P.Q.2d 1526, 1529-30 (S.D. Fla. 1988), aff'd

17  without op., 894 F.2d 412 (11th Cir. 1990) (CHICKEN TENDERS not generic

18  to the general consuming public for chicken parts, even if it might be generic

19  to the chicken industry); **Schmidt v. Quigg**, 609 F. Supp 2227, 230, 226

20  U.S.P.Q. 518, 521 (E.D. Mich. 1985) (HONEY BAKED HAM not generic for

21  hams that are honey glazed); **Park 'N Fly, Inc. v. Park & Fly, Inc.**, 489 F.

22  Supp. 422, 427, 204 U.S.P.Q. 204, 209 (D. Mass. 1979) (PARK 'N FLY not

23  generic for airport parking operations); **Dictaphone Corp. v. Dictamatic**

24  **Corp.**, 199 U.S.P.Q. 437, 445-47 (D. Or. 1978) (DICTAPHONE not generic

25  for dictating equipment or machines; **In re AM. Online, Inc.**, 77 U.S.P.Q.2d

26  1618, 1623 (T.T.A.B. 2006) (INSTANT MESSENGER not generic for real

27  time text messaging service); **In re Homes & Land Publ'g Corp.**, 24

28

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
CASE NO. SACV11-01309-DOC(ANx)

U.S.P.Q.2d 1717, 1718 (T.T.A.B. 1992) (RENTAL GUIDE not generic for a magazine listing rental properties); **In re Minnetonka Inc.**, 3 U.S.P.Q.2d 1711, 1713 (T.T.A.B. 1987) (SOFT SOAP not generic for liquid soap after originally held to be a generic name in **In re Minnetonka, Inc.**, 212 U.S.P.Q. 772 (T.T.A.B. 1981)).

("The record does not contain any examination of dictionary definitions or other sources that might have indicated that joining the separate words 'steel' and 'building' would create a word that, in context, would be generic."); **Door Sys., Inc. v. Pro-Line Door Sys.**, 83 F.3d 169, 171, 38 U.S.P.Q.2d 1771, 1773 (7th Cir. 1996) ("The term 'door systems' does not appear in the dictionary. Its component words do, of course, but that in itself cannot count for much; otherwise it could be argued that 'Seven-Up' is generic, which no one believes").

There can be no question that the phenomenal popularity of the PLAINTIFF'S products has made it the gold standard by which other dental restoration products are judged. That this is so, however, hardly constitutes grounds for declaring its mark generic.

The fact that PLAINTIFF actively polices unauthorized uses of confusingly similar marks and has stopped most such uses as a result of its efforts, further supports a finding that PLAINTIFF'S mark is not generic. See **In re Trek 2000**, 97 U.S.P.Q.2d 1106 at 1112-13 (fact that media outlets agreed to stop using THUMBDRIVE generically supported applicant's arguments that the term was not generic).

In order to prove its claim of trademark infringement, PLAINTIFF will introduce evidence of a likelihood of public confusion.  There are eight relevant criteria that a jury will be asked to consider in regard to a likelihood of public confusion.  [**Pignons S.A. de Mecanique de Precision v. Polaroid Corp.**, 657 F.2d 482, 487 (1st Cir. 1981)].

These criteria include the following:

    a)    the similarity of the respective marks;

    b)    the similarity of the respective goods;

    c)    the respective channels of trade;

    d)    the respective advertising of the products;

    e)    the prospective purchasers of the respective goods;

    f)    evidence of actual confusion;

    g)    defendant's intent in adopting the accused marks; and

    h)    strength of the plaintiff's mark.

## ARGUMENT IN OPPOSITION TO DEFENDANT'S MOTION

PLAINTIFF is frankly having some difficulty understanding the grounds for DEFENDANT'S Motion.  DEFENDANT does not appear to be challenging the validity of the PLAINTIFF'S mark "BRUXZIR®" that has been duly registered by the U.S. Patent and Trademark Office.  Even if BRUXZIR® is deemed to be formed by combining two generic portions, (something PLAINTIFF vehemently denies), that is not a proper legal standard for attacking a mark's validity.  Numerous well-known and extremely strong marks are formed from generic portions.  Several are cited above including by way of example "BOOKS ON TAPE", "VISION

1   CENTER", "DICTAPHONE" and SEVEN-UP".  DEFENDANT should be

2   well aware that the focus in evaluating genericness is on the mark as a whole

3   and requires a fact-intensive assessment of the primary significance of the

4   mark as a whole to a substantial majority of the relevant public.

5

6          DEFENDANT does not appear to be denying that the accused terms

7   KDZBRUXER and KDZBRUXER and design are being used by Keating as

8   trademarks.  The fact that DEFENDANT is seeking to register at least one of

9   these two marks is an admission that it regards and uses these terms as

10  trademarks.  In its Statement of Uncontroverted Facts, DEFENDANT has

11  admitted that the PLAINTIFF'S and DEFENDANT'S trademarks both use the

12  term BRUX or BRUXER; that both trademarks are used on competing goods

13  (Zirconia Restorations); that both trademarks are sold through the same

14  channels of trade to the same type of purchasers, namely, dentists and the

15  dental industry.  Basically, in its Motion, DEFENDANT has already admitted

16  that at least 4 or 5 of the 8 accepted criteria for finding trademark infringement

17  are satisfied in this Action.  If given the opportunity at trial, PLAINTIFF

18  believes it will be able to introduce ample proof of the remaining criteria

19  including at least the similarity of the marks taken as a whole, the

20  DEFENDANT'S intent and the strength of PLAINTIFF'S mark.

21

22          Whether the marks are sufficiently similar, whether DEFENDANT

23  had an intent to exploit the goodwill generated by PLAINTIFF'S mark in the

24  dental industry and whether PLAINTIFF'S mark is a strong mark, are all

25  issues that should be litigated in this Action and depend on controverted facts

26  that preclude summary judgment.

27

28

DEFENDANT'S principal argument for summary judgment appears to be based on the assertion that the term "BRUXER" which forms a portion of its mark, is generic as used by Keating and that therefore PLAINTIFF is abusing its trademark rights by alleging infringement.  PLAINTIFF believes that as used by DEFENDANT, the term BRUXER is not generic, but that in any case whether BRUXER is being used by Keating as a generic term is irrelevant.  BRUXER is a term used to describe a person who suffers from the condition of Bruxism which is defined in the Background section above.  As also previously noted herein, the term BRUX or BRUXER is not generic when used in a trademark in regard to dental restoration products.

KDZBRUXER is no more generic than other arguably descriptive terms that courts have long recognized as capable of serving as valid marks, including such terms as BOOKS ON TAPE (for cassettes on which books are recorded), THE MONEY STORE (for money lending); VISION CENTER (for retail services involving optical services and related goods such as eyewear); WEBPHONE (for computer software and computer hardware that enable real-time audio communication over computer networks); CASH MANAGEMENT ACCOUNT (for, among other things, stock brokerage services); THE BEEF JERKY OUTLET (for retail store services featuring beef snacks); DICTAPHONE (for dictation machines); POLY PITCHER (for polyethylene pitchers); INSTANT MESSENGER (for real time text messaging service, and a host of other marks discussed below.

Until PLAINTIFF adopted and began using its trademark BRUXZIR®, no one had used the term BRUX or BRUXER in a trademark for a dental restoration product.  The various examples referred to in

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
CASE NO. SACV11-01309-DOC(ANx)

1   DEFENDANT'S Motion documents relate to products designed to inhibit or

2   prevent nocturnal grinding of the teeth, not to crowns, bridges, etc.

3   PLAINTIFF does not offer or sell any such anti-grinding products under any

4   trademark which includes the term BRUX.  As previously stated, as used in

5   PLAINTIFF'S trademark BRUXZIR®, the term BRUX merely suggests that

6   its restoration products are hard, tough and durable.

7

8           PLAINTIFF'S BRUXZIR® dental restoration products have proved

9   to be extremely successful.  Sales of such products rose quickly as shown in

10  Declaration of Greg Minzenmayer Exhibit A which compares monthly sales of

11  PLAINTIFF'S BRUXZIR® crowns to PLAINTIFF'S monthly sales of its

12  more conventional crowns commonly referred to as PFM (porcelain fused to

13  metal).  The PLAINTIFF'S BRUXZIR® trademark just as quickly became

14  well-known throughout the dental industry.  Over the last two and one-half

15  years, the BRUXZIR® trademark and its associated goodwill have exploded in

16  the dental industry as a result of massive and unprecedented notoriety, awards

17  and product sales (See Declaration of Greg Minzenmayer Exhibits A to X).  In

18  November, 2009, Glidewell Labs began offering zirconia ceramic blocks

19  under the BRUXZIR® mark to other dental laboratories under a licensing

20  program to permit them to manufacture BRUXZIR® restorations for their own

21  customer dentists.  This program also proved to be very successful and

22  PLAINTIFF has signed up about 165 dental laboratories.

23

24          During the first six months of 2011, DEFENDANT Keating evidently

25  began offering and selling a competing zirconia ceramic dental restoration

26  under the trademark KDZBRUXER.  Keating management apparently decided

27  to use this trademark to confuse the buying public and to exploit the goodwill

28

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
CASE NO. SACV11-01309-DOC(ANx)

1   generated by the PLAINTIFF in its significant success associated with its

2   BRUXZIR® products.  Despite attempts by PLAINTIFF to persuade

3   DEFENDANT to cease such exploitation of PLAINTIFF'S registered

4   trademark, DEFENDANT refused and alleged that because the portion of the

5   its mark consisting of the word bruxer is generic, it did not have to stop using

6   its KDZBRUXER mark.  As noted above, bruxer is suggestive, not generic in

7   regard to zirconia restorations.  However, even if it were generic, under the

8   law of trademarks, the use of a generic portion of a mark is not determinative

9   of the outcome of an infringement question.  This is because the marks need to

10   be considered as a whole and whether the asserted mark or the accused mark

11   has a generic portion is irrelevant.  Clearly, PLAINTIFF has the right to

12   enforce its federally registered trademark against those, including

13   DEFENDANT, who have seen fit to adopt confusingly similar marks to

14   market and sell competing goods in the same channels of trade to the same

15   potential consumers.  The allegation by DEFENDANT that somehow such

16   enforcement constitutes abuse or misuse of trademark rights , is not well

17   founded and is based on a misconception of the applicable law.  If

18   DEFENDANT or anyone else uses BRUXER not as a trademark or portion

19   thereof, but as a generic term, PLAINTIFF would have no objection.

20   PLAINTIFF has itself used it generically to refer to one type of dental patient

21   who might benefit from the fracture resistance of the material.  DEFENDANT

22   seeks to obfuscate its use of a confusingly similar trademark by alleging that

23   its mark consists of a so-called main mark "KDZ" to which the generic term

24   BRUXER has been added.  This is a nonsensical argument which defies the

25   facts and the law of trademarks.

26

27

28

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
CASE NO. SACV11-01309-DOC(ANx)

## CONCLUSION

Both parties hereto have used trademarks in conjunction with their sale of dental restorations made of zirconia ceramic materials.  PLAINTIFF'S mark BRUXZIR® is federally registered and has been in use since about June, 2009.  DEFENDANT'S mark KDZBRUXER is not registered and has been in use since early 2011.  DEFENDANT has filed this Motion For Partial Summary Judgment on the issue of infringement.  It appears that there are some uncontroverted facts that are relevant to the question of whether there is a likelihood of public confusion.  The parties appear to agree that they compete in the dental industry for sale of their respective products primarily to dentists.  They appear to agree that they use the same channels of trade and the same forms of advertising.  However there are still controverted facts related to the degree of similarity of their respective marks, the strength of PLAINTIFF'S trademark and whether the term BRUX in PLAINTIFF'S mark and the term BRUXER in DEFENDANT'S mark are merely suggestive, descriptive or generic and how that may affect the infringement issue.  The presence of controverted facts yet to be determined by a trier of fact, points out the premature nature and inappropriateness of DEFENDANT'S Motion.

As detailed above, DEFENDANT'S proofs fall far short of establishing by clear and convincing evidence that the primary significance of its mark to a substantial majority of the relevant public is as a generic term when taken as a whole.  Accordingly, its motion should be denied without any proofs from Glidewell.  However, Glidewell does not rest its opposition on the manifold defects apparent in Keating's evidence.

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
CASE NO. SACV11-01309-DOC(ANx)

1    DEFENDANT has failed to meet its high burden of proof necessary for

2  it to prevail on summary judgment.  At a minimum, PLAINTIFF has

3  demonstrated the existence of genuine issues of fact.

4

5    For all of these reasons, DEFENDANT'S Motion for Partial

6  Summary Judgment should be denied.

7

8

9  DATED: March 5, 2012          By:    /s/ Leonard Tachner
                                        Leonard Tachner
10                                      Attorney for Plaintiff

11  (949) 752-8525 Telephone
12  (949) 955-2415 Telefax

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLF'S OPPOSITION TO DEF'S MOTION FOR PARTIAL SUMMARY
                                                      JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK
                                                      CASE NO. SACV11-01309-DOC(ANx)

PROOF OF SERVICE

I am a resident of the state of California, I am over the age of 18 years, and I am not a party to this lawsuit. My business address is 17961 Sky Park Circle, Suite 38-E, Irvine, California 92614. On March 5, 2012, I served the following document(s) in the manner indicated:

1.      PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK BRUXZIR, AND IN DEFENDANT'S FAVOR ON ALL CAUSES OF ACTION IN THE COMPLAINT

☒      via electronic means by the Court's electronic filing system CM/ECF.

☐      by placing the document(s) listed above in a sealed envelope to the person at the address set forth below by postage prepaid United States First Class United States mail on the same date set out below.

J. Mark Holland
J. Mark Holland & Associates
3 San Joaquin Plaza, Suite 210
Newport Beach, CA 92660

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed March 5, 2012 at Irvine, California.

By:    /s/ Jodie Miller
_____
        Jodie Miller

Case No.: SACV11-01309-DOC(ANx)
CERTIFICATE OF SERVICE

Case 8:11-cv-01309-DOC-AN   Document 41   Filed 03/05/12   Page 20 of 87   Page ID #:476

As a result, Plaintiff's Motion for Preliminary Injunction and Motion to Amend its Complaint are MOOT.

## In re America Online Inc.

### U.S. Patent and Trademark Office Trademark Trial and Appeal Board

Serial Nos. 75460305, 75460306, 75496386, 75497543

Decided January 18, 2006

### TRADEMARKS AND UNFAIR TRADE PRACTICES

**[1] Registration and its effects — Nonregistrable subject matter — Descriptive; deceptively misdescriptive (§ 315.0407)**

**Types of marks — Generic — Particular marks (§ 327.0603)**

Term "Instant Messenger" is not generic for applicant's services related to provision of "real-time" text messages, even though trademark examiner has met initial burden of showing that term is generic, since applicant's search of computerized database shows that majority of articles refer to applicant, since applicant has shown that it has engaged in substantial marketing of its services under "Instant Messenger" mark, since applicant claims that more than 80 million customers use identified services, and it has submitted affidavits from customers showing recognition of term as source indicator, since numerous corporations have either acknowledged term as applicant's trademark or are applicant's licensees, and since examiner's evidence of generic use therefore is offset by evidence that shows significant amount of proper trademark use, as well as trademark recognition by customers, publishers, and third parties.

**[2] Registration and its effects — Nonregistrable subject matter — Descriptive; deceptively misdescriptive (§ 315.0407)**

**Types of marks — Secondary meaning (§ 327.02)**

**Types of marks — Descriptive — Particular marks (§ 327.0303)**

Term "Instant Messenger" is primarily merely descriptive of applicant's services related to provision of "real-time" text messages, since there is evidence in record that consumers would use "instant messaging" as generic term to refer to such services, and that "messenger" is understood by prospective purchasers or users as term that describes software or program involved in providing "instant messaging"; however, applicant has demonstrated proposed mark has acquired distinctiveness, since applicant claims that over 80 million customers use its services, and it has licensed many corporations to use services identified by term "Instant Messenger," since applicant's advertising has reached significant percentage of people in United States, and since applicant has provided affidavits of customers who recognize term as mark for its services.

———

Applications of America Online Inc. for registration of "Instant Messenger" and "AOL Instant Messenger" as trademarks for telecommunications and computer services. Applicant appeals from final refusal of registration. Reversed.

Michael A. Grow, of Arent Fox, Washington, D.C., for applicant.

Before Hairston, Rogers, and Drost, administrative trademark judges.

**Drost, J.**

On 24 June 2004, the board granted applicant's (America Online, Inc.) motion to consolidate the appeals in these four applications. These applications for registration on the Principal Register all involve the term INSTANT MESSENGER in typed (standard character) form. Basic information about the four applications on appeal is set out below.

I.

Serial No. 75497543
Filing date: 04 June 1998
Mark: INSTANT MESSENGER
Services:
Class 38: Telecommunications services, namely, electronic transmission of data, images and documents via computer terminals; electronic mail services; and facsimile transmission
Class 39: Electronic storage of data and documents
Date of first use (both classes): 14 March 1997

Date of first use in commerce (both): 14 March 1997

## II.

Serial No. 75496386

Filing date: 04 June 1998

Mark: INSTANT MESSENGER

Services:

Class 42: Computer services, namely, providing multiple user access to computer networks and bulletin boards and the transfer and dissemination of a wide range of information, providing a wide range of general interest information via computer networks

Date of first use: 14 March 1997

Date of first use in commerce: 14 March 1997

## III.

Serial No. 75460305

Filing date: 01 April 1998

Mark: AOL INSTANT MESSENGER

Services:

Class 38: Telecommunications services, namely, electronic transmission of data, images and documents via computer terminals; electronic mail services; and facsimile transmission

Class 39: Electronic storage of data and documents

Date of first use (both classes): 14 March 1997

Date of first use in commerce (both): 14 March 1997

## IV.

Serial No. 75460306

Filing date: 01 April 1998

Mark: AOL INSTANT MESSENGER

Services:

Class 42: Computer services, namely, providing multiple user access to computer networks and bulletin boards for the transfer and dissemination of a wide range of information, providing a wide range of general interest information via computer networks

Date of first use: 14 March 1997

Date of first use in commerce: 14 March 1997

## *Issues*

The issues in all four cases are basically the same:

1. Is the term INSTANT MESSENGER a generic term for the identified services?
2. Is the term INSTANT MESSENGER merely descriptive when used in association with the identified services?
3. If the term INSTANT MESSENGER is merely descriptive, has applicant demonstrated that the mark has acquired distinctiveness under Section 2(f) of the Trademark Act?

Obviously, the question in Serial Nos. 75460305 and 75460306 is whether the term INSTANT MESSENGER must be disclaimed under the provision of Section 6 of the Trademark Act. We add that, inasmuch as neither the examining attorney nor applicant raised arguments specifically attributed to the different classes in the applications, we will not separately address each class of services. When we refer to the record, which is largely the same in the four cases, file references will be to the file in Serial No. 75497543, unless we indicate otherwise.

## *Background*

After many years of prosecution, the evidence in these applications is quite extensive. We begin by discussing the examining attorney's evidence that the mark is generic. This evidence is also relevant to the other issues of descriptiveness and acquired distinctiveness. The examining attorney has included numerous examples from the NEXIS database and the Internet regarding uses of the term INSTANT MESSENGER. These uses fall into several categories. Some appear to be generic uses of the term INSTANT MESSENGER for similar services, as the examples below indicate.

Nowadays, thoughts are conveyed electronically through instant messengers and cell phones.
*Macon Telegraph*, 14 December 2001.

Drop superfluous programs, such as instant messengers and screen savers, that run in the background and suck up system resources
*Washington Post*, 13 December 2001.

Giving computer makers much flexibility to configure versions of Windows operating system with applications – such as Web browsers, instant messengers and streaming media players.
*Washington Post*, 18 August 2001.

You have three E-mail accounts, two instant messengers on your PC, a pager, a cell phone, an answering machine and voice mail.
*Orange County Register*, 26 April 1998.

Fortunately, users can limit their availability to instant messaging by setting up lists of authorized instant messengers.
*InformationWeek*, 31 May 1999.

The Internet offers a variety of communication channels: e-mail, instant messengers, Web greeting cards.
*Press Journal (Vero Beach, FL)*, 06 September 1999.

The more programs that are used involving the Internet – personal finance software that electronically interacts with a local bank or an instant messenger program, for example – the more ports that open up on a computer.
*The Plain Dealer*, 06 August 2001.

Improvements include an instant-messenger application, the ability to beam data to and from PDAs running Palm Inc.'s Palm OS, and Bluetooth support.
*InfoWorld Daily News*, 06 December 2001.

Evans students said they use e-mail, instant messenger programs and chat rooms as many as five or six hours a day.
*Augusta Chronicle*, 04 December 2001.

WordPerfect, Lotus WordPro, 1-2-3, Approach, Organizer, instant messengers and e-mail clients.
*Information Security*, December 2001.

Additionally, an instant messenger feature at each booth will allow entrepreneurs to exchange questions and answers privately.
*Tulsa World*, 24 October 2001.

People in far-flung countries are chatting via instant messenger software, posting thoughts on electronic bulletin boards, and searching for relevant Web journals at sites.
*Washington Post*, 04 October 2001.

The Internet stood out in the area of personal communication with instant messenger services and e-mail leading the way.
*Las Vegas Review-Journal*, 17 September 2001.

The whole project has been through e-mail and instant messenger.

*The Ledger (Lakeland, FL)*, 29 December 1998.

Other examples appear to use the term in association with similar services but these services are apparently provided by competitors:

At Yahoo, alerts are also available via instant messenger, though it doesn't always work properly.
*Chicago Tribune*, 03 December 2001.

Yahoo! promotes LogiTech's QuickCam Web cams as a way to use video capabilities of Yahoo!'s instant messenger service.
*ASAP*, 01 December 2001.

Yahoo added video chats to its instant messenger program in June.
*San Francisco Chronicle*, 26 September 2001.

Expedia's involvement is in the part of the XP platform Windows Messenger that used to be known as Instant Messenger.
*Computing*, 25 October 2001.

Also bundled for the first time is Microsoft's Instant Messenger software.
*Computing*, 11 October 2001.

The two together could provide a powerful combination, and with the use of Microsoft client interfaces – Office XP, Microsoft Instant Messenger or a Web browser.
*Network World*, 08 October 2001.

That's the audio and video conferencing software integrated into Microsoft's instant messenger.
*Investor's Business Daily*, 21 September 2001.

Microsoft's Instant Messenger product was hit by an embarrassing glitch last week.
*Computing*, 12 July 2001.

Microsoft Corp. said it will use technology from Net2Phone in a new version of its instant messenger e-mail software available this week.
*The Record (Bergen County, NJ)*, 21 July 2000.

Microsoft Corp. said it will use technology from Net2Phone in a new version of its instant messenger e-mail software that enables Internet users to make long-distance calls.
*St. Petersburg Times*, 21 July 2001.

Still other uses are equivocal because it is not clear whether the term is being used as a

generic term or as a reference to applicant's services, perhaps without capitalizing the initial letter of the words:

When there was a break in the action, he sent love notes to his wife, Rachel, by instant messenger.
*New York Times*, 13 December 2001.

As soon as I get back to my dorm from class, I turn on my instant messenger.
*Dayton Daily News*, 11 December 2001.

She also suggested he turn off the instant messenger when she is writing her English essays.
*Hartford Courant*, 06 December 2001.

The man from the home of the recently sunken Seattle Mariners went online in Starbucks with Ed Koch, talking to Starbucks boss Howard Schultz live by Instant Messenger video phone.
*New York Post*, 26 October 2001.

VeeAreCity.com will offer news, weather, sports, financial information and Instant Messenger and other Internet services.
*Broward Daily Business Review*, 29 November 1999.

Without the Instant Messenger program, my kids stopped fighting over the computer.
*Sacramento Bee*, 10 November 1999.

Other uses appear to be references to applicant or its licensees:

AOLes
(n) people who spend their whole lives talking on Instant Messenger.
*Management Today*, 31 July 2001.

Aim Adjuster, a program that removes the advertisements from American Online's Instant Messenger client.
*Houston Chronicle*, 22 October 1999.

I was on the instant messenger and my "you've got mail" thing came up.
*San Jose Mercury News*, 05 December 2001.

We also add that there is evidence that "instant messaging" is a generic term used in association with applicant's services:

The instant messaging world is dominated by four platforms: Microsoft's MSN Messenger, AOL Instant Messenger (AIM), Yahoo! Messenger and ICQ (also owned by AOL).
*Computing*, 22 June 2002.

But providers of instant messaging have not been able to turn their millions into profits.
*New York Times*, 17 June 2002.

For more information on instant messaging programs, visit. . .
*Lexington-Herald Leader*, 18 August 2003.

