Page 1

ROUGH DRAFT TESTIMONY OF KEITH ALLRED

TAKEN ON 10/25/2012


THE FOLLOWING IS A ROUGH, UNEDITED TRANSCRIPT


By receiving this unofficial draft
transcript, you are agreeing to purchase the
certified transcript of this matter when it is
prepared by the court reporter.
This unofficial draft transcript is
provided to you solely as a litigation support
tool for use in-house by you, other members of
your staff, associate counsel, paralegals, or
expert consultants. We agree to provide this
service to you with the explicit understanding
that you will in no way make it available, in
whole or in part, in any form, to anyone else.
This transcription has been neither
checked nor proofread. It is a rough draft, not a
certified transcript. The unofficial draft
transcript may contain computer-generated
mistranslations of stenotype code resulting in

Page 2

1  nonsensical word combinations or untranslated
2  symbols which cannot be deciphered by
3  non-stenotypists. Corrections will be made in the
4  preparation of the certified transcript resulting
5  in differences in page and line numbers,
6  punctuation, and formatting.
7  ///
8  ///
9  ///
10
11          ** WITNESS WAS SWORN **
12  BY MR. JANKOWSKI:
13      Q. Good morning. My name, again, is David
14  Jankowski. I'm an attorney representing Keating
15  dental arts, the defendant in this lawsuit. Could
16  you please state your name for the record?
17      A. Keith Allred.
18      Q. And Glidewell Laboratories is your
19  current employer; correct?
20      A. Yes.
21      Q. What's your current title?
22      A. Director of professional services. Also

Page 3

1  the in-house attorney.
2      Q. And so professional services is a way of
3  referring to legal services?
4      A. No. It would be something I could use if
5  I was communicating with anyone about any matter
6  that didn't have anything specifically to do with,
7  for instance, making a crown, some kind of
8  business matter. But not necessarily a legal
9  matter.
10      Q. Okay. Is your title also general
11  counsel?
12      A. Yes.
13      Q. Okay. Do you have any other titles other
14  than director of professional services and general
15  counsel?
16      A. I'm the secretary.
17      Q. Any other titles?
18      A. No.
19      Q. Have you ever been deposed before?
20      A. No.
21      Q. Let me go over a few ground rules about
22  the deposition process here and help us understand

Page 4

1  what's going to happen today.
2          First of all, do you understand the oath
3  that the court reporter just administered to you?
4      A. Yes.
5      Q. Although this deposition is being taken
6  in a conference room in the law offices of Knobbe,
7  Martens, Olson & Bear in Irvine, California, it
8  has the same force and effect as if you were
9  testifying in a court of law before a judge. Do
10  you understand that?
11      A. Yes.
12      Q. I'm going to be asking you questions and
13  up provide answers to my questions. You must
14  answer truthfully do you understand that?
15      A. Yes.
16      Q. This deposition is being by the court
17  reporter. Spoken words rather than a nod or other
18  knob verbal response do you understand?
19      A. Thumbs up.
20      Q. Please wait until I've completed a
21  question because the court reporter cannot capture
22  what we say if we talk over one another. Okay?

EXHIBIT 12
-181-

Page 5

1      A.  Okay.
2      Q.  If I ask I question and it is unclear to
3  you in this sway, please let me know and I'll try
4  to address it.  If you do not ask for
5  clarification, I will assume you understand what I
6  am asking.  Did you understand?
7      A.  Yes.
8      Q.  From time to time your attorney
9  Mr. Tachner may be stating objections, for the
10  record.  Unless he instructs you not to answer a
11  question, you must still answer my question.  Do
12  you understand that?
13      A.  Yes.
14      Q.  If you would like to take a break
15  innocent during the deposition, simply say so and
16  we'll take a break at the next convenient stopping
17  point.  Is that fine?
18      A.  That's good.
19      Q.  I do request we not take breaks while a
20  question is pending.
21      A.  Okay.
22      Q.  Are you taking any prescription

Page 6

1  medication or other drugs that may impair your
2  ability to testify truthfully today?
3      A.  No.
4      Q.  Is there any reason you can't give
5  truthful testimony here today?
6      A.  No reason.
7      Q.  Okay.  Let me just put in front of you
8  what has been previously marked as Exhibit 2.
9  I'll have you take a quick look at that document.
10  Mr. Allred, have you seen this document before?
11      A.  Corrected notice of deposition?
12      Q.  Correct.
13      A.  Is this for the.  Most knowledgeable?
14      Q.  Well, basically.  It's a deposition
15  pursuant to fed rule of civil procedure 30(b)(6).
16  So it's a deposition of Glidewell, the entity, and
17  Glidewell designates one or more persons to
18  provide testimony on the topics.  I understand
19  that, yes.
20      Q.  And, in fact, you're ware that Mr. Jim
21  Shuck gave testimony on some of these topics a few
22  weeks ago; correct?

Page 7

1      A.  Yes.
2      Q.  And you're here to testify today to also
3  help us out here understand information associated
4  with these topic.  You're familiar with that?
5      A.  Yes.
6      Q.  Okay.  And you know what?  I was going to
7  did this later but let's go over your background a
8  little bit before we get into this.
9      You're an attorney; correct?
10      A.  Yes.
11      Q.  Can you briefly describe what is your
12  educational background?
13      A.  I went to San Diego State university and
14  the University of San Diego.
15      Q.  And so you got your undergraduate degree
16  at San Diego State?
17      A.  Yes.
18      Q.  And what was your major?
19      A.  Finance and business law and a master's
20  degree in business administration.
21      Q.  So you have two separate degrees from San
22  Diego State, a bachelor's and an MBA?

Page 8

1      A.  Yes.
2      Q.  And what year did you receive your
3  bachelor's degree?
4      A.  '72.
5      Q.  The early 1970s?
6      A.  Yes.
7      Q.  And then do you recall what year you
8  received your MBA?
9      A.  Ultimately I will.  Let me see.  I'm
10  going to go 057.  It strikes me as right.
11      Q.  You didn't go straight through and get an
12  MBA right after your undergraduate degree?
13      A.  Not immediately.  I didn't just go to
14  school full-time either.
15      Q.  Okay.  When did you start studying at San
16  Diego State?
17      A.  1969.
18      Q.  When did you receive your law degree from
19  University of San Diego?
20      A.  It was December of '81, I believe, is
21  when it would be on their orders or February of
22  '82, something like that.  I remember the bar in

EXHIBIT 12
-182-

Page 9

1  February of '82. I know that.
2      Q. Now, JD degrees aren't normally conferred
3  in December time of year. Were you on a different
4  program?
5      A. I'm not quite sure. It seems like I got
6  it in '81 and I got continual communications from
7  them and it seems like I'm under the heading of
8  '82. I'm not quite sure how they figure that.
9      Q. When did you start studying law at
10 University of San Diego?
11     A. 1979 in their evening program.
12     Q. Okay.
13     A. I was employed full-time.
14     Q. Where were you employed at that time?
15     A. General dynamics at that time.
16     Q. I actually used to work at general
17 dynamics down in San Diego.
18     A. I worked in Kearny Mesa.
19     Q. That was while I was in college. What
20 was your position at general dynamics?
21     A. Master scheduler.
22     Q. What time period did you work at general

Page 10

1  dynamics?
2      A. Let's see, I guess that was till -- well,
3  before '79. I don't know exactly when and until
4  about '81 or so.
5      Q. So about three years?
6      A. Yeah.
7      Q. And did you work somewhere before general
8  dynamics?
9      A. Yes.
10     Q. Where did you work before general
11 dynamics?
12     A. Immediately before that I think it would
13 be Pacific Telephone. Downtown San Diego.
14     Q. What was your position at Pacific
15 Telephone?
16     A. It was statistical clerk in the division
17 office there.
18     Q. What does a statistical clerk do?
19     A. It's kind of hard to describe, but it was
20 pretty much keeping performance statistics on all
21 the central offices of California.
22     Q. And so statistics on financial

Page 11

1  performance?
2      A. Not really, no. It's performance
3  statistics of the machinery and equipment and the
4  services provided.
5      Q. Okay.
6      A. More of an electronic thing.
7      Q. Okay. And over what time period did you
8  work at Pacific Telephone?
9      A. I think that was a couple years.
10     Q. So you started there in the mid-'70s?
11     A. Yeah.
12     Q. And did you work somewhere before Pacific
13 Telephone?
14     A. I did, yeah.
15     Q. Where did you work?
16     A. I worked at La Jolla village apartment.
17     Q. What did you do there?
18     A. I was an assistant manager.
19     Q. And do you recall what time period that
20 you worked at La Jolla village apartments?
21     A. I think I started about 1971. I'm not
22 sure exactly.

Page 12

1      Q. So that's while you were still in
2  college?
3      A. Yeah, it's what I was doing during the
4  days and nights. It was kind of a flexible
5  schedule. Mainly it was nighttime but maybe one
6  or two days during the week during the day.
7      Q. And so you graduated from San Diego State
8  with a degree, I think you said, in business
9  finance?
10     A. It's called finance and business law.
11 That's the name of the degree.
12     Q. Finance and business law. Okay. And
13 so -- and the job you had at La Jolla village
14 apartments was not related to the finance side of
15 it, was it?
16     A. No, it was property management.
17     Q. And you went straight from La Jolla
18 village apartments to Pacific Telephone?
19     A. Uh-huh.
20     Q. And straight from Pacific Telephone to
21 general dynamics?
22     A. Yes.

EXHIBIT 12
-183-

Page 13

1    Q. That gets us up to about 1981. Where did
2  you work after general dynamics?
3    A. I had some part-time jobs because I
4  switched over to full-time daytime in the law
5  school. So I had a lot of different things.
6  Account temps would be one of them.
7    Q. When after general dynamics did you first
8  have full-time employment with somebody?
9    A. That would be -- well, I did work
10  full-time as a temporary basis even though it was
11  through. Temporary was really contractors. So
12  there was several of those. You mean for a
13  company to actually employee me as an employee.
14    Q. Correct.
15    A. I think that would probably be coal teen.
16    Q. Can you spell that?
17    A. C-o-l-t-e-n-e, coal teen, Inc.
18    Q. And what's the business of coal teen,
19  Inc.?
20    A. They were in the business of
21  manufacturing dental materials primarily
22  impression material at the time I started there is

Page 14

1  what they were known for. They're a Swiss
2  company, and they were selling direct in the
3  United States; so it was something new for them.
4    Q. What was your position at coal teen,
5  Inc.?
6    A. I was the controller.
7    Q. And what year did you begin working at
8  coal teen?
9    A. 1985.
10    Q. And how long did you work at coal teen,
11  Inc.?
12    A. Till 1990.
13    Q. And you were the controller that whole
14  time?
15    A. No, at the end I was the president of
16  that company.
17    Q. And when did your title change to
18  president?
19    A. I guess about 1989 or maybe '88. I'm not
20  quite sure.
21    Q. And when your employment at coal teen,
22  Inc., ended, where did you go from there?

Page 15

1    A. I opened up my own law practice.
2    Q. Where was your law practice located?
3    A. I was just out of my own home.
4    Q. What city?
5    A. In Cardiff, California.
6    Q. And so that would have been in 1990?
7    A. Yeah.
8    Q. What kind of law did you practice?
9    A. Condominium law.
10    Q. Why did you transition from coal teen,
11  Inc., to your own law practice at that time?
12    A. Well, it worked out pretty good. That
13  business sold in a way. Actually it was the
14  reverse way around. Coal teen purchased whale
15  dental and whale dental sells through dealers and
16  they eliminated the company that was essentially
17  selling direct, and it was a chance to start
18  something new during the depression.
19    Q. How long were you working as your own law
20  practice (*** GET SPELLING ***)?
21    A. Until 1996.
22    Q. And that whole time you were practicing

Page 16

1  condominium law?
2    A. Well, it's one of my specialties, but
3  there was also property law. I handled a divorce,
4  brought a lawsuit, in and that, quite a few
5  different things.
6    Q. I asked you earlier if you've ever been
7  deposed. I guess I should ask you have you taken
8  depositions of witnesses?
9    A. Yeah.
10    Q. How many depositions have you taken?
11    A. I would say I've only taken one. I've
12  participated in more than one, but I remember
13  asking questions in one.
14    Q. And the other ones you were defending
15  witnesses?
16    A. I was there with -- representing a
17  company as the company's attorney that had hired
18  within attorney to do something or another. I
19  don't know that we were defendant or plaintiff.
20  I'd have to think about that.
21    Q. But you were participating in the
22  deposition?

EXHIBIT 12
-184-

Page 17

1      A. Yes.
2      Q. Okay. How many depositions have you
3  participated in?
4      A. Oh, probably more than five.
5      Q. Okay. Was that back in this time frame
6  in the 1990s?
7      A. No, I was say since '96. I was never
8  part of any depositions prior to working for the
9  company I work for now.
10     Q. Okay. Is part of your law practice
11 between 1990 and '96 you weren't involved in
12 depositions then?
13     A. No.
14     Q. So you mentioned condominium law,
15 property law, family law. Any other areas of law
16 that you practiced?
17     A. Well, I guess I can list them all as part
18 of that. Condominium law, for instance, is
19 handling liens. I've actually filed foreclose
20 you'res on properties, contract matters. That was
21 also a realtor. I had a broker's license.
22     Q. And what did you do in 1996 when you --

Page 18

1  well, let me ask you in 1996 did you stop that law
2  practice?
3      A. Yes.
4      Q. And what happened at that point?
5      A. Well, I was hired full-time basis as
6  director of professional services.
7      Q. By Glidewell?
8      A. Yes.
9      Q. Okay. And so you've been working
10 consistently from 1996 until today at Glidewell as
11 the director of professional services?
12     A. Yes.
13     Q. Okay.
14     A. And before that I did a few things for
15 them too. Filed a trademark.
16     Q. Okay. Has your title been general
17 counsel the whole time as well?
18     A. I don't know that it's really been called
19 that from the very beginning though I've been an
20 attorney there from the very beginning.
21     Q. Okay. So at least at some point you took
22 on the title general counsel?

Page 19

1      A. Yeah, definitely at some point.
2      Q. How about secretary? When did you take
3  on that title?
4      A. I think that was probably about six years
5  ago.
6      Q. So roughly 2006?
7      A. Uh-huh.
8         MR. TACHNER: Yes? You have to mouth the
9  word.
10        THE WITNESS: Yes.
11        MR. JANKOWSKI: Excuse me. How is it
12 that you first developed a working relationship
13 with Glidewell Laboratories.
14        THE WITNESS: I think the first thing I
15 ever did professionally for Glidewell Laboratories
16 was filing a trademark.
17 BY MR. JANKOWSKI:
18     Q. And when was that?
19     A. Well, it would have been before '96.
20     Q. You don't recall the year, though?
21     A. I don't recall it, but it would be easy
22 to see because I could look up the trademark.

Page 20

1      Q. What was the trademark in?
2      A. Play safe was the name.
3      Q. P-l-a-y-s-a-f-e?
4      A. Uh-huh.
5      Q. Is that all as one word?
6      A. Yeah.
7      Q. Okay. Now, you hadn't been practicing
8  trademark law prior to that; is that correct?
9      A. That's true.
10     Q. So how is it you came to be asked by
11 Glidewell to file a strayed mark application?
12     A. Just a well-rounded individual.
13     Q. But how did they find you to do this
14 particular task?
15     A. Well, I know the person that works there
16 in the marketing department.
17     Q. Is that Mr. Shuck?
18     A. Yes.
19     Q. So you had a preexisting relationship
20 with Mr. Shuck that predated the filing of this
21 trademark application?
22     A. Yes. We worked at coal teen together.

EXHIBIT 12
-185-

Page 21

1    Q. So when you were working at coal teen
2  between 1985 and 1990, ing whether was one of the
3  people you were working with?
4    A. Yeah, for.  He was the president of the
5  company then.
6    Q. So you became president of coal teen in
7  or around 1988 or '89?
8    A. Yes.
9    Q. Did you replace Mr. Shuck as president?
10   A. Yes, he left.
11   Q. Where did he go from there?
12   A. PTC, I think.
13   Q. Is that an acronym or what was PTC?
14   A. It stands for something.
15   Q. That's the name of the company?
16   A. Yes.
17   Q. And that's a dental company of some time?
18   A. Yeah, it is.
19   Q. What do they make or sell?
20   A. They were in the business of selling
21  training, and I think they also had a line of
22  artificial teeth from a manufacturer in Europe.

Page 22

1    Q. Okay.  So basically what happened at some
2  point prior to 1996 was you received a phone call
3  or some kind of communication from Mr. Shuck
4  asking you to file a trademark on behalf of
5  Glidewell; is that right?
6    A. That's correct.
7    Q. Okay.  Had you been working with
8  Mr. Shuck in a professional capacity, a business
9  capacity, prior to joining Glidewell after he left
10  coal teen?
11   A. No.
12   Q. Do you know when Mr. Shuck joined
13  Glidewell?
14   A. I don't.
15   Q. Okay.  But it was before you?
16   A. Long time before.  I think he's worked
17  there more than 20 years.
18   Q. And Mr. Shuck is the vice president of
19  advertising and marketing; is that right?
20   A. Sales and marketing.
21   Q. Sales and marketing.
22   A. Uh-huh.

Page 23

1    Q. Right.  Okay.
2      Were there any other projects that
3  Glidewell gave you to work on prior to you
4  beginning employment there in 1996?
5    A. I think there might have been another
6  trademark.
7    Q. Do you recall what the trademark was?
8    A. If it was before that I was actually
9  employed there, it would be Silent Night.  That's
10  N-i-t-e.  Silent Nite.
11   Q. What goods or services was the mark
12  silent Nite being used by Glidewell for?
13   A. It's a mandibular device and it's for the
14  treatment of snoring and mild to moderate sleep
15  apnea.
16   Q. I think I understand the name.
17     How about play safe?  What kind of goods
18  or services is that mark associated with?
19   A. That is a custom fabricated mouth guard.
20   Q. Would that be a mouth guard for use by
21  athletes?
22   A. Yes.

Page 24

1    Q. I think I understand that name as well.
2      Are there any other trademarks that you
3  filed for Glidewell before beginning employment
4  there in 1996?
5    A. I'm not even sure the silent Nite was
6  before.  I think it was No. 2.
7    Q. Okay.
8    A. If one comes to me, I'll let you know,
9  but I can't recall right now.
10   Q. Okay.
11   A. There may have been one before I captured
12  possibly.  I'm not sure where they fall in the
13  timeline.
14   Q. How many trademarks have you filed for
15  Glidewell?
16   A. Maybe more than 10.
17   Q. Okay.  Can you name for me the ones you
18  recall?
19   A. Oh, sure.  Well, the three I've
20  mentioned.
21   Q. What was the last one you said?
22   A. Capture.

EXHIBIT 12
-186-

Page 25

1    Q. Capture. Okay. What kind of product or
2  services is capture?
3    A. That is polyvinyl impression material.
4  Dental impression material.
5    Q. Okay. What's another one.
6    A. I'll give you a tongue twister. Occlusal
7  glass. I don't know that it was fourth in line,
8  but it's always been easy to remember for me.
9    Q. Occlusal glass?
10    A. Occlusal glass
11    Q. It sounds carry to have glass in your
12  mouth. Can you think of the others? What are the
13  others?
14    A. Oh, sure. Center press. Simply natural
15  dentures. Inclusive. That's more recent. Chair
16  side. I think there's about three more I can't
17  think of.
18    Q. Okay. We're up to eight. That's a
19  pretty good number.
20       Does Glidewell also write on attorneys
21  other than you to file trademarks?
22    A. No.

Page 26

1    Q. One trademark I guess at issue is going
2  to be BruxZir, correct? That's the reason we're
3  sitting here today.
4    A. Yes.
5    Q. So we can add that to the list as well?
6    A. Definitely.
7    Q. The way I've been referring to
8  Glidewell's mark just as a shorthand just so I can
9  say it in a way that I think everybody can
10  understand it and without having me to spell it
11  out each time is I call it BruxZir with a Z. When
12  I say BruxZir with a Z, I mean Glidewell's mark
13  specifically I mean B-r-u-x-z-i-r?
14    A. Okay.
15    Q. When I say that that's what I'll be
16  referring to?
17    A. Okay.
18    Q. So BruxZir is one of the marks you filed
19  for them?
20    A. Yes.
21    Q. And, in fact, there's at least two
22  filings for BruxZir; correct? Separate trademark

Page 27

1  applications that have been filed?
2    A. Well, there's one in Class 10, and
3  there's one in Class 5. Is that what you mean?
4    Q. That's right.
5    A. That's in the United States.
6    Q. Right, right. I'm just asking about the
7  United States.
8       When you say Class 10, what's Class 10?
9    A. That would cover, for instance, a
10  custom-made crown or bridge or inlay or on lay.
11    Q. How about Class 5?
12    A. That would be a material like. In our
13  situation BruxZir block.
14    Q. I think just yesterday I was questioning
15  Mr. Bartolo, and I've also questioned Mr. Carden.
16  It seems like the material that's sold by
17  Glidewell is referred to as blanks. Have you
18  heard it referred to that way?
19    A. Yes.
20    Q. So that's what Class 5 is referring to,
21  the blanks material; correct?
22    A. Yes.

Page 28

1    Q. Okay?
2    A. And color ants too.
3    Q. So Class 5 would include the color ants?
4    A. Yes.
5    Q. Now, there's also, at least the mark
6  BruxZir has been used by Glidewell for a number of
7  other offerings for sale as well; correct? Like
8  milling machines, for example?
9    A. Yes.
10    Q. That won't fall under a Class 10 or
11  Class 5; correct?
12    A. That's correct.
13    Q. Is there a filing for BruxZir for
14  anything other than Class 10 and Class 5?
15    A. Not yet.
16    Q. Okay. Chair side by the way I think is
17  the name of an internal publication of Glidewell;
18  right?
19    A. That's true.
20    Q. Do you recall what class the mark simply
21  natural dentures is associated with?
22    A. What product is it for?

EXHIBIT 12
-187-

Page 29

1    Q. Right.
2    A. That was for a denture.  They were
3  partial.  It would be simply natural dentures.
4    Q. Does it have -- like I said, Class 5 and
5  Class 10 for BruxZir --
6    A. That would be Class 10.
7    Q. That's Class 10.
8    A. Another mark would be BioTemps.
9    Q. And what's BioTemps?
10    A. That is a custom-made provisional
11  restoration.
12    Q. Does that mean a restoration that's
13  designed to not be permanent?
14    A. Correct.
15    Q. Is that also in Class 10?
16    A. Yes.
17    Q. How about occlusal glass?  What class
18  would that be associated with?
19    A. That would be Class 10.
20    Q. What product was that?
21    A. That was a crown.  It was made by fusing
22  glass over a metal coping, and it was a particular

Page 30

1  type of metal coping, and it was a particular type
2  of glass.
3    Q. How about center press?  What kind of
4  product is that?
5    A. It was going to be.  It's nothing we ever
6  actually marketed.  It was going to be a
7  nonprecious metal coping system made with powdered
8  metal.
9    Q. I take it that would be in Class 5?
10    A. That would be in Class 5.  We also have
11  the mark Prismatik net press, and that's Prismatik
12  with a K.
13    Q. So it's P-r-i-s-m-a-t-i-k?
14    A. Yes.  And we also have Prismatik
15  something press.  Thin press.
16    Q. I'm sorry.  The first Prismatik press
17  was -- can you repeat the name of that?
18    A. Well, it's Prismatik thin press, and it's
19  Prismatik net press.
20    Q. Right.  Net press.  Okay.
21      What is the Prismatik net press product?
22    A. That is a block of ceramic that's used to

Page 31

1  make either all ceramic or pressed to metal
2  ceramic crowns and bridges.
3    Q. That's zirconia, in fact; correct?
4    A. No, it's ceramic.  It's glass.
5    Q. This particular one is not zirconia?
6    A. No, it's not.
7    Q. There is a Prismatik zirconia, I think,
8  associated with Glidewell's products as well;
9  correct?
10    A. Well, the company is Prismatik dental
11  craft, Inc., and it makes zirconia blocks.  So it
12  does have the Prismatik -- well, clinical
13  zirconia.  I believe we have a trademark on that.
14  But that was a product we had, Prismatik clinical
15  zirconia.
16    Q. Right.  Sometimes called Prismatik CZ?
17    A. And sometimes called Prismatik CZ,
18  correct.
19    Q. So Glidewell does have a trademark this
20  that?
21    A. I don't think we have a trademark in
22  that.

Page 32

1    Q. It's just something that's used as a
2  name?
3    A. That's just a TM.  And also has a 510 K.
4    Q. So Prismatik net press and Prismatik thin
5  press, these are going to be Class 5 filings; is
6  that correct?
7    A. For trademark, yes.
8    Q. Yes.  In other words, it's materials?
9    A. It is.
10    Q. Okay.  And you just mentioned the use of
11  TM.  You understand how in trademark law there's
12  the circle R concept and the TM concept; correct?
13    A. Yes.
14    Q. Can you tell me your understanding of
15  what those designate?
16    A. I know our circle R register are patent
17  and register office.  (*** CHECK ***).
18    Q. What does TM mean?
19    A. Wouldn't have to use it, I suppose but
20  that's just put out there for the the world the
21  fact that it's something the company uses to
22  identify its goods.  When someone sees that, they

EXHIBIT 12
-188-

Page 33

1 know who the source of the product is.
2 Q. They know the word the word TM is
3 associated with is being associated with the
4 company as a trade name of some kind?
5 A. Correct.
6 Q. What if there's no circle R or no TM?
7 Does that designate anything?
8 A. It would to me if I saw that and I was
9 looking at examples of trademarks to see if other
10 people were using it.
11 Q. In other words, if there's no circle R or
12 no TM, the reader may not interpret that as a
13 trade maim at all. Is that fair?
14 A. I think I would not necessarily jump to
15 that conclusion.
16 Q. But they're at least -- if they don't see
17 a T -- the point of the TM and circle R is to
18 provide notice to the reader; correct?
19 A. Correct.
20 Q. If it's not there, you're at least not
21 getting that notice to the reader?
22 A. That's correct.

Page 34

1 Q. So let's go back to Exhibit 2 you've got
2 in front of you there. If you turn to the fourth
3 page of the document, you'll see there's a
4 numbered list under topics for examination. Do
5 you see that?
6 A. Well, these pages aren't numbered but --
7 Q. They're not numbered. I apologize.
8 A. What number are we starting at, the
9 number 1 topics for examination.
10 Q. You see the page that says topics for
11 examination?
12 A. I do.
13 Q. You see there's a series of numbered
14 topics and it actually goes all the way down to
15 No. 21. It spans three pages. Do you see that?
16 A. That's what mine has.
17 Q. The good news for you is that Mr. Shuck
18 provided testimony on most of these topics, and so
19 we certainly don't need to go through entire list
20 with you. But there were certain topics where
21 Mr. Shuck didn't have knowledge and topics where
22 he said you were the person who's most

Page 35

1 knowledgeable on it. So I just want to point
2 those out to you and see what you do know about
3 them.
4 A. Okay.
5 Q. So if you turn actually to topic 8, for
6 example, this is one of the topics that Mr. Shuck
7 basically directed us to talk to you about. If
8 you could just read topic 8 for me.
9 A. Okay. I've read that.
10 Q. I'm going to be asking you questions to
11 get your understanding or knowledge associated
12 with topic 8.
13 A. Okay.
14 Q. Likewise is a similar topic. If you look
15 down at No. 10, all communications between
16 Glidewell and it lists various other parties,
17 certainly at least some of which kind of fall in
18 the category of parties that are using brux in
19 their names, things like that. I'll be asking
20 questions in connection with topic 10?
21 A. No. 10, okay.
22 Q. And then topic 11 which is

Page 36

1 representations made to the U.S. Patent and
2 Trademark Office regarding basically the trademark
3 application BruxZir.
4 A. Okay.
5 Q. And topic 12 any and all instances of
6 actual or parent confusion association between the
7 BruxZir mark and the KDZ BRUXER mark. So I'll ask
8 you questions about that. Topic 13 also gets back
9 to the trademark issue of BruxZir, any searches or
10 studies that Glidewell's done in connection with
11 that. Finally if you turn the page, you'll see
12 topic 20, which is Glidewell's enforcement of the
13 BruxZir mark which I believe Mr. Shuck said you'd
14 have knowledge on that as well. *** check dock
15 ***
16 A. No. 20.
17 Q. Right.
18 A. Which sounds a lot like --
19 Q. Yeah, there's overlap.
20 A. -- No. 10, I guess.
21 Q. Exactly.
22 A. Okay.

