Lynda J. Zadra-Symes (SBN 156,511)
Lynda.Zadra-Symes@kmob.com
Jeffrey L. Van Hoosear (SBN 147,751)
Jeffrey.VanHoosear@kmob.com
David G. Jankowski (SBN 205,634)
David.iankowski@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Defendant/Counter-Plaintiff,
KEATING DENTAL ARTS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES R. GLIDEWELL DENTAL CERAMICS, INC. dba GLIDEWELL LABORATORIES,<br><br>Plaintiff,<br><br>v.<br><br>KEATING DENTAL ARTS, INC.<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Civil Action No.<br>SACV11-01309-DOC(ANx)<br><br>**KEATING DENTAL ARTS, INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF GLIDEWELL'S BRUXZIR® TRADEMARK**<br><br><u>HEARING:</u><br>Date: December 17, 2012<br>Time: 8:30 a.m.<br>Crtrm: 9D<br><br>Honorable David O. Carter |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1, Defendant Keating Dental Arts, Inc. ("Keating") submits this Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Summary Judgment of Noninfringement of Plaintiff James R. Glidewell Dental Ceramics, Inc. dba Glidewell Laboratories' ("Glidewell") BruxZir® Trademark.

# I. <u>MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE</u>

**A.**   <u>**Dentists and Dental Restorations ("Crowns")**</u>

1.   Crowns and bridges are dental restorations used by dentists to treat patients with damaged or missing teeth. (Eggleston Decl. ¶ 9).

2.   Dentists order crowns from "dental laboratories" that manufacture the crowns based on specifications provided by the dentist. (Eggleston Decl. ¶ 9; Belton Decl. ¶ 2; Brady Decl. ¶ 2; Campbell Decl. ¶ 2; Colleran Decl. ¶ 2; Jacquinot Decl. ¶ 2; Murphy Decl. ¶ 2; Myers Decl. ¶ 2; Nussear Decl. ¶ 2; Richardson Decl ¶ 2; Scott Decl. ¶ 2; Stephens Decl. ¶ 2; Sweet Decl. ¶ 2; Tobin Decl. ¶ 2).

3.   Crowns and other dental restorations are regulated medical products, and dentists order them from dental laboratories by submitting a prescription form signed by the dentist. (Eggleston Decl. ¶ 9; See also Belton Decl. ¶ 2; Brady Decl. ¶ 2; Campbell Decl. ¶ 2; Colleran Decl. ¶ 2; Jacquinot Decl. ¶ 2; Murphy Decl. ¶ 2; Myers Decl. ¶ 2; Nussear Decl. ¶ 2; Richardson Decl ¶ 2; Scott Decl. ¶ 2; Stephens Decl. ¶ 2; Sweet Decl. ¶ 2; Tobin Decl. ¶ 2).

4.   Finished crowns are not staple goods; they are personalized to the patient with custom-shaping and coloring to fit the needs of a particular tooth for a particular patient. (Eggleston Decl. ¶ 9).

5.   Dentists are highly educated and trained professionals in the business of patient care. They are responsible for, among other things:

- 1) assessing whether a patient needs a crown;
- 2) assessing the type of crown that is best for the patient;
- 3) creating specifications for the crown personalized to the patient;
- 4) placing an order with a dental laboratory to have the personalized crown made;
- 5) ensuring the crown received from the laboratory is correct and high quality; and
- 6) and affixing crowns in the mouths of their patients.

(Eggleston Decl. ¶ 10-11; See also, Belton Decl. ¶ 2; Brady Decl. ¶ 2; Campbell Decl. ¶ 2; Colleran Decl. ¶ 2; Jacquinot Decl. ¶ 2; Murphy Decl. ¶ 2; Myers Decl. ¶ 2; Nussear Decl. ¶ 2; Richardson Decl ¶ 2; Scott Decl. ¶ 2; Stephens Decl. ¶ 2; Sweet Decl. ¶ 2; Tobin Decl. ¶ 2).

6.     Dentists strive to provide excellent patient care, and in this regard they are careful in choosing the dental laboratories with whom they work. (Eggleston Decl. ¶ 12).

**B.     Dental Laboratories**

7.     There are over 2,000 dental laboratories in the U.S. servicing the needs of dentists. (Jankowski Decl., Ex. 5 (Bartolo Dep. Tr.), at 17:7 – 18:2).

8.     Plaintiff Glidewell, founded in 1970, is the largest dental laboratory in the U.S. In 2002, Shaun Keating founded Defendant Keating Dental Arts. (Jankowski Decl., Ex. 6 (Allred Dep. Tr.), at 51).

9.     Prior to founding his company, Mr. Keating worked for 18 years at Glidewell. (Keating Decl. ¶ 2).

10.     For decades dental labs primarily manufactured crowns made

entirely or partially of porcelain, a material that gives a tooth-like appearance. (Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 34:22 – 42:22; Eggleston Decl. ¶ 14).

11.     Dental labs have developed layered combinations of materials, to create stronger crowns that look tooth-like. (Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 34:22 – 42:22; Eggleston Decl. ¶ 15).

12.     An example of a layered crown developed years ago is a porcelain-fused-to-metal ("PFM") crown, which includes a top porcelain layer—visible in the mouth for aesthetics—atop a lower hidden metal layer for strength. (Eggleston Decl. ¶ 15; Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 35:15-22; Mangum Decl., Ex. 50 (Shuck Dep. Tr.), at 235:3-10).