Indeed, instant messaging is a security disaster waiting to happen, so you should take precautions to make sure your chat app. is as safe and secure as possible.
www.cnet.com.

Applicant responded to the examining attorney's evidence by presenting various types of evidence in support of its position that its mark is not generic or descriptive and that it had acquired secondary meaning.

According to applicant's general counsel, Paul T. Cappuccio (pp. 2-3), applicant began using the marks in 1997. "As early as May of 1997, applicant had 8 million customers. At present [2000] there are over 80 million users." These customers use applicant's INSTANT MESSENGER services to send approximately one billion messages each day. The declarant claimed that applicant "spent a substantial amount of money promoting the mark INSTANT MESSENGER and the accompanying services. The amount of money spent on promoting this mark is difficult to estimate given that many of the promotions are done in conjunction with the promotion of Applicant's other products [and] services. Samples of promotional materials . . . are found all over the Internet bearing Applicant's mark."

Applicant's Vice-President of Brand Marketing, Eddie Leonard, has submitted a declaration dated November 20, 2001 (p. 2) that provided evidence that applicant's "INSTANT MESSENGER service had over 125 million registered users" and applicant's webpage at " 'www.aol.com,' which provides a link to the INSTANT MESSENGER service and which displays the mark INSTANT MESSENGER, receives over 28 million hits per day."

In a declaration dated 15 February 2001, applicant's senior vice-president and general counsel (Randall Boe) reported (p. 2) that applicant had licensed its INSTANT MESSENGER mark to Earthlink, Lycos, Juno and others and that these licensees agreed "not to do anything which may adversely affect the validity or enforceability of the mark." The de-

clarant also described one example of its advertising efforts. In that one case, "over 60 million copies of just one direct mail piece alone were sent out with a prominent display of the mark INSTANT MESSENGER."

Applicant also attached approximately twenty declarations from users who state that they "recognize the mark INSTANT MESSENGER as identifying the service coming from America Online as opposed to other companies, and I recognize that the mark INSTANT MESSENGER indicates America Online is the source of the real time communications service branded as INSTANT MESSENGER service."

Applicant also performed a search of the NEXIS News Group File for articles dated 15 June 2002 through 30 June 2002 for the term INSTANT MESSENGER. According to applicant (Henry declaration at 1), 70 articles were found. Of these, 43 "correctly display INSTANT MESSENGER as a trademark and in virtually all instances specifically identify Applicant as the source of the services offered under the mark." Henry declaration at 2. Applicant also discounts 20 articles because they involve articles showing trademark infringement, duplicate articles, and foreign articles. In effect, applicant concluded, the majority of the articles refer to applicant. Applicant also submitted numerous copies of third-party trademark registrations that show the terms "instant" or "messenger" registered on the Principal Register without a disclaimer or an indication that the mark was registered under the provision of Section 2(f).

### Arguments

The examining attorney argues (Brief, p. 11) that the "wording INSTANT MESSENGER has become the means by which consumers refer to real-time Internet communications services. . . The wording is generic because it is commonly used by relevant consumers to describe the type of services specifically offered by the applicant." Furthermore, the examining attorney maintains that applicant's "computer services, namely email and chatrooms, are 'instant messenger' services that enable users to receive messages instantly from people who are included on their 'buddy' lists. The wording INSTANT MESSENGER, therefore, merely describes a feature of the applicant's services." Brief at 6. Regarding the question of acquired distinctiveness, the examining attorney maintains

that "'Instant Messenger' is generic, and therefore, not registrable under Section 2(f)." Brief at 12.

On the other hand, applicant argues that consumers, licensees, and third parties recognize applicant's rights in the mark INSTANT MESSENGER. Applicant also submitted numerous examples of its attempts to police its mark, and it has provided responses from entities that were cited by the examining attorney as examples of generic use of the term Instant Messenger. Applicant asserts that "these third parties and publishers, including many of those cited by the PTO, have acknowledged their mistakes or have agreed to use Applicant's INSTANT MESSENGER mark properly in the future." Brief at 16. Applicant argues that many of the examples "may show infringement or unauthorized use of Applicant's mark by competitors" while others "may reflect misuse or misunderstanding on the part of reporters writing about unrelated third parties." Brief at 20. Furthermore, applicant maintains that because "applicant's mark INSTANT MESSENGER does not immediately call to the minds of consumers the specific services provided under the mark, the mark is suggestive rather than generic as applied to such services." Brief at 17. Finally, applicant argues that the "first section of the PTO Brief alleges that the mark is merely descriptive. However, there is no allegation that the secondary meaning evidence offered by Applicant is inadequate. Thus, if the Board finds the mark merely descriptive, the subject application should be approved for publication." Reply Brief at 4.

### Genericness

The first issue we must address is whether the term INSTANT MESSENGER is generic for applicant's services.

The Court of Appeals for the Federal Circuit has held that: "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn Corp. v. Int'l Association of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). *Marvin Ginn* goes on to explain that:

Determining whether a mark is generic therefore involves a two-step inquiry: First, what is the genus of goods or services at is-

sue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?

*Id.*

[1] When we view the examining attorney's evidence, it is clear why applicant's marks were refused registration on the ground that the marks were generic. Numerous references in a wide variety of publications over a number of years show use of the term "Instant Messenger" to refer to services related to providing real time text messages. Such excerpts as "thoughts are conveyed electronically through instant messengers and cell phones" and "[d]rop superfluous programs, such as instant messengers and screen savers" clearly show generic use of the term. These references convince us that the examining attorney has met her initial burden of setting forth a prima facie case that the term INSTANT MESSENGER is generic for the services identified in applicant's applications.

We must now consider whether applicant has rebutted the examining attorney's prima facie case of genericness. To respond to this evidence, applicant has submitted its own NEXIS evidence that attempts to show a snapshot of NEXIS printouts during a set period (15-30 June 2002). When we view this "snapshot," regardless of whether we consider the total number of stories or if we exclude the alleged infringers, we must nonetheless conclude that the majority of the articles refer to applicant. Moreover, applicant has shown that it has engaged in substantial marketing of its services under this mark. Just one mailing of its advertisement involved 60 million copies. In effect, the one mailing would have been distributed to a significant percentage of the total population of America. Furthermore, applicant has 80 million users of its identified services. Its services deliver more than one billion messages every day. More mundanely, applicant has submitted affidavits from several of its customers that demonstrate recognition of applicant's term as a source indicator and show that numerous corporations have either acknowledged applicant's term as a trademark or are licensees of applicant.

While the examining attorney has submitted significant evidence to support the genericness refusal, applicant's response is impressive. The Federal Circuit has addressed a similar case where there was a mixed record

on the question of genericness. "The mixture of usages unearthed by the NEXIS computerized retrieval service does not show, by clear evidence, that the financial community views and uses the term CASH MANAGEMENT ACCOUNT as a generic, common descriptive term for the brokerage services to which Merrill Lynch first applied the term." *In re Merrill Lynch, Pierce, Fenner and Smith Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987) (footnote omitted). We add that the mere fact that a record includes evidence of both proper trademark use and generic use does not necessarily create a mixed record that would overcome an examining attorney's evidence of genericness. Quite simply, it would be fairly easy for a well-heeled applicant to ensure that there were at least some stories that would properly use an applicant's mark. However, in this case, the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition by customers, publishers, and third parties.

We add that this case is distinguishable from *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 39 USPQ 296 (1938). In that case, the Court found that "since 1894 the article has been known to the public as shredded wheat. For many years, there was no attempt to use the term 'Shredded Wheat' as a trade mark." 39 USPQ at 298-99. In the present case, we cannot conclude that the identified services have been known to the public as "Instant Messenger" or that applicant did not attempt to use this term as a trademark.

In light of the evidence of record, we cannot conclude that there is clear evidence that "members of the relevant public primarily use or understand the term sought to be protected to refer to the genus" of the services. Therefore, the refusal on the ground of genericness is reversed.

### Descriptiveness

The next question we address is whether applicant's mark is primarily merely descriptive when applied to applicant's services.

A mark is merely descriptive if it immediately conveys information concerning a quality or characteristic of the product or service. [*In re Nett Designs,* 236 F.3d 1297, 1341, 57 USPQ2d 1564 (Fed. Cir. 1999)]. The perception of the relevant purchasing

public sets the standard for determining descriptiveness. *Id.* Thus, a mark is merely descriptive if the ultimate consumers immediately associate it with a quality or characteristic of the product or service. On the other hand, "if a mark requires imagination, thought, and perception to arrive at the qualities or characteristics of the goods [or services], then the mark is suggestive." *Id.*

*In re MBNA America Bank N.A.,* 340 F.3d 1328, 67 USPQ2d 1778, 1780 (Fed. Cir. 2003).

Another important factor is that, when we consider the mark, we must consider it in relationship to applicant's services. *In re Abcor Development Corp.,* 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978) ("Appellant's abstract test is deficient – not only in denying consideration of evidence of the advertising materials directed to its goods, but in failing to require consideration of its mark 'when applied to the goods' as required by statute"). Therefore, applicant's argument that its marks do "not immediately call to the minds of consumers the specific services provided under the mark" (Brief at 17) is not relevant.

**[2]** In this case, there is evidence that consumers would understand the term "instant messaging" as the generic term to refer to services that are of the type identified by applicant. *See, e.g., Computing,* 22 June 2002 ("The instant messaging world is dominated by four platforms") and *New York Times,* 17 June 2002 ("providers of instant messaging"). The *High-Tech Dictionary* entry made of record by the examining attorney defines "instant messaging" as "A live chat and email service that enables you to find your friends when they are on line and send messages or talk via a private chat room. Each user has a private list of instant messaging addresses and the instant messaging system can be set to alert you when someone on your list is online. You can leave an email message for a user who is not available online." Another article describes "instant messaging" as follows:

Instant messages appear on a recipient's computer screen almost as soon as they are sent and allow "real-time" typed communication among people who are on the Internet. To trade instant messages, though, both sender and recipient typically have to use the same software.
*Washington Post,* 19 November 1999.

The term "messenger" is used to describe software that sends "messages." For example, in response to a letter from applicant's counsel, one respondent replied that: "We received your letter complaining about the use of the name Instant messenger on our websites and promotion material. We apologize [f]or this matter and changed the language wherever we were able to . . . either just 'messenger' (like MSN, Yahoo etc) or better Dateparty Messenger." Email from Ronald Stevens dated 10 December 2002. An article in *CNET* dated 10 May 2002 refers to: "Virus writers have already shown us that they know a thing or two about exploiting messengers." *See also* www.highwired.com ("[T]he messenger will stay open until you close it, even if you navigate away from HighWired"); *CNet* 01 March 2000 ("CMGI's iCast unveils messenger that trades video, music").

Applicant points to numerous registrations that the Office has issued for various marks that contain either the term "instant" or "messenger" as evidence that its term INSTANT MESSENGER is not merely descriptive. In these registrations, the marks are registered on the Principal Register without a disclaimer of the term or an indication that the registration is under the provision of Section 2(f). In response to applicant's argument, we note that even "if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court." *In re Nett Designs Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). More specifically in this case, there is ample evidence to support a conclusion that "Instant Messaging" is a generic term for the identified services. There is also evidence that "messenger" is understood by prospective purchasers or users as a term that describes the software or program involved in providing "instant messaging." Thus, prospective purchasers or users encountering the term "Instant Messenger" used in association with applicant's services would immediately understand that applicant's services involve the sending, storing, and displaying of messages sent by instant messaging services. Therefore, we conclude that the term "Instant Messenger" would immediately describe the function of the identified services, and the examining attorney's refusal to register the mark on the ground of mere descriptiveness is affirmed.

### Acquired Distinctiveness

Lastly, we must consider whether applicant's mark, which we have found to be merely descriptive, is registrable on the Principal Register because it has acquired distinctiveness under the provision of Section 2(f) of the Trademark Act. Here, applicant has the burden of proving that its mark has acquired distinctiveness. *In re Hollywood Brands, Inc.*, 214 F.2d 139, 102 USPQ 294, 295 (CCPA 1954)("[T]here is no doubt that Congress intended that the burden of proof [under Section 2(f)] should rest upon the applicant"). "[L]ogically that standard becomes more difficult as the mark's descriptiveness increases." *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988).

The examining attorney has not seriously questioned applicant's assertion that its marks have acquired distinctiveness but instead relies primarily on the argument that a generic term can never acquire distinctiveness. *See* Brief at 12 (" 'Instant Messenger' is generic, and therefore, not registrable under Section 2(f) Acquired Distinctiveness"). At this point, we refer to some of the evidence we discussed in our genericness discussion. To summarize, applicant has 80 million users who send approximately one billion messages each day on applicant's identified services. There are millions of visitors to its website each day where the mark is displayed. It has licensed many corporations to use its services identified by the term INSTANT MESSENGER. Its advertising has reached a significant percentage of people in the United States and it has provided some affidavits from customers who recognize its term as a mark for applicant's services. Therefore, applicant has met its burden of showing that its term INSTANT MESSENGER has acquired distinctiveness and the examining attorney's refusal to register under Section 2(e)(1) is reversed.

DECISION: The refusals to register applicant's INSTANT MESSENGER marks (Serial Nos. 75497543 and 75496386) on the ground that the marks are generic, or because applicant must disclaim the generic term INSTANT MESSENGER (Serial Nos. 75460305 and 75460306) are reversed. The examining attorney's refusal to permit registration of applicant's marks under Section 2(f) is, likewise, reversed. The applications will be published for opposition with a notation of applicant's claim under the provision of Section 2(f) of the Trademark Act.

## Energizer Holdings Inc. v. International Trade Commission

### U.S. Court of Appeals Federal Circuit

No. 05-1018

Decided January 25, 2006

## PATENTS

### [1] Patentability/Validity — Construction of claims (§ 115.03)

### Patentability/Validity — Specification — Claim adequacy (§ 115.1109)

Neither need to construe claim, nor proffer of alternative constructions, renders claim indefinite, since claim that is amenable to construction is not invalid on ground of indefiniteness; in present case, claim for electrolytic alkaline battery cell is not indefinite, even though it does not provide explicit antecedent basis for term "said zinc anode," since "anode gel" recited in claim is, by implication, antecedent basis for "said zinc anode," and since claim is therefore amenable to construction.

### Particular patents — Chemical — Alkaline batteries

5,464,709, Getz, Nardi, and Scarr, alkaline cells that are substantially free of mercury, determination of invalidity reversed.

———

Appeal from final order of the U.S. International Trade Commission.

Energizer Holdings Inc. and Eveready Battery Co. Inc. filed complaint against respondents PT International Chemical Industrial Co. Ltd., Golden Power Industries Ltd., Guangdong Chaoan Zhenglong Enterprise Co. Ltd., Guangzhou Tiger Head Battery Group Co. Ltd., Fujian Nanping Nanfu Battery Co. Ltd., Hi-Watt Battery Industry Co. Ltd., Ningbo Baowang Battery Co. Ltd., Sichuan Changhong Electric Co. Ltd., Zhejiang 3-Turn Battery Co. Ltd., and Zhongyin (Ningbo) Bat-

Case 8:11-cr-01593-DOC-AN   Document 41   Filed 03/05/12   Page 28 of 87   Page ID #:484

Court to determine if the attorney-client privilege has been properly asserted is an examination of each document for which the privilege is asserted. Defendant Pullman is directed to file copies of the documents designated as category No. 2 with the Clerk of this Court within 15 days of this date for an in camera review by the Court. Said filings should be made in sealed envelopes with the document identified on the envelope.

---

**District Court, D. Oregon**

Dictaphone Corporation
v. Dictamatic Corporation, et al.

No. 73-912
Decided Feb. 1, 1978

### TRADEMARKS

**1. Infringement — Tests of (§67.439)**

Test of trademark infringement under Lanham Act Section 32(1) is likelihood of confusion.

**2. Evidence — Of confusion (§67.337)**

  **Identity and similarity — How determined — In general (§67.4051)**

  **Infringement — Tests of (§67.439)**

Only few of factors deemed important in determining likelihood of confusion, which are strength or weakness of marks, similarity in appearance, sound, and meaning, class of goods in question, marketing channels, evidence of actual confusion, and evidence of intention of accused infringer in selecting and using alleged infringing mark, need be present to enable court to find likelihood of confusion.

**3. Evidence — Of confusion (§67.337)**

  **Infringement — Tests of (§67.439)**

Test of infringement under common law is likelihood of confusion, and factors of strength or weakness of marks, similarity in appearance, sound, and meaning, class of goods in question, marketing channels, evidence of actual confusion, and evidence of intention of accused infringer in selecting and using alleged infringing mark are used in determining likelihood of confusion.

**4. Marks and names subject to ownership — Descriptive — Misdescriptive or not descriptive — Particular marks (§67.5078)**

"Dictaphone" is not descriptive of dictating machines.

**5. Marks and names subject to ownership — Secondary meaning (§67.523)**

Extensive advertising and publicity greatly strengthens name.

**6. Marks and names subject to ownership — Secondary meaning (§67.523)**

Use of mark in corporate name for over 50 years strengthens mark.

**7. Acquisition of marks — Use of plurality of marks (§67.087)**

Use of trademark together with group of marks having same prefix can enhance strength of trademark.

**8. Acquisition of marks — Use of plurality of marks (§67.087)**

  **Identity and similarity — How determined — Adding to other's mark (§67.4053)**

  **Identity and similarity — How determined — Appearance, meaning or sound (§67.4055)**

Use of "Dictaphone" together with other marks having "Dict-" or "Dicta-" as prefix strengthens "Dictaphone" and increases likelihood of confusion between "Dictaphone" and "Dictamatic."

**9. Identity and similarity — How determined — Appearance, meaning or sound (§67.4055)**

  **Identity and similarity — Words — Similar (§67.4117)**

  **Marks and names subject to ownership — Descriptive — Particular marks (§67.5081)**

"Matic" is weak and non-distinctive suffix; use of prefix "Dicta" in "Dictaphone" and "Dictamatic" makes them similar in appearance, sound, and meaning, and would be likely to cause confusion.

**10. Marks and names subject to ownership — Descriptive — Misdescriptive or not descriptive — Particular marks (§67.5078)**

"Dictaphone" is strong and famous mark entitled to broad protection as is "Dictaphone Corporation".

**11. Identity and similarity — How determined — Adding to other's mark (§67.4053)**

Use of terms "Tank-Type" and "Thought-Tank" increases likelihood of confusion between "Dictamatic" and "Dictaphone."

**12. Marks and names subject to ownership — Descriptive — Misdescriptive or not descriptive — Particular marks (§67.5078)**

"Dictaphone" is not generic.

**13. Marks and names subject to ownership — Descriptive — How determined (§67.5073)**

Trademark for product becomes generic when buyers of product do not know any other name for it.

**14. Evidence — In general (§67.331)**

Opinions of lay witnesses who testified that term had become most widely used term to describe goods and was therefore generic but who indicated on cross examination that term was trademark and that they knew and used descriptive terminology for products upon which mark is used, and who made it apparent that most misuse of term was in casual conversation, repair calls, or non-buying situations, and none of whom kept numerical record of number of correct and incorrect uses of term they heard, are entitled to little weight.

**15. Evidence — In general (§67.331)**

**Marks and names subject to ownership — Descriptive — How determined (§67.5073)**

Use of particular term by buyers when seeking to buy product with which it is associated is relevant in determining descriptiveness, usage by those who are not buyers is not relevant.

**16. Marks and names subject to ownership — Descriptive — How determined (§67.5073)**

Employment ads not placed by or directed to buyers or sellers and that used term for convenience or cost savings are not competent to prove genericness.

**17. Evidence — In general (§67.331)**

Use of opinion surveys conflicts with hearsay evidence rule so that their admissibility is carefully regulated by court; factors governing admissibility of survey evidence set forth in 25 FRD 429 should be used in determining weight to be given each survey admitted in evidence; surveys with respect to which no witness was presented to testify as to circumstances under which they were taken, one of which was not even intended to survey issues in case, and as to which no evidence was presented that proper universe was examined limited to buyers of goods, are entitled to little or no weight.

**18. Marks and names subject to ownership — Descriptive — How determined (§67.5073)**

Availability and widespread use of descriptive terms proves that it is not necessary to use particular trademark to make buyer understand what is being sold.

————

Action by Dictaphone Corporation, against Dictamatic Corporation, Percy C. Davies, and Pacific Northwest Bell Telephone Company, for trademark infringement and unfair competition, in which defendants Dictamatic Corporation and Percy C. Davies counterclaim for cancellation of trademark registrations. Judgment for plaintiff in part.

Gregor N. Neff, Arthur V. Smith, and Curtis, Morris & Safford, P.C., all of New York, N.Y., and Charles J. Pruitt, John P. Bledsoe, and Dezendorf, Spears, Lubersky & Campbell, all of Portland, Ore. for plaintiff.

Richard E. Alexander, Chicago, Ill., and Davies, Biggs, Strayer, Stoel & Boley, Portland, Ore., for defendants Dictamatic Corporation and Percy C. Davies.

Lloyd G. Hammel, Jr., and William A. Replogle, II, both of Portland, Ore., for defendant Pacific Northwest Bell Telephone Company.

Skopil, District Judge.

This is a suit for trademark infringement and unfair competition pursuant to the Lanham Act (15 USC) and the common law. Plaintiff Dictaphone claims that defendants have infringed its rights by using "Dictamatic" as a name for their business of selling and servicing dictation equipment. Defendants deny infringement and counterclaim for cancellation of all of plaintiff's registrations and rights to the name "Dictaphone," alleging that "Dictaphone" has become the generic name for all dictation equipment.

Defendant Pacific Northwest Bell has no interest in the outcome of this action, and, upon determination by the Court of which party has the right to use the name "Dictamatic," agrees to be bound by the Court's determination. Unless otherwise indicated, general references herein to the "defendants" are not meant to include defendant Pacific Northwest Bell.

Plaintiff Dictaphone is a New York corporation with its principal offices in Rye, New York, and a district office in Portland, Oregon. Defendant Dictamatic is an Oregon corporation with its principal offices in Portland. Dictamatic markets dictation equipment supplied to it by Lanier Business Systems, a division of Oxford Industries, Atlanta, Georgia. Lanier is a major competitor of Dictaphone Corporation in the dictation equipment marketplace. Dictamatic's territory includes all of Oregon, the southern part of Washington up to and including Tacoma, and part of Idaho. Dictamatic has offices in Spokane and Tacoma, Washington, and Eugene, Oregon, as well as in Portland. Defendant Davies is the president, a director, and owner, together with his wife, of the entire stock of Dictamatic Corporation. Mr. Davies is a resident of the State of Oregon.

Defendant Pacific Northwest Bell Telephone Company is a corporation organized and existing under the laws of the State of Washington and is licensed to do business in the State of Oregon.

Jurisdiction has been established pursuant to 15 USC §1441(1), 28 USC §1338(a) and §1338(b). Venue lies with this Court pursuant to 28 USC §1391(b) and §1391(c).

## I. Infringement

[1] Under Section 32(1) of the Lanham Act [15 USC §1114(1)] the test of trademark infringement is whether there is a "likelihood of confusion." Therefore, if defendant's use or advertising of "Dictamatic" is likely to cause confusion with plaintiff's registered trademark "Dictaphone," or any of its registered trademarks having "Dicta-" or "Dict-" as a prefix, this constitutes trademark infringement under the Lanham Act.

A rather complete statement of the test for likelihood of confusion appears in the recent case of J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc., 523 F2d 187, 186 USPQ 317 (9th Cir. 1975). In that case, plaintiff used "Conti" on hand soaps and shampoos, and defendant used "Le Conte" for cosmetics and hair products. The court granted an injunction against defendant's further use of "Le Conte" on the ground that such use created a "likelihood of confusion."

The court stated the test as follows:

"In order to determine whether there is likelihood of confusion in a trademark infringement case, the Court must consider numerous factors, including inter alia the strength or weakness of the marks, similarity in appearance, sound, and meaning, the class of goods in question, the marketing channels, evidence of actual confusion, and evidence of the intention of defendant in selecting and using the alleged infringing name. See Carter-Wallace, Inc. v. Procter & Gamble Co., supra, 434 F2d at 800, 167 USPQ at 717-718; Paul Sachs Originals Co. v. Sachs, supra, 325 F2d at 214, 139 USPQ at 415-416. After considering these factors, the Court then must determine whether there exists a likelihood of confusion." 523 F2d at 191, 186 USPQ at 320 (footnotes omitted)

Thus, the factors deemed important were:

(1) Strength or weakness of the marks.
(2) Similarity in appearance, sound and meaning.
(3) The class of goods in question.
(4) The marketing channels.
(5) Evidence of actual confusion.
(6) Evidence of the intention of defendant in selecting and using the alleged infringing name.

[2] The court found a likelihood of confusion despite the fact that there was no evidence of either actual confusion or intent to trade on plaintiff's good will, and significant differences between the goods and the channels of commerce. Therefore, it is clear that only a few of the factors need be present to enable a court to find a likelihood of confusion.