EXHIBIT 12
-189-

Page 37

1    Q.  The other area that Mr. Shuck was
2    questioned about where he had trouble answering
3    questions was in connection with financial
4    documents that Glidewell had produced in the case,
5    and I believe you've been designated to provide
6    testimony on the financial documents as well.
7        A.  Yes.
8        Q.  In that regard we have a deposition of
9    Mr. Sasaki noticed for tomorrow, and your counsel
10   and I have spoken about assuming that you have
11   sufficient knowledge of the documents to testify
12   it knowledgeably about them, we may not need the
13   deposition tomorrow.
14       A.  Okay.
15       Q.  So we'll see how it goes today.  In that
16   regard, why don't we get to those documents
17   because I think I'll credit the court reporter
18   mark as Exhibit 118 what's entitled consolidated
19   financial statements years ended December 31,
20   2010, and 2009 for James R. Glidewell, dental
21   ceramics, Inc.
22   ///

Page 38

1            (Exhibit No. 118 was marked for
2            identification.)
3        MR. JANKOWSKI:  And then I'll have the
4    court reporter also mark as Exhibit 119 the same
5    document except it's for the years ended
6    December 31, 2011 and 2010.
7            (Exhibit No. 119 was marked for
8            identification.)
9    BY MR. JANKOWSKI:
10       Q.  Mr. Allred, if you could briefly look at
11   these exhibits and have you seen Exhibits 118 and
12   119 before?
13       A.  Yes.
14       Q.  And what are Exhibits 118 and 119?
15       A.  They both have the year 2010, and it
16   starts at 2009 and ends in 2011.  They are balance
17   sheet and income statements.
18       Q.  In fact, each one presents information
19   for two consecutive years; correct?
20       A.  Correct.
21       Q.  I think what you were just saying was
22   they share the year 2010, one for the first

Page 39

1    document that's the later year, and for the second
2    document that's the earlier year?
3        A.  Correct.
4        Q.  Okay.  And is this a document that you
5    participate in the creation of within Glidewell?
6        A.  It is not.
7        Q.  But can you confirm for me that this is a
8    business record of Glidewell Laboratories that it
9    creates in the ordinary course of business?
10       A.  Yes, and it is audited by a certified
11   public accountant.
12       Q.  And, in fact, this is something that is
13   prepared every year by Glidewell, a document like
14   this is prepared every year?
15       A.  That is correct.
16       Q.  And that's been true ever since you've
17   been at Glidewell?
18       A.  That has been true.  Not this firm
19   necessarily.
20       Q.  When you say this firm, it's --
21       A.  I see it's KSJG.
22       Q.  Right.  Which is a CPA firm; correct?

Page 40

1        A.  Correct.
2        Q.  And what's your understanding of the
3    reason why Glidewell creates these documents?
4        A.  Well, I think it probably would be
5    required to because it does have loans with banks,
6    but then you'd have to have some kind of document
7    to pay your taxes, of course.
8        Q.  So these kind of documents to be used
9    among other things associated with the tax filings
10   of Glidewell; correct?
11       A.  Correct.
12       Q.  Okay and if turn to the page 2 of the
13   document, I think they're -- if you turn to page 2
14   of both documents?
15       A.  Oh, both?
16       Q.  You can turn to both because I think they
17   really follow the same structure.  And it's
18   actually numbered page 2.  It's in a little
19   deeper.  You'll see there's a list of?
20       A.  Oh, I see that.
21       Q.  You'll see on page 2 there's a list of
22   assets.  Do you see that?

EXHIBIT 12
-190-

Page 41

1     A. I do.
2     Q. Okay. And so this is just a page where
3  Glidewell is setting forth assets of the entity;
4  correct?
5     A. Correct. This is a balance sheet.
6     Q. Right. And as we've been discussing it's
7  a consolidated balance sheet meaning it's showing
8  two consecutive years?
9     A. Meaning it's actually comprised of
10  several different companies.
11     Q. Oh, so consolidated in this context means
12  multiple companies are being considered?
13     A. Correct.
14     Q. What companies are being considered in
15  this?
16     A. Would you like a list of companies?
17     Q. Sure.
18     A. Okay. Well, the major player in that
19  whole thing is James R. Glidewell dental ceramics,
20  Inc.
21     Q. Okay.
22     A. There also would be Prismatik dental

Page 42

1  craft, Inc.
2     Q. Is that with a K?
3     A. Yes. And dental craft is one word.
4     Q. What other companies?
5     A. Riverside dental ceramics, Inc.. new
6  west dental laboratories, Inc. Smith sterling
7  dental laboratories. That's an Inc. That's a
8  Florida company, and new west is an Arizona
9  company. The first two or California companies.
10  And another California company -- did I say
11  Riverside dental ceramics?
12     Q. You did.
13     A. So that would be three. The first three
14  or California companies. A Nevada company is Las
15  Vegas digital dental, and that's an LLC. I think
16  I'm kind of messing that up a little bit. Smith
17  sterling is actually a fictitious name. It's a
18  trademark also. But it's a fictitious name for
19  Dentalium dental ceramics, Inc., which is the
20  Florida company. And that owns LVDDS -- no. Not
21  LV. I have to think of the acronym, but it owns a
22  company in Costa Rica. So that's a Costa Rican

Page 43

1  company and Smith sterling is the fictitious name
2  for that operation. But that actual company is
3  Dentalium dental centimeter, Inc. So there is
4  (*** GET SPELLING ***) also a JRG Dentalium, Inc.,
5  and that owns pacific edge dental laboratories
6  which is also a fictitious name, but it stands for
7  actually a company of that name in Mexico.
8     Q. And all of these companies are
9  encapsulated in the consolidated balance sheets
10  here?
11     A. And there's more than that even. Those
12  are the ones I mainly remember because they
13  indirectly related to dental products.
14     Q. I see on the page -- it's not numbered
15  but page 1, I guess, which has the independent
16  auditors report it's signed by the CPA firm, I
17  guess, it mentions James R. Glidewell dental
18  centimeter, Inc. and subsidiaries. The and
19  subsidiaries is basically the laundry list you're
20  going through?
21     A. Correct. I'm not remembering the name
22  right off but there's a company, and I think it's

Page 44

1  an LLC and its asset is a corporate jet, for
2  instance.
3     Q. So that would be included in here as
4  well?
5     A. All the companies would be.
6     Q. Now, on the --
7     A. There's also a company called IOS that
8  would be part of this.
9     Q. Okay. And then on that independent
10  auditor's report I see there is a board of
11  directors that it references of James R. Glidewell
12  dental centimeter. Do you see that?
13     A. We're still on this page here, the
14  independent auditor's report?
15     Q. Correct, at the very top. How many
16  directors are there on the board of directors? Do
17  you know?
18     A. There's one.
19     Q. The board is just one director?
20     A. Yes.
21     Q. Is that Mr. James Glidewell?
22     A. Yes.

EXHIBIT 12
-191-

Page 45

1    Q. I bet he's the chair too?
2    A. Chairman of the board and the president
3  of the company and the CEO.
4    Q. Okay. And you obviously work very
5  closely with Mr. Glidewell; correct?
6    A. I do as much as all his managers do.
7    Q. I wasn't going to put the org chart in
8  front of you. I've put it in front of so many
9  witnesses I'm tired of seeing it. Mr. Glidewell
10  is on the top and there's a number of people
11  underneath him like Mr. Shuck and yourself;
12  correct?
13    A. Correct. 3300 employees the last number
14  I remember.
15    Q. How many employees were there when you
16  started in '96? Do you recall?
17    A. I don't recall how many, but I think I
18  was like the 700th person hired I don't know how
19  many left before that.
20    Q. So it's grown pretty significantly since
21  1996 and 2012?
22    A. It has.

Page 46

1    Q. And it's still growing today?
2    A. It is.
3    Q. In fact, even looking at the numbers and
4  the, you know, in the documents Exhibits 118 and
5  119, they show growth from 2009 to 2010 to 2011 of
6  the company as a whole. Is that accurate?
7    A. That's correct.
8    Q. And if you turn to the last page of
9  Exhibit 118 -- actually go one more page back.
10    A. You mean the very last page?
11    Q. Yeah, there you go. I see there's a
12  note 8 associated with this statement, and it
13  makes a referencing to certain litigation arising
14  in the normal course of its business. Do you see
15  that?
16    A. I do.
17    Q. And if you look in the last page of
18  Exhibit 119, you'll see a similar statement is in
19  there as well. It doesn't identify what the
20  litigation is.
21    A. Oh, I see that, yeah. Note 8?
22    Q. Right.

Page 47

1    A. They're both note 8.
2    Q. Right. Note 8. Is it fair to say that
3  Glidewell is involved in litigation pretty much
4  every year of its existence?
5    A. No, that wouldn't be correct.
6    Q. That would not be correct? But it was
7  true since 2009?
8    A. Definitely true since 2009.
9    Q. Do you recall what litigation would be
10  associated with note 8 in Exhibit 118?
11    A. I do. It's the only thing that it could
12  have been, and that would have been a lawsuit
13  brought against Glidewell Laboratories by a
14  Pennsylvania doctor named Dr. Deep.
15    Q. How is his name spelled?
16    A. Deep. It's her. D-i-p-i-e-t-r-o.
17    Q. That was the only lawsuit you recall?
18    A. No. There would be another one. I'm not
19  exactly sure of the timing, but I'm sure it would
20  have to be somewhere around that period, and it
21  was a lawsuit brought on behalf of a plaintiff tan
22  Nguyen. It was a labor action.

Page 48

1    Q. So tan Nguyen was an employee?
2    A. Yes. It's Nguyen. I think it starts
3  with an H, not the N.
4    Q. Oh, how is that name spelled?
5    A. It's not easy to remember. I I had it's
6  H-u-y-e-n.
7    Q. Do you recall what the resolution of the
8  lawsuit was with employee Huyen?
9    A. I pretty much me to everything that's
10  happened, and I wouldn't call it a resolution.
11  I'd say it was an ongoing thing.
12    Q. Is it still ongoing today?
13    A. It is.
14    Q. Oh, it is.
15    A. Yes.
16    Q. Okay. How about the lawsuit with -- I
17  can't pronounce the name but the Pennsylvania --
18    A. Deep?
19    Q. Yeah, the Pennsylvania doctor.
20    A. That's an odd one. That was the longest
21  lawsuit in history, I think, for me and it still
22  is not over even though it may actually be when I

EXHIBIT 12
-192-

Page 49

1    look back a couple years from now.  It's just gone
2    dead.
3       Q.  So the lawsuit is still in existence?
4       A.  Yes.
5       Q.  What's the nature of that lawsuit?
6       A.  She had some failed crowns, and she
7    decided that the laboratory somehow had given her
8    some crowns that were going to fail.
9       Q.  So some kind of claim of defective
10   product?
11      A.  Exactly.
12      Q.  Okay.  Now, Glidewell sells a lot of
13   crowns?
14      A.  True.
15      Q.  Do you have a sense of how many crowns a
16   year Glidewell sells?
17      A.  Yeah.  Well, I should back up.  I don't
18   know exactly how many crowns, but we think in
19   terms of units.
20      Q.  Right.
21      A.  And that could be more than crowns.  Even
22   a denture could be a unit.  So you're looking at

Page 50

1    about 50,000 a month.
2       Q.  So more than half a million units a year;
3    correct?
4       A.  Yes.
5       Q.  And Glidewell puts a lot of effort into
6    quality control to make sure they're not getting
7    lawsuits like this one from the Pennsylvania
8    doctor?
9       A.  Yes.  And, in fact, it started as a gripe
10   about the specific material that we had used and
11   morphed into a lawsuit against the lab for having
12   made an inferior crown.
13      Q.  Are there any other lawsuits you can
14   think of since 2009?
15      A.  I don't think there are any others.
16      Q.  And Glidewell does not get sued for
17   defective crowns very often.  Is that fair?
18      A.  Not very often.  I would know of every
19   instance, and it's not very often, but there were
20   some when I first started working there.  Didn't
21   really have to do with the laboratory.  It had to
22   do with the material, manufactured material.

Page 51

1       Q.  Because Glidewell would buy the material
2    from another party and make crowns with it and
3    sell it it to dentists; right?
4       A.  Correct.
5       Q.  What's the material at issue, if you
6    know, in this lawsuit with this Pennsylvania
7    doctor?
8       A.  I do know.  It was a material from
9    Ivoclar, and it was called design which is spelled
10   odd.  It's a small D and a dash and a capital
11   S-i-g-n.  IPS design.  It's a glass.
12      Q.  So it would be capital I, capital P,
13   capital S and space lower case D, hyphen capital
14   S-i-g-n?
15      A.  Correct.
16      Q.  That's from Ivoclar?
17      A.  Yes.  It's a powdered centimeter that's
18   used to overlay a metal coping to make a PFM.
19      Q.  As I said, Exhibit 119 has that same
20   note 8 about litigation and it sounds like the
21   same litigation was still going on.  So guess the
22   notes here in note 8 in the two exhibits here in

Page 52

1    front of you Exhibit 118 and 119 are referring to
2    the same litigation.  Is that fair?
3       A.  Yeah.
4       Q.  And 119 can include the present
5    litigation?
6       A.  I'm trying to think of the dates on that.
7       Q.  This lawsuit was filed, I believe, in
8    2011.
9       A.  Okay.  I guess it would include this one
10   too, then.
11      Q.  When the they're preparing a document
12   like this, would your office be consulted to
13   contribute to review language, things -- this
14   refers to litigation.  I assume you're office
15   handles -- manages internally litigation?
16      A.  I have done that before, and I think I do
17   remember our attorney in Pennsylvania having
18   written something about that.  I don't remember if
19   Leonard had been asked to write anything about
20   that.  I know that they do get opinions of
21   attorneys when they do this.
22      Q.  Now, who works underneath you, if any,

EXHIBIT 12
-193-

Page 53

1  within Glidewell --
2      A.  No one.
3      Q.  In terms of the office of the general
4  counsel, it's basically you.  Is that fair?
5      A.  That's correct.
6      Q.  Okay.  Let me put in front of you -- you
7  can put these documents aside.
8         MR. TACHNER:  By the way David, as soon
9  as you decide one way or the other with respect to
10  Sasaki, just let us know so we could tell him
11  whether he's free tomorrow or has to be here?
12         MR. JANKOWSKI:  Right.  And that's why
13  I'm going through these now so we'll know earlier
14  rather than the end of the day.
15         MR. TACHNER:  Thank you.
16  BY MR. JANKOWSKI:
17      Q.  I'm going to hand you what has previously
18  been marked as Exhibit 37.  This is from the Shuck
19  deposition.  Mr. Allred, what this appears to be
20  me anyway is an assemblage of documents produced
21  by Glidewell in this case.  You'll see how it's
22  got the little numbers at the bottom.  The first

Page 54

1  page as GL 227?
2      A.  Right.  I see that.
3      Q.  So that's a production number that
4  Glidewell or Glidewell's attorney affixed to the
5  document just to indicate this is a document of
6  Glidewell that's being produced in the case, and
7  you see it's page 1 of 1.  If you turn to the
8  second page you see it's Glidewell 228.  I don't
9  think it's one document.  I think it was an
10  assemblage that was presented to Mr. Shuck in this
11  form and I'm present it to you in this form
12  because it was produced to him.  Not that I think
13  they actually go together.
14      A.  Okay.
15      Q.  Let me see if we can learn a little bit
16  about what appears to have been produced here.
17  The first page labeled GL 227 appears to have
18  numbers on it for -- well, columns for four years,
19  basically 2012 back to 2009.  Do you see that?
20      A.  I do.
21      Q.  And it looks like there's dollar amounts
22  there associated with a reference to things being

Page 55

1  sent to labs and things being sent to doctors.  Do
2  you see that?
3      A.  I do.
4      Q.  What's your understanding of what's being
5  shown here?  Can you tell?
6      A.  Based on what I think I'm looking at, I
7  would think I know what it's talking about.  And
8  it's talking about Prismatik zirconia blanks.
9  Well, it says blocks.
10      Q.  Why do you say Prismatik?  I would think
11  it's BruxZir blanks.
12      A.  That's correct.  Prismatik BruxZir
13  blanks.
14      Q.  Oh, sewer using -- so you're using the
15  word Prismatik with the BruxZir product as well?
16      A.  (No verbal response.)
17      Q.  Okay.  So -- or I guess another way we
18  can say it is BruxZir zirconia blanks?
19      A.  Correct.
20      Q.  And, in fact, is the BZ that's referenced
21  there a shorthand reference to BruxZir?
22      A.  It's got to be.

Page 56

1      Q.  I've seen that in a lot of these
2  documents.  And I see a reference to blocks and
3  solution which I would interpret as being the
4  blanks plus some of thenceary product that goes
5  with the blanks suches the coloring and liquid and
6  the like?
7      A.  That must be color ants.
8      Q.  Equipment associated with BruxZir such
9  as --
10      A.  Okay.
11      Q.  -- milling machines and sintering ovens?
12      A.  Correct.
13      Q.  And that's what the equipment is referred
14  to?
15      A.  That and even includes tools.
16      Q.  Okay.  And the first half of GL 227 says
17  two labs which I would interpret as this is a
18  reference to sales to dental laboratories.  Is
19  that accurate?
20      A.  Correct.
21      Q.  And I questioned Mr. Bartolo at length
22  about the Glidewell direct program and the fact

EXHIBIT 12
-194-

Page 57

1  that Glidewell sells blanks and also equipment to
2  dental laboratories, the authorized Glidewell
3  Laboratories.  And you're familiar with that;
4  correct?
5      A.  The blanks makes them an authorized
6  dental laboratory if they purchase blanks and make
7  crowns out of it.
8      Q.  Right.  And the bottom half of GL 227
9  says to doctors.  So those, I take it,
10  areferenceses to sales of blocks and solution or
11  equipment to dentists as opposed to dental labs.
12  Is that accurate?
13     A.  That's correct, but it could be a doctor
14  that owns a lab.
15     Q.  Yeah, in fact, that's probably what this
16  is because it does look like they're delegate them
17  blanks.  You're not normally going to sell a
18  dentist a blank unless they have their own ability
19  to fabricate; correct?
20     A.  True that would have to have a mill.
21     Q.  That would explain why the numbers in the
22  top half of the document are a lot bigger than the

Page 58

1  numbers in the bottom because there aren't a lot
2  of dentists buying blanks from Glidewell; correct?
3      A.  That's correct.
4      Q.  There's a lot buying crowns but not the
5  blanks?
6      A.  That's correct.
7      Q.  All right.  And do you have an
8  understanding of what the numbers are that are in
9  this page?  Is it just revenue?
10     A.  I am less familiar with this than the
11  later document we provided.  The later document,
12  if they're the same, it would be net sales.  It
13  would be less discounts.
14     Q.  That was actually going to be my next
15  question is I know we have had another document
16  production with more information, and maybe
17  that -- maybe this falls within that in any event.
18  But we'll get to the later document, and that
19  probably answers that question.  Okay.  If we turn
20  to the next page, this would be GL 228, this one
21  appears to be a reference to marketing expenses.
22  Do you see that?

Page 59

1      A.  I do.
2      Q.  This is associated with the BruxZir
3  brand, and you see it's referenced there on the
4  page.  Do you see that?
5      A.  I do.
6      Q.  This is an area where Mr. Shuck actually
7  has a little more knowledge in this area.  This
8  one I don't think is -- I don't think this
9  information was produced again later -- correct me
10  if I'm wrong -- but I think this is probably the
11  only presentation of marketing expense that we
12  have in this form.  Are you familiar with this
13  data?
14     A.  I know what it's talking about.
15     Q.  What is being shown on GL 228?
16     A.  This looks to me like the money that's
17  been spent on these various activities that are in
18  the left-hand column.
19     Q.  This is cumulative from 2009 to 2012?
20     A.  Correct.
21     Q.  And who is it within Glidewell who would
22  be, you know, managing the expenses?  Would that

Page 60

1  be Mr. Shuck?
2      A.  It would be.
3      Q.  Okay.  If we turn to the next page,
4  there's a plot of BruxZir sales.  Do you see that?
5      A.  I do.
6      Q.  And this document looks like it's
7  associated with a Darryl Withrow at the bottom,
8  vice president operations.  Do you see that?
9      A.  Correct.
10     Q.  And you know Mr. Withrow?
11     A.  I do.
12     Q.  Okay.  Do you have an understanding of
13  what's shown on this page?
14     A.  This is sales by month.  I don't see the
15  years.  They're probably there if I look a little
16  closer.  It looks like several years, and these
17  dot dot dots I suppose make it clearer.
18     Q.  The product started being sold in 2009,
19  correct, the BruxZir?
20     A.  Correct.
21     Q.  That probably tells us the first month
22  would be June, 2009?

15  (Pages 57 to 60)

**EXHIBIT 12**
**-195-**

Page 61

1     A.  Correct.  That's probably June, 2009, and
2  then you could just count the years down there.
3     Q.  Right.  And if that were the case, then
4  this would be showing sales through about June,
5  2012?
6     A.  Can you write on this?  Not really?
7     Q.  You can but I don't think you need to.
8     A.  Well, I guess you just count up those
9  Decembers there.  That would be one year.
10     Q.  Right, right.  I see -- if you want to
11  write and add -- do you just want to write and add
12  years to the document?
13     A.  I was just going to draw a line there to
14  December.
15     Q.  Go ahead.  That's not a bad idea since it
16  didn't do that.
17     A.  This one only goes to June, 2012.
18     Q.  Okay.  And this document looks like just
19  based on the document itself it was produced back
20  in early August.
21     A.  That's why it only goes to June.
22     Q.  Right.

Page 62

1     A.  The later one we provided you, I think,
2  goes to September.
3     Q.  And this is sales by month.  This is just
4  revenue; is that right?
5     A.  Correct.
6     Q.  And the top line -- the copy we are
7  looking at in this deposition are in black and
8  white; so I don't know if the original would have
9  been in color or otherwise to distinguish the
10  lines better.  The top line is the one associated
11  with the label Glidewell BruxZir; correct?
12     A.  Correct.
13     Q.  And the all satellite labs BruxZir is the
14  lower line; correct?
15     A.  True.
16     Q.  And when it says Glidewell BruxZir,
17  that's referencing dental restorations made out
18  the of the BruxZir material; correct?
19     A.  That's correct.
20     Q.  Okay.  And for all satellite labs
21  BruxZir, that's referring to the blanks --
22     A.  No, that's the same thing.  It's just

Page 63

1  that that's the other companies.  It's called
2  subsidiaries.
3     Q.  Oh, okay.  I'm confused then.  So you're
4  saying -- the lower line -- the satellite labs,
5  first of all, that's a reference to Glidewell's
6  authorized labs?
7     A.  No, that's Glidewell's subsidiaries.
8     Q.  Oh, okay.  Oh. Oh. So these are sales of
9  crowns by Glidewell's subsidiaries?
10     A.  Correct.
11     Q.  I see.  And these subsidiaries are
12  selling crowns -- is this limited to the U.S.?
13     A.  Definitely.
14     Q.  And these subsidiaries would be some of
15  the same ones you were referring to earlier
16  associated with the financial statements?
17     A.  They are the same ones.
18     Q.  Okay.  If we turn to the next document --
19  the next document is a little hard to read and, in
20  fact, the next two document are a little hard to
21  read.  One appears to be a two-page document and a
22  12-page document which is kind of in a spreadsheet

Page 64

1  form.
2     A.  This might look a little better on a
3  spreadsheet.
4     Q.  That's what I was going to say was we are
5  going to look at the spreadsheets that were
6  produced later.  Is it fair to say that the
7  spreadsheets that were produced to us later
8  include the same information?
9     A.  Yes.
10     Q.  And that's probably easier to look at
11  those?  I have nice printouts of those that I
12  think we can understand a little easier than
13  these.  We probably don't need to go through the
14  harder form of presentation.  Does that sound fair
15  to you?
16     A.  It does.
17     Q.  Okay.  Good.  I like that idea.  How you
18  doing?  You want to take a little break?
19          MR. TACHNER:  Sure.
20          THE WITNESS:  I'm doing good.
21  BY MR. JANKOWSKI:
22     Q.  You want to keep going or take a

EXHIBIT 12
-196-

1   break?
2       A.  It's up to you guys.
3           MR. JANKOWSKI:  Why don't we take a
4   five-minute break.
5           MR. TACHNER:  Okay.
6           (Recess taken from 10:58 a.m. to
7       11:11 a.m.)
8   BY MR. JANKOWSKI:
9       Q.  Mr. Allred, I'm going to hand you what
10  has been previously marked as Exhibit 40.  This is
11  a document that was provided to Mr. Shuck when he
12  was being questioned as Glidewell's designee.  If
13  you could just briefly look at Exhibit 40 for me.
14      A.  Okay.
15      Q.  I'll say this appears to be another
16  example of an assemblage of documents.  I don't
17  think it's one document.  I think it's a
18  collection of Glidewell documents each of which
19  was produced by Glidewell in the case but they
20  were all kind of combined together and submitted
21  to Mr. Shuck this way. :  Does it go on like this?
22  Is it more than one document?

1       Q.  Exactly.  It is.  The first one appears
2   to be a three-page document with Glidewell's
3   designation for purposes of producing it, GL 229.
4   Then there's a one-page document, GL 230.  Another
5   one-page document, GL 231.  Another one-page
6   document, GL 232.  Then a two-page document GL
7   233.  Two-page document, GL 234.
8       A.  There's a 234 on here?  Oh, okay.  There
9   it is.  They don't have any headings on them at
10  all, do they.
11      Q.  They don't appear to.
12      A.  Are these in response to particular
13  questions?
14      Q.  They were produced in the case, and in
15  the case Glidewell was asked to produce documents
16  associated with certain areas.  The short answer
17  is question.
18      A.  Okay.  It might help.
19      Q.  Let's just go through the first one, the
20  first single page document identifies a doctor ID
21  column, a description column, and a date column.
22  Do you see that?