## C.     **Bruxing Patients and the Development of Zirconia Crowns**

13.     With regard to dental restorations, a particularly challenging group of patients for dentists are "bruxers," patients who subconsciously grind their teeth. (Mangum Decl., Ex. 50 (Shuck Dep. Tr.), at 33:13 – 34:17; Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 80:10 – 81:10; Eggleston Decl. ¶ 16-17).

14.     Bruxers are well known for breaking traditional porcelain crowns due to the excessive forces they place on their teeth. (Mangum Decl., Ex. 50 (Shuck Dep. Tr.), at 33:13 – 34:17; Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 80:10 – 81:10; Eggleston Decl. ¶ 17).

15.     Bruxers who have previously broken porcelain crowns have often had those broken crowns replaced by gold crowns, which are strong and nearly unbreakable. (Mangum Decl., Ex. 50 (Shuck Dep. Tr.), at 33:13 – 34:17; Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 41:11 – 42:9, 80:10 – 81:10; Eggleston Decl. ¶ 14, 17; Mangum Decl., Ex. 52 (Friebauer Dep. Tr.), at 63:21 – 64:20).

16.     Despite their excellent functional qualities, gold crowns are typically unpopular with patients because they do not look like natural teeth. (Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.), at 42:5-16, 52:4-8, 53:4-7, 112:14-19, 170:1-13); (Mangum Decl., Ex. 52 (Friebauer Dep. Tr.), at 64:3-12).

17.     Zirconia is an extremely strong material that dental labs began using as a substitute for the metal lower layer in PFM crowns. (Mangum Decl., Ex. 52 (Friebauer Depo. Tr.), at 50:11-52:6).

18.     Although Zirconia is approximately white, it does not have the appropriate reflective properties to appear tooth-like, so it is not as aesthetic as porcelain. (Jankowski Decl., Ex. 4 (DiTolla Dep. Tr.) at 35:15-36:2; 61:7-13).

## 1.     **Keating's "KDZ Zirconia" Crown (2006)**

19.     In 2006, Keating began selling a layered crown with a porcelain top layer and a zirconia base, which it variously called "KDZ," "KDZ Zirconia," or "KDZ CAD/CAM Zirconia." (Keating Decl. ¶ 12; Keating Decl., Ex. A-E; Mangum Decl., Ex. 54 (Keating Dep. Tr.), at. 43:15 – 45:12).

20.     That year (three years before Glidewell came out with its later all-zirconia crown under the "BruxZir" name), Keating Dental Arts gained national recognition as "Best Crown and Bridge Laboratory" from Dental Town, a dental industry community. (Keating Decl. ¶ 6; Keating Decl., Ex. C).

21.     Below is an excerpt from a Keating brochure from that time.

-4-



(Keating Decl., Ex. C).

22.    Mr. Keating chose to call his new zirconia product "KDZ" as a reference to "Keating Dental Zirconia." (Keating Decl. ¶ 12; Mangum Decl., Ex. 53 (Brandon Dep. Tr.), 20:15-16; 26:21-27:4; 38:10-12).

23.    Keating has been selling its layered KDZ crown continuously from 2006 to the present. (Jankowski Decl., Exs. 46-49; Keating Decl. ¶ 12; Mangum Decl., Ex, 54 (Keating Dep. Tr.), at 40:22 – 45:12); Mangum Decl., Ex. 53 (Brandon Dep. Tr.), 20:4-7, 27:15 – 28:4; 26:21 – 27:4).

24.    Keating's layered KDZ crown has been, and remains, Keating's most popular crown made with zirconia. (Keating Decl. ¶ 12; Mangum Decl., Ex, 54 (Keating Dep. Tr.), at 40:17-19, 41:7-9; Mangum Decl., Ex. 53 (Brandon Dep. Tr.), 96:14-17, 97:1-2).

### 2.    Glidewell's "BruxZir" Crown (2009)

25.     In June 2009, Glidewell began offering for sale an all-zirconia crown under the name "BruxZir." (Mangum Decl., Ex. 50 (Shuck Dep. Tr.) at

15:21-16:3; 155:6-8.)

26.     Below is an excerpt from a Glidewell marketing document.



(Jankowski Decl., Ex. 10 at 1.)

27.     Glidewell's mark for the new crown, "BruxZir," was a composite of "Brux," with a capital B, and "Zir," with a capital Z. The "Zir" has an italicized font, and the "Z" partially obscures the "x" giving the impression that the "Zir" letters are in front of the word "Brux." (*Id*.) Glidewell's advertising consistently uses this stylized version of its mark. (Jankowski Decl., Exs. 7-11.)

28.     Glidewell markets its BruxZir all-zirconia crowns at industry tradeshows, on its internet website, in dental magazines, in brochures mailed to dentists, and through e-mail blasts sent to dentists. (Jankowski Decl., Exs. 7, 9-11; Mangum Decl., Ex. 50 (Shuck Dep. Tr.) at 55: 11-20; 57:6-12; 48:18-49:10; 173:5-22; 52:18-54:3; Eggleston Decl., Exs. 79-84.)

### 3.     Keating's "KDZ Bruxer" Crown and the KDZ Family (2011)

29.     In 2010, in response to requests from its dentist customers, Keating began selling a prototype all-zirconia crown as a substitute for a gold crown. (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:15-44:22.)

30.     Dentists began asking for all-zirconia crowns at least partly because the cost of gold had increased significantly in the recent years. (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:15-21; 46:10-47:13.)