[3] Under the common law, the test of infringement also is "likelihood of confusion," and the foregoing factors also are used in determining likelihood of confusion. Stork Restaurant v. Sahati, 166 F2d 348, 76 USPQ 374 (9th Cir 1948); Starr v. Hotelling, 168 Or 207, 122 P2d 432, 53 USPQ 68 (1942); Lift Truck, Inc. v. Bourne, 235 Or 446, 385 P2d 735, 139 USPQ 246 (1963); Frostig v. Saga Enterprises, Inc., 272 Or 565, 539 P2d 154, 188 USPQ 715 (1975); Milgrim Bros. v. Schlesinger, 168 Or 476, 123 P2d 196, 53 USPQ 183 (1942); Wood v. Wood, 78 Or 181, 151 P 969 (1915). Because of this similari-

ty between the common law and the Federal law on this subject the following discussion will be under the Federal law only.

### A. The Strength and Inherent Distinctiveness of "Dictaphone"

"Dictaphone" was coined in 1907. It was the winning name in a contest among the employees of Columbia Graphophone Company to name the "graphophone" or business phonograph products sold by the company. The name was used on the company's products, and it was first registered in the U.S. in 1908.[1] Over the years since 1908, "Dictaphone" has been granted eleven other U.S. registrations for use on a variety of different products and services.[2] By 1923, when Dictaphone Corporation bought the dictating machine business of Columbia, "Dictaphone" had been registered in many foreign countries, as well as in the U.S.

[4] "Dictaphone" was a completely novel or "coined" word at the time it was first used. Furthermore, "Dictaphone" is not now and never was descriptive of dictating machines. In fact, "dictating machine" was not even used as a descriptive term in 1907. Thus, from its inception "Dictaphone" was an inherently distinctive, strong name. See J. B. Williams Co., Inc. v. Le Conte Cosmetics, Inc., supra.

Defendants have attempted to show that "Dictaphone" is not distinctive because it was merely a combination of "Dicta-" from "dictate" and "phone." However, the evidence shows that "Dictaphone" is derived from the Latin verb "dicere," meaning "to assert or say," and from the Greek word "phono," which means "voice or sound." The combination of ancient words used in forming "Dictaphone" has no inherent meaning to the public, and therefore is inherently distinctive and strong. Telechron, Inc. v. Telicon Corp., 198 F 2d 903, 94 USPQ 363 (3rd Cir 1952).

---

[1] Registration No. 66,997, granted January 7, 1908.

[2] Other registrations for "Dictaphone" are:

| Reg. No. | Registered | Reg. No. | Registered |
|---|---|---|---|
| 198,072 | 5 - 5-25 | 639,275 | 1 - 1-57 |
| 203,885 | 9 -29-25 | 818,248 | 11- 8-66 |
| 331,854 | 1 -21-36 | 840,505 | 12-12-67 |
| 546,422 | 8 - 7-51 | 872,557 | 7- 8-69 |
| 588,130 | 4 -13-54 | 1,015,457 | 7- 8-75 |
| 634,833 | 9 -25-56 | | |

### B. Use, Advertising and Publicity of "Dictaphone"

"Dictaphone" has been used for approximately 70 years to identify dictation equipment and services, and also has been used for over 50 years in the corporate name of Dictaphone Corporation. "Dictaphone" always has been used on dictating machines, supplies and accessories. It also has been used, in more recent times, on a number of other types of products and services, such as telephone answering equipment, multi-channel recorders, calculators, facsimile transmission machines and teaching machines.

"Dictaphone" and the "Dicta-" and "Dict-" words to be described below have been used on many millions of products. The sales of such products have been over one billion dollars; over 500 million dollars in the last 10 years alone. Dictaphone has invested tens of millions of dollars in advertising and publicizing such products in the U.S. and foreign countries. Advertising expenditures in the decade 1964-1974 alone have been over ten million dollars. Dictaphone's advertising has been of high quality and has appeared in many national magazines and newspapers, and in brochures, catalogs, mailers, price lists and other company literature distributed nationwide. As a result, "Dictaphone" has been listed in many dictionaries as a trademark and has become internationally famous.

Dictaphone's advertisements have been directed primarily to the business and professional market. The ads have appeared in "Time," "Newsweek," "The Wall Street Journal" and similar publications. Also, Dictaphone regularly has exhibited its products at many trade shows, such as those sponsored by the Computer and Business Equipment Manufacturers Association and the American Medical Association.

Dictaphone has consistently made over one million direct mailings of sales literature to prospective customers each year. Also, it has engaged in a considerable amount of publicity activities such as the distribution of booklets on how to dictate and how to type. Dictaphone has distributed large numbers of press releases regarding new products. The press releases have been published in many magazines. The reader responses to such publicity provide sales leads enabling a sales representative to telephone the prospect for an appointment.

Similar high-quality advertising has been used by Dictaphone for non-dictation products such as calculators and telephone answering equipment.

Telephone directories are a principal advertising medium used by Dictaphone throughout the U.S. Both distinctive white page listings and Yellow Page advertisements have been used — in Portland, Tacoma, Seattle and other cities in the Pacific Northwest, as well as in the rest of the country. The telephone plays a very important part in the sales of Dictaphone's products. People calling for repairs or supplies are potential customers. People frequently call in orders, or they call to ask a sales representative to visit them. People call in response to Dictaphone's ads. A large part of Dictaphone's business is directly or indirectly dependent on the telephone book. Therefore, the telephone book listings are prepared and reviewed with great care. In fact, Dictaphone employs an advertising agency solely to handle its Yellow Page ads.

The Yellow Pages are also important to Dictaphone's competitors in the dictation equipment industry. Many magazine ads and some radio commercials placed by Dictaphone's competitors direct the reader to the Yellow Pages to find his local sales office. For example, in one radio commercial by Lanier, defendants' supplier, the announcer states: "Look for Lanier in the Yellow Pages under dictating machines."

The trial evidence established that the location of a company's name in the telephone directory is important because people tend to be rather careless when looking up telephone numbers. Some competitors, trying to use this carelessness to gain an advantage over Dictaphone, have adopted a "Dicta-" name to secure a listing preceding Dictaphone's in the telephone book. A major reason for the use of many "Dicta-words" by Dictaphone was to establish a family of marks that would keep competitors from unfairly competing in this way.

[5] The extensive advertising and publicity of "Dictaphone" greatly strengthens the name. National Lead Company v. Wolfe, 223 F2d 195, 105 USPQ 462 (9th Cir 1955); Stork Restaurant v. Sahati, supra.

## C. The Use of "Dictaphone" in the Corporate Name

In the Stork Restaurant case, supra, the use of "Stork" both as part of the trademark "Stork Club" and in the corporate name "Stork Restaurant, Inc." strengthened the name. The court stated:

"The property right in a trade name will be recognized perhaps even more readily when, as here, it embodies the distinctive part of the owner's corporate name." 166 F2d at 353, 76 USPQ at 377-378.

To the same effect, see Sweetarts v. Sunline, Inc., 380 F2d 923, 154 USPQ 459 (8th Cir 1967); 3 Callman, Unfair Competition, Trademarks and Monopolies 756 (3rd ed).

[6] The use of "Dictaphone" in plaintiff's corporate name for over 50 years adds further strength to the name.

## D. "Dicta-" and "Dict-" Words

For over 50 years, Dictaphone has been using trademarks with the prefix "Dicta-" or "Dict-" (called "Dicta-words") for some of its dictation and other products mentioned above and for accessories and supplies for such products. These trademarks have been used and advertised together with "Dictaphone" and with one another as a family of marks.

For example, "Dicta-" words such as "Dictabelt," "Dictet," "Dictamate" and "Dictamite" consistently are used together with "Dictaphone" in many of Dictaphone's ads to identify various Dictaphone products. Somewhere in almost every ad in which more than one trademark is used there is a notation such as "Dictaphone and Dictabelt are registered trademarks of Dictaphone Corporation."

| | | | | | | |
|---|---|---|---|---|---|---|
| DICTAPHONOIL | 185,875 | DICTRONIC | 440,282 | DICTAFONO | 576,403 |
| DICTADYNE | 217,880 | DICTABELT | 534,650 | DICTACORD | 576,983 |
| DICTAGRAM | 236,488 | DICTASHEET | 534,651 | DICTAVOX | 583,375 |
| DICTALOG | 395,290 | DICTAPE | 534,652 | DICTASTAT | 587,794 |
| | | DICTAWIRE | 534,653 | DICTAPAK | 591,186 |
| DICTAMAILER | 613,661 | DICTASCRIBE | 744,770 | DICTACALL | 980,913 |
| DICTET | 648,161 | DICTACOIL | 782,000 | DICTAFAX | 995,483 |
| DICTACHRON | 686,293 | DICTACLEAN | 790,117 | | |
| DICTAYPER | 703,171 | DICTMITE | 839,595 | | |
| DICTAMITE | 716,407 | DICTAFAX | 847,774 | | |
| DICTALAB | 717,602 | DICTAMATE | 857,502 | | |
| DICTAFAX | 735,678 | DICTABELT | 910,683 | | |

Dictaphone has used more than 30 "Dicta-" or "Dict-" words in the U.S., and has registered most of them.[3] Not all of the names are in current use, but the large majority of them are. Similarly, not all of the registrations are kept alive forever because, after the product becomes obsolete, the suffix of the name may be too specific to allow use of the name on another product. Otherwise, the name usually is re-used later when an appropriate product becomes available.

**[7]** In determining the effect of the use of the "Dicta-" word family, it is not necessary to rule on the viability of the so-called "family of marks" doctrine. It is sufficient to say merely that the use of a trademark together with a group of marks having the same prefix can enhance the strength of the trademark. For example, in Motorola, Inc. v. Griffiths Electronics, Inc., 317 F2d 397, 137 USPQ 551 (CCPA 1963), Griffiths had used "The Golden Grid" for electron guns for television tubes and related goods and was attempting to register it. Motorola successfully opposed the registration, claiming the mark would be likely to cause confusion with its registered trademark "Golden Voice" which was used for radios and loudspeakers. In finding a likelihood of confusion, the court considered it to be significant that Motorola had used additional marks including "Golden" on similar products and had advertised those marks together with "Golden Voice" as a group. See also Procter & Gamble Company v. Conway, 419 F2d 1332, 164 USPQ 301 (CCPA 1970), where "Mister Stain" was held confusingly similar to "Mr. Clean," both marks being used for cleaning compounds, and with other names in the "Mr. Clean" family including "Mr. Clear," "Mr. Sheen," "Lady Clean," "Mrs. Clean," and "Master Klean."

The strengthening effect of Dictaphone's family of marks is apparent from the opinion in Dictaphone Corporation v. Memory Master Corporation, 169 USPQ 310 (Patent Office Trademark Trial and Appeal Board, 1971). In that case, Dictaphone successfully opposed the registration of "Dicta-Master" for use on dictating equipment. The Board (consisting of three senior trademark examiners) commented favorably on Dictaphone's prior use of a large number of marks beginning with "Dicta" and ruled that there was a "strong likelihood of confusion of the public concerned with the purchase of dictating machines."

A case which shows the strengthening effect of the use of marks having "Dict-" as a prefix is Dictaphone Corporation v. N.V. Philips Gloeilampenfabrieken, which was decided by the District Court in Cologne, West Germany in an opinion dated January 20, 1960.[4] In that case, Dictaphone sued for infringement of its "Dictaphone" trademark by use of "Dictina" for dictating machines by N.V. Philips. Dictaphone also cited its then recent use of "Dictet" as enhancing the likelihood of confusion.

The court enjoined N.V. Philips from using "Dictina" for dictating equipment.

The court ruled:

"The designation 'Dictina,' which was registered as an international trademark in the name of the defendant, who wishes to use it as a trademark and advertising slogan, is confusingly similar to the plaintiff's trademarks 'Dictaphone' and 'Dictet.' The marks are identical in their initial components, the phonetic and visual effects of which are determined by the sequence 'Dict' which they have in common. Nor does the different order of their vowels, i-a-o, i-e, and i-i-a, eliminate the danger of confusion. It must be taken into consideration that what is decisive is the overall impression which the trademark makes on the unwary consumer who, according to experience, can never be expected to show a high measure of attention.

"Moreover, since the number of brand articles, especially in the field of electrical appliances which have in the last decades been meeting steadily growing popularity, is increasing all the time, the trade is inclined more and more to draw its guidance about the origin and quality of the goods from the trade name used as the firm's slogan. This increases the danger that a superficial viewer or listener, when coming

---

[3] Registrations:

---

[4] The parties have stipulated that the decision was not appealed, and that the translation from which the following excerpts were taken is an accurate translation. The translation was entered in evidence. The opinion is accepted as evidence of the law of West Germany in this field.

upon a name new on the market that lies within the range of similarity to the slogan of a well-known company, may attribute this name to the same company even if there are certain variations.

"If the device is an appliance that serves a special purpose, the interested persons, precisely because they remember the well known and strong trademark, will, when finding a similar designation on the same type of appliance, more easily fall prey to the error that this is a smaller or simplified model made by the same manufacturer and distinguished by a variation of the famous trademark.

"The plaintiff's trademark 'Dictaphone' is such a famous and strong trademark, covering a special appliance intended for use in offices." (Pages 11-12 of translation)

[8] The use of "Dictaphone" together with other marks having "Dict-" or "Dicta" as a prefix strengthens "Dictaphone" and increases the likelihood of confusion between "Dictaphone" and "Dictamatic."

### E. Dictaphone's Prosecution of Infringers

Plaintiff has actively prosecuted infringers who have used Dicta-words in connection with dictation equipment. Sometimes the prosecution has taken the form of opposition proceedings in the U.S. Patent and Trademark Office, and before corresponding foreign tribunals, and sometimes the form of infringement actions.

For example, in addition to "Dictina" and "Dicta-Master," plaintiff successfully opposed registration of the name "DICTASCRIBER." The decision of the Trademark Trial and Appeal Board is reported at 41 Trademark Reporter 763.

In support of foreign protection of its trademarks, Dictaphone has obtained some 195 registrations for "Dictaphone" in 71 countries around the world, as well as 30 registrations for the "Dicta-" and "Dict-" words. Also, Dictaphone has conducted oppositions in foreign countries and has stopped the use of names having "DICTA-" or "DICT-" as prefixes for dictation products.

It is apparent that the elimination of other uses of "Dicta-" words as trademarks in the dictation equipment field enhances the distinctiveness of "Dictaphone." Since no one else uses a similar sounding name, plaintiff's name looks and sounds all the more unique.

### F. Summary, Strength of "Dictaphone" As A Trademark

In summary, "Dictaphone" has been used long, well and on millions of products. It has been advertised and publicized. It has been fought for and sought after by envious competitors. It is famous and distinctive. It is the epitome of a strong trademark.

### G. History of "Dictamatic"

Davies started in the dictating machine business in Tacoma using the name "Nyematic of Tacoma." He then formed "Nyematic of Portland" and moved to Portland in 1966. He distributed "Nyematic" dictation equipment made by Nye Products Co. of Seattle.

In late 1970 Davies became a distributor of Lanier Business Systems, a division of Oxford Industries, Inc., right after Lanier bought Nye Products Co. He started selling Lanier's various brands of dictating equipment, such as "Gray," "Stenocord," and "Edison," and continued selling "Nyematic" products, as well as "Lanier" products.

"Dictamatic" was adopted as a corporate name in 1971. However, the name was not used for dictation products until June of 1972. Later in 1972, the name was listed, for the first time, in the Yellow Pages of the Portland, Tacoma and Spokane telephone books. Davies personally decided that "Dictamatic" should be used, and caused the corporation to do so.

"Dictamatic" has been used by defendants on invoices, letterheads, sales literature, and on business cards. It has been used in advertising at trade shows, in telephone book ads and listings, and direct mailings to sales prospects.

"Dictamatic" also is used by Dictamatic sales personnel when introducing themselves to prospective customers. They use it particularly when they wish to identify themselves as a dictating machine company because "Lanier," the brand they sell, is not widely recognized as a dictating machine company. The name is used in answering the telephone and in "cold calling," a major source of sales.

### H. Similarity of Names

[9] "Dictaphone" and "Dictamatic" have the same number of letters. They have the same distinctive prefix, "Dicta." The only difference is between "phone" and "matic" — the suffixes. However,

"matic" is a weak and non-distinctive suffix. Many trademarks use such a suffix to imply automtic operation. The use of the prefix "Dicta" in both names makes them similar in appearance, sound and meaning. This similarity would lead to confusion in recall from memory by the average person.

Defendants assert that the relatively high prices of the products and the education and sophistication of the customers makes them more discriminating, thus minimizing the likelihood of confusion. However, the likelihood of confusion in recall from memory is just as great for educated people as it is for uneducated people — it depends upon the amount of attention they are paying, not their education.

There may actually be a greater likelihood of confusion between the corporate names because some of the business and professional people to whom dictation products are sold have become accustomed to dealing with related companies with similar names. Such people easily could believe that "Dictamatic Corporation" is associated with "Dictaphone Corporation," especially when the names are located close to one another in the telephone book.

### I. The Class of Customers and Marketing Channels

Dictamatic sells dictating machines which are manufactured by Lanier Business Machines and sold nationally in direct, head-to-head competition with Dictaphone. The functions and prices of the equipment are virtually identical, as are the customers who buy it. Such customers are business managers and executives, purchasing agents for hospitals, government agencies, insurance companies, and other large and small businesses, doctors, lawyers, judges and other professional people.

Both plaintiff and defendants sell by means of advertising in the same media. This media includes trade magazines and magazines of general circulation, direct mail advertising, and the Yellow and white pages of the telephone books of the various cities in which Dictamatic and Dictaphone have offices. Both companies use telephone calls to obtain appointments with prospective customers, and both use "cold calling" (visiting a prospect without an appointment) as a selling technique.

Both the class of customers and the marketing channels of the parties are substantially identical.

### J. Conclusion - Likelihood of Confusion

[10] "Dictaphone" is a strong and famous mark and is entitled to broad protection. "Dictaphone Corporation" is similarly strong and protectable.

"Dictaphone" and "Dictamatic" are similar in sound, appearance and meaning, especially since both use the unique "Dicta" prefix. The goods of the parties are identical, as are their customers. The parties' channels of advertising their products are identical, and the fact that the "Dictamatic" listings in the telephone book are immediately ahead of "Dictaphone" listings heightens the chances of confusion. Therefore, defendants' use of "Dictamatic" creates a great likelihood of confusion.

This conclusion is reached without having to consider either the intent of defendants or the amount of actual confusion. As in the case of J. B. Williams Co. v. Le Conte Cosmetics, Inc., supra, the evidence here supports a finding of likelihood of confusion without evidence of either of the latter factors.

If it were necessary to consider the evidence of actual confusion, that evidence would support the finding of likelihood of confusion. There was proof of mis-directed mail, telephone calls, invoices and checks, as well as cases of mistaken identity between the two companies.

### K. Use of the "Thought-Tank" Name

In attempting to show the wrongful intent of defendants, Dictaphone established its use of the name "Thought-Tank" as a trademark.

In 1972 Dictaphone introduced the "Thought-Tank" endless loop dictation system and advertised the name (along with "Dictaphone") heavily, spending ¾ of a million dollars in advertising the product that year alone. The product became associated with Dictaphone's endless loop dictation products.

The name "Thought-Tank" suggests to customers the term "think-tank," a colloquial expression describing an institution for thoughtful research. Some customers even shorten the name to simply "Tank" - but they refer to it as Dictaphone's product.

[11] During the pendency of this lawsuit, Dictamatic added the notation

"Tank-Type" to its advertising to indicate the competitive endless-loop dictation system it sold. It is not necessary to consider whether this shows wrongful intent. It is sufficient to find that Dictaphone has established its common-law trademark rights in "Thought-Tank" and that defendants' use of the term "Tank-Type" increases the likelihood of confusion caused by their use of "Dictamatic."

## II. The Counterclaim - Genericness

[12] Much of the evidence presented at the trial related to defendants' claim that "Dictaphone" has become generic. It is the conclusion of this Court that "Dictaphone" has not become generic, and that the counterclaim should be dismissed.

[13] Simply stated, the law is that a trademark for a product becomes generic when the buyers of the product do not know any other name for it. Ross-Whitney Corp. v. Smith Kline & French Lab., 207 F2d 190, 99 USPQ 1 (9th Cir 1953); Bayer Co. v. United Drug Co., 272 F 505 (SDNY 1921). The reason for the rule is that competitors of the trademark owner should not be prevented from using the only name which the buyers know for the product. Bayer Co. v. United Drug Co., supra.

The percentage of buyers who must meet the test in order to make a trademark generic is not clear from the prior decisions. Some courts apparently hold that only a simple majority of the buyers is required King-Seeley Thermos Co. v. Aladdin Industries, Inc., 321 F2d 577, 138 USPQ 349 (2nd Cir 1963), whereas other courts hold that substantially all buyers must meet the test before the trademark has become generic. Marks v. Polaroid Corporation, 129 F Supp 243, 105 USPQ 10 (D Mass 1955).

It is not necessary to choose between the foregoing views of the law because defendants have not established facts sufficient to meet either version of the test.

The evidence presented by defendants in support of the genericness defense consisted of the testimony of over thirty lay witnesses, one expert witness, documentary exhibits showing misuse of "Dictaphone," and the results of three surveys.

[14] Most, if not all, of the lay witnesses testified that, in their opinion, "Dictaphone" had become the most widely used term to describe dictation equipment of all types and therefore was generic. On cross-examination, however, it became clear that all of the witnesses knew that "Dicta-

phone" is a trademark, and that each knew and used the term "dictating machine," "dictation equipment" or similar descriptive terminology for the products upon which "Dictaphone" is used. Also, most if not all of the witnesses made it apparent that most of the misuse of "Dictaphone" which they had heard was in casual conversation, calls for repairs, or other non-buying situations. Furthermore, none of the witnesses had kept a numerical record of the number of correct and incorrect uses of "Dictaphone" they had heard. The opinions of these witnesses is entitled to little weight.[5]

[15] The only truly relevant usage described by the witnesses was the use of "Dictaphone" by buyers when seeking to buy dictation equipment. The usage by those who are not buyers is not relevant. Ross-Whitney Corp. v. Smith Kline & French Lab., supra; Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F Supp 479, 160 USPQ 777 (SDNY 1968). The testimony of the current and recent competitors (including a former salesman for defendants) was to the effect that no more than 5 to 10 percent of those buyers misused "Dictaphone." Even when they did misuse "Dictaphone," on further inquiry, the customers usually realized that they had used "Dictaphone" mistakenly. The misuse of "Dictaphone" seems to have been largely the result of convenience or mistake rather than genericness.

Defendants' documentary evidence of misuse of "Dictaphone" consisted of a few newpaper and magazine articles in which "Dictaphone" was used in a generic sense, some business college literature, some job application forms, and other miscellaneous examples of misuse. Dictaphone produced a much larger number of examples of proper use of the generic terms "dictating machine," "dictation equipment," "dictator," "transcriber" and the like. Much of such use was by buyers and sellers of dictation equipment. The use of such proper generic terms predominates over the misuse. Furthermore, all of the comprehensive, authoritative English language dictionaries refer to "Dictaphone" as a trademark.

---

[5] This testimony was entered in evidence despite the objections of counsel for plaintiff on the grounds that such opinion testimony by lay witnesses is inadmissible. The fact that the opinions were given by lay witnesses has been taken into consideration in determining the weight to be given to the evidence.

The misuse of "Dictaphone" has been fought by plaintiff for many years. The actions of plaintiff in combatting misuse include requesting employees to watch for misuses and call them to the attention of the company. When misuses are found, they are protested. In most cases, the misuses were stopped voluntarily.

Several editions of a booklet entitled "Please" have been published explaining the proper way to use Dictaphone's trademarks. This booklet was sent with the protests in many cases, and has been distributed to the public. Also, advertising which attempts to educate the public that "Dictaphone" is a trademark has been published.

The generic term "dictating machine" or the like has been used for many years in all of Dictaphone's advertising, and thus has been promoted for use by the public.

There is a regular review of the telephone books, especially the "Dictating Machine" section in the Yellow Pages, to look for misuses. Advertising is reviewed by counsel, and corrected, if necessary, in order to insure proper trademark usage. Other misuse correction activities are conducted regularly in the U.S. and overseas by outside trademark counsel.

As a result of these activities, the term "dictating machine," or similar terms have been and are used by every manufacturer in the industry (including defendants and their supplier Lanier) and are well known by office personnel.