1       A.  I do.
2       Q.  And do you know whether Glidewell has a
3   way of identifying -- well, the doctor ID column,
4   is doctor ID something that Glidewell.  Does
5   Glidewell use the term doctor ID?  Does it have a
6   particular meaning that you're aware of?
7       A.  It does.
8       Q.  What does doctor ID mean?
9       A.  Every client of the company has a unique
10  ID number, and the first two digits, I believe,
11  has to do with the company that that doctor is
12  dealing with.  So a 10 I believe is Glidewell
13  Laboratories.
14      Q.  Okay.  Some of the subsidiaries would
15  have different two digit beginnings?
16      A.  That is what I believe is correct.
17      Q.  What about the six digit number that
18  follows the two digit number?
19      A.  That's all part of the unique number
20  assigned to a particular individual.
21      Q.  So that would be a particular --
22      A.  Account I guess you'd say because an

1   account could be more than one doctor.
2       Q.  Sure.  And the account in this context is
3   referring to a dentist office typically?
4       A.  Correct.
5       Q.  Okay.  The date column is probably
6   self-explanatory.  It's the date something is
7   happening.  In fact, it's got a time as well;
8   correct?
9       A.  That's correct.
10      Q.  And the middle column has a description
11  in it.  Can you tell by looking at this what is
12  being referenced in the description column?
13      A.  I don't know what that is short for.  I
14  would look at that and see that as part of
15  something bigger.  Doctors requesting something.
16  I have no idea what it is because it doesn't have
17  any more information than that.  It looks like the
18  same account.  All the way down this first row
19  here is this same account.  It just looks like a
20  doctor requesting something day after day.  I
21  don't know what that means.
22      Q.  If you go down to the second page of the

EXHIBIT 12
-197-

Page 69

1    document still on GL 229, I see a prefix 30
2    instead of 10 at the beginning?
3        A. Correct.
4        Q. So that's going to be one of the
5    subsidiaries?
6        A. That's true.
7        Q. Do you know which subsidiary 30 is?
8        A. I don't.
9        Q. But it's one of them?
10       A. It would be one of them.
11       Q. And I see some of the descriptions a
12   things like confirm ship date information. Do you
13   see that?
14       A. I do see that.
15       Q. So this appears like maybe what it is is
16   some sort of log of people within Glidewell who
17   are handling communications with the accounts?
18       A. I'm pretty sure I know where this
19   information comes from.
20       Q. Where does it come from?
21       A. This would be a -- we call it GCM. It's
22   what you might think of as an information storage

Page 70

1    retrieval account management system. Maybe you're
2    familiar with the old telemagic. That's a way
3    that you record some transaction with an account,
4    a client, and it does record that kind of
5    information, what it was that was discussed, it
6    was, and the date it was done on.
7        Q. So, for example, a Glidewell employee is
8    talking on the phone with a dentist and they'll
9    enter something into the computer that
10   memorializes the phone call?
11       A. Pretty much can count on that with any
12   customer service person.
13       Q. So these entries are probably by the
14   customer service people?
15       A. That would be almost every case.
16       Q. When I was questioning Mr. Bartolo
17   yesterday, he talked about having customer service
18   people working underneath him at Glidewell direct.
19   Is that probably that this is associated with?
20       A. It might be specifically Glidewell
21   direct.
22       Q. Or might not because actually there's

Page 71

1    probably customer service separate from Glidewell
2    direct as well; correct?
3        A. That's true.
4        Q. Okay. If we turn to the next page which
5    is designated GL 230?
6        A. Okay.
7        Q. This is a three-column table with the
8    headings product, product ID, and product for sale
9    date. Do you see that?
10       A. That helps, yes.
11       Q. This one I think is a little easier to
12   understand, and we also see the -- if you look
13   under product ID I see BZCLA 1 in the first one.
14   And to the left I see BruxZir color liquid shade
15   A1. This is further confirmation that the BZ
16   seems to be Glidewell's internal designation for
17   BruxZir. Is that fair?
18       A. Yes.
19       Q. Here when it says CL, it looks like it's
20   a shorthand for color liquid. Would you agree?
21       A. That's a logical deduction. It could be
22   anything. Definitely the products are uniquely

Page 72

1    identified by codes. That's how they price them
2    in the accounting system. It's all part of the
3    same system.
4        Q. Right. So that first entry there you can
5    see BZCLA1 corresponds nicely with BruxZir color
6    liquid shade A 1?
7        A. That works out good.
8        Q. The last column appears to be providing
9    information on when that particular product was
10   first sold by Glidewell; is that right?
11       A. I see that, yes.
12       Q. If we go down towards the bottom of the
13   column, I see reference to BruxZir milling blanks,
14   12 millimeter, 15 millimeter, 20 millimeter, and
15   25 millimeter. Do you see that?
16       A. I do.
17       Q. You're aware that BruxZir sells milling
18   blanks with different sizes; correct?
19       A. Yes.
20       Q. Similarly this table appears to be giving
21   for each of these various products the first sale
22   date by Glidewell; is that right?

18 (Pages 69 to 72)

EXHIBIT 12
-198-

Page 73

1    A. Definitely the first date that this code
2  was ever used.
3    Q. Okay.  And to answer your earlier
4  question, this is an example where Glidewell was
5  asked to provide information on the first date of
6  sale, and so this is a document that was produced
7  in response to the sets of requests that included
8  that request.
9    A. Okay.
10    Q. To understand why that would be
11  presented?
12    A. Relating to this first page?
13    Q. Or even this first page.  In other words,
14  each of these documents was produced by Glidewell
15  because in the lawsuit they were asked to provide
16  certain types of information.  One of the types of
17  information that was asked was what was your first
18  day selling these various products, for example?
19    A. And what was this in response to, the
20  first?
21    Q. I don't know.  I'm speaking generally
22  about why the documents are being produced?

Page 74

1    A. Okay.
2    Q. If you turn to the next document, GL 231?
3    A. I guess I'm there.
4    Q. On this one I see a four-column table,
5  and I see on the left a company.  Do you see that?
6    A. I do.
7    Q. A customer first name do you see that?
8    A. Uh-huh.
9    Q. A customer last name, and a customer ID.
10  Do you see that?
11    A. I do.
12    Q. I think you already testified about this
13  about how the customer ID is referring to a
14  particular account?
15    A. Correct.
16    Q. Is it fair to say this table is just
17  providing more information on these accounts,
18  namely a company name and then an individual name?
19    A. It does look to be laboratories in
20  particular.
21    Q. Right.  For these instances here, it is.
22  Correct.  So the customer ID, the customer might

Page 75

1  be a dental lab; correct?
2    A. I would say this one they are dental
3  labs.
4    Q. Do you have an understanding for why
5  these particular labs have been identified in this
6  document?
7    A. It looks to me like they are purchasers
8  given the rest of this stuff here of the zirconia
9  blanks.
10    Q. But certainly this is not a comprehensive
11  list of all the dental labs that buy the blanks
12  because there's a lot more than this; correct?
13    A. There's a lot more than that.
14    Q. And do you have a sense for why this
15  subset was called on in this particular page?
16    A. I don't because I don't see a date which
17  you were saying before maybe corresponded to the
18  first purchasers of blanks.  So I don't know why
19  just those few.
20    Q. All right.  Let's turn to the next
21  document, GL 232.  This is another four-column
22  table that shows model, number serial number, lot

Page 76

1  number, and product category.  Do you see that?
2    A. I do.
3    Q. Do you have an understanding for what
4  those headings mean within Glidewell?
5    A. I would just have to guess.  It doesn't
6  apply to anything on this page.  Nothing having to
7  do with this page.
8    Q. But what about model -- just the phrase
9  model number, does that have a meaning within
10  Glidewell, a particular meaning?
11    A. Not that I am familiar with.
12    Q. Okay.  How about serial number?
13    A. I only see that it's used here.
14    Q. How about lot number?
15    A. I see that's used here too.
16    Q. Product category I think is
17  understandable; right?
18    A. Yeah, that's pretty straightforward.
19    Q. Okay.  Let's turn to the next document,
20  GL 233.  This is a two-page document.  You know, I
21  think this may maybe helps answer my earlier
22  question to you where we saw some of these names

19  (Pages 73 to 76)

EXHIBIT 12
-199-

Page 77

1    of these companies and we saw first sale
2    information, and you were saying they might be
3    connected, the names and sales, and it looks like
4    GL 233 might do just that; right?  In other words,
5    I see a column, the second column over says
6    product first sale date.  Do you see that?
7        A.  I do.
8        Q.  And you've got the product ID on the left
9    which we've already discussed what that is;
10   correct?
11       A.  Correct.
12       Q.  And now we've got the information we saw
13   before namely a company, a customer first name and
14   a customer last name.  Now those are correlated.
15   So is it fair to say that this is providing
16   information on not just the for sale date but who
17   the customer was who purchased the product on that
18   sale date?  Does that look accurate?
19       A.  Definitely looks like it's showing
20   exactly what a laboratory bought on a particular
21   date.
22       Q.  Right.  For the various product IDs;

Page 78

1    correct?
2        A.  Correct.
3        Q.  Okay.  And the customer ID at the far
4    light is going to be the same customer ID
5    information we discussed earlier; correct?
6        A.  That will be a unique number for each
7    account, correct.
8        Q.  If we turn to the next page or next
9    document I should say, GL 234, this is similar to
10   one of the earlier ones that appears to have that
11   model number, the serial number, lot number,
12   product category and the product.  So, again, this
13   doesn't really have much helpful information on it
14   that I can tell.  Can you make heads or tails of
15   GL 234?
16       A.  It just looks like the type of product
17   that we sell and all of the different ways that it
18   can be purchased, and primarily in this page here
19   seems to be the different shades of coloring
20   liquid.  I see some milling blanks at the bottom
21   and the different sizes.  It looks like there's
22   different sizes of sintering boats.

Page 79

1        Q.  And again, you don't have an
2    understanding of what the lot number is that's
3    referenced in the third column over?
4        A.  Well, I understand why they use lot
5    numbers.  I don't know exactly when they cut over
6    and maybe put it on this sheet or when they
7    stopped using them on this sheet because they were
8    keeping track of it in some other way.
9        Q.  What does lot number mean to you?
10       A.  That would be something that's kept track
11   of for purposes of quality control and the
12   regulatory affairs, some kind of quality
13   assessment program having to do with ISO
14   certification that Prismatik is ISO certified.  So
15   they would have to keep track of that information.
16       Q.  When you say Prismatik, this is the
17   Prismatik BruxZir --
18       A.  Prismatik dental craft, Inc.
19       Q.  Prismatik dental craft, Inc.  Okay.
20   Actually the lot numbers are only shown for some
21   of these for some reason.  Do you have an
22   understanding for why some of these don't have lot

Page 80

1    numbers associated with them?
2        A.  What I was just ruminating on, I don't
3    know if they began to be used on this particular
4    program that's printing this and they were kept
5    track of in some other way before or if now
6    they're kept in some other way and they're not
7    longer kept on this program.  I just know they are
8    kept and they are done and every single thing
9    that's made and has to be kept track would have a
10   lot number.
11       Q.  So for example the BruxZir milling blanks
12   that are listed towards the bottom of this page,
13   GL 234, page 1 of 2, those are going to lot
14   numbers even though they're not shown on this
15   exhibit?
16       A.  Yes.
17       Q.  Okay.  Let's move on to a lot exhibit and
18   set that one aside.  In fact, let's get to the
19   newer documents.  I think are we up to
20   Exhibit 120?
21       THE REPORTER:  Correct.
22       MR. JANKOWSKI:  I'll have the court

20 (Pages 77 to 80)

EXHIBIT 12
-200-

Page 81

1   reporter mark as the next Exhibit 120 a nine-page
2   document which is a printout from an ex-he will
3   spreadsheet that was produced in native format by
4   Glidewell.
5          (Exhibit No. 120 was marked for
6          identification.)
7   BY MR. JANKOWSKI:
8      Q.  Mr. Allred, if you just briefly look at
9   Exhibit 120, do you recognize this exhibit?
10     A.  I recognize what's on the document.  Or
11  recognize the words, what they're talking about.
12     Q.  Okay.  And what is being shown in
13  Exhibit 120?
14     A.  It looks like blocks in various sizes
15  made to fit various mills, each of them being
16  identified by a unique ID.
17     Q.  So this correlates the product ID with a
18  description of what the product is?
19     A.  Correct.
20     Q.  As you go down the document, it's not
21  just the milling blocks.  It goes into other
22  products as well correct such as coloring liquids

Page 82

1   and dental restorations?
2      A.  Yeah, blank block, blank block.  This
3   looks mainly blocks and then final moves into
4   coloring liquids, correct.
5      Q.  And then moves into dental restorations?
6      A.  Then dental restorations.
7      Q.  And I notice under department ID that the
8   blocks are sold by Glidewell direct; correct?
9      A.  Well, it was on this first page here.
10  And the second page.
11     Q.  Right.  And that's --
12     A.  And the third page.  And part of the
13  fourth page.
14     Q.  And coloring liquids are also sold by
15  Glidewell direct?
16     A.  Correct.
17     Q.  Okay.  And then if you get to the fourth
18  page when you get to dental restorations, which
19  are now being sold to doctors or dentists, the
20  department changed.  It's not Glidewell direct
21  anymore.  It's other departments; correct?
22     A.  Correct.

Page 83

1      Q.  And I see references to a fixed
2   department and a BioTemps department and a gold
3   zirconia and comp department.  Do you see that?
4      A.  I do.
5      Q.  And so they're various departments within
6   Glidewell that are responsible for fabricating
7   these dental restorations and selling them to
8   dentists around the country.  Is that accurate?
9      A.  That's true.
10     Q.  And that's what's being shown here is
11  which dental is responsible for these various
12  products; correct?
13     A.  That is the code that is used for each of
14  these departments when they fabricate that
15  product.  So that's how you would keep track of
16  your sales if you were in the high tech
17  department, all ceramics and you were make a
18  BruxZir bridge unfinished, for instance.
19     Q.  Every crown or dental restoration that's
20  sold by Glidewell is going to have a particular
21  product ID as shown in Exhibit to and it's going
22  to come out with a particular department with a

Page 84

1   department ID as shown in this exhibit; correct?
2      A.  That's what this is right here.
3      Q.  And so, again, your testimony today is
4   that this is true and accurate business records of
5   Glidewell as produced in this case; correct?
6      A.  That's true.  That's how they keep track
7   of their production.
8      Q.  Okay.  Let me show you -- or excuse me.
9   Let me have the court reporter mark as Exhibit 121
10  a four-page document.
11         (Exhibit No. 121 was marked for
12         identification.)
13  BY MR. JANKOWSKI:
14     Q.  Exhibit 121, Mr. Allred --
15     A.  Are we done with this one?
16     Q.  We are done with that one.
17     A.  Oh, okay.
18     Q.  Yes, you can set that one aside.
19         Exhibit 121 was also produced by
20  Glidewell at the same time as the previous
21  document, and it was produced in a native format?
22     A.  This was the most recent we provided you?

EXHIBIT 12
-201-

1  Q. Correct.
2  A. I'm familiar with this.
3  Q. What is shown mere in Exhibit 121?
4  A. This is showing the sales by month
5  beginning in June, 2009, to, I believe, September,
6  2012. And be it's broken apart by -- it was four
7  categories. I see dental restorations, blocks,
8  coloring liquids.
9  Q. And then equipments if you go down far
10  enough?
11  A. And then equipments.
12  Q. Okay. And so, again, this document would
13  be accurate business records of Glidewell as
14  produced by Glidewell in this case?
15  A. This is an accurate record produced
16  pursuant to your request for document.
17  Q. Right. And the left most column is
18  showing the year of invoicing; correct?
19  A. That's correct.
20  Q. And the second column is showing the
21  month where one is January and 12 is December and
22  so on?

1  A. Correct. It looks like same info there,
2  month and month name.
3  Q. They give us both ways of presenting the
4  month and product groups are the one you just
5  mentioned broken out. Dental restorations which
6  means crowns and the like, blocks which mean the
7  milling blanks, the coloring liquids and then
8  equipment are separate categories in this
9  document; correct?
10  A. Correct.
11  Q. And then the net sales is shown in the
12  far right column; correct?
13  A. Correct.
14  Q. Do you know whether Glidewell maintains
15  information on, you know, cost of goods sold
16  associated with these categories?
17  A. They would have the ability to get that
18  information if they didn't do it on a regular
19  basis already, for sure.
20  Q. Associated, that they could generate
21  gross profits by category as well?
22  A. That would be something that they could

1  do for sure.
2  Q. Okay.
3  MR. JANKOWSKI: Okay. Can we go off the
4  record.
5  (Lunc recess taken from 11:40 a.m. to
6  12:58 p.m.)
7  BY MR. JANKOWSKI:
8  Q. Mr. Allred, one of the things that -- we
9  just had our lunch break, and one of the things
10  that happened was we expedited to cancel the
11  deposition of Mr. Sasaki, the chief financial
12  officer of Glidewell based on the testimony you've
13  been given of giving this morning. And also I had
14  a conversation with your counsel. What I had like
15  you to do is investigate from Glidewell additional
16  financial information along the lines of the
17  spreadsheet with the sales informing by month that
18  you were testifying about just before lunch and
19  under particular I think what -- basically what we
20  want to know is both net and gross sales of the
21  products. So, you know, like taking into account
22  if you have cost of goods sold information on the

1  categories that correlates with the sales. Like
2  right now the information is just revenue --
3  A. The net sales is only net of discounts so
4  that is gross sales less any discounts less the
5  cost to make it.
6  Q. Let me ask you this: What I'd like you
7  to investigate is cost of goods sold associated.
8  Providing the information on cost of goods sold
9  associated with the same sales are shown --
10  A. I think we can do that in general with
11  you that wouldn't be anything that we would ever
12  know on a unit by unit basis which is how all
13  those figures are derived by the individual
14  product code by doctor. There's no way to know
15  what the actual cost of goods sold is for that
16  unit. It would be very easy for a company like I
17  work for to be able to determine what the cost of
18  goods sold was for something, for example, a
19  finished crown. Any type.
20  Q. In a sense that's what I'm asking for?
21  A. It's not anything that exists on a
22  monthly to monthly basis necessarily.

EXHIBIT 12
-202-

Page 89

1        Q.  You don't need to give it on a
2    month-by-month basis if that's not appropriate.
3        A.  Okay.
4        Q.  For example, if you've got a cost of
5    goods sold for what the product is generally for
6    the 2011 calendar year, I think that suffice.
7        A.  And you're interested in that for a
8    specific product?  Because obviously for all
9    products that's part of the statements where you
10   look down and see the net income.
11       Q.  Okay.  So the products that are
12   identified in the exhibit we were looking at
13   before lunch.
14       A.  Well, we had equipment, color ants,
15   dental restorations.
16       Q.  Right.
17       A.  And one other thing.  Blocks.
18       Q.  Right.
19       A.  So obviously colorants are divided up
20   into many many different types, and it probably
21   would make sense to at most have it for colorants
22   in general.  And then crowns could, of course, be

Page 90

1    many different laboratories we know, and it would
2    probably make sense to just have something in
3    general for the company in general.  Otherwise, it
4    looks like a lot of tedious work, and I don't know
5    how much time that would take or how difficult it
6    would be.
7        I just know my company could easily know
8    what the cost of goods sold was for a particular
9    item if you have one in mind like, for instance, a
10   mill and even that might be kind of difficult but
11   I'm sure they could come up with it, something
12   based on an analysis.  Some of these things would
13   be a little difficult because it would be
14   difficult to know how much you put in there if you
15   as a company looking from the point of view from a
16   long range plan of building mills because
17   obviously in the early stages you have research
18   and engineering and you have things you try and
19   don't work and you replace and theoretically your
20   first unit could cost a million dollars even
21   though the target price could be 60,000.  Some of
22   these things would be up to us how we interpreted

Page 91

1    what your request was.  If you made it something
2    as narrow as what, for instance, is the cost of
3    goods sold for a full contour zirconia crown given
4    the fact that you buy the block for a certain
5    amount, you could come up with that amount.  If
6    you then say how much does it cost to produce a
7    zirconia block of, say, a certain thickness and I
8    remember seeing 25, for instance the ones we use,
9    that would give you an idea.  I think if that's
10   all you need, I think that would be pretty easy to
11   do.
12       Q.  I understand what you're saying.  Why
13   don't you investigate for us the cost of goods
14   sold associated with the BruxZir crown.
15       A.  Okay.
16       Q.  That product specifically.  I mean that's
17   the product that's kind of at issue in this case
18   in terms of Keating sells crowns under the KDZ
19   Bruxer mark and so on.
20       A.  Okay.  And then let me ask you in
21   Exhibit 121, do you still have that in front of
22   you.

Page 92

1        A.  Is that the last one we looked at?
2        Q.  Yes.
3        A.  Okay.
4        Q.  Where it has net sales on the right hand
5    column, does Glidewell have unit information as
6    well on that?
7        A.  Oh, yeah, it would.  It would have it all
8    the way down to what the sales would be by the
9    particular laboratory that did it.  You saw that
10   code there.
11       Q.  Right, right.  So here another thing I
12   would like to have is a number of unit associated
13   with this spreadsheet essentially, the information
14   in this spreadsheet.  So each entry has a net
15   sales amount, but I don't know how many of the
16   dental restorations --
17       A.  Shall we just agree that we just do that
18   for just the BruxZir crowns?
19       Q.  Sure.
20       A.  Because that might be a little bit more
21   manageable.
22       Q.  Yes and same for cost of goods sold.

23  (Pages 89 to 92)

EXHIBIT 12
-203-

Page 93

1    A.  Do you want it actually broken out by --
2  in some particular way more than just a number?
3  Because I can tell you right now we're going over
4  15,000 full contour circumstance crowns every
5  week.
6    Q.  Okay.  That's helpful.  That's the kind
7  of information that -- if you can -- I mean if you
8  can just have somebody generate --
9    A.  How about number of units of the crowns
10 per week since 2009 because I think we actually
11 have that.  It's something we've actually provided
12 but we can do it on a separate spreadsheet.
13   Q.  Or per month since this is per month?
14   A.  Yeah.  I think we have it already, in
15 fact.
16   Q.  Right.
17   A.  We could just maybe redo it again in a
18 format like this if you'd like it.  So we have
19 2009, we have June.  This whole sheet would be
20 nothing but full contour zirconia crowns and in
21 the right hand column the net sales would be
22 number of units.

Page 94

1    Q.  Correct.
2    A.  Okay.  I think that's very doable.
3    Q.  Can you also do net sales with the crown
4  as well?
5    A.  You mean right with it?  Sure.
6    MR. JANKOWSKI:  Here it says dental
7  restorations.  That might be something beyond the
8  crown.
9    THE WITNESS:  You can divide it up by $99
10 it's roughly the same number.
11 BY MR. JANKOWSKI:
12   Q.  Has the price been the same the whole
13 time?
14   A.  I can't he.
15   Q.  Do these dental restorations include
16 restorations beyond crown here?
17   A.  No, they're all per unit.  Could very
18 well be a bridge but it still would be by unit.
19   Q.  Let me ask you this then; make this
20 spreadsheet just for the crowns.  And where --
21 actually I guess that's all we -- you're telling
22 me the price has been 99 the whole time?

Page 95

1    A.  Yeah I'm just giving you a heads up on
2  what it be.  I already pretty much know what the
3  number would be just by the sales.
4    Q.  An equivalent to this spreadsheet where
5  it's nothing but the full zirconia crowns
6  coverage?
7    MR. TACHNER:  Do you break it out
8  separate from bridges?
9    THE WITNESS:  No.
10   MR. TACHNER:  Then you can't apply with
11 this request.
12   THE WITNESS:  Yeah, we have them by unit
13 because a bridge is a certain number of units, and
14 that's how they're built.
15   MR. TACHNER:  If you have a three-unit
16 bridge, it's a $300 item?
17   THE WITNESS:  Yes, it is.  From us.  Of
18 course, from the doctor it's 3,000.
19   MR. TACHNER:  I'm just making sure you
20 agree to something you could do.  That's all.
21 BY MR. JANKOWSKI:
22   Q.  And then, in fact, I guess the -- then

Page 96

1  the units is just going to be -- well, if it's
2  easy, just put the units on the spreadsheet as
3  well.
4    A.  I'm sure that's how -- this might even
5  come about.  It might have been the number of
6  units times -- minus something and times 99
7  dollars.  I don't know if they actually have
8  separate columns for all that or not.
9    Q.  Right?
10   A.  That's what the codes are all about.
11 Once you put in the code you put 1 times that code
12 and you get the dollar amount; so it's built in.
13 That's what the codes are all about but they
14 obviously have some discounts or something.  Maybe
15 that's a minus 1 or minus 10 percent for a could
16 you please on so that's why you end up with the
17 net sales being a little different.  It roughly
18 would be something -- if anything it would be more
19 units than what it would be by dividing by 99
20 because if it was cheaper than 99 because someone
21 had a 10 percent discount in every ace, it would
22 actually be 10 percent more units than if you

EXHIBIT 12
-204-

Page 97

1    divided that by 99.  We're talking about
2    something -- I can tell you the figure would be a
3    certain number if divided by 99 or more.
4        Q.  In fact, I've seen $20 off coupons?
5        A.  Okay.  Per unit?
6        Q.  Right, per unit with a maximum of four or
7    something.
8        A.  That could be different because say it
9    was an eight-unit bridge.
10       Q.  Yes.  Okay.  So that would be perfect.
11   So it would look like Exhibit 121.  You don't need
12   the replicate the month by number and name other
13   than it would be the same except for product group
14   it's just going to say BruxZir crown?
15       A.  Dental restoration, sure.
16       Q.  And units and net sales.  Does that sound
17   right?
18       A.  Sure.  In fact, I can just write it on
19   here.
20       Q.  Don't write it on that because this goes
21   with the court reporter.
22       A.  Oh, because that one is already written

Page 98

1    on.
2        Q.  That's okay.  But we'll make a point of
3    that.
4        A.  So we only just want the number or name
5    of the month.
6        Q.  If you want to put in both you can but
7    it's redundant and you don't have to repeat that.
8        And does Glidewell keep track of a
9    profit, a profit ability of its products does it
10   have a sense what the profitability is of its
11   BruxZir crowns?
12       A.  Sure.
13       Q.  That was also information we asked for?
14       A.  Profitability?  That would be the profit
15   margin; right.
16       Q.  Yeah.  I would like something like that
17   to be also include.  Can that be tracked by month?
18       A.  I doubt.  Anything can be put on a
19   monthly basis.
20       Q.  I'm not trying to make work for you?
21       A.  I'm just saying anyone can come with
22   numbers.  Those things aren't done on a monthly or

Page 99

1    a unit by unit basis.
2        Q.  Okay.
3        A.  Because there's costs that aren't paid
4    that.  For our own purposes obviously not for
5    purposes of litigation but only keeping track of
6    all cost and can be spread in any number of ways.
7    You would obviously be looking at a company like
8    this at what products have the highest profit
9    margin and that might be irrelevant if a product
10   with a low profit margin has a lot more units but
11   still it's just information like a company I work
12   for would probably keep in some format or another,
13   not on a daily basis but certainly on a yearly
14   basis and probably episodically for planning
15   purposes.  So I know it's something we can derive.
16   As far as on a monthly basis, all you'd be doing
17   is just finding the figure and however we would at
18   some point in time through some certain date and
19   you divide it by the number of units and just
20   spread it.  It is a make work thing but it
21   wouldn't be a difficult thing obviously.  I just
22   want you to know that's all someone would be

Page 100

1    doing.  You'd be interpreting my request with me
2    understanding it the way I do and directly it
3    somewhat is say they want to divide it out by unit
4    based on the month because they want to see it by
5    month.  At firm they would be determining it based
6    on gross numbers because that's what it would be.
7    It would be number of costs associated with why
8    not use the most possible.  If question do 15,000
9    a week, for instance, why not to date.  We're
10   talking at least 20 weeks or something.  Why not
11   find out everything it took over a 20-week period
12   to make that many crowns and from that month on
13   you can spread it by month or hour.  I'm saying
14   mainly over all you're not going to get more than
15   a number, it's a real number it's what it cost to
16   make a particular type of crown (*** CHECK ***).
17       Q.  I appreciate in an explanation and with
18   that in mind I'm asking for if you can gather for
19   me what Glidewell considers the profitability of
20   its BruxZir crown.
21       A.  Okay.
22       Q.  Product.