31.     Glidewell and Keating each sent letters to their respective dentist/customers to promote all-zirconia crowns as a less expensive replacement for gold crowns. (Jankowski Decl., Ex. 12; Keating Decl., Ex. F.)

32.     In 2010 and early 2011, Keating did not advertise an all-zirconia crown, though it sold such crowns to its existing customers who requested them. (Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 63:8-64:12; Ex. 54 (Keating Dep. Tr.) at 44:12-22.)

33.     Based on the perceived demand of its dentist customers for all-zirconia crowns, Keating decided to formally add an all-zirconia crown to its product offerings. (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:15-44:8; Keating Decl., Ex. F.)

34.     For his new all-zirconia crown, Mr. Keating decided to keep using the "KDZ" prefix that he had been using continuously since 2006 with his layered ceramic/zirconia product. (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 86:13-16; Keating Decl. ¶ 10.)

35.     To avoid confusion with his new all-zirconia offering, Mr. Keating decided to rebrand his existing layered "KDZ Zirconia" crown as the "KDZ Ultra" crown. (Keating Decl. ¶ 12; Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 26:21-27:4.)

36.     Keating further added another new product made with zirconia to its offerings, which Mr. Keating named the "KDZ Max." (Keating Decl., Ex. F.)

37.     Because the new all-zirconia crown was specifically designed to replace gold crowns for bruxer patients, Mr. Keating wanted to call the new crown the "KDZ Bruxer." (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 83:11-15).

38.     Mr. Keating explained: "We've had our dentists for years always saying, 'What can I use for my grinding patients, my bruxism patients?' And

gold is through the roof right now. And every day I'm getting calls, 'What can I do for my bruxer patients? I can't afford the gold." (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:17-21.)

39.    Mr. Keating sought the advice of counsel to ensure his use of the "KDZ Bruxer" name would not cause problems. (Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:17-44:8; Keating Decl. ¶ 10.)

40.    A trademark search was performed by counsel and, after receiving the advice of his counsel, Mr. Keating proceeded to name the new crown the "KDZ Bruxer." (Keating Decl. ¶ 10; Mangum Decl., Ex. 54 (Keating Dep. Tr.) at 43:17-44:8.)

41.    On March 31, 2011 Keating sent a letter to all of its dentist/customers referencing the increase in the cost of gold and offering a KDZ family of products consisting of:

- KDZ Bruxer ("Solid Zirconia for bruxer & grinder patients")
- KDZ Ultra (a rebranding of the existing KDZ Zirconia product) and
- KDZ Max (a ceramic pressed onto a zirconia base)

(Keating Decl. ¶ 9, Ex. F.)

42.    In May 2011, Keating began marketing its new KDZ family using the following stylized marks, which it has been using continuously since:

  

(Keating Decl. ¶ 11.)

43.     The most prominent part of Keating's mark for its new crown is the prefix "KDZ." Following is a second word ("Bruxer," "Ultra," or "Max") in a smaller font, sometimes in all caps and sometimes lower case with a capital first letter. (*Id.*)

44.     Keating presents its KDZ Bruxer product as originating from Keating Dental Arts, with no affiliation to Glidewell or any other dental laboratory. The advertisement that Glidewell attached as Exhibit B to the Complaint is typical: "Introducing the all-new KDZ Bruxer. The best full-contour zirconia solution available. ***Exclusively from Keating Dental Arts***." (Jankowski Decl., Ex. 45 (emphasis added).)

45.     Keating markets its KDZ Bruxer all-zirconia crowns at industry tradeshows, on its internet website, in dental magazines, and in brochures mailed to dentists. (Jankowski Decl., Exs. 46, 47, 49; Keating Decl., Ex. D.)

46.     Dentists interpret the "KDZ" in Keating's marks as a reference to "Keating Dental Zirconia." (Stephens Decl. ¶ 10; Campbell Decl. ¶ 6.)

**D.   Glidewell's "BruxZir" Mark Is Weak At Best**

    **1.   "BruxZir" Is Generic Or At Least Highly Descriptive**

47.     Glidewell named its all-zirconia crown "BruxZir" because it is a zirconia crown for bruxers. (Jankowski Decl., Ex. 3 at 6; Ex. 4 (DiTolla Dep. Tr.) at 85:15-87:5; Ex. 5 (Bartolo Dep. Tr.) at 71:19-72:5; Ex. 18; Mangum Decl., Ex. 50 (Shuck Dep. Tr.) at 41:1-13; Ex. 52 (Friebauer Dep. Tr.) at 72:1-4.)

48.     Since 2009, Glidewell has marketed its all-zirconia crown at dentists and dental labs for use with bruxer patients. (Mangum Decl., Ex. 50 (Shuck Dep. Tr.) at 87:18-88:7; 176:19-178:22; Jankowski Decl., Ex. 7 at 2, 9, 20; Ex. 8 at 1-9; Ex. 9 at 2; Ex. 10 at  3, 12, 23, 26; Ex. 11 at 1, 3, 5-6; Ex. 12;

Ex. 13; Ex. 14 at 5, 17, 19; Ex. 15 at 5; Ex. 16 at 3; Eggleston Decl., Exs. 79-84.)

49.　　The name BruxZir is phonetically equivalent to "bruxer," the term for a person with bruxism. (Eggleston Decl., Ex. 65 at 14-16; Van Hoosear Decl., Exs. V-1 through V-4; Stephens Decl, ¶ 12; Scott Decl., ¶ 11; Colleran Decl., ¶ 12; Jacquinot Decl., ¶ 11; Nussear Decl., ¶ 11; Jankowski, Ex. 6 (Allred Dep. Tr.) at 220:5-12; 229:5-8; Ex. 24 at 5; Ex. 25 at 1; Ex. 30 at 4; Frattura Decl., ¶ 15.)