One of defendants' exhibits consists of copies of "help wanted" advertisements in local and national newspapers. Many of these advertisements use the expression "Dictaphone operator" or "dictaphone secretary" or a similar expression. In each case, the ad seems to be using "Dictaphone" (capitalized or uncapitalized) to describe the skill desired of a prospective employee. Defendants contend that the great majority of the advertisements use "Dictaphone" without capitalizing it, thus indicating generic use of the trademark.

Several employees or principals of employment agencies who have placed such ads testified at the trial. On cross-examination these persons explained that they use "Dictaphone" rather than "dictating machine" or the like because it is shorter and costs less to use in the ad. However, each witness knew that "Dictaphone" is a trademark. Also, each made it clear that he or she was advertising for services and was not selling dictating equipment. It was explained by one witness that her use of "Dictaphone" in her ads was like the fre-

quent use of the term "Hyster operator" instead of "forklift truck operator" because "Hyster" is shorter and cheaper to use, and because "Hyster" is the best known brand and would be understood to mean "forklift truck" by all persons who might respond to the ad.

[16] The employment ads presented by defendants are not competent to prove genericness. One reason is that the ads are not either placed by or directed to buyers or sellers of dictation equipment. Furthermore, the use of "Dictaphone" for the purposes of convenience and cost savings by the personnel agencies and others placing the ads does not prove the unavailability of alternative terminology. In fact, the evidence shows that the alternative terminology is available and known to the personnel people, but it is not used in these instances because of its greater cost in advertising lineage.

The latter conclusion is buttressed by plaintiff's own collection of classified ads from the same newspapers as those canvassed by defendants. These ads included every ad offering dictation equipment (mostly used) in each newspaper for the three months immediately preceding the trial. Over 90 percent of those ads either used correct generic terminology, such as "dictating machine," or used one or more other brand names to describe the equipment. Only three percent of the ads contained generic uses of "Dictaphone." Also, the newspaper classified advertising managers testified that "Dictaphone" usually is used correctly in equipment advertisements in their newspapers. This is good evidence that "Dictaphone" is known and used as a trademark among buyers and sellers of dictation equipment.

The final evidence offered by defendants to show genericness were surveys. One of the surveys was the newspaper classified ad survey discussed above. The others were opinion surveys.

[17] The use of opinion surveys conflicts with the hearsay evidence rule. Therefore, the admissibility of such surveys is carefully regulated by the courts. The general requirements for admissibility of such surveys are set forth in 25 FRD 429.[6] Although the surveys were admitted

---

[6] "The offeror has the burden of establishing that a proffered poll was conducted in accordance with accepted principles of survey research, i.e., that the proper universe was examined, that a representative sample was drawn from that universe, and that the mode

in evidence, the same factors should be used in determining the weight to be given each survey.

No one was presented as a witness to testify as to the circumstances under which the surveys were taken. One of the surveys was not even intended to survey any of the issues in this case. There is no evidence that the "proper universe" was examined in either survey; that is, there is no evidence that the survey was limited to the buyers of dictation equipment. Therefore, the surveys are entitled to little or no weight.

[18] In conclusion, although its fame and familiarity have led to some misuse of "Dictaphone" by the general public, the descriptive terms "dictating machine," "dictation equipment" and the like are well known and used both by Dictaphone's competitors and by the buyers of dictation equipment. The availability and widespread use of these descriptive terms proves that it is not necessary for others to use "Dictaphone" to make the buyers understand what is being sold. Therefore, "Dictaphone" is not generic. Q-Tips, Inc. v. Johnson & Johnson, 108 F Supp 845, 95 USPQ 264 (DNJ 1952), aff'd, 206 F2d 144, 147, 98 USPQ 86, 88-89 (3rd Cir 1953); Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F Supp 479, 497, 160 USPQ 777, 792-793 (SDNY 1968).

### III. The "Unclean Hands" Defense

Defendants contended that plaintiff has come into court with unclean hands because of its own unfair acts and, therefore, is not entitled to the relief requested.

One unfair act was alleged to be the spreading of false rumors that defendants were going out of business. This allegation was denied by Dictaphone and was not proved by defendants.

---

of questioning the interviewees was correct. He should be required to show that: the persons conducting the survey were recognized experts; the data gathered was accurately reported; the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; the sample design and the interviews were conducted independently of the attorneys; and the interviewers, trained in this field, had no knowledge of the litigation or the purposes for which the survey was to be used. Normally this showing will be made through the testimony of the persons responsible for the various parts of the survey." (footnotes omitted)

The only other allegedly unfair act was Dictaphone's distribution of a letter from a supplier of records for one of defendants' machines. The letter indicated that no records would be available for that machine in the future. The evidence shows that Dictaphone believed that the statements in the letter were true. When, after a few weeks, it was independently learned that the records would be available from a new source, Dictaphone promptly and voluntarily furnished the correct information to its sales force and instructed its sales force not to use the letter any more.

The above facts do not establish any unfair acts by Dictaphone. Dictaphone distributed information it had good reason to believe was true and, when it learned that the information was not completely correct, it took immediate steps to remedy the situation. Furthermore, courts have scrutinized with a critical eye similar claims of unclean hands made by a defendant accused of unfair competition. See Q-Tips, Inc. v. Johnson & Johnson, 108 F Supp 845, 869, 95 USPQ 264, 282-283 (DNJ 1952).

The defense of unclean hands also must fail.

### IV. Remedy

Because defendants' use of "Dictamatic" and "Dictamatic Corporation" infringes plaintiff's trade name and trademark rights, defendants Dictamatic Corporation, Percy C. Davies and Pacific Northwest Bell Telephone Company shall be enjoined from using, in connection with the sale or service of dictation equipment, any of the names or terms "Dictamatic" or "Dictamatic Corporation," or "Dictaphone" or any term or name utilizing "Dicta-" or "Dict-," or "Thought-Tank" or any colorable imitation of any such names or terms, or the term "Tank Type" in conjunction with the use of any of the foregoing terms. Plaintiff's claims for damages and attorneys' fees are denied and each party shall bear its own costs.

educational use of computers has expanded the computer market to encompass many poorly informed and unsophisticated purchasers . . . [Citations omitted.]

Decision: The refusal of registration is affirmed.

---

### U.S. Patent and Trademark Office Trademark Trial and Appeal Board

In re Homes & Land Publishing Corp.

Serial No. 73/836,305

Decided September 30, 1992
Released October 8, 1992

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Practice and procedure in Patent and Trademark Office — In general (§325.01)**

**Types of marks — Generic — In general (§327.0601)**

Critical issue in determining whether term is common descriptive name of goods is whether relevant public primarily uses or understands term to refer to category of goods applicant sells under that term, and evidence of public's understanding of term may be obtained from any competent source, including purchaser testimony, surveys, dictionaries, trade journals, newspapers and other publications; examining attorney need not submit all stories in which term at issue is used, especially if there are large number of such stories, but sufficient number should be made available to enable determination as to meaning of term to relevant public, and if only portion of articles is introduced, examining attorney should indicate whether those submitted constitute representative sample.

**2. Types of marks — Generic — Particular marks (§327.0603)**

Dictionary meanings of "rental" do not constitute sufficient evidence to find that "Rental Guide," for real estate listing magazine for rental properties, is generic; mark can be registered if applicant submits evidence to demonstrate that it has acquired secondary meaning.

**3. Types of marks — Secondary meaning (§327.02)**

"Rental Guide," for real estate listing magazine for rental properties, has achieved secondary meaning, in view of evidence demonstrating sales of $3½ million in two-year period, distribution of more than 10 million magazines in same time period, and promotion of mark in brochures and related advertising.

Appeal from refusal of registration (Kathleen Cooney, examining attorney; Thomas Lamone, managing attorney).

Application for registration of trademark of Homes & Land Publishing Corp., serial no. 73/836,305. From refusal of registration, applicant appeals. Reversed.

Herbert L. Allen, Orlando, Fla., for applicant.

Before Rice, Rooney, and Hanak, members.

**Rooney, member.**

An application was filed to register the mark shown below for real estate listing magazine for rental properties. Use since October 1987 was alleged.



Applicant was required by the Examining Attorney to submit a disclaimer of the descriptive wording RENTAL GUIDE. In response, applicant filed an amendment to the Supplemental Register. The Examining Attorney replied that matter which is eligible or registration on the Principal Register may not be registered on the Supplemental Register and, inasmuch as applicant's mark was eligible for registration on the Principal Register with a disclaimer of the words, RENTAL GUIDE, registration on the Supplemental Register was refused. Applicant then filed an amendment seeking registration on the Principal Register with a claim of distinctiveness under Section 2(f) of the Trademark Act with respect to the words RENTAL GUIDE. Applicant's showing under Section 2(f) was deemed to be insufficient since, in the Examining Attorney's view, RENTAL GUIDE is generic for a real estate listing guide for rental properties. This refusal was made final and the applicant has appealed.

[1] The court has said, in the case of H. Marvin Ginn Corporation v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986), that the critical issue in determining whether a

term is the common descriptive name of the goods is whether the relevant public primarily uses or understands the term to refer to the category of goods applicant sells under that term. Evidence of the public's understanding of a term may be obtained from any competent source, including purchaser testimony, surveys, dictionaries, trade journals, newspapers and other publications. In re Northland Aluminum Products, Inc., 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985).

The evidence submitted by the Examining Attorney consists of excerpts from the Lexis/Nexis data base in which the term "rental guide" is used. We have said before that it is not necessary that an Examining Attorney submit all stories found, especially where there are a large number of them. However, a sufficient number of them should be made available to enable a determination to be made as to the meaning of the term in question to the relevant public. In addition, when introducing only a portion of the reported articles, the Examining Attorney should indicate whether the ones submitted constitute a representative sample of the whole of the search results. See In re Monotype Corporation PLC, 14 USPQ2d 1070 (TTAB 1989).

In this case, the Lexis/Nexis printout indicates that the search found eighteen stories. Three stories were submitted as evidence. One of the three was a reference to applicant. It is extremely difficult, if not impossible, to find, on the basis of such a weak showing, that the term in question is generic of the goods on which it is being used. Moreover, there was no indication from the Examining Attorney that the submitted articles constitute a representative sample of the entirety of the search results.[1] Eighteen articles is a small enough number that submission of the entire search would have been quite easy to accomplish and would have been infinitely more helpful than three. In the absence of the full search, we must presume that the excerpts selected for submission provide the best support of the refusal to register available from that source. See In re Federated Department Stores, Inc., 3 USPQ2d 1541 (TTAB 1987).

[1] In her appeal brief, the Examining Attorney listed the evidence of record as follows: "(1) copies of excerpts from MEAD Data Central's Nexis data base which retrieved searches for 'RENTAL GUIDE' (It is noted that the LEXIS/NEXIS articles of record represent only a sampling of the available evidence)". Saying that the three articles are only a sampling of the evidence is not the same as saying that they are a "representative sample" thereof.

In addition to the foregoing, the Examining Attorney argued that application of basic rules of the English language gives a descriptive interpretation of the wording in question; that applicant sells magazines listing rental properties under the mark RENTAL GUIDE and design; that applicant's magazines provide information on various types of rental properties available to purchasers of its goods; and that applicant's mark refers to the exact goods that it sells, hence, "rental guides".

Rental is defined as "n. 1. An amount paid out or taken in as rent. 2. A list of tenants and schedule of rents. 3. Property available for renting. 4. The act of renting. . . .adj. Of, concerning or available for rent." A guide is defined as "n. . . .4a. A book or manual that serves to instruct or to direct one's thinking." (*The American Heritage Dictionary* 1976) Thus, a "rental guide" may be a book or manual instructing or directing one's thinking about an amount to be paid for rent, a list of tenants and schedule of rents, property which may be available for renting, or the act of renting.

[2] In determining whether or not a term is generic, one must decide what is the primary significance of the term to the relevant purchasing public. The dictionary offers a number of possible meanings for the word "rental" and there is no evidence to indicate which meaning is attributed to it by the relevant public when it is used with the suffix "guide". Even knowing full well what applicant's goods are, the dictionary meanings are not enough to establish that the public views this term as the common name for these goods. Thus, while the dictionary supports the finding that RENTAL GUIDE is certainly descriptive of applicant's goods, we cannot say that it is sufficient evidence to find the term generic. Cf. In re Gould Paper Corporation, 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir. 1987).

Accordingly, on the basis of this record, we find that RENTAL GUIDE, while merely descriptive, is not generic as applied to applicant's goods. Thus, applicant's mark may be registered on the Principal Register without a disclaimer if the evidence submitted by applicant establishes that the term RENTAL GUIDE has acquired secondary meaning.

Applicant has filed the affidavit of William L. Needham, Vice President of Homes & Land Publishing Corporation who attests that sales of the product, bearing the mark sought to be registered, have increased steadily since the first use of the mark, October 1987; that from April 1988 through Decem-

ber 1990, sales have amounted to $3,629,326; that more than 10,240,000 magazines have been distributed during the same period; and that the mark has been heavily promoted in brochures and related advertising. Applicant has submitted a copy of its six page color brochure. In addition, applicant has submitted affidavits from three of its customers[2] attesting to recognition of applicant's magazines in the industry by the term RENTAL GUIDE.

[3] While the affidavits of applicant's customers on their own would be less than sufficient, when we add thereto sales of $3½ million in a two-year period; distribution of more than 10 million magazines in the same time period; promotion of the mark in brochures and related advertising; and the fact that the matter sought to be registered, including the designation, RENTAL GUIDE, is clearly used in the manner of a trademark, we are persuaded that applicant has achieved secondary meaning for the descriptive portion of its mark.

In view thereof, the refusal to register on the Principal Register with a claim of distinctiveness as to the words RENTAL GUIDE, is reversed.

---

### District Court, E.D. Louisiana

Ram's Horn Music v. Foundry Entertainment Inc.

No. 91–2582

Decided May 22, 1992

## REMEDIES

1. **Non-monetary and injunctive — Equitable relief — Permanent injunctions — Copyrights (§505.0709.04)**

Evidence showing that copyright infringement defendants continued to perform plaintiffs' copyrighted songs after their license was terminated for failing to pay fee warrants issuance of injunction prohibiting defendants' future performance of all works in licensing organization's repertory.

2. **Monetary — Damages — Copyrights — Statutory (§510.0509.03)**

Award of statutory damages under 17 USC 504(c)(1) that is merely equal to li-

² It appears that the "customers" with whom the affiants are associated are companies who list properties in applicant's magazine rather than the recipients and/or users of the magazines.

censing fee defendants would have had to pay does not properly deter infringing behavior; appropriate amount of statutory damages for defendants' performance of plaintiffs' copyrighted work is $1,500 per work.

---

Action by Ram's Horn Music, EMI April Music Inc., Desmobile Inc., PRI Music Inc., Bon Jovi Publishing, and Superhype Publishing against Foundry Entertainment Inc. and Alvin J. Clause, for copyright infringement. On plaintiffs' motion for summary judgment. Granted; injunctive relief, statutory damages, and attorney's fees granted.

Virginia N. Roddy, of Preaus, Roddy & Krebs, New Orleans, La., for plaintiffs.

Larry P. Boudreaux, New Orleans, for defendants.

### Wicker, J.

This matter is before the Court on motion of plaintiffs, Ram's Horn Music, EMI April Music, Inc., Desmobile, Inc., PRI Music, Inc., Bon Jovi Publishing and Superhype Publishing, for summary judgment on their claims of copyright infringement on the part of defendants Foundry Entertainment and Alvin J. Clause. The defendants have filed no opposition to this motion. Having reviewed the record, the memorandum and affidavits filed in support of the motion, and the applicable law, and taking as true the movers' statement of uncontested facts, the Court finds that the plaintiff has established a *prima facie* case for granting the motion on its merits.

[1] By this motion, plaintiffs also seek injunctive relief, statutory damages, and attorney's fees. The Copyright Act provides for injunctive relief "on such terms as (the court) may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Defendants originally obtained a license to perform plaintiffs' works through the American Society of Composers, Authors and Publishers ("ASCAP"), a society of artists which arranges the licensing of copyrighted works. Courts have commonly enjoined infringers from performing any and all music in the ASCAP repertory when the infringement before the court resulted from a failure to maintain an ASCAP license. *See Brockman Music v. Miller,*

Case 8:11-cv-01309-DOC-AN   Document 41   Filed 03/05/12   Page 42 of 87   Page ID #:498

**Krugman, Member, concurring.**

I concur with the majority's decision to sustain Opposition No. 65,603 for the reasons stated in my dissent from the original determination dismissing the opposition.

---

### Patent and Trademark Office
### Trademark Trial and Appeal Board

In re Minnetonka Inc.

Serial No. 458,195

Decided April 9, 1987

### TRADEMARKS AND UNFAIR COMPETITION

**1. Types of Marks — Descriptive — In general (§327.0302)**

Assertion that term which is generic for one product cannot function as trademark for related products is illogical and unsupportable, since genericness is question of fact determined from relevant public's perception of given term.

**2. Types of marks — Not descriptive — Particular marks (§ 327.0505)**

"Softsoap" is not generic designation for liquid soap.

---

Appeal from trademark examining attorney.

Application for registration of trademark of Minnetonka Inc. From decision refusing registration, applicant appeals. Reversed.

See also 212 USPQ 772.

Arthur J. Greenbaum and Steven M. Weinberg, both of New York, N.Y., for applicant.

David Shallant, trademark examining attorney, Law Office VII (Lynne Beresford, managing attorney), for PTO.

Before Rice, Krugman, and Cissel, Members.

**Krugman, Member.**

An application has been filed by Minnetonka, Inc. to register "SOFTSOAP" as a trademark for liquid hand soap in a pump-type dispenser.[1] Applicant has claimed that the mark has become distinctive of the goods for purposes of Section 2(f) of the Act as a result of substantially exclusive and continuous use of the mark in commerce for the five years next preceding the application filing date, and as evidenced by a separate evidentiary showing of acquired distinctiveness.

---

[1] Application Serial No. 458,195 filed December 27, 1983.

Registration has been refused under Section 2(e)(1) of the Act on the ground that the mark sought to be registered is merely descriptive or deceptively misdescriptive as applied to the recited goods. While conceding that applicant has shown that its mark has acquired de facto secondary meaning, it is the Examining Attorney's position that the mark is a generic designation for certain types of industrial soaps, some of which are used in the manufacture of personal soap products, and that, therefore, the mark is unregistrable in that it constitutes generic matter for products closely related to the goods involved herein.

Applicant has appealed.

This represents applicant's second attempt to register the mark SOFTSOAP for the recited goods and a brief recital of the circumstances leading up to this appeal is in order. Applicant filed its first application to register SOFTSOAP for liquid hand soap in a pump-type dispenser on November 15, 1978. Registration was finally refused by the Examining Attorney on the ground that the mark was a generic designation as applied to the goods. On appeal, the Board affirmed the refusal of registration, holding that the term SOFTSOAP was a common descriptive name of applicant's goods ". . . . and that, being generic for the goods, it is so highly descriptive that no quantum of evidence of acquired distinctiveness is sufficient to qualify it for registration under Section 2(f). . . ." See: In re Minnetonka, 212 USPQ 772, 782 (TTAB 1981).

Applicant then sought review of the Board's decision by way of a civil action filed pursuant to Section 2l(b) of the Act and Trademark Rule 2.145(c) in the U. S. District Court for the district of Minnesota (Civil Action No. 3-81-1071). In connection with the civil action, applicant gathered a large amount of evidentiary material which was not of record either at the time registration was finally refused by the Examining Attorney or at the time the Board affirmed the refusal of registration. In view of this new evidentiary material, the Court, the applicant and the Patent and Trademark Office agreed to stay the civil action and further agreed that applicant would file a second application to register SOFTSOAP. As part of this agreement, applicant was to submit the additional evidence not of record prior to the civil action and the Office agreed that the Board's decision in connection with the first application would not be res judicata, stare decisis or raise any issues of collateral estoppel against applicant with respect to the examination of the new application.

Pursuant to the terms of the agreement and the Order of the Court, this application, together with the additional evidentiary material, was filed. The Examining Attorney, as stated in his appeal brief at p.3, has treated the present application without any reference to either the examination or the Board decision in the first application. Our decision which follows will similarly make no reference to the prior proceeding.

It is the Examining Attorney's position that the term SOFTSOAP is not an apt name or an apt descriptive name for the recited goods and, therefore, the term is not generic on that basis. The Examining Attorney concedes that the term does not accurately describe the form or viscosity of applicant's liquid hand soap since the goods are not "soft" in the ordinary meaning of the term. The Examining Attorney further admits that SOFTSOAP, as applied to the recited goods, can refer to characteristics other than the form or viscosity of them, such as the concepts of flattery and gentleness, both of which admittedly have positive connotations in relation to soap. The Examining Attorney states that to be legally generic as an apt name, a term should be unambiguous in relation to the goods and should not have a double entendre, citing In re Colonial Stores Incorporated, 394 F.2d 549, 157 USPQ 382 (CCPA 1968) and In re Priefert Mfg. Co., Inc., 222 USPQ 731 (TTAB 1984).

While conceding that the designation SOFTSOAP is not a legally generic term for the recited goods, the Examining Attorney nevertheless contends that registration must be refused regardless of any amount of evidence of "de facto" secondary meaning because the term "soft soap" is a generic designation for a type of industrial soap and hence that the term is a recognized generic term in the soap industry and in the genus in which applicant's goods fall. The Examining Attorney maintains that a recognized generic term in a particular field is absolutely unregistrable for goods in that field, citing H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986); In re Steel Sash Service, Inc., 160 USPQ 345 (TTAB 1960).

In support of his position, the Examining Attorney has made of record a substantial amount of evidence taken from various general references as well as specific publications relevant to the soap industry. These include excerpts from *Perfumes, Cosmetics and Soaps; Soap and Detergents; American Soaps; ASTM (American Society For Testing Materials) Standards on Soaps and oth-* er Detergents; Soap Manufacture; The Modern Soap and Detergent Industry; Soap/Cosmetics/Chemical Specialties; general and specialized encyclopedic references, such as the *Encyclopedia of Chemical Technology, The Encyclopedia Brittanica,* and a number of soap making references, such as *Making Soap With Lye* and *The Art of Soap Making.* The Examining Attorney has further introduced a number of United States trademark registrations for various marks wherein "soft soap" appears as one of the items in the identification of goods, as well as a number of articles taken from the *NEXIS* research database. The sum and substance of the evidence submitted by the Examining Attorney, only a portion of which has been referred to above, is persuasive to demonstrate that the term "soft soap" is a recognized term in the soap industry; that said soap is an industrial type soap made from potash; that this type of soap can be used in the manufacture of some liquid shampoos and shaving cream; that liquid soap can be made from a potash type soft soap; and that soft soap is useful in cleaning environmental surfaces and inanimate objects, such as floors and automobiles, and is further used in the textile industry. One reference, *American Soaps,* states that soft soap is little used in the United States outside of the textile industries. It also appears that soft soap has medicinal utility in connection with pre-surgery scrubbing and in connection with some skin disorders.

In the face of the foregoing evidence relating to the significance of the term "soft soap," applicant has submitted a large amount of evidence comprising affidavits, consumer surveys, advertising materials and articles concerning soap. This body of evidence is persuasive, and the Examining Attorney does not claim otherwise, to show that there exists a fairly substantial number of competitors in the business of selling liquid hand soap; that none of these competitors uses the term "soft soap" descriptively, generically or otherwise in connection with its product; that the predominant common descriptive or generic designation for these goods is "liquid soap" and that the significance of SOFTSOAP to the consuming public and to competitors in the field is that of a trademark indicating origin in applicant. Applicant has submitted a large amount of evidence relating to its sales, advertising and promotion of its SOFTSOAP product and the success it has enjoyed.

The Examining Attorney, while conceding that applicant has, in fact, demonstrated that SOFTSOAP has acquired distinctive-

ness, nevertheless does not believe registration may be allowed in view of the term's significance not as the generic name of applicant's goods but as the generic designation for a certain product in the soap industry, which product it appears could be used in the manufacture of applicant's liquid hand soap. It appears, then, that the crux of the Examining Attorney's refusal is that, looking at the genus of goods as being soap, under the test set forth in the *Fire Chief* case, supra, the term SOFTSOAP is a recognized term in that industry and refers to goods within that genus. Further, aside from the "genus-species" test set out in the *Fire Chief* case, the Examining Attorney also appears to be making the argument that since SOFTSOAP is not generic as applied to applicant's liquid hand soap, but is generic of a different kind of soap product, the term is deceptively misdescriptive of applicant's goods.