25  (Pages 97 to 100)

**EXHIBIT 12**
**-205-**

Page 101

1    A. And you'd be talking about gross profit
2  margin or net.
3    Q. Both gross and net?
4    A. We kind of me to the net only we know it
5  will probably be more than the financial statement
6  shows because I think the figures will show that
7  it is a higher profit margin than the old
8  fashioned way.
9    Q. Okay. Which would explain why you guys
10 are putting a lot of effort in that area.
11   A. Well, that definitely works out well for
12 the customer too because that's probably resolved
13 in the price. So it could be even though it might
14 be more affordable to me, we might be pricing it
15 so attractively that it isn't. I don't know. I'd
16 have to look at the numbers. I'm not quite
17 sure.
18   Q. It sounds like that's a number that may
19 exist by year for the product?
20   A. Oh, definitely, yeah. I'd say it would
21 probably exist over a certain number of units,
22 however many number of units. The more you take,

Page 102

1  the more accurate they will would be. All books
2  are done at least on a yearly basis so I know we
3  can get a yearly. I think it's possible -- a
4  yearly would be great actually.
5    Q. Let's go with yearly.
6    A. Okay.
7    Q. That sounds like something that's exists?
8    A. That would be a very accurate number.
9    Q. It's something Glidewell already kind of
10 creates in its ordinary course of which is?
11   A. And the costs would kind of naturally
12 flow on a year to year basis because that's when
13 the calendar year is.
14   Q. Okay. I'd appreciate if you can gather
15 that information and then Mr. Tachner can produce
16 that?
17   A. Okay.
18   Q. To us. Thank you.
19   A. So I'll just write on here plus
20 separately.
21   Q. Right. That's separate.
22   A. Net and gross profit margin, and mail

Page 103

1  just say BZ. I might as well go with the code
2  there.
3    Q. Mr. Allred, what I'd like to ask you
4  about now is Glidewell's application for its
5  trademark in the mark BruxZir --
6    A. Okay.
7    Q. -- that we've been talking about. And in
8  particular, the mark -- why don't I just put it in
9  front of you here. We'll have the court reporter
10 mark as Exhibit 122 what was submitted, I believe,
11 as Exhibit A to the complaint in this lawsuit
12 which is from the United States Patent and
13 Trademark Office, and it is a trademark
14 registration in the mark BruxZir?
15       (Exhibit No. 122 was marked for
16       identification.)
17 BY MR. JANKOWSKI:
18   Q. Mr. Allred, do you recognize Exhibit 122?
19   A. I do.
20   Q. This is the registered trademark that's
21 kind of the subject of the lawsuit that brings us
22 here today; correct?

Page 104

1    A. Well, it's the Class 10 mark; so that is
2  for the dental restoration, the custom-made dental
3  restoration.
4    Q. Do you recognize it as something that was
5  attached to the complaint?
6    A. I recognize it as our trademark document.
7  I don't remember attaching it to the complaint.
8    Q. Do you see at the bottom where it says
9  Exhibit A?
10   A. Yes.
11   Q. And you have a copy of this registration
12 in Glidewell's files; correct?
13   A. Sure. You mean the original? Yeah,
14 sure.
15   Q. Right. So are you the person who was
16 associated with filing this application with the
17 U.S. Patent and Trademark Office?
18   A. I filed it.
19   Q. Okay. You filed it. In that regard what
20 materials did you provide to the PTO in connection
21 with filing for this trademark?
22   A. Well, you can see it all there on the web

EXHIBIT 12
-206-

Page 105

1    because they have the documentation right there,
2    but I remember it was our crown box, and it was
3    even exemplars of full contour zirconia crowns. I
4    think the box had the foam pad in it and had the
5    label of the goods on the under side of the lid so
6    that it showed through. It was a clear plastic
7    lid that crowns were separate laying next to the
8    box is how I think it was.
9        Q. When you say exemplars, were there
10   actually crowns?
11       A. Yes, and they were described in the
12   goods.
13       Q. So these must have been crowns that were
14   made for actual patients. They were crowns made
15   to be an exhibit essentially?
16       A. Yeah, they could have been a patient's
17   crown. Once you got the file, you can make as
18   many as you want. It was probably a real crown
19   for somebody maybe. I don't know. Some model.
20   It wasn't necessarily a model of a patient. Maybe
21   it was a model of a model, but it was definitely a
22   real crown.

Page 106

1        Q. And after filing the application did you
2    have any more actions -- interactions or
3    communications with the trademark office?
4        A. I don't think so. I think it just sailed
5    right on through.
6        Q. So you didn't speak with the trademark
7    examiner?
8        A. I definitely didn't speak with the
9    trademark examiner. It there was anything that
10   came up, it would have been in writing, but I
11   don't remember anything ever came up on it.
12       Q. Okay. Did you submit -- now, you said
13   you submitted the actual box that the crowns come
14   in; right?
15       A. Just an image.
16       Q. Or an image of the box. How were the
17   crowns provided?
18       A. They were just laying next to it, and
19   everything was photographed on kind of a felt
20   background.
21       Q. So the physical crowns didn't go to
22   Washington, D.C.?

Page 107

1        A. No.
2        Q. It was just an image?
3        A. Yeah, all together the box with the label
4    with the crowns laying next to the box.
5        Q. Okay.
6        A. It's not really a box, I guess. It's a
7    plastic case in the shape of a tooth. It has a
8    foam insert.
9        MR. JANKOWSKI: I'll have the court
10   reporter mark as the next exhibit Exhibit 123 --
11   I'm sorry. A document bearing production Nos. KDA
12   002808 through KDA 002831 and Mr. Allred this is
13   as you were suggesting a printout of materials
14   from this trademark application that you can
15   access on the web as you said. I'll ask you
16   questions to see whether you agree with that.
17       A. Okay.
18       (Exhibit No. 123 was marked for
19       identification.)
20   BY MR. JANKOWSKI:
21       Q. If you can just briefly review
22   Exhibit 123.

Page 108

1        A. Am I looking at the same thing again
2    here?
3        Q. Some of it looks like it gets replicated.
4    I'm not sure why that is.
5        A. That's their end, huh?
6        Q. Could be.
7        A. Oh, here's their search criteria. It all
8    looks like something I've seen before.
9        Q. Okay. And if you turn to the page that
10   bears production No. 2814, it's a page with not
11   much on it actually.
12       A. Oh, you mean just the signature?
13       Q. Well, not a signature there but
14   there's --
15       MR. TACHNER: Right here.
16       MR. JANKOWSKI: Right.
17       THE WITNESS: Oh, I got it, yeah.
18   BY MR. JANKOWSKI:
19       Q. So there under the correspondence and
20   address it has your name; correct?
21       A. Correct.
22       Q. Which, again, is consistent with your

EXHIBIT 12
-207-

Page 109

1  recollection that you're the one who filed this
2  particular trademark application; is that correct?
3      A.  Yes.
4      Q.  If you turn to the page 1 ahead of that,
5  2813, you'll see there's information on the
6  current owner that shows that the owner is James
7  R. Glidewell, dental ceramics, Inc. do you see
8  that?
9      A.  Correct.
10     Q.  And that's accurate; correct?
11     A.  That's true.  Dba Glidewell Laboratories.
12     Q.  There's a section on goods and services
13  where it describes the goods and services as
14  dental bridges, dental caps, dental crowns, dental
15  inlays, dental onlays and dental process three
16  sees; correct?
17     A.  That's true.  It's what comes with the
18  010.
19     Q.  Which is the Class 10 you talked about
20  earlier?
21     A.  Correct.
22     Q.  So this particular application is about

Page 110

1  applying the BruxZir name to the dental
2  restorations, namely, the crowns made of zirconia;
3  correct?
4      A.  Specifically out of zirconia, correct.
5      Q.  Right, right.  And at the bottom of this
6  page can be KDA 2813, there's a printout of the
7  prosecution history.  Do you see that?
8      A.  I do.
9      Q.  I think you said a moment ago it sailed
10  through prosecution pretty readily, and that's
11  reflected here as well; correct?
12     A.  I think it looks like three months.  Four
13  months.  Three months and a week.
14     Q.  Three months to a week.  That's pretty
15  fast to sale through, don't you think?
16     A.  I thought so.
17     Q.  If you turn to page 215, there's a very
18  big presentation of the mark BruxZir; correct?
19     A.  That's their doing.  They make it that
20  big.  They must have known something.
21     Q.  That's not showing Glidewell's pride in
22  the mark?

Page 111

1      A.  No, that's the prescience of the USPTO.
2  I'm amazed.
3      Q.  Just to be clear the mark is in the text
4  BruxZir as opposed to a stylized presentation.
5      A.  Strictly the type.
6      Q.  It doesn't have to be a certain font
7  doesn't have to be a certain color?
8      A.  True.
9      Q.  Because sometimes you can seek that kind
10  of thing with trademark protection; correct?
11     A.  True.
12     Q.  But here the protection is going to the
13  word?
14     A.  Or the words
15     Q.  One thing I wanted to ask you is on -- if
16  you turn back to the page KDA 2813, some of the
17  information that gets entered in here has to do
18  with the first use of the mark by Glidewell;
19  correct?
20     A.  Correct.
21     Q.  And that's listed here on KDA 2813 about
22  halfway down the page.  Do you see that under

Page 112

1  goods and services classification?
2      A.  I see a date to the right -- oh, yeah to
3  the right of first use date, correct.
4      Q.  Right, right.  So what's your
5  understanding of what is asked for when it says
6  first use date?
7      A.  That would be the earliest time it was
8  used in commerce.
9      Q.  That actually leads to one of my
10  follow-up questions which there's also an entry
11  for first used in commerce date.  Do you see that?
12     A.  Correct.
13     Q.  So do you have an understanding for what
14  the difference is between a first use date and a
15  first use in commerce date?
16     A.  I don't know unless it means when maybe
17  the goods were first used versus when the mark was
18  first used.  Maybe it would refresh my memory and
19  I'm not remembering.  It seems if there was a
20  difference, I probably knew at one time.  Let me
21  see here.
22     Q.  In case the same date is used?

28  (Pages 109 to 112)

EXHIBIT 12
-208-

Page 113

1    A. It's the same, right. I know it has
2  nothing to do with the application date. It's the
3  first use date, first use in commerce date. I
4  don't know. You'd have to refresh my recollection
5  to see if I ever knew it.
6    Q. And what is the, if you recall, what does
7  the date June 6, 2009, represent in being entered
8  here? What was it that was done then that
9  triggered entry in this application?
10    A. That would be the first date that the
11  goods were ever sold to a dentist for use in a
12  patient's mouth.
13    Q. Okay. By sold to a dentist, it would
14  mean invoice, an invoice date?
15    A. Definitely. A prescription date probably
16  was the week ending of whatever week that was
17  billed out. I believe where that date would come
18  from.
19    Q. So you said prescription date. What is a
20  prescription date?
21    A. That would be whatever date it was that a
22  doctor had given a prescription for something or

Page 114

1  was given in lieu of whatever the doctor --
2  whatever he was organized. I know when he first
3  started doctors are getting both what they
4  prescribe and also the BruxZir full contour
5  zirconia crown.
6    Q. The prescription would be for something
7  other than the BruxZir product?
8    A. I don't know that that's what this is
9  for. This is the bill date.
10    Q. So what would the prescription be for
11  that Glidewell would receive that would trigger
12  providing the BruxZir crown?
13    A. Could have gotten a prescription for a
14  crown that was, for instance, a metal occlusal
15  otherwise a PFM crown. And then they would have
16  included that for free to let the doctor see what
17  the difference would be if he chose one over the
18  other for no additional price. Anything here
19  would have to be void so it would be something
20  someone paid for. But the very first crowns that
21  went out were done in that way also. This was
22  actually for free.

Page 115

1    Q. So if they were done for free, were they
2  providing these free crowns to dentists before
3  this June 6, 2009 date?
4    A. I don't think so. I think it was all at
5  the same time.
6    Q. So this would be reflecting a crown
7  that's sent to a dentist?
8    A. That would be billed, but there would be
9  a lot of others that were done at the same time
10  that were free.
11    Q. Oh, I see. Okay. So the June 6, 2009,
12  date is a billed date for a BruxZir crown that was
13  sold to a dentist?
14    A. That would be the date that this is, the
15  first time it was ever billed and sold, but at the
16  same time there were crowns more than were billed
17  that were actually provided for free.
18    Q. In addition to the ones being sold?
19    A. Exactly.
20    Q. The ones that were being sold, were those
21  being sold to dentists who were writing
22  prescriptions out for the BruxZir product?

Page 116

1    A. Exactly.
2    Q. Since this was a new product, how did
3  dentists know to write a prescription for the
4  BruxZir product?
5    A. Well, in addition to whatever advertising
6  there was, one of the best advertising was what I
7  just described. It was a situation where perhaps
8  a full contour zirconia crown might be what the
9  doctor would have rather prescribed if he had
10  known about it. So he got both and got a chance
11  to try both so he could see the fit, the look
12  compared to what he actually ordered and choose
13  one over the other and no difference in price. It
14  was system Mr. I a way to point the doctor to a
15  new option.
16    Q. At this point in June, June 6, 2009, you
17  hadn't yet been providing out the free BruxZir
18  crowns; correct?
19    A. I don't think so. I think it all
20  happened during that week.
21    Q. Right. So the very first dentist who was
22  paying for a crown wasn't doing so because he'd

EXHIBIT 12
-209-

Page 117

1  earlier got a free crown, correct, because he's
2  paying for it on June 6.
3       A.  It could have all been in the same week.
4       Q.  Oh, so he got a free crown earlier in the
5  week and he decided to buy a crown later in the
6  same week?
7       A.  True.
8       Q.  You mentioned advertising.  Do you know
9  when Glidewell began advertising the BruxZir name?
10      A.  I don't know the exact dates.  I know
11  we've probably gone through all that.  You might
12  have either got that from Jim.  I think it was at
13  the same time.  Probably through e-mail blasts.
14      Q.  And do you know if any of those e-mail
15  blasts were before June 6, 2009?
16      A.  No, I don't know.
17      Q.  I'll have you briefly look back at
18  Exhibit 122.  This was the one-page registration.
19  You might have put it underneath the previous
20  exhibit.  You might have put it at the bottom.
21      A.  The trademark?
22      Q.  Yes.  So one thing I see on here is

Page 118

1  there's an reg number, 3739663.  Do you see that?
2       A.  Yes.
3       Q.  That's a number associated with this
4  formal registration by the trademark office;
5  correct?
6       A.  Correct.
7       Q.  And there's another number if you look
8  down towards the bottom which is listed as a
9  serial number, 77-761757.  Do you see that?
10      A.  I do.
11      Q.  And that's another number associated with
12  the application for trademark; correct?
13      A.  Correct.
14      Q.  Okay.  And this also shows the date on
15  which it was filed which was June 17, 2009;
16  correct?
17      A.  Correct.
18      Q.  Is that consistent with your recollection
19  as to when you filed the trademark application?
20      A.  It is.
21      Q.  So it was shortly after the first use
22  date that you put in the application; correct?

Page 119

1       A.  True.
2       Q.  And the registration itself came out, it
3  looks like, on January 19, 2010.  Correct?
4       A.  I saw that on here.  Is it on here too.
5       Q.  It's on Exhibit 22 as well.  Underneath
6  the reg number?
7       A.  Oh, up here.  Correct.
8       Q.  And at the very bottom of Exhibit 122
9  there's a reference to Kevin Corwin as the
10  examining attorney.  Do you see that?
11      A.  Uh-huh.
12      Q.  Does that name ring a bell at all for
13  you?
14      A.  It doesn't.
15      Q.  Which makes sense because you didn't
16  really deal with him?
17      A.  I didn't.
18      Q.  Okay.  And inside Exhibit 123 if you turn
19  to page KDA 2810, inside that document, correct.
20  Turn in about four pages?
21      A.  Oh, okay.
22      Q.  To 2810.  This is another copy of the

Page 120

1  registration.  It's the same as Exhibit 122;
2  correct?
3       A.  Yes.
4       Q.  It also shows that the class of goods is
5  Class 10 be on the formal registration; correct?
6       A.  That's correct.
7       Q.  Now, if you turn to page 2820 within the
8  same document towards the end, here you see and I
9  think I heard you mention this earlier when you
10  were looking through the document at the
11  beginning, what is shown at KDA 2820?
12      A.  It looks like a search criteria that this
13  examiner was using to see if the mark as taken, I
14  suppose.
15      Q.  Okay.  And you didn't play any role in
16  the searching that the examiner did; correct?
17      A.  No.
18      Q.  One thing I notice is it doesn't look
19  like the examiner searched for the term bruxer,
20  meaning a patient with bruxism; correct?
21  B-r-u-x-e-r.
22      A.  I don't say that on there.  I see brux

EXHIBIT 12
-210-

Page 121

1  with asterisks before and after so I suppose
2  that's the same way of searching for that.
3      Q.  Do you understand the language there?  I
4  see where it says brux, and I see bi and ti and
5  reference to be not dead.  Do you know what that
6  means?
7      A.  I think so.  What does that mean?
8      A.  It looks to me like he's looking for the
9  letters b-r-u-x if they occur in the middle or end
10 or anywhere in a trademark and is still alive, I
11 suppose.
12     Q.  What's the bi refer to, the bi, ti in
13 brackets?  Do you see that?
14     A.  Yeah.  Is that in the goods maybe?  I'm
15 not sure.  I don't know.  What is it?
16     Q.  I don't know.
17     A.  I'm not going to guess then.
18     Q.  No, I don't want you to guess.  I'm just
19 wondering if you knew.
20     A.  I'm not sure.
21     Q.  And you didn't do anything to educate
22 Mr. Core win about the significance of the word

Page 122

1  bruxer in the dental industry is that accurate?
2      A.  I don't remember ever talking to him.
3      Q.  Your normal practice was to fill out
4  trademark applications without interacting with
5  the trademark examiner more than you had to.  Is
6  that fair?
7      A.  That's true.  That's a fact.  That's how
8  this went.  It's in their system.  It really just
9  fell into place.
10     Q.  And if you turn to the page KDA 2822 so a
11 few more pages forward in the document or toward
12 the back.  I'm sorry.
13     A.  Towards the back yeah.
14     Q.  Is this a reproduction of the
15 illustration you were discussing earlier when you
16 said there were actual examples of crowns you had
17 provided?
18     A.  It is.
19     Q.  There you can see the BruxZir brand on
20 the sicker on the container; correct?
21     A.  True.
22     Q.  Did you do any searching yourself on

Page 123

1  behalf of Glidewell before you filed this
2  application just to see whether BruxZir was a good
3  mark to be using?
4      A.  I did.
5      Q.  And what kind of searching did you do?
6  Do you recall?
7      A.  I went to their site, and I looked for
8  anything that had the word brux in it, and I also
9  Googled anything there was to find on Google.
10     Q.  When you say in their site, you're
11 talking about the trademark office site?
12     A.  Yes.
13     Q.  And you did a going search for brux as
14 well?
15     A.  I did.
16     Q.  Any other search terms that you looked
17 for other than brux?
18     A.  A lot of different search terms at the
19 time because the name was not established until
20 this was final adopted.  So I was doing a lot of
21 different searches on a lot of different names.
22     Q.  Names that were candidates that you were

Page 124

1  considering?
2      A.  Exactly.
3      Q.  Do you recall what candidates existed
4  before you -- before Glidewell decided on BruxZir?
5      A.  I don't.  I just remember the general
6  idea of things that had the word zir in it.
7      Q.  And so did you do searching on zir, z-i-r
8  as well?
9      A.  When something looked like it was a
10 candidate, like I say, not just thrown out there
11 because there was maybe 40 or 50 ideas were going
12 back and forth here and there, but not on every
13 single one, just something that became a focus.
14     Q.  My understanding is that Mr. Shuck is the
15 one who originated the name BruxZir.  Is that
16 consistent with your recollection?
17     A.  It is.
18     Q.  And he ran the name by various management
19 people at Glidewell including Dr. DiTolla;
20 correct?
21     A.  Dr. DiTolla is the person that he talked
22 to about it who was at a dental show at the time.

31 (Pages 121 to 124)

EXHIBIT 12
-211-

Page 125

1      Q. And he shared the name with an audience
2  of dentists at the time. Is that your
3  understanding?
4      A. It is, yeah.
5      Q. Let me show you another exhibit here.
6  I'll have the court reporter mark as Exhibit 124 a
7  one-page document --
8      A. Are we done with this one?
9      Q. Yes, you can put that one with an away
10  one-page document bearing the production number
11  boat right 000085.
12      (Exhibit No. 124 was marked for
13      identification.)
14  BY MR. JANKOWSKI:
15      Q. Mr. Allred, do you recognize the document
16  marked as Exhibit 124?
17      A. Is this our serial number here? I don't
18  know.
19      Q. Yes, you'll see halfway down you'll see
20  the serial number 77761757. Do you see that?
21      A. I see that.
22      Q. If you compare it with Exhibit 122 you'll

Page 126

1  see it's the same serial number.
2      A. Same serial number?
3      Q. Correct.
4      A. I've never actually seen this page.
5      Q. Do you recognize this page as a -- do you
6  see halfway down the page you see a reference to
7  the trademark status and document retrieval with
8  the acronym TSDR? Do you see that?
9      A. Somewhere in here it will say retrieval?
10      Q. Right. It's about halfway down the page.
11      A. Oh, you mean TSDR?
12      Q. Yes.
13      A. I see that.
14      Q. Do you have a familiarity with what a
15  TSDR is?
16      A. I think it's one of the USPTO subsystems
17  for accessing their data, I think.
18      Q. And have you used that system yourself?
19      A. I probably have if that's the only way to
20  get to certain information I might have looked
21  for. I don't really remember all is in there. Is
22  that what you would look at to, for instance, pull

Page 127

1  up a copy of your application?
2      Q. Right. It gives you. It's a user
3  interface so you can go on the trademark website
4  and access information?
5      A. I have used it then.
6      Q. In fact, if you look at this printout out
7  that what it looks like to you is a printout from
8  the U.S. PTO website that's giving you the ability
9  to access documents associated with Glidewell's
10  trademark we've been discussing?
11      A. It does. It looks like if I checked the
12  box here for specimen and it says JPEG I would get
13  that image there that we looked at earlier.
14      Q. Right. And, in fact, there's entries
15  here that correspond to the filing of the
16  application and the issuance of a registration
17  certificate, a notice of publication, and so on.
18  Do you see that in the bottom half?
19      A. I do.
20      Q. One thing I see is there's two entries
21  there, more recent entries in the chronology
22  that's known in Exhibit 124 it says NOS notice of

Page 128

1  suit incoming. Do you see that?
2      A. I do.
3      Q. Do you have an understanding of what that
4  notice is referring to?
5      A. Is that when attorney Holland on behalf
6  of the defendant filed something with the Patent
7  and Trademark Office to prevent the registration
8  of the mark in Class 5? That's what I would guess
9  from looking at this. That's all I would know. I
10  don't know if that's it.
11      Q. Okay. And there's one listed for
12  November 9, 2011, and a second one listed for
13  March 15, 2012. Do you see that?
14      A. I do.
15      Q. So those dates have any significance to
16  you?
17      A. Well, the fact that this one on the top
18  here is fairly recent, March; so it would have to
19  be something that's happened fairly recently.
20      Q. I'm just asking if you have an
21  understanding for what happened on that date?
22      A. I can confirm if that's something your

EXHIBIT 12
-212-

Page 129

1  law firm has done on behalf of the client.  If
2  it's on behalf of something attorney Holland did,
3  I don't know whether I would remember whether or
4  not what that would be.
5      Q.  Okay.  You can put that exhibit down.  So
6  this trademark BruxZir associated with the
7  registration at Exhibit 122 registered in January,
8  2010; correct?
9      A.  Yes.
10     Q.  And deposit Glidewell begin doing
11 anything different once it received this
12 registration?
13     A.  No.
14     Q.  Did it change its marketing materials?
15     A.  No.
16     Q.  How about the use of a circle R as
17 opposed to a TM?  Did did make any changes in that
18 regard?
19     A.  When we got the circle R, we started
20 using it.
21     Q.  This January, 2010, date, is that
22 associated with when Glidewell would have started

Page 130

1  using the circle R?
2      A.  Yes.
3      Q.  On which products did Glidewell begin
4  using the circle R?
5      A.  On the full contour zirconia crowns sold
6  to dentists.
7      Q.  Any other products?
8      A.  No.
9      Q.  How about today?  Do you know whether
10 Glidewell applies its circle R product designation
11 to products other than the full contour zirconia
12 crowns?
13     A.  I don't believe it does but I sews it
14 could since we have the circle R in Europe.  It
15 could also apply to to blocks, but I don't think
16 we do.
17     Q.  Now, you said a circle R in blocks.  So
18 Glidewell has a registration to apply BruxZir to
19 its blocks sold to Europe?
20     A.  We have the circle R for that, yes.
21     Q.  But I take it the packaging is different
22 for goods going to Europe than it is for goods

Page 131

1  going to customers in the U.S.; correct?
2      A.  I'm not sure about that.  I don't know.
3  It could be a different kind of box they use
4  there.  I'm not sure.
5      Q.  So Glidewell might be using the circle R
6  BruxZir circle R on its packaging of milling
7  blanks sent to customers in the United States?
8      A.  Not in the United States, no.
9      Q.  Okay.  So it's not using the circle R on
10 its packaging for milling blocks being sent to
11 customers in the United States?
12     A.  No?  How about on its advertising
13 materials.
14     A.  No.  TM.
15     Q.  Do you monitor that?
16     A.  Yeah.  I would say yes.
17     Q.  How do you monitor that?
18     A.  Well, whenever I become aware of an
19 improper use of the mark, I notice it.
20     Q.  And if you notice it, what do you do?
21     A.  Well, we only use it the proper way; so
22 whenever I notice it, I make sure it is used the

Page 132

1  proper way.
2      Q.  Who do you talk to about that?
3      A.  The best person to talk about that would
4  be the person who works directly with the people
5  that actually do the design for all of our
6  materials.  So that would be Mike Cash.
7      Q.  And he works underneath Mr. Shuck;
8  correct?
9      A.  Yes.
10     Q.  And how about on Glidewell's website?  Do
11 you monitor how the circle R is used on the
12 website?
13     A.  Yes.  I don't go there specifically to
14 see if anyone has changed something in the
15 meantime but I'm there quite often.
16     Q.  If you see a circle R that shouldn't be
17 there, you'll let somebody know about it?
18     A.  Definitely.
19     Q.  For the website would that also be
20 something where you say something to Mike Cash?
21     A.  Yes, same thing.  That's also the same
22 group that would keep the website up to date.