2.　　**The Widespread Use of "Brux" and "Zir" In The Dental Industry**

50.　　In addition to Glidewell and Keating, many other companies have been using "Brux" to refer to dental products for use with bruxers and "Z" or "Zir" to refer to dental products associated with zirconia. (Eggleston Decl., Ex. 65 at 16-18; Ex. 66 at 3-7; Ex. 68 at 3-5.)  Examples include:

- Arthtek Bruxing Splint (Eggleston Decl., Ex. 121)
- GPS BruxArt (Eggleston Decl., Ex. 114)
- BruxChecker (Eggleston Decl., Ex. 122)
- Brux-eze (Eggleston Decl., Ex. 124)
- BruxCare (Eggleston Decl., Ex. 125)
- Bruxguard (Eggleston Decl., Ex. 126)
- Dr. Brux (Eggleston Decl., Ex. 123)
- ZirCAD (zirconia blocks) (Eggleston Decl., Ex. 129)
- ZirColor (coloring product for zirconia) (Eggleston Decl., Ex. 135)
- ZirPress (for ceramic ingots) (Eggleston Decl., Ex. 130)
- ZirLiner (zirconia bonding material) (Eggleston Decl., Ex. 131)
- Zir-Cut (zirconia polisher) (Eggleston Decl., Ex. 127)

- ZirBlock (dental products) (Eggleston Decl., Ex. 128)
- Zirprime (pre-sintered zirconia) (Eggleston Decl., Ex. 132)
- Zir.Care (multipurpose stone) (Eggleston Decl., Ex. 133)
- ZiReal (Zr dental posts) (Eggleston Decl., Ex. 134)

### 3. All-Zirconia Crowns Offered By Other Dental Laboratories

51. In addition to Glidewell and Keating, many other dental laboratories have been offering all-zirconia crowns under a variety of names, including names with "Brux," "Zir," or variations thereon. (Eggleston Decl., Ex. 66 at 3-7; Ex. 68 at 3-5.)  Examples include:

- Advanced Dental Lab — BruxZir (Jankowski Decl., Ex. 31.)
- Assured Dental Lab — Z-Brux (Jankowski Decl., Ex. 28.)
- Authentic Dental Lab — Brux (Jankowski Decl., Ex. 27.)
- Barth Dental Lab — "Z-Brux" (Jankowski Decl., Exs. 34 & 37.)
- Burbank Dental — "Zir-Max" (Eggleston Decl., Ex. 99.)
- California Dental Arts — "ZirFit" (Eggleston Decl., Ex. 103.)
- CDLLab – ZerisBRUX (Eggleston Decl., Ex. 109.)
- China Dental Outsourcing — "Bruxer All Zirconia" (Jankowski Decl., Ex. 29.)
- China Dental Outsourcing — All Zirconia for Bruxers (Jankowski Decl., Ex. 39.)
- Continental Dental — "Full Zirconia for Bruxing Patients" (Eggleston Decl., Ex. 112.)
- Cosmetic Dentistry of SA — "Bruxer Crown" (Eggleston Decl., Ex. 119.)
- Dani Dental — "Full Zirconia (Bruxer)" (Jankowski Decl., Ex. 43.)

- Diadem Precision Technology — "Diazir" (Eggleston Decl., Ex. 101.)
- Drake Dental — "Zir-Cast" (Eggleston Decl., Ex. 96.)
- Expertec — "Full-Z" (Eggleston Decl., Ex. 93.)
- Fusion Dental Lab — "Full Solid Bruxer Zirconia" (Jankowski Decl., Ex. 24.)
- GPS Dental Lab — "GPS BruxArt" (Eggleston Decl., Ex. 114.)
- Infinity Dental Lab — Bruxer Crowns (Eggleston Decl., Ex. 108.)
- Kastle Mills — "ZirCrown" (Eggleston Decl., Ex. 100.)
- Mascola Esthetics — "Xtreme Bruxer (Eggleston Decl., Ex. 110.)
- Pittman Dental — "ZirCAM" (Eggleston Decl., Ex. 106.)
- Pittman Dental — Bruxer Crown (Eggleston Decl., Ex. 120.)
- Somer Dental Labs — "Full Contour Zir" (Eggleston Decl., Ex. 104.)
- Summers Dental Lab — "BruxThetix" (Eggleston Decl., Ex. 113.)
- Sun Dental Labs — "Suntech Full Zirconia" (Eggleston Decl., Ex. 94.)
- Technics Dental Lab — "Tech/ZIR FC" (Eggleston Decl., Ex. 105.)
- Trachsel Dental — "All Zirconia Bruxer" (Jankowski Decl., Ex. 42.)
- York Dental Lab — "Bruxer" (Eggleston Decl., Ex. 111.)
- Zahn Dental — "Zirlux" (Eggleston Decl., Ex. 102.)

### 4.    Glidewell's "Authorized" Labs Sell "BruxZir" Crowns, Most of Which Do Not Identify Glidewell As An Affiliated Entity

52.    Glidewell makes zirconia "blanks" (the raw material from which zirconia crowns may be made) which it sells to about 180 "authorized" dental laboratories for use by those laboratories in making their own all-zirconia crowns. (Mangum Decl., Ex. 50 (Shuck Depo. Tr.) at 45:11-46:18; Ex. 51 (Carden Depo. Tr.) at 85:5-86:6; 208:4-10)

53.    Glidewell's "authorized" laboratories make and sell crowns using the "BruxZir" name, in the same manner as does Glidewell. (Mangum Decl., Ex. 50 (Shuck Depo. Tr.) at 45:11-46:13; Ex. 51 (Carden Depo. Tr.) at 208:16-209:2; Eggleston Decl., Ex. 66 at 4-5; Exs. 136-137.)