We turn first to the genus-species test set out in *Fire Chief*. As stated by the Court, the critical issue in genericness cases is whether members of the relevant public primarily understand the term to refer to the genus of goods in question. To determine genericness, then, the Court set out a two part inquiry. First, what is the genus of goods (or services) at issue? Second, is the term understood by the relevant public primarily to refer to that genus of goods? Recognizing, as do the applicant and the Examining Attorney, that an inherent difficulty in this test is how broadly or narrowly to define the genus, we nevertheless hold that liquid hand soaps, rather than soaps per se, comprise the genus or class of goods at issue. The next question is whether SOFTSOAP is understood by the relevant public primarily to refer to that genus of goods, that is, liquid hand soaps. We think the record overwhelmingly compels us to answer this question negatively. While there is some evidence that the industrial potash soap known as soft soap has some usefulness in the manufacture of some liquid soaps, the record does not demonstrate the frequency of the use of soft soap in the manufacture of liquid hand soaps sold in the United States, or how significant an ingredient soft soap is in liquid hand soap. Contrast: In re Hask Toiletries, Inc., 223 USPQ 1254 (TTAB 1984) (HENNA 'N' PLACENTA held to be the generic name of the two key ingredients of hair conditioner and, hence, generic for hair conditioner and incapable of indicating origin).

With respect to the Examining Attorney's deceptive misdescriptiveness argument, suffice it to say that we agree with applicant

that to the extent a relatively small number of members of the purchasing public may be aware of the technical meaning of soft soap as an industrial or commercial type potash soap, these people would likely be members of the industry or soap maker hobbyists and the like and that, to those people, the mark SOFTSOAP as applied to liquid hand soaps might be misdescriptive, but not deceptively so since it is likely that these people would know that a soft soap would not be marketed as a liquid hand soap in a pump-type dispenser. Moreover, to the extent that SOFTSOAP may be deceptively misdescriptive as applied to applicant's goods, the inherent deceptive misdescriptiveness of the mark has long since been overtaken by the secondary meaning of the term as a distinctive indicium of origin, as evidenced by the evidentiary showing of acquired distinctiveness.

[1] We further agree with applicant that the dictum in the *Steel Sash* case, supra, relied on by the Examining Attorney, to the effect that a term generic for one product cannot function as a trademark for related products is, indeed, illogical and unsupportable as a general proposition since genericness is a question of fact determined from the relevant public's perception of a given term. We note, moreover, that subsequent decisions have effectively ignored the Steel Sash dictum. See, for example, Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 189 USPQ 759 (2nd Cir. 1976); In re Priefert Mfg. Co., Inc., supra.

[2] In conclusion, it is the view of the Board that the issue of genericism is based in the basic tenet of trademark law that competitors must not be hampered from the free use of generic terms to name their goods. The record fails to show that competitors have a need to use the term SOFTSOAP as a generic designation for liquid hand soap; on the contrary, the record shows the opposite, namely, that a fairly substantial number of competitors exist and that none of them use the term but, rather, appear to use the terms "liquid soap," "liquid hand soap" or variants thereof as the common name for the goods. We find, therefore, that SOFTSOAP has not been shown to be of such a nature as to preclude registration on the Principal Register upon a satisfactory showing of acquired distinctiveness; that such a showing has, without question, been made and that, therefore, the mark must be published for opposition pursuant to Section 2(f) of the Act.

Case 8:11-cv-01309-DOC-AN   Document 41   Filed 03/05/12   Page 45 of 87   Page ID #:501

Decision: The refusal of registration is reversed and the mark will be published pursuant to Section 2(f) of the Act.

---

### Patent and Trademark Office
### Trademark Trial and Appeal Board

In re Remington Products Inc.

Decided January 29, 1987

## TRADEMARKS AND UNFAIR COMPETITION

### 1. Acquisition, assignment and maintenance of marks — Acquisition through use — In general (§305.0501)

#### Types of marks — Slogans (§327.13)

Appearance on specimens of trademark applicant's slogan, "Proudly made in USA," even separate and apart from any other indicia which appear on them, does not make slogan trademark, absent use in manner calculated to project to purchasers or potential purchasers single source or origin for goods in question.

### 2. Acquisition, assignment and maintenance of marks — Acquisition through use — In general (§305.0501)

Use of letters "TM" on product does not turn unregistrable matter into trademark, nor is recognition by one individual sufficient to do so.

---

Appeal from trademark examining attorney.

Application for trademark of Remington Products Inc., Serial No. 493,829, filed August 8, 1984. From decision refusing registration, applicant appeals. Affirmed.

Charles R. Miranda, Bridgeport, Conn., for applicant.

Steven Fine, trademark examining attorney, Law Office VIII (Sidney Moskowitz, managing attorney), for PTO.

Before Sams, Rooney, and Simms, Members.

**Rooney, Member.**

Remington Products, Inc. has appealed the refusal to register the term PROUDLY MADE IN USA (MADE IN USA disclaimed) for electric shavers and parts thereof [1] on the principal register under Section 2(f).[2] The ground for refusal is that the term does not function as a trademark within the meaning of Section 45 of the Trademark Act and is therefore unregistrable under Sections 1 and 2.

The issue on appeal is stated by both applicant and the Examining Attorney to be whether applicant's slogan functions as a trademark. Specifically the Examining Attorney argues that the term sought to be registered is an unimaginative embellishment of a common informational phrase; that adding the word "proudly" does not change the informational character of the slogan; that applicant has attempted to elevate an informational slogan to the level of a trademark by prominently displaying it on its packages, using the letters "TM" in connection therewith and by attempting to promote the phrase as its own on television and in magazines. It is the Examining Attorney's position that, while the absence of "trademark trappings" may be evidence that the subject matter sought to be registered does not function as a trademark, the reverse does not necessarily follow. In support of her position, the Examining Attorney submitted the results of a Lexis/Nexis search.

Applicant's position is that the word "proudly" adds a new dimension to what is, admittedly, a commonly used expression on numerous products; that that word, appearing before the phrase, changes the impression from purely informational to one of pride. The expression is catchy and is prominent on applicant's packaging, it is asserted, and presents an image separate and apart from other matter thereon. Declarations submitted by applicant indicate that in the three

---

[1] Serial No. 493,829, filed August 8, 1984 alleging use as of April 29, 1982.

[2] In the first Office action, attention was directed to the Supplemental Register as a result of which applicant sought registration under Section 2(f), whereupon the Examining Attorney indicated his belief that the slogan was not capable of functioning as a mark and withdrew his suggestion that the application should be amended to seek registration on the Supplemental Register.

dence properly adduced pursuant to 37 CFR 1.272 ff. See Meitzner v. Mindick, 549 F.2d 775, 193 USPQ 17 (CCPA 1977). We consider that Klug has not sufficiently excused the delay, and the presumption of unreasonableness of the 26 month delay and consequent inference of intent to suppress have not been overcome. Under these circumstances, we find that Klug suppressed and concealed the invention in issue.

### Decision

In view of the foregoing, the senior party is entitled to an award of priority as the de jure first inventor, pursuant to 35 USC 102(g).

Priority of invention of the subject matter in issue is hereby awarded to Louis L. Wood, Frank J. Hartdegen and Peter A. Hahn, the senior party.

---

### Patent and Trademark Office Trademark Trial and Appeal Board

In re Minnetonka, Inc.

Decided Dec. 4, 1981

### TRADEMARKS

**1. Marks and names subject to ownership — Descriptive — In general (§67.5071)**

**Marks and names subject to ownership — Secondary meaning (§67.523)**

Not all signs or words which, in fact, indicate or come to indicate source will be restricted in their use to single proprietor; in particular, right of all competitors to use generic words in their ordinary meanings may not be restricted; one may not appropriate generic word as trademark; fact that there is only one source of product to which generic name has been applied over period of time such that it may have acquired what has been described as de facto secondary meaning indicating that source, does not alter this principle.

**2. Marks and names subject to ownership — Descriptive — In general (§67.5071)**

**Registration — Acts prior to 1946 (§67.733)**

1905 Trademark Act's "ten year clause" permitted unrestricted registration of marks that had been exclusively used by single proprietor for ten years prior to date of enactment of new statute; nevertheless, generic terms were refused registration under this proviso since they could not function as trademarks; 1905 Trademark Act Section 5(b) precluded registration of any mark consisting merely in words or devices that are descriptive of goods with which they are used.

**3. Marks and names subject to ownership — Descriptive — In general (§67.5071)**

Trademark Act Section 2(f) is not open sesame whereby every sign that acquires de facto secondary meaning becomes automatically registrable; some descriptive words are incapable of registration under any circumstances even if they have acquired secondary meaning, because they are common names of articles to which exclusive right to use can be granted to no one person or legal entity; important distinction to be made before applying this doctrine is that it is not applicable to signs that, albeit descriptive, are not by their nature generic; it is not necessary that sign in question be only apt or common name of goods, or that name be universally recognized as such, to be held generic.

**4. Registration — In general (§67.731)**

Question of registrability must be determined on basis of facts as they exist and are revealed by evidence in record at time application was acted upon by Patent and Trademark Office.

**5. Marks and names subject to ownership — Descriptive — In general (§67.5071)**

There is no authority for proposition that generic term somehow loses its status as such if it is not "commonly" used or is not used by "consumers"; there are decisions that support opposite conclusion, that is, that generic term may not be appropriated by or registered to single proprietor even though it may be technical term or is not in common use.

**6. Marks and names subject to ownership — Descriptive — How determined (§67.5073)**

Evidence of acquired distinctiveness resulting from extensive advertising and promotion by dominant or aggressive marketer cannot "bootstrap" name of marketed article out of public domain; on

other hand, appearance of name in dictionaries or other references is not conclusive, if for no reason other than that this would endow editors of such works with power to destroy trademarks, merely by defining them generically; accordingly, other credible evidence should be considered, if available, as to whether term continued to have generic significance as of date of action under appeal, or whether its genericness has since become obsolete.

### 7. Marks and names subject to ownership — Descriptive — How determined (§67.5073)

#### Marks and names subject to ownership — Secondary meaning (§67.523)

While brand awareness surveys may be relevant to consideration of whether term, if not generic, has acquired secondary meaning, they are not pertinent to question of term's genericness.

### 8. Marks and names subject to ownership — Descriptive — How determined (§67.5073)

One must look at nature of advertising in order to determine whether advertising expenditures and sales supported brand name significance of term or its genericness; use of "TM" symbol has little or no effect in altering commercial impression conveyed by generic term.

### 9. Marks and names subject to ownership — Descriptive — In general (§67.5071)

Assumption that common or generic term can also be brand name is clearly erroneous statement of law.

### 10. Marks and names subject to ownership — Descriptive — In general (§67.5071)

Term need not be only common term by which product is known for it to be generic and hence not registrable as trademark.

### 11. Marks and names subject to ownership — Descriptive — How determined (§67.5073)

Applicable standard by which to determine whether coined word for commercial product has become generic through common usage is not same as test applicable to determination of whether generic word has lost its genericness.

### 12. Marks and names subject to ownership — Descriptive — In general (§67.5071)

All of generic names for product belong in public domain; only justification for holding that term is registrable to single proprietor would be if name had become practically obsolete as common name.

## UNFAIR COMPETITION

### 13. Fraud, deception and palming off (§68.55)

Conclusion that term has not lost substantially all of its significance as common or apt name of applicant's goods does not mean that applicant is wholly without protection from predatory unfair competition; there may well be protection against uses of term that comprises unfair competition under common law principles or that violates proscriptions of Lanham Act Section 43(a); if issue as to protectability of generic name of product as trademark of single enterprise for that product, although framed in language of Section 43(a) or in rubric of state unfair competition law, is same as it would be in trademark proceeding, then result will be same.

## TRADEMARKS

### 14. Marks and names subject to ownership — Descriptive — Particular marks (§67.5081)

"Soft Soap" is one of common descriptive names of liquid hand soap in pump-type dispenser and, being generic for goods, is so highly descriptive that no quantum of evidence of acquired distinctiveness is sufficient to qualify it for registration under Section 2(f).

---

Appeal from Examiner of Trademarks.

Application for registration of trademark of Minnetonka, Inc., Serial No. 193,371. From decision refusing registration, applicant appeals. Affirmed.

Merchant Gould Smith Edell Welter & Schmidt, Minneapolis, Minn., for applicant.

Before Rice, Allen, and Fruge, Members.

Allen, Member.

An application has been filed to register the sign "SOFTSOAP" as a trademark for liquid hand soap in a pump-type dispenser.[1]

---

[1] This identification of goods was submitted and entered following the Trademark Attorney's first action in which the original identification, "soap, namely a cream soap for the skin," was held to be indefinite.

Although on the drawing originally submitted, the alleged mark was depicted as two words, not in special form, i.e. "SOFT SOAP", an amended drawing was filed on which the mark is shown as illustrated below:

# Softsoap

Registration was refused on the grounds that "SOFTSOAP" immediately describes the goods and is no more than an apt name for a liquid or semi-liquid toilet soap; that it is so highly descriptive as to be incapable of distinguishing applicant's soap from like soaps of others; and that it is not a trademark within the meaning of §2, as defined in §45 of the Trademark Act.

Applicant has appealed.[2] In addition to the briefs filed by applicant and the Trademark Attorney, applicant was represented at an oral argument of the issues.

The Trademark Attorney supports her position that "SOFTSOAP" is a generic term which cannot distinguish one kind of soap from like soaps of others by a barrage of dictionary, encyclopedia and other textual references.[3] Based on these references,

she concludes that "soft soap" was discovered in the period A.D. 23-113 by Pliny and that while the soap industry may have changed down through the centuries, "soft soap" is still "soft soap". The issue, as the Trademark Attorney views it, is whether this "generic term can be appropriated by a single trader and by a blitz campaign of

---

"soft soap n 1 : soap of a semifluid consistency made principally with potash or with soda by control of the fluidity by other factors (as the unsaturation of the fat used and the amount of water and glycerol present) and used chiefly in liquid soaps, in blending with hard soaps to increase solubility and lathering properties, and in medicine — see GREEN SOAP. 2: The art or device of persuasion or flattery: BLARNEY. * * *" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 2166 (unabr. 1967).

\* \* \* \* \*

"SOAPS are the metallic salts of fatty acids. The sodium and potassium salts of the fatty acids are soluble in water, and constitute our ordinary 'hard' and *soft*' washing soap respectively — although today certain sodium salts are manufactured which are quite *soft*, while certain potassium soaps possess a considerable degree of hardness, so that the old distinction between these classes of soap no longer holds accurately. * * *" 1 G. MARTIN, THE MODERN SOAP AND DETERGENT INDUSTRY, Sec. I., p. 3 (3rd ed., rev. 1950), emphasis added.

\* \* \* \*

"The resulting soaps [from the process of treating vegetable or animal oils with caustic alkalis without separating the glycerol] may be divided into three classes: (a) Cold Process Soaps; (b) Hydrated Soaps (which include 'marine') and 'soft' Soaps; (c) High Pressure Soaps.

\* \* \*

(b) HYDRATED SOAPS, SOFT SOAPS. — *Soft Soaps* are prepared by boiling together caustic potash and suitable oils at ordinary pressures until a sample, when cold, sets to a clear translucent mass. The mass is then boiled down until sufficiently concentrated, and put up in barrels, canisters, or drums for sale. *Soft soaps* form soft, jelly-like masses. * * *" Id, Sec. I., pp. 4, 5, emphasis added.

\* \* \* \* \*

"*Soft* caustic potash soaps are the liquid, soft and semisoft pastes. Mixtures of the two are also used. * * * The soft soaps and liquid soaps of USP grade have a therapeutic value and may be sold under trade names. The 'PHISOHEX' of the Winthrop Laboratories contains 3% hexaclorophene with lanolin and

---

[2] Applicant filed various evidentiary documents, together with arguments pertaining thereto, following the Trademark Attorney's final refusal. Each submission was reviewed by the Trademark Attorney, who persisted, however, in her refusal of registration. (3) "soft-soap. 1. A fluid or semifluid soap. 2. Informal. Cajolery." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (new college ed. 1976).

\* \* \* \* \*

[3] \* \* \* Soap appears to have been first made by boiling goat's tallow and causticized wood ashes (Pliny); the resulting *soft potash soap* was converted into hard soda soap by treating the paste repeatedly with salt. \* \* \* In the potash soaps the solution, with some modification with glycerine or alcohol, form the liquid soaps of commerce. \* \* \* When the soap-water system contains about 40-50% water a different phase or form of soap results. This phase is called *middle* soap or gum soap, and when derived from potash is sometimes sold as *soft soap.* \* \* \*" 20 ENCYCLOPEDIA BRITANNICA, 858 (1944 ed), emphasis added.

\* \* \* \* \*

modern-day advertising become a brand discriminator and a term subject to exclusive use by that single entity." (Examiner's statement, paper 16, p. 4). She holds that it cannot, relying principally on Weiss Noodle Co. v. Golden Cracknel & Specialty Co., 129 USPQ 411 (CCPA 1961) as the controlling law of the case. It should be noted that the final refusal of registration rests on three statutory grounds: that the word "SOFTSOAP" is merely descriptive as applied to the goods and, hence, not registrable under Section 2(e)(1); that applicant's claim that "SOFTSOAP" has become distinctive of applicant's goods and is registrable under the provisions of Section 2(f) is not persuasive; and that the term "SOFTSOAP" is so highly descriptive that it is incapable of distinguishing applicant's goods from like goods of others, and hence, is not a trademark within the meaning of §2 and as defined in §45 of the Trademark Act. (See: paper 4, dated May 1, 1980, 1).

Applicant's position is that the inferences drawn from dictionaries and other texts in which "soft soap" is listed or discussed are rebuttable; that the most competent evidence from which to determine whether consumers recognize "SOFTSOAP" as a mark distinguishing the source or origin of applicant's hand soap in a pump-type dispenser are the results of consumer surveys; that it has submitted such evidence, as well as substantial evidence of the kind typically used to substantiate secondary meaning; that such evidence clearly proves that consumers consider "SOFTSOAP" not as a generic term but rather a trademark which distinguishes and identifies the source or origin of applicant's particular product; and that the Trademark Attorney ignored this evidence, relying only on the dictionary and

textual references as the basis of her refusal of registration.[4]

[1] The general legal principles applicable to this appeal are well-established and have remained essentially unchanged in more than a century of American trademark jurisprudence. Thus, not all signs or words which, in fact, indicate or come to indicate source will be restricted in their use to a single proprietor. In particular, the right of all competitors to use generic words in their ordinary meanings may not be restricted. It has long been part of our law that one may not appropriate a generic word as a trademark. Canal Co. v. Clark, 13 Wall 311 (1871); Elgin National Watch Co. v. Illinois Watch Co., 179 U.S. 665 (1901); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 39 USPQ 296 (1939). The fact that there is only one source of the product to which the generic name has been applied over a period of time such that it may have acquired what has been described by some as de facto secondary meaning indicating that source does not alter the above principle. This point was long ago made clear by Justice Brandeis, writing for the majority in Kellogg:

"It is contended that the plaintiff has the exclusive right to the name 'SHREDDED WHEAT' because those words acquired the 'secondary meaning' of shredded

---

DICTIONARY OF THE ENGLISH LANGUAGE, 2385 (2d ed., unabr., 1957).

[4] Counsel's assertion in its reply brief, repeated during the oral argument, that the Trademark Attorney failed to consider its evidentiary submissions is not well founded. The Trademark Attorney wrote two comprehensive actions in this case (page #4, dated May 1, 1980, and paper #8, dated March 6, 1981), both of which were incorporated by reference in the Examiner's Statement (papger #16). From these papers, it is quite clear that applicant's submissions were given full consideration. For example, in the letter dated March 6, 1981, page 2, Attorney Merchant stated that she "[had] given careful consideration to counsel's further argument, the declaration of Mr. Wallace A. Marx, the Vice President of applicant corporation, and the exhibits numbered 1 through 30." These exhibits included the consumer surveys and the affidavits concerning them (exhibits 22-25). The Gillies affidavit (evaluating the survey results) is discussed on page 3 of the same letter. The Trademark Attorney also made perfectly clear that she was not persuaded by this evidence. Not being persuaded is claims different than failing to consider.

---

cholesterols. * * * Ordinary *soft soaps* used as bases for toilet soap are made with linseed and olive-oil mixtures. * * * High-grade *soft soap* for industrial use is made with coconut or palm kernel oil with caustic potash. But *soft soap* in past form is generally made of lower titer oils with caustic soda, usually linseed, soybean, or corn oil. * * *" G. BRADY, MATERIALS HANDBOOK, 696-698 (9th ed., 1956, 1963). emphasis added.

* * * * *

"*Solid, or hard, soap* is usually made with soda from the harder fats and from nondrying oils (or their acids), and is finished in the form of bars, or tablets, chips, and powder. *Soft* or *semifluid* soap is made chiefly with potash from liquid fats (or their acids). * * *" WEBSTER'S NEW INTERNATIONAL

wheat at Niagara Falls by the plaintiff's predecessor. There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term 'shredded wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done. * * *" Id, 39 USPQ 296, 299.

The same rule and rationale is still applied by our federal courts. S.S. Kresge Co. v. United Factory Outlet, Inc., 202 USPQ 545 (1st Cir. 1979) ["MART" used in association with the services of a grocery store or market]; Reese Publishing Co. v. Hampton Int'l Communications, Inc. 205 USPQ 585 (2d Cir. 1980) ["VIDEO BUYER'S GUIDE" for a magazine about television sets]; CES Publishing Corp. v. St. Regis Publications Inc., 188 USPQ 612 (2d Cir. 1975) ["CONSUMER ELECTRONICS" for a magazine about electronic equipment]; Miller Brewing Co. v. Jos. Schlitz Brewing Co., 203 USPQ 642 (7th Cir. 1979) ["LITE" for a low calorie beer]; Johnson & Johnson v. Carter-Wallace, Inc., 205 USPQ 827 (S.D. N.Y. 1979) ["BABY OIL" for oil formulated for use on the skin of babies]; Surgicenters of America Inc. v. Medical Dental Surgeries Co., 196 USPQ 121 (D. Ore. 1976) ["SURGICENTER" for surgical centers].

**[2]** The rule was also consistently applied to the determination of registrability of generic terms under the Trademark Act of Feb. 20, 1905. Barber-Coleman Co. v. Overhead Door Corp., 17 USPQ 501 (CCPA 1933) ["OVERHEAD" for doors]; In re Bailey Meter Co., 41 USPQ 275 (CCPA 1939) ["BOILER METER" for meters to measure the flow of steam from boilers]; McGraw-Hill Pub. Co. v. Amer. Aviation Ass., Inc., 47 USPQ 494 (D.C. Cir. 1940) ["AVIATION" for a magazine about aeronautics]. The prohibition even applied to terms sought to be registered under the "ten year clause."[5] These decisions applied

the common law rule of Canal Co. v. Clark, supra, and other decisions in this line, holding that generic terms were so descriptive that no amount of evidence showing secondary meaning would be admitted or considered to demonstrate their protectability as technical trademarks.[6]

**[3]** While there was some hesitation in the decisions of the Patent Office during the early years of our current statute,[7] there is now no question that proof of de facto secondary meaning cannot transform a generic term into a subject for trademark registration. Thus, Section 2(f) of the Trademark Act is not an open sesame whereby every sign which acquires de facto secondary meaning becomes automatically registrable. Some descriptive words are incapable of registration under any circumstances even if they have acquired a secondary meaning, because they are the common names of ar-

---

which had been exclusively used by a single proprietor for ten years previous to the date of enactment of the new statute. Nevertheless, generic terms were refused registration under this proviso since they could not function as trademarks. 2 NIMS, UNFAIR COMPETITION AND TRADE-MARKS, 792, at fn. 16 (4th ed. 1947).

[6] The statutory ground of refusal in these cases was Sect. 5(b) of the 1905 Act which precluded registration of any mark consisting "* * * merely in words or devices which are descriptive of the goods with which they are used. * * *" 38 Stat. 726.

[7] Even in the few decisions which hesitated to follow a per se rule, the burden of proving secondary meaning of such terms was generally held to be an extremely heavy one. See: e.g. Ex parte Pocket Books, Inc., 91 USPQ 182 (Pat. Off. Ex.-in Chief, 1951) ["POCKET BOOK" for paperback books]; Ex parte Stauffer Chemical Co., 81 USPQ 255 (Com'r Pats. 1949) ["FLEUR DE SOUFRE" for sulphur]. In Pocket Book Examiner-in-Chief Federico wrote as follows:

"In a case of this kind * * * distinctiveness as a trademark should not be recognized without *completely overwhelming proof* with respect to all aspects of the matter.