EXHIBIT 12
-213-

Page 133

1      Q.  And e-mail blasts be the same answer?
2  You go to Mike Cash?
3      A.  If there was a change in an e-mail, if
4  somehow it had been used inappropriately and I had
5  seen that, definitely I would raise the issue with
6  Mike Cash.
7      Q.  And what about if it's involving
8  materials sold by Glidewell direct?  Is Mike Cash
9  still the person to talk to?
10     A.  Yeah, because that would be a label.
11     Q.  So Mike Cash handles Glidewell direct
12 marketing as well?
13     A.  Well, that's for sure, but he would
14 handle all design and printing.
15     Q.  Now, Glidewell's -- let me set a
16 foundation here.
17         Glidewell has a relationship with a
18 number of authorized labs who purchase the BruxZir
19 milling blanks; correct?
20     A.  That's true. .
21     Q.  So those dental labs have the right to
22 use the BruxZir name associated with the product

Page 134

1  they make with the BruxZir milling blanks;
2  correct?
3      A.  Our authorized labs are providing the
4  Class 10 goods to dentists.  So they probably will
5  always be using the circle R.
6      Q.  Right.  You anticipated my next question
7  which is do you monitor what the use of the
8  BruxZir name is by Glidewell's 180 or so
9  authorized labs?
10     A.  I have to say yes because I know we've
11 had to contact labs now and again.  But it's not
12 anything that we have a program of actually
13 following on any periodic basis.  Just if we do
14 become aware of any improper use, we definitely
15 would do something about it.
16     Q.  And the something about it is you'll
17 notify them about the property usage to follow?
18     A.  Definitely.
19     Q.  And who will notify the authorized lab or
20 who will contact them?  Is that you personally or
21 somebody else?
22     A.  No that would be someone like Robin

Page 135

1  Bartolo who has a relationship with them and
2  probably deals with them on a regular basis
3  anyway.
4      Q.  Oh, since you raised Mr. Bartolo's name,
5  I just want to confirm something.  In talking
6  about these authorized labs, I asked Mr. Bartolo
7  whether there were written agreements between
8  Glidewell and the authorized labs that contained
9  written provisions associated, things like the
10 right to use the trademark.  Mr. Bartolo said he
11 did not believe there were any such written
12 agreements.  Is that your understanding as well?
13     A.  That's correct.  There isn't.
14     Q.  I was going to say I think you would know
15 better than Mr. Bartolo for sure since it's a
16 legal document and you being the general counsel.
17         Do you have an understanding for how
18 quickly after the registration was issued by the
19 PTO in January, 2010, that Glidewell started
20 adopting the circle R?
21     A.  I could only guess that it was almost
22 immediately.

Page 136

1      Q.  You don't recall?
2      A.  I think I do kind of recall telling
3  everybody we got the circle R, and I'm sure it
4  would have been incorporated in anything beyond
5  that.  I don't recall ever having any reason to
6  think we ought to wait or anything that's very
7  responsive company.  (*** CHECK ***) I'm sure it
8  was pretty much about the same time.
9      Q.  And the instructions to start using a
10 circle R would have that have gone to Mike Cash as well
11 or would that go to Jim Shuck or someone else?
12     A.  Definitely both of them would have been
13 something that would have been probably worthwhile
14 sharing with everyone in the company.  But it
15 wouldn't have necessarily been me sharing it.
16 Probably would have been me telling Jim Shuck
17 about it.
18     Q.  And in addition to the marketing done by
19 Mr. Shuck and Mr. Cash, Glidewell also has
20 information being conveyed by Dr. DiTolla as well;
21 correct?
22     A.  Information conveyed about?

34  (Pages 133 to 136)

EXHIBIT 12
-214-

Page 137

1    Q. About the BruxZir crowns.
2    A. He is definitely a purveyor of
3  information about anything to do with dentistry,
4  and he promotes that material.
5    Q. So he lectures to dentists, for example;
6  correct?
7    A. He does.
8    Q. And do you monitor the use of the BruxZir
9  trademark in the materials that are used and
10  developed by Dr. DiTolla?
11    A. Any materials he uses probably are
12  prepared by Glidewell Laboratories under his
13  instruction.
14    Q. I guess what I'm wondering about is do
15  you or does somebody else monitor the marketing
16  materials or I won't even call them marketing
17  materials. Whatever materials Dr. DiTolla is
18  using when he's lecturing to dentists to see how
19  the BruxZir mark is being used?
20    A. I don't know about the word monitor, but
21  I'm very aware of everything that goes out to the
22  public.

Page 138

1    Q. And how are you aware of it?
2    A. I see it myself just like the public
3  does. It's right on our website.
4    Q. Does Dr. DiTolla pass it by you or by
5  Mr. Shuck or somebody for authorization before he
6  uses the materials?
7    A. Not for authorization, no.
8    Q. Does he pass it by you for comments or
9  feedback?
10    A. Very possibly he could run ideas by
11  anybody. That's possible.
12    Q. But that's not like a required procedure
13  before he presents to dentists?
14    A. Well, he is the director of education; so
15  that is really his responsibility.
16    Q. Right. And I questioned him about that.
17  He said the same thing about that. In fact, he
18  testified that he really makes the videos that
19  he's in. He's responsible for the content;
20  correct?
21    A. That's true. But the resources he's
22  using is Glidewell Laboratories and those people

Page 139

1  are under Mike Cash.
2    Q. I'll have the court reporter mark as
3  Exhibit 125 a seven page document produced by
4  Glidewell in this case with the production No. GL
5  223.
6        (Exhibit No. 125 was marked for
7        identification.)
8  BY MR. JANKOWSKI:
9    Q. Mr. Allred, can you just briefly review
10  Exhibit 125 for me, please?
11    A. Okay. I know what this would be. Sure.
12    Q. What is Exhibit 125?
13    A. It is a filing here in the United States
14  for the mark under international Class 5.
15    Q. So this is the other patent
16  application -- I'm sorry, not patent, the other
17  trademark application that we talked about earlier
18  for the name BruxZir. This one being for the
19  milling blanks; correct?
20    A. Correct.
21    Q. And your name appears on this document as
22  the correspondence person who filed the

Page 140

1  application; correct?
2    A. That's correct.
3    Q. Like the other application, this one is
4  seeking protection just in the name BruxZir;
5  correct?
6    A. Yes.
7    Q. This one has a later serial number
8  because it's filed later in time. I'll just read
9  it off of the front page of Exhibit 125. It
10  appears to be 85332886. Do you see that?
11    A. I see that.
12    Q. Okay. And do you know what date this
13  was -- this application was filed on?
14    A. If I look on here I would.
15    Q. Sure, you can look on there.
16    A. May 27, 2011.
17    Q. Okay. Is that consistent with your
18  recollection of when you filed the application?
19    A. It doesn't seem like that along ago, does
20  it? It seems like a lot longer ago. I guess that
21  is consistent with the facts.
22    Q. So it was roughly two years after the

EXHIBIT 12
-215-

Page 141

1    earlier application; correct?
2        A. Let's see. I guess the other one was
3    June, 2009, and this is May, 2011. So that's
4    roughly two years.
5        Q. Okay. Is there a particular -- well,
6    first of all, in terms of first use, do you know
7    what date was provided -- that you provided for
8    this application associated with the first use of
9    the mark or first use in commerce of the mark?
10       A. I'd have to look as far as what the exact
11   date would be.
12       Q. If you look on page 2 of the document, I
13   think it's listed there.
14       A. Page 2. I'm on that page. Page 2 of 7?
15       Q. Correct.
16       A. First use anywhere and first use in
17   commerce are the same, 1102009.
18       Q. The blanks are first being sold by
19   Glidewell with the BruxZir mischaracterize in
20   November of 2009 is that accurate?
21       A. Correct. That makes more sense. I
22   thought things were much further back very good.

Page 142

1        Q. Blanks were already being sold in 2009.
2    They just didn't have the application filed
3    promptly for that?
4        A. For the circle R, that's true.
5        Q. Staying on page 2 of this exhibit, the
6    identification of the goods here is for dental
7    ceramics this time; correct?
8        A. That's correct. That's what the 005
9    class is.
10       Q. Right. And do you have an understanding
11   as to whether this application has issued as a
12   registered mark?
13       A. I do understand. I know that had hasn't.
14       Q. If you turn to page 7 of Exhibit 125, I
15   see an illustration of a box. Do you see that?
16       A. Last page well.
17       Q. Correct.
18       A. Yeah, I see it.
19       Q. Is this what's been produced here as
20   Exhibit 125, is this a complete representation of
21   the patent application -- excuse me, the trademark
22   application you filed with the Patent and

Page 143

1    Trademark Office?
2        A. It is.
3        Q. Okay. We had the discussion earlier
4    about materials provided. You didn't provide any
5    additional materials beyond what's shown in this
6    exhibit?
7        A. No additional materials.
8        Q. You haven't had any telephone calls with
9    the examiner in this case either; is that correct?
10       A. I don't remember this being anything
11   other than something that sailed right on through
12   too unless he might through some writing asked if
13   it was the same company or not. I'd have to look
14   to see if there was anything like that. Still
15   James.
16       A. Right. Glidewell dental ceramics, Inc.,
17   so I don't know why he would have called but if
18   there was it would strictly be that, if interpret
19   the owner of the previous mark. I don't remember
20   getting such a call.
21       Q. And the image that's on the last page of
22   Exhibit 125, that's an example showing the

Page 144

1    packaging for the zirconia milling blanks using
2    the BruxZir mark; correct?
3        A. That's correct.
4        Q. It has a little TM next to it because, of
5    course, you don't have a registration in BruxZir
6    for use with the milling blanks; correct?
7        A. That's correct. It's still that way.
8        Q. So your understanding is to this day when
9    used in connection with zirconia milling blanks,
10   Glidewell's going to use the TM and not the circle
11   R; is that correct?
12       A. Correct. My only caveat was in Europe I
13   suppose we could still use the circle R but I
14   don't know if we do.
15       Q. But in the U.S. you would not use the
16   circle R?
17       A. We would not.
18       Q. In this document, Exhibit 125 that was
19   produced by Glidewell, this is kind of a business
20   record of Glidewell's that you have a copy of this
21   application in Glidewell's files; is that correct?
22       A. It is correct.

EXHIBIT 12
-216-

Page 145

1    Q.  Okay.  This is a true and correct copy of
2  of that document from your files?
3    A.  It is.
4    Q.  Okay.  I'll have the court reporter mark
5  as Exhibit 126 a two-page document bearing
6  production Nos. Boat right 83 and boat right 84.
7      (Exhibit No. 126 was marked for
8      identification.)
9     THE WITNESS:  Is boat right one of your
10  employees that run that off?  Where did that come
11  from?
12  BY MR. JANKOWSKI:
13    Q.  Boat right is actually the name of an
14  expert that was retained by Keating dental arts
15  for in case just to provide opinions on the
16  practice of examining trademarks in the U.S.
17  Patent and Trademark Office.  So she provided an
18  expert opinion in the case and also produced a
19  number of documents, some of which are these that
20  you're looking at here.
21    A.  You mean before he ever filed for his
22  trademark?

Page 146

1    Q.  No no no.  This has all happened in the
2  last couple weeks.
3    A.  Okay.
4    Q.  If I have you just look at Exhibit 126
5  would you agree with me this is another printout
6  like the earlier exhibit we looked at which is a
7  printout off the USPTO website associated with the
8  TSDR system?
9    A.  I see that.
10    Q.  This one is for the Class 5 application
11  of BruxZir.  Do you see that?  Do you see the
12  serial number about halfway down the first page?
13    A.  Oh, I see that, yeah.
14    Q.  Serial number is 85287029.  Do you see
15  that?
16    A.  I do.
17     MR. TACHNER:  Are you stating, David,
18  that it is the same serial number as the one we
19  just looked at?
20     MR. JANKOWSKI:  It's not the same serial
21  number, is it?
22     MR. TACHNER:  It doesn't appear to be.

Page 147

1     MR. JANKOWSKI:  No, it's a different
2  serial number.
3     MR. TACHNER:  This appears to be
4  something called em Bauer.
5     MR. JANKOWSKI:  Right.
6     MR. TACHNER:  I don't think this has
7  anything to do with this litigation.
8     MR. JANKOWSKI:  Whether or not it has to
9  do with the litigation, I'm not going to ask
10  Mr. Allred about it.
11     MR. TACHNER:  Good.  Because I don't
12  think he could answer it.
13     MR. JANKOWSKI:  You're right.  I don't
14  think he'll be able to answer it either.
15     Let me show you another exhibit.
16     MR. TACHNER:  But you did mark it?
17     MR. JANKOWSKI:  It was marked.  We'll
18  move on to another one.  I'll have the court
19  reporter mark as Exhibit 127 a printout from the
20  website trademarks Justia.com.  It's a six-page
21  printout, and it's associated with the trademark
22  BruxZir.

Page 148

1      (Exhibit No. 127 was marked for
2      identification.)
3  BY MR. JANKOWSKI:
4    Q.  Mr. Allred, I just wanted to show you
5  this.  Are you familiar with this particular
6  website which just provides information online
7  about trademarks.  It's not the USPTO website but
8  it's another website that provides information on
9  trademarks.
10    A.  It seems like I've seen the Justia name.
11  I don't know that I associated that just with
12  trademarks.  I know there are sites for that.
13  Trademarkia I've seen.  I don't think I've used
14  the site.  ** GET SPELLING **
15    Q.  On the front page of Exhibit 127 there's
16  a status listed for this particular trademark
17  application.  Do you see that?
18    A.  What's this thing right here?
19  Opposition?  This is Whittaker brown?  Is this
20  from your law office here?  Employee named
21  Whittaker brown?
22    Q.  Where are you reading?

EXHIBIT 12
-217-

Page 149

1    A.  Right here on the second page.
2  Opposition date.  Attorney it says Keith Allred
3  and employee named Whittaker brown.  I don't know
4  who Whittaker brown is.
5    Q.  I don't know who Whittaker brown is
6  either.  But if you look on the first page do you
7  see the status listed opposition pending?
8    A.  Yeah.
9    Q.  And this is for the serial number which
10 is listed down below there 85332886.  Do you see
11 that?
12   A.  I see that.
13   Q.  This one is Glidewell's trademark
14 application it's referring to; correct?
15   A.  For what while is 5 I see Class 5 here.
16   Q.  Right.  This is for Glidewell's Class 5
17 application; correct?
18   A.  It looks like it is without pulling
19 anything else out of the bottom of this stack it
20 definitely looks like it would be it.
21   Q.  Is this consistent with your
22 understanding that there is an opposition pending

Page 150

1  to Glidewell's BruxZir mark for Class 5?
2    A.  If this is something that happened fairly
3  recently here?  This is 11/1/2011 what is we
4  talked about?  This is done by attorney Holland?
5    Q.  If you look down, for example, to --
6  there's no page numbers on it here but there's a
7  listing three pages from the back ending of the
8  document that lists trademark events at the top.
9  Do you see that?
10   A.  Yeah.
11   Q.  This is goes through a chronology
12 starting with the filing of the application in
13 May, 2011.  Do you see that?
14   A.  At the very top.
15   Q.  Right.
16   A.  Correct.
17   Q.  And then it goes down to the bottom, and
18 you see in December, 2011, it says opposition
19 instituted.  Do you see that?
20   A.  Yeah, two down below when it was approved
21 for publication in th dof official gazette.
22   Q.  Right.  So is that consistent with your

Page 151

1  application -- excuse me, your understanding of
2  the status of this?
3    A.  It is if this is from attorney Holland
4  and this is his opposition to having a
5  registration for the mark and Class 5.
6    Q.  You keep mentioning attorney Holland.
7  What's your understanding as to what Mr. Holland
8  did?
9    A.  My understanding is he was hired by
10 Keating dental arts to oppose -- well, as part of
11 his representation.  I guess it was his
12 recommendation or the client or both -- I don't
13 know.  Obviously I don't know what their
14 misunderstanding is -- to oppose the registration
15 of our trademark in Class 5 as part of their
16 defense in this matter against our charge of
17 trademark infringement.  That's my understanding.
18 Of course, the trademark infringement is in
19 Class 10, and this is in Class 5.
20   Q.  Right.  I'll have the court reporter mark
21 as Exhibit 128 a two-page document from the United
22 States Patent and Trademark Office, trademark

Page 152

1  trial and appeal board, mailed February 3, 2012.
2         (Exhibit No. 128 was marked for
3         identification.)
4  BY MR. JANKOWSKI:
5    Q.  Mr. Allred, do you recognize Exhibit 128?
6    A.  I know what it's about.
7    Q.  What is this about?
8    A.  It looks to me like someone writing on
9  behalf of the trademark office thinks we should
10 have just laid down and let them oppose the
11 registration of the mark in Class 5 and it looks
12 like we didn't see it his way and it looks like
13 he's telling me I'm really full of it.
14   Q.  Do you know whether this particular
15 opposition is associated with Glidewell's Class 5
16 mark, application for a Class 5 mark?
17   A.  I think I should look at it more closely.
18 I just assumed it was.  If it was associated with
19 what we were just talked about earlier, the
20 decision of the defendant to oppose our mark in
21 Class 5, I understand it.  If it's something
22 different than that I'll have to look at it more

EXHIBIT 12
-218-

Page 153

1  closely.
2      Q. Let me ask you a question which is you're
3  aware that Glidewell is opposing Keating's
4  trademark application for its mark KDZ Bruxer,
5  B-r-u-x-e-r; correct?
6      A. Of course. We tried to stop everything
7  before he even infringed it in public. That was
8  the first thing we did. We could have stopped
9  there.
10     Q. So there's at least two opposition
11 proceedings existing between the -- in front of
12 the TPAB now; correct?
13     A. Oh, okay. All right. Is that when this
14 is then?
15     Q. I'm just asking you whether you know
16 whether this has to do -- which of those two
17 oppositions that has to do?
18     A. I really don't know. I guess I can look
19 at this real closely and try to figure it out.
20     Q. But do you understand there's oppositions
21 going both ways, Glidewell has an opposition to
22 Keating's pending application and Keating has an

Page 154

1  opposition in place to Glidewell's pending
2  application for the Class 5 use of the mark;
3  correct?
4      A. Well, yes, but our opposition was to the
5  application by KDA for a confusingly similar mark
6  in Class 10. I don't know if this has anything to
7  do with it or not. I don't know which class this
8  is talking about. I can look at it close. I
9  don't know exactly what it is, but I do understand
10 that we did oppose before the patent and trademark
11 office as soon as we were legally allowed to do
12 the issuance of a trademark in Class 10 of a
13 confusingly similar mark. I do know that after
14 that through his earlier attorney representation
15 they opposed our application for a trademark in a
16 completely different class all together.
17     Q. So Glidewell's opposition is associated
18 with Keating's mark in Class 10?
19     A. Correct.
20     Q. And Keating's opposition is directed at
21 Glidewell's pending application in Class 5;
22 correct?

Page 155

1      A. Correct.
2      Q. Okay.
3          MR. TACHNER: David, want to take a
4  break? It's about an hour-and-a-half.
5          MR. JANKOWSKI: Sure, we can take a
6  break.
7          MR. TACHNER: Whenever it's convenient.
8          MR. JANKOWSKI: No, this is fine. This
9  is a fine time.
10         (Recess taken from 2:25 p.m. to
11         2:51 p.m.)
12 BY MR. JANKOWSKI:
13     Q. Mr. Allred, I'm going to hand you a
14 document the court reporter has marked as
15 Exhibit 129. This is a four-page document from
16 the United States Patent and Trademark Office
17 patent trial and appeal board associated with
18 opposition No. 91201389.
19         (Exhibit No. 129 was marked for
20         identification.)
21 BY MR. JANKOWSKI:
22     Q. I'll just ask you do you recognize

Page 156

1  Exhibit 129?
2      A. November 18, 2011, is when they mailed
3  it. Is this mailed to somebody? Is that how this
4  works?
5      Q. Well, my understanding is yes, that the
6  November 1, 2011, date is the date that the Patent
7  and Trademark Office mailed it.
8      A. Because you don't see any addresses on
9  here or anything. It's hard to tell if this was
10 something sent to me. It wouldn't as it is.
11 There would have to be a cover letter or
12 something. I could look at it if see what it's
13 about if you'd like.
14     Q. If you can look at it and see if you
15 recognize it.
16     A. You mean what it's about? It wouldn't
17 necessarily be something I'd ever actually seen
18 even though I might know what it's about?
19     Q. Well, no, I think you may have seen it.
20 That's why I'm asking you if you recognize it.
21     A. How would I have received it I guess is
22 the thing. Would it be mailed to me? Would it be

EXHIBIT 12
-219-

Page 157

1   like this with a cover sheet or something?  My
2   address is not on here is what I'm not quite
3   understanding how -- in what form I would have
4   seen it.
5       Q.  It's associated with, as you can see at
6   the top there an opposition proceeding between
7   James R. Glidewell dental ceramics and Keating
8   dental arts?
9       A.  Exactly.  I might understand everything
10  this is about.  I don't know how I would have
11  received it I don't know if this come with a cover
12  letter and I would have opened.  And this would
13  have been attached and I would have looked at
14  this.  I'm just asking if you knew.
15      Q.  I don't know.
16      A.  Okay.  "I know that moreover judicial
17  economy lies in the suspension of the board
18  proceeding because the board as limited
19  jurisdiction."  I am guessing this has to do with
20  our opposition to the application for the mark
21  here, KDZ Bruxer.  If that's the case that's
22  something I remember we would have opposed that at

Page 158

1   the earliest opportunity and that's when it was
2   published in the gazette.
3       Q.  Do you monitor the gazette to look for
4   marks you think may be a problem?
5       A.  I do not.
6       Q.  How is it you happened to notice Keating
7   dental arts mark as it appeared in the gazette?
8       A.  I didn't notice it in the gazette.
9       Q.  How did you --
10      A.  Not initially.
11      Q.  Okay.
12      A.  You're right.  It was me, and I guess it
13  was rather serendipitously I noticed this was
14  something that had been filed for.  At the
15  earliest opportunity we had communicated with
16  the defendant through counsel that we would oppose
17  this mark because it was confusingly similar.  He
18  didn't do anything about it.  All we could do is
19  wait for it to be published in the gazette.
20      Q.  How did you learn about the pending
21  application?
22      A.  Doing a trademark search on our own

Page 159

1   trademark, anything that contained the word brux.
2       Q.  When was that search conducted do you
3   recall?
4       A.  It would have been whenever it was we
5   sent a letter to KDA, Inc.'s attorney that we had
6   object to this mark.  I don't know exactly when
7   the date of that letter was.  It is at the same
8   time.  Probably no more than days after I would
9   assume.
10      Q.  And is running searches for marks that
11  use brux, is that something you do periodically?
12      A.  I don't really know why I was doing it I
13  might have been looking for our own mark I can't
14  tell you why I was searching it.
15      Q.  When you say your own mark, you mean the
16  application for use on the milling blanks?
17      A.  Possibly then.  It would have been
18  looking for our mark and checking to see what
19  existed in Class 5.  It could have been about that
20  time.  I don't know.  I'd have to look at the
21  dates.
22      Q.  Have you filed any other oppositions to

Page 160

1   trademark applications that Glidewell deems to be
2   confusingly similar the the BruxZir mark?
3       A.  No.
4       Q.  Let me hand you a document the court
5   reporter has marketed as Exhibit 130.  It's a
6   letter of protest memorandum dated December 2,
7   2010. I'll show this to you.
8           (Exhibit No. 130 was marked for
9           identification.)
10          THE WITNESS:  Are we done with this?
11      Q.  Yes, you can set that aside.
12      A.  This is from Katherine /HOL man to
13  Charles joiner.
14      Q.  I think it's from Mr. Joiner to Ms. /HOL
15  man.  Added least it looks that way.
16      A.  There you go.  To /HOL man from joiner.
17      Q.  This document makes reference to a
18  protester who has filed a letter of protest.  Do
19  you see that?
20      A.  I see the heading here, letter of
21  protest.  Is that what you mean?
22      Q.  Right.

EXHIBIT 12
-220-

Page 161

1    A. Should I be looking through this or
2 something?
3    Q. No, just look at -- in fact, now that I'm
4 looking at this, let me see your copy of that. I
5 really only want the front page of that. I don't
6 know why this is all attached. Sorry. A little
7 inelegant. That's the exhibit.
8       Oh, you know what? I take that back.
9    A. You do want that?
10   Q. Yeah, I want that. So just put that and
11 I'll give you that up with back. Now I recognize
12 why it looks that way. Just keep them together
13 and I will restaple them.
14      The rest of it looks different, but
15 actually it's printouts that are referenced in the
16 protest is what it is.
17      So Mr. Allred this is a letter of protest
18 associated with somebody saying that the mark brux
19 xxx is merely descriptive of the application's
20 goods do you see that (*** CHECK DOCUMENT ***)?
21   A. I do see that written right here.
22   Q. You're understanding is Glidewell is not

Page 162

1 the protester that's referenced here; correct?
2    A. Yeah, I know for sure it has nothing to
3 do with Glidewell Laboratories.
4    Q. If you do looking at the pages inside,
5 you'll see what they are printouts of
6 dictionary definitions, for example, of the word
7 brux, B-r-u-x, and bruxism. Do you see that?
8    A. I see free dictionary. I see the word
9 brux on there. Right there in between brute us
10 and something else.
11   Q. Right.
12   A. I see a brux and then night guard,
13 bruxism, bruxism, brux.
14   Q. Are you familiar with the mark brux xx in
15 Exhibit 130?
16   A. No. I'm just curious as to what it even
17 was. Is it a mouth vanguard some kind?
18   Q. Well, let's take a look. You can put
19 that at the bottom of your stack and I'll get a
20 stapler for that.
21   A. I've like AAA plumbing, huh?
22   Q. I'm going to hand you a series of

Page 163

1 exhibits. These are numbered Exhibits 131 through
2 Exhibit 138. Let me just state, for the record,
3 Exhibit 131 is a registration from the trademark
4 office on the principal register for brux guard,
5 b-r-u-x-g-a-r-d. Exhibit 132 is a registration on
6 principal b-r-u-x-e-z-e. Exhibit 133 is a
7 registration on the principal register for the
8 mark brux care, b-r-u-x-c-a-r-e. Exhibit 134 is a
9 registration on the principal register for
10 Brux-eze, b-r-u-x-e-z-e. Exhibit 135 is a
11 registration for the mark Dr. Brux, Dr. spelled
12 D-r period. Exhibit 136 is a registration for the
13 mark brux checker, spelled B-r-u-x-c-h-e-c-k-e-r.
14 Exhibit 137 is a printout from the PTO website
15 associated with an application to register the
16 mark brux cure, spelled B-r-u-x-c-u-r-e. And
17 Exhibit 138 is a printout from the trademark
18 electronic search system associated with an
19 application for the mark Brux XXX spelled B-r-u-x
20 X-X-X. I'll give you these exhibits and let you
21 look at them.
22   A. Okay.

Page 164

1       (Exhibit Nos. 131 through 138 were
2       marked for identification.)
3 BY MR. JANKOWSKI:
4    Q. So the question itch for you, Mr. Allred,
5 is in the searching that you're saying that you've
6 done, I guess that would be in connection with any
7 of your trademark applications BruxZir, have you
8 encurrent the marks that are shown here in
9 Exhibits 131 through Exhibit 138?
10   A. I probably did it was something back
11 further than, what, June 2009. Some of these look
12 like they were after June, 2009. So obviously I
13 wouldn't have seen it then.
14   Q. But you were also doing searches later it
15 sounds like, for example, when you discovered
16 Keating dental arts pending application; is that
17 correct?
18   A. That's true. I didn't see anything in
19 Class 5 in there but I could look through it
20 again.
21   Q. And right. These particular examples of
22 registrations are from Class 10; correct?