54.    Most of Glidewell's "authorized" laboratories have web sites promoting their "BruxZir" crowns, often with the same language used in Glidewell's marketing materials. (Eggleston Decl., Ex. 66 at 4-5; Exs. 136-137.)

55.    The vast majority of Glidewell's "authorized" laboratories do not identify Glidewell as an affiliated entity.  Instead, they typically promote the BruxZir crown as their own crown coming from their own dental laboratory. (*Id.*)

56.    Glidewell does not monitor the use of the BruxZir mark by its "authorized" labs, and it does not require those labs to identify Glidewell as an affiliated entity. (Jankowski Decl., Ex. 5 (Bartolo Dep. Tr.) at 63:12-68:13; 69:9-14; 178:11-180:10; Ex. 6 (Allred Dep. Tr.) at 142:2-143:8; Mangum Decl., Ex. 50 (Shuck Depo. Tr.) at 45:11-46:18.)

### 5.    Dentists Use The Term "BruxZir" Generically

57.    Up through May 2012, Keating had fulfilled over 5,000 prescription forms by supplying its dentist customers with the KDZ Bruxer

product. (Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 60:13-17; 66:3-7; 68:6-8; Ex. 55; Ex. 56 (native Excel spreadsheet from which Ex. 55 was created); Ex. 57; Ex. 58 (native Excel spreadsheet from which Ex. 57 was created); Ex. 63; Ex. 64 (native Excel spreadsheet from which Ex. 63 was created).)

58.    Over that span, dentists (or their assistants) wrote the word "BruxZir," "bruxzir," or variations thereof, on about 75 of the prescription forms requesting Keating's all-zirconia crown. (Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 56:23-57:6.)

59.    The prescription forms received with these spellings constitute about 1.5% of the total number of prescription forms received by Keating for its all-zirconia crown. (Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 68:9-11.)

60.    When receiving prescription forms with such misspellings, Keating implemented a policy of calling the dentist to confirm that the dentist wanted Keating's all-zirconia crown rather than a crown from another laboratory. (Mangum Decl., Ex. 53 (Brandon Dep. Tr.) at 68:12-18.)

61.    In each instance, the dentist confirmed that they wanted Keating's KDZ Bruxer all-zirconia crown. (Mangum Decl., Exs. 59- 62.)

62.    Thirteen of the dentists (identified in the list below) who submitted prescription forms with the aforementioned misspellings wrote "BruxZir," "bruxzir," or variations thereof, on their prescription forms as a generic reference to an all-zirconia crown, not because they wanted a crown from Glidewell or were otherwise confused that Glidewell and Keating were affiliated:

- Dr. William Belton. (Belton Decl. ¶¶ 9-11 ; Ex. A.)
- Dr. Raymond Brady. (Brady Decl. ¶¶ 9-11 ; Ex. A.)
- Dr. Jonathan Campbell. (Campbell Decl. ¶¶ 10-12 ; Ex. A.)
- Dr. Michael Colleran. (Colleran Decl. ¶¶ 10-12 ; Ex. A.)

-14-

- Dr. Joseph Jacquinot. (Jacquinot Decl. ¶¶ 9-10 ; Ex. A.)
- Dr. Dennis Murphy. (Murphy Decl. ¶¶ 9-11 ; Ex. A.)
- Dr. Terry Myers. (Myers Decl. ¶¶ 9-10 ; Ex. B.)
- Dr. Thomas Nussear. (Nussear Decl. ¶¶ 9-11 ; Ex. A.)
- Dr. Stan Richardson. (Richardson Decl. ¶¶ 10-12; Ex. A.)
- Dr. Richard Scott. (Scott Decl. ¶¶ 9-11 ; Ex. A. )
- Dr. Scott Stephens. (Stephens Decl. ¶¶ 10-12 ; Ex. A.)
- Dr. Daniel Sweet. (Sweet Decl. ¶¶ 8-10 ; Ex. A.)
- Dr. Gary Tobin. (Tobin Decl. ¶¶ 9-11 ; Ex. A.)

63.    Keating is not the only dental laboratory which receives prescription forms from dentists with "BruxZir," "bruxzir," or variations thereon written as a generic reference to an all-zirconia crown: Showcase Dental Laboratory, a dental lab unaffiliated with Glidewell or Keating, has also received prescription forms from dentists who generically describe an all-zirconia crown as a "BruxZir," "bruxzir," or variation thereon. (Frattura Decl., ¶¶ 7-11, 18; Ex. A.)

64.    Glidewell itself uses the term BruxZir generically, as a noun and plural noun. (Van Hoosear Decl., Ex. V-4;  (Compendium Clips) ("this Bruxzir is 100% zirconia" and "one question I get about Bruxzirs is . . ." and "We do 15,000, say, BruxZirs a week."); Van Hoosear Decl., Ex. V-1 (Shuck Dep. Video Clips);  Van Hoosear Decl., Ex. V-2 (DiTolla Dep. Video Clips); Van Hoosear Decl., Ex. V-3 (Carden Dep. Video Clips); Jankowski Decl., Ex. 6 (Allred Dep. Tr.), at 195:22 – 196:1.)