While the statement made by the examiner that 'no amount of usage, advertising, or repetition can establish for a user any rights in a word or group of words which at the time of adoption was inherently incapable of functioning as a trade mark' may be unnecessarily broad, still it is not believed that usage, advertising and repetition alone, and even the acquiescence of the professional trade group, is sufficient to remove the name of an article from the category of a generic word of the English language to that of a trade mark for the article." Id 185, 186. (emphasis added)

---

[5] 33 Stat. 724, et seq. The ten year clause permitted the unrestricted registration of marks

ticles to which the exclusive right to use can be granted to no one person or legal entity. J. Kohnstamm, Ltd. v. Louis Marx & Co., 126 USPQ 362 (CCPA 1960). ["MATCH BOX" for toys in matchbox type containers]; DeWalt, Inc. v. Magna Power Tool Corp., 129 USPQ 275 (CCPA 1961) ["POWER SHOP" for saws]; Weiss Noodle Co. v. Golden Cracknel & Speciality Corp., supra ["HA-LUSH-KA" for egg noodles and products made therefrom]; In re Sun Oil Co., 165 USPQ 718 (Rich, concurring) (CCPA 1970) ["CUSTOM BLENDED" for gasoline]; In re Abcor Development Corp., 200 USPQ 215, 219 (Rich, concurring) (CCPA 1978) ["GASBADGE" for device to monitor personal exposure to gaseous pollutants].

An important distinction to be made before applying the above doctrine is that it is not applicable to signs which, albeit descriptive, are not by their nature generic. The difference is crucial and determination of the dividing line between the two categories of signs is an awesome responsibility of the trier of facts, in view of the value of trademark rights on the one hand and importance of the public interest in the use of common names on the other. See, e.g. In re Automatic Radio Mfg. Co., 160 USPQ 233 (CCPA 1969) ["AUTOMATIC" for radios held descriptive, but not generic]; In re Ideal Industries, 184 USPQ 487 (CCPA 1975 ["WING-NUT" held not generic for connecting members for joining the ends of electric wires or conductors]. However, to be held generic, it is not necessary that the sign in question be the *only* apt or common name of the goods or that the name be universally recognized as such. Krey Packing Co. v. Williams Food Products, Inc., 163 USPQ 495 (TTAB 1969) ["SLOPPY JOE" held generic even though it was one of several common names for barbequed beef sandwiches]; McGraw Hill Publ. Co. v. American Aviation Ass'n, Inc., 47 USPQ 494 (D.C. Cir. 1940) ["AVIATION" held generic for a magazine, the subject matter of which concerned aviation, notwithstanding the fact that "aeronautics" was another apt term]; Charles Hansen's Laboratory, Inc. v. Samuel B. Kirk, 28 USPQ 72 (E.D. Pa. 1935) ["JUNKET", not the only generic name for a jelly-like milk pudding and considered "quaint" rather than an ordinary term, nevertheless, held generic].

[4] With the above principles in mind, the first question which we need to examine in the instant case in order to decide whether the Trademark Attorney's refusal of registration of "SOFTSOAP" was in error or not, is whether the term "softsoap" is a generic term for applicant's "liquid hand soap in a pump-type dispenser"? If the answer to the first question is "YES", the answer to the first question is "YES", the case is determined and applicant's mark must be refused registration. If the answer is "NO", then a second question is whether the term has acquired distinctiveness within the meaning of Section 2(f) of the statute such that it is registrable pursuant to that provision. In both of these inquiries the question of registrability must be determined on the basis of the facts as they exist and are revealed by evidence in the record at the time the application was acted upon by the Office. In re Thunderbird Products Corp., 160 USPQ 730 (CCPA 1969); In re The General Tire & Rubber Co., 194 USPQ 491 (TTAB 1977).

Applicant relies on use by predecessors for its claimed date of first use, i.e. October, 1975, its own "SOFTSOAP" product having been introduced in November of 1977 (Declaration of Wallace A. Marx, attached to paper #5, page 1, para. 3). There is ample evidence in the record that "soft soap" was a generic term for soap of semifluid consistency on and before either of these dates. See: fn. 3, supra. This evidence is uncontroverted by any credible evidence offered by applicant. Applicant's only proffered evidence on the point was a declaration attached to paper #3 by Mr. Robert R. Taylor, applicant's president. In pertinent part, the declaration reads as follows:

"7. I have become aware that the words 'soft soap' have a dictionary meaning which refers to a technical or scientific description for a particular type of soap. However, in my many years of experience in the soap business, I have never known of any use of the words 'soft soap' in any common or consumer usage with respect to soap products. Although 'soft soap' has an apparent technical dictionary meaning, I believe and state that such meaning is not known to the ordinary trade and retail consumer, and also that such meaning has no relevance nor application with respect to the unique product of our company identified in this application, which is a liquid hand soap in a pump-type dispenser."

Counsel for applicant infers from the above that Mr. Taylor became aware of the dictionary meaning of "soft soap" only after the references to such meaning were cited by the Trademark Attorney in the application before us. (Brief, 5) Although such inference is difficult to draw from the Taylor declara-

tion, the same disclaimer of prior knowledge by President Taylor was repeated during the oral argument of this appeal in the presence of Mr. Taylor, who also attended. Considering the fact that the Trademark Attorney found not just one, but six dictionary, encyclopedia or other textual generic references to "soft soap," in sources which should have been readily accessible to Mr. Taylor, the inference is surprising. However, accepting it on its face, the fact that the declarant was unaware of these references to the term "soft soap" in standard texts utterly destroys any foundation for his further statements about the lack of any common or consumer uses of the term.

**[5]** More significantly, we find no authority (and applicant's counsel cites none) for the proposition that a generic term somehow loses its status as such if it is not "commonly" used or is not used by "consumers."[8] There are some decisions, albeit few in number, holding that a generic term, the generic significance of which has become totally obsolete, may be registered and protected as a technical trademark. These are discussed below in reference to the second question.

**[6, 7]** We now direct our attention to whether the once generic term was still generic as of the date of the determination by the Trademark Attorney of the question of its registrability under the Trademark Act. In re Thunderbird Products Co., supra. It is important not to confuse this with the question whether a descriptive, albeit not generic, term has acquired a secondary meaning within the meaning of section 2(f). That inquiry is foreclosed when evaluating the registrability of terms which are generic. Thus, evidence of acquired distinctiveness resulting from extensive advertising and promotion by a dominant or aggressive marketer cannot "bootstrap" the name of the marketed article out of the public domain. Roselux Chemical Co., Inc. et al. v. Parsons Ammonia Co., 132 USPQ 627 (CCPA 1962); In re Bridge, 170 USPQ 428 (T-TAB 1971); Weiss Noodle Co. v. Golden Cracknel & Specialty Co., supra; In re Sun Oil Co., supra. On the other hand, appearance of the name in dictionaries or other references is not conclusive, if for no other reason than that this would endow editors of such works with the power to destroy trademarks, merely by defining them generically. See: In re Bridge, supra; Kunin et al., Trademarks in Dictionaries, 59 TRADEMARK REP. 735 (1969). Accordingly, other credible evidence should be considered, if available, as to whether the term continued to have generic significance as of the date of the action here under appeal or whether its genericness has since become obsolete. Accordingly, we need to examine applicant's advertising and promotion of "SOFTSOAP" and the results of a consumer survey dated August 21, 1980 titled "Generic Product Description Study" (Exhibit 22, submitted with amendment dated September 30, 1980, paper #5).

**[8]** Applicant's advertising and promotion of "SOFTSOAP" does little to support its claim that this term does not continue to serve the function of a generic or common descriptive name for its liquid soap product. In its brief, counsel for applicant emphasizes the magnitude of applicant's advertising expenditures[10] and the phenomenal growth of "SOFTSOAP" sales over the short period of time since its introduction.[11] However, in this inquiry, we must also look at the nature of the advertising in order to determine whether these advertising expenditures and sales supported the brand name significance of the term "soft soap," or its genericness. On this analysis, we find that the substantial emphasis of the advertising has been towards establishing in purchasers' minds the identity of "SOFTSOAP" as the name of a new kind of product rather than as an indicator of source in the trademark sense. The materials introduced by applicant are replete with generic and semi-generic references, of which the following are examples:

---

[8] Indeed, there are decisions which support the opposite conclusion, i.e. that a generic term may not be appropriated by or registered to a single proprietor *even though* it may be a technical term or is not in common use. In re U.S. Plywood Corp., 138 USPQ 403 (TTAB 1963); In re Green Lane Hosiery Co., 145 USPQ 509 (TTAB 1965).

[9] Applicant also introduced the results of two other brand awareness surveys conducted in the Denver metropolitan area. While these may be relevant to a consideration whether, if not generic, the term "soft soap" has acquired a secondary meaning, they are not pertinent to the question of the term's genericness. See: In re Sun Oil Co., supra (Rich, concurring).

[10] In less than three years, advertising and promotion expenditures in support of "SOFTSOAP" rose to more than $4,000,000 in the period from January, 1980 through September, 1980.

[11] Sales of "SOFTSOAP" have grown from $345,000 in 1978 to $22,000,000 in the period from January to August, 1980.

*In re Minnetonka*

"Softsoap is a substitute for bar soap."

"Softsoap * * * the Modern Alternative."

"Softsoap is the first new idea in washing since soap was discovered * * * truly the modern alternative."

"Softsoap or Bar 'Soap'? Now you have a choice at the sink."

"Softsoap creme soap on tap. Eliminates messy bar soaps!"

"Why'd you switch from bar soap to Softsoap? * * *"

"Softsoap. Soap without that soapy mess."

"On the one hand, bar soap. On the other hand, Softsoap. * * *"

Advertising copy such as the above has dominated applicant's advertising and promotional materials, clearly evidencing a conscious effort on its part to differentiate "SOFTSOAP" as the name of a *new* category of soap products rather than as a brand name indicating source. About the only deference to brand identity in these materials is use of a "TM" symbol [12] and, more recently, of the word "Brand", in close association with "SOFTSOAP". During introductory stages, the only reference to an alternative generic term on applicant's product was the phrase, "creme soap on tap," which was used on the dispenser cap underneath the name "SOFTSOAP". This phrase appears to be more in the nature of an advertising slogan than any serious effort to establish a name other than "SOFTSOAP" as an alternative common name of the product. [13] For example, this term was not used at all in the copy portion of the ads in which the emphasis was almost totally directed towards projecting the commercial image of "SOFTSOAP" as a new and unique product category. This pattern is characteristic of the "have your cake and eat it too" theory of brand name management which seeks to promote the brand name as a "household word" to consumers, while, at the same time, maintaining a proprietary position against its use by competitors. Whether or not this may be sound adver-

tising strategy, its effect in the matter before us here is to support the Trademark Attorney's finding that "SOFTSOAP" is a generic term for a category of soap products rather than refute that inference.

### The Survey

Applicant relies heavily on the August, 1980 "Generic Product Description Study" to support its position that "SOFTSOAP" does not have sufficient generic significance in the environment of its purchasers to justify barring its registration as a trademark. In this survey, 200 persons in Philadelphia, Cleveland, Atlanta and Phoenix, all of whom had purchased body/face/hand soap in the past six months, were shown a picture board (reproduced below) depicting configurations (without any brand, design or other identification) of liquid soap dispensers in their usual household setting.





With this background, the interviewees were then presented with the following question:

"2. There is a type of soap now on the market which comes in these types of containers with a dispenser on the top. People primarily use this type of product to wash their hands.

I would like your opinion of what you would call this type of product. But before I do that, I'd like to give you a background example.

---

[12] Use of the "TM" symbol has little or no effect in altering the commercial impression conveyed by a generic term. See: In re Union Carbide Corp., 171 USPQ 510 (TTAB 1971; In re Nosler Bullets, Inc., 169 USPQ 62, 63 (TTAB 1971).

[13] Very recently, applicant started to use "liquid soap" instead of "creme soap on tap" in association with "SOFTSOAP", apparently based on the results of the consumer survey which is discussed infra.

There are two ways to name products sold on the market. First, there is the *common* name for the product class, the common name by which you refer to all products that are of a certain type or class.

Second, there is a *brand* name, the brand of a particular company that makes a particular product in that class.

An example is the Chevrolet brand of automobiles. *Chevrolet* is a *brand* name of a particular automobile; *automobile* is the *common* name by which we refer to all brands that are in this class.

Please examine the products in these pictures. We have eliminated the *brand* names from these products. Please tell me the *common* name of the products shown in these pictures.

COMMON NAME._____

The findings of the study based on the responses to the above question and reported on page 6 of the report, are as follows:

"No one dominant name emerged in this survey for products in this category or group. Respondents scattered their comments across many names. As such, the conclusion can be drawn from this study that there is no clear generic name being used by the public to describe products in this category. The majority of respondents in this survey cited one of the following four names as the common name for this group of products:

| | |
|---|---|
| SOAP | (cited by 23%) |
| LIQUID SOAP | (cited by 23%) |
| HAND SOAP | (cited by 14%) |
| SOFT SOAP | (cited by 12%) |

All other common names cited by respondents were at or below a 4% level of mentions."

A follow-up question was asked of *only* those respondents who indicated one of the brand names as the common name for products in this group. (The interviewers were instructed to consult a list of the current brands to determine which of the respondents should be asked the follow-up question, but the list was not supposed to be shown to the interviewees.) This question, and the responses to it, are set forth below:

QUESTION

"2. Do any companies also use (ANSWER IN Q. 2 as their brand name?"

RESPONSES

"Two of the brand names, 'Yardley' and 'Soap Machine' received one mention each; further, the respondents citing these brand names cited that these were also brand names.

One of these brand names, 'Soft Soap' received 24 mentions (12% of total respondents); further, 17 of these respondents cited that 'Soft soap' is also a brand name while 7 of these people responded that 'Soft Soap' is not also a brand name." (Report, p. 6)

From the above data, the surveying firm concluded that "since 'SOFTSOAP' was only cited by 7 respondents (4% of the total sample) as a common name and *not* also a brand, this level of mention is clearly minimal, and demonstrates that the public is not, to any extent, using 'SOFTSOAP' as a common or generic name for products in the category." (Report, p. 7) Counsel for applicant carried this analysis one step further (brief, p. 8), arguing that since 4% is well below the usual "noise" factor of 10 — 15% in a survey of this type, the responses indicating "SOFTSOAP" as a common name and not also a brand can be ignored altogether. We do not agree.

[9] There are at least three defects in the follow-up question and the methodology employed concerning it which, in our opinion, totally destroy the credibility of the results of this part of the study as evidence in evaluating the issue before us. Firstly, the assumption on which the follow-up question was based conflicts materially with the assumption of the main question. There, the interviewers carefully explained the difference between the brand name and the common name, using the automobile/"CHEVROLET" as an example to illustrate in particular, i.e., that common names refer to all products of a certain type. Here, the interviewer's question assumes that a common name can also be a brand name. It is as if the first example had been altered by indicating that the term "automobile" can also be a brand name. The question also strongly implies that the respondent was mistaken in having indicated a brand name (in answer to Question 2) as a common name for the product category and that he or she is now being given an opportunity (tactfully) to correct this error. From this viewpoint, the question

was flagrantly leading, and especially so since no one being interviewed in a survey ever wants to appear to have given incorrect responses. Secondly, the assumption that a common or generic term can also be a brand name is clearly an erroneous statement of the law which must form the basis of our opinion in this appeal. Finally, the follow-up question should not have been asked only of those respondents who indicated brand names in their answers to the main question. This methodology eliminated any possibility of comparing the responses given as to "SOFTSOAP" with, for example, those given as to "liquid soap".[14] For these reasons, we do not consider that the tabulation of responses to the follow-up question furnishes any credible justification for reducing the 12% response of "SOFT-SOAP" as the common name of the category to 4%.

[10] In fact, the methodology employed in regard to the main question was also unsatisfactory as far as the issues involved in this appeal are concerned. The study appears to have been grounded on the assumption that there was only one common name for the category. Thus, interviewees were asked what was "*the* common name of the products shown" (emphasis added). From dictionary and encyclopedia references, the study might have proceeded from the more realistic assumption that more than one common name existed for the category; hence, more than one correct answer to the question could be expected to emerge. Such approach would also have been more relevant to the issue herein since, to be generic and, hence, not registrable as a trademark, a term need not be the *only* common term by which the product is known. Krey Packing Co. v. Williams Food Products, Inc., supra. However, the study appears to have been structured to determine what name was the most commonly used generic name. Respondents who answered with a correct response were not given an opportunity to indicate a second common name, or a third, etc., even though a large number of respondents who in-

dicated "soap" as the common name might, if given a second choice, have indicated "liquid soap", "hand soap" or "SOFTSOAP" as an alternative common name. Since "soap" is generic to all three of these other terms, it is reasonable to expect that such methodology would have raised the percentages of these other three categories of response. Such results would have been more germane to the question herein whether "SOFTSOAP" *is one of the* common names for the category of products. Even on the basis of the results of the methodology employed, we conclude that the 12% response for "SOFTSOAP" approximates the *minimum* number of persons who would consider that term as one of the common names for applicant's product.

[11] This brings us to the question what is the appropriate standard of review for determining whether a term is sufficiently generic to warrant refusing registration. In its brief, applicant directs our attention to Bayer Co. v. United Drug Co., 272 F. 505 (S.D. N.Y. 1921), E.I. du Pont de Nemours and Co. v. Yoshida International, Inc., supra; Coca-Cola Co. v. Koke Co. of America, 254 U.S. 143 (1920) and other cases in this line. The argument is that since in du Pont, 185 USPQ 597, 615, for example, "COKE" was regarded as the common name for its class by 24% of the respondents, and "TEFLON" was regarded as the common name by 31%, and since both of these marks are valid, the significantly lower 12% for "SOFTSOAP" should be significant support for sustaining its validity as a mark. The problem with the argument is that the applicable standard by which to determine whether a coined word for a commercial product has become generic through common usage is not the same as the test which is applicable here. See: Miller Brewing Co. v. Schlitz Brewing Co., supra.

[12] The reason for the different standard is apparent. In the cases involving the defense that the coined word has become generic in its use, i.e. the so-called "Aspirin and Cellophane" defense, the burden on the defendant is heavy and doubts are resolved in favor of the trademark owner because, after all, the mark was originally a creature of the owner's efforts. Here, whether or not applicant's president happened to know its generic meaning, in adopting "SOFT-SOAP", applicant, in fact, latched onto one of the common names for the product, thereby raising the question whether its competitors ought to be forced to limit themselves to the use of one of the other names. But *all* of the generic names for a

---

[14] In this respect, the survey differed markedly from the one reported in E.I. du Pont de Nemours and Co. v. Yoshida International, Inc., 185 USPQ 597 (E.D. N.Y. 1975) on which the survey herein was purportedly patterned. In the du Pont survey, respondents could choose between "Brand" or "Common" for *all* of the listed names, some of which were, in fact, common names, and others of which were brand names.

product belong in the public domain. See: In re Sun Oil Co., *supra* (Rich, Concurring), 165 USPQ 718, 719. Accordingly, the only justification for holding that the term is registrable to a single proprietor would be if the name had become practically obsolete as a common name. United Shoe Mach. Corp. v. Compo Shoe Mach. Corp., 12 USPQ 246 (CCPA 1932) ["COMPO", used previously for years to indicate a shoe the sole of which is glued to the upper, but had not been used to any extent for a number of years subsequent to its earlier popularity, nevertheless held not subject to being appropriated as a registered trademark.]; Charles Hansen's Laboratory, Inc. v. Samuel B. Kirk, *supra*; Ex parte Pocket Books, Inc., *supra*.] ["(B)efore it can be stated that a work which is a generic designation of an article can be considered as having acquired the status of a trademark of a single company for the same article * * * it must have become practically obsolete as a generic name for the article. * * *"]; S.S. Kresge Co. v. United Factory Outlet, Inc., *supra*. Compare, Ex parte Procter & Gamble, Co., 47 USPQ 218 (Comm'r. Pats. 1940) [Refusal to register "TEEL" for dentifrice due to its meaning as a name reversed because, although "as applied to an oil it (was), of course, descriptive, notwithstanding its obscurity, * * * as applied to a dentifrice * * * it is sufficiently arbitrary to constitute a valid trade mark."] Applying the above standard and based on applicant's own survey, it cannot certainly be said that "SOFT-SOAP" has lost substantially all of its significance as a common or apt name of applicant's goods.

**[13]** The above conclusion does not, of course, mean that applicant is wholly without protection from predatory unfair competition. There may well be protection against uses of the term which comprise unfair competition under common law principles or which violate the proscriptions of Section 43(a) of the Trademark Act. However, these considerations are not pertinent to the question which we have to decide. DeWalt, Inc. v. Magna Power Tool Corp., *supra*; Ex parte Pocket Books, *supra*. Thus, as the Trademark Attorney has pointed out, applicant's reliance on Miller Brewing Co. v. Falstaff Brewing Corp., 208 USPQ 919, (D.R.I. 1980), a §43(a) case involving "LITE" beer, is misplaced. As stated succinctly in Pocket Books, 91 USPQ 182, 185,

"There is no doubt that the courts will protect applicant against unfair competi-

tion and will prevent others from palming off their goods as those of the applicant, however, the scope of trademarks is not at all coextensive with the domain of unfair competition and it does not necessarily follow that applicant has a registrable trademark."

Of course, if the issue as to protectibility of a generic name of a product as the trademark of a single enterprise for that product, although framed in the language of §43(a) or in the rubric of State unfair competition law, is the same as it would be in a trademark proceeding, then the result will be the same. Thus, in an appeal of the Miller Brewing Rhode Island decision relied upon by applicant here (decided after the oral hearing of arguments on this appeal), the First Circuit Court of Appeals reversed the district court, holding that "[u]nder no circumstances is a generic term susceptible of de jure protection under §43(a) of the Lanham Act * * * or under the law of unfair competition." Miller Brewing Co. v. Falstaff Brewing Corp., 211 USPQ 665, 666-667 (1st Cir. 1981).

**[14]** In view of the above, we agree with the Trademark Attorney's conclusions that "SOFT SOAP" is one of the common descriptive names of the goods in respect of which applicant seeks registration, that this term is not registrable under Section 2(e)(1) of the Trademark Act, and that, being generic for the goods, it is so highly descriptive that no quantum of evidence of acquired distinctiveness is sufficient to qualify it for registration under Section 2(f).

The Trademark Attorney's reliance on the preamble of §2, read together with the definition of "trademark" in §45, is considered superfluous.[15] There are no references in any of the history of the Trademark Act of 1946 to the §2 preamble/§45 combination as constituting a separate ground for refusing registration, where the conclusion of fact on which the refusal is based is the subject of the application is a common or generic name of the goods. To the contrary, the hearings before Senator Pepper's committee on H.R. 82, the

---

[15] There is no question that, being a "word", "SOFTSOAP" is not by its form excluded subject matter. Nor is there any doubt that the nature of applicant's use of the term — as a brand name —, would qualify as trademark use. The problem, rather, is that the word, albeit used in the trademark sense, cannot be granted protection as a source indicator of any single enterprise to the exclusion of others.

bill which was enacted into law on July 5, 1946[16], and the conference report on the Senate's amendments to that bill[17], leave little doubt that the only appropriate statutory ground of refusal is §2(e)(1).[18]

### Decision

The refusal of registration is affirmed.

---

[16] Hearings on H.R. 82 Before Subcomm. of the Senate Comm. on 78th Cong., 2d Sess., 43-50, 98-113, 134-147 (1944).

[17] H.R. REP. No. 2322, 79th Cong., 2d Sess. (1946); Text of Statement of House Managers Regarding Conference Report on Lanham Trade-Mark Bill, 93 CONG. REC. 7525 (1946).

[18] During the Senate hearings, representatives of the Dept. of Justice belatedly entered an opposition to §2(f) because they feared that the Patent Office would, through error, register some generic terms under its provisions. Amendments were proposed to §§2(e) and 2(f) that would have excluded the registration of generic terms under any circumstances by express language. Amendments addressing the same concerns were also offered to §§14 and 33, especially as to the point that erroneous registration of a generic term should not grant a right to the registrant that could not later be challenged. While the latter amendments were eventually adopted in revised form, the Senate did not persist in the Justice sponsored proposals to amend §(2). From the discussions of this issue during the public hearings, two points appear clear: first, that no one considered the §(2) preamble, read with §45, to be a statutory ground for refusal of a generic term; and second, that the new language in §2(f) was not intended to alter the principle of Kellogg Co. v. National Biscuit Co., supra that generic terms are neither protectible as technical trademarks nor registrable under the "merely descriptive" test, even if they may have acquired a de facto secondary meaning. Although it is difficult to pinpoint any single part of the hearing record which demonstrates the latter principle, perhaps the most instructive, is the remark by Miss Robert (later, Asst. Comm'r Daphne Leeds), responding to the charge by Mr. Moyer, one of the Justice representatives, that the bill provides incentives for producers to promote marks into generic names, as follows:

"A generic name is not registrable under the Act under any possible interpretation of it. I think Mr. Moyer is referring to marks which were fanciful to begin with and have become generic. *.* *" Hearings on H.R. 82, supra, at 100.

The necessary implication from the debate and sequence of events is that the drafters intended the words "merely descriptive" to encompass generic terms just as they did in the Act of 1905, but that §2(f) would not be applicable to a term in the latter category.