EXHIBIT 12
-221-

Page 165

1      A.  Yeah, I noticed that.
2      Q.  Right.  So one thing that's true is there
3  are a lot of marks associated with Class 10 that
4  do use the term brux in them.  Would you agree?
5      A.  I would agree, yes.
6      Q.  Do you think the names shown in
7  Exhibits 131 to 138 are there any problems with
8  them being confusingly similar with the BruxZir?
9      A.  Certainly not confused with a ceramic
10  crown, no.
11      Q.  Why do you say they're not?
12      A.  A ceramic crown is something a dentist
13  prepares a tooth for and you get something that
14  fits exactly and cements in place and a patient
15  may have it for the next 40 years.  It's all
16  together different than anything on this page.
17      Q.  How about the names themselves?
18      A.  Well, the fact this it does start with
19  b-r-u-x?  Theoretical I suppose I can hire an
20  attorney's firm and send out letters to all these
21  people but we don't do that.
22      Q.  When you say we don't do that what do you

Page 166

1  mean?
2      A.  As a company we're not really very
3  litigious.
4      Q.  But you sent a letter to Mr. Keating?
5      A.  Of course.
6      Q.  Why do you see, of course?
7      A.  Because he was marketing purposefully I
8  think a confusingly similar mark right on the coat
9  tails of our product.
10      Q.  I think we were asking or the issue came
11  up earlier about what brux xxx was associated
12  with.  If you look on Exhibit 138, this answers
13  the question as to what material -- excuse me,
14  what the goods and services are associated, that
15  application.  Do you want to take a look and you
16  can educate yourself on that.
17      A.  I see that.
18      Q.  What goods and services is the mark brux
19  xxx associated with?
20      A.  It looks like to me exactly what our
21  comfort bite splints are.  That is a mouth guard.
22  It's for helping people who grind their teeth save

Page 167

1  their teeth.  They could have expensive dental
2  work they don't want to destroy or afraid of the
3  damage they might do to their own teeth.  That's
4  what a bite splint is for.  It's generally made
5  out of plastic.  This may very well be something
6  that's custom fit.  I don't really know if it's
7  prefabricated and supposed to fit everybody and
8  anybody.  I don't know.  I have never really
9  looked into it that close.  I don't know if this
10  would tell me if I did.  I'm not familiar with
11  their product.
12      Q.  Now, in the description it says right on
13  Exhibit 138 for treatment of bruxism.  Do you see
14  that?
15      A.  Are you talking about?  Under goods and
16  services?
17      Q.  Yes.
18      A.  I see that.
19      Q.  That's not a surprise to you, correct
20  because you know from working in the dental
21  industry that mouth guards is one of the products
22  that will be used to try to treat people who have

Page 168

1  bruxism; correct?
2      A.  I think it's kind of confusing to use
3  that language.  I understand it if someone does.
4  I think of a mouth guard that's something that's
5  removable someone uses in sports to protect their
6  teeth in case they collide with another player,
7  hit in the head with a hockey stick.  I think of
8  this more as a bite splint.  It could be -- I
9  guess that really is one of the marks we have too.
10  I've never registered it.  Maybe when you go on
11  the USPTO site it doesn't give more options than
12  this.  I'm not that familiar with it.  I do think
13  that is confusing because I think a lot of people
14  think of a mouth guard as something you can even
15  buy prefabricated and just for kids playing
16  football.  The bite splint we make and I know we
17  make thousands every week they're custom fit for
18  the particular patient and they're made of plastic
19  and made according to a doctor's prescription and
20  they're made for a specific purpose and, of
21  course, the doctor is the one prescribing it but
22  it's for a patient that apparently suffers from

EXHIBIT 12
-222-

Page 169

1  grinding and clenching.
2      Q. It's a product for bruxers; correct?
3      A. Absolutely.
4      Q. And Exhibit 138 seems to be trying to
5  register a name for a similar product for bruxers;
6  correct?
7      A. It look like most of these were that web.
8      Q. Actually you're anticipating my
9  questions. What's shown here in Exhibits 131
10 through 138 are examples of products all designed
11 for bruxers wouldn't you agree?
12     A. Yes, absolutely.
13     Q. Exhibit 137, for example, is also brux
14 cure and it also says under goods and services
15 mouth guards for medical purposes. Do you see
16 that?
17     A. I do.
18     Q. There again I see the fact that it says
19 mouth guards, and I think ideally it would say a
20 bite splint or perhaps a mouth protection device
21 or something like that just to avoid confusion. I
22 know what they're talking about.

Page 170

1      Q. And the name in and of itself is telling
2  you something about the purpose for which the
3  product is being used?
4      A. That's really all I have to go by. For
5  instance, this would be very similar for how our
6  goods would be described for the play safe mouth
7  guard, but it has nothing to do with bruxism.
8      Q. And you don't have brux in the name of
9  that product; right?
10     A. Not at all.
11     Q. But do you have brux in the name of the
12 BruxZir product, the full contour zirconia crown
13 as it's registered; correct?
14     A. That is correct.
15     Q. And that is a product that was developed
16 for bruxers; correct?
17     A. It really was not developed for bruxers.
18     Q. Well, Glidewell's marketing materials say
19 it's ideal for bruxers; correct?
20     A. I think that's good marketing.
21     Q. Exhibit 131 on here the first one brux
22 guard, spell B-r-u-x-g-a-r-d is also for dental

Page 171

1  mouth guards for medical purposes. Do you see
2  that?
3      A. I do.
4      Q. Also to treat bruxers would you agree?
5      A. I'm guessing like you say from the name
6  brux guard I don't really know. It could be a
7  mouth guard. I assume they just have to do it
8  that way. It must be the only option they have
9  under the way the registration system works here.
10 I'm just guessing at that.
11     Q. So you don't recall seeing these
12 registrations before? You think you may have,
13 you're not sure?
14     A. I'm pretty sure I would have if any of
15 these were prior to June of 2009. Yeah, 2009,
16 June. If they were around the time that I would
17 have looked again when we were filing a trademark
18 for the blank, I might have seen them. I don't
19 know if I did or not, but I wouldn't have been
20 alarmed about it because of the fact of our prior
21 registration being in a different class all
22 together and being so related to what it was our

Page 172

1  business was. I should check this be out, though.
2  It's on my birthday of this year.
3      Q. Now, earlier you said that Glidewell's
4  not a litigious company; correct?
5      A. That's correct.
6      Q. It sound like an exception was made for
7  what's gun here with Keating dental arts; is that
8  correct?
9      A. Not exactly. Any company that did what
10 Keating dental arts had done we would have
11 followed the same course.
12     Q. Okay. And have you followed the same
13 course with other companies?
14     A. There's no other company that's done
15 that. But we would if any other company had.
16     Q. So the only trademark infringement
17 lawsuit that Glidewell's filed has been against
18 Keating dental arts; is that correct?
19     A. That's correct.
20     Q. And you made the comment that Keating
21 dental arts purposefully was infringing
22 Glidewell's mark; correct?

43 (Pages 169 to 172)

EXHIBIT 12
-223-

Page 173

1    A.  That's correct.
2    Q.  Why do you say purposefully?
3    A.  Well, I know that he would have been
4  aware of our use of the mark and that he would
5  have copied it in what he did just as others have
6  copied it.
7    Q.  Why do you say he copied it?
8    A.  It's pretty obvious.  It's very
9  confusingly similar to exactly what our mark is.
10    Q.  First of all, what's your understanding
11  of what Keating dental arts mark is that's at
12  issue in this lawsuit?
13    A.  The fact he's using a word that's
14  confusingly similar to our mark and marketing the
15  goods in the same class to the same people.
16    Q.  What goods is he marketing?
17    A.  Full contour zirconia crowns.
18    Q.  And what's he calling them?
19    A.  He calls them KDZ Bruxer.
20    Q.  So why is KDZ Bruxer confusingly similar
21  to Glidewell's mark?
22    A.  Because it looks and sound very similar.

Page 174

1    Q.  And why do you say it looks similar?
2    A.  Easily confused and I think we have
3  examples of that.
4    Q.  Why is it obvious to you?
5    A.  When I look at it, it looks very similar.
6    Q.  All right.  Let's have the court reporter
7  mark as Exhibit 139.
8        (Exhibit No. 139 was marked for
9        identification.)
10  BY MR. JANKOWSKI:
11    Q.  Exhibit 139 is a copy of Exhibit B to the
12  complaint in this action.  Mr. Allred, do you
13  recognize Exhibit 139?
14    A.  I recognize it.
15    Q.  And because it's attached to the
16  complaint as Exhibit B, I assume this is an
17  example of the use of Keating dental arts' mark
18  that Glidewell is concerned about being
19  confusingly similar; is that correct?
20    A.  That's correct.
21    Q.  And in this document, I see the KDZ
22  Bruxer the stylized logo at the bottom of the page

Page 175

1  with the TM next to it.  Do you see that?
2    A.  I see that.
3    Q.  I also see midway through the page
4  they're introducing the all new KDZ Bruxer written
5  out in two words, KDZ space B-r-u-x-e-r.  Do you
6  see that?
7    A.  I see that.
8    Q.  And it's characterized as full contour
9  zirconia solution available exclusively from
10  Keating dental arts.  Do you see that?
11    A.  I do see that.
12    Q.  What is it about this presentation, for
13  example, Exhibit 139 that is, you believe,
14  confusingly similar to Glidewell's mark BruxZir
15  shown in Exhibit 122 spelled B-r-u-x-Z-i-r?
16    A.  Obviously because four times on the page
17  he went out of his way to emphasis B.
18    Q.  Why do you say he's emphasizing b-r-u-x?
19    A.  It says all new KDZ Bruxer, the all new
20  KDZ Bruxer.  Before that it's exclusively from
21  Keating dental arts, not KDZ arts.  And you come
22  down here and it says the KDZ Bruxer and down

Page 176

1  there stylized logo, KDZ Bruxer.  There's not a
2  thing on that page that has anything to do with
3  bruxism other than in his mark.  So I think it's
4  obviously purposefully aimed at riding on the coat
5  tail of our mark.  We saw it before.  We just
6  never had anyone no blatantly and just continue to
7  do it.  That's why we had to filed a case in U.S.
8  District Court.
9    Q.  Let me make another exhibit here.  Let me
10  mark as 140 a one-page document which is a letter
11  from Leonard Tachner to Thomas Gourde, dated
12  May 31, 2011.  I believe it's attached as
13  Exhibit C to the complaint.
14        (Exhibit No. 140 was marked for
15        identification.)
16    THE WITNESS:  Am I done with this?
17    MR. JANKOWSKI:  You can set it down if
18  you'd like but we're not done with that.  I just
19  want to set the time frame here that we're talking
20  about.
21    THE WITNESS:  Okay.
22  ///

EXHIBIT 12
-224-

Page 177

1  BY MR. JANKOWSKI:
2      Q.  You mentioned earlier that Glidewell sent
3  a letter to Keating dental arts associated with
4  this.  Is this the letter you're referring to
5  marked as Exhibit 140?
6      A.  I think it is because this looks well
7  before even our opposition to the mark before the
8  Patent and Trademark Office.
9      Q.  And in letter Glidewell is providing its
10  position to Keating dental arts about the
11  confusingly similar appearance that you're
12  testifying about today; correct?
13      A.  That's correct.
14      Q.  And so the time frame we're talking about
15  is May, 2011; correct?
16      A.  Yes.
17      Q.  And it's about that time that you
18  discovered that Keating dental arts was using KDZ
19  Bruxer spelled B-r-u-x-e-r, as a mark; correct?
20      A.  No, I think this is probably within days
21  of discovering that he had filed for a trademark.
22      Q.  When did you first cover or is there an

Page 178

1  earlier letter you're thinking about?
2      A.  If this is the first letter, then this is
3  probably days after I first learned that he had
4  filed for a confusingly similar mark before the
5  Patent and Trademark Office and was subsequently
6  educated that we couldn't do anything about it
7  until it was published in the gazette.  So I know
8  we wouldn't have done anything more than something
9  like this prior to our formal opposition when it
10  was published in the gazette.
11      Q.  Let me provide you with another document.
12  This was previously marked as Exhibit 29.
13      A.  Okay.
14      Q.  This is a letter dated August 9, 2011,
15  from Robin Bartolo to Sean, spelled S-h-a-u-n.
16      So Exhibit 29 was also a letter sent?
17      Q.  Glidewell to Keating dental.  Is that
18  correct?
19      A.  That's correct.
20      Q.  It's also associated with the BruxZir
21  mark that Glidewell has; correct?
22      A.  That's written right in here.  BruxZir

Page 179

1  coloring liquid and BruxZir instruction manual.
2      Q.  Right.  So both Exhibit 29 and
3  Exhibit 140 are letters that Glidewell sent to
4  Keating dental arts basically expressing its
5  position that Keating's mark is confusingly
6  similar to the registered mark.  Is that fair?
7      A.  That's fair.
8      Q.  Now, at that time in 2011 all zirconia
9  crowns were being used predominantly for bruxers;
10  correct?
11      A.  That wouldn't be true.
12      Q.  Why do you say that wouldn't be true?
13      A.  It's just a fact.
14      Q.  What do you base that understanding on?
15      A.  Based on the fact that doctors prescribed
16  crowns they thought were what they wanted to use
17  for a patient.  A patient wasn't necessarily a
18  buckerer.
19      Q.  But you were well aware that the BruxZir
20  product when it was released in 2009 was
21  considered a crown that was not very aesthetically
22  pleasing correct?

Page 180

1      A.  Not correct anything you can get at that
2  time because what you'd compare it to, a solid
3  gold crown and our crowns would be considerably
4  more aesthetically pleasing more than a gold crown
5  at least to most people that ended up going with
6  this option.  Doctors would have educated patients
7  on their options and we know from our business
8  experience that a lot of patients don't want gold
9  crowns this their mouth.  (*** CHECK ***) So they
10  would prefer this over a gold crown.
11      Q.  But the patients that you're talking
12  about who are having to decide between, for
13  example, gold and full contour zirconia are
14  patients who can't have the more aesthetic crowns
15  such as crowns with porcelain on top; correct?
16      A.  That's not correct.  That's probably more
17  crowns today are prescribed for patients that
18  probably have bruxism that are PFMs than anything
19  else.  Certainly not that many gold crowns which
20  would be the optimal solution for a patient that
21  had bruxism.
22      Q.  Okay.  That's a good example.  So PFMs

EXHIBIT 12
-225-

Page 181

1   are crowns that are more aesthetically pleasing
2   than a full contour zirconia crown; correct?
3       A.  It's kind of hard to say because PFM
4   means porcelain fused to metal, and there's such a
5   thing as porcelain fused to zirconia, and I don't
6   know that porcelain fused to metal is more
7   attractive than porcelain fused to zirconia.  I
8   guess I should argue it's not.
9       Q.  First of all, I want to go back to this
10  time frame, back to 2009 to -- mid 2009 to mid
11  2011 time frame.  Okay?
12      A.  Okay.
13      Q.  At that time frame the full contour
14  zirconia crown considered something that wasn't
15  that aesthetically pleasing.  I was promote air
16  region promote for use in the posterior part of
17  the mouth because it was not as aesthetic as other
18  crowns that are available; correct?
19      A.  We definitely been promote it as an
20  anterior crown and bridge system at the time and
21  still do have better option for that since that
22  register doesn't have the same type of forces

Page 182

1   irrespective of whether a person is a bruxer or
2   not and even bruxers don't necessarily destroy an
3   anterior crown.  I'm not an expert on that.  I'm
4   not a dentist.  Generally veneers -- I haven't
5   heard them contraindicated for bruxers, and
6   they're generally made of the weakest material
7   there is, and that strictly is the glass.
8       Q.  Again, at this time, 2009 to mid 2011
9   time frame, full zirconia crowns would have been
10  promoted by Glidewell and others as an alternative
11  to gold for their bruxer patients.  Isn't that
12  true?
13      A.  As an alternative to gold, gold is a
14  premium restoration and dental technicians think
15  that it's the best whether or not they themselves
16  are bruxers.  The thing about gold is that it's
17  only the thickness of the metal.  It has a lot
18  more applicability than something that's going to
19  have a metal and then a ceramic over it.  Even
20  purchasers don't like it, but there's not a whole
21  lot you can do about it unless you sent the work
22  back to the doctor who prepared the teeth, and you

Page 183

1   wouldn't do that because he's already given you
2   what he wants you to build a crown on.  As an
3   option you could use a full contour zirconia crown
4   because there you have only the thickness of the
5   ceramic and there's no metal underlying it and at
6   the same time it arguably will last as long as
7   gold.  So you could call it a gold substitute in a
8   lot of situations where ordinarily you can only
9   use gold.
10      Q.  In fact, I've heard testimony --
11      A.  I say gold.  I should say metal, in other
12  words, you could have a metal crown that was made
13  out of chrome cobalt.  It's just that you know
14  what that would look like.  It would look like
15  your car bumper.
16      Q.  Mr. Friebauer testified yesterday the
17  development of the BruxZir crown was an attempt to
18  give Dr. DiTolla a more tooth looking gold crown
19  which is what he had always wanted.  Are you
20  familiar with that?
21      A.  That's probably a way of saying.  I think
22  in my own mind if I heard that and I would think

Page 184

1   of maybe the idea behind what those words would be
2   is more in the way of -- I wouldn't say it was a
3   joke.  I don't know -- maybe I'll think of the
4   right word for it but it would be more if you
5   would ask a doctor how would you like a white
6   colored gold crown and, of course, that would be a
7   joke because oh, yeah, sure, do you got it?  Of
8   course, you don't because there no such thing as a
9   white colored gold crown.  That would be similar
10  to whatever language I don't know what you just
11  said.  That just kind of remind me of something
12  that could be said to a doctor if you were giving
13  him an option of a gold crown for this patient or
14  how many doctors here would like a tooth colored
15  gold crown?  And then I'm sure doctors would maybe
16  go to raise their hand but wouldn't bother
17  because, yeah, sure, that doesn't exist.  But then
18  the idea is, oh, well, maybe it does.  Here's an
19  all ceramic that could be a replacement for your
20  next prescription for a gold crown.
21      Q.  And the truth of the matter is Glidewell
22  is absolutely trying to make the all zirconia

EXHIBIT 12
-226-

Page 185

1    crowns look as much like a tooth as they can?
2        A.  Of course.
3        Q.  And as you said zirconia, one aspect of
4    it, is in terms of function it is a lot more like
5    gold than any of the earlier solutions that were
6    more aesthetic is that fair?
7        A.  I don't really -- it may be you're
8    thinking and I would agree with.  What you're
9    saying I couldn't agree with I don't know what you
10   men much more like gold.  It's obviously not
11   metal.
12       Q.  More like gold meaning you can use it in
13   applications such as for bruxers where you use
14   would gold?  You can substitute the full contour
15   zirconia.
16       A.  I wouldn't actually agree to that.  You
17   can use a gold crown for anybody.  I have a gold
18   crown, and I'm not a bruxer.
19       Q.  I'm not saying I'm limiting it to
20   bruxers.  I'm saying any application you can use
21   gold for, you can use the full contour zirconia
22   crown as well and be more aesthetic than the gold.

Page 186

1        A.  That's true.  You can say the same thing
2    for PFM.
3        Q.  I don't think you can, though; right?
4    There are bruxer patients that will destroy the
5    PFMs that won't destroy the gold; correct?
6        A.  That's not correct.  A bruxer patient
7    will destroy anything, even destroy their car
8    bumper crown.  They'll chew through anything.
9    They destroy their own dentation.  They lose all
10   their teeth.  They destroy their jaws.  They need
11   TMJ.  They need to have their faces rebuilt.
12       Q.  But the gold and zirconia solutions are
13   an optimal solution and better solution for
14   grinders; correct?
15       A.  Maybe to a dental lab.  You'd be
16   surprised how few doctors actually work with gold.
17       Q.  I'm not following what you're saying.
18       A.  Dental labs they know.  They see.  We do
19   15,000, say, BruxZirs a week.  How many you think
20   a dentist does a week?  Maybe two a month.  The
21   labs see hundreds of thousands of models of
22   patients.  They have a different appreciation for

Page 187

1    something that's going to last and its properties
2    than even dentists.  So that's where a dental lab
3    would think a gold crown is the optimum
4    restoration just like the mummy, the pharoah.. I
5    mean that's not the way a dentist necessarily
6    thinks.  Maybe they think whatever the patients
7    like.  I assume there's a two way communication
8    and they're giving the patient the options and
9    there some kind of informed consent and they're
10   giving the patient what they want.  Apparently
11   most patients don't like gold and it's been that
12   way for a long time.  When it come to porcelain
13   fused to metal crown, gold is arguably I would
14   agree a superior coping material, but that's
15   probably the fewest of all the PFMs is going to be
16   with the precious metal coping.  Most of them will
17   be with a nonprecious metal coping or maybe a
18   semiprecious metal coping.  Nonprecious would be
19   the strongest and it could be the thinnest; so
20   that would be an option that probably doctors
21   would consider and suggest to a patient.
22   Porcelain fused to nonprecious metal, and that's

Page 188

1    what they've been doing for years and years and
2    years and that's what they're doing now.
3        Q.  Prior to Glidewell coming out with a
4    BruxZir crown, gold was considered the best
5    solution for bruxers for crowns in the back;
6    correct?
7        A.  I'm just talking between you and me as a
8    person that works for a lab and has an
9    understanding of things that might be idealic.
10   That's all.  There's very few gold crowns
11   prescribed compared to all crowns prescribed in
12   the United States.  A very small number.
13       Q.  You don't have an understanding as to
14   whether dentists in 2009 or 2010 would have been
15   prescribing gold crowns for their bruxer patients?
16       A.  Some would but only doctors who prescribe
17   gold crowns.  Not that many do.
18       Q.  Why do you say not that many do it?
19       A.  It's just the numbers.  I don't know why
20   they do or don't.
21       Q.  Are you aware that Dr. DiTolla has
22   testified he thinks gold is the best solution for

47 (Pages 185 to 188)

EXHIBIT 12
-227-

Page 189

1  bruxers?
2      A.  Sure.
3      Q.  At the time Keating dental arts was
4  marketing its new KDZ Bruxer crown at that time,
5  gold would have been a popular choice as a crown
6  for bruxers; correct?
7      A.  It's not in our numbers.
8      Q.  I'm just asking about what dentists
9  prefer in terms of materials used in crowns?
10     A.  We would only know by what they
11 prescribe.
12     Q.  How do you know what dentists are
13 prescribing?
14     A.  Because we get their prescription and we
15 fill the order.  That's our business.
16     Q.  And how do you know if it's for bruxer
17 patients?
18     A.  We don't know.
19     Q.  Well, then you don't know whether
20 dentists at the time that Keating dental arts was
21 marketing its new product in May, 2011, whether
22 dentists were choosing gold as the preference of

Page 190

1  choice for their bruxer patients; is that correct?
2      A.  That's not what I'm saying.  What I'm
3  saying is our numbers show that very few doctors
4  prescribe gold crowns.  That's all I'm saying.
5      Q.  What I'd like you to do is answer my
6  question which is at the time that Keating dental
7  arts was coming out with the KDZ Bruxer at that
8  time gold was a popular choice as a material to
9  use for bruxer patients who had destroyed other
10 crowns?
11     A.  Not based on our numbers.  Our numbers
12 show that it is prescribed very infrequently
13 period.
14     Q.  So your certify is no to that?
15     A.  On many levels.  He came out with his --
16 you mean he came out with his full contour
17 zirconia crown.  Other labs were selling that
18 before KDA dental arts.  The same thing goes for
19 everyone, not just KDA dental arts and before that
20 many labs were using porcelain fused to zirconia
21 crowns and that goes back even further.
22     Q.  Are you aware that Mr. Keating testified

Page 191

1  that he came out with this product to meet the
2  requests of his dentist who wanted a stronger
3  crown that wasn't gold for his bruxer patients?
4      A.  I'm not aware of his testimony.  I know
5  he did have his deposition taken but I have no
6  idea what he said.
7      Q.  Does that surprise to you hear that?
8      A.  It doesn't surprise me that someone would
9  say that.
10     Q.  Why do you characterize it that way?
11     A.  It just makes sense that someone would
12 say something like that.  It sounds like our
13 marketing.
14     Q.  Because he's marketing this product to
15 dentists to use with their bruxer patients;
16 correct?
17     A.  I don't see him.
18     Q.  I see the work bruxer?
19     A.  Only in his mark.  It's not in there
20 anyplace else.
21     Q.  If I'm a dentist, and I see the word
22 bruxer isn't that going to tell me this is for

Page 192

1  bruxer patients?
2      A.  You mean it might suggest to a dentist
3  that if the word bruxer is in there, it must be
4  strong enough to hold up to a bruxing patient and
5  thereby be a ceramic that is very durable?  You
6  mean that?  Is that what you're saying?
7      Q.  No.
8      A.  Oh, I don't know what you're saying then.
9      Q.  I'm saying I'm a dentist reading this ad
10 Exhibit 139.  I see the word bruxer in it.
11     Q.  Okay.
12     A.  I'm going to think of a patient suffering
13 from bruxism; correct?
14     A.  I'm going to think probably a lot of
15 dentists looked at this thought of what we've been
16 advertising for all of the time before this.  A
17 full contour zirconia crown and I'm thinking what
18 went through their minds is what I just described
19 to you.
20     Q.  So I'm a dentist and I went to dental
21 school.  I learned about bruxism.  I learned about
22 bruxers.  I've known about it for decades.  Now I

EXHIBIT 12
-228-

Page 193

1  read this and I'm going to think that Mr. Keating
2  is misspelling Glidewell's trademark?  Is that
3  what you're saying?
4      A.  I think that he probably is trying to
5  ride on the coat tails of a company that spent a
6  lot of money advertising a crown that is
7  confusingly similar to ours.  So I think they
8  probably would be thinking that they would be
9  getting material -- a crown made from a material
10  exactly as ours would be.
11     Q.  Well, right in the mill of Exhibit 139 is
12  says exclusively from Keating dental arts?
13     A.  Exactly.
14     Q.  If he's confusingly similar to your
15  crown, why is he saying that?
16     A.  I would think that probably that has to
17  do with the fact that it's all new.  All new
18  something like maybe he's making his own material
19  I don't know.  Do you think?  Is that what it
20  would be?  I don't know.
21     Q.  That's my question for you.  What is it
22  that you think -- what connection between Keating

Page 194

1  dental arts and Glidewell are you thinking is
2  going to be in the minds of dentists when they see
3  Exhibit 139?
4      A.  I'm thinking they see that and it's
5  something they heard of before because they've
6  been advertised to and they've maybe seen reviews
7  about it in dental magazines and go they think
8  this is the product that they heard about, others
9  talking about, maybe other dentists that have used
10  it and liked it.  Maybe they saw something at one
11  of the dental shows they went to for CEU education
12  talking about something that Glidewell
13  Laboratories came out and I'm pretty sure that's
14  exactly what he's trying to do because we know
15  others have tried to do the same thing.
16     Q.  When you say the same thing, what's the
17  same thing?
18     A.  Trying to ride on the coat tails of all
19  the advertising that Glidewell Laboratories has
20  done in introducing it's full contour zirconia
21  crowns.
22     Q.  And when you say ride the coat tails,

Page 195

1  what does that mean?
2      A.  Well, we put a lot of money into
3  advertising that mark, and it's got a favorable
4  review by a lot of dentists, and when doctors see
5  something like that, they can confuse that with
6  ours because it looks very similar.
7      Q.  Because of the word bruxer?
8      A.  Especially the b-r-u-x.
9      Q.  What about the e-r on the end of b-r-u-x?
10     A.  That would be confusing too.
11     Q.  What about the KDZ part?  That part
12  confusing?
13     A.  Definitely the Z.  It do you understand
14  like the zirconia they probably heard about.
15     Q.  It makes sense to have a Z for zirconia
16  because this is Keating dental arts full contour
17  zirconia crown; correct?
18     A.  It doesn't seem to me that way.  It seems
19  like it would be more like KDA bruxer, not KDZ
20  bruxer.
21     Q.  You're aware that Keating dental arts has
22  other zirconia products that are called KDZ;

Page 196

1  correct?
2      A.  I think that just happened right about
3  the time he started doing this.  I don't know that
4  ever happening before that.
5      Q.  Well, he had a product called KDZ that
6  was a zirconia product that used KDZ and that was
7  before the KDZ bruxer spelled B-r-u-x-e-r came out
8  are you aware of that?
9      A.  I'm not.
10     Q.  In fact he was selling it as far back as
11  2006.  Are you aware of that?
12     A.  I'm not.
13     Q.  So the KDZ by itself is not confusingly
14  similar with Glidewell do you agree?
15     A.  The KDZ has nothing to do with Glidewell
16  anymore than any of the other authorized dental
17  labs than actually sell the BruxZir product.  It
18  could be a name of any dental laboratory.
19     Q.  And, in fact, I mean when I see KDZ here,
20  it looks to me like Keating dental zirconia.
21  Would you agree?
22     A.  I guess in hindsight you can make it say

EXHIBIT 12
-229-

Page 197

1    anything you want.  To me it's kind of funny that
2    it says that when I've actually seen on his --
3    some of his information he does use KDA for his
4    product.
5        Q.  Okay.  And Keating dental arts is an
6    Akron for Keating dental arts; correct?
7        A.  That makes more sense to me because we
8    don't have authorized dental labs and say the name
9    is Keller and then they all of a sudden change the
10   two Ls to Zs.  They say Keller and then they have
11   our brand name.  They don't change their name to
12   Keller spelled with two Zs instead of two Ls and
13   then put bruxer after it.  It seems like that's
14   what he's done here.  Instead of KDA it's KDZ.
15       Q.  So even the KDZ aside from the bruxer you
16   think is suggestive of Glidewell Laboratories?
17       A.  I think it could be.  If someone
18   remembers the B-r-u-x and the fact it had a Z in
19   it and they see KDZ Bruxer and we know persons who
20   were confused about the fact they thought he was
21   actually selling our product.
22       Q.  What are you referring to?  What people?