## E.    Glidewell Has Produced No Evidence Of Actual Confusion As To Source Of Goods Or Affiliation Between Glidewell And Keating

65.   Keating served Glidewell with an interrogatory asking Glidewell to identify any examples of actual confusion on the part of third parties regarding a relationship between Keating and Glidewell or Keating's KDZ Bruxer and Glidewell's BruxZir. (Jankowski Decl., Ex. 1 at 10.)

66.   Glidewell's interrogatory response alleged details for two such instances:

- In April 2011, a Glidewell employee named Nicole Fallon offered a $20 coupon to Dr. Jade Le's dental office in Florida to try a BruxZir restoration. An employee in Dr. Le's office asked if she could apply the coupon to a previous purchase the office had made for Keating's KDZ Bruxer. (Jankowski Decl., Ex. 1 at 7-8, 10.)

- In May 2011, Dr. Thomas Nussear's dental office placed an order with Keating for a KDZ Bruxer crown and wrote "BruxZir" on the prescription form. (*Id.*)

67.   Keating served Glidewell with a follow up interrogatory asking Glidewell to identify all facts relating to the alleged instance of confusion involving Dr. Jade Le's dental office.   (Jankowski Decl., Ex. 2 at 7.)   In response, Glidewell further explained that Ms. Fallon made a telephone call to Dr. Le's office and offered a discount on BruxZir crowns.  (*Id.*)

68.   Glidewell employees, and dental professionals generally, pronounce "BruxZir" and "Bruxer" identically. (Eggleston Decl., Ex. 65 at 14-16; Van Hoosear Decl., Exs. V-1 through V-4; Stephens Decl, ¶ 12; Scott Decl., ¶ 11; Colleran Decl., ¶ 12; Jacquinot Decl., ¶ 11; Nussear Decl., ¶ 11.)

69.   In response to Keating's follow up interrogatory, Glidewell pointed again to Dr. Nussear's "Rx Order Form" (prescription form). (Jankowski Decl., Ex. 2 (Interrogatory No. 22); Jankowski Decl., Ex. 1 (Interrogatory Nos. 7 & 8))

70.     Dr. Nussear wrote "BruxZir" on his prescription form as a generic reference to an all-zirconia crown. (Nussear Decl., ¶¶ 9, 11.) Furthermore, Dr. Nussear neither intended to order a crown from Glidewell, nor was he confused as to any affiliation between Keating and Glidewell. (Nussear Decl., ¶ 10.)

## F.     Glidewell's Attempts To Prevent Others From Using "Bruxer" In Connection With All-Zirconia Crowns

71.     On January 19, 2010, Glidewell received a federal registration in its trademark "BRUXZIR." (Jankowski Decl., Ex. 6 (Allred Dep. Tr.) at 126:15; 137:1-4.)

72.     Since that time, Glidewell has relied upon that registration as grounds for threatening trademark infringement suits against any other dental laboratory using "Brux" or "Bruxer" in a mark for an all-zirconia crown. (Jankowski, Ex. 6 (Allred Dep. Tr.) at 213:19-264:13 & Exs. 24-34.)

73.     Specifically, Glidewell sent cease-and-desist letters to at least the following dental labs:

- Assured Dental Lab — "Z-Brux" (Jankowski Decl., Ex. 28)
- Authentic Dental Lab — "Brux" (Jankowski Decl., Ex. 27)
- China Dental Outsourcing — "Bruxer All Zirconia" (Jankowski Decl., Ex. 29)
- Fusion Dental Lab — "Full Solid Bruxer Zirconia" (Jankowski Decl., Ex. 24)
- Old Dominion Milling Corp. — "Bruxzer" (Jankowski Decl., Ex. 32)
- Pittman Dental — "Bruxer All-Zirconia Crown" (Jankowski Decl., Ex. 25)
- R-dent Dental Laboratory — "R-Brux" (Jankowski Decl., Ex.

26)

- Showcase Dental Lab — "Zir-Bruxer") (Jankowski Decl., Ex. 30)

74.    In each instance, the dental laboratory chose to change its name rather than face the risk of a lawsuit in Federal court versus Glidewell. (*Id*.; Jankowski Decl., Ex. 6 (Allred Dep. Tr.) at 213:19-264:13.)

## II.  CONCLUSIONS OF LAW

1.    To prevail on its claim for infringement of its registered mark, Glidewell must show (1) ownership of a protected mark; and (2) that Keating is using a colorable imitation of the protected mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services such that Keating's use is likely to cause confusion among customers of the goods or services. *Applied Info. Scis. Corp. v. eBay, Inc*., 511 F.3d 966, 969 (9th Cir. 2007); 15 U.S.C. § 1114(1)(a).

### A.    Glidewell Does Not Have A Protectable Trademark in BRUXZIR

2.    The trademark holder "bears the ultimate burden of proof in a trademark infringement action," including the burden to show that it has a valid mark. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc*., 419 F.3d 925, 928 (9th Cir. 2005).

3.    Because Glidewell has a federally-registered mark, it preliminarily meets its burden because a federally-registered mark is presumed to be protected.  *See* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark . . . shall be prima facie evidence of the validity of the registered mark"); *see also Yellow Cab*, 419 F.3d at 928.    However, Keating may overcome this presumption by showing by "a preponderance of the evidence" that Glidewell's

mark is not protected.  *Yellow Cab*, 419 F.3d at 928.