## New York Supreme Court, Appellate Div., First Dept.

Brinkley v. Casablancas et al.

No. 10510

Decided May 14, 1981

### UNFAIR COMPETITION

**1. Miscellaneous cases (§68.65)**

Section 50 of New York Civil Rights Law provides penal sanction, while Section 51 provides cause of action for both injunctive relief and monetary redress when person's name, portrait, or picture is used within state for advertising purposes or for purpose of trade without his or her written consent.

**2. Miscellaneous cases (§68.65)**

Public figure retains independent right to have his personality, even if newsworthy, free from commercial exploitation at hands of another.

**3. Miscellaneous cases (§68.65)**

Written consent is required under New York Civil Rights Law Section 50 and 51 before person's name or photograph may be used for trade or advertising; oral consent is not defense and is relevant only on question of damages; neither oral consent nor estoppel is complete defense; they are available only as partial defenses in mitigation of damages; plaintiff's previous written consent to use of other photographs of herself does not constitute implied authorization for use of different photograph; that plaintiff may have voluntarily on occasion surrendered her privacy, for price or gratuitously, does not forever forfeit for anyone's commercial profit so much of her privacy as she has not relinquished.

**4. Miscellaneous cases (§68.65)**

Four kinds of interest protected under umbrella of right of privacy are intrusion upon plaintiff's physical solitude, public disclosure of private facts, false light in public eye, and appropriation of plaintiff's name or likeness for defendant's benefit; fourth is obviously so-called right of publicity.

**5. Miscellaneous cases (§68.65)**

So-called right of publicity is subsumed in Sections 50 and 51 of New York Civil Rights Law to extent that even public figure has privacy interest that finds recognition in statute and for violation of which remedy of monetary redress is provided.

THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Oral Hearing:                          Mailed:
August 19, 2010                        November 30, 2010

## UNITED STATES PATENT AND TRADEMARK OFFICE

————

## Trademark Trial and Appeal Board

————

In re Trek 2000 International Ltd.

————

Serial No. 77099785

————

Julieta L. Lerner, Christopher J. Glancy, Jennifer L. Co
and Thomas C. Flynn, of White & Case LLP for Trek 2000
International Ltd.

Karen P. Severson, Trademark Examining Attorney, Law Office
117 (Brett Golden, Managing Attorney).

————

Before Bucher, Kuhlke and Cataldo, Administrative Trademark
Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Trek 2000 International Ltd. (applicant), on February
5, 2007, filed an application to register THUMBDRIVE in
standard characters for goods identified as "portable
digital electronic devices for recording, organizing,
transferring, storing, and reviewing text, data, image,
audio and video files; computer software for use in
recording, organizing, transferring, storing, and reviewing
text, data, image, audio and video files on portable

Ser No. 77099785

digital electronic devices" in International Class 9.  The
application was filed under Trademark Act Section 1(a), 15
U.S.C. § 1051(a), based on acquired distinctiveness under
Section 2(f), 15 U.S.C. § 1052(f).  In addition, applicant
claimed ownership of Supplemental Register Registration No.
3175651, issued on November 21, 2006, for the mark
THUMBDRIVE for various computer-related goods, including
"computer hardware and peripherals, computer chips and
apparatus used for the acquisition, recording, processing,
transmission, storage or output of sound, images, or data,
or combination thereof ... drives, namely hard drives,
computer disk drives, digital disc drives ... used for the
acquisition, recording, processing, transmission, storage
or output of sound, images, or data, or combination
thereof; discs, namely hard discs, disc memories in the
nature of flash memory, and blank computer discs used for
the acquisition, recording, processing, transmission
storage or output of sound, images, or data, or combination
thereof."

    The examining attorney initially refused registration
under Section 2(e)(1) of the Trademark Act, 15 U.S.C. §
1052, on the ground that applicant's mark is merely
descriptive and its declaration of acquired distinctiveness
was not sufficient to establish acquired distinctiveness

Ser No. 77099785

under Section 2(f).  Applicant responded with additional
evidence of acquired distinctiveness, whereupon the
examining attorney accepted that evidence and approved the
application for publication.  The application was published
for opposition on March 18, 2008.  After the thirty day
publication period passed without drawing an opposition,
the examining attorney, on May 1, 2008, requested
jurisdiction be restored.  On May 14, 2008, the request was
granted and on July 3, 2008, the examining attorney then
refused registration under Section 2(e)(1), on the ground
that applicant's proposed mark is generic and, as such,
unregistrable.  Applicant filed a petition with the
Commissioner for Trademarks challenging the restoration of
jurisdiction.  Pending disposition of the petition,
applicant responded to the refusal.  On January 27, 2009,
the petition was denied, and on February 27, 2009, the
examining attorney issued a final refusal.  Applicant filed
an appeal and a request for reconsideration.  On September
18, 2009, the examining attorney denied the request for
reconsideration and the appeal was resumed.

     As a preliminary matter, regarding applicant's
argument that "it was procedurally improper to restore
jurisdiction to the examining attorney [because n]o showing
has been made that a 'clear error was made in approving the

3

Ser No. 77099785

mark for publication'" (Br. p. 13), it is well established
that "questions involving the applicability of the 'clear
error' standard are the subject matter of a petition to the
Director, and are not proper for consideration by way of an
appeal to the Board."  In re Jump Designs, LLC, 80 USPQ2d
1370, 1373 (TTAB 2006).  As stated in In re Sambado & Son
Inc., 45 USPQ2d 1312, 1314-15 (TTAB 1997):

> [T]he question of whether the clear error
> standard was properly applied is a procedural one
> arising out of examination practice.  The
> Examination Organization makes the determination
> of "clear error," which determination ultimately
> is properly reviewable on petition to the
> Commissioner.  The Board's determination on
> appeal is to be limited to the correctness of the
> underlying substantive refusal to register.  The
> Board will not second guess the Examining
> Organization's procedural determination, that is,
> the latter's application of the "clear error"
> standard.  As noted, the application of the
> "clear error" standard is, in this context, a
> procedural decision (one that answers the
> question, "Should a new refusal be made and
> defended by the Examining Attorney?").

See also Trademark Rules 2.63 and 2.146, 37 C.F.R. §§ 2.63,
2.146.

Thus, the Board will not consider the merits of
applicant's argument that the refusal is procedurally
improper.  Jump Designs, 80 USPQ2d at 1373.

In its brief, applicant states that the examining
attorney "has refused registration on the ground that the
applied for mark is generic for Applicant's goods [and

Ser No. 77099785

a]pplicant requests the Trademark Trial and Appeal Board reverse this decision and allow THUMBDRIVE to be registered on the Principal Register." Br. p. 1. The examining attorney, in her brief, while maintaining the genericness refusal, explicitly states that "in the event that an appellate tribunal reverses the finding of genericness, applicant's claim of acquired distinctiveness and the evidence in support thereof is considered sufficient to support registration on the Principal Register under Trademark Act §2(f)." Br. p. 2. Thus, the only issue to be decided is whether THUMBDRIVE is generic for the listed goods.

Whether a particular term is generic, and therefore cannot be a trademark or service mark, is a question of fact. In re Hotels.com LP, 573 F.3d 1300, 91 USPQ2d 1532, 1533 (Fed. Cir. 2009). When a proposed mark is refused registration as generic, the examining attorney has the burden of proving genericness by "clear evidence" thereof. Id. See also In re Merrill Lynch, Pierce, Fenner & Smith, Inc., 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); and In re Gould Paper Corp., 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987).

The critical issue is to determine whether the record shows that members of the relevant public primarily use or

Ser No. 77099785

understand the term sought to be registered to refer to the
category or class of goods or services in question.  H.
Marvin Ginn Corp. v. International Ass'n of Fire Chiefs,
Inc., 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986);
In re Women's Publishing Co. Inc., 23 USPQ2d 1876, 1877
(TTAB 1992).  Making this determination "involves a two-
step inquiry:  First, what is the genus of goods or
services at issue?  Second, is the term sought to be
registered ... understood by the relevant public primarily
to refer to that genus of goods or services?"  Ginn, 228
USPQ at 530.  Evidence of the public's understanding of a
term may be obtained from any competent source, including
testimony, surveys, dictionaries, trade journals,
newspapers and other publications.  See Merrill Lynch, 4
USPQ2d at 1143, and In re Northland Aluminum Products,
Inc., 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985).

In making this determination, we cannot lose sight of
the primary purpose behind this policy, which is to prevent
competitive harm.  As stated in Merrill Lynch, 4 USPQ2d at
1142 (citations omitted):

> Generic terms, by definition incapable of
> indicating source, are the antithesis of
> trademarks, and can never attain trademark
> status.  The reason is plain:  To allow trademark
> protection for generic terms, i.e., names which
> describe the genus of goods being sold, even when
> these have become identified with a first user,

Ser No. 77099785

would grant the owner of the mark a monopoly,
since a competitor could not describe his goods
as what they are.

As noted by the Court of Appeals for the Seventh

Circuit:

To determine that a trademark is generic and thus
pitch it into the public domain is a fateful
step.  It penalizes the trademark's owner for his
success in making the trademark a household name
and forces him to scramble to find a new
trademark.  And it may confuse consumers who
continue to associate the trademark with the
owner's brand when they encounter what they
thought a brand name on another seller's brand.
... The fateful step ordinarily is not taken
until the trademark has gone so far toward
becoming the exclusive descriptor of the product
that sellers of competing brands cannot compete
effectively without using the name to designate
the product they are selling.

Ty Inc. v. Softbelly's Inc., 353 F.3d 528, 69 USPQ2d 1213,

1215 (7th Cir. 2003).  See also In re Bayer

Aktiengesellschaft, 488 F.3d 960, 82 USPQ2d 1828, 1837-38

(Fed. Cir. 2007) Judge Newman dissenting (citations

omitted) ("Commercial policy and international treaty

obligations do not favor depriving trademark owners of

valuable commercial rights ... public and private interests

are served by recognition of trademark rights, not their

gratuitous eradication. ... To deny the statutory federal

registration, there must be clear and convincing evidence

of the invalidity of that property right and a sound public

interest served by its forfeiture.")

7

Ser No. 77099785

The protection of the public interest includes
ensuring that sellers who must use a particular term to
compete effectively can do so.  It is well established that
the availability of other words for competitors to use does
not, by itself, transform a generic term into capable
matter.  Blinded Veterans Ass'n v. Blinded American
Veterans Foundation, 872 F.2d 1035, 10 USPQ2d 1432, 1437
(D.C. Cir. 1989) ("A term need not be the sole designation
of an article in order to be generic..."). However, where
the evidence of record does not show that competitors use
the designation in issue, this may create doubt, depending
on the totality of the record, as to whether a term
primarily refers to a genus of goods such that "sellers of
competing brands cannot compete effectively without using
the name to designate the product they are selling."  Ty
Inc., 69 USPQ2d at 1215.

In support of her position that the relevant consuming
public understands THUMBDRIVE to refer to the genus of
goods, the examining attorney highlights several examples
from the record, including the following:

> Web page printout from www.google.com defining
> THUMB DRIVE as "one of many terms used in popular
> language for USB flash drive";
>
> Web page printout from www.allbusiness.com
> defining "USB flash drive" as "a small, keychain-
> sized flash memory device with a USB interface

Ser No. 77099785

(Figure 287), treated by the computer as if it were a disk drive; also called a thumb drive. USB flash drives...";

An excerpt from credoreference.com taken from "High Definition: A-Z Guide to Personal Technology" defining "flash drive" as "A portable data storage device that is small enough to fit in a pocket and can be connected to the USB port of a computer or other device. Flash drives use flash memory chips for storage. Also called flash disk, key drive, thumb drive, USB flash drive, USB key.";

Web page printout from www.pexagontech.com, an online retailer, with the following display,



;

Web page printout from www.inveo.org "Do you have old thumb drives (otherwise known as USB Memory Sticks) at your office or home that you don't use anymore? We're collecting these drives to share with the organizations we work with.";

An article appearing on www.thinkgeek.com displaying a picture of a flash drive that is not from applicant with the following text "This Thumb Drive will self-destruct in 10 seconds... Thumb drives are a convenient and cool way to carry around your data, and with drive sizes in the gigabytes...";

An article appearing on lifehacker.com with the following text "Stay Productive on Your Thumb Drive with Tiny USB Office ... if your thumb drive is already scrimping for space, and you just want a few super-lightweight apps that can handle most general office tasks..." and posted comments, including "...could you please address

9

Ser No. 77099785

the safety/security issues behind carrying around your whole digital life on a thumb drive? ... I generally use a combination of my USB thumb drive and Jungle Disk. I can easily back up any local data files to JungleDisk, which runs on Windows, Mac, and Linux, and supports encryption.";

Commentary from ask-leo.com titled "Can a USB thumbdrive 'wear out'?" which includes "Flash memory, the type of memory used in USB thumb drives and other devices, is very, very cool. ... Now, in your case, you're using USB thumbdrive in perhaps the worst possible way for longevity. ... The best use of USB thumb drives and other flash memory based devices is simply copy-to and copy-from.";

Commentary from tech-yahoo.com titled "Create a Thumbdrive Loaded with Portable Apps in One Easy Step" "... I just opened a drawer in my office to find, literally, a dozen USB thumbdrives just collecting dust.";

An online article from the National Institutes of Health which includes the statement "To minimize the risk of data loss in the event your laptop is stolen, use an encrypted thumb drive to back up sensitive data and keep it separate from your laptop.";

Articles from the "New York Times" Article dated April 24, 2008 ("A Four-Gigabyte Thumb Drive With Two Safety Nets"), "The Houston Chronicle" dated August 22, 2007 ("But consider this list taken from a back to the U cheat sheet on the web: personal audio player, noise-canceling earphones, USB thumbdrive...,"), "St. Louis Post-Dispatch", dated March 7, 2008 ("Heck, you can now buy USB thumbdrives that are as big as 32 GB."), "The Washington Post" dated April 6, 2009 ("To exchange contact information with a new acquaintance, they pointed the sticks, which resembled large thumb drives toward each other and clicked a small button.), and "The Biloxi Sun Herald" ("Thumbdrives are cheap, plentiful"); and

Ser No. 77099785

An excerpt from a transcript for the National
Public Radio Show "Talk of the Nation:  Science
Friday" aired on September 11, 2009, which
includes the following statement by the host Ira
Flatow, "Okay can you picture a day when you'll
carry a little thumb drive around with you."

The examining attorney contends the "evidence of
record is competent and diverse and adequately shows the
relevant consumers' understanding of the term THUMBDRIVE as
identifying a genus of goods such as those identified in
the instant application, thereby supporting the finding
that THUMBDRIVE is generic for the identified goods."  Br.
p. 10.   In regard to applicant's prior registration on the
Supplemental Register, she argues that "[s]ince examination
of that application, the evidence of record shows that the
term THUMBDRIVE has become generic."  Br. p. 12.  Further,
citing In re Sun Microsystems, Inc., 59 USPQ2d 1084, 1088
(TTAB 2001) (AGENTBEANS merely descriptive for specific
computer software where individual terms are merely
descriptive and combined remain merely descriptive) and In
re Styleclick.com Inc., 57 USPQ2d 1445, 1448 (TTAB 2000) (E
FASHION merely descriptive of Internet retailing services
and computer software used in connection therewith), she
notes that "[v]ocabulary used in the computer and
electronics fields is particularly noted for changing
rapidly, and descriptiveness is determined based on the

Ser No. 77099785

facts and evidence in the record at the time registration
is sought." Br. p. 12. She further notes that "[a] term
that was once arbitrary or suggestive may lose its
distinguishing and origin-denoting characteristics through
use in a descriptive sense over a period of time, and can
thus come to be regarded by the purchasing public as
nothing more than a descriptive designation." Id.

In traversing the refusal, applicant argues that the
examining attorney has not met her evidentiary burden and
that, at a minimum, the prosecution history of this
application and the prior Supplemental Register
Registration, and the evidence of record demonstrate doubt
as to whether the mark is generic. In particular,
applicant stresses that it relied on the prior
determination that led to its registration on the
Supplemental Register and since "November 21, 2006, when
THUMBDRIVE was placed on the Supplemental Register,
Applicant has continued to strengthen and protect its
mark." Br. p. 7.

In support of its position, applicant submitted the
Declaration of Gurcharan Singh, applicant's Chief Financial
Officer and Executive Director, with accompanying exhibits,
showing U.S. sales under the THUMBDRIVE brand name, uses of

12

Ser No. 77099785

THUMBDRIVE on the Internet by applicant and third parties,
and applicant's use on products and packaging.

Through the declaration of Mr. Singh, applicant
provides some background as to origin of its asserted mark
THUMBDRIVE.   In 2000, applicant coined the term THUMBDRIVE
and has continuously used it as a brand name since that
time.   Singh Dec. ¶ 2.   Applicant has been designing,
manufacturing and selling portable storage devices under
the brand name THUMBDRIVE since 2000.   Id.   Between 2002
and 2007 its U.S. sales have totaled over $4.3 million.
Singh Dec. ¶ 6.   It advertises its products under the mark
THUMBDRIVE in print media and the Internet and has also
promoted its products under the brand THUMBDRIVE at
industry trade shows in the United States.   Singh Dec. ¶¶
4-5.   Applicant authorizes other companies to co-brand and
sell USB storage devices bearing the THUMBDRIVE trademark
in the United States, including Memorex, Creative
Technology Ltd., Imation, Iomega and TEAC.   Singh Dec. ¶ 9.
Further, applicant "now designs, manufactures and sells a
family of THUMBDRIVE branded products, including THUMBDRIVE
Touch, THUMBDRIVE Swipe and THUMBDRIVE Tuner portable USB
storage devices."   Br. p. 2; Singh Dec. ¶ 3.

Applicant's specimens of use show the manner of
applicant's use:

13

Ser No. 77099785





        Applicant's examples of media usage of THUMBDRIVE as a

brand name are set forth below:

        USB flash memory hard drives like the ThumbDrive
        range from TREK (www.bytezone.com);

        Memorex USB ThumbDrive 64MB USB flash memory
        devices strike a chord with the uninitiated.  ...
        Most of the desktops and notebooks sold in the
        past few years have USB ports, and most desktop
        OSes in use support flash devices.  The problem

Ser No. 77099785

is when a device inexplicably reads and writes as
slowly as a floppy, which happened to me with the
Memorex USB ThumbDrive 64MB.  Memorex's
ThumbDrive is essentially the Trek ThumbDrive
Smart. ... (www.computerpoweruser.com); and

Product:  Thumbdrive SMART 16MB USB Drive ...
Supplied By:  Trek USA ... MODTHEBOX would like
to thank Lauren & Jyh Shyong from Trek USA for
sending the Thumbdrive SMART for review ...
World's smallest portable storage drive ... The
Thumbdrive SMART is a solid state disk with a USB
interface for PC or Mac compatibility.
(www.modthebox.com).

In rebuttal to the examining attorney's evidence of

what may be characterized as online references (google.com,

allbusiness.com and credoreference.com), applicant

submitted an excerpt from Wikipedia for the entry "USB

Flash Drive" that includes the following:

History  First Commercial Product  Trek
Technology and IBM began selling the first USB
flash drives commercially in 2000.  Singaporean
company Trek Technology sold a model dubbed the
"ThumbDrive," and IBM marketed the first such
drives in North America, with its product the
"DiskOnKey" ... Recently, "USB flash drive" or
simply, "UFD" has emerged as the de facto
standard term for these devices, although
potentially confusing alternatives (such as
memory stick) are still prevalent.  The myriad
different brand names and terminology used, in
the past and currently, make UFDs more difficult
for manufacturers to market and for consumers to
research.  Some commonly used names are actually
trademarks of particular companies, such as
Cruzer, TravelDrive, ThumbDrive, and Disgo.

www.wikipedia.org

Ser No. 77099785

     In addition, applicant submitted search results from Merriam-Webster Online and Bartleby.com showing no listings for THUMBDRIVE.

     Applicant also submitted pages from competitors' websites where the term "flash drive" is used as the generic designation of the goods.  Two examples are set forth below:



ironkey.com.

Ser No. 77099785

Featured Products



SanDisk Ultra® Backup
USB Flash Drive
The SanDisk Ultra® Backup
USB Flash Drive will help to
protect digital valuables
quickly—at the touch of a
button. With 64GB* you can
back up 19,200 photos or
128 hours of video**.

sandisk.com.

Finally, the record also includes examples of applicant policing its asserted trademark.  For example, applicant submitted copies of its letters to and responses from various media outlets, including "PC Magazine" and "The New York Times," whereby they agreed not to use THUMBDRIVE in a generic manner.

We begin by finding that the genus of goods at issue in this case is adequately defined by applicant's identification of goods, namely, "portable digital electronic devices for recording, organizing, transferring, storing, and reviewing text, data, image, audio and video files; computer software for use in recording, organizing, transferring, storing, and reviewing text, data, image audio and video files on portable digital electronic devices."  Magic Wand Inc. v. RDB Inc., 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of

17

Ser No. 77099785

registration.") More specifically, the genus includes portable digital storage devices and software used in connection therewith.

Turning to the second inquiry, the public's understanding of the term, the relevant public consists of the ordinary consumer interested in purchasing flash drives or portable digital storage devices.

As noted above, the evidentiary burden of establishing that a term is generic rests with the United States Patent and Trademark Office (USPTO) and the showing must be based on clear evidence. Merrill Lynch, 4 USPQ2d at 1143.

While the record shows use of the term THUMBDRIVE or THUMB DRIVE to refer to a genus of goods, the record also shows the origin of the term as a trademark and extensive use of the term as a trademark. As stated by Mr. Singh, and not rebutted by the record, applicant created this term and used it as a brand name in connection with a new product on the market. Moreover, from the outset, applicant used other terminology as the name of the goods, e.g., "external storage device." This record also shows that "flash drive" is the commonly used term of art for these portable digital storage devices. We further note that several of the media references presented by the examining attorney involve publications that have agreed to

18

Ser No. 77099785

stop using THUMBDRIVE in a generic manner. The examining attorney counters that the proffered examples of media outlet agreements not to misuse the term only pertain to uses brought up by the examining attorneys during prosecution of applicant's applications (both this application and the underlying application of the Supplemental Registration). However, this does not detract from the evidence; rather, it supports applicant's position in that certain of the media outlets present in the examining attorney's evidence have agreed to cease misuse of the term. See In re America Online Inc., 77 USPQ2d 1618 (TTAB 2006). With regard to dictionary definitions, the record shows that the more mainstream reference works (e.g., Merriam-Webster Online, copyright 2007) do not have a listing for THUMBDRIVE. Moreover, two out of the three listings from the examining attorney's evidence, allbusiness.com and credoreference.com, are definitions for another term, "flash drive," where "thumb drive" is merely listed as a synonym, and we view this as weak evidence of genericness.

Finally, while the record includes a few examples of online retailers using the term THUMBDRIVE or THUMB DRIVE in a generic manner, it is quite noticeable that there are no examples of competitors using this term, and applicant

19

Ser No. 77099785

submitted excerpts from competitors' websites showing the absence of that term and the use of "flash drive" as the name of the goods.  In other words, the evidence does not "demonstrate a competitive need for others to use" this term.[1]  Hotels.com, 91 USPQ2d at 1536.

As noted in America Online, the Federal Circuit has addressed a similar case where there was a mixed record on the question of genericness.  America Online, at 77 USPQ2d at 1623, citing Merrill Lynch, 4 USPQ2d at 1143.  Similarly, here we find that "the evidence of generic use is offset by applicant's evidence that shows not only a significant amount of proper trademark use but also trademark recognition" by third parties.  Id.  Thus, we cannot conclude that "members of the relevant public primarily use or understand the term sought to be protected to refer to the genus" of the goods.  At a minimum, the record creates doubt and we are constrained to resolve that doubt in favor of applicant.

We reiterate that the ultimate purpose behind the prohibition of registration of generic terms springs from a statute that regulates commerce - not the English language.  By this decision, we are not undermining the well-

---

[1] We note that during the opposition period no opposition was filed.

established principle that the availability of other words for competitors to use does not, by itself, transform a generic term into registrable matter, but the complete absence of competitor use after ten years of these products being on the market tends to indicate that THUMBDRIVE has not fully entered the public domain. Today, with a 24-hour news cycle and 24/7 online global activity, undoubtedly many trademarks are misused repeatedly, perhaps, in part, because there is less time for editing and reflection before news reports or blog posts are released, and, in part, because what was the casual spoken word between people is now the written word posted to the world.

The examining attorney argues that the fact that some companies correctly use the term THUMBDRIVE as referencing applicant's goods "does not negate the evidence of record that shows wide and varied use of the term THUMBDRIVE (and/or THUMB DRIVE) in a generic sense such that the relevant consumers perceive the primary significance of the term as generic for external digital storage devices." Br. p. 13. In support of this position, she quotes the following passage in the McCarthy treatise:

> For example, if a survey showed that 75% of the public regarded the word as generic, then that is its "principal significance." Even if the seller educates a few customers to use the generic term as a mark, it is still principally generic.