Page 198

1        A.  Persons that prescribed our crown on his
2    Rxes and used our brand name.
3        Q.  How do you know what's been prescribed on
4    his forms?
5        A.  They wrote it down in the prescription
6    blank.  They wrote our brand name on their
7    prescription form.
8        Q.  Now, have you seen this?
9        A.  I have.
10       Q.  And when did you see this?
11       A.  Fairly recently.  In the last three
12   months I'd say.
13       Q.  And how did you get those prescription
14   forms?
15       A.  You provided them to us.
16       MR. TACHNER:  There were redacted forms
17   used in my opposition to your motion to amend the
18   answer.
19       MR. JANKOWSKI:  They were redacted in --
20   I'm sorry.  They were submitted -- they were filed
21   with the court.
22       MR. TACHNER:  Yes.

Page 199

1        MR. JANKOWSKI:  In connection with with
2    which motion?
3        MR. TACHNER:  You filed an motion to
4    amended your answer we filed an opposition.  In
5    that opposition two redacted forms that the
6    witness is referring to were included, and a copy
7    of that opposition was sent to the client
8    including the witness.  Now, that's exactly the
9    way the confidentiality agreement says we can show
10   the court material that you've marked attorneys
11   eyes only which is to redact the material that
12   caused it to be so marked.  We redacted the name
13   of the doctor and the name of the patient.
14       MR. JANKOWSKI:  Okay.  I just don't
15   recall the filing itself or even seeing the
16   filing.
17       MR. TACHNER:  You'll have to check it
18   out.
19       MR. JANKOWSKI:  It wasn't in connection
20   with the partial summary judgment motion.
21       MR. TACHNER:  No.
22       MR. JANKOWSKI:  This is the recent

Page 200

1    motion.
2        MR. TACHNER:  This is your motion.
3        MR. JANKOWSKI:  Okay.
4    BY MR. JANKOWSKI:
5        Q.  So aside from what you might have seen in
6    the last three months and, again, going back to
7    the time frame May, 2011, when Exhibit 140 was
8    sent to Keating dental arts, you hadn't seen any
9    prescription forms of Keating dental arts at that
10   time; correct?
11       A.  You're talking about now No. 140?
12       Q.  Yes.  Going back to the time frame of
13   Exhibit 140.
14       A.  Okay.  At this time I don't believe that
15   he was using this mark in commerce.  I have no
16   knowledge of it if he was.  This was the first
17   time, days before this date I'm pretty sure, that
18   I first became aware of his application for the
19   mark, and that's really all I know at that time is
20   that he had applied for the mark.  I'm not aware
21   of the fact he was actually using it in commerce
22   anyway.

EXHIBIT 12
-230-

1     Q.  I'll represent for you that Keating
2  dental arts has provided information in the case
3  that shows that the KDZ bruxer was associated with
4  a full zirconia crown and that name was being used
5  at least as early as May, 2011, and perhaps as
6  early as April, 2011.  So with that representation
7  in mind, when this letter was being written or you
8  authorized Exhibit 140 to be sent, you were not
9  aware of incidences of actual confusion between
10 Mr. Keating's products and Glidewell's mark;
11 correct?
12    A.  That's correct.
13    Q.  Now, you're saying other parties have
14 also been riding the coat tails of Glidewell's
15 mark; correct?
16    A.  That's true.
17    Q.  Is that also by using the word brux,
18 b-r-u-x?
19    A.  Sometimes that and sometimes b-r-u-x-e-r.
20    Q.  Someone bruxer, b-r-u-x-e-r?
21    A.  Yeah.
22    Q.  Now, you would agree that Mr. Keating and

1  these other parties can use the word bruxer in
2  their promotional materials to refer to patients
3  with bruxism; correct?
4     A.  I think that that is something that's
5  permed.  We don't stop anyone from doing that.
6  That isn't anything he did do here.  I don't think
7  it's great marketing to pigeonhole a product that
8  way, and he probably sees it that way too because
9  it's not mentioned in his advertising anywhere in
10 here with you someone could do that ideal nor
11 productioners.
12    Q.  In fact, ideal for bruxers is a saying
13 Glidewell uses, correct, in its marketing?
14    A.  I'd have to look at it but it seems like
15 we do talk about that.
16    Q.  It also uses the moto more brawn than
17 beauty; correct?
18    A.  That's true.  That was something early on
19 was decided would be some effective marketing.
20    Q.  And Mr. Keating can refer to his full
21 contour zirconia solution as ideal for bruxers as
22 well; correct?

1     A.  I guess he could.  I don't see his doing
2  that but I'm sure he could.  Instead it's
3  uncompromising aesthetics, outstanding strength,
4  and flawless fit.
5     Q.  It sounds like he's promoting the product
6  which is understandable; correct?
7     A.  Definitely.
8     Q.  And does he do anything on here that's
9  trying to suggest to the dentists that he's
10 affiliated as an authorized lab of Glidewell
11 Laboratories?
12    A.  He does not have anything on there saying
13 he's an authorized lab, no.
14    Q.  And, in fact, at this time, May, 2011,
15 Glidewell had its authorized lab program in place
16 for some time; correct?
17    A.  I don't know how long it had been in
18 place but we can look into that.
19    Q.  And there were a number of authorized
20 labs a large number of authorized labs of
21 Glidewell Laboratories by May, 2011 right for sure
22 yes?

1     Q.  And those labs would be using BruxZir;
2  correct?
3     A.  That's correct.
4     Q.  Which Mr. Keating is not using; correct?
5     A.  He's not.
6     Q.  Why don't we take a short break.
7        (Recess taken from 3:55 p.m. to
8        4:07 p.m.)
9  BY MR. JANKOWSKI:
10    Q.  I'm going to show you an exhibit that the
11 court reporter has marked as Exhibit 141.  It's a
12 document produced by Glidewell in this case
13 bearing production No. GL 241 from page 25 of 99
14 to 49 of 99.  I'll have you take a look at that
15 exhibit.
16        (Exhibit No. 141 was marked for
17        identification.)
18     THE WITNESS:  This name looks familiar.
19 BY MR. JANKOWSKI:
20    Q.  That's my question actually.  Do you
21 recognize -- it's a series of e-mails and written
22 correspondence that includes your name on it.  I'd

EXHIBIT 12
-231-

Page 205

1 like you to tell me in you recognize this?
2    A. I recognize that.
3    Q. And, in fact, we've been discussing today
4 about different parties using that's correct that
5 might be confusingly similar to Glidewell is this
6 similar to correspondence you had with a third
7 party that you believe was using a mark that was
8 confusingly similar to Glidewell's mark?
9    A. Yes.
10    Q. And so this is -- again, this was
11 produced to us this way by Glidewell. This is a
12 true and correct copy of the correspondence you
13 had with this third party?
14    A. Let me see here exactly how this is
15 arranged.
16    Q. It appears that it's as e-mails often are
17 the farther back in the document you get, the
18 earlier the communications are because the e-mails
19 get put later on top of earlier.
20    A. Okay. This is my recollection of it, and
21 I would just add that it actually began
22 January 19, and that would have been the first

Page 206

1 e-mail. I'm not seeing anything else like a
2 picture of anything as an example which might have
3 been on the original. I don't know where it would
4 go if it ever had been there. It seemed like it
5 would have been probably showing up in there as
6 something that didn't print or something. I'm
7 just guessing. I'd have to go back to actually
8 the back that I sent or maybe it shows up later
9 on. I don't know. Usually I put an example of
10 what it is I'm seeing where it looks like they're
11 using the very mark that is colored gold crown to
12 ours. I see I did put in there what the spelling
13 of it is.
14    Q. I see on page 48 of 99 it looks like
15 you're making a reference to -- first of all, let
16 me just state, for the record, your e-mail is
17 dated January 19, 2011. It's being sent to fusion
18 dental lab solution; correct?
19    A. Yes, and I remember that name too because
20 that was the first infringement letter I ever
21 sent, and that's the first infringement letter
22 I -- that's the first active infringement I am

Page 207

1 aware of, and that is a front for crowns from
2 China as I subsequently learned.
3    Q. On the page marked page 48 of 99 there's
4 the statement in your communication to fusion. It
5 says your promotion in lab management today of
6 full solid bruxer, spelled b-r-u-x-e-r, zirconia
7 is using a similar mark where there's an
8 appreciable likelihood of confusion. Do you see
9 that?
10    A. I do.
11    Q. And bruxer is in all bold. Do you see
12 that?
13    A. I do.
14    Q. This is an example of the word bruxer
15 being the source of the confusion in your mind;
16 correct?
17    A. Correct.
18    Q. Is it the appearance of the mark or just
19 the word bruxer however it appears, however font
20 or color?
21    A. It is just the way that it appears there.
22    Q. Okay. And your interpretation here is

Page 208

1 again that this is confusingly similar to
2 Glidewell's BruxZir mark; correct this is exactly
3 that this letter is saying; correct?
4    A. That's true.
5    Q. If you turn to page 47 of 99 so move
6 forward one page, we get to see fusion dental
7 lab's response to your letter. Do you see that?
8    A. I do.
9    Q. How did they respond?
10    A. They responded with the fact that the
11 word brux they put it in quotes is a common
12 clinical term for a person with bruxism.
13    Q. Right. Which is a true statement;
14 correct?
15    A. I think so. I'm not a doctor, but I
16 think all doctors know what that would mean if
17 they saw that.
18    Q. Right. And that's all they say. It's a
19 very short communication they sent; correct?
20    A. That's true.
21    Q. And then it looks like you followed up
22 with another communication after that, correct,

EXHIBIT 12
-232-

Page 209

1  asking them to cease and desist despite their
2  explanation of what they think the word bruxer
3  means in their mark; correct?
4      A. On the 21st?
5      Q. Yes?
6      A. Let me see and go back to this date.
7  5:03 p.m., yeah. 21st. It looks like the next
8  morning. Yeah, this looks like the 19th at
9  3:27 p.m. and by the next morning they're going to
10 see if we're serious and so I followed up with a
11 further explanation it looks like on the follow
12 morning.
13     Q. And then on Friday, the 21st about
14 16 minutes later they responded again and said
15 that the name of their crown is full solid bruxer
16 zirconia, and they say which is the description of
17 the type of crown we offer, a full solid bruxer
18 zirconia crown for bruxers, patient of bruxism.
19 Please read or advertise many precisely. So they
20 don't think they're trying to be similar to
21 Glidewell at all, do they?
22     A. Naturally not. They would like to just

Page 210

1  keep using that so long as they're allowed to. Of
2  course, this is as of 2011, and we've already been
3  on the market now since June, 2009, and I don't
4  know how many millions of dollars we've spent. So
5  sure, they would love it if they could just do
6  that.
7      Q. But do you think they -- are they somehow
8  trying to copy Glidewell? Is this innocent
9  infringement or malicious infringement?
10     A. I don't know if you call it malicious but
11 it's definitely intention infringement just like
12 you associate with China that they could get away
13 with anything that they do. I'm surprised they
14 didn't say made in Switzerland while they were at
15 it.
16     Q. If you turn to page 43 of 99, there's a
17 communication that you sent still on January 12.
18 Now it's in the afternoon. This is in response to
19 them saying there's no confusing similarity
20 between the marks. You state it is pronounced the
21 same, isn't it? Do you see that?
22     A. I do.

Page 211

1      Q. I think you testified to that earlier as
2  well that that's one of the sources of the
3  confusion is the pronunciation; correct?
4      A. That's a possibility you you never know
5  how someone is going to pronounce something that's
6  giving them an opportunity to see what they're
7  going to say next. I see they say no it's not
8  pronounced the same for them it might not be who
9  knows.
10     Q. On page 41 of 99, we're up to April 19.
11 So this is a little further along in time. It
12 looks like you were sending additional information
13 to them basically, a little stronger letter.
14     A. That's correct.
15     Q. And then I also see if I move forward to
16 page 39 of 99, I see something referencing the
17 notice of a filing of a complaint in U.S. District
18 Court. Do you see that?
19     A. I do.
20     Q. So did Glidewell file a lawsuit against
21 fusion dental in district court?
22     A. No.

Page 212

1      Q. I'm confused then. What's been
2  referenced on page 39 of 99?
3      A. It is a cease and desist letter in the
4  form of a notice of complaint.
5      Q. This says notice of filing of complaint?
6      A. Right. It says subject notice of
7  complaint and in block letters notice of filing of
8  complaint.
9      Q. So you weren't trying to put them on
10 notice that you'd filed a complaint against them?
11     A. They might draw that conclusion from
12 that. I don't know that they knew that it had
13 been filed or hadn't at this point.
14     Q. Well, had you prepared a complaint to
15 file against them?
16     A. No, only this, something that would be --
17 something to get their attention. I especially
18 love the block letters.
19     Q. Right. I see that. And did it get their
20 attention?
21     A. Apparently it did.
22     Q. And why do you say that?

EXHIBIT 12
-233-

Page 213

1      A. They stopped using the infringing mark in
2   their advertising.
3      Q. I guess the communication on page 36 is a
4   repeat it looks like of the April 19 communication
5   it looks like.
6      A. Well, maybe it's part of something that
7   precedes it.
8      Q. I think what it is is she's
9   communications seem like they're duplicated in the
10  production?
11     A. Maybe something precedes it and has that
12  as a part of it.  It looks like like the date is
13  January 19, 2011.
14     Q. Right.  That's when they start?
15     A. It looks like right after that is
16  attached to it this second notice of trademark
17  infringement.
18     Q. The last communication I'm seeing on here
19  is the all capital letters communication that you
20  sent to fusion on May 16, 2011.  Would you agree?
21     A. Let me see the date of that.  That is
22  dated May 16, 2011.

Page 214

1      Q. Right.
2      A. And these are things are dated --
3      Q. Everything after that seems to be
4   dated --
5      A. This is before that or it's dated
6   January 21.  That might be an attachment to
7   something prior to it.  I'd have to go back to the
8   very beginning here.
9      Q. What I'm inclined to do here --
10     A. I think that is and it's out of order.  I
11  think it might be the last one and all of these
12  were earlier.
13     Q. Let me mark the Exhibit in a way which is
14  going to be less confusing.  If it's okay with
15  you, it looks to me like this is just repeating
16  what we just went through up to this
17  communication.
18     A. Yes.  I think that would be the last one
19  and these others --
20     Q. That's the last one.
21     A. Would be January 21.
22     Q. Let me try to rebuild it in that way.  So

Page 215

1   starting on 39.
2          (Discussion off the record.)
3          MR. JANKOWSKI:  Let me just state, for
4   the record, then Exhibit 141 is, for the record,
5   GL 241 from page 39 of 99 through 49 of 99.
6   BY MR. JANKOWSKI:
7      Q. Okay, Mr. Allred, I think you already
8   testified that -- so the communication you sent on
9   May 16, notice of filing of complaint in U.S.
10  District Court was successful.  They did react and
11  they changed the name of their product; is that
12  correct?
13     A. I don't know what they changed their name
14  to, but they did stop using the confusingly
15  similar mark.
16     Q. They changed it to a name you were
17  satisfied with?
18     A. Yes.
19     Q. That's why there's no more correspondence
20  on that?
21     A. Yes.
22         (Discussion off the record.)

Page 216

1   BY MR. JANKOWSKI:
2      Q. So next I'm going to hand you a document
3   which has been marked by the court reporter as
4   Exhibit 142.  It is -- it was produced by
5   Glidewell in this case with production Nos. GL 241
6   from page 54 of 99 through 57 of 99.
7          (Exhibit No. 142 was marked for
8          identification.)
9   BY MR. JANKOWSKI:
10     Q. If you can just briefly look at that and
11  tell me if you recognize it.
12     A. Pittman dental.  I recognize that.
13     Q. And, in fact, this is another situation
14  where there's multiple communications, a string of
15  communications.  I guess there's two in this
16  instance; right?  One on February 9, 2011, and one
17  on February 15, 2011?
18     A. It looks like a notice that is
19  substantially similar to the very first one I ever
20  sent and then beyond that perhaps a response to
21  something they said.
22     Q. Well, on the front page it says hello

EXHIBIT 12
-234-

Page 217

1  Rudy.  Thank you for your call and you
2  explanation.  It looks like to me like Pittman
3  called you.
4       A.  Okay.
5       Q.  Do you have a recollection of that?
6       A.  Maybe if I read what I wrote here, I
7  would remember his call.
8       Q.  Sure.
9       A.  Okay.  I remember this.  But I don't
10  remember his call.
11       Q.  This is another instance of a third party
12  using a confusingly similar mark in the position
13  of Glidewell; correct?
14       A.  From the looks of it he was calling and
15  must have expressed in kind of feeling -- is there
16  more from this anything else to do with Pittman in
17  the pile?
18       Q.  I don't believe so.
19       A.  Okay.  So I responded.  It looks like I'm
20  still providing some arguments that might make
21  sense to him as far as why we would want to stop
22  him from using a confusingly similar mark.  It

Page 218

1  doesn't look like we've necessarily reached an
2  understanding at this point.  So I don't know
3  what -- if there's any further things along here.
4       Q.  And if you look on page 56 of 99, you see
5  the letter that you sent.  As I think you just
6  testified, it's very similar to the letter you
7  sent to fusion dental; correct?
8       A.  Similar.
9       Q.  Did you have a template letter you were
10  sending --
11       A.  Oh, yeah, you bet.  We have a place in
12  here that would change as far as what the mark was
13  they were using.
14       Q.  On page 56 of 99 you can see that halfway
15  down the page.  In this instance Pittman was using
16  bruxer in all cap B-r-u-x-e-r, all zirconia crown;
17  correct?  That was the colored gold crown mark?
18       A.  It looks like from the back that's
19  exactly what it looked like.
20       Q.  Here's an example where you did attach a
21  visual on the last page of Exhibit 142, correct,
22  of their mark?

Page 219

1       A.  It looks like.  I'm not sure if that
2  printed.  I must have printed an image there it
3  looks like.
4       Q.  And you explained to Pittman dental just
5  as you explained to fusion how bruxer was
6  confusing with Glidewell's mark; correct?
7       A.  Yes.
8       Q.  And if you look on the front page of
9  Exhibit 142, you make the same argument again that
10  BruxZir and bruxer sounds the same; correct?
11       A.  I did write that.
12       Q.  Now, do you know did Pittman change their
13  name?
14       A.  They did, yes.
15       Q.  I notice that you cc'd Robin Bartolo on
16  this e-mail.  Do you see that?
17       A.  I do.
18       Q.  And why are you cc'ing Mr. Bartolo?
19       A.  I don't know.  I'd have to look at this
20  letter right here.
21       Q.  Just to help guide your attention I think
22  at the top of page 55 of 99 you make reference to

Page 220

1  Mr. Bartolo's contact information.
2       A.  I see yes cc'd Robin Bartolo on there.
3       Q.  Why did you CC?
4       A.  It looks to me that that goes along with
5  what is at the bottom of this second e-mail that's
6  apparently responding to a telephone conversation
7  that I had with him.
8       Q.  Isn't the reason you're cc'ing
9  Mr. Bartolo that you want to offer Pittman dental
10  labs the opportunity to join Glidewell's family of
11  authorized labs?
12       A.  That's what it says here in the last
13  paragraph.
14       Q.  Because since Pittman obviously is
15  offering an all zirconia crown and this is an
16  opportunity, you're saying, for them to join
17  Glidewell and sell BruxZir crowns; correct?
18       A.  Well, I don't know what our telephone
19  conversation was but it obviously a way where he
20  can actually promote his services using the very
21  trademark that looked to me like he was trying to
22  copy.  He can use the real trademark.

EXHIBIT 12
-235-

Page 221

1    Q.  Now, do you think he was trying to copy a
2  trademark or was he just using the word brux in
3  reference to patients with bruxism?
4    A.  No I'm pretty sure he was trying to copy
5  something he realized by then was very popular, a
6  name doctors might -- it might resonate with
7  doctors.  And did Pittman push back and say they
8  were not confusingly similar?
9    A.  I don't see that here.  I don't remember
10  what he might have said in whatever telephone call
11  we had.
12    Q.  Whatever he said you responded to it by
13  point out the similarity in pronunciation; right?
14    A.  I sent another e-mail February 14.
15  Almost five days later.  He must have called
16  sometime after Wednesday and it looks like it was
17  probably Monday and I probably wrote him back.
18    Q.  That's all I can guess from this.  Thank
19  you for your call.  He might have even left a
20  voicemail for all I know.  It could have been
21  that?
22    Q.  You don't recall?

Page 222

1    A.  Let me see again.  Thank you for your
2  call and explanation today concerning the use --
3    Q.  You don't recall what his explanation
4  was?
5    A.  Pittman.  I'm not even sure where they're
6  located.  Let me see here.  Centennial circle,
7  Gainesville, Georgia.  It just doesn't ring a
8  bell.
9    Q.  If you look on the first page of
10  Exhibit 142 and you go down to the fifth paragraph
11  down, it says prior to the promotion of BruxZir
12  mark, the use of all ceramic crowns even with
13  patients with parafunctional problems was counter
14  intuitive.  Do you see that?
15    A.  I see that.  I see it.  It's not very
16  artfully worded.  It should have said even for
17  patients with parafunctional problems was counter
18  intuitive for restoration of posterior teeth is
19  probably what I was getting at there.
20    Q.  Fair afunctional problems is a reference
21  to bruxism; correct?
22    A.  That is, yes.

Page 223

1    Q.  And so --
2    A.  And even then it probably would have been
3  better to say all ceramic crowns irrespective of
4  patients with parafunctional problems, was counter
5  intuitive as a material of choice for the
6  restoration of posterior teeth but obviously I
7  didn't put it in that many words.
8    Q.  This is suggestive that that the
9  telephone call you had with the representative
10  from Pittman Dental raised the issue that they
11  were using the word bruxer spelled b-r-u-x-e-r as
12  a reference to a patient with bruxism; correct?
13    A.  Could be.  I don't know that this is
14  suggesting it but he could have been raising that
15  point, sure.
16    Q.  Okay.  You can set that one aside and let
17  me show you what's been marked as Exhibit 143.  It
18  bears production No. GL 241 page 58 of 99 through
19  page 70 of 99.
20    A.  Okay.
21      (Exhibit No. 143 was marked for
22      identification.)

Page 224

1  BY MR. JANKOWSKI:
2    Q.  This bears to be a communication with a
3  dental laboratory called R dental.  Do you recall
4  having an e-mail exchange with them?
5    A.  I do.
6    Q.  In fact, this is just another example of
7  the same type of exchange you had with fusion and
8  you had with Pittman; correct?
9    A.  It is.  I see there's an image there that
10  doesn't come through.  Maybe it does later, but
11  other than that it looks like probably -- the
12  spacing looks like it got changed around a little
13  bit but that letter looks like the other letter to
14  fusion even.  I don't see if there's additional
15  facts added.  It does have the word R brux in
16  there.
17    Q.  Where are you seeing R brux?  Which page?
18    A.  Page 69.
19    Q.  Right towards the top; correct this is an
20  example where they're not using the entire word
21  bruxer but rather just the form brux, b-r-u-x;
22  correct?