4.   A mark may be held generic if it is understood by the consuming public to identify the name of the product, not the producer.  *Yellow Cab*, 419 F.3d at 929.

5.   Combining two descriptive terms in and of itself does not make a mark registrable.  *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979), citing *Warner & Co. v. Lilly & Co.*, 265 U.S. 526, 528, 44 S.Ct. 615 (1924).

6.   The corrupted spelling or phonetic equivalent of a generic term is also generic.  *See*, *e.g.*, *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977) ("Using the phonetic equivalent of a common descriptive word, *i.e.*, misspelling it, is of no avail."); *Nupla Corp. v. IXL Mfg. Co.*, 114 F.3d, 191, 196 (Fed. Cir. 1997).

**B.   Even If Glidewell Is Assumed To Have A Protectable Trademark, No Reasonable Jury Could Find A Likelihood Of Confusion**

7.   The corrupted spelling or phonetic equivalent of a generic term is also generic.  *See*, *e.g.*, *Miller* "[T]he burden of proving likelihood of confusion rests with the plaintiff." *KP Permanent Make-Up, Inc. v. Lasting Impression, Inc*., 543 U.S. 111, 122, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004).

8.   The Ninth Circuit directs district courts to consider the following eight "*Sleekcraft* factors" when assessing the likelihood of confusion between marks: "[1] strength of the [plaintiff's] mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1145 (9th Cir. 2011); *see also AMF, Inc.*, 599

F.2d 341 (first identifying the factors).

9. However, "the list is not exhaustive," and "[o]ther variables may come into play depending on the particular facts presented." *Id.*; *see also* 4 McCarthy on Trademarks and Unfair Competition § 24:39 (4th ed.).

10. The Court need not "rigidly weigh[]" these factors, nor need it consider all of them. *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

### 1. Strength of Glidewell's Mark

11. "Trademarks are classified along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Generic and descriptive marks are deemed weak; arbitrary marks are considered strong. However, even 'strong' marks will be deemed 'weak' if they exist in a 'crowded field' of similar marks." *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948 at *12 (N.D.Cal. Aug. 13, 2007) (internal quotations omitted).

12. Widespread third party use greatly narrows the scope of any trademark rights. *See Network Automation, Inc. v. Hewlett-Packard Co.*, 2009 U.S. Dist. LEXIS 125835, *24 (C.D. Cal. 2009) (plaintiff's "Network Automation" mark is generic, or at least extremely weak). *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) ("In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd.") (citation omitted); *Glow Industries, Inc. v. Lopez*, 252 F.Supp.2d 962, 990 (C.D. Cal. 2002) (noting the weakness of Glow, Inc.'s mark, which competes in a crowded field of beauty products using the word "glow" in some manner as a trademark.)

### 2. Proximity of Relatedness of Goods

13. The proximity or relatedness of goods is relevant to determine

whether the products "are likely to be connected in the mind of a prospective purchaser." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963).

### 3. Similarity of the Marks

14. "The similarity of the marks will always be an important factor. Where the two marks are entirely dissimilar, there is no likelihood of confusion." *Brookfield Commc'n, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

15. In determining whether marks are similar, courts consider their sight, sound and meaning. *Id.*; *see also Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998).

16. "In analyzing this factor, 'the marks must be considered in their entirety and as they appear in the marketplace.'" *Brookfield Commc'n*, 174 F.3d at 1054 (citations omitted).

17. According to the "anti-dissection" rule, courts may not dissect marks to examine and compare their component parts. 2 McCarthy, McCarthy On Trademarks And Unfair Competition, § 23:41 (4th ed. 2004). "[A] court does not consider the similarity of the marks in the abstract, but rather in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase." *McCord*, 452 F.3d at 1137 (citation and internal quotation marks omitted).

18. If one mark is two words and the other is one word, this can help support a finding that the marks look different. *See Echo Drain v. Newsted*, 307 F.Supp.2d 1116, 1126 (C.D.Cal. 2003) (fact that "Echo Drain" is two words and "Echobrain" is one word helps support finding that marks look different).

19. Additional elements, such as logo designs, can help distinguish the parties' marks as used in commerce. *See Self-Insurance Institute of America,*

-21-

*Inc. v. Software And Information Industry Assoc.*, 208 F.Supp.2d 1058, 1071 (C.D.Cal. 2000) (parties' "SIIA" marks look dissimilar because they include additional elements that are visually distinct, such as an eagle whose wing surrounds part of plaintiff's mark).

20.    The meaning of the mark is also relevant to the likelihood of confusion analysis. *See Brockmeyer v. Hearst Corp*., 248 F.Supp.2d 281, 296 (S.D.N.Y 2003) (the meaning of defendant's "O" is a reference to Oprah Winfrey, while plaintiff's mark "<<O>>" does not reference a particular personality).