21

McCarthy, 12:6.

Notably, that passage continues as follows:

> If a majority of buyers regard the term as a
> generic name, courts can still give limited
> recognition to any residuary trademark
> significance in the term.  Thus, even "minority"
> usage can be accommodated in a carefully worded
> decree.  If, on the other hand, 75 percent of the
> public regards the term as an indication of a
> single commercial source for certain goods or
> services, then that term should be protected as a
> trademark or service mark.

Id.

This passage is referencing decisions arising out of

infringement cases.  For example, after upholding the

finding that THERMOS had become synonymous for vacuum

bottle, the court in King-Seely Thermos Co. v. Aladdin

Indus., Inc., 321 F.2d 577, 138 USPQ 349, 352-353 (2d Cir.

1963) stated the following:

> The court below, mindful of the fact that some
> members of the public and a substantial portion
> of the trade still recognize and use the word
> "thermos" as a trademark, framed an eminently
> fair decree designed to afford King-Seeley as
> much future protection as was possible.  The
> decree provides that defendant must invariably
> precede the use of the word "thermos" by the
> possessive of the name "Aladdin"; that the
> defendant must confine its use of "thermos" to
> the lower-case "t"; and that it may never use the
> words "original" or "genuine" in describing its
> product.  In addition, plaintiff is entitled to
> retain the exclusive right to all of its present
> forms of the trademark "Thermos" without change.
> These conditions provide a sound and proper
> balancing of the competitive disadvantage to
> defendants arising out of plaintiff's exclusive

Ser No. 77099785

use of the word "thermos" and the risk that those
who recognize "Thermos" as a trademark will be
deceived. ...  The use by defendant of the now
generic word "thermos" was substantially
curtailed.  Plaintiff's trademark "thermos" was
protected in every style of printing except the
lower case "thermos" and then the use of the word
must be preceded by the possessive of defendant's
name "Aladdin" or the possessive of "Aladdin"
plus one of defendant's brand names."

We do not have the option of crafting a decree to

protect trademark significance while allowing other generic

uses.  Before this Board, the decision to allow

registration is an "all or nothing" determination.  In

circumstances where a coined term used as a trademark is

quickly taken up by the public but not by competitors and

the stakes are "the fateful step" of full "eradication" of

an applicant's "commercial rights," the evidentiary burden

is heavy indeed.  While evidence of competitor use is not

required to satisfy this burden, where the record

demonstrates both trademark and generic uses, evidence of

the lack of competitor use, at a minimum, may create doubt

sufficient to tip the balance in favor of registration.

Such circumstances are distinguished from cases where

a term was in the public domain at the time of adoption by

an applicant (see, e.g., In re Ex Parte Pocket Books, Inc.,

91 USPQ 182, 185 (Chief Examiner 1951) (POCKET BOOK used in

a generic manner since 1617 thus "it is not believed that

Ser No. 77099785

usage, advertising and repetition alone and even the
acquiescence of the professional trade group, is sufficient
to remove the name of an article from the category of a
generic word of the English language to that of a trade
mark for the article")) or cases where the term in question
is simply a combination of generic terms (see, e.g., In re
Gould Paper Corp., 834 F.2d 1017, 5 USPQ2d 1110 (Fed. Cir.
1987), (SCREENWIPE, the combination of the generic terms
SCREEN and WIPE, generic for television and computer screen
cleaning wipes).

    In view of the above, the USPTO has not met its burden
to establish by clear evidence that THUMBDRIVE is generic
for the identified goods.  Further, because the examining
attorney found that if the term is not generic the evidence
shows it has acquired distinctiveness, it is registrable
under Section 2(f).

    **Decision:**  The refusal to register is reversed
and the mark in the application will proceed to
registration.[2]

_____

[2] As noted above, the application has already completed the
publication process.

24

eon recess, the following testimony was given on cross-examination, at 83-84:

Q. Now, let me ask you a more specific question, but it is a more specific question being a little bit more down to reality.

You are Bank One, at least you have been for the past year or so, two years, and a bank comes right over there — What is that building right over here?

A. Newspaper.

Q. That tall building? That is a bank?

A. That is a bank, right.

Q. It comes in there. What is the address on that?

A. 180 East Broad — 155 East Broad.

Q. Out in front they put a sign "The One," "The" being smaller than the word "ONE." They put a sign way up on top of the building so it is visible for miles. It flashes on and off, and it says "The One."

I want you to tell me honestly, because you are under oath here, and I remind you of that, whether that would cause you any concern in terms of your trademark?

A. Well, it is a rather esoteric question, first, because they wouldn't do it because of the close proximity of it, one to the other building.

Q. I am telling you it happened. I want your honest opinion as to what your reaction to that would be from a trademark sense.

A. From a trademark sense or from a personal sense? From a legal sense, I can't answer your question.

Q. I am not asking for a legal sense. You are an experienced person in marketing.

A. From personal experience, it would be upsetting, certainly.

Q. Why? Why would it upset you?

A. Because it would be basically a future cause of potential confusion.[5]

Applicant has argued that bank customers are accustomed to the traditional similarity of bank names and have developed the ability to distinguish names and marks which have but minor overall differences. We note that most of these names in the record include geographical and descriptive terms, traditionally used in the titles of financial institutions.

Except for the word "BANK" in applicant's mark, the marks before us contain no such infirmity. In any event, what opposer's counsel argued on this point in his reply brief, 13-14, seems to us persuasive.

[W]hatever may have been the situation traditionally in banking has little bearing on the situation as it exists today. Banking has changed drastically in recent years and will continue to change in the future. In view of these changes, name recognition and identity are key. Applicant itself has candidly conceded as much * * * Except for the smallest of banks, traditional notions of bank markets being limited to counties or contiguous counties are no longer valid. While in the past, banks could co-exist with substantially similar names and service marks in the same locale, often within the same county or city, it is generally recognized that, for all but the smallest of banks, such situations are no longer tolerable if one expects to grow and to be competitive. Clearly, Applicant is neither a small nor traditional bank. Its aspirations are national, if not international in character. To the extent that it has not happened already, the time has come that banking service marks be treated on an equal footing with trademarks involved in other, truly national, highly competitive, consumer oriented business.

**Decision**

[8] The opposition is sustained and registration to applicant is refused.

---

**Patent and Trademark Office
Trademark Trial and Appeal Board**

Visa International Service Association
v. Life-Code Systems, Inc.

Decided Dec. 6, 1983

**TRADEMARKS**

**1. Pleading and practice in Patent Office — In general (§67.671)**

Purpose of motion for summary judgment is to persuade trier of fact that there is no genuine issue of material fact and that moving

---

[5] After the recess, the witness stated that his response to the hypothetical question on cross-examination was premised on his understanding that the new bank's name included the numeral 1 rather than the word "ONE." It is difficult to understand why the witness believed there would be "future cause of potential confusion" if the new mark were "THE 1," but there would be no likelihood of confusion with applicant's mark BANK ONE if the mark were "THE ONE." See Russell dep., 109-110.

party is entitled to judgment as matter of law; nonmoving party is not required to adduce evidence sufficient to prove its case in order to prevail on motion for summary judgment; nonmoving party need only submit evidence sufficient to show that there is genuine issue as to material fact and that there is therefore need for trial; affidavit evidence is certainly sufficient for this purpose.

## 2. Pleading and practice in Patent Office — In general (§67.671)

Applicant whose request for additional discovery is based upon its asserted desire to take "discovery" deposition of its own president is confusing discovery depositions with testimony depositions, and such request is in reality request that case be allowed to go to trial.

## 3. Applications to register — Amendments (§67.133)

Amendments may not be made if nature of mark is changed thereby; modified mark must contain what is essence of original mark, and new form must create impression of being essentially same mark; general test of whether alteration is material is whether mark would have to be republished after alteration in order to fairly present mark for purposes of opposition; if one mark is sufficiently different from another mark as to require republication, it would be tantamount to new mark appropriate for new application.

## 4. Acquisition of marks — Character and extent of use — In general (§67.0731)

Fact that initial sale may have been made primarily for purposes of federal registration is immaterial, so long as initial sale was bona fide commercial transaction followed by activity that amounted to continuing effort or intent to continue such use and place product or services in market on commercial scale.

## 5. Opposition — Pleading and practice (§67.589)

TTAB has power to enter proper judgment when it finds that while moving party is not entitled to partial summary judgment, nonmoving party is so entitled, even though cross-motion for such was not made; FedRCivP 54(c) gives TTAB power to enter final judgment to which prevailing party is entitled, even if party has not demanded such relief.

---

Trademark opposition No. 65,453, by Visa International Service Association, against Life-Code Systems, Inc., application, Serial No. 255,941, filed Mar. 31. 1980. On opposer's motion for summary judgment. Partial summary judgment granted to applicant sua sponte.

Limbach, Limbach & Sutton, San Francisco, Calif., for Visa International Service Association.

Cohen, England, Whitfield & Osborne, Oxnard, Calif., for Life-Code Systems, Inc.

Before Rice, Simms, and Sams, Members.

An application has been filed by Life-Code Systems, Inc. to register the mark OMNI-VISA and design for procuring medical data and promoting use and carrying of cards containing medical data on microfilm and the maintaining of record files indicating medical history and disabilities of cardholders.[1]

Registration was opposed by Visa International Service Association on the grounds that applicant's mark so resembles opposer's previously registered mark VISA for a variety of banking and financial services as to be likely, when applied to applicant's services, to cause confusion, to cause mistake or to deceive.

Opposer, on April 27, 1983, filed a motion for summary judgment. In support of its motion, opposer argued that the design mark sought to be registered was abandoned in 1981 and that there had never been use of the mark in commerce as defined by Section 45 of the Trademark Act. In its brief in opposition to opposer's motion for summary judgment, applicant objected that the issues of nonuse and abandonment had not been pleaded in the notice of opposition. The Board denied opposer's motion for summary judgment but permitted opposer time to file a motion to amend its pleading to allege abandonment and nonuse. The Board ordered that proceedings remain otherwise suspended. Opposer, on June 29, 1983, filed (i) a motion to amend, (ii) a memorandum in support of the motion and (iii) an amended opposition opposing the registration of applicant's mark on the grounds of likelihood of confusion, abandonment, nonuse and fraud. Applicant, on July 15, 1983, filed a motion for an extension of its discovery period and for reinstatement of proceedings. Applicant argued that, if the Board granted opposer's motion to amend the opposition and if opposer renewed its motion for summary judgment, "equity and law [would]

---

[1] Application Serial No. 255,941, filed March 31, 1980.

Case 8:11-cv-01309-DOC-AN   Document 41   Filed 03/05/12   Page 84 of 87   Page ID #:540

require that applicant be accorded an opportunity" for meaningful discovery on the issues of abandonment, nonuse, and fraud. The Board, in an order dated September 9, 1983, set a date for answer to the amended notice and stated that it was "* * * unclear about applicant's argument that it has had no meaningful opportunity for discovery on the issues of abandonment, nonuse, fraud and unclean hands since said information is solely within applicant's knowledge." Applicant was permitted time in which to explain its need to take discovery on the above-mentioned issues. In response to the Board's order dated September 9, 1983, applicant filed a supplemental memorandum in support of its motion. It also filed an answer to the amended notice. Opposer then renewed its motion for summary judgment.

Applicant argues that it will be at a severe disadvantage if it is denied the opportunity to take discovery before the motion for summary judgment is decided. Applicant maintains that, since the original notice of opposition was based solely on the ground of likelihood of confusion, applicant had no notice that opposer intended to raise issues of fraud, nonuse and abandonment. Applicant argues that it would be put at a disadvantage if opposer is permitted to rely on discovery depositions in support of its motion for summary judgment, while applicant would be forced to rely on affidavits which, according to applicant, have "decidedly lesser impact." Discovery is needed, alleges applicant, so it can take the deposition of its own president. Applicant also claims to need discovery on the issue of likelihood of confusion.

**[1]** Applicant has misconceived the purpose and nature of a motion for summary judgment. The purpose of such a motion is to persuade the trier of fact that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The nonmoving party is not required to adduce evidence sufficient to prove its case in order to prevail on a motion for summary judgment. The nonmoving party need only submit evidence sufficient to show that there is a genuine issue as to a material fact and that, therefore, there is a need for a trial. Affidavit evidence is certainly sufficient for this purpose.

**[2]** Further, insofar as applicant's request for additional discovery is based upon its asserted desire to take the "discovery" deposition of applicant's own president, applicant appears to be confusing discovery depositions with testimony depositions. Applicant's request that it be permitted to take the deposi-

tion of its own president is in reality a request that the case be allowed to go to trial.

Accordingly, applicant's motion for an extension of discovery and reinstatement of proceedings is denied. While normally the Board would allow applicant additional time in which to submit affidavits in support of its opposition to the renewed motion for summary judgment, for the reasons set forth below, the Board finds that there is already of record sufficient evidence to show that the motion for summary judgment should be denied.

Opposer's motion for summary judgment is based on evidence derived from the discovery deposition of Arthur I. Froerer, President and sole shareholder of applicant. The following facts were brought forth in the discovery deposition. Applicant, Life-Code Systems, Inc., was incorporated June 26, 1979. Around the end of January 1980, Mr. Froerer conceived the idea of the OMNI-VISA services. Applicant would make a card for customers, which card would contain the customer's picture, medical information and travel documentation, such as copies of passports and visas. Mr. Froerer designed the OMNI-VISA logo shown below.



On February 10, 1980, applicant placed an advertisement for the OMNI-VISA services in the Santa Barbara News Press.

On February 2, 1980, Mr. Froerer sold an OMNI-VISA card to Steven Kent Olsen.[2] The purpose of this sale was to establish trademark rights.

On February 20, 1980, Mr. Froerer contacted the American Express Company solic-

---

[2] Exhibit 34 attached to Froerer's deposition shows that Steven Olsen filled out an OMNI-VISA application on February 1, 1980. In addition, exhibit 34 includes a check from Steven Olsen made payable to applicant dated February 13, 1980.

iting that company's participation in the promotion and marketing of the OMNI-VISA services. On March 31, 1980, Mr. Froerer contacted the Bank of America soliciting that company's participation in the promotion and marketing of the OMNI-VISA services. Subsequently, Mr. Froerer contacted AAA, the American Society of Travel Agents, the American Institute for Foreign Studies and others soliciting their participation in the promotion and marketing of the OMNI-VISA services. At the end of January 1981, Mr. Froerer sent out a mass mailing to over 19,000 travel agents soliciting their participation in the promotion and marketing of the OMNI-VISA services. The response to Mr. Froerer's solicitations was disappointing. Mr. Froerer also contacted many companies with employees in foreign countries. Mr. Froerer sent out a letter and sample brochure to all newspapers with a circulation of over 100,000. In response to the mass mailing to the travel agents, applicant received seven responses. The responding travel agents agreed to make applicant's brochures available to their clients. Applicant made no further sales. The major companies chose not to participate in the promotion because of prior promotional and marketing plans or lack of interest. However, Mr. Froerer is persevering and continues to believe that the OMNI-VISA concept is a good and marketable idea.

Applicant, on March 31, 1980, filed an application to register its mark, OMNI-VISA and design. Subsequent to the filing of the application, applicant decided that the impression conveyed in its mark by the airplane pointing down was too negative. Accordingly, applicant modified the mark as shown below.



Applicant sought to amend the drawing in the trademark application. The Trademark Examining Attorney refused to enter the amendment to the drawing stating the following:

The drawing of record shows the mark as used on the original specimens submitted with the application wherein the designation "OMNI-VISA" appears above (rather than below) the aircraft which is pointed downward (rather than upward).

The Trademark Examining Attorney stated no basis for refusing to enter the amendment. The Trademark Examining Attorney required a statement by applicant that the mark shown in the drawing originally filed with the application was still in use. Applicant withdrew the amendment and stated that the mark shown in the original drawing was still in use. The mark was published for opposition October 13, 1981.

Opposer mailed a copy of the notice of opposition to applicant on December 10, 1981.[3] At that time, applicant ceased making an active effort to promote its trademark pending the disposition of the opposition proceeding.

Opposer believes this evidence, taken in sum, is sufficient to establish nonuse, abandonment and fraud as a matter of law.

In opposition to opposer's renewed motion for summary judgment, applicant argues that the discovery deposition of Arthur I. Froerer, President of applicant, shows that (i) applicant clearly made actual use of the mark OMNI-VISA and (ii) subsequent to the initial sale of its services, applicant had taken numerous affirmative measures to create a commercially viable business utilizing the mark OMNI-VISA.

We find that there is no genuine issue as to any material fact concerning the issues of abandonment, nonuse, and fraud. The parties are, indeed, in agreement on the facts. They disagree only about the legal significance of those facts.

[3] The Board turns first, then, to the issue of whether, as a matter of law, applicant abandoned its mark by making a material alteration in the design of the mark. Trademark Rule 2.72 provides, in part: "Amendment may not be made if the nature of the mark is changed thereby." The modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same mark. The general test of whether an alteration is material is whether the mark would have to be republished after the alteration in order to fairly present the mark for purposes of opposition. If one mark is sufficiently different from another mark as to require republication, it would be tantamount to a new

---

[3] The Board mailed the notice instituting the opposition on March 9, 1982.

mark appropriate for a new application. Applicant's original mark sought to be registered and the amended mark are shown below.

 

ORIGINAL                                    AMENDED

It is the opinion of the Board that the amendment to the drawing is not a material alteration of the mark. The Examining Attorney incorrectly refused to enter the amendment to the drawing when applicant sought to amend it. The two marks create the same commercial impression.

Since the Board finds that the proposed amendment to the drawing of the mark does not amount to a material alteration, it follows that the Board does not find that applicant abandoned its mark. Moreover, since applicant did not abandon its mark, applicant did not commit fraud upon the Patent and Trademark Office by continuing to prosecute the application to register a mark which had been abandoned.

[4] We turn, then, to the issue of whether applicant's use of its mark constituted use sufficient to support registration. The fact that an initial sale may have been made primarily for purposes of federal registration is immaterial, so long as the initial sale was a bona fide commercial transaction followed by activity which amounted to a continuing effort or an intent to continue such use and place the product or services in the market on a commercial scale. See: CPC International, Inc. v. Seven-Up Co., supra; Columbia Pictures Industries, Inc. v. Miller, 211 USPQ 816 at 819 (TTAB 1981); Monorail Car Wash, Inc. v. McCoy, 178 USPQ 434 at 438 (TTAB 1973); Computer Food Stores Inc. v. Corner Store Franchises, Inc., 176 USPQ 535 at 538 (TTAB 1973); McCarthy, Trademarks and Unfair Competition, Section 19:37B and the cases cited therein. Based on the essentially undisputed facts before us, the Board finds that applicant made a valid initial transaction and thereafter took steps to establish a viable commercial business using the mark sought to be registered.

In the course of Mr. Froerer's discovery deposition, Mr. Froerer testified that there was a confidentiality statement in the promotional materials sent to American Express Company, Bank America, and AAA. In addition, applicant cancelled its business insurance coverage as a result of its unsuccessful promotional efforts and opposer's opposition.

We find that the confidentiality clause placed in some of the promotional materials does not vitiate the open and notorious nature of applicant's other promotional activities; that applicant's cancellation of its insurance coverage is not material; and that its subsequent decision to hold further activities in abeyance pending the outcome of the opposition does not demonstrate a lack of intention to market services commercially upon successful termination of the opposition. See: The Community of Roquefort v. Santo, doing business as The Sign of The Dove, 170 USPQ 205 (CCPA 1971); La Societe Anonyme de Parfums le Galion v. Jean Patou, Inc., 175 USPQ 555 (S.D.N.Y. 1972), rev'd on other grounds, 181 USPQ 545 (2nd Cir. 1974); and Penthouse International, Ltd. v. Dyn Electronics, Inc., 196 USPQ 251 (TTAB 1977).

It also follows, therefore, that, since the Board finds that applicant made use of its mark in commerce prior to the filing of its application, applicant has not committed fraud upon the Patent and Trademark Office.

[5] The Board, thus, finds that while opposer, the moving party, is not entitled to partial summary judgment, applicant, the nonmoving party, is so entitled. In such circumstances, the Board has the power to enter the proper judgment, although a cross-motion therefor was not made. Rule 54(c) of the Federal Rules gives the Board the power to enter final judgment to which the prevailing party is entitled, even if the party has not demanded such relief. See: Missouri Pacific Railroad Company v. National Milling Co., Inc., 409 F.2d 882, 13 FR Serv2d 1231 (3rd Cir. 1969); Sarelas v. Porikos, 320 F.2d 827, 7 FR Serv2d 1033 (7th Cir. 1963); Local 33, International Hod Carriers, Building & Common Laborers Union of America v. Mason Tenders District Council of Greater New York, 291 F.2d 496, 4 FR Serv2d 939 (2nd Cir. 1961); Roberts v. Fuquay-Varina Tobacco Board of Trade, Inc., 223 F.Supp. 212, 7 FR Serv2nd 2d 1082 (E.D.N.C. 1963); Kent v. United States, 228 F.Supp. 929, 8 FR Serv2nd 56(c) 54, Case 1 (S.D.N.Y. 1964), aff'd 343 F.2nd 349 (2nd Cir. 1965); United States v. Franklin Federal Saving and Loan Association, 140 F.Supp. 286, 22FR Serv 757 (M.D. Pa. 1956); and 6 Moore's Federal Practice, Paragraph 56.12 and the cases cited therein.

Therefore, because the Board finds that there is no genuine issue of material fact regarding the issues of abandonment, nonuse, and fraud, and because applicant is entitled to judgment as a matter of law on these issues, opposer's motion for summary judgment is denied, partial summary judgment in favor of

applicant is hereby entered on these issues, and the opposition will go forward to trial only on the issue of likelihood of confusion.

The trial dates, including the period for discovery, are reset in the accompanying trial order.

---

**Patent and Trademark Office
Trademark Trial and Appeal Board**

In re Conti

Decided Nov. 2, 1983

## TRADEMARKS

**1. Marks and names subject to ownership — Descriptive — Particular marks (§67.5081)**

"Shear," as applied to barber shop, hair styling, and beauty salon services, is merely descriptive of feature or characteristic of service, and is properly disclaimed.

**2. Marks and names subject to ownership — Descriptive — Misdescriptive or not descriptive — Particular marks (§67.5078)**

"Sheer Perfection," for makeup for legs and body, is suggestive of sheer appearance of fine hosiery for leg without need for hosiery.

**3. Class of goods — Particular cases — Not similar (§67.2071)**

**Identity and similarity — Words — Not similar (§67.4111)**

Use of "Shear Perfection" for barber shop, hair styling, and beauty salon services, and "Sheer Perfection" for makeup for legs and body, is not likely to cause confusion.

**4. Pleading and practice in Patent Office — In general (§67.671)**

It is not always clear from application that there is use in commerce when service activity is basically local in nature, and it is within examining attorney's discretion to inquire whether there is use in commerce and to require satisfactory explanation or showing of use in commerce.

Appeal from Trademark Examining Attorney.

Application for registration of trademark of Dennis James Conti, Serial No. 252,665, filed Mar. 5, 1980. From decision refusing registration, applicant appeals. Reversed in part, affirmed in part.

Buell, Blenko, Ziesenheim & Beck, Pittsburgh, Pa., for applicant.

Before Frugé, Krugman, and Cissel, Members.

Krugman, Member.

An application has been filed by Dennis James Conti, doing business as Shear Perfection, to register "SHEAR PERFECTION" in the stylized form shown below for barber shop, hair styling and beauty salon services..[1]

*Shear Perfection*

The word "SHEAR" has been disclaimed apart from the mark as shown.

Registration has been refused on two grounds. The Examining Attorney refused registration under Section 2(d) of the Trademark Act in view of the previously registered mark "SHEER PERFECTION" for makeup for legs and body.[2] Registration was also refused under Sections 1 and 45 of the Trademark Act on the ground that applicant is not rendering any services in commerce regulable by Congress.

Applicant has appealed.

[1,2] Turning first to the question of likelihood of confusion, while it is clear that the marks are identical in sound, only one letter being different (i.e. SHEAR and SHEER), it is our view that the one letter difference changes the commercial impression engendered by the marks. The word "shear" means to cut with shears or a similar sharp edged instrument (Webster's New World Dictionary of the American Language, 1964). The term, as applied to applicant's barber shop, hair styling and beauty salon services, is merely descriptive of a feature or characteristic of the service and has been properly disclaimed. Nevertheless, the disclaimed matter

---

[1] Application Serial No. 252,665 filed March 5, 1980.
[2] Registration No. 853,359 issued July 23, 1968. Section 8 affidavit accepted.