56 (Pages 221 to 224)

EXHIBIT 12
-236-

Page 225

1    A.  That's correct.
2    Q.  You're not saying the R part is colored
3  gold crown you're saying the brux part is;
4  correct?
5    A.  That's correct.
6    Q.  It's fair to say that RDent disagreed
7  that they should not be allowed to use that name;
8  correct?
9    A.  They may have initially.
10    Q.  And do you know what happened with RDent?
11  Did they change their name?
12    A.  They did.
13    Q.  Do you know whether they became an
14  authorized lab?
15    A.  I don't know if they did or not.  It
16  seemed to me at this point in time that's what
17  they were planning on doing.
18    Q.  And, in fact, again, I think you offered
19  to put them in communication with Mr. Bartolo;
20  correct?
21    A.  Correct.  That's how you would become an
22  authorized dental laboratory.  You'd have to order

Page 226

1  the blocks.  It looks to me like as far as I knew
2  back then he had decided to offer the product that
3  would allow him to be a certified laboratory.
4    Q.  Which means the BruxZir milling blocks?
5    A.  That's right, BruxZir.  And he was
6  wanting to know if he could change it after he
7  finished using the prescriptions that he had that
8  already had the confusingly similar mark on it.
9    Q.  Okay.  You can set that one aside.  Thank
10  you.
11       Next I'll show you what the court
12  reporter has marked Exhibit 144 which bears
13  production Nos. GL 241, page 7 of 99 through
14  page 9 of 99.
15       (Exhibit No. 144 was marked for
16       identification.)
17  BY MR. JANKOWSKI:
18    Q.  If you can look at that and tell me if
19  you recognize it?
20    A.  Authentic.
21    Q.  Right.  This appears to be an e-mail
22  exchange between you and Authentic Dental lab;

Page 227

1  correct?
2    A.  Correct.
3    Q.  And do you recall having an e-mail
4  exchange with Authentic Dental lab?
5    A.  I don't recall that for sure.  I don't
6  remember Whitney but I do recall authentic.
7    Q.  And, in fact, this has another example of
8  the form letter that we talked about earlier;
9  correct?
10    A.  It is there, and it looks --
11    Q.  They're using the mark brux, B-r-u-x,
12  crowns which is in Glidewell's mind confusingly
13  similar; correct?
14    A.  That's true.  And I guess there's a copy
15  of that use attached.
16    Q.  Right.  It shows the assured dental lab
17  website where it was copied from; correct?
18    A.  True.
19    Q.  And what's your understanding?  Did
20  Authentic Dental lab change its mark in response
21  to your communication?
22    A.  Yes, they did.  I think it's almost even

Page 228

1  false advertising because they talk about
2  authentic zirconia which almost conveys in that
3  context the fact that they made their own blocks
4  because Lava is a brand name of 3M.  And as far as
5  I know authentic dental lab is a dental lab that
6  is like 15,000 other dental labs, and they don't
7  make the material that they make their zirconia
8  crowns out of.
9    Q.  Do you believe that -- where did
10  authentic get their zirconia?  Do you know?
11    A.  Maybe Lava.  I don't know.  I don't know
12  if it was any other material.  No clue.  Could
13  have even been our material.  You don't really
14  know -- I guess you do know because they weren't
15  buying our blocks at least from us directly and
16  apparently from this they weren't or it could
17  probably be on here.
18    Q.  If they were buying from Glidewell direct
19  you'd know about that?
20    A.  I'd know about that.
21    Q.  On page 8 of 99 on the bottom of your
22  form letter or template you again offer them that

57 (Pages 225 to 228)

EXHIBIT 12
-237-

Page 229

1  opportunity to join the list of BruxZir authorized
2  dental laboratories; correct?
3      A.  That's true.
4      Q.  You say if you wish to be on the list
5  call Glidewell direct which is really Mr. Bartolo;
6  correct?
7      A.  True.
8      Q.  Okay.  You can set that aside.  Thank
9  you.  Next I'd like to have you look what the
10  court reporter has mark as Exhibit 145 bearing
11  production Nos. GL 241, page 4 of 99 through
12  page 6 of 99.
13          (Exhibit No. 145 was marked for
14        identification.)
15      THE WITNESS:  Assured dental lab.  Just
16  one letter.
17  BY MR. JANKOWSKI:
18      Q.  This one it's just one letter you sent to
19  assured on April 18, 2011; correct?
20      A.  It looks like one letter, and it may
21  be . . .
22      Q.  Do you recall writing to assured dental

Page 230

1  lab?
2      A.  I do.
3      Q.  It looks like on the front page of
4  Exhibit 145 you wrote to them because they had a
5  crown they were calling Zir-Brux.
6      A.  This one's Zir-Brux.
7      Q.  Earlier we had R-brux?
8      A.  Correct now we have Zir-Brux.
9      Q.  Now we have Z-brux; correct?
10      A.  Correct.
11      Q.  Because there's no more communication, do
12  you know what happened with assured?
13      A.  They stopped using that.  They came up
14  with their own mark.
15      Q.  Do you know whether they respond inspect
16  anyway claiming they wanted to keep using it or
17  should be allowed to keep using it or anything
18  like that?
19      A.  I think that they would like to have used
20  it, but then, again, they don't even make these
21  crowns in the United States.  I think they came
22  from Taiwan.  It just wasn't anything we were

Page 231

1  going to allow and they saw it our way.
2      Q.  The dental lab is not located in Taiwan;
3  right?
4      A.  No, but their material is.  I remember
5  this lab.  This is a lab that's like a front for
6  foreign-made crowns.  If I remember correctly,
7  that is the same outfit.  I remember Portland,
8  Oregon.  What I'm not quite sure about I don't
9  know if it's China.  I think it could be either
10  the Philippines or Taiwan.  I don't know for sure
11  that it's China, but it could be from China.  I
12  forget exactly where but it was outside the
13  country.  Vietnam for all I know, but it was
14  definitely foreign-made crowns.
15      Q.  Not just zirconia but crowns themselves?
16      A.  I don't know about the zirconia.  I don't
17  know what block it would be.  I don't think anyone
18  would know probably from their advertising but
19  certainly that would help if someone was not
20  trying to create confusion they might actually
21  disclose the fact that they were using a zirconia
22  product that was from someone that the doctor

Page 232

1  white know and he could maybe put two ask two
2  together.  These people never do that just like
3  Keating never did.
4      Q.  I'm sorry.  Keating never did what?
5      A.  Never disclosed the material he was using
6  when he was doing the advertising he never said
7  KDZ bruxer made from blocks from 3 M.
8      Q.  And would that have made a difference in
9  your assessment whether there was a likelihood of
10  confusion?
11      A.  Not necessarily.  I think it would have
12  showed that at least a dentist would have had a
13  fighting chance of knowing there might be
14  something more to should similarity in the park
15  than obvious on its face.
16      Q.  Do you think dentists care very deeply
17  about where the zirconia comes from in the full
18  contour --
19      A.  Some certainly do.  I don't know how many
20  dentists, but I know more and more states are
21  actually passing laws requiring dental
22  laboratories to disclose the material they use,

EXHIBIT 12
-238-

Page 233

1    where it's made, and not just the crowns if
2    they're made here but even the material that it's
3    made of which you then can tell where that's from
4    also. Some states you have to do that and put it
5    on the invoices that you send the crowns back.
6    It's all in response to fears about stuff from
7    China that's not properly controlled and might
8    have lead in it even. Nothing to do necessarily
9    with zirconia crowns but definitely is enough of a
10   concern among someone, maybe the public, maybe
11   politicians more than dentists, but it's
12   definitely a growing trend.
13       Q. Next I'll show you a document the court
14   reporter has marked as Exhibit 146, bears
15   production Nos. GL 241 page 16 of 99 through
16   page 19 of 99.
17       (Exhibit No. 146 was marked for
18       identification.)
19   BY MR. JANKOWSKI:
20       Q. It appears to be a communication with
21   China dental outsourcing, Inc.
22       A. I remember that.

Page 234

1        Q. Do you remember writing to China dental
2    outsourcing, Inc.?
3        A. I do.
4        Q. What do you recall about writing to them?
5        A. I remember trying to find out who to
6    write to.
7        Q. It looks like you found somebody.
8        A. Yeah, it looks like I figured it out.
9    Some of these places are pretty well cloaked. It
10   looked like I even would have been able with
11   Google Maps to find a picture of the factory that
12   it was coming from. They look like a pretty big
13   outfit too.
14       Q. On the front page of Exhibit 146 you
15   indicate that their mark was bruxer, b-r-u-x-e-r,
16   all zirconia; correct?
17       A. True.
18       Q. So, again, the similarity that's of a
19   concern to Glidewell is the use of bruxer;
20   correct?
21       A. Especially when used as a mark.
22       Q. And I think this is the only

Page 235

1    communication I saw with this entity. Did they
2    stop using the name?
3        A. They stopped using the name. If this is
4    the only thing you have, then this is the only
5    communication. I thought we got something back
6    from them saying okay, won't do it again, but I
7    don't see that here; so I don't know whether they
8    ever wrote anything back or not but they did stop
9    using it. They couldn't resist using the word
10   bruxer if I remember. I think they changed it. I
11   think they put on their site good for bruxers.
12       Q. Similar to what Glidewell says ideal for
13   bruxers?
14       A. Sort of. I don't know if that's even on
15   our site anymore. I'd have to look. I know that
16   was the initial marketing campaign to indicate
17   something durable even though it was all ceramic.
18       Q. Okay next I'm going to show you what's
19   been marked as Exhibit 147, bearing production
20   Nos. GL 241, 71 of 99 through 97 of 99.
21       (Exhibit No. 147 was marked for
22       identification.)

Page 236

1    BY MR. JANKOWSKI:
2        Q. This appears to be communication with
3    showcase dental laboratories.
4        A. I remember them. Sure. It's getting
5    more recent here.
6        Q. The first letter here looks like it was
7    written in January, 2012; correct?
8        A. Yes.
9        Q. We're getting more recent in time as we
10   go through the exhibits.
11       A. It looks like January 10 was the first
12   letter.
13       Q. And looking on the page bearing
14   production No. Page 77 of 99, it looks like their
15   mark that was of a concern to you was Zir-Bruxer
16   crowns. Z-i-r-B-r-u-x-e-r crown; correct?
17       A. That is true and it looks like they also
18   were pirating an image of the BruxZir crown for
19   their advertising. Even they took the name even.
20   They didn't even take the name off it. They
21   actually have our trademark name right next to it.
22       Q. An image that they -- an image associated

EXHIBIT 12
-239-

Page 237

1  with Glidewell that Glidewell used in their
2  materials?
3      A. Not only that it's our trademark.  It
4  would have been something probably plucked right
5  trying to ride our site or advertising they didn't
6  even that I the name.
7      Q. You're looking on page 97 of 99, the last
8  page?
9      A. Yes.
10     Q. I see.
11     A. It looks like the three crowns is also in
12 their own advertising where they have it next to
13 zir con.  I think showcase might also be a show
14 case for foreign made crowns possibly from China.
15     Q. So the image -- the way I interpret this
16 last page is you attached the image with the
17 BruxZir at the bottom to show the copyrighted
18 image that they cut and paste into their thing?
19     A. It says right here it's plucked off of
20 something.
21     Q. In other words, I don't think the image
22 there that has BruxZir on the last page --

Page 238

1      A. You know what that might be right.  Maybe
2  it's to show where they got -- I bet that's right.
3  They plucked the picture -- they erased the name
4  and put it with this advertisement for zir can it
5  looks like.  Check dock I can't really read the
6  rest of the print.  The e-mail could have been
7  large and they could have seen whatever it was.
8  Somewhere or another here I think they also were
9  using a name somewhere zir bruxer crown.
10     Q. Right.
11     A. I don't know where that shows up on here
12 because it's too small.  I assume it's in that
13 block.
14     Q. Your letter makes reference to it?
15     A. Yes.
16     Q. So they must have been using it.  If you
17 look on page 76 of 99, they pushed back like
18 fusion pushed back and Pittman pushed back;
19 correct?  You see how they're now referencing
20 Wikipedia's entry for bruxism and the reference to
21 a bruxer as somebody who suffers from bruxism?  Do
22 you see that?

Page 239

1      A. I see that.
2      Q. Then as you did with the other dental
3  labs you wrote back explaining why it's
4  confusingly similar to Glidewell; correct?
5      A. That's true.
6      Q. And ultimately do you know what happened
7  with this particular third party?
8      A. Well, interestingly enough it's right
9  here and it's from their website which is part of
10 the package which is I think interesting because
11 they actually printed the infringement letter on
12 their site as a way to acknowledge the fact that
13 they used to use a mark that they decided not to
14 use anymore and here's why.  So they printed my
15 letter and they put my name for all posterity.
16     Q. There it is on the front page of the
17 exhibit?
18     A. It's the front page of this exhibit.  I
19 think of it more as maybe the back page of their
20 site.  It's not something that was on the -- their
21 website the minute you pull it up, but it was in
22 their website somewhere and I remember seeing that

Page 240

1  and thinking oh, that's interesting.  That's never
2  happened before.  Maybe someone in some damning
3  way like look what they said but it seemed to me
4  like they were not too judgmental about the whole
5  thing.  They seemed to acknowledge the fact that
6  it was a mark that was confusingly similar and
7  they certainly had other options to use and they
8  decided to do that.
9      Q. At the bottom of the front page it looks
10 like they changed their name to full contour
11 zirconia?
12     A. I'd have to see that on here, but I
13 wouldn't be surprised if that's what you're
14 looking at.  We have hereby changed the -- yeah,
15 definitely.  That isn't really much of a mark.
16     Q. But it certainly --
17     A. It's acceptable.
18     Q. Acceptable to Glidewell?
19     A. Definitely.
20     Q. You can put that down.  Let me show you
21 what's been marked as Exhibit 148, bearing
22 production Nos. 241 pages 1 of 99 through 3 of 99.

EXHIBIT 12
-240-

Page 241

1     A.  To Sarah Wang.
2     Q.  Right.  This is communication that
3  appears to have been sent in March of 2012 to
4  Sarah Wang?
5     A.  To ADL dental lab from the looks of the
6  CC.
7     Q.  Right.  Advanced dental laboratory.  Does
8  that name ring a bell?
9     A.  China.  If I look into this further,
10  somehow something gave me the clue that I was
11  writing to another organization that was selling
12  crowns from China.  My attachment on the back
13  there seems to even have some kind of address from
14  China.
15     Q.  On the front page of the exhibit in this
16  example it looks like the lab is using BruxZir as
17  their mark as one of their products; is that
18  correct?
19     A.  That's true.  They're actually using the
20  mark spelled exactly like our own trademark.
21     Q.  And what happened after this?  Do you
22  know I don't see any other communications.  Did

Page 242

1  they change the name?
2     A.  They changed the name.
3     Q.  Let me remember here.  I think -- you
4  know, I don't know what they're doing.  I'd have
5  to go and see if I can even find this site.  I
6  think what this was was something that was given
7  to us by a lab that received it as a promotion
8  because they were being marketed to as a
9  laboratory that makes crowns for laboratories, and
10  they were obviously making the assertion that they
11  were providing our material to make a crown to
12  other labs, and this lab, whoever gave it to us,
13  would have turned us on to it because that's what
14  it looks like this is because there's a copy on
15  the back of an e-mail communication there?
16     Q.  The one from Sarah Wang?
17     A.  Exactly.  It's from and the subject and
18  the date is it's just addressed to dear friend.
19  So that dear friend was who knows how many dental
20  laboratories in the United States that don't have
21  a mill and they don't provide this product.  There
22  it is right there.  Their main products that you

Page 243

1  can get from them are PFMs, FMCs, IPS e.max, and
2  zirconia  and  BruxZir.  Who knows if they even
3  have IPS e.max.  I assume they do but we know they
4  didn't have BruxZir.
5     Q.  Okay.  Do you know who forwarded you that
6  e-mail from Sarah Wang?
7     A.  I don't, no.  It was a dental laboratory.
8     Q.  You don't recall which one?
9     A.  I don't remember who it was but it could
10  have been any of 15,000 dental laboratory.
11     Q.  But there's not 15,000 who had be likely
12  to be forwarding you e-mails like that; correct?
13     A.  Could be.  I don't know why not.
14     Q.  You think it was Mark Jackson?
15     A.  Doubt it.  I don't think it was.  I think
16  if it was, I'd remember that.
17     Q.  Okay.  I'll show you what the court
18  reporter's marked as Exhibit 149 bearing
19  production Nos. GL 241, page 50 of 99 through 53
20  of 99.
21        (Exhibit No. 149 was marked for
22        identification.)

Page 244

1        THE WITNESS:  Dominion milling center.
2  BY MR. JANKOWSKI:
3     Q.  Right.  Do you recall that second
4  correspondence to dominion?
5     A.  I do.
6     Q.  And this particular correspondent
7  actually attaches some invoices it looks like and
8  it looks like they're using a mark which is
9  BruxZir spelled in a different way which is
10  B-r-u-x-z-e-r; correct?
11     A.  It's something they would have been able
12  to tell.  Obviously they did it.  If I had the
13  e-mail I could blow it up but boy that's hard to
14  read.  I probably say in the letter; right.
15     Q.  You do.
16     A.  Okay.  Yeah, B-r -- this didn't print
17  outright and it's probably just the software.
18  Probably should have been in quote marks but it
19  says B-r-u-x-z-e-r, correct.
20     Q.  Yes I think the --
21     A.  In fact, I can see where it says clients
22  up there it changed the hyphen to a question mark

EXHIBIT 12
-241-

Page 245

1  too. Wherever you see a question mark it looks
2  like it should be a quote mark. That's through
3  that whole letter there.
4      Q. And you got an enthusiastic response from
5  Scott on the first page of the exhibit.
6      A. Oh, yeah.
7      Q. Howdy Keith with an exclamation mark. Do
8  you remember getting that response?
9      A. Sort of. It hasn't been that long ago.
10  I remember old dominion.
11      Q. He makes reference to a bruxer crown with
12  his spelling B-r-u-x-z-e-r?
13      A. I think I am remembering. This is I
14  think if I'm not mistaken this is a la be where if
15  you were to go on their site it looked like a
16  family transmission like data was the lab owner or
17  a dentist and his son or them was a lab guy and
18  his son was a lab guy. This is what I'm
19  remembering now obviously if anyone would know
20  that wasn't true it would be a lab guy. (***
21  CHECK ***) Then he said he would stop using it it
22  looks like because I'm saying thank you for your

Page 246

1  prompt response we certainly appreciate your
2  understanding. He said they'd gladly change.
3  They changed it to FCZ.
4      Q. He basically says the name is a reference
5  to patients with bruxism; correct but they'll
6  change the name anyway. Do you have any more
7  communications after this?
8      A. No.
9      Q. Next I'll have you look at Exhibit 150
10  bearing production Nos. GL 241 page 20 of 99
11  through 24 of 99.
12          (Exhibit No. 150 was marked for
13          identification.)
14  BY MR. JANKOWSKI:
15      Q. Appears to be communications with dental
16  Dentopia or Dentopia dental lab?
17      A. That does sound familiar. I think that's
18  fairly recent too.
19      Q. Right. These communications are looks
20  like in August, 2012. Do you recall these e-mail
21  exchanges?
22      A. I remember Dentopia.

Page 247

1      Q. What do you recall about it?
2      A. Let's see if there's anything in
3  particular here that jumps out. I've got
4  something here I've attached. That is wring a
5  bell. I do remember a little bit more about this.
6  You can't really read that letter too much, but it
7  was evidence of the fact they knew who we were --
8  this is as I remember it -- and had called and
9  asked about buying blanks for use in making
10  crowns. It seemed to me at the time they
11  obviously knew the owner of the mark and and we
12  knew about that because we had immortalized that
13  in the system there that they had communicated
14  with us.
15      Q. In this instance based on your letter, it
16  looks like they were using the name full zirconia
17  and then in parentheses bruxers spell
18  B-r-u-x-Z-i-r; correct?
19      A. Correct.
20      Q. So this is another instance where they
21  were word for word or letter for lettered I should
22  say using the register mark of Glidewell; correct?

Page 248

1      A. That is true. I don't know if we can
2  tell from this where exactly they're from.
3      MR. TACHNER: Virginia.
4      THE WITNESS: Oh, okay. As far as their
5  crowns go.
6  BY MR. JANKOWSKI:
7      Q. Now --
8      A. I'm not sure if they're really made in
9  Virginia I don't know what I knew back then. I
10  guess it would be this e-mail communication if I
11  could read it closer might tell me something if
12  they were communicating from the United States or
13  a foreign country. I don't remember maybe all
14  this on the bottom. Company name there's an it
15  looks like a dot com address. I am a dental
16  laboratory -- I would like to become an authorized
17  and then they're spelling it the exact same way,
18  BruxZir -- I can't read the rest. It's smeared.
19  I guess they want to know if they become an
20  authorized and then spelling it our way, if they
21  could use the word. It looks like they just
22  decided to use the word anyway without ever buying

EXHIBIT 12
-242-

Page 249

1  our blocks. I'm not quite sure what country
2  they're from, but it could be the United States.
3      Q. Well, Dentopia is in Virginia; correct?
4      A. I realize that, but you get the companies
5  here locally but they're actually selling crowns
6  made from other countries. I don't know if that's
7  their case or not.
8      Q. Do you know what happened with Dentopia
9  after your correspondence with them on August 31,
10  2012?
11      A. Well, it looks to me like they decided
12  not to use it from that. I have to read his
13  letter down below here to verify that but it looks
14  like they decided to stop using the mark there in
15  their advertising.
16      Q. Right. What they say is BruxZir is a
17  common name in the dental field and they say we
18  attempted to contacted Glidewell regarding the use
19  of the term BruxZir before we started the
20  promotion. We didn't receive any response. Do
21  you see that?
22      A. I do.

Page 250

1      Q. Do you recall them ever communicating
2  with you in the past about the name?
3      A. Yes, that was what was attached there it
4  was evidence about the fact they queried us and we
5  replied back. It was pretty much evidence of the
6  fact what he was saying was not correct. He said
7  that anyway.
8      Q. To your knowledge, they stopped using the
9  name?
10      A. To my knowledge they did.
11      Q. Let me hand happened you what's been
12  marked Exhibit 151 bearing production Nos. GL
13  21510 of 99 through 15 of 99.
14      A. Okay.
15          (Exhibit No. 151 was marked for
16          identification.)
17      MR. TACHNER: Is this the last one?
18      MR. JANKOWSKI: This is the last one of
19  these, yeah.
20      THE WITNESS: I'm glad it wasn't that
21  many labs.
22  ///

Page 251

1  BY MR. JANKOWSKI:
2      Q. Mr. Allred this appears to be a
3  communication in September, 2012, with Barth
4  Dental laboratory. Do you recall that?
5      A. As close in time as it is, I probably
6  will if I look at it closer. Maybe these
7  attachments will -- something's starting to ring a
8  bell here. Oh, yes. This was pretty recent.
9  This was an odd one.
10      Q. Why do you say that?
11      A. Note, your signature image is not the
12  property of dentist ry today. It is the property
13  of assured DL. If you remember this hashingens
14  back to an earlier communication with assured DL
15  where it showed their use of the mark Zir-Brux,
16  and they had a picture of a crown, and if you --
17  this was on their web, and, in fact, if you tabbed
18  on the image that they were using, it actually
19  went to a dentist ry today article that talked
20  about the introduction of Zir-Brux by authentic
21  dental lab. So I thought that was interesting
22  that they were employing a confusingly similar

Page 252

1  mark to ours and at the same time were passing on
2  a picture that had been provided by assured to
3  dentist ry today for their product. And also I
4  think -- I'd have to go through this and refresh
5  my memory anew, but it seemed to me they were miss
6  quoting some information from a Dr. Christianson.
7  I see some stuff. I see his name. It's kind of
8  coming back to me. Frankly, we'd have to go there
9  it point by point to find out what I wrote.
10  Whatever it was they used someone else's picture,
11  they used a confusingly similar mark and they
12  rewrote someone's review of our material in some
13  way to satisfy their own use of their product.
14      Q. This seems to be a lot more information
15  than you usually provided with your opening
16  letter; correct?
17      A. Only because more existed. Usually it's
18  some kind of use of the mark that we would like to
19  let them know we've seen and that's been brought
20  to our attention and we'd like them to stop using
21  it. This particular one just seemed to have more
22  and more. The more you into the it. So I put

EXHIBIT 12
-243-

Page 253

1  every instance of it.
2      Q. And how did Barth lab respond to this?
3      A. I don't know that they have.  Maybe
4  that's why I don't remember too well.  I don't
5  know if they've changed their site.  I don't
6  remember looking to see if they changed.  I don't
7  know if they wrote me back.  It's pretty recent
8  and probably something I ought to check up on.
9  September 26, it looks like, 2012.
10     Q. So you don't recall as you sit here
11 rightly now?
12     A. I don't recall looking to see and
13 noticing they had stopped doing all these things.
14 There may have though.
15     Q. Very quickly these aren't new exhibits
16 but I want to put a couple exhibits --
17     A. We're done with this one here.
18     Q. Yes, you can put that one aside.  Let me
19 just show you previously marked Exhibit 93.
20 Here's an example from Glidewell's website that
21 shows the use of the trademark with the circle R;
22 correct?  Do you see that on the, site?

Page 254

1      A. Yes.
2      Q. And that's, in fact, for a dental
3  restoration made with the all zirconia -- it's an
4  all zirconia crown basically; correct?
5      A. Well, bridge looks like here.
6      Q. Or a bridge.  But it's a dental
7  restoration?
8      A. Definitely.
9      Q. Okay.  And I'll then show you previously
10 marked Exhibit 97.  So now here's an example from
11 Glidewell's website here's an all now of the
12 dental ceramic.  This would be the product that's
13 associated with the pending application correct
14 that's not yet registered?
15     A. That's true.
16     Q. Now, it uses a circle R; right?
17     A. I see that there.
18     Q. Is that a correct use of the circle R?
19     A. It wouldn't be by what we do unless this
20 was from Germany or something.  It looks like it's
21 our homepage I don't know what date that was or
22 how far back it was.

Page 255

1      Q. This was printed out on October 22.
2      A. I saw that there.
3      Q. This is from Glidewell's own website?
4      A. Oh, okay.  Constantly having to look at
5  this stuff.
6      Q. So you agree that's not a proper use of
7  the circle R?
8      A. No, no, we're not doing it.  We're not
9  doing it for that.
10     Q. What do you mean you're not doing?
11     A. Well, the companies use that all the time
12 when they have a circle R in Europe and they use
13 their circle R trademark.  We're not doing that
14 we're just keeping it TM.
15     Q. So it should say TM?
16     A. By the way we're doing it true it should
17 be TM on that.
18     Q. Let me show you what's been previously
19 marked Exhibit 98.  This is another prinout from
20 Glidewell Laboratories' website. This is for a
21 BruxZir mill.  I think you testified earlier you
22 don't have a trademark registration pending for

Page 256

1  BruxZir in connection with with this type of
2  equipment; correct?
3      A. That would be incorrect too.  That should
4  be a TM.
5      Q. That should be a TM as well.  Now finally
6  let me show you what's been labeled as previously
7  as Exhibit 99.  This is also printed out from the
8  website associated with authorized BruxZir
9  laboratories.  Take a look at that.  Here we see
10 the use of the circle R again?
11     A. True.
12     Q. Is this the proper use of the circle R?
13     A. I think we have been using it for that
14 because it does stand for providing the all
15 zirconia crowns which we do have the trademark on.
16     Q. Right.  What you're mostly doing with
17 your authorized labs are providing the milling
18 blanks for them to make the crowns themselves?
19     A. That's true.
20     Q. So they're allowed under the agreement
21 you have with them to use the BruxZir name --
22     A. True.

EXHIBIT 12
-244-

Page 257

```
 1       Q.  -- with their crowns; correct?
 2       A.  That's true just like if they used
 3   someone else's material.
 4       Q.  They can use a circle R with that is your
 5   understanding because it's the crowns that they're
 6   making that have the BruxZir name on it?
 7       A.  Exactly just like if they provided an IPS
 8   e.max crown or Lava crown, same sort of thing.
 9       Q.  And that would be, I'm sorry, the
10   registration is Class 10; correct?
11       A.  Correct.
12       Q.  Okay.  It's in connection with Class 10
13   that the authorized labs are using the circle R;
14   correct?
15       A.  That's true.
16       Q.  Okay.  Well, thank you very much
17   Mr. Allred.  I appreciate your time.  I have no
18   further questions.
19          MR. TACHNER:  I have no questions.
20          MR. JANKOWSKI:  Off the record.
21
22
```

**EXHIBIT 12**
**-245-**