21.    When the commonality between composite marks is a term, or letters, that are generic or highly descriptive, courts find the likelihood of confusion reduced. *California Security Alarms v. Escobar's Security Plus Alarm Systems*, 1996 U.S. Dist. LEXIS 14914 (C.D.Cal. 1996) (finding the parties' marks dissimilar where the commonality, "Security," describes the parties' services); *Alchemy II, Inc. v. Yes! Entertainment Corp*., 844 F.Supp. 560, 569 (C.D.Cal. 1994) (finding the marks "Teddy Ruxpin" and "TV Teddy" dissimilar where the commonality, "Teddy," describes the parties' products: plush, talking teddy bears);  *Boston Duck Tours, LP v. Super Duck Tours*, LLC, 531 F.3d 1, 25 (1st Cir. 2008) (finding the marks "Boston Duck Tours" and  "Super Duck Tours" dissimilar where the commonality, "Duck Tours" describes the parties' services); *Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306, 309 (2d Cir. 1986) (finding the marks  HibVAX and HIB-IMUNE dissimilar where the commonality, "Hib," describes the parties' Haemophilus influenza type b vaccine); *Water Pik, Inc. v. Med-Systems, Inc*., 848 F.Supp.2d 1262, 1272 (D.Col. 2012) (finding the marks Sinu*Cleanse* and SinuSense dissimilar where the commonality, "sinu," is ubiquitous in the sinus irrigation market); *Smithkline Beckman Corp. v. Proctor & Gamble Co*., 591 F.Supp. 1229, 1238 (N.D.N.Y.

1984) (finding the marks ECOTRIN and ENCAPRIN dissimilar where the commonality, "RIN," is derivative of the generic term "aspirin"). *See also* 4 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:49 (4th ed. 2008) (when the common element of two trademarks is a generic term, the likelihood of confusion is reduced, as the public has come to expect that element on different products).

### 4.   **Actual Confusion**

22.   A "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Cohn v. Petsmart, Inc*., 281 F.3d 837, 843 (9th Cir. 2002).

23.   Relevant confusion is that which affects purchasing decisions, not confusion generally.  *See Echo Drain v. Newsted*, 307 F.Supp.2d 1116, 1126–27 (C.D.Cal. 2003).

24.   Nor does a showing of some confusion automatically create a triable issue of fact.  *See*, *e.g*., *Universal Money Centers v. AT & T*, 22 F.3d 1527, 1535 (10th Cir.); *Universal City Studios, Inc. v. Nintendo Co*., 746 F.2d 112, 118 (2d Cir. 1984).

25.   The absence of survey evidence itself may be used to infer that the results of the survey would be unfavorable.  *See Playboy Enter., Inc. v. Netscape*, 55 F.Supp.2d 1070, 1084 (C.D.Cal. 1999); *Cairns v. Franklin Mint Co*., 24 F.Supp.2d 1013, 1041–42 (C.D.Cal.1998) ("[A] plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so may lead to an inference that the results of such a survey would be unfavorable.")

26.   "Convergent marketing channels increase the likelihood of confusion." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1083 (9th Cir. 2005) (quoting *Nutri/System, Inc. v. Con-Stan Indus., Inc*., 809 F.2d

601, 606 (9th Cir. 1987)).

26.     "It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and are thus less easily confused." *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F. Supp. 2d 1325, 1333 (D. Or. 2003) (citing *Brookfield Comm's*, 174 F.3d at 1060). *See Accuride Int'l, Inc., v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) (holding factor weighed heavily against a finding of likelihood of confusion where purchasers were highly specialized professionals expected to exercise a high degree of care).

27.     To prevail on the ultimate question toward which the *Sleekcraft* analysis is directed—the likelihood of confusion of consumers—Glidewell must show sufficient evidence to permit a rational trier of fact to find that confusion is "probable," not merely "possible."  *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996).

30.     The evidence must establish that Keating's mark is "likely to confuse an appreciable number of people as to the source of the product." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

**C.    Keating's Use Of "Bruxer" In the Mark "KDZ Bruxer" Is Protected By The Classic Fair Use Defense**

31.     Under the "classic fair use" doctrine, a party is not liable for trademark infringement where it "use[s] a descriptive term in good faith in its primary, descriptive sense other than as a trademark." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150-51 (9th Cir. 2002).

32.      To establish this defense, Keating must prove that its use of "Bruxer" is: (1) not a use "as a trademark or service mark"; (2) done "fairly and in good faith"; and (3) "[o]nly to describe its goods or services." *Cairns*, 292 F.3d at 1150-51.

33. "The fair use defense only comes into play once the party alleging infringement has shown by a preponderance of the evidence that confusion is likely." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608–09 (9th Cir.2005) (citing *KP Permanent Make-Up*, 543 U.S. at 118 ("burden of proving likelihood of confusion rests with the plaintiff, and the fair use defendant has no freestanding need to show confusion unlikely").

### III.  SUMMARY JUDGMENT OF NO VIOLATION OF SECTION 43(A) OF THE LANHAM ACT

34. The analysis for Glidewell's claim of false designation of origin under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) is the same as the analysis for infringement of a registered trademark under 15 U.S.C. § 1114. *See Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046-47 & n. 8 (9th Cir. 1999) (applying same analysis to claims under Sections 1114 and 1125); *Church & Dwight Co. Inc. v. Mayer Laboratories, Inc.*, 2012 U.S. Dist. LEXIS 51770, *124 (C.D.Cal. 2012) (same).

### IV.  SUMMARY JUDGMENT OF NO UNFAIR COMPETITION UNDER CALIFORNIA LAW

35. The analysis for Glidewell's claim of unfair competition under California law is the same as the analysis for its claim of infringement of its registered trademark. *See Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996) ("Since dismissal of [plaintiff's] Lanham Act claim was proper, dismissal of its § 17200 claim was proper as well."); *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 875 (9th Cir. 2002) (same).

/ / /

/ / /

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: November 19, 2012          By: /s/ David G. Jankowski
                                       Lynda J. Zadra-Symes
                                       Jeffrey L. Van Hoosear
                                       David G. Jankowski

                                  Attorneys for Plaintiff,
                                  KEATING DENTAL ARTS, INC.

14179649