Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


JAMES R. GLIDEWELL DENTAL CERAMICS,     )

INC., DBA GLIDEWELL LABORATORIES,       )

                                        )

        PLAINTIFF/COUNTER-DEFENDANT, )CASE NO.

                                        )SACV11-01309-DOC

                v.                      )(ANx)

                                        )

KEATING DENTAL ARTS, INC.,              )

                                        )

        DEFENDANT/COUNTER-PLAINTIFF. )

_____ )




VIDEOTAPED DEPOSITION OF MICHAEL DITOLLA

TAKEN TUESDAY, OCTOBER 2, 2012

IRVINE, CALIFORNIA




Reported by Audra E. Cramer, CSR No. 9901


_____

DIGITAL EVIDENCE GROUP

1726 M Street NW, Suite 1010

Washington, DC  20036

(202) 232-0646

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-41-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

**Page 2**

1  VIDEOTAPED DEPOSITION OF MICHAEL DITOLLA, TAKEN ON
   BEHALF OF THE DEFENDANT/COUNTER-PLAINTIFF, AT 9:38 A.M.
2  TUESDAY, OCTOBER 2, 2012, AT 2040 MAIN STREET, IRVINE,
   CALIFORNIA, BEFORE AUDRA E. CRAMER, CSR NO. 9901,
3  PURSUANT TO NOTICE.
4
   APPEARANCES OF COUNSEL
5
   FOR PLAINTIFF/COUNTER-DEFENDANT:
6      LEONARD TACHNER PLC
       BY: LEONARD TACHNER, ESQUIRE
7      17961 SKY PARK CIRCLE
       SUITE 38-E
8      IRVINE, CALIFORNIA 92614-6364
       (949) 752-8525
9      ltachner@aol.com
10
   FOR DEFENDANT/COUNTER-PLAINTIFF:
11     KNOBBE MARTENS OLSON & BEAR LLP
12     BY: DAVID G. JANKOWSKI, ESQUIRE
13        RUSTIN MANGUM, ESQUIRE
14     2040 MAIN STREET
15     14TH FLOOR
16     IRVINE, CALIFORNIA 92614
17     (949) 760-0404
18     david.jankowski@kmob.com
19     rustin.mangum@kmob.com
20
21  ALSO PRESENT:
22     CHUCK GOSWITZ, VIDEOGRAPHER
                                                    Page 2

**Page 3**

1        I N D E X
2  WITNESS
3  MICHAEL DITOLLA
4
5  EXAMINATION                    PAGE
6  MR. JANKOWSKI                   6
   (P.M. SESSION)                 101
7
8        E X H I B I T S
9  NO.    PAGE    DESCRIPTION
10 Exhibit 43 10    DEPOSITION NOTICE OF
                    DR. MICHAEL DITOLLA
11 Exhibit 44 103   TWO-PAGE WEBSITE PRINTOUT
   Exhibit 36 107   GLIDEWELL LABORATORIES ORG
12                  CHART
   Exhibit 8 118    20-PAGE COLOR GLIDEWELL LAB
13                  INTERNET PRINTOUT RE
                    UPDATED VIDEO
14 Exhibit 9 151    TWO-PAGE COLOR BRUXZIR
                    INTERNET PRINTOUT
15 Exhibit 12 154   AUTHORIZED LABORATORIES
16                  PROGRAM BENEFITS COLOR
                    PRINTOUT
17 Exhibit 13 157   BRUXZIR COLOR WEB PRINTOUT
18 Exhibit 15 166   SIX-PAGE GLIDEWELL COLOR
19                  BROCHURE
20 Exhibit 19 171   PR WEB MULTIPAGE DOCUMENT
21 Exhibit 26 173   ONE-PAGE TECH SPECS AXIS
22                  DOCUMENT
                                                    Page 3

**Page 4**

1  EXHIBITS (CONTINUED)
   NO.    PAGE     DESCRIPTION
2  Exhibit 17 176    LETTER DATED 8/7/12 TO JIM
                     SHUCK FROM NICOLE FALLON
3  Exhibit 18 179    DENTAL PRODUCTS REPORT
                     ARTICLE ON GLIDEWELL
4  Exhibit 27 189    THREE-PAGE ORAL ARTS
                     DOCUMENT BATES KDA-002350
5                    THRU 352
   Exhibit 28 191    DOCUMENT BATES KDA-002446
6                    THRU 2447
   Exhibit 32 193    DOCUMENT BATES KDA-002237
7                    THRU 2239
   Exhibit 33 195    ONE-PAGE DOCUMENT BATES
8                    KDA-002359
   Exhibit 45 198    DOCUMENT BATES KDA-002770
9                    THRU 2772
   Exhibit 46 214    DOCUMENT BATES KDA-002832
10
11                   AND 2833
   Exhibit 47 216    DOCUMENT BATES KDA-002758
12 Exhibit 48 218    FIVE-PAGE DOCUMENT BATES
13                   GL-226, PAGES 1 THRU 5 OF 5
14 Exhibit 49 221    13-PAGE NORTHCOAST RESEARCH
15                   DOCUMENT, VARIOUS PAGES
16 Exhibit 50 222    GLIDEWELL'S INITIAL
17                   DISCLOSURES PURSUANT TO
18                   FEDERAL RULES OF CIVIL
19                   PROCEDURE 26
20 Exhibit 35 229    12-PAGE, TWO-SIDED
21                   GLIDEWELL LAB DOCUMENT
22                                                   Page 4

**Page 5**

1     IRVINE, CALIFORNIA;
2    TUESDAY, OCTOBER 2, 2012, 9:38 A.M.
3
4       THE VIDEOGRAPHER:  Good morning.  This is
5  Tape No. 1 of the videotaped deposition of
6  Dr. Mike DiTolla taken by Defendants and
7  Counter-plaintiffs in the matter of James R. Glidewell
8  Dental Ceramics, Inc. et al. v. Keating Dental Arts,
9  Inc. in the United States District Court for the
10 Central District of California, Southern Division,
11 Case No. SACV11-01309-DOC.
12      This deposition is being held at 2040 Main
13 Street, 14th Floor, in Irvine, California.  Today's date
14 is Tuesday, October 2, 2012.  The time on the video
15 screen is 9:38 a.m.
16      My name is Chuck Goswitz.  The court reporter
17 is Audra Cramer.  We are both with Digital Evidence
18 Group.
19      Will counsel please introduce themselves for
20 the record.
21      MR. JANKOWSKI:  David Jankowski of Knobbe
22 Martens Olson & Bear for Defendant Keating Dental Arts,
                                                    Page 5

1 and with me is my associate Rustin Mangum.
2        MR. TACHNER:  I am Leonard Tachner.  I am the
3 attorney for the Plaintiff Glidewell Laboratories.
4        THE VIDEOGRAPHER:  Thank you.
5        Will the court reporter please swear in the
6 witness.
7
8              MICHAEL DITOLLA,
9        having been first duly sworn, was
10       examined and testified as follows:
11
12             EXAMINATION
13 BY MR. JANKOWSKI:
14    Q.  Good morning, Dr. DiTolla.
15    A.  Good morning.
16    Q.  Again, my name is David Jankowski.  I'm an
17 attorney representing the defendant/counterclaimant in
18 this case Keating Dental Arts, and I'll be asking you
19 some questions today.
20       Can you please state your full name for the
21 record.
22    A.  Michael Christopher DiTolla.
                                              Page 6

1 are going to be providing answers to my questions.  You
2 must answer truthfully.  Do you understand that?
3    A.  Yes.
4    Q.  This deposition is being recorded on audiotape,
5 on videotape and stenographically by a court reporter.
6 The court reporter can only record actual words, so
7 please answer with spoken words rather than a nod or
8 another nonverbal response.  Do you understand?
9    A.  Uh-huh, yes.
10    Q.  Good catch.
11       Please wait until I've completed a question
12 before you begin your answer, because the court reporter
13 cannot capture what we say if we talk over one another.
14 Okay?
15    A.  Okay.
16    Q.  If I ask a question and it's unclear to you in
17 some way, please let me know, and I can try to address
18 it.  If you do not ask for clarification, I will assume
19 that you understand what I am asking.  Is that fair?
20    A.  Yes.
21    Q.  From time to time your attorney Mr. Tachner may
22 be making spoken objections.  Unless your attorney
                                              Page 8

1    Q.  And what is your occupation?
2    A.  I'm a dentist.
3    Q.  What is your current employer?
4    A.  Glidewell Laboratories.
5    Q.  And have you ever been deposed before?
6    A.  No.
7    Q.  Okay.  I'm going to go through some
8 ground rules just to familiarize yourself --
9    A.  Okay.
10    Q.  -- with the process, and if you have any
11 questions, you know, feel free to ask me, and I can get
12 them worked out for you.
13       First of all, do you understand the oath that
14 the court reporter just administered to you?
15    A.  I believe so, yes.
16    Q.  And although this deposition is being taken in
17 a conference room at the law offices of Knobbe Martens
18 in Irvine, California, it has the same force and effect
19 as if you were testifying in a court of law in front of
20 a judge.  Do you understand that?
21    A.  Yes.
22    Q.  I'm going to be asking you questions, and you
                                              Page 7

1 instructs you not to answer a question, you must still
2 answer my question.  Do you understand that?
3    A.  Yes.
4    Q.  If you'd like to take a break at any time
5 during the deposition, please say so, and we'll take a
6 break at the next convenient stopping point.  Do you
7 understand?
8    A.  Uh-huh.  Yes, I do.
9    Q.  I do request that you not ask for a break while
10 a question is pending.  We'll take breaks after
11 questions have been answered.  Is that fair?
12    A.  That's fair.
13    Q.  Are you taking any prescription medication or
14 other drugs that may impair your ability to testify
15 truthfully today?
16    A.  I am not.
17    Q.  Is there any reason you can't give full and
18 truthful testimony here today?
19    A.  No, there isn't.
20       MR. JANKOWSKI:  I'm going to have the
21 court reporter mark as Exhibit 43 Keating Dental Arts,
22 Inc.'s deposition notice of Dr. Michael DiTolla.
                                              Page 9

Pages 6 to 9

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-43-

1    (Whereupon, Exhibit 43 was marked
2    for identification.)
3    THE WITNESS:  Uh-huh.
4    This is mine to keep?
5    MR. JANKOWSKI:  You get to keep it during the
6    deposition, and then the court reporter will take
7    custody of it.
8    THE WITNESS:  Okay.
9    BY MR. JANKOWSKI:
10   Q.  Have you seen this document before?
11   A.  I think it might have been attached to an
12   e-mail that was sent to me, but I don't remember if I
13   saw this exact document or not.
14   Q.  Okay.  Well, basically, this is the formal
15   document which is being served in the lawsuit in order
16   to notice today's deposition.
17   A.  Okay.
18   Q.  And it identifies you as the witness to provide
19   information.
20   A.  Okay.
21   Q.  I don't know if you've talked about this with
22   your attorney, but there are two different types of

Page 10

1    depositions that can be noticed in a case like this:
2    There are fact depositions and so-called Rule 30(b)(6)
3    depositions.  That's where you can request testimony
4    from Glidewell as an entity, for example.
5    Are you aware that, I think, your colleague
6    Mr. Shuck testified last week?
7    A.  Uh-huh.  Yes.
8    Q.  And I believe that was in the context of a
9    30(b)(6) deposition --
10   A.  Okay.
11   Q.  -- where he was providing testimony on behalf
12   of Glidewell as an entity.  So I just want to make sure
13   that we understand the ground rules here that here
14   you're being noticed as a fact witness.  You're not
15   testifying on behalf of Glidewell, but, rather, on your
16   own behalf.
17   A.  Okay.
18   MR. JANKOWSKI:  And I did see, Mr. Tachner, a
19   communication somewhere where it sounded like Glidewell
20   might have been designating or thinking about
21   designating Dr. DiTolla as a 30(b)(6) on some topics?
22   MR. TACHNER:  Yes, that's correct.  I believe

Page 11

1    the deposition of Mr. Shuck based upon 30(b)(6) resulted
2    in the conclusion that Dr. DiTolla would also be
3    designated as a 30(b)(6) witness on some issues.
4    MR. JANKOWSKI:  Do you know what -- I mean, I
5    haven't heard what issues he would be designated on, but
6    it's something that's being considered or...
7    MR. TACHNER:  I think they were related to the
8    technology of dentistry as it relates to the issues in
9    this case, basically.
10   Also, Dr. DiTolla had done some DVDs --
11   tutorial DVDs for dentists to familiarize them with the
12   BruxZir products and also wrote some articles in the
13   same vein, and I believe that when Mr. Shuck was asked
14   about those, he deferred to Dr. DiTolla.
15   MR. JANKOWSKI:  Okay.  We'll address that, I
16   guess, when the time comes.
17   BY MR. JANKOWSKI:
18   Q.  Dr. DiTolla, let me just ask you a little bit
19   about your background.  Can you just give me your
20   educational background, please.
21   A.  I went to -- did my undergrad at Occidental
22   College in Los Angeles and then went to dental school at

Page 12

1    University of the Pacific, School of Dentistry, in
2    San Francisco.  Graduated in 1988 and then came down
3    here and was in private practice in Orange County for --
4    well, until 2001.
5    And then in 2001 I had the opportunity to
6    become part of the Glidewell team.  So I sold my
7    practice and moved inside of Glidewell Laboratories and
8    started practicing dentistry there.
9    Q.  So that transition to Glidewell happened in the
10   calendar year 2001.
11   A.  Yeah, I think it was February 5, 2001.
12   Q.  And what year did you graduate from Occidental
13   College?
14   A.  Actually, I got into dental school after my
15   junior year, so that would have been 1985.  So I didn't
16   actually graduate.  I got accepted before I graduated.
17   Q.  So 1985 was the completion of your junior year
18   at Occidental College?
19   A.  Uh-huh.
20   Q.  Wasn't President Obama at Occidental College
21   for a little bit there?
22   A.  He was.  That's our claim to fame.

Page 13

Pages 10 to 13

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-44-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1    Q. Did you overlap with him?
2    A. No. No. I don't think so. I think I'm --
3    Q. A little younger than him.
4    A. -- a little younger than him, right.
5    Q. It's close though.
6        And then University of the Pacific, you were in
7    the dental school there; correct?
8    A. Yes.
9    Q. And then how many year program is that?
10   A. That's a three-year program. I think it's the
11   only one left in the nation that's three years instead
12   of four. We go year-round.
13   Q. So you were really going at a fast clip, three
14   years at Occidental College, then three years --
15   A. Yeah, it's now an official program. If you
16   know, like I did, that you want to be a dentist after
17   high school, you OP -- they have you go to their
18   undergrad in Stockton and then to their dental school,
19   and you're done in six years.
20   Q. Is the dental school also located in Stockton?
21   A. No. It's in San Francisco.
22   Q. That's in San Francisco.

Page 14

1        So then you finished at University of the
2    Pacific in 1988?
3    A. Uh-huh, yes.
4    Q. And I believe I saw somewhere that -- did you
5    also do education in Nevada?
6    A. Yes. I took some postgraduate education at the
7    Las Vegas Institute for Cosmetic Dentistry.
8    Q. When did you study at the Las Vegas Institute?
9    A. 1995.
10   Q. So was there any degree conferred, or was that
11   just --
12   A. No, there's not a degree there. That's just a
13   clinical course where you're working on live patients.
14   So it's a unique type of education, but there's no
15   degree given for that.
16   Q. Now, your education at University of the
17   Pacific also would have included some clinical courses
18   and some nonclinical; is that correct?
19   A. Yes, that's correct.
20   Q. And the Las Vegas Institute, it was all
21   clinical courses?
22   A. That's correct.

Page 15

1    Q. And what courses did you take at the Las Vegas
2    Institute?
3    A. All the courses that were available at the time
4    were centered around cosmetic dentistry. So it all had
5    to do with porcelain veneers, all ceramic crowns, things
6    like that, things to improve the appearance of the
7    patient.
8    Q. And at that time you were in private practice;
9    correct?
10   A. Correct.
11   Q. And you said you were in private practice --
12   was that in Orange County?
13   A. Yes.
14   Q. What city did you practice out of?
15   A. I was in -- actually, I started in Los Angeles
16   County in Downey, and then we moved to Tustin in
17   probably 1995, right about that same time, '94, '95.
18   Q. So you were in Downey from 1988 to 1995?
19   A. That's correct.
20   Q. And then you were in Tustin from 1995 to 2001.
21   A. Uh-huh, correct.
22   Q. Now, your private practice in Tustin, was it

Page 16

1    focused on cosmetic dentistry?
2    A. It was focused on cosmetic dentistry, but we
3    still treated patients in all different phases of
4    dentistry.
5    Q. And how about when you were in private practice
6    in Downey?
7    A. No, that was more of a basic restorative
8    dentistry practice.
9    Q. So high level, you can say -- for the seven
10   years at Downey, you were providing normal -- I
11   shouldn't call it normal --
12   A. Typical.
13   Q. -- typical dentistry services, whereas in
14   Tustin you were still providing typical dentistry
15   services, but then you also had -- the cosmetic
16   dentistry aspect of your practice was enhanced; is that
17   fair?
18   A. Yes. In fact, those cosmetic procedures that I
19   learned in Las Vegas were not being taught in dental
20   school while I was still in dental school and still
21   currently are not being taught -- or they're being
22   taught academically, but they don't get to treat

Page 17

Pages 14 to 17

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2012      202-232-0646

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4
-45-

1 patients like that.

2    So my intent was to improve my skill set by

3 going out there and learning how to do something that I

4 wasn't taught to do in school. The materials that we

5 used for that didn't even exist when I was in school.

6 So...

7    Q.  What materials are you referring to?

8    A.  Primarily IPS Empress.

9    Q.  Is that one material, IPS Empress?

10    A.  Yes, that's one material.

11    Q.  What is IPS Empress?

12    A.  Empress -- it's just referred to as Empress,

13 usually. IPS would be the official name.

14    But Empress is an all-ceramic material from

15 Ivoclar Vivadent that can be made very thin, about 6/10

16 of a millimeter, and for many, many years was the one

17 material that most dentists used for doing porcelain

18 veneers for a cosmetic change on a patient's smile.

19    Q.  And this is an example of a material that

20 really didn't exist while you were in dental school at

21 University of the Pacific?

22    A.  Yes, it did not exist when I was -- maybe in

Page 18

1 "porcelain-fused-to-metal crowns." That's sometimes

2 shortened to PFM crowns?

3    A.  That's correct.

4    Q.  I've noticed a lot of little acronyms and

5 jargon in --

6    A.  I was trying to stay away from that for your

7 clarification.

8    Q.  I appreciate that actually. That's helpful.

9    And to the extent you do use an acronym -- you

10 can feel free to use one, but I'll try to bring out --

11    A.  Okay.

12    Q.  -- the fuller meaning if I hear one being used.

13    When you were in dental school or, as you said,

14 IPS Empress was a material that wasn't being used, are

15 there other materials you can think of that weren't

16 being used back at that time frame that are being used

17 today?

18    A.  Do you mean restorative materials such as

19 porcelains, or you mean in all of dentistry?

20    Q.  In all of dentistry.

21    A.  Oh, definitely, yes, there's certainly

22 materials that exist today in a different form or that

Page 20

1 Europe, but not in the United States. We never saw it

2 here.

3    Q.  Do these materials go through a certification

4 program with the federal government before you're

5 allowed to use them with patients?

6    A.  I would assume so, but I think most dentists

7 accept that some sort of testing and regulation has been

8 done before we get to use them. But -- yeah, I would

9 assume they do. I didn't check before, you know, we'd

10 start using them.

11    It was similar to a lot of other ceramic

12 materials that we were using at the time. It just

13 happened to be much more translucent, and so it was prettier

14 once it was on the teeth.

15    Q.  And what was the material that was used prior

16 to IPS Empress for porcelain veneers?

17    A.  A broad range of porcelains just known as

18 feldspathic porcelains with trade names like Ceramco and

19 things like that, the same porcelains that have been

20 used in dentistry on porcelain-fused-to-metal crowns

21 for, you know, the 20 years before that.

22    Q.  You just used the phrase

Page 19

1 didn't exist at all. There's products. There's

2 technology such as diode lasers that we have today that

3 did not exist when I was in dental school.

4    And certainly most of the restorative

5 material -- a lot of the restorative materials we have

6 in dentistry today -- we have a new one called

7 Lava Ultimate that didn't exist three years ago from

8 3M ESPE that now exists today.

9    Q.  It's called Lava Ultimate?

10    A.  Uh-huh, yes.

11    Q.  And what is Lava Ultimate?

12    A.  Lava Ultimate is a resin polymer crown that's

13 been infiltrated with ceramic particles.

14    Q.  So Lava Ultimate is being used today; correct?

15    A.  It is being used today.

16    Q.  What makes Lava Ultimate a wonderful material

17 to use today?

18    A.  According to the manufacturer, it's the fact

19 that it's a high-strength, tooth-colored crown that

20 won't chip as much as porcelain, for example.

21    And, also, its main use right now is for

22 dentists who own a CEREC machine in their office, which

Page 21

Pages 18 to 21

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-46-

1 is a machine that will make a chairside crown within an
2 hour or so for a patient so the patient can leave with a
3 permanent crown that day instead of a temporary crown.
4     So when the dentist takes a digital impression,
5 they mill a Lava Ultimate crown, and that crown at this
6 point does not have to go into an oven or be stained.
7 It can simply be polished and put right into the
8 patient's mouth.
9     So 3M is finding their biggest use for this
10 material with the dentists who are making crowns in
11 their own offices.  We haven't seen a lot of demand for
12 it at the laboratory yet, but the dentist with the
13 chairside crown machines are doing the majority of the
14 Lava Ultimate right now.
15     Q.  When you say "chairside crown machine," that
16 just means a machine that's going to be right there in
17 the dentist's office?
18     A.  Yeah, the dentist purchases a machine --
19 there's two manufacturers -- and they take a digital
20 impression of the patient's tooth once they prepare it
21 for a crown, and then they make a crown themselves
22 chairside and then bond it into the patient's mouth at
**Page 22**

1 certain tooth and then sends the impression in with the
2 prescription into a dental laboratory, who then fulfills
3 that prescription.
4     Q.  And Glidewell Laboratories is one example of a
5 lab that provides that kind of service; correct?
6     A.  Correct.
7     Q.  So today you're still seeing patients; correct?
8     A.  Today I still see patients.  Most of them are
9 for our marketing efforts, you know, for things that we
10 do -- or for educational purposes where we want to show
11 dentists what this crown or that brand of crown would
12 look like in the mouth in case they're considering using
13 them or they're on the fence between which one they
14 should use.
15     Q.  Do you still have your office in Tustin?
16     A.  No.  I sold that in 2001 when I came over.
17     Q.  So your practice as a dentist when you're
18 performing it is performed at Glidewell's facilities?
19     A.  That's correct.
20     Q.  Is that physically in the same location where
21 the laboratory is where they're creating crowns?
22     A.  We have several buildings, and yes, I'm in one
**Page 24**

1 that same appointment so the patient doesn't have to
2 wear a temporary around for two weeks.
3     Q.  So using a more conventional process, how long
4 does it take between imaging tooth and the patient
5 getting a permanent crown?
6     A.  Well, typically, imaging is not done.
7 Typically, we use a polyvinyl material to take an
8 impression.  But for the last 20 years it's been a
9 two-week turnaround period from the time a dentist sends
10 an impression to a dental laboratory like ours, and
11 we'll typically send it back in about a week, and
12 they'll have the patient back maybe a few days after
13 that.  So it's usually a two-week turnaround period.
14     Q.  And while that two weeks is happening, work is
15 being done at a dental lab somewhere; correct?
16     A.  Correct.
17     Q.  All right.  And just so that we're on the same
18 page here, dental labs then are in the business of
19 supporting the work of dentists who are providing these
20 patients with crowns, for example; correct?
21     A.  Yes.  We follow -- the dentist fills out a
22 prescription and asks for a specific material on a
**Page 23**

1 of them where crowns are made, yes.
2     Q.  So I assume this is a portion of the building
3 which is modeled to look like a dental office; is that
4 correct?
5     A.  It does, yeah.  When you walk inside, it does.
6     Q.  I say that because I would expect patients
7 going to the dentist want to get the dentist experience
8 that they're expecting.
9     A.  Yeah, they get the dentist experience, and
10 because everything's being filmed, there's a high burden
11 for me to get it right while we're filming it.  So we're
12 doing things -- we want to set a good example for our
13 dentist clients out there.  We don't want to do anything
14 sloppy and let them think that's okay, because that's
15 not in the patient's best interest.
16     Q.  Sure.  And you say it's being filmed because,
17 as you said, this is for marketing purposes as well for
18 Glidewell?
19     A.  And educational purposes.  The dentist -- we
20 actually write continuing education tests where the
21 dentist can watch a video and then go online and answer
22 10 questions and get a unit of CE credits for their
**Page 25**

Pages  22  to  25

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-47-

1  license renewal.
2      Q.  I see.  Okay.
3          So Glidewell is the creator of the educational
4  videos; is that correct?
5      A.  Yes.
6      Q.  So the patients that are having this done, they
7  obviously know that it's going to be part of something
8  beyond them receiving dental services; correct?
9      A.  Potentially, yes.
10     Q.  Why do you say "potentially"?
11     A.  Because not every case turns out as nice as you
12  would want it to.  You know, you find out all of a
13  sudden that the woman you're working on has a bleeding
14  disorder that she didn't know about, and it's just going
15  to be a compromised case, and the gums are bleeding all
16  over the place, and it's difficult to show what you're
17  doing when you tell her to stop bleeding and she won't.
18          (Laughter.)
19          THE WITNESS:  You can't command them to do it.
20          So there's just times where cases don't --
21  wouldn't make good filmed cases for educational
22  purposes.

Page 26

1      A.  They do, but you just don't want to spring that
2  on somebody.  The women especially, sometimes, who agree
3  to it are a little flustered afterwards when they see
4  their mouth blown up on the size of a TV screen and they
5  can see nose hairs sticking out, for example, or their
6  mustache.
7      Q.  Right.
8      A.  That doesn't go over well.
9      Q.  Do you have photoshopping you can do to --
10     A.  Well, you know, actually, that's the reason why
11  I love video is because you can't photoshop it.  So
12  there's a lot of dentists who -- and companies, dental
13  companies, who run advertisements, and we do too, of
14  still pictures, but those can always be photoshopped.
15          I like our videos that we send out to dentists
16  because you can't photoshop video.  What you see is what
17  you get.  This is really happening, and it looks like it
18  looks.  So there's a certain authenticity to that
19  because you can't photoshop it.
20     Q.  Right, right.  So when you're doing a procedure
21  for one of these marketing videos, typically, who's in
22  the room?

Page 28

1          Or sometimes in the back of the mouth -- it's
2  very difficult to get the camera towards the back of the
3  mouth, especially on a patient who has a limited
4  opening, and you just can't see anything.  So we film it
5  just to film it, because the couple times we've
6  forgotten to film it, everything turns out perfect.
7  BY MR. JANKOWSKI:
8      Q.  Right, right.
9      A.  So it's Murphy law.  So we film everything,
10  just to be safe.
11     Q.  Okay.  So when you said "potentially" before,
12  the "potentially" meaning it may or may not be used for
13  educational or marketing purposes?
14     A.  Correct.  It will get filmed, but it may or may
15  not be used.
16     Q.  So it's not "potentially" in the sense that the
17  client goes in knowing it's going to be filmed, for
18  example?
19     A.  No.  Everybody who goes in knows it's going to
20  be filmed.
21     Q.  In fact, I imagine they sign some sort of
22  waiver saying --

Page 27

1      A.  Usually just myself, my dental assistant, the
2  patient and then our videographer, the guy who films it
3  and then edits it as well.
4      Q.  And how often are you filming patient
5  procedures?
6      A.  Usually every Tuesday and Wednesday.
7      Q.  How many procedures per day?
8      A.  Two.  Usually one in the morning, one in the
9  afternoon.
10          But a lot of what we do is different than in a
11  regular dental office.  For example, if you wanted to
12  show a case to a dentist where you're doing two front
13  crowns, you know, this is a case where it's got to look
14  good for the patient, and dentists will often call and
15  say, "What crowns would look the best there?"
16          So we do a video where we try in a set of maybe
17  Empress crowns, maybe e.max crowns and maybe some
18  BruxZir crowns as well, and the dentist gets an
19  opportunity to see what all three of these different
20  crowns would look like.  In addition, some of the
21  research projects we do, I may have five or six
22  different sets of crowns to try in that were

Page 29

Pages 26 to 29

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-48-

1  manufactured in different ways, and we as a company just
2  want to see which ones look better.
3      So we usually end up seeing two patients a day
4  because, unlike a regular patient where the laboratory
5  makes one crown and you put it in and it's done, we
6  might be trying in 20 crowns.
7      Q.  When you say trying 20, are you saying
8  20 crowns on one patient?
9      A.  Yes.
10     Q.  So you'd be trying them sequentially?
11     A.  Yes.
12     Q.  Wow.  How long does that take?
13     A.  A while.  There's a reason the patient is
14  getting these two crowns for free, and it's because of
15  the time involved.
16     Q.  I see.
17     A.  There is no free dentistry.  No money's going
18  to change hands, but you're going to have to lay there
19  for a while while we try these in and take them out.
20     Q.  I see.
21     A.  But we use a long-lasting anesthetic, so they
22  stay numb.  But, yeah, it can take a while.  It can take

Page 30

1  a couple hours.
2      Q.  So that's the incentive for the patient to go
3  through this, among other things, is they're getting the
4  crown for free?
5      A.  They're getting the crown for free.  They're
6  all employees, so they feel like maybe they're doing
7  something that will benefit the company as well.
8      Q.  Okay.  So the patients that you're putting the
9  crown on are Glidewell employees?
10     A.  That's correct.
11     Q.  Oh, I see.
12     A.  It would be difficult to put a regular patient
13  through all this, I would think, because we -- there's
14  times where we'll try them in and we'll even like how
15  one or two of the sets of the crowns look, but we'll put
16  the temporaries back on again and go do some staining on
17  the crowns, which might take two hours.
18     So with the patients in the building, we can
19  send them back to work with the temporaries, and they
20  can come back, walk up one flight of stairs two hours
21  later and put it back in.  It would be a logistical
22  nightmare to try to do this on an outside patient.

Page 31

1      Q.  Do you ever have times when you're running out
2  of patients; I mean, there just aren't any Glidewell
3  employees who need the work done that you want to
4  perform?
5      A.  No.  The exact opposite.  We have plenty of
6  employees, and for them it's like winning the lottery.
7  You know, it's like getting the golden ticket if they
8  get to come in and get $4,000 worth of stuff done
9  probably the best that it can be done since we're
10  filming it and we have on-staff technicians helping to
11  make it look as good as possible.
12     So we have plenty of people who need stuff.
13     Q.  How do you get involved in this?  You know,
14  within the company is there like a website you go to and
15  you --
16     A.  There is.  There is.  And we have a
17  hygienist -- I brought a dental hygienist on many years
18  ago, and so we actually do cleanings for the employees,
19  low-rate cleanings, basically at cost, so that patients
20  don't -- so employees don't have to go out and get their
21  teeth cleaned at an outside dentist.
22     But it's really -- selfishly, it's more so that

Page 32

1  while their being cleaned, we can see, "Oh, you need a
2  crown here and a crown here.  That'll be perfect for
3  this e.max video we want to make."  And so the hygienist
4  keeps a list of their needs and their existing
5  conditions, and then we can pick from that.
6      We used to screen the new employees that we
7  would hire on Monday.  So we would hire 10 people on
8  Monday, but it seemed a little invasive to go in and
9  pull their lips up and take a picture on their first
10  day, and so we stopped doing that.
11     Q.  Yeah, I would imagine.
12     A.  That wasn't my idea.  Not good bedside manner
13  on your first day to spread them open wide and start
14  taking some pictures.
15     Q.  Yeah, they have a meeting to learn how the
16  computer system works, and the next meeting is --
17     A.  Exactly.
18     Q.  -- in a dental chair having your teeth looked
19  at.  That would be a little awkward for new employees.
20     A.  So we clean their teeth, and that's how we get
21  a peek inside their mouth.
22     And really what happens is we have a lot of

Page 33

Pages  30  to  33

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-49-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1   patients stopping us in the hallway begging to come in,
2   but their tooth just doesn't qualify for one of the
3   projects that we're doing?
4       Q.  I was going to say that I imagine the way that
5   you do select patients are just based on what's most
6   appropriate to show what you -- the educational purpose
7   and marketing purpose that you're serving; right?
8       A.  That's correct.
9       So, for example, it's much easier to educate on
10  front teeth than it is on back teeth.  Ironically, most
11  people only brush their front teeth and not their back
12  teeth, and so they've got big blown-out teeth, and they
13  want help in the posterior, but it's difficult to film.
14      So we're always on the lookout for good-looking
15  men and women with really ugly crowns on their front
16  teeth.  That's our dream come true.
17      Q.  And I think you mentioned a ways back something
18  called e.max.
19      A.  Uh-huh.
20      Q.  Did I hear that right?
21      A.  Yes.
22      Q.  What is e.max?

Page 34

1       A.  e.max is another restorative material -- an
2   indirect restorative material, which means that -- a
3   direct restorative material would be like a composite
4   resin or a bonding where a dentist puts in your tooth,
5   shines a light at it, and it's done.  And indirect
6   restorative material is one that has to be fabricated
7   for the most part by a dental laboratory.
8       So e.max is an indirect restorative material
9   for crowns.  It's lithium disilicate, and it's from
10  Ivoclar Vivadent, and it's actually called IPS e.max,
11  kind of like IPS Empress, to be official.  And e.max
12  is another high-strength, cementable, all-ceramic crown,
13  and by "all-ceramic crown" I mean this is a class of
14  crown that no longer has a metal coping underneath it.
15      So from about 1959 to 1980 all crowns were the
16  PFM crowns we referenced before with the metal coping
17  and porcelain on top of it.  There's a lot of esthetic
18  compromise with this gray metal coping underneath that
19  PFM crown, so there's always been a drive in dentistry
20  to come up with tooth-colored crowns, where it's
21  tooth-colored on the outside and tooth-colored on the
22  inside with no metal.  And these historically have not

Page 35

1   nearly been as strong as the PFMs; much better looking
2   but with a higher tendency for fracture.
3       And when e.max was made available in 2007, it
4   was really the first time we had a high-strength,
5   all-ceramic crown that we could count on working in many
6   areas of the mouth.
7       Q.  And that's still a material which is popular
8   today?
9       A.  Yes.
10      Q.  And is "e.max" sometimes spelled e-dot-m-a-x?
11      A.  That's correct.  All the time.
12      Q.  Do you have an understanding for why it's
13  called e-dot-m-a-x?
14      A.  Originally it was released as Empress 2.  They
15  had -- Ivoclar found a lot of success with Empress.
16  They launched what they like to call the esthetic
17  revolution in about 1992, and that's why that Las Vegas
18  Institute existed, because Empress allowed us to do
19  things we could never do before.
20      So a few years after that they released
21  Empress 2 to take advantage of that great name, the
22  Empress name, and the trust that dentists had in it.

Page 36

1   And it was the lithium disilicate e.max material, but
2   it was overlaid with porcelain.  So it was porcelain
3   fused to lithium disilicate, so a PFL, if you will.  Not
4   that that term actually exists.
5       But they had a lot of problems with the
6   porcelain falling off it, which is one of the
7   liabilities of these two-layered crowns.  And so they
8   pulled it off the market about two years after that.
9       Then they released it again as IPS Eris,
10  E-r-i-s, which was a lithium disilicate framework that
11  again had a porcelain, a different porcelain, on the
12  outside of it which they said would stick to it better,
13  and that kept coming off.  So that was pulled off the
14  market about two years after it was launched.
15      Then they came back to us a third time, and
16  they said, "We've got another lithium disilicate crown,"
17  and we're like, "That's enough guys.  We're still --
18  we've got a lot of angry doctors, and we're still
19  replacing the last two that failed."
20      We said, "What are you putting on the outside
21  this time?" and they said, "Nothing.  We're making the
22  whole crown out of lithium disilicate."

Page 37

Pages 34 to 37

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-50-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

---

**Page 38**

1    We said, "Can you do that?" and they said,
2  "Yeah."
3      "How does it look?" and they said, "It looks
4  pretty darn good."  And that was e.max.
5      So it had failed twice with porcelain on the
6  outside of it, and the third time they took that
7  framework and just made the whole crown out of it.
8  Shocking in a sense, because no one had ever seen
9  something like that in dentistry before where you could
10  use a framework -- it'd be like taking that silver-gray
11  framework from the PFM and making a whole crown out of
12  it.  It would be very ugly.
13      But e.max, that was its third incarnation,
14  without any porcelain on the outside, which qualified it
15  as a monolithic material because there was not -- no two
16  layers to come apart.
17  Q.  "Monolithic" meaning one layer?
18  A.  Meaning one material essentially.
19  Q.  Right.
20  A.  So no porcelain and gold like we had before,
21  because when you fire those in the oven and you run them
22  up to, you know, 1,200 degrees, as they cool, they have

**Page 39**

1  different coefficients of thermal expansion, and it sets
2  up thermal stresses within that system almost waiting to
3  break.
4      And patients will come in and say -- they'll
5  pop porcelain off their crown, and you say, "What were
6  you chewing?" and they say, "Nothing.  A piece of bread
7  soaked in coffee."
8      And we just always assumed they were lying,
9  because patients do that.  And we'd say, "What were you
10  biting on?  Were you opening a beer bottle?  What are
11  you afraid to tell me?"
12      And we know that those PFMs are prone to
13  cracking like that, and so that's -- e.max as a
14  monolithic material kind of took the dental world by
15  storm when it came out in 2007, and the growth curve on
16  that's just been phenomenal since 2007.
17  Q.  So e.max is a material that Glidewell will
18  make crowns out of?
19  A.  Yes.
20  Q.  And I think you said before, it'll be based on
21  a prescription from a dentist asking for that particular
22  crown; correct?

**Page 40**

1  A.  Right.  That's the only crown in that category
2  of lithium disilicate as of today.
3  Q.  That was released in 2007.  So prior to 2007
4  were there any monolithic crowns at all?
5  A.  Empress was technically a monolithic crown
6  because it was pressed, leucite-reinforced ceramic, and
7  it was all -- there was no coping or inside layer, but
8  because of its weaker strength -- the e.max is about
9  three times stronger than the Empress in terms of
10  flexural strength.  Because of the weaker strength, it
11  had to be bonded into place.
12      And so being is where we use a resin
13  cement -- a composite resin cement, and we'll bond a
14  weaker restoration to the tooth, and then it takes on
15  the strength of the tooth.  So a good example would be
16  like a ceramic floor tile.  If you take a ceramic floor
17  tile, you could break it over your knee.  But if you
18  bond it to the subfloor, a herd of elephants can walk
19  across it, and it won't crack.
20      And Empress was the same way:  It was very weak
21  until it was bonded to the tooth, and then it was
22  strong.  But the bonding procedures are difficult;

**Page 41**

1  they're finnicky; they could lead to a lot of
2  postoperative sensitivity on the tooth for the patient.
3  What dentists prefer to do is just cement things into
4  place, a much lower-tech way to attach a restoration to
5  a tooth, but you can only do it if it's a high-strength
6  restoration.
7      So when we talk about e.max, we really should
8  say it's a high-strength, all-ceramic, cementable crown,
9  which refers to the fact that it doesn't have to be
10  bonded into place.
11      So Empress was a monolithic restoration, but it
12  was not cementable.  It had to be bonded into place.
13  The very first monolithic restoration of all were cast
14  gold crowns, you know, which were being done back in
15  the 1940s.  They were being done up until 1959.  They're
16  still done today, but it's only about 3 percent of what
17  we do.  And you've probably seen a grandparent, or
18  somebody opens their mouth and they have a gold crown in
19  the back.
20  Q.  Or a pirate.
21  A.  Or a pirate.
22      It's the best material we've ever had in

Pages 38 to 41

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-51-

1  dentistry. It's a metal, so it won't break or chip.
2  It's very kind to the opposing teeth when you chew on
3  it, and it lasts -- it's longevity is measured in
4  decades, not years.
5       So monolithic restorations have been around
6  forever. The very first indirect one that we had, cast
7  gold, was a monolithic restoration. It wasn't until we
8  tried to pretty things up in 1959 that we started
9  putting two dissimilar materials together on crowns.
10     Q. Because people didn't want to look like
11  pirates.
12     A. Yeah, you know, for as much talk as things
13  about plastic surgery today in Newport Beach, apparently
14  what they looked like bad in the Mad Men days in the
15  early '60s as well, and they did not want gold showing
16  on their teeth when they smiled. So, yeah, that's why
17  the PFM was invented, but it was pretty much a
18  compromise from the very beginning.
19     Q. And I'm sorry. When did the PFMs start? In
20  the '60s?
21     A. 1959, 1960.
22     Q. 1959.

Page 42

1       And so a gold crown is attached to a tooth
2  using cement; is that correct?
3       A. It can be bonded as well, but it certainly can
4  be cemented, because it's strong enough.
5       The other consideration -- you know, you have
6  to bond, as I said, if you have a weaker restorative
7  material. The other consideration is if you have a
8  really short tooth. So sometimes in the back on a lower
9  second molar you have a really short tooth that you have
10  to put a crown on top of, and since you don't have a lot
11  of mechanical retention -- you know, you have a lot more
12  mechanical retention if a crown slides down a tooth
13  surface like this versus a short one -- you may bond
14  gold into place where you're going to have a higher
15  requirement for the cement to help hold that on.
16     Q. So for the layperson, nondentist, what's the
17  difference between cementing and bonding? How would you
18  describe it?
19     A. Cementing is easy to do, simple, simple
20  cleanup, very low to no postoperative sensitivity, so
21  lots of benefits there, but a very weak bond between the
22  cement and the tooth and maybe no bond at all to the

Page 43

1  crown. But if you've prepared your teeth correctly and
2  you've got a tooth that looks not straight up and down,
3  but just barely tapered, that crown slides into place,
4  and there's literal mechanical retention. Sometimes
5  hard to take the crown off even before the cement's
6  there. So in that kind of tooth you can cement it into
7  place, and you have nothing to worry about.
8       Bonding is either you have a weak material,
9  like a thin, all-ceramic material or even something like
10  Empress, and you need to have the restoration take on
11  some of the physical properties of the tooth below it.
12  So it uses -- like I don't know if you've ever had a
13  bonding done on your teeth, again that bonding material
14  where they shape it and they shine that blue light on it
15  and it gets hard as a rock. That's essentially what
16  bonding is.
17       We take a layer of resin cement inside the
18  crown and put it on and shine a light at it, and now we
19  have this hard, rigid cement on the inside that's going
20  to bond to the tooth just like we did a bonding on your
21  tooth up in the front. But it's more expensive, it's
22  harder to do, it's hard to do well, it can lead to more

Page 44

1  sensitivity for the patient because you have to do an
2  acid etch on the tooth. So it's just a different degree
3  of luting something to the tooth.
4       So it's kind of -- you know, cementation kind
5  of exists here, and it's how most dentists would prefer
6  to put most crowns in, because it's very predictable and
7  easy to clean up, and the resin cements take the degree
8  of difficulty on the case up a lot higher. So dentists
9  would prefer not to have to bond things into place if
10  they didn't have to.
11     Q. So another term you mentioned was BruxZir crown
12  BruxZir crown.
13     A. Uh-huh.
14     Q. What do you mean by a BruxZir crown?
15       I mean, you're talking now about a monolithic
16  zirconia crown?
17     A. Right.
18     Q. Okay.
19     A. Yeah, I'm talking about, yeah, a monolithic
20  zirconia crown.
21     Q. Now, when did those types of crowns appear?
22  What year?

Page 45

Pages 42 to 45

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4
-52-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1      A.  I first started using them in 2007 in-house,
2    again, on employees, and it was easy to look at what
3    Ivoclar did with e.max and what a great restoration they
4    had by taking the porcelain off the top.  At the time we
5    were using other zirconia-based restorations such as
6    Lava from 3M ESPE and Procera Zirconia from
7    Nobel Biocare, and these were both bilayered,
8    zirconia-based crowns.
9         So there was a zirconia coping that was white
10   and then porcelain fused to the outside of it.  And as
11   you might imagine, when you put those two things
12   together, there's a chance they come apart.  So
13   initially our experience with zirconia was soured a
14   little by the porcelains that were on the outside.
15        When we saw what Ivoclar did by taking the
16   porcelain off e.max and making the whole restoration
17   out of it, it occurred to us that you might be able to
18   do the same thing with these other zirconia-based crowns
19   and take the porcelain off and make the whole crown out
20   of zirconia.  And that's how the BruxZir project started
21   was seeing what that would look in the patient's mouth,
22   seeing how it would act, like seeing what it was like to
                                              Page 46

1      Q.  Right.  Because instead of metal on the bottom,
2    you get the zirconia on the bottom.
3      A.  You have the zirconia, correct.
4      Q.  So just like e.max built the whole crown out of
5    the lithium disilicate, the BruxZir product that
6    Glidewell has is building the entire crown out of
7    zirconia?
8      A.  Correct.
9      Q.  Now, I take it you were involved in this
10   decision process to develop this product; is that
11   correct?
12     A.  Well, I was certainly involved in the execution
13   of it.  I remember Jim Glidewell coming up with the idea
14   one day at lunch, and -- I don't recall being asked if I
15   wanted to do it or not.
16     Q.  More you were told it was being done, and you
17   were going to play the role --
18     A.  Yeah, it was more of a let's do this, and I was
19   like, "Okay.  Is this going to work?"  And looking
20   around the table, everybody was like, "We don't know.
21   No one's ever done it."  You know, we didn't know what
22   was going to happen.
                                              Page 48

1    try to fabricate it and make it and put it into place.
2    And that was back in about 2007 probably.
3      Q.  Okay.  So the Lava product was -- it was
4    monolithic zirconia -- or would you call that
5    monolithic?
6      A.  No, would I not call that --
7      Q.  You'd call that bilayer?
8      A.  Yeah.
9      Q.  Okay.  And that's with porcelain on top and
10   some sort of zirconia underneath?
11     A.  That's correct.
12     Q.  You mentioned Procera.
13     A.  Yes.
14     Q.  That also describes Procera?  It was a bilayer?
15     A.  Correct.  And there's another one, Cercon,
16   which was the very first one, C-e-r-c-o-n, which we had
17   brought to us in probably 2002 or 2003 from a company
18   called Dentsply, and that was the first porcelain fused
19   to zirconia.
20     Q.  But these are not PFMs; correct?
21     A.  Correct.  PFZs I suppose we would call it,
22   porcelain fused to zirconia.
                                              Page 47

1      Q.  So the BruxZir product that's the trademarked
2    product was first used in 2009; is that correct?
3      A.  By outside dentists or by me?
4      Q.  By anybody.
5      A.  Including me?
6      Q.  Yes -- well, let me ask you that question.  Let
7    me strike that question and ask you:  When were you
8    first using monolithic zirconia crowns?
9      A.  2007.
10     Q.  Okay.  So already back in 2007 you were doing
11   that?
12     A.  Correct.
13     Q.  And you were performing this service with
14   monolithic zirconia crowns on which patients?
15     A.  At the time we were just using posterior teeth.
16     Q.  That means teeth in the back?
17     A.  Yes, I'm sorry.  Yeah, molars and things like
18   that.  Because this -- these early crowns were uglier
19   than anything I'd ever seen before in my life.  If I
20   grew up trying to learn how -- in dentistry trying to
21   learn how to do cosmetic dentistry, this was the mother-in-law
22   anticosmetic dentistry.  This was the mother-in-law
                                              Page 49

                                    Pages  46 to 49

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-53-

1 crown.

2    Q.   And it's because the material was chosen for
3 its strength not its appearance; correct?

4    A.   Yes.  Yes, it was chosen for its strength.

5        There's a problem we have as dentists where
6 we'll suggest something to a patient, typically cast
7 gold.  One of the big differences -- I mentioned earlier
8 that PFM was a compromise from the beginning.  It was a
9 compromise in a couple of ways:  It was two layers being
10 put together on a crown, one's a metal, one's a glass.
11 You know, they're probably not going to stick together
12 in they get under a lot of stress.

13       And the other compromise was you have to drill
14 away 2 millimeters of tooth structure on the top of a
15 tooth for a porcelain-fused-to-metal crown.  That's
16 a lot.  You know, you've only got about a millimeter and
17 a half now until you get to the nerve of the tooth.

18       Cast gold can be as thin as 3/10 of a
19 millimeter.  So dentists were used to preparing teeth
20 conservatively, and when the PFM came out, all of
21 a sudden it was 2 millimeters off the top.  Dentists
22 revolted and continue to revolt to this day by not

Page 50

1 prepping a full 2 millimeters off the top of the tooth,
2 and as a result, the PFMs are compromised; they're too
3 thin, and they're subject to breakage.

4        So, as I mentioned earlier, the cast gold crown
5 stands as the -- literally, the gold standard for
6 restorative dentistry.  So you'll see a patient whose
7 got a tooth that's only sticking maybe 3 millimeters out
8 of the gum tissue versus the traditional 10 millimeters,
9 and it's a short what we call clinical crown.  There's
10 not much tooth sticking out of the gums, and we can't
11 take much -- if we took 2 millimeters off, we would be
12 leveling the tooth with the gum tissue, amputating it
13 essentially.

14       So this is a tooth that would really benefit
15 from a cast gold restoration, where we'd only reduce
16 3/10 of a millimeter from the top of it.  But you find
17 that many patients aren't willing to have gold in their
18 mouth, and you can't force it on them.

19       My dad was a dentist.  He forced gold on a lot
20 of people.  In my first two years in practice I spent
21 a lot of time replacing it on women who said, "I can't
22 believe your dad put this in my mouth."  One of them was

Page 51

1 my own mother before my wedding.  We had a two-year
2 argument.  I finally took her gold out and put it in.

3        So initially we thought, "What are we going to
4 do?"  What do you do as a dentist when you want to do
5 gold and you know it's the right thing to do, and a
6 woman says -- or a man maybe, but a lot of times it was
7 women -- says, "I'm not going to let you put gold in my
8 mouth"?

9        It's ironic.  They have gold earrings, there's
10 a gold necklace.  I had a girl once with a gold stud in
11 her nose.  I was like, "Wait a minute.  You don't want
12 to show gold?  The sun's glinting off it right now as
13 we're talking, and where I'm talking about putting it is
14 between a cheek and a tongue."

15       And so it was thought that if we had a
16 high-strength, all-ceramic, all-zirconia, monolithic
17 material, that it might be an answer for these areas
18 where we couldn't prepare as much as we wanted to for a
19 PFM crown or an e.max crown.  An e.max crown, it may
20 have occurred to you, would have been good for that
21 situation, but it needs a full millimeter of reduction
22 on the top of the tooth.  And it may be three times

Page 52

1 stronger as Empress, but as it turns out, the
2 full-contour zirconias are three times stronger than the
3 e.max as well.

4        And as it turns out, the cast gold's even
5 stronger than all of them.  It still kind of rules the
6 roost.  It's first in strength and last in esthetics, a
7 tough tradeoff.

8        So most of the cases that we did initially were
9 back teeth.

10    Q.   So the cases that you were doing, I guess you
11 would -- were these being filmed and shown to people at
12 all, or was this being done for R&D purposes within
13 Glidewell?

14    A.   This was just being done for R&D purposes.  And
15 typically what we would do is prep a crown on somebody,
16 and we let a couple different departments make the
17 crowns.  Everybody kind of got to have this technology
18 and work with it.  They really were so ugly in the
19 beginning that we thought it would speed everything up
20 if different departments were able to approach the
21 shading issues of this material with their own unique
22 approaches.

Page 53

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

10/2/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.    Michael DiTolla

---

1    And so I would prepare a patient for a crown,
2  the patient would come back in a week, and seven
3  department managers would show up with two crowns each.
4  And this patient would lay there with retractors in
5  their mouth, and we would try in 14 crowns, on camera,
6  so that everybody could look at a plasma screen up on
7  the wall.
8    And I wouldn't tell anybody whose crowns were
9  whose, and everybody in the room would vote on which one
10  we liked the best, and then whoever won would share what
11  they did on that crown.  And then -- and it would
12  continue like that, just trying to the coloration of
13  those materials to look a little bit better.
14    So we didn't film any of it for distribution to
15  the dentists.  It was all R&D stuff in-house to try to
16  figure out how to make this material look a little
17  better.
18    Q.  And the patients are, again, Glidewell
19  employees; is that correct?
20    A.  Correct.
21    Q.  So you're talking about the appearance and
22  trying to get the shading right.  What was your sense of

Page 54

---

1  Germany, in Regensburg, I think that University, that
2  were being done as well.
3    And, consequently, now there's lots of studies
4  done and research that's being done by -- I don't know
5  if you know who Gordon and Rella Christensen are.  They
6  run the Clinicians Report, a nonprofit research group
7  for dentistry where they do a lot of clinical testing on
8  materials and work with 30 to 40 dentists out in the
9  United States who place different crowns in the mouth
10  and take impressions of the crowns and send it back to
11  Utah, where they pour it up and gold-plate it, then look
12  at it with an SEM.
13    So they've started doing clinical testing on
14  these materials -- on the monolithics, on e.max and
15  BruxZir.
16    Q.  These studies you're talking about, these are
17  not specifically on Glidewell zirconia.  It's just on
18  monolithic zirconia crowns that may or may not be from
19  Glidewell; is that correct?
20    A.  I believe we provided the crowns for those
21  studies, but I could be wrong.
22    Q.  Who would know?  Who within Glidewell?

Page 56

---

1  these monolithic zirconia crowns from a performance
2  perspective, aside from appearance?
3    A.  I had no idea how they were going to perform
4  clinically.  I just knew when we broke them
5  downstairs on the Instron machine out of the mouth, it
6  was the highest numbers that we were seeing for any
7  crown.  But we really didn't know what was going to
8  happen when we put it in the mouth, in terms of the
9  esthetics as well.
10    So we started seeing some of the wear studies
11  that were coming back, and they looked very promising.
12  It was going to wear the opposing teeth at about the
13  same rate as e.max.  But, you know, in the beginning we
14  were just -- we knew a couple people in Europe who we'd
15  heard of who were doing full-contour zirconia crowns,
16  and we had some conversations with them, and it sounded
17  like it was working well.
18    Q.  Did Glidewell do its own internal studies on
19  wear or durability performance?
20    A.  We have a chew simulator in R&D, and I believe
21  they did some studies, but there was also university
22  studies that were done, one in Alabama and one in

Page 55

---

1    A.  Jim Shuck.
2    Q.  And what about Mr. Carden?  Would he know?
3    A.  I don't remember when he started.  This might
4  predate him, but he may know, yes.
5    Q.  Now, these studies, don't they take time to --
6  for example, wear studies, doesn't it take years to get
7  results on those things?
8    A.  The in vivo ones do, but the in vitro ones,
9  where they do it on a chew simulator, can go through
10  millions of chewing cycles and thermocycling relatively
11  quickly, in a matter of a month and a half, I think.
12    Q.  And the monolithic zirconia crowns went through
13  both types of investigation?
14    A.  They certainly went through -- those studies
15  that I mentioned before were in vitro studies, and the
16  only one I'm familiar with now is the Clinicians Report
17  study that Gordon and Rella Christensen are doing that's
18  an in vivo one where they had dentists place these
19  high-strength, all-ceramic, monolithic crowns, and then
20  they're looking at those.
21    Q.  So the early studies you talked about were
22  in vitro studies?

Page 57

---

Pages 54 to 57

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-55-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

1    A.  As far as I know, yes.
2    Q.  So those are chew simulators; correct?
3    A.  Yes.
4    Q.  And now you're saying -- the most recent study
5    you're referring to, this was one done in Utah; correct?
6    A.  Well, that's where it's being administered, but
7    the dentists are all over the country who are
8    participating in it.
9    Q.  Okay.  Administered out of Utah, using dentists
10   around the country, and that's an in vivo investigation?
11   A.  Correct.
12   Q.  And the results of the tests out of Utah has
13   already been released?
14   A.  We saw Rella Christensen give a presentation in
15   August in Las Vegas at a meeting called CEREC 27.5 where
16   she showed e.max crowns and BruxZir crowns and the
17   wear that they caused on opposing teeth and how opposing
18   teeth were also wearing the e.max and the BruxZir
19   restorations.
20   So there was wear taking place on both
21   surfaces, which was good news for us to be able to say
22   that -- everything wears against each other.  Two

Page 58

1    the final test," and I like that.  You know, that's
2    different than the in vitro chewing machine stuff.  I
3    like to see when it's actually in the human mouth and
4    what's going on.
5    BY MR. JANKOWSKI:
6    Q.  Because the environment's different?
7    A.  Yeah.  It's a simulator still.  I mean, it's
8    really hard -- the human skull and the way people chew
9    and the acidity or saliva and all that -- it's difficult
10   to replicate.
11   So you get a good idea if a proposed material
12   is going to just chew up natural teeth putting it in a
13   chew simulator against, you know, enamel, but you get a
14   much better idea of what's going to happen when you do
15   it in vivo.
16   Q.  So you were putting these monolithic zirconia
17   crowns in patients' teeth starting in 2007; correct?
18   A.  Correct.
19   Q.  Were you doing that continuously in 2008
20   and 2009?
21   A.  Yes.
22   Q.  And you were putting in, what, the different

Page 60

1    natural enamel teeth wear against each other, and
2    they'll wear at, you know, 10 to 15 microns a year.  And
3    when you take restorative material such as cast gold and
4    oppose that to a natural tooth, it actually wears the
5    gold away.  The gold's so soft that the gold won't take
6    any -- a very negligible amount of tooth away.
7    So we're always looking for something that
8    wears about the same rate as enamel, and e.max and
9    BruxZir are very close and just slightly higher.  But
10   she showed examples of enamel, porcelain and even
11   composite resin wearing the e.max and the BruxZir crowns
12   as well.  And I believe their newsletters -- they've got
13   some of those SEMs in one of their latest newsletters,
14   their CR report.  I don't know if you've seen those or
15   if we sent those over.
16   MR. TACHNER:  Yes.
17   THE WITNESS:  Have we?  Okay.
18   And they're such a big -- they're so well
19   recognized in dentistry that that's the type of research
20   that I tend to share with dentists, because you can see
21   it, you can feel it, you can see the SEMs, you can see
22   what's going on.  Their motto is, "Clinical success is

Page 59

1    batches of what the material was based on Glidewell was
2    updating what the zirconia had in it?  Is that fair?
3    A.  More -- I think more of the issue was the
4    coloring technique of the zirconia.  I don't think the
5    material was changing so much as what we were doing to
6    the outside of it to make it look like a tooth.
7    Zirconia has a tendency to look very white,
8    like this piece of paper, and even if the beginning when
9    we would color it, before it got more translucent, it
10   had a real tendency to reflect light, you know, when you
11   would take a picture of it.  So we would have to try to
12   color and stain the outside of it to try to tone that
13   down a little bit and make it look more like a tooth.
14   So that's what the majority of what we did in
15   the operatory was about those first two years was trying
16   to get something that we thought a patient would be okay
17   with.
18   Q.  How is that coloring accomplished?
19   A.  With the soaking of the zirconia crowns in
20   different coloring solutions where it infiltrates the
21   zirconia material.
22   Q.  So it's immersed in a liquid?

Page 61

Pages 58 to 61

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-56-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1     A.  Yes.
2     Q.  This is something that would be done by the
3   dental laboratory?
4     A.  Yes.
5     Q.  When did Glidewell start going from the R&D
6   phase to actually promoting its product commercially?
7     A.  It was 2009, maybe April.  I don't remember the
8   exact launch date, but it was sometime in 2009.
9     Q.  And I imagine there was a big marketing effort
10   associated with the release of that product; is that
11   true?
12     A.  I don't recall how big it was.  At the time we
13   had kind of low expectations about this material.  It
14   still was -- it was acceptable in an esthetic sense, but
15   it still snapped your head back a little bit when you
16   saw it because it didn't really look like a human tooth.
17   Initially, we just thought it was going to be a very
18   niche product for use on molars for the most part in the
19   very back of the mouth, where the patient who didn't
20   want to have gold showing, could say, "Well, here's
21   this whitish one that we could put in there."
22     And that was my experience was many patients,

Page 62

1   product.
2     Q.  And did you start doing public videos like we
3   talked about before where you were filming -- you know,
4   being filmed putting the BruxZir crown inside a patient,
5   for example?
6     A.  I don't recall when the first one of those was,
7   but it probably would have been within the first couple
8   months of when it was launched.  Yeah, I don't remember
9   exactly when it was.  I doubt it would have been before
10   the product was launched, so it probably would have been
11   a couple months afterwards, but I don't remember the
12   exact date.  But that would be a typical scenario for us
13   would be to do something like that.
14     Q.  Probably in the calendar year 2009?
15     A.  I would assume so, yeah.  If it was released in
16   April, it doesn't take that long to turn a video around.
17   We can have it done in two months.
18     Q.  And you have videos that you make that are
19   available on Glidewell's website; correct?
20     A.  Correct.
21     Q.  And that kind of serves the same purpose;
22   right?

Page 64

1     when you showed them the gold one, they said no, and you
2   showed them this ugly one, but it was still a shade of
3   white, would say, "I want that one."
4     And you'd say, "But it doesn't really look like
5   a tooth," and they'd go, "Well, you think that gold one
6   looks like a tooth?  That looks nothing like a tooth.
7   That looks like a brass fixture."
8     So it seemed like it was just going to be a
9   niche product, and -- so I don't recall being a ton of
10   fanfare, although we -- when we advertise almost
11   anything, there's a fair amount of effort between it.
12   Whether it's a new snoring appliance or whatever, we
13   don't do it quietly.  There's going to be ads in dental
14   journals and things like that.
15     Q.  What was your role in that marketing effort?
16     A.  Mainly being asked, "Why would a dentist want
17   this?" or "What would make a dentist want to purchase
18   this?"  So it was trying to -- as the only -- well, I
19   used to be the only dentist over there.  Now there's
20   another couple.  But they would always want me to think
21   for every dentist in America and say what -- you know,
22   what would appeal to me if I was considering this

Page 63

1     It's just you talking to dentists about the
2   products and services that Glidewell offers; is that
3   fair?
4     A.  It's the products and services that -- yes,
5   that we offer as a laboratory, but it's also trying to
6   get them to do things a little bit better:  To prep the
7   teeth a little better, take a little better impression,
8   take a little better shade or give us a little better
9   description of what it looks like.  Hopefully, they're
10   learning something as well.
11     After being in private practice for 13 years
12   and then coming into this setting, I realized when I
13   slowed down and paid attention to what I was doing, that
14   I learned some things that would make it easier for me
15   to accomplish dentistry.  And when you're running around
16   in a busy private practice from room to room to room,
17   you never have time to stop and think.  So I try pass
18   those things on too.
19     If it was simply about, yeah, products and
20   services, I'm not sure that we would qualify to be able
21   to give continuing education credits through the Academy
22   of General Dentistry like we do.  So there's got to be

Page 65

Pages 62 to 65

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2012      202-232-0646

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-57-

1  some clinical stuff in there as well and not just a
2  promo piece for the product.
3      Q.  Sure.
4          And some of the videos that were on the
5  website, I assume, were devoted to the BruxZir crown
6  product; is that fair?
7      A.  Correct.
8      Q.  And would that have started appearing as well,
9  you think, calendar year 2009?
10     A.  I do think so, but I don't remember exact dates
11 for that.
12     Q.  And you mentioned -- you characterized it that
13 you were thinking that this product would be a niche
14 product; correct?
15     A.  Correct.
16     Q.  I mean, one niche is for people who grind their
17 teeth; is that accurate?
18     A.  Yeah, for people who grind their teeth, they're
19 the ones who traditionally we had to gently force
20 cast gold onto and deliver the bad news that the only
21 thing that can probably stand up to what you do with
22 your teeth in this area is with the cast gold.

Page 66

1      So, yeah, we saw this as an opportunity to
2  maybe be able to give those patients something besides
3  that shiny gold thing in the back of their mouth as a
4  replacement for the gold crown.
5      Q.  Because some of these patients would have been
6  people who had previous, say, PFMs that had failed
7  because they were grinding their teeth so hard; is that
8  fair?
9      A.  That is fair, and that is something that you
10 see.  Certainly when we talk about the PFM failures,
11 sometimes -- it could be on a front tooth, but certainly
12 sometimes it's on a back tooth as well.  And you'll see
13 a fracture on that crown and think, "I need to go with
14 something stronger next time if I want it to survive."
15     Q.  And then having the monolithic zirconia is a
16 nice solution for those patients because it is much
17 stronger than the PFM; right?
18     A.  Correct.  And maybe even the monolithic e.max
19 as well.  You know, both those monolithic products have
20 really changed the way dentists are doing dentistry
21 these days.  The porcelain-fused-to-metal crown, which
22 in 2007 made up 65 percent of our business is now down

Page 67

1  to under 20 percent.  So...
2      Q.  So for a patient who grinds their teeth, what
3  is it that dentists should be looking at to decide
4  whether the IPS e.max or a monolithic zirconia crown
5  might be better for that patient?
6      A.  That's just personal judgment and comfort level
7  on the part of the average dentist.  It's really
8  difficult to know for sure what's going to work or
9  what's not going to work in somebody's mouth, and you'll
10 find dentists who put e.max everywhere, including on
11 lower first and second molars, and then you'll find ones
12 who only place it in the front of the mouth and probably
13 everything in between.  That's a judgment call.  That's
14 the art part of dentistry.
15     Q.  What do you see as the advantages of monolithic
16 zirconia crown compared to the IPS e.max crown?
17     A.  Higher flexural strength, and it can be milled
18 at a thinner dimension.  So in a sense it's a more
19 conservative crown; you have to grind less tooth away on
20 the patient.
21     Q.  And what are the disadvantages of the
22 monolithic zirconia crown compared to the IPS e.max

Page 68

1  crown?
2      A.  Esthetics.  It doesn't look as good.  And when
3  the full-contour zirconia crown is tried in the mouth,
4  it gets contaminated by saliva, which is the first time
5  we've ever had that happen in dentistry before.  You
6  know, in dentistry for decades we'd try a crown in the
7  mouth, we'd take it out, we'd just rinse it out with
8  water, you know, clean it out, and cement it into place,
9  and that doesn't work with zirconia-based crowns.
10     The only thing that bonds to zirconia are
11 phosphate groups, and you find a lot of them in saliva,
12 in the phospholipids in saliva.  So these full-contour
13 zirconia crowns are the first one that when you try it
14 in the mouth -- and there's saliva everywhere in the
15 mouth, and typically on the tooth -- you've now
16 contaminated that surface.  But dentists didn't realize
17 it for a long time, and we didn't realize it until the
18 research came out.
19     And so it's -- you have to go through some
20 steps to decontaminate it before you put it back in the
21 mouth.  So it's got a more -- a slightly more difficult
22 cementation or bonding procedure than the e.max crown

Page 69

Pages 66 to 69

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

---

1  has too.  So that would be another, I would say,
2  disadvantage.
3      Q.  So do you have videos available on the
4  Glidewell website showing how to do the steps for a
5  monolithic zirconia crown that dentists would have to
6  perform, including the steps you're talking about here?
7      A.  Yes.
8      Q.  How about -- do you make videos as well as for
9  how to use the IPS e.max crown?
10      A.  Yes.
11      Q.  How about PFM crowns?
12      A.  Yes.  Although we haven't made one of those for
13  about 10 years.  Not a lot of interest out there right
14  now, and there's no new story to tell, really.
15          So, yeah, we did most of our e.max videos
16  probably 2007/2008, and then probably switched to
17  BruxZir for a 2009/2010 kind of thing.
18          MR. JANKOWSKI:  Okay.  This is probably a good
19  time for a breaking point.
20          THE WITNESS:  Sure.
21          MR. TACHNER:  Sounds good.
22          THE VIDEOGRAPHER:  Off the record at 10:51 a.m.

Page 70

---

1          (Recess taken.)
2          THE VIDEOGRAPHER:  Back on the record at
3  11:08 a.m.
4  BY MR. JANKOWSKI:
5      Q.  Now, Dr. DiTolla, you understand you're still
6  under oath?
7      A.  Yes.
8      Q.  I'd like to change gears a little bit and let's
9  talk now about the brand name that Glidewell has in its
10  monolithic zirconia crown product, BruxZir, by which I
11  mean B-r-u-x-Z-i-r.
12      A.  Okay.
13      Q.  What was your role or participation in the
14  development of the brand name BruxZir?
15      A.  It was laughing at and mocking most of the
16  suggestions that were coming in.  They for some reason
17  opened it up to everybody in the company, or at least
18  the R&D department and some other people, to come up
19  with some titles, and they were pretty bad, and I wasn't
20  sure why we were doing that.
21          And we were just kind of talking back and
22  forth, and I was out at a lecture, giving a lecture to

Page 71

---

1  some dentists on e.max, another monolithic, and I got a
2  message from Jim Shuck saying, "What do you think about
3  the name BruxZir?" as you spelled it.
4          I wrote back at the break, and I said, "I
5  love it," and I told him how -- I got the message at the
6  first break, and then I actually ran this name by this
7  group of 75 or 80 dentists who were sitting there and
8  asked if that would be a name that would be memorable to
9  them, and a bunch of hands went up.  And I said, "Well,
10  I just did my focus group of 75, and they like it, and I
11  like it," and I wrote him an e-mail about why I thought
12  it was such a good name.
13          So I had nothing to do with coming up with it,
14  but I gave it an unconditional endorsement when I heard
15  it, and it sure sounded to me like -- I think my e-mail
16  to him said it was clever, catchy and memorable.
17      Q.  Okay.  So you were saying it was clever, catchy
18  and memorable.  What about it do you think is clever?
19      A.  Finding a way to get part of the name of the
20  material into it.  Dentists have a bad habit -- like if
21  we called 100 dentists right now and said, "Have you
22  heard of e.max?" 97 would say yes.  If we said, "What

Page 72

---

1  is it made of?" 3 would see lithium disilicate.  There's
2  probably more attorneys than dentists in Orange County
3  who know that, which is sad.
4          But you don't have to be smart to be a dentist.
5   You just have to be good with your hands.  It's
6  helpful, though, if you know what the material is,
7  because then you can kind of compare apples and owners
8  and not just brand names.  So I liked it, thought it was
9  clever because of the "Zir" for "zirconia"; that the
10  dentist was going to know what was in there.
11          Kind of like your question about why was it
12  called e.max.  I don't know.  I don't think it's a
13  great name.  I mean, it's got "max" in it.  I guess
14  that's okay and somewhat memorable, but I liked that
15  this gave an indication as to what it was made of in the
16  name.
17      Q.  And, in fact, zirconia could be a good thing to
18  have in there because it's associated with a strong
19  material; is that accurate?
20      A.  Well, keep in mind that before the release of
21  this, the three zirconia-based restorative systems that
22  I mentioned, the Cercon, the Procera Zirconia and the

Page 73

---

Pages 70 to 73

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-59-

| | |
|---|---|
| 1    Lava, were all known for chipping, and a lot of people<br>2    who were talking about zirconia were trying to talk<br>3    about strength by talking about how it had been used in<br>4    hip replacements, you know, in ball-and-joint sockets<br>5    and things like that.<br>6          So I had seen a lot of the same chipping on my<br>7    Lava restorations.  Now, I understood it was the<br>8    porcelain chipping from the outside and not the zirconia<br>9    chipping, but I think most dentists did not necessarily<br>10   think of zirconia being all that strong, even though in<br>11   reality it was the veneering ceramic that was breaking<br>12   off of there.<br>13         So since there were no full-contour zirconia<br>14   materials before this, I don't know if dentists -- if<br>15   there was a perception that dentists thought would be<br>16   strong.  I know we did from the testing we did on the<br>17   Instron machine, but I don't know that at that point<br>18   there was a general feeling in dentistry that zirconia<br>19   was strong.<br>20        Q.  It certainly has become a marketing point to<br>21   make though; correct?<br>22        In other words, Glidewell absolutely wants<br>                                        Page 74 | 1         A.  I don't recall contributing any, but I do<br>2    remember having something to do with its initial motto?<br>3         Q.  What do you mean by "its initial motto"?<br>4         A.  Well, at the top of the advertisements it said<br>5    "More Brawn than Beauty."<br>6         Q.  Yes, I've noticed that.  So that came from you?<br>7         A.  In spirit.  Jim Shuck is really good with<br>8    words, and he probably -- I remember standing together<br>9    at a computer in the marketing department playing with<br>10   it, but it was probably more him than me.<br>11        I just knew that, for once, I didn't want to do<br>12   what most companies do, and that is, try to convince<br>13   dentists that this was the most beautiful crown in the<br>14   world, because it wasn't.  It was -- it was far from it<br>15   at the time, and I thought being honest about that would<br>16   be refreshing in the advertising world, or at least the<br>17   dental advertising world.<br>18        Q.  And as you said earlier, also, it certainly was<br>19   a niche product as well; correct?<br>20        A.  That was our -- certainly our expectation for<br>21   it --<br>22        Q.  So, in other words --<br>                                        Page 76 |
| 1    people to know zirconia is strong; correct?<br>2         A.  Correct.<br>3         Q.  And the fact that you now have this monolithic<br>4    crown all made of zirconia is a good strong crown, and<br>5    that's a selling point; right?<br>6         A.  Correct.<br>7         Q.  So you say you received the name in an e-mail<br>8    from Jim Shuck.  Do you know who came up with the name?<br>9         A.  Yeah, I'm reasonably sure it was him.<br>10        Q.  Oh, so you think it was Jim Shuck himself?<br>11        A.  Oh, yeah.  Yeah, I definitely think so.<br>12        Q.  And why do you think that?<br>13        A.  Because he's better at that than anybody in our<br>14   company, and the e-mail came from him, and I seem to<br>15   recall -- yeah, I don't know who else would have been<br>16   involved.<br>17        It may have even been a Saturday lecture.  The<br>18   e-mail may have even been from his house.  I don't<br>19   recall, but it was clear that it came from him.  I had<br>20   seen the list of the other names that were floating<br>21   around prior to that.<br>22        Q.  Did you contribute any names to the list?<br>                                        Page 75 | 1         A.  -- as --<br>2         Q.  I'm sorry.  Go ahead.<br>3         A.  Well, it was just that, "Hey, we got this<br>4    little strong, ugly crown here."  In fact, when we first<br>5    got ready to launch it, we sent it out for free to<br>6    dentists who had asked for a cast gold crown.  We'd say,<br>7    "Do us a favor.  Just try them both in, and see what you<br>8    and the patient think.  We don't care which one you put<br>9    in.  Your call.  Just let us know which one you put in."<br>10        Without exception, the patients preferred the<br>11   look of the ugly BruxZir crown to a chunk of shiny gold,<br>12   but about half the dentists said, "Let's still go with<br>13   the gold.  It's been around for 50 years.  We know it<br>14   works."  But initially that's the niche that we thought.<br>15        Or there's another time where a dentist asks<br>16   for a porcelain-fused-to-metal crown, and if they don't<br>17   reduce enough, that full 2 millimeters as we talked<br>18   about -- if they only reduce a millimeter, you can still<br>19   make a porcelain-fused-to-metal crown, but now the top<br>20   chewing surface has to be metal, because the porcelain<br>21   would be too thin.  It would crack when you chewed on<br>22   it.<br>                                        Page 77 |

Pages 74 to 77

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-60-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1      So now it's metal on the top and it's porcelain
2  on the outside, so if you pull your cheek back, it still
3  looks somewhat like a tooth.  And in those cases
4  patients will get upset too where you tell them you're
5  going to do a porcelain crown, which is really a PFM,
6  and then they get it back and the whole top of it's
7  silver.
8      Those were really what we thought would be the
9  two initial indications:  for PFM crowns where you had
10  to do a metal occlusal due to lack of reduction and for
11  cast gold when the patient said no.  And the early
12  marketing reflects that, that that's what we thought it
13  was going to be.  There's a picture of it, and it shows
14  the BruxZir crown, a PFM with a metal occlusal, and a
15  cast gold crown.
16      Q.  Do you recall any of the other names on the
17  list that was floating around, the candidates that
18  didn't make it?
19      A.  I remember Atlas and -- all I remember was when
20  I got back from that lecture trip, that one further
21  e-mail had gone out, and somebody had just taken the
22  name BruxZir and turned it backwards to make Rizxurb.

Page 78

1  And I'm not even sure what that -- he no longer works
2  with us.  That's not why, but that one for some reason
3  stuck in my mind because it was so out there.
4      Q.  How was that spelled, I can't picture it.
5      A.  It was BruxZir backwards, so it was
6  R-i-z-x-r-u-b.  It appears to be a Czechoslovakian
7  surname.  But there were lots of other ones that weren't
8  very memorable.
9      Q.  How about Zirbrux, Z-i-r-b-r-u-x?
10      A.  I don't recall that one.  That one seems
11  like -- like I said, I kind of had a lot of disdain for
12  most of the ones I heard except for that one.  I don't
13  recall hearing that one.
14      Q.  Who ultimately made the decision to use
15  "BruxZir" the way its currently spelled?
16      A.  I believe Jim Shuck did.  He sits in a room
17  with Jim Glidewell, but I don't think he needs to run
18  to Jim Glidewell and ask, "Is it okay if we do this?"
19      Q.  So you said that you thought the name was
20  clever because of the "Zir."  How about the "Brux" part?
21      A.  That would probably be more of the memorable
22  part, I think.

Page 79

1      Q.  And why do you say having "Brux" makes it
2  memorable?
3      A.  It's the sound of those two together.  The
4  BruxZir, it's just -- it's memorable.  I don't know.
5  It's just something that, especially when you see it in
6  print and you see the Z-i-r, I just think it leaves an
7  imprint.  I think it's easier to remember than e.max
8  or Empress, for example, which just are kind of words
9  that seem randomly chosen almost.
10      Q.  And by contrast, "Brux" is not randomly chosen.
11      A.  No, "Brux" and "Zir" were not randomly chosen.
12      Q.  So what's your understanding for why "Brux" is
13  not randomly chosen in this name?
14      A.  Well, because one of the possible -- for a long
15  time, as I said before, when you had somebody who showed
16  signs of wear or, like you even said, when they break
17  off a PFM crown before, those were the times where we
18  really had to give the patient the bad news that, "This
19  is going to be a gold crown.  That's really all we can
20  do here.  You're going to break anything else that we
21  put in here.  You already broke that one in front of it
22  in that one particular case."

Page 80

1      So one of the possible indications for it was
2  in somebody who had broken other restorations before.
3  This would be a tooth-colored restoration that you could
4  use in there instead of the gold restoration that you
5  really wanted to do.
6      Q.  And bruxer is a name dentists us for patients
7  who grind their teeth; correct?
8      A.  Spell it.
9      Q.  B-r-u-x-e-r?
10      A.  Yes.
11      Q.  And that when you see the "Brux," B-r-u-x, in
12  the brand name B-r-u-x-Z-i-r as a dentist, it's going to
13  make you think of somebody who grinds their teeth; is
14  that fair?
15      A.  I don't know.  I don't know if that's what it's
16  evocative of to me.  Bruxism is a destructive process
17  where there's a loss of tooth as someone's bruxing.  It
18  doesn't necessarily say strength to me.  It has more
19  destructive connotations to me.
20      Q.  But isn't the connotation as a reference to an
21  application of the crown; in other words, here's a crown
22  to consider when somebody has bruxism, somebody is a

Page 81

Pages 78 to 81

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-61-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1  bruxer, b-r-u-x-e-r?
2      A.  Yeah, it is a crown to consider if somebody
3  shows seen of bruxism.
4      Q.  And when you saw Jim Shuck's e-mail and you saw
5  BruxZir with the B-r-u-x at the beginning, in your mind
6  it made you think of bruxism or bruxers, meaning people
7  who suffer from bruxism; correct?
8      A.  That's hard to say, because I had two years of
9  experience with the product at that point, and we were
10 not using it strictly in patients who were bruxers.  It
11 was becoming, for me, my default crown in the posterior
12 just because of how strong I knew it was, and as it
13 turns out, that's what happened with the average dentist
14 as well.  We underestimated how important strength was
15 to them.
16     Q.  But I guess my question is, when you see "Brux"
17 there, you don't see it as just, you know, a fanciful or
18 made-up word.  "Brux" is a dental term of art; correct?
19     A.  Yes.
20     Q.  And when you saw Jim Shuck's e-mail, you would
21 have recognized it as a dental term of art, and that was
22 part of it being clever as well, don't you think?

                                        Page 82

1      A.  I think the clever part was the Z-i-r.  If he
2  would have sent me B-r-u-x-x-e-r, for example, that
3  doesn't strike me as clever necessarily.
4          Maybe it's because I'm an educator, but I
5  appreciated the fact that the name let the dentist know
6  what the material was made of almost more than anything
7  else.  Because we've moved far beyond --
8          THE WITNESS:  We're allowed to talk numbers;
9  right?  Everybody knows the numbers of how many crowns
10 we're doing?
11         MR. TACHNER:  Yes.
12         THE WITNESS:  I mean, 60,000 BruxZir crowns a
13 month.  We've moved way beyond using it for bruxers, you
14 know, for people who brux.  There's -- it makes up
15 15 percent of the crowns we do in the front now, which
16 is crazy, and I'm not even sure well advised on the part
17 of the dentists actually.
18         But I -- the thing to me that I really liked
19 was that dentists were going to know what was in this
20 product and be able to compare it to the other
21 generations of crowns like it that would come and be
22 able to tell the difference BruxZir with zirconia and

                                        Page 83

1  e.max or e.lith if they would have done something to
2  teach them that it was lithium disilicate inside of
3  there.
4  BY MR. JANKOWSKI:
5      Q.  But going again back in time to -- first of
6  all, when would this e-mail have been sent by Jim Shuck?
7  That would have been in 2009 calendar year?
8          THE WITNESS:  Do you have it, Leonard, or is it
9  not --
10         MR. TACHNER:  I don't have it with me.  I think
11 it's been served.
12         MR. JANKOWSKI:  I haven't seen it.
13         MR. MANGUM:  I haven't seen it.
14         THE WITNESS:  I thought it was.  Should I look
15 at the date?  I think it's on my phone.  Or...
16         MR. TACHNER:  If you want, sure.
17         THE WITNESS:  June 6, 2009 -- June 5, 2009.
18 BY MR. JANKOWSKI:
19     Q.  June 5, 2009?
20         And that was an e-mail from Jim Shuck to you;
21 correct?
22     A.  Actually, what I have is the one from me back

                                        Page 84

1  to him on June 5?
2      Q.  You don't have the e-mail from him to you?
3          Does it show it below your e-mail?
4      A.  No, it doesn't.  And maybe -- you know,
5  honestly, maybe he texted me and then I e-mailed back.
6  I don't recall exactly how it happened.  But I'm
7  commenting back to him on June 5, 2009, about the name,
8  but the e-mail below it is an unrelated thing from him
9  about -- that doesn't mention the name.
10     Q.  And what was your message?
11     A.  Read the e-mail?
12     Q.  Sure.
13     A.  Is that what you're asking?
14     Q.  Sure, please.  Thank you.
15     A.  "I like BruxZir for a couple of reasons.  It's
16 catchy, clever and memorable.  It won't make or break
17 the product by any stretch, but it makes it easier for
18 dentists to ask their friends if they have heard of it.
19         "It also describes an indication as we see it
20 today:  an unbreakable crown for patients who have
21 broken or might break other restorations.  When you want
22 gold and the patient wants white, BruxZir will make both

                                        Page 85

                                Pages 82 to 85

be61b411-147b-43b5-a766-086b5efed110
EXHIBIT 4
-62-

1  of you happy.  No other crown has ever been marketed as
2  a crown for bruxers; in fact, most other crowns have run
3  from this indication.  Even cast gold, which does very
4  well in bruxers, has never been marketed, per se.
5      "The name keeps us from overpromising and
6  underdelivering.  The name BruxZir talks about the
7  function of the crown and not the esthetics.  It doesn't
8  try to be something that's it's not.  As the esthetics
9  improve, dentists might even be surprised by how good it
10 looks, but perhaps it should still be sold on toughness
11 then.  We have sold so many esthetic restorations over
12 the years, I'd prefer to emphasize its physical
13 advantages.
14     "I like some of the other names too, but if we
15 want to launch this cautiously without dentists
16 expecting too much, BruxZir seems like a great name to
17 do it with.  It allows us to tell a story about the
18 material, and it's a name dentists won't forget.  I've
19 always liked our product name Clinical Zirconia" --
20 which is a different product that we have; it's a
21 layered crown -- "which is a great name if dentists are
22 familiar with the properties and benefits of zirconia.

Page 86

1      "I field a lot of questions from dentists who
2  don't know much about zirconia or e.max.  Their
3  questions tend to be indication-specific, 'What about on
4  an endodontically treated incisor?' and yes, 'What
5  should I use on a grinder?' BruxZir is a great answer."
6      Q.  Okay.  Thank you for that.
7          So even looking at your e-mail, you were at
8  that time thinking about the indication of the product
9  being used with bruxer patients; correct?
10     A.  Yes.
11     Q.  Now, that's kind of what I was getting at
12 earlier was at that time in 2009 the fact that the crown
13 would have a good application for people that grind
14 their teeth was certainly in the minds of Glidewell;
15 correct?
16     A.  Right, yeah, and that it was a replacement for
17 the cast gold and the PFMs with the metal occlusals.
18     Q.  So having B-r-u-x at the beginning is a way of
19 connoting this application of the product with somebody
20 suffering from bruxism; correct?
21     A.  Yes, that's fair.
22     Q.  How long after this exchange do you recall

Page 87

1  before Glidewell decided to go forward with this name?
2      A.  I think it was probably decided then.
3          You mean when did the first ad run?
4      Q.  Sure, when they --
5      A.  The first time it was seen in public?
6      Q.  When they started marketing it, putting the
7  name on things.
8      A.  Do not know that date.  Would guess a month, if
9  I had to guess.
10     Q.  But not long after that exchange?
11     A.  Yeah, not long after that exchange I would
12 think that it would all begin.  Maybe two or three
13 months just because of the lag rate for some of the
14 dental journals, by the deadlines where you have to get
15 your ads in.
16     Q.  Were you involved in the decision for how the
17 name would be used, where it would be placed on
18 products, what marketing channels would be used, things
19 like that?
20     A.  No, not -- not a big part of that.  Maybe a
21 question thrown at me at lunch or something like that,
22 but no, I'm primarily responsible for testing it and

Page 88

1  then the educational portion with the magazine and the
2  videos and stuff like that.
3      Q.  And the decision of which marketing channels
4  and labeling, things like that, that's under the purview
5  of Jim Shuck; correct?
6      A.  What do you mean by "marketing channels"?
7      Q.  Advertising in magazines --
8      A.  Oh, okay.  Yes, yes.
9      Q.  In fact, he heads the marketing department at
10 Glidewell?
11     A.  That's correct, yes.
12     Q.  And what is your recollection of the reaction
13 of the industry when the name was first being used?  Do
14 you have a recollection?
15         Did people like the name?
16     A.  Well, the dentists did in that one room, you
17 know, where I asked them about that, and that's really
18 all who -- I really can't speak for the industry.  Most
19 of the people who I deal with are clients who are
20 dentists at Glidewell.
21         I seem to recall people -- yeah, dentists
22 commenting on it favorably, but I think more important

Page 89

Pages 86 to 89

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-63-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

| | |
|---|---|
| 1   to them was the material itself.  I think we got a lot | 1   A.  Than a zirconia hockey puck. |
| 2   more comments -- in fact, looking for that e-mail, I | 2   Q.  Correct. |
| 3   just noticed comments from a dentist that he sent in | 3   A.  Okay.  Yes. |
| 4   today about those crowns. | 4   Q.  And I believe the BruxZir, B-r-u-x-Z-i-r, name |
| 5       So I don't think dentists concern themselves | 5   is also being used on milling machines provided by |
| 6   a lot with the marketing, per se.  They're more | 6   Glidewell; is that correct? |
| 7   concerned how the material's going to perform in the | 7   A.  Correct. |
| 8   mouth, and there's certainly been a lot of positive | 8   Q.  I believe the BruxZir name, B-r-u-x-Z-i-r, is |
| 9   comments about them. | 9   also being used by Glidewell on products associated with |
| 10   Q.  So let's move forward now to the point where | 10   coloring of crowns; is that correct? |
| 11   now a product is being sold under the name BruxZir, | 11   A.  That's correct. |
| 12   B-r-u-x-Z-i-r.  Okay? | 12   Q.  Are there any other products you can think of |
| 13   A.  Uh-huh. | 13   that Glidewell puts the B-r-u-x-Z-i-r name on? |
| 14   Q.  At the beginning -- so we're in mid calendar | 14   A.  I don't know if they put it on the ovens or |
| 15   year 2009 -- that name would have been associated with a | 15   not, but there is a centering oven that the authorized |
| 16   monolithic zirconia crown; correct? | 16   laboratories use once it's been milled.  That's outside |
| 17   A.  Correct. | 17   my area of interest, so I don't know if the oven says |
| 18   Q.  Was that the only product at the beginning at | 18   "BruxZir" on it or not.  I wouldn't be surprised if it |
| 19   that time? | 19   did. |
| 20   A.  Yes. | 20   Q.  Okay. |
| 21   Q.  And today I believe the name is associated with | 21   A.  It's kind of part of the system most of the |
| 22   a suite of products; is that fair? | 22   time, but maybe most of the authorized labs already have |
| Page 90 | Page 92 |

| | |
|---|---|
| 1   A.  How many is a suite? | 1   their own ovens.  So I'm not sure about that.  Robin |
| 2   Q.  More than just the crown. | 2   would probably know that. |
| 3   A.  I suppose.  I tend not to think of it that way | 3   Q.  Let me just hand you something that I saw for |
| 4   necessarily, but -- because -- well, I'm not sure what | 4   the first time this morning. |
| 5   you're referring to. | 5   A.  Uh-huh. |
| 6   Q.  Okay.  Well, let me ask some more specific | 6   Q.  Do you recognize what that is? |
| 7   questions. | 7   A.  Yes, I do.  It's our version of a bur kit that |
| 8       Does Glidewell today market its unfinished | 8   Axis Dental was making for the last few years that had |
| 9   zirconia blocks under the name "BruxZir," B-r-u-x-Z-i-r? | 9   our name on it, but it was built by Axis and sold by |
| 10   A.  Oh, yes.  To outside laboratories?  To | 10   Axis Dental products. |
| 11   authorized laboratories? | 11   Q.  And it was -- |
| 12   Q.  Correct. | 12   A.  Because these zirconia materials require a |
| 13   A.  Yes. | 13   different grit of bur -- of diamond on the bur than |
| 14   Q.  So that's another use of the name which is | 14   we're used to using for other ceramic materials. |
| 15   separate from the use on, you know, the dental | 15   Q.  That was my next question:  What is a bur? |
| 16   replacement products; correct? | 16   What does that mean? |
| 17   A.  I'm not sure I get the distinction. | 17   A.  A bur is the thing that -- that whiney sound |
| 18   Q.  Well, it's a different product.  I mean, you | 18   from a handpiece that everybody hates from a dentist. |
| 19   know, a crown -- | 19   So this is -- a bur is, I guess, for lack of a better |
| 20   A.  Right. | 20   term, a drill bit that gets put into the handpiece and |
| 21   Q.  -- that the laboratory is providing for a | 21   is used to shape the tooth or to shape the porcelain on |
| 22   particular patient is a different product than just -- | 22   a crown.  And the porcelain burs that we use |
| Page 91 | Page 93 |

Pages 90 to 93

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-64-

1 traditionally don't work very well on zirconia, or e.max
2 for that matter, and so there was a new grit that had to
3 be used -- a new size of grit to be able to adjust these
4 full-contour zirconia crowns.
5      And so Axis Dental, who's a bur company, was
6 sending over samples in the beginning because we knew we
7 were going to have an issue when you put a BruxZir crown
8 off and you have -- and then you have to -- you put it
9 on the patient's tooth, and then three years later they
10 get decay around it and it has to be cut off.  So I
11 wanted to make a video showing me cutting one off to
12 show dentists how to do it, and it took a lot of
13 experimentation with different grits of burs to find one
14 that would work reasonably well with zirconia.
15      So once they did that, they got our permission
16 to use the BruxZir name on the kit, and they've sold it
17 without any help from us, and we did not resell it.
18 Recently, because they felt that kit was too expensive,
19 there has been an effort to make one ourselves, but it
20 hasn't been sold yet to anybody.  It's not actually
21 commercially available at this point.
22      Q.  So what you were looking at right there was

Page 94

1 made by Axis Dental products?
2      A.  No, that was not -- that's not the Axis one
3 that available for sale.
4      Q.  Oh, this is not the Axis?
5      A.  No.  This is the one that Glidewell is having
6 made somewhere else as a cheaper alternative to the one
7 that Axis sells.
8      Q.  Okay.  So this is being made on behalf of
9 Glidewell?
10      A.  On behalf of Glidewell, but it hasn't been
11 released yet.
12      Q.  And I see this one does have the BruxZir,
13 B-r-u-x-Z-i-r, name on it; correct?
14      A.  Yes.
15      Q.  And so Glidewell's intention, I guess, when
16 it's ready, is to offer this adjustment/polishing kit
17 under the BruxZir name; correct?
18      A.  That's correct.
19      Q.  Okay.  So today you can actually get a kit like
20 this under the BruxZir name provided by Axis Dental
21 products?
22      A.  Correct.

Page 95

1      Q.  So this is another type of product that does
2 have the name BruxZir, B-r-u-x-Z-i-r, associated with
3 it?
4      A.  Correct.  I didn't include that initially
5 because I thought the question was provided by
6 Glidewell, and the bur kit was provided by Axis.
7      Q.  Understood, sure.
8      Are there any other products provided by
9 Glidewell or other parties that use the BruxZir name
10 other than the ones we've been discussing so far?
11      A.  There are some other companies who have used
12 the name in their advertisement, that their product is
13 compatible with BruxZir, for example.  I mean, there's
14 only one I can think of, a cement company, Ceramir,
15 C-e-r-a-m-i-r, whose cement contains those phosphates
16 that I mentioned before, the only thing that bonds to
17 zirconia.  And so their cement actually bonds to it.
18      And I think -- I'm not 100 percent sure, but I
19 think they've used the BruxZir trade name in an
20 advertisement.
21      Q.  Because they're saying, "Our cements can be
22 used with" --

Page 96

1      A.  Works with.
2      Q.  -- BruxZir --
3      A.  Yeah.
4      Q.  Okay.
5      A.  But that's not on a product, per se.  That's
6 just in an advertisement.  So I don't know if that's...
7      Q.  Okay.
8      A.  Then I guess that opens it up to the
9 185 authorized labs that are using BruxZir in their
10 advertisements as well.  But...
11      Q.  Right.  So let's talk a little bit about that.
12      The 180 authorized labs are labs that have a
13 relationship with Glidewell under which they can use the
14 BruxZir name; correct?
15      A.  Correct.
16      Q.  And what's your understanding of what these
17 authorized labs are authorized to do?
18      A.  Again, that's not really my area of expertise,
19 but I would say that they're authorized to fabricate,
20 sell and advertise BruxZir crowns and bridges to their
21 dentists.
22      And these 180 authorized labs, they purchase

Page 97

Pages 94 to 97

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-65-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1  the zirconia from Glidewell; is that correct?
2     A.  Correct.
3     Q.  So among other aspects of the relationship,
4  the 180 authorized labs are customers of Glidewell Labs
5  for purposes of getting the unfinished zirconia hockey
6  pucks, as you called them?
7     A.  Correct.
8     Q.  And dentists, then, will fill out prescriptions
9  that can be sent to the authorized labs, who can then
10 create individualized crowns for their patients using
11 the zirconia provided by Glidewell to the authorized
12 labs; correct?
13    A.  Correct.
14    Q.  Do you have an understanding for -- you know,
15 is Glidewell compensated in any way by these labs apart
16 from the fact that they're purchasing the zirconia?
17    A.  No, not to my knowledge.
18    Q.  I mean, obviously Glidewell makes money from
19 selling the zirconia --
20    A.  Right.
21    Q.  -- and your understanding is that's how
22 Glidewell makes money from them?

Page 98

1  deposition of MICHAEL DITOLLA was
2  adjourned for noon recess.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 100

1     A.  Right.
2     Q.  Okay.  And do you have an understanding as to
3  whether, you know, Glidewell monitors what these labs
4  are doing in terms of how they're creating the crowns
5  and other products?
6     A.  I do not know what they do to monitor how those
7  crowns are being made.
8     Q.  Do you know who within Glidewell would know
9  that?
10    A.  I think Robin Carden.
11    Q.  Robin?
12       MR. JANKOWSKI:  We're at a point where the
13 videographer needs to change the tape, and it's also
14 about 10 minutes to noon.  So why don't we just take a
15 lunch break now.
16       MR. TACHNER:  Sure.
17       MR. JANKOWSKI:  So I think an hour would be
18 fine.
19       THE WITNESS:  Okay.
20       MR. TACHNER:  With us, yes.
21       THE VIDEOGRAPHER:  Off the record at 11:47 a.m.
22          (Whereupon, at 11:47 a.m., the

Page 99

1        (At 12:58 p.m., the deposition of
2        MICHAEL DITOLLA was reconvened.)
3        THE VIDEOGRAPHER:  And we are on the record at
4  12:58 p.m.  This is the beginning of Tape 2.
5
6        EXAMINATION (RESUMED)
7  BY MR. JANKOWSKI:
8     Q.  Now, Dr. DiTolla, you understand that you are
9  still under oath; correct?
10    A.  I do.
11    Q.  Okay.  When we broke, we were talking about
12 the 180 authorized labs that Glidewell has and what they
13 do, and we'll talk a little bit more about that.  I
14 think I have some documents that I'll put in front of
15 you --
16    A.  Okay.
17    Q.  -- and we'll talk more about that, but...
18       Do you personally deal with the authorized labs
19 at all?
20    A.  No, I don't.
21    Q.  And, again, I think we established earlier that
22 you tend to be associated with a clinical role for one

Page 101

Pages 98 to 101

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-66-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

| | |
|---|---|
| 1  thing; correct? | 1   Q.  What is Exhibit 44? |
| 2     A.  Yes. | 2   A.  That is my website. |
| 3     Q.  And then from that clinical role, that's used | 3   Q.  When you say "my website," this is not a |
| 4  for educational purposes and also for marketing | 4  Glidewell -- |
| 5  purposes; correct? | 5   A.  No. |
| 6     A.  Correct. | 6   Q.  Okay.  What is your website for? |
| 7     Q.  Are there any other roles you play at | 7   A.  In addition to what I do at Glidewell, I also |
| 8  Glidewell? | 8  give lectures out to the dental community, and so this |
| 9     A.  No, that's about it.  I'm editor of the | 9  is kind of a resource for that. |
| 10  magazine, but that falls under -- we have a magazine we | 10   Q.  Is this also part of the continuing education |
| 11  can send out to dentists.  That falls under the | 11  you talked about earlier, or is this separate from that? |
| 12  marketing and education, both of them.  I publish some | 12   A.  No, this is separate. |
| 13  of the cases that we do.  The ones for whatever reason | 13   Q.  So is this kind of a side business that you do? |
| 14  might not be great on video, we'll put them in the | 14   A.  Yeah, this is something that I was doing before |
| 15  magazine.  But, no, that falls under the same heading | 15  I came to Glidewell and really has nothing to do with |
| 16  with the other stuff. | 16  Glidewell.  They don't pay for it or reimburse me in any |
| 17     Q.  And that magazine is called Chairside; correct? | 17  way.  They get a small benefit probably of having me out |
| 18     A.  That's correct. | 18  in public talking about things and get a little |
| 19     Q.  So you have some say over the content of what's | 19  recognition when I'm out there. |
| 20  in Chairside? | 20   Q.  But it's an indirect benefit because you're not |
| 21     A.  I do. | 21  there as a Glidewell representative? |
| 22     Q.  Do you have a formal title?  Are you the | 22   A.  That's correct. |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  editor? | 1   Q.  And just from looking at the website, it looks |
| 2     A.  I am. | 2  to me like what your website is about is you presenting |
| 3     Q.  And, likewise, there are videos that are | 3  talks on, you know, dental topics; is that fair? |
| 4  available on Glidewell's website; correct? | 4   A.  That's fair. |
| 5     A.  Correct. | 5   Q.  What topics do you tend to talk about in |
| 6     Q.  And are you responsible for the content of the | 6  connection with Distinctive Dental Seminars? |
| 7  videos? | 7   A.  Really, just one lecture this year, kind of an |
| 8     A.  I am, yes. | 8  all-encompassing lecture called "The Modern Restorative |
| 9     Q.  And many, if not all the videos, feature you as | 9  Practice." |
| 10  well; correct? | 10   Q.  So it varies year to year. |
| 11     A.  I believe they all do. | 11   A.  Things change, yeah, as time goes on.  Some |
| 12        MR. JANKOWSKI:  I'm going to have the | 12  things get more popular than other things, and certain |
| 13  court reporter mark as Exhibit 44 a two-page document | 13  things like porcelain veneers, like we talked about |
| 14  that includes printouts from a website associated with | 14  before, have become a subject that the dental societies |
| 15  something called Distinctive Dental Seminars. | 15  don't seem to have a lot of interest in anymore. |
| 16        (Whereupon, Exhibit 44 was marked | 16   Q.  Who's your audience for these presentations? |
| 17        for identification.) | 17   A.  Dentists who are required to have about |
| 18  BY MR. JANKOWSKI: | 18  50 hours of continuing education every two years.  So |
| 19     Q.  Dr. DiTolla, if I could just have you just look | 19  the local dental societies they belong to bring speakers |
| 20  at Exhibit 44 and ask you, do you recognize what's shown | 20  in to come in for six, seven hours a day and provide a |
| 21  in Exhibit 44? | 21  course for them, and then they receive their CE credits |
| 22     A.  I do. | 22  after that. |
| Page 103 | Page 105 |

Pages 102 to 105

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-67-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

| | |
|---|---|
| 1  Q.  So you will be hired by those local dental | 1  it appears that everybody's in the position that they |
| 2  societies to give these talks in connection with a CE | 2  should be. |
| 3  program? | 3  Q.  So Glidewell Laboratories does maintain an |
| 4  A.  Exactly. | 4  org chart like this or with this kind of information in |
| 5  Q.  So you'll give these presentations, I guess, | 5  the ordinary course of business; is that correct? |
| 6  various places around the United States? | 6  A.  Yes, I've seen one before. |
| 7  A.  Correct. | 7  Q.  On this org chart, you're identified near the |
| 8  Q.  How long have you been doing this? | 8  middle of the org chart underneath "James Shuck, |
| 9  A.  First one was in 1995.  So 17 years? | 9  VP Advertising/Marketing." |
| 10  Q.  And you've been doing it every year since? | 10     Do you see that? |
| 11  A.  Yes. | 11  A.  Yes, I do. |
| 12  Q.  Who decides what the subject matter of the talk | 12  Q.  And that's an accurate understanding of the |
| 13  is? | 13  relationship between you and Mr. Shuck. |
| 14  A.  It depends.  It's -- the dental societies may | 14  A.  Yes.  I report to him. |
| 15  request a certain topic, or they may ask, "What's | 15  Q.  Does anybody report to you? |
| 16  your 2013 presentation that you're giving?"  And so it's | 16  A.  Yeah, I've got a couple employees working for |
| 17  typically between me and them deciding together what | 17  me, a hygienist, dental assistant and an associate |
| 18  it's going to be. | 18  dentist. |
| 19  Q.  Do you have a staff associated with this, or do | 19  Q.  So they're associated with the clinical work |
| 20  you just handling it by yourself? | 20  that you do that we were talking about earlier? |
| 21  A.  No, yeah, it's not -- it doesn't require a lot | 21  A.  Yes. |
| 22  of -- very low overhead.  Doesn't require a lot of extra | 22  Q.  How about Michael Cash, who's showed on here as |
| Page 106 | Page 108 |

| | |
|---|---|
| 1  work to do. | 1  also being underneath James Shuck?  Do you work with |
| 2  Q.  I see from the website you were, it looks like, | 2  Mr. Cash at all? |
| 3  awarded something called Dr. Bicuspid in 2011; is that | 3  A.  I do.  He'll ask for stuff from time to time. |
| 4  right? | 4  We sit in the same office, so it's not -- he's just |
| 5  A.  Yes.  That's dentistry's version of the Academy | 5  always -- to turn and ask me a question.  But most of |
| 6  Awards, but not really. | 6  what I do -- as you mentioned, I'm in charge of the |
| 7  Q.  Yeah, and it says "Most Effective Dental | 7  content for the magazine and the DVDs, so I'm doing it |
| 8  Educator."  That's a nice accolade to have. | 8  without a ton of input from Mike Cash or Jim Shuck. |
| 9  A.  It's something. | 9  Q.  What's your understanding of what Mr. Cash's |
| 10  MR. JANKOWSKI:  Dr. DiTolla, I'm putting in | 10  areas of responsibilities are for marketing and |
| 11  front of you a document.  This has already been marked | 11  advertising? |
| 12  at the deposition last week as Exhibit 36, and it's a | 12  A.  He is responsible for planning the advertising |
| 13  two-page document entitled "Glidewell Laboratories," and | 13  schedule in the different dental journals.  He does |
| 14  it seems to have an organizational chart. | 14  the -- a lot of the beginning work putting the |
| 15  (Whereupon, Exhibit 36 was marked | 15  advertisements together, and then it's brought to |
| 16  for identification.) | 16  Jim Shuck to see and approve.  And they'll work on the |
| 17  BY MR. JANKOWSKI: | 17  wording and the headlines and things like that together, |
| 18  Q.  Dr. DiTolla, do you recognize what's been | 18  and they might ask me for clinical images if they need |
| 19  previously marked as Exhibit 36? | 19  some pictures for an advertisement. |
| 20  A.  Yes, I do.  I've never seen it laid out quite | 20  So he does, really, a lot of the organizational |
| 21  this way, so I can't say I recognize this exact layout, | 21  work, deciding what advertisements are going to go where |
| 22  but I've seen an org chart similar to this before, and | 22  and when and what mailings are going to be done and how |
| Page 107 | Page 109 |

Pages 106 to 109

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-68-

| | |
|---|---|
| 1  many are going to be done and what dentists they're<br>2  going to go to.<br>3     Q.  And if he's going to create an advertisement<br>4  that does have a clinical photograph or two in it, he's<br>5  going to come to you to get the photographs?<br>6     A.  Most likely, but there's some well-established<br>7  photographs that we have on our central server.  So if<br>8  he needs pictures of e.max crowns, he knows where to get<br>9  them.  He might turn and say, "Do you have any new<br>10  ones?"<br>11     Q.  Because he's used them before, for example?<br>12     A.  Perhaps, yeah.<br>13     Q.  Do you have an understanding for what are the<br>14  responsibility of Dwight Brown, who's listed here as a<br>15  senior marketing specialist?<br>16     A.  No, I don't, and I'm not even sure what that<br>17  title means, to tell you the truth.  He's probably been<br>18  there -- I don't know -- maybe a year or two now, but I<br>19  do not have many dealings with him.  I see him, I know<br>20  him, but I don't know exactly what --<br>21     Q.  Okay.<br>22     A.  -- he does.<br>                      Page 110 | 1     A.  That's correct.<br>2     Q.  And what's it replaced with?<br>3     A.  "More Brawn and Improving Beauty."<br>4     Q.  Right, right.<br>5      Do you know who came up with that updated<br>6  version of the motto?<br>7     A.  Jim Shuck did.  I remember standing next to him<br>8  as we were trying to figure out what words -- what words<br>9  to use.<br>10     Q.  And, again -- I mean, we've talked about this<br>11  already, but this particular product was really one that<br>12  was designed because of -- or the appeal of it to<br>13  Glidewell was the brawn aspect initially; correct?<br>14     A.  The appeal for me initially -- I've asked the<br>15  R&D department for the last 10 years -- when they come<br>16  to me at the beginning of the year at the planning<br>17  session and say, "What can we do for you this year?"<br>18  I've always asked them for a cast gold material that's<br>19  white like a tooth so patients will accept it.  For me<br>20  it was wanting to be able to have a cast gold<br>21  replacement.<br>22      I guess strength was part of that, but we did<br>                      Page 112 |
| 1     Q.  Does this org chart look complete to you in<br>2  terms of the advertising and marketing people,<br>3  understanding that there's lower-level employees, but<br>4  for the higher-level employees is this the full list of<br>5  people?<br>6     A.  Yes.  I think everybody else would be<br>7  considered on a lower level.  Even those departments<br>8  where there's somebody, you know, who's the manager,<br>9  quote, unquote, of that department, they would not be on<br>10  the org chart, I don't think.<br>11     Q.  And as you said before, I guess, you do have<br>12  some input into the advertising and marketing beyond the<br>13  clinical work you do and the videos and so on in the<br>14  sense that you were asked about the brand name BruxZir;<br>15  correct?<br>16     A.  Yes.<br>17     Q.  And you did contribute to the motto "More" --<br>18  what was the motto again?<br>19     A.  "More Brawn than Beauty."<br>20     Q.  "More Brawn than Beauty," right.<br>21      I think I've seen another motto, an updated<br>22  motto where the "than" is slashed out.<br>                      Page 111 | 1  not set out to find a stronger crown.  You know, we were<br>2  looking for -- we started playing with this material and<br>3  realized it was strong, and for me the key point was<br>4  that I could use it on patients who didn't want gold.<br>5     Q.  Isn't it true, though, that the patients who<br>6  need gold or are indicated for gold are in need of a<br>7  strong crown?<br>8     A.  It depends.  It depends on the clinical<br>9  conditions, whether it's a short clinical crown.  It<br>10  depends if they've had some sort of accident where<br>11  there's just not a lot of tooth to grab onto or the<br>12  tissue's growing around it.  It doesn't necessarily --<br>13  it almost needs to be strong more by virtue of the fact<br>14  that it's in the back of the mouth with those huge<br>15  biting portions.  So by that definition, yes.  If it's<br>16  in the back of the mouth, it's got to be a pretty strong<br>17  crown, or it's going to get killed.<br>18     Q.  And the fact that the PFM solution doesn't work<br>19  as well back there for these patients because of --<br>20  you know, it's a weaker crown when you consider the<br>21  whole thing; correct?<br>22     A.  Because of the glass on the top of it, correct.<br>                      Page 113 |

Pages 110 to 113

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-69-

| | |
|---|---|
| 1   Q.  Right.  So having a monolithic crown of a | 1   Q.  So Mr. Allred was there for part of it? |
| 2  strong material is a big improvement in terms of the | 2   A.  All of it. |
| 3  brawn; correct? | 3   Q.  Oh, he was there for all of it, and Mr. Carden |
| 4   A.  Yes. | 4  was there for part of it? |
| 5   Q.  And that's the origin of the motto "More Brawn | 5   A.  I believe he was there for, yeah, the first |
| 6  than Beauty" for the original product; correct? | 6  half to two thirds of it. |
| 7   A.  Correct. | 7   Q.  And then Mr. Shuck was there for all of it; |
| 8   Q.  And the updated motto is essentially telling | 8  correct? |
| 9  the world, "Hey, we still have the brawn, and we're | 9   A.  Right. |
| 10  improving the beauty"; is that fair? | 10   Q.  And did talking with these individuals, did any |
| 11   A.  Correct. | 11  of the discussion refresh your memory about the facts |
| 12   Q.  I think you may have answered this already, but | 12  that we're talking about today? |
| 13  on the org chart, Exhibit 36, you don't see anything | 13   A.  I don't recall any talking about the facts that |
| 14  that looks incorrect to you in this org chart? | 14  we've discussed so far today.  It was more -- |
| 15   A.  You mean that I'm not a level up higher?  Is | 15      MR. TACHNER:  I caution the witness not to say |
| 16  that what you're... | 16  anything about the content of that discussion since it |
| 17      (Laughter.) | 17  was protected by attorney-client privilege. |
| 18  BY MR. JANKOWSKI: | 18      THE WITNESS:  Well, yeah, I was going to say I |
| 19   Q.  Well, not where you should be -- | 19  just remember you had that handout, that kind of |
| 20   A.  Oh. | 20  standard copy handout that you had about behavior at |
| 21   Q.  -- just if you think it accurately represents, | 21  depositions, general rules and guidelines for being |
| 22  you know, the personnel at Glidewell to your | 22  deposed. |
| Page 114 | Page 116 |

| | |
|---|---|
| 1  understanding of what their responsibilities are. | 1  BY MR. JANKOWSKI: |
| 2   A.  Yes, it does. | 2   Q.  Okay.  So you don't recall any facts associated |
| 3   Q.  Okay.  Let me change subjects just for a minute | 3  with, you know, the lawsuit generally that you |
| 4  here and just ask you, what did you do to prepare for | 4  remembered because of the meeting that you didn't recall |
| 5  the deposition today? | 5  beforehand to help you testify today? |
| 6   A.  Sat with Leonard and Jim Shuck, and I guess | 6      MR. TACHNER:  Same caution. |
| 7  Keith was there for about a half hour, and had a | 7      THE WITNESS:  Say it again. |
| 8  discussion. | 8  BY MR. JANKOWSKI: |
| 9   Q.  And when did you sit down with these folks? | 9   Q.  From that meeting, did you remember any facts |
| 10   A.  Two weeks ago? | 10  that you now have knowledge of that you didn't recall or |
| 11   Q.  So about two weeks ago you had a face-to-face | 11  that weren't in your memory prior to that meeting? |
| 12  meeting; is that correct? | 12   A.  No, not facts. |
| 13   A.  Uh-huh, yes, we did. | 13   Q.  Did you review documents at that meeting, aside |
| 14   Q.  With Mr. Tachner and Mr. Shuck and -- I'm | 14  from a document -- |
| 15  sorry.  Who was the third person? | 15   A.  No, I did not see -- |
| 16   A.  Keith Allred. | 16   Q.  -- provided by your -- |
| 17   Q.  Keith Allred.  Okay. | 17   A.  -- any documents besides that -- |
| 18      So he's in-house counsel at Glidewell. | 18   Q.  Okay. |
| 19   A.  That's correct. | 19   A.  -- xeroxed copy. |
| 20   Q.  Okay. | 20   Q.  So you didn't look at documents relating to, |
| 21   A.  Oh, and Robin Carden was there for the first | 21  you know, the BruxZir product or anything like that? |
| 22  half, I believe. | 22   A.  No, I don't remember seeing any documents |
| Page 115 | Page 117 |

Pages 114 to 117

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-70-

| | |
|---|---|
| 1 relating to any of that. | 1 5 is to the laboratories. |
| 2 Q. Any other meetings, or just the one meeting two | 2 6 is the labs. |
| 3 weeks ago? | 3 7 is dentists. |
| 4 A. Just that one. | 4 8 is labs. |
| 5 Q. How long did that meeting last? | 5 You want all these? |
| 6 A. 30 minutes? 40 minutes perhaps, at the | 6 Q. Yes. |
| 7 longest. | 7 A. 9 is dentists. |
| 8 Q. Was that held at Glidewell's offices? | 8 10 is labs. |
| 9 A. Yes, it was. | 9 11 is labs. |
| 10 MR. JANKOWSKI: Now, Dr. DiTolla, I'm going to | 10 12 is dentists. |
| 11 put in front of you a document that has already been | 11 13 is dentists. |
| 12 marked as an exhibit called Exhibit 8. | 12 14 is German. I don't know who that's for. |
| 13 (Whereupon, Exhibit 8 was marked | 13 Q. Maybe German dentists? |
| 14 for identification.) | 14 A. Could be, or German labs. It looks like it's a |
| 15 THE WITNESS: Okay. | 15 German version of a dentist ad, to tell you the truth, |
| 16 BY MR. JANKOWSKI: | 16 just looking at the bullet points that are there and the |
| 17 Q. It's a multipage document -- color document. | 17 way it's laid out. |
| 18 Looks like it might be 20 pages long. | 18 15, laboratories. |
| 19 A. Okay. | 19 16, labs. |
| 20 Q. And it looks like printouts or hard copies of | 20 17, labs. |
| 21 what would appear on a computer screen. If you could | 21 18, labs. |
| 22 just briefly look at previously marked Exhibit 8. | 22 19, labs. |
| Page 118 | Page 120 |

| | |
|---|---|
| 1 A. Okay. | 1 And 20, dentists. |
| 2 Q. My understanding is that this is kind of an | 2 Q. I notice, looking up at the top of each page -- |
| 3 assemblage of documents associated with what Glidewell | 3 because it's a printout that actually shows a URL inside |
| 4 calls e-mail blasts. | 4 a little box at the top. Do you see that? |
| 5 Are you familiar with Glidewell doing something | 5 A. Yes, I do. |
| 6 called e-mail blasts? | 6 Q. And it looks to me that each of these URLs |
| 7 A. I am with the ones that go to dentists, not as | 7 includes a date in it. So, for example, on page 1 I see |
| 8 familiar with ones that go to labs. I don't have | 8 "2011-08." Do you see that? |
| 9 anything to do with those. | 9 A. I do. |
| 10 Q. So Glidewell actually has different types of | 10 Q. I would interpret that that this was a blast |
| 11 e-mail blasts, those to dentists and those directed at | 11 that went out in August 2011. Do you think that's |
| 12 labs? | 12 accurate? |
| 13 A. Correct. | 13 A. It seems that it could also be the date the ad |
| 14 Q. Okay. And the ones that are shown here in | 14 was created, not necessarily sent. I don't know. I'm |
| 15 Exhibit 8, who's the audience for these e-mail blasts? | 15 not sure. And I don't know what "Web Test" at the |
| 16 A. Page 1 is laboratories. | 16 beginning means either. If it was a real -- I'm not -- |
| 17 Q. Okay. | 17 I'm... |
| 18 A. Page 2 is dentists. | 18 Q. Okay. Well, this is the form the documents |
| 19 3 is just a list of some of those 180 | 19 were produced by Glidewell. |
| 20 authorized labs. | 20 A. Oh, okay. |
| 21 Q. Uh-huh. | 21 Q. But you'd agree with me that those look like |
| 22 A. 4 is to the laboratories. | 22 they're probably a year and a month? |
| Page 119 | Page 121 |

Pages 118 to 121

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-71-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

| | |
|---|---|
| 1   A.  Yes, definitely. | 1   to the hockey pucks that are provided to the labs? |
| 2   Q.  Is it also your understanding -- if you just | 2   A.  Oh, no, that's to the crowns. |
| 3   flip through here, you'll see these things have | 3   Q.  That's to the crowns? |
| 4   different years and months associated with them, | 4   A.  This is a dentist e-mail. |
| 5   suggesting the e-mail blasts go out every couple of | 5   Q.  That's true.  They wouldn't tend to be |
| 6   months.  Is that consistent with your understanding? | 6   promoting the solid zirconia hockey pucks to the |
| 7   A.  That sounds about right. | 7   dentists.  Those would be for the labs; correct? |
| 8   Q.  Okay.  Looking on the front page of Exhibit 8, | 8   A.  Right.  But I -- yeah.  And I really think |
| 9   I see a reference to a BruxZir -- spelled | 9   for -- and I don't know.  I'd have to look through here, |
| 10  B-r-u-x-Z-i-r -- solid zirconia crowns and bridges, | 10  but I think probably we don't have to -- we probably |
| 11  "More Brawn than Beauty." | 11  call it BruxZir Solid Zirconia to them as well when |
| 12      And that's exactly what we've been talking | 12  referring to the pucks, but their material knowledge is |
| 13  about, the motto associated with the BruxZir crown | 13  so much higher than the dentists that you probably |
| 14  product; correct? | 14  wouldn't have to spell it out for them like we try to do |
| 15  A.  Correct. | 15  for dentists to educate them. |
| 16  Q.  I keep seeing that model there.  Is that a | 16  Q.  So the reference to solid zirconia there is |
| 17  Glidewell employee, or is that probably some | 17  reference to the fact that the whole crown is solid |
| 18  professional model? | 18  zirconia? |
| 19  A.  That, I think, is somebody who we brought in | 19  A.  Correct. |
| 20  and did a photo shoot with.  We do have other employees | 20  Q.  And if we look down below, about halfway down |
| 21  who we use for modeling, but we've worked our way | 21  the page below the video, there is a statement -- or a |
| 22  through most of the photogenic men and women in the | 22  paragraph that starts with the words "When we launched." |
| Page 122 | Page 124 |
| 1   laboratory.  We have a couple on there, waitress from a | 1       Do you see that? |
| 2   local deli and things like that.  So we do go outside | 2   A.  I do. |
| 3   the building at times. | 3   Q.  And this is the discussion back in 2009 we |
| 4   Q.  If we turn to page 2, I see an e-mail blast | 4   talked about this morning, a characterization of that. |
| 5   from -- looks like from late 2011 that now has, as we | 5   Do you recall that? |
| 6   were talking about, "More Brawn and Improving Beauty." | 6   A.  Yes. |
| 7       Do you see that? | 7   Q.  Can you just read into the record that little |
| 8   A.  Yes, I do. | 8   paragraph right there that starts "When we launched." |
| 9   Q.  That was exactly what we were talking about | 9   A.  "When we launched BruxZir Solid Zirconia crowns |
| 10  before. | 10  and bridges in 2009, our intention was to provide a |
| 11      And at the top of that page, I see the BruxZir, | 11  monolithic zirconia restoration indicated for bruxers |
| 12  B-r-u-x-Z-i-r, with "solid zirconia" next to it.  Do you | 12  and grinders as an esthetic alternative to posterior |
| 13  see that? | 13  metal occlusal PFMs and full-cast metal restorations. |
| 14  A.  I do. | 14  The result was a material we said was 'More Brawn than |
| 15  Q.  So I would interpret that as a reference, at | 15  Beauty.'" |
| 16  least that little part of the reference, to the zirconia | 16  Q.  Okay.  And that's consistent with what we've |
| 17  material; is that fair, or am I misinterpreting that? | 17  been talking about today, you'd agree? |
| 18  Or is that more a reference just to the crown, how it's | 18  A.  I agree. |
| 19  being used there? | 19  Q.  Then the next paragraph goes on to talk about |
| 20  A.  Say it again. | 20  "More Brawn and Improving Beauty."  Do you see that? |
| 21  Q.  Well, what I'm asking is, is the reference | 21  A.  I do. |
| 22  there to the solid zirconia a reference to the crowns or | 22  Q.  And I think we've talked about that as well, |
| Page 123 | Page 125 |

Pages 122 to 125

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-72-

1 how a lot of what Glidewell has been doing is trying to
2 make the product look more like a human tooth; is that
3 fair?
4     A.  Correct.
5     Q.  Then in the third paragraph I see a reference
6 to a patent pending process.  Do you see that?
7     A.  I do.
8     Q.  Do you have any knowledge about that?  I mean,
9 is it still patent pending?
10    A.  That's a good question for Robin Carden.
11    Q.  Okay.
12    A.  I think it's been approved, but I'm not sure.
13    Q.  You haven't been involved in the patent
14 application process?
15    A.  Thankfully, no.  It doesn't look pleasant.
16    Q.  And then turning to page 3 of Exhibit 8, I
17 think you already said this is at least a partial list
18 of the 180 or so authorized laboratories out there;
19 correct?
20    A.  Correct.
21    Q.  And turning to page 4 of Exhibit 8, this is now
22 something which is directed at laboratories, not

                                            Page 126

1 be a written piece, some more information.
2     Q.  And then turning to page 5 of Exhibit 8, again,
3 this would be a page that's directed at the authorized
4 laboratories; correct?
5     A.  Correct.
6     Q.  And here I see towards the bottom third of the
7 page a reference to BruxZir Milling Blanks.
8        Do you see that?
9     A.  I do.
10    Q.  This is the hockey pucks we were talking about
11 earlier; correct?
12    A.  Correct.
13    Q.  In fact, I see them there.  Kind of thin, but
14 otherwise absolutely looking like hockey pucks; right?
15    A.  Correct.
16    Q.  So that's the raw material from which a BruxZir
17 crown or bridge would be made?
18    A.  That's correct.
19    Q.  And this is also showing that the term
20 "BruxZir," B-r-u-x-Z-i-r, is used by Glidewell in
21 connection with the raw material in addition to being
22 used in connection with the crown; correct?

                                            Page 128

1 dentists, but it still uses the motto "More Brawn than
2 Beauty."  Do you see that?
3     A.  I do.
4     Q.  I see you're referenced here, and maybe that's
5 a click button where it says "Dr. Michael DiTolla talks
6 about BruxZir Total Zirconia."  Do you see that?
7     A.  I do.
8     Q.  Do you know what -- is that a click button,
9 like you click on it, and something happens?
10    A.  It is.
11    Q.  What happens if you click on that button?
12    A.  I don't know -- well, obviously a movie of me
13 talking about BruxZir launches, but I can't recall which
14 one it is.  That was 2009 --
15    Q.  Sure.
16    A.  -- and, yeah, we've replaced them and updated
17 them.
18    Q.  But it's not uncommon for Glidewell to send out
19 e-mail blasts with the ability of the recipient to click
20 and get a video from you; is that fair?
21    A.  To click and be able to do something.
22 Sometimes it might be a video; other times it might just

                                            Page 127

1     A.  Yeah, but I'm not sure about your use of the
2 term "raw material."  You know, when we speak about raw
3 material, we mean the zirconia powder that we get and
4 that we form into these pucks.  We don't refer to these
5 pucks as raw material.
6     Q.  Okay.  That's a good point.  Right, no, this
7 has already gone through a lot of processing.
8     A.  Right.
9     Q.  So the milling blanks that Glidewell provides
10 to its authorized labs are something that they provide
11 associated with the name BruxZir --
12    A.  Correct.
13    Q.  -- b-r-u-x-Z-i-r?
14    A.  Correct.
15    Q.  Okay.  Now turning to page 6 of Exhibit 8, this
16 is going to be another page which is directed to the
17 authorized labs; correct?
18    A.  That's right.
19    Q.  In fact, it says right there "Dear authorized
20 BruxZir lab"; right?
21    A.  Yes.
22    Q.  It's pretty clear about that.

                                            Page 129

                                    Pages 126 to 129

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

1    And I see there's a reference a few lines down
2  to an exclusive website just for authorized BruxZir
3  labs.  Do you see that?
4    A.  I do.
5    Q.  That's a website that you're aware of?
6    Is that something that you provide content to?
7    A.  I do not.  I have never been to that website,
8  to be honest.
9    Q.  You don't have any personal knowledge as to
10  what's in that website?
11    A.  I don't.
12    Q.  On this page at the very bottom there's a PS,
13  and it says, "View Dr. DiTolla's latest clinical video
14  'Unique Shade Considerations for BruxZir' online now."
15    Do you see that?
16    A.  I do.
17    Q.  Do you recall creating a clinical video
18  entitled "Unique Shade Considerations for BruxZir"?
19    A.  I do.
20    Q.  Generally speaking, what is in that video?
21    A.  What's in the video is before -- this goes back
22  to the older days of BruxZir before it was as

Page 130

1    A.  It would snap your head back when you saw some
2  of these teeth --
3    Q.  Right.
4    A.  -- and then you'd try it in the mouth and it
5  would look better.  So it was kind of a heads-up not
6  only to dentists, but to the authorized labs to make
7  sure they didn't get a lot of kickback from their
8  dentists as well.
9    Q.  All right.  Turning to page 7 of Exhibit 8, so
10  this is a page, I think you said, which is directed at
11  the dentists, not the labs; correct?
12    A.  Correct.
13    Q.  This particular blast makes reference to a wear
14  study, w-e-a-r.  Do you see that?
15    A.  Yes.
16    Q.  And, in particular, comparing BruxZir and
17  Ceramco.  And I think you talked a bit about these wear
18  studies this morning; correct?
19    A.  Correct.
20    Q.  So here you're just educating dentists, just
21  giving them information to help them decide on their
22  selection of crowns; is that fair?

Page 132

1  translucent as it is now, and so the light affected it
2  in kind of an odd way.  So when the crown was sitting
3  out on a table like this and the light hit it, it looked
4  ugly, and you'd go, "That doesn't look good."
5    And then when you put it in the mouth and you
6  got off the light, and the tongue and the cheek were
7  there, then it blended in well.  And we realized that we
8  should probably explain to dentists that this was
9  happening.
10    I think we might have taken this one down
11  because it doesn't occur anymore -- take that video
12  down.  But we wanted to make sure that they understood
13  that when you open the box, if you look at the crown and
14  it doesn't look like a tooth, you know, still try it in
15  the mouth to see what it looks there to see what the
16  final shade's going to be.
17    Q.  This is similar to the people in Home Depot
18  like finding a paint and saying, "That looks great," and
19  then they put it on their walls at home, and they're
20  like, "That's not what I chose."
21    A.  Except this is the opposite.
22    Q.  The opposite.

Page 131

1    A.  That is fair.
2    Q.  In fact, there's a link.  It says, "Read full
3  study here."  There's a link on here so they can
4  actually read the study itself; is that right?
5    A.  That's correct.
6    Q.  And this particular study, it looks like, was
7  done at the University of -- I don't speak German very
8  well, but University of Tübingen, Germany.  Is that your
9  understanding as well?
10    A.  Correct.
11    Q.  So was that study -- that study would have been
12  done with crowns provided by Glidewell; correct?
13    A.  Yes.
14    Q.  Do you know if this was going to be an in vitro
15  or an in vivo study?
16    A.  This is in vitro.  You can see by the
17  conclusion where it says 1.2 million wear cycles.
18  That's really tough to measure on a human.
19    Q.  Yeah, so this is a simulated --
20    A.  Right.
21    Q.  Like a chewing machine?
22    A.  Exactly.

Page 133

Pages 130 to 133

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-74-

1    Q.  Okay.  If you turn to page 8 of Exhibit 8,
2  there's another page I believe that has been provided to
3  the labs, and this one is a technical update.
4       Do you see that?
5    A.  I do.
6    Q.  So this is a particular kind of e-mail blast,
7  if you will; right?  More technical in nature?
8    A.  Yes.
9    Q.  This one says, "Do not use to discs finish
10  full-contour zirconia."  Do you see that?
11    A.  Yes.
12    Q.  First of all, I do see that phrase
13  "full-contour" a lot.  What does "full-contour" mean?
14    A.  "Full-contour" refers to the shape of the crown
15  in its final shape.  So zirconia's beginning was as a
16  coping material with porcelain on it.  So "full-contour"
17  is probably another way of saying "monolithic."
18       "Monolithic" is a word probably more used by
19  the dentists, and "full-contour" is probably used more
20  by the laboratories, but they mean the same thing,
21  essentially.  I mean, I guess you could have a
22  bilayered, full-contoured crown, but there's no way to

Page 134

1  make them right now.
2       So "full-contour" means it's got all the
3  chewing anatomy and everything on it in its final shape.
4    Q.  Just like the tooth that's shown here on this
5  page --
6    A.  Yes.
7    Q.  -- with all the crenulations?
8       Now, it makes reference here to a fractured
9  BruxZir bridge, and it says that it tends to be due to a
10  diamond disc being used to separate connectors or
11  violation of the "Rule of 27."
12       Do you see that?
13    A.  I do.
14    Q.  What is the Rule of 27?
15    A.  The Rule of 27 is when you have a bridge --
16  let's say you have a missing tooth in the middle of
17  three teeth.  A bridge is going to be a restoration that
18  connects to each of these tooth [sic] and has a fake one
19  in the middle, and they're all going to be connected
20  together.  So you're going to involve three teeth to
21  replace one tooth.
22       So this is an abutment tooth that sits on it --

Page 135

1  that sits on tooth, and this is an abutment tooth, and
2  that's called the pontic in the middle.  And where the
3  abutment and the pontic connect together, it needs to be
4  27 square millimeters, height squared times the width.
5  We learned that just by seeing bridges break.
6       Because even though as a single unit this
7  behaves better than a PFM when you get a bridge because
8  it's still in all-ceramic, if you violate the Rule of 27
9  with a BruxZir bridge, it typically with break; if you
10  violate the Rule of 27 with a PFM bridge, it typically
11  won't.  Porcelain may chip off, but the metal won't
12  break underneath it.
13       And so the Rule of 27 dictates that sometimes
14  you have a wider connector in between those two teeth.
15  And so it'll get designed that way in the CAD/CAM
16  software, it'll get milled that way, and then when the
17  technician sees it, they look at it and they go, "That's
18  ugly.  I don't want this.  This looks like one big tooth
19  shaped like the number 8."
20       And so they'll go in to define those grooves
21  like a natural tooth would have, thereby violating the
22  Rule of 27.  And then they send it out to a dentist, and

Page 136

1  the dentist goes, "I thought this stuff was strong.  It
2  broke."
3    Q.  Okay.
4    A.  We learned that the hard way, and then we
5  passed that information on to the laboratories.
6    Q.  I see.
7       Do you understand what the issue is with the
8  diamond disc being used?  What is the problem?
9    A.  It's talking about the same thing.  It's almost
10  the same point, but it's using that diamond disc to
11  separate the connectors to open it up for esthetic
12  purposes to make it look more like real teeth.
13       Real teeth have these embrasures, these spaces
14  between them, and bridges that don't have that, it just
15  looks like a big chunk of enamel on the front.  So they
16  would go in with a diamond disc and try to open that,
17  and when you do that, what you do is violate the
18  Rule of 27.
19       So it's really kind of the same point.  It's
20  not two separate things really.
21    Q.  I see.  I see.
22       Are you with your clinical practice involved in

Page 137

Pages 134 to 137

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-75-

10/2/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.    Michael DiTolla

1  troubleshooting some of these things?
2      I mean, if there is a problem, for example, one
3  that was identified here, does that come back to you to
4  be part of the solution?
5      A.  Only if it's something that we've observed
6  happen on one of the patients.  It's difficult in good
7  conscience to take a bridge where the Rule of 27 has
8  been violated, prep somebody's teeth, put it in their
9  mouth and say, "Try to break it."  That gets done
10 downstairs.  That's usually done in R&D on the testing
11 machines, where they will violate that rule and start
12 breaking it and see if it breaks at different points.
13     But if I had a bridge break, certainly I'll try
14 to cut it off and send it down to R&D so they can look
15 at it underneath the scope and we can figure out what
16 happened.
17     Q.  So, in other words, as part of your practice,
18 to the extent things fail, the information will get
19 incorporated into the R&D; if it's happening in the
20 outside world, the R&D people would deal with it, but
21 there's no reason for you to?
22     A.  That's correct, yeah.  Or -- because usually

Page 138

1  it's the outside authorized laboratories calling in with
2  the issues.
3      Q.  And, again, if they do call in, it's going to
4  be somebody in the R&D group who deals with it; correct?
5      A.  It's going to be somebody in Glidewell Direct.
6  You'll notice that the lab ones should say -- well, I
7  guess BruxZir hadn't been moved into Glidewell Direct
8  yet, but I did see one that -- Glidewell Direct is the
9  branch that now sells the blanks, sells the mills and
10 deals with the laboratory and the couple of products
11 that we sell to dentists that aren't crowns.
12     I saw it somewhere.  I saw the mark on here.
13 But that's usually the department that deals with the
14 laboratories; that would take those calls.
15     Q.  In Exhibit 36, the org chart, who is
16 responsible for Glidewell Direct?
17     Is it going to be Robin Carden's department?
18     A.  No.  No, it's a different Robin, Robin Bartolo.
19     What's the difference between these two pages?
20     It says "1 of 2" and "2 of 2."  Are they
21 identical?
22     Q.  I don't know.  They look identical to me.

Page 139

1  They're even dated the same, so I'm not sure why
2  they're --
3      A.  Okay.
4      Q.  Since I'm just looking here at Exhibit 36, let
5  me ask you the question.  I see there's a
6  Bradley Bockhorst listed as a dentist.
7      A.  Correct.
8      Q.  And he's under Greg Minzenmayer's group.  Do
9  you see that?
10     A.  Correct.
11     Q.  What is his role within Glidewell?
12     A.  Well, he's no longer with the company, but it
13 was to be the dentist in charge of the implant division.
14 So he was in a different building than we were, and
15 we've now produced a line of implants, and he was
16 providing the kind of education that I do, but for
17 implants.
18     Q.  Why does that put him in a completely different
19 part of the org chart than you?
20     A.  Because Greg Minzenmayer came from the implant
21 world, and when he became COO, he oversees most of the
22 stuff that goes on over at the implant department.  So

Page 140

1  he wanted to have direct connection with Brad about what
2  they were doing over there in terms of their clinical
3  projects.
4      Q.  And do you have an understanding of when
5  Mr. Bockhorst left Glidewell?
6      A.  Two months ago perhaps.
7      Q.  Do you know where he is today?
8      A.  I believe he left to work for an implant
9  company in San Diego.
10     Q.  Referring back to page 8 -- we're still on
11 page 8.
12     A.  Okay.
13     Q.  Certainly in these e-mail blasts, one of the
14 themes of Glidewell's communications is about the
15 strength of their BruxZir crowns.  You'd agree with
16 that?
17     A.  "More Brawn than Beauty," correct.
18     Q.  Sometimes they have some pretty creative ways
19 of explaining it, and at the bottom of page 8, right
20 below where it says, "Click here to learn why discs
21 should not be used to finish full-contour zirconia
22 restorations," it says, "Following the processes

Page 141

Pages 138 to 141

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-76-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1  outlined will ensure that your BruxZir crowns and
2  bridges continue to live up to their reputation of being
3  virtually 'bulletproof.'"
4      Do you see that?
5      A.  I do.
6      Q.  And so, again, that's another reference to how
7  strong these things are, and perhaps here they wanted to
8  put a little emphasis on that point since the whole
9  point of the technical update is about a product that's
10 breaking.  So they're saying, "Hey, it's not the
11 strength.  It's because it's being used improperly"; is
12 that fair?
13     A.  That's fair.
14     Q.  Okay.  So turning to the next page, page 9,
15 this is a page that I believe you said is going to be
16 directed to dentists as opposed to the labs; correct?
17     A.  Correct.
18     Q.  And this one includes a listing of clinical
19 indications for BruxZir with three bullet point entries.
20 Do you see that?
21     A.  I do.
22     Q.  The first entry says, "Bruxers and grinders who

Page 142

1  certainly one of the prominent patient populations that
2  Glidewell wants dentists to be thinking about when
3  they're considering its product; isn't that fair?
4      A.  Yes, that's one of the patient populations.
5      Q.  And, in fact, it was probably the initial
6  motivation when you had the "More Brawn than Beauty"
7  idea at the inception in 2009?
8      A.  Correct.  It played well into the story when
9  the crown was so ugly you had to hide it in the back of
10 the mouth.
11     Q.  Let me have you turn up to page 12 of
12 Exhibit 8.  I just want to point out this is another one
13 that's going to the dentists, I believe.  This one makes
14 a reference to you as well if you look there.  It says
15 that "Dr. Michael DiTolla shares two anterior crown
16 cases and a BruxZir roundhouse bridge case."
17     Do you see that?
18     A.  I do.
19     Q.  And then I think there's probably a link they
20 can click to see the video; right?
21     A.  Looks like it.
22     Q.  Now, in this instance, the anterior crown

Page 144

1  have destroyed other restorations"; right?
2      A.  Correct.
3      Q.  The second one is, "An esthetic alternative to
4  posterior PFMs with metal occlusal and full-cast
5  crowns."
6      A.  Correct.
7      Q.  And the third one is, "Ideal for implant cases
8  because of its milled precision of fit and chip-proof
9  durability."  Do you see that?
10     A.  Correct.
11     Q.  So, again, this is consistent with, you know,
12 bruxers being a prominent target audience of these
13 crowns when they're thought of for use by dentists; is
14 that fair?
15     A.  I don't know if it's more prominent than other
16 indications, but it is an indication.
17     Q.  I mean, it's the first one listed here at
18 least.
19     A.  It is the first one listed there.  I don't know
20 if that was intentional or not.
21     Q.  I mean, you would agree that Glidewell makes
22 the application with bruxers as a -- you know, that's

Page 143

1  cases, these are not back teeth; correct?  These are
2  front teeth?
3      A.  Correct.
4      Q.  And this e-mail blast looks like it's from 2011
5  or thereabouts.  So in 2011 certainly Glidewell is
6  starting to move into -- at least by then moving into
7  trying to get the product -- expanding it beyond just
8  the back teeth; is that fair?
9      A.  It's a fair assessment, but it was really done
10 by the dentists and not by us.  We were the ones seeing
11 them starting to prescribe it in the front of the mouth
12 and were like, "What are they doing?"  So we started
13 working on it and said, "Okay.  We've got to step this
14 up.  This is going to be used in more places," and now
15 it's become -- yeah, it's pretty much used everywhere at
16 this point.
17     Q.  If you turn to page 13, I think this is another
18 page you said was directed at dentists, and I see a
19 reference to a Dr. Gordon Christensen on BruxZir.  Do
20 you see that?
21     A.  I do.
22     Q.  Who is Dr. Gordon Christensen?

Page 145

Pages 142 to 145

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-77-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

| | |
|---|---|
| 1  A.  He is perhaps the best known dental clinician<br>2  and researcher in the country and has been doing<br>3  research up in Provo, Utah, at CRA, his Clinical<br>4  Research Associates, for 35 or 40 years.  He's a<br>5  prosthodontist who got involved with this years ago, and<br>6  he also makes DVDs like we do, but he charges for them.<br>7      He's a very well-trusted name with dentists.<br>8  He's got a monthly column in our ADA journal, our<br>9  national journal, and then he writes for some other<br>10  magazines as well.<br>11  Q.  This morning you made a reference to studies<br>12  being done in Utah.  Are they studies being done by his<br>13  lab?<br>14  A.  That's correct.<br>15  Q.  Do you know Dr. Christensen personally?<br>16  A.  I have met him a couple times, yes.<br>17  Q.  Okay.  I'll have you turn forward to page 16 of<br>18  Exhibit 8.<br>19  A.  Okay.<br>20  Q.  This page is a little different than the other<br>21  ones in that it looks like it's talking about a BruxZir<br>22  Milling System.  Do you see that?<br><br>                                      Page 146 | 1  one says it's a technical update video now available.<br>2  Q.  Do you see that?<br>3  A.  I do.<br>4  Q.  This one, similar to the last thing, looks like<br>5  it's getting at various kinds of equipment that can be<br>6  provided, including -- well, the video anyway provides<br>7  instructions for things like digitally scanning models,<br>8  designing contacts and occlusion, designing bridges,<br>9  milling and spruing BruxZir blocks and recovering milled<br>10  units.<br>11  Do you see that?<br>12  A.  I do.<br>13  Q.  This is really getting into the fabrication<br>14  side of the actual finished crowns; is that right?<br>15  A.  That's correct.<br>16  Q.  And, again, I think Robin Carden would be<br>17  somebody who could speak to those issues; is that --<br>18  A.  Definitely.  That's a good example of a video<br>19  that I had nothing to do with and have never seen.<br>20  Q.  Does Mr. Carden get to put himself in videos,<br>21  or...<br>22  A.  He's not quite as camera-ready as I am.  He has<br><br>                                      Page 148 |
| 1  A.  I do.<br>2  Q.  You'll recall this morning we were talking<br>3  about how the BruxZir name has been used on other<br>4  products in addition to the crowns and in addition to<br>5  the milling material.  This is an example of that;<br>6  correct?<br>7  A.  Correct.<br>8  Q.  And for just $54,995 you can get a complete<br>9  set, it looks like, and all you need is a scanner and a<br>10  centering oven; right?<br>11  A.  Right.  But I can get you a discount.<br>12  Q.  And you can get me a discount.  Oh, I'll have<br>13  to think about that.<br>14  And, again, I think you testified earlier, you<br>15  don't really have personal knowledge about what's going<br>16  on with these products; is that correct?<br>17  A.  That's correct.<br>18  Q.  Who at Glidewell would be aware of these<br>19  products?  Would it be Robin Carden?<br>20  A.  Absolutely.<br>21  Q.  If you turn to page 17, you see another e-mail<br>22  blast I believe is directed at the laboratories.  This<br><br>                                      Page 147 | 1  a face for R&D.<br>2      MR. TACHNER:  They'd need a panoramic screen.<br>3      THE WITNESS:  You'll see when he comes in.<br>4  BY MR. JANKOWSKI:<br>5  Q.  Okay.  So if you'd turn to the next page,<br>6  page 18 of Exhibit 8, it's an e-mail blast to the<br>7  laboratories about recycling the solid zirconia.<br>8  Do you see that?<br>9  A.  I do.<br>10  Q.  So it looks like this is a situation where<br>11  Glidewell will be paying the labs some money if they<br>12  send back the remains of the solid zirconia that's left<br>13  over after they've made the crowns; correct?<br>14  A.  That is correct.<br>15  Q.  And then I assume Glidewell can take it and<br>16  reuse it and repackage it and make new milling materials<br>17  probably.  Is that your understanding?<br>18  A.  My understanding is that we're collecting it<br>19  but not necessarily doing that just yet.<br>20  Q.  Okay.<br>21  A.  I'm not sure if we've really figured out<br>22  exactly -- I think we think we're close, but we haven't<br><br>                                      Page 149 |

Pages 146 to 149

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-78-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

1  really got a handle on exactly how to do it.
2      Q.  And then turning to page 19 --
3      A.  And, again, that's Robin.  He would know all
4  about it.
5      Q.  Robin would know, right.
6          And page 19 is another one I think Robin would
7  be speaking to, and in this situation we have a FastFire
8  furnace available for $6,900 as well.
9          Again this is another area where Robin would
10 know; correct?
11     A.  Correct.  And it does have the word "BruxZir"
12 in front of it.  I told you I wasn't sure if it did or
13 not, but it does.
14     Q.  It looks like it.  So even the furnace has
15 "BruxZir" associated with it?
16     A.  Correct.
17     Q.  Then page 20 I think we already spoke about.
18 To me it looks like a duplicate of page 2 of the
19 document.  It's the dentists again, and it's got the
20 "More Brawn and Improving Beauty," and I think it's --
21 it looks to be the same e-mail blast.
22     A.  I agree.

Page 150

1  what's the purpose of sending out this e-mail blast?
2  What's the message Glidewell is trying to present?
3      A.  Well, that BruxZir zirconia's 50 percent
4  smaller average grain size improves its physical
5  properties and that they're warmer, more natural-looking
6  restorations.
7      Q.  When it says "improves its physical
8  properties," that's again a reference to strength;
9  wouldn't you agree?
10     A.  Yes.
11     Q.  First page of Exhibit 9 there's a reference to
12 the processing of the zirconia being patented.
13         Do you see that?
14     A.  Yes.
15     Q.  I think I asked you this earlier, but do you
16 know whether there's an issued patent on that process?
17     A.  Well, the thing that you showed me before said
18 "patent pending," and I told you that I thought it had
19 gone through and was now patented.  And since this is
20 from this year and that other one was from a year and
21 a half ago and it now no longer says "patent pending,"
22 it says "patented," I'm assuming that it did in fact go

Page 152

1          MR. JANKOWSKI:  So, Dr. DiTolla, I'm going to
2  put in front of you a document that was previously
3  marked as Exhibit 9.  This is a shorter document, but if
4  you could just take a look at it.  It's just two pages.
5              (Whereupon, Exhibit 9 was marked
6              for identification.)
7          THE WITNESS:  Okay.
8  BY MR. JANKOWSKI:
9      Q.  Do you recognize Exhibit 9?
10     A.  I recognize the images on both pages, but I've
11 seen them used in a print ad, and I'm not sure if this
12 is -- I don't recognize where this was used, if it's --
13 it looks like it's -- oh, well, it says "E-mail ADA."
14         I haven't seen this particular e-mail blast,
15 which it says down at the bottom apparently, but I have
16 seen all these images used before in print ads.
17     Q.  Who would be the intended audience for this
18 kind of e-mail blast?
19     A.  It would be dentists if -- what it says down
20 here at the bottom says "E-mail Blast:  ADA News," so
21 that would be going to dentists.
22     Q.  What's your understanding of -- you know,

Page 151

1  through.
2      Q.  And when you say you're assuming, you're not
3  sure one way or the other?
4      A.  No.  I don't get involved with regulatory
5  meetings and R&D and things like that.  That would just
6  be from talk I overhear at lunch.
7      Q.  Do you have an understanding for what the scope
8  of the patent is that Glidewell is seeking?
9      A.  Yes.
10     Q.  What's your understanding of that scope?
11     A.  That it relates strictly to the way we treat
12 the zirconia after we get it from our supplier to make
13 it into those pucks.  It's the way we make it into those
14 pucks that is different from what other companies are
15 doing.
16     Q.  So Glidewell doesn't have a patent on an
17 all-zirconia dental crown, for example?
18     A.  No.
19         MR. JANKOWSKI:  Dr. DiTolla, I'm going to show
20 you next a document that was marked as Exhibit 12
21 previously, and this is a multipage document produced by
22 Glidewell.  The front page says "Authorized Laboratories

Page 153

Pages 150 to 153

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-79-

1  Program Benefits," and it has the name Jim Shuck,
2  Vice President, Sales and Marketing.
3          (Whereupon, Exhibit 12 was marked
4          for identification.)
5  BY MR. JANKOWSKI:
6      Q.  This is kind of a long document.  I really
7  don't want to spend much time on it.
8      A.  Okay.
9      Q.  I'm not really going to go through it in any
10 detail.  I'm just curious if you have seen -- this looks
11 like a PowerPoint presentation perhaps that Mr. Shuck
12 gave, and I think from his testimony, this is associated
13 with a -- as it says on the front page, a BruxZir
14 laboratory summit from January 2012.
15      Do you see that?
16     A.  I do.
17     Q.  Are you familiar with that summit?
18     A.  I am.
19     Q.  Did you participate in that summit?
20     A.  I did.
21     Q.  Did you attend the presentation that Mr. Shuck
22 gave where these were used as slides?

Page 154

1  like that.
2      Q.  Do you recall how many people attended your
3  presentation?
4      A.  20?  I think there was about 20 people in the
5  room.
6      Q.  Do you still have a copy of whatever slides or
7  material that you used with that --
8      A.  I do.  It's on my computer.
9          MR. JANKOWSKI:  Mr. Tachner, I'd like to have a
10 copy of Dr. DiTolla's presentation produced from the
11 January 2012 summit, please.
12         MR. TACHNER:  Yes.
13         MR. JANKOWSKI:  And you know what, I should
14 have mentioned this before lunch, but also a copy of
15 Mr. DiTolla's e-mail that we were talking about this
16 morning.
17         THE WITNESS:  Okay.
18         MR. JANKOWSKI:  You had it on your phone.  I
19 don't think you want to produce your phone --
20         THE WITNESS:  No.
21         MR. JANKOWSKI:  -- so we'll take a hard copy.
22         MR. TACHNER:  We will produce that.

Page 156

1      A.  No.  I gave my presentation and had to run out
2  to catch a flight at John Wayne.
3      Q.  That was actually my next question, which was,
4  did you give a presentation --
5      A.  I did.
6      Q.  -- at the summit?
7      So you had some sort of PowerPoint which is,
8  you know, along the lines of what Mr. Shuck has put
9  together on his subject matter?
10     A.  Yeah, it's talking about it from the point of
11 view of a dentist, not a laboratory.
12     Q.  Who attends the summit?  These are
13 representatives of the authorized laboratories?
14     A.  Correct.
15     Q.  And where did this summit take place?
16     A.  At one of our other buildings just about a mile
17 from the main building.
18     Q.  So here in Orange County?
19     A.  Yes.
20     Q.  What was the title of your talk, do you recall?
21     A.  Might have been "BruxZir: A Dentist's
22 Perspective" or something like that.  Probably something

Page 155

1          MR. JANKOWSKI:  Dr. DiTolla, next I'm going to
2  hand you a document that was previously marked as
3  Exhibit 13.
4          THE WITNESS:  Okay.
5          MR. JANKOWSKI:  This is a document produced by
6  Glidewell, about eight or nine pages, and it appears to
7  be a printout from a website.
8          (Whereupon, Exhibit 13 was marked
9          for identification.)
10 BY MR. JANKOWSKI:
11     Q.  If you could just briefly look at Exhibit 13.
12     A.  Okay.
13     Q.  Do you recognize the content of Exhibit 13?
14     A.  I'm not in charge of the BruxZir blog, but
15 they've had me write things for it before and give them
16 pictures.  So I don't spend any time on this blog, but I
17 see there is a video of me and some testimonials.
18     Q.  Is this an example where Michael Cash would be
19 asking you fro material sometimes?  Would he be working
20 on the blog?
21     A.  He might be, or the guy right underneath him
22 who's in charge of the website, Kevin, would probably

Page 157

Pages 154 to 157

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-80-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1   ask Mike or ask me directly for some pictures.  Or if a
2   dentist had written in with a question, he would ask me
3   to write the answer.
4        Q.  What's your understanding of who the intended
5   audience of the blog?  Is this for dentists?  For
6   labs?  For both?
7        A.  I'd say both.
8        Q.  If you look at the second page of Exhibit 13,
9   you'll see that again right at the front center -- top
10  center, I should say, there's the "More Brawn and
11  Improving Beauty"; right?
12       A.  Correct.
13       Q.  And there's that same quote about, "When
14  Glidewell launched BruxZir Solid Zirconia crowns and
15  bridges in 2009, the intention was to provide a
16  monolithic zirconia restoration indicated for bruxers
17  and grinders," and we read that earlier into the record.
18       A.  Right.
19       Q.  I also see -- actually, this is a really nice,
20  compact presentation of a lot of the things we've been
21  talking about.  I see at the lower left
22  Dr. Gordon Christensen is listed, and that's probably a
                                              Page 158

1   clickable link that you could get to more information on
2   his research.  Is that your understanding as well?
3        A.  My understanding would be that he probably
4   wrote about -- that wouldn't be so much on his research
5   as it would be just his opinion on these solid zirconia
6   crowns and where they're going.
7        Q.  Okay.
8        A.  And e.max kind of thing.  All the monolithic
9   crowns.  I think that was an article he wrote.
10       Q.  Okay.  Right, right.
11          Along the lower left side, all these recent
12  posts, these are going to be ways of clicking and
13  accessing information on these various subjects; right?
14       A.  Yes.
15       Q.  If you turn to the next page, you'll see now
16  there's a page where there are some pictures at the
17  bottom.  Those would have been pictures you would have
18  been providing for the blog?
19       A.  Actually, those two are from the dentist right
20  above that --
21       Q.  Oh, right, there's the quote.
22       A.  -- in the testimonial section, yeah.
                                              Page 159

1        Q.  Okay.  So dentists will send in their own
2   photos for use with this blog?
3        A.  From time to time it happens.  More of the time
4   they're sending it in just to let the technician who
5   made the crown know, "Hey, you did a great job.  It
6   really matched well.  Thank you."
7        Q.  And this whole page, it looks like, is devoted
8   to BruxZir testimonials, which is a solicitation, I take
9   it, of people's experiences use the BruxZir product; is
10  that fair?
11       A.  Yes, it appears to be fair.  I honestly didn't
12  know that was on there, but yeah, that's exactly what
13  that looks like.
14       Q.  There also appears to be a video on there that
15  says "BruxZir Solid Zirconia Introduction" with one of
16  your videos at the upper right; correct?
17       A.  Correct.
18       Q.  Whoever chose to make the exhibit just chose to
19  capture you at a point when your eyes are closed and
20  you're not looking your best.  I don't know who did
21  that.
22       A.  Awesome.  Thank you so much.
                                              Page 160

1        Q.  Because you're very photogenic.
2        A.  Someone's whose crown must still be sensitive.
3        Q.  It's similar to the driver's license pictures
4   at the DMV.
5        A.  Exactly.
6        Q.  They're magical in their ability to capture the
7   wrong moment.
8           If you turn to the next page, it looks like
9   it's an entire page devoted to scientific validation.
10  This would be an exam of the studies that we've been
11  talking about since this morning, wear studies in Utah
12  and Germany and so on; is that correct?
13       A.  That's correct.
14       Q.  And, in fact, the top one has a description
15  there where -- I think you eluded to this earlier --
16  where the concern of the wear wasn't even on the BruxZir
17  crown, but rather on, say, a natural tooth which is
18  adjacent to that crown; is that accurate?
19       A.  Well, it's opposing it.  It's not adjacent to
20  it.
21       Q.  Oh.
22       A.  And the BruxZir did cause some wear facets on
                                              Page 161

                                    Pages 158 to 161

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-81-

1 the opposing tooth, but that the tooth -- they both wore
2 each other.
3     Q.  Right, right.
4        In other words, one issue of the zirconia
5 monolithic crowns is that they're so strong, some people
6 might have a concern that they're going to cause
7 problems to the tooth opposing it?
8     A.  That's correct.
9     Q.  And this is a study that says no, that doesn't
10 seem to be a problem?
11     A.  That's correct.  Because wear of an opposing
12 tooth has to do with how rough the surface is, not how
13 hard it is.
14     Q.  So as long as the zirconia crown is smooth
15 enough, you're going to have an acceptable --
16     A.  Right.
17     Q.  -- amount of wear?
18     A.  And if you take something flexible like a
19 coarse sandpaper, even though it's flexible, and rub it
20 against a tooth, it will wear on it even though it's not
21 hard.
22     Q.  The second entry down shows a comparative wear
                                                Page 162

1 study between BruxZir and Ceramco, and I think we spoke
2 about that earlier; correct?
3     A.  Yes.
4     Q.  And then the third entry down is an enamel wear
5 test comparing it to IPS e.max, which we were speaking
6 about this morning as well; correct?
7     A.  Correct.
8     Q.  In this particular study it says that "glazed
9 BruxZir was found to wear compatible with enamel and
10 virtually identical to glazed IPS e.max."
11        Do you see that?
12     A.  I do.
13     Q.  And that's consistent with your understanding?
14     A.  It is.  And with what I recently saw
15 Rella Christensen present in Las Vegas.
16     Q.  Is he the person who did that study?
17     A.  Well, Rella is Gordon's wife in Utah, and
18 they're the ones who are working with those 20 other
19 clinicians across the U.S.
20        This appears to be Dr. Burgess from University
21 of Alabama who presented that at a meeting in
22 Washington, DC.
                                                Page 163

1     Q.  Okay.  If we turn to the next page of the blog,
2 I see a before and after case gallery.  Do you see that?
3     A.  Yes.
4     Q.  Now, are these pictures your handiwork?
5     A.  Yes, they are.  That's what BruxZir looked like
6 in 2009.
7     Q.  Do you just recognize it as a photo from 2009?
8     A.  No, I just recognize these are not pretty
9 tooth, those two crowns.
10     Q.  And this is an example of photographs that
11 would have been taken in your office when you're doing
12 your clinical studies at Glidewell's facility; correct?
13     A.  Correct.
14     Q.  How are pictures like this taken?
15        I mean, this probably isn't easy to get these;
16 right? I mean --
17     A.  We have a long mirror, and the patient opens,
18 and you put it against the lower teeth to get the upper
19 teeth.  And then she blows air on it to keep it from
20 fogging since the patient probably can't hold their
21 breath for 30 seconds.  Then you take a camera with a
22 100-millimeter macro lens and get in as close as you
                                                Page 164

1 can.
2        It's a process.  It's why they're free -- part
3 of why they're free.
4     Q.  Who actually snaps the photo?  Is it the
5 videographer or --
6     A.  It's usually me or my assistant.  She's gotten
7 so good, she can do it by herself now.
8     Q.  And turning the page to the next page of the
9 blog, there's a reference to a video gallery.
10        The videos here would be videos that you put
11 together for Glidewell; is that correct?
12     A.  Correct.
13     Q.  Okay.
14     A.  Do you notice how good those crowns look,
15 though, on that page?  See on the befores those two
16 front ones and then on the after compared to what we
17 just looked at, those two in the back.
18     Q.  Uh-huh.
19        And turning to the next page of the blog,
20 there's a -- it looks like more of the same actually.
21     A.  Yes.
22     Q.  More of your videos; correct?
                                                Page 165

Pages 162 to 165

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4
-82-

1      A.   Yes.
2      Q.   Then turn the page again, it looks like more of
3  your videos.
4      A.   Yes.
5      Q.   Okay.
6      A.   It actually seems to be the same videos listed
7  on each page with just a different still shown in that
8  right-hand side maybe.  Just so you don't think there's
9  21 videos on there; there's 7.
10          In the Google search window it says "Play-Doh
11  Shape & Spin Elmo," so we know they were surfing the
12  Internet doing some personal shopping in between
13  printing the pages.
14          MR. JANKOWSKI:  Dr. DiTolla, I'm going to hand
15  to you next a document that was previously marked as
16  Exhibit 15.
17          THE WITNESS:  Okay.
18          MR. JANKOWSKI:  This is a looks, like, six-page
19  document.  It looks like a Glidewell brochure.  This was
20  produced by Glidewell in this case.
21          (Whereupon, Exhibit 15 was marked
22              for identification.)

                                            Page 166

1  BY MR. JANKOWSKI:
2      Q.   If you can just briefly look at Exhibit 15,
3  please.
4      A.   Okay.
5      Q.   Have you seen Exhibit 15 before?
6      A.   I haven't.  These look like pieces that would
7  be sent directly from the fulfillment department to
8  doctors.  I don't have a lot to do with these.
9      Q.   So the intended audience of this is going to be
10  dentists?
11      A.   Definitely.
12      Q.   When you said "fulfillment department," what do
13  you mean by that?
14      A.   We have a department that when dentists want
15  more information on a product or want some of the DVDs
16  that we produce, there's a department that exists just
17  to send information out like that to dentists.
18      Q.   And this brochure is consistent with what we've
19  been talking about, that a selling point of the BruxZir
20  product, the solid zirconia crowns and bridges, is their
21  strength; wouldn't you agree?
22      A.   That's correct.

                                            Page 167

1      Q.   On the first page at the upper right it says
2  "Virtually Unbreakable Crowns and Bridges."
3          Do you see that?
4      A.   I do.
5      Q.   I love -- there's one reference in here.  If
6  you turn to the very last page of the brochure, you'll
7  see the whole page is devoted to high-strength crown
8  options.  Do you see that?
9      A.   I do.
10      Q.   And the first line says, "BruxZir Solid
11  Zirconia is made from biocompatible, virtually
12  unbreakable medical-grade zirconia, the same element
13  used to reinforce bulletproof military armor."
14          Do you see that?
15      A.   I do.
16      Q.   It's a great reference to convey the strength
17  of the material.  Do you know who came up with that?
18      A.   I don't.  I vaguely remember voting against it,
19  but...
20      Q.   Okay.
21      A.   It sounds like -- that sentence is a little
22  full of itself, but -- I do not know, but it's safe to

                                            Page 168

1  say a combination of Jim Shuck and Mike Cash, who pretty
2  much write all of these ad pieces.
3      Q.   It sounds like they do ask for your input, on
4  some of these anyway; is that correct?
5      A.   They do, yeah, if they -- again, as the focus
6  group of one, I'm supposed to predict how all the
7  dentists in America are going to react to something like
8  that.  And as a dentist I sit there and read it, and I'm
9  like, "Oh, please.  Bulletproof military?"  It might be
10  true, but it just seems like -- there's nothing we've
11  ever seen in dentistry besides this that you can put in
12  a mouth and that never breaks, because that never
13  breaks.  So it's like, "Yeah, yeah, yeah, tell us
14  again."
15          Probably Jim and Mike came up with it.
16      Q.   And the "Choose your preference" there, correct
17  me if I'm wrong, but I think, you know, putting the
18  BruxZir product there next to the gold crown, next to
19  the metal crown, the unstated message is that your
20  patients are going to want the solid zirconia crown
21  because it looks like a tooth; is that fair?
22      A.   That's correct.

                                            Page 169

                              Pages 166 to 169

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**
-83-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1    Q.  In other words, these are all options, and
2  they're all from a functionality perspective good
3  options.  But once you take the esthetics into account,
4  it's kind of no contest.  You should be choosing the
5  BruxZir; is that fair?
6    A.  Well, it's a choice.  No, you should be
7  choosing the gold, but your patients not going to let
8  you do it.  They insist on tooth color.  That's the
9  next -- second choice.  BruxZir's the second choice.
10 There's no doubt about it that gold's the best.
11   Q.  On functionality, but not esthetics?
12   A.  On functionality.  On esthetics, yeah, gold
13 loses big time.
14   Q.  Right.  That was kind of the point of my
15 question:  When you take esthetics into account, BruxZir
16 wins hands down.
17   A.  Oh, yeah, definitely.
18   MR. JANKOWSKI:  Okay.  This is a good time to
19 take a break.
20   MR. TACHNER:  I was just going to suggest that.
21   THE VIDEOGRAPHER:  Off the record at 2:23 p.m.
22   (Recess taken.)

                                    Page 170

1    THE VIDEOGRAPHER:  We are on the record at
2  2:45 p.m.  This is the beginning of Tape 3.
3    MR. JANKOWSKI:  Dr. DiTolla, I'm going to hand
4  you a document that was marked previously at Exhibit 19.
5    THE WITNESS:  Okay.
6    MR. JANKOWSKI:  This looks like an assemblage
7  of press releases from Glidewell, or at least they've
8  got the label "PRWeb" on top of them.
9    (Whereupon, Exhibit 19 was marked
10     for identification.)
11 BY MR. JANKOWSKI:
12   Q.  I'll have you briefly look at that.  You don't
13 need to study it in detail.
14   A.  Okay.
15   Q.  Just briefly familiarize yourself with the
16 contents.
17   While you're looking at it, let me just ask you
18 the question:  Do you recognize this thing called PRWeb?
19   A.  Yes.  I've seen it for our company and other
20 companies.
21   Q.  What is PRWeb?
22   A.  I believe it's a company that takes press

                                    Page 171

1  releases from different companies and releases them on
2  the Internet.
3    Q.  Is it fair to say that the attachment here, the
4  assemblage, is a collection of press releases from
5  Glidewell?
6    A.  Yes.
7    Q.  And part of your job in marketing is to be
8  contributing in some capacity to the press releases from
9  Glidewell; is that accurate?
10   A.  No, I actually have nothing to do with these.
11 They may might take -- I see one quote from me on the
12 first one, and it looks like they pulled something from
13 an interview, but no, I don't -- we have a team of
14 copywriters who writes these.
15   Q.  They're working in Mr. Shuck's group?
16   A.  Yes.
17   Q.  Does this fall under Mr. Cash's responsibility?
18   A.  Yes, it does.
19   Q.  And on the first page of Exhibit 19 there's a
20 reference to you and the BruxZir adjustment and
21 polishing set.  Do you see that?
22   A.  Yes, I do.

                                    Page 172

1    Q.  I think we talked a little bit about that this
2  morning.  Do you recall that?
3    A.  Yes.
4    Q.  This is the set which I believe you said was
5  being manufactured by Axis Dental; is that right?
6    A.  Correct.
7    Q.  And it's still available; is that correct?
8    A.  Yes.
9    Q.  And I believe you said that Glidewell is
10 developing its own internal version, and in fact, that
11 was the example that I provided -- the physical sample
12 that I provided to you earlier.
13   A.  I saw that, yes.
14   MR. JANKOWSKI:  Let me also show you a document
15 that's already been marked as an exhibit.  This document
16 was marked as Exhibit 26 previously.  It's a one-page
17 document.  Let me show you that.
18   (Whereupon, Exhibit 26 was marked
19     for identification.)
20 BY MR. JANKOWSKI:
21   Q.  Do you recognize previously marked Exhibit 26?
22   A.  Yes.

                                    Page 173

                            Pages 170 to 173

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-84-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

| | |
|---|---|
| 1   Q.  And what is Exhibit 26? | 1   to Jim Shuck.  It's unsigned. |
| 2   A.  It is a series of directions on how to use that | 2         (Whereupon, Exhibit 17 was marked |
| 3   BruxZir adjustment and polishing kit. | 3         for identification.) |
| 4   Q.  So this says that this was developed by you; | 4   BY MR. JANKOWSKI: |
| 5   correct? | 5   Q.  Dr. DiTolla, have you ever seen Exhibit 17 |
| 6   A.  Yeah, that's probably giving me a little too | 6   before? |
| 7   much credit.  I mean, I put it together and I tested all | 7   A.  I don't recall seeing this exact letter, but |
| 8   the burs.  I guess that's what they meant.  Axis | 8   I've seen many like it. |
| 9   actually prints that.  That's on their product. | 9   Q.  Okay.  And, in fact, I think Mr. Shuck |
| 10   Q.  Okay.  Right, so this particular document is | 10   testified that this is actually a sample letter -- |
| 11   generated by Axis, not by Glidewell? | 11   A.  It is a sample letter, which is why it's |
| 12   A.  Correct. | 12   addressed to him from somebody else in the company. |
| 13   Q.  Well, Axis is giving you a lot of credit | 13   Q.  Right.  Nicole wouldn't normally be writing a |
| 14   anyway. | 14   letter to Jim Shuck on Glidewell letterhead; correct? |
| 15   A.  "Conceived by Dr. Michael DiTolla" would | 15   A.  No.  Not to tell him about BruxZir. |
| 16   probably be more accurate. | 16   Q.  Right.  But you've seen letters like this that |
| 17   Q.  Having said that, though, I guess Glidewell and | 17   have been sent out by Nicole to other recipients? |
| 18   you were associated with the development of the product; | 18   A.  I haven't seen them sent from Nicole, but I've |
| 19   is that fair? | 19   seen them sent from Jim Shuck, from his desk.  Most of |
| 20   A.  I was, yeah.  I was the only employee who was | 20   the marketing materials that come out have Jim's name at |
| 21   involved with developing it, but we needed to come up | 21   the bottom, most of the letters like this. |
| 22   with some burs that would work well on these | 22   Q.  And the letters you've seen that were sent with |
| Page 174 | Page 176 |
| 1   restorations. | 1   Jim's name at the bottom, who were the recipients?  Was |
| 2   Q.  Do you have a connection to this product | 2   it dentists? |
| 3   separately from Glidewell? | 3   A.  Dentists, yes. |
| 4   A.  No.  They just -- when I teach courses, if it's | 4   Q.  Was the body of the letter the same as you're |
| 5   a hands-on course, they'll provide burs for the doctors | 5   seeing it in Exhibit 17? |
| 6   to use.  And so they are a good supporter of the lecture | 6   A.  There's been so many, I can't say for sure, but |
| 7   efforts that we'd have. | 7   this is certainly representative of the type of letter |
| 8   Q.  So you don't make a royalty if Axis sells one | 8   that would go out. |
| 9   of these things? | 9   Q.  Over what time frame do you believe Mr. Shuck |
| 10   A.  At one point they were talking about doing a | 10   or his department have been sending out letters like |
| 11   royalty based on sales at the lectures.  It's been | 11   this to dentists? |
| 12   difficult to follow that through.  I don't like to stand | 12   A.  Specifically regarding this product? |
| 13   on stage and sell stuff and pass out order forms, things | 13   Q.  Correct. |
| 14   like that. | 14   A.  From June of 2009 up to the present. |
| 15   Q.  Seems to undermine the educational part of what | 15   Q.  Okay.  So over the entire history of the |
| 16   you're doing. | 16   commercial BruxZir crown product; correct? |
| 17   A.  Yeah, it kind of does undermine it if you get | 17   A.  Uh-huh, yes. |
| 18   into selling products like that at lectures. | 18   Q.  And this particular letter is including an |
| 19   Q.  Sure, sure. | 19   incentive to prescribe BruxZir in the form of five |
| 20      MR. JANKOWSKI:  Let me provide you with what's | 20   special BruxZir Rx coupons. |
| 21   been previously marked as Exhibit 17.  It's a one-page | 21   A.  Yes. |
| 22   document.  It appears to be a letter from Nicole Fallon | 22   Q.  Do you see that? |
| Page 175 | Page 177 |

Pages 174 to 177

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-85-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

| | |
|---|---|
| 1    A.  Yes. | 1    before? |
| 2    Q.  You're familiar of the providing of coupons | 2    A.  I have not. |
| 3    like that? | 3    Q.  Are you familiar with |
| 4    A.  Yes. | 4    dentalproductsreport.com? |
| 5    Q.  Are you involved personally in this coupon | 5    A.  I'm familiar with Dental Products Report, the |
| 6    program? | 6    magazine, which I think this is out of.  I think they're |
| 7    A.  No. | 7    just listing their Web address down there. |
| 8    Q.  So you don't talk with dentists yourself about | 8    Q.  Okay.  I see what you're saying. |
| 9    these coupons? | 9        This particular article is featuring |
| 10   A.  No. | 10   Greg Minzenmayer, COO of Glidewell Laboratories. |
| 11   Q.  I notice in the very center of the letter, the | 11       Do you see that? |
| 12   product is characterized as "nearly chip-proof and can | 12   A.  Yes, I do. |
| 13   be used for all patients, but it is ideal for bruxers | 13   Q.  Does Mr. Minzenmayer get involved much in |
| 14   who have destroyed other restorations or natural teeth." | 14   marketing efforts on behalf of Glidewell? |
| 15       Do you see that? | 15   A.  Only in relation to implant products. |
| 16   A.  Yes, I do. | 16   Q.  Okay.  Is it your understanding that this is a |
| 17   Q.  And that's again consistent with the marketing | 17   reference to implant products? |
| 18   message that Glidewell has for this product? | 18       I mean, to me this looks like a marketing |
| 19   A.  Yes, it is. | 19   effort right here; would you agree? |
| 20   Q.  I have an understanding that Nicole Fallon | 20   A.  Yes. |
| 21   contacted a dentist back East somewhere associated with | 21   Q.  But I don't think this particular piece is |
| 22   an offer of a coupon that's being alleged in this case | 22   limited to implants; is that correct? |
| Page 178 | Page 180 |
| 1    as an example of confusion. | 1    A.  No.  I see two other products down at the |
| 2        Are you aware of that? | 2    bottom, and I see some other product names as I glance |
| 3    A.  I am not. | 3    at the interview itself. |
| 4    Q.  So you're not familiar with Ms. Fallon's | 4    Q.  So to you this is a little unusual that |
| 5    communication with anybody about an alleged incident of | 5    Mr. Minzenmayer is kind of the face of Glidewell for |
| 6    confusion between Glidewell's BruxZir product and | 6    this particular advertisement? |
| 7    another competing product? | 7    A.  No.  He's the COO of the company.  It's just |
| 8    A.  I am not. | 8    typically me getting interviewed for these things as |
| 9        MR. JANKOWSKI:  Let me provide with you a | 9    kind of the public dentist face of the company. |
| 10   document that's been previously marked as Exhibit 18. | 10       So, no, I have no idea how -- what the genesis |
| 11   This is a one-page document out of what looks to be a | 11   of this piece was, but -- what did you ask?  How unusual |
| 12   publication called "Enterprise 360." | 12   it was or... |
| 13       (Whereupon, Exhibit 18 was marked | 13   Q.  Well, I was just wondering whether you thought |
| 14       for identification.) | 14   it was unusual that Mr. Minzenmayer was the face that |
| 15       THE WITNESS:  Actually, it's called Dental | 15   was presented here. |
| 16   Products Report. | 16   A.  Oh. |
| 17       MR. JANKOWSKI:  Thank you. | 17   Q.  It sounds like you don't expect to see him as |
| 18   dentalproductsreport.com.  The title of this page is | 18   the face of Glidewell on an advertisement. |
| 19   "Glidewell Laboratories."  It bears Production | 19   A.  Well, I'm not convinced that this is an |
| 20   No. GL199. | 20   adver- -- I don't -- this doesn't look like a typical |
| 21   BY MR. JANKOWSKI: | 21   advertisement.  It certainly appears to be only about |
| 22   Q.  Dr. DiTolla, have you ever seen Exhibit 18 | 22   us -- oh, "Special Advertising Section."  I take that |
| Page 179 | Page 181 |

Pages 178 to 181

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-86-

1 back. Okay.
2      Yeah, I haven't seen Greg interviewed as much
3 in nonimplant publications as in implant publications.
4      Q.  In the implant arena, though, you would not be
5 surprised to see him associated --
6      A.  No.
7      Q.  Okay.
8      At the bottom you see a reference to "Featured
9 Products."  Do you see that?
10      A.  I do.
11      Q.  It includes "BruxZir Solid Zirconia" at the
12 lower left.  Do you see that?
13      A.  I do.
14      Q.  And the very last sentence underneath "BruxZir
15 Solid Zirconia" reads, "BruxZir is ideal for bruxers and
16 grinders who have previously broken other restorations."
17      Do you see that?
18      A.  I do.
19      Q.  So again this piece is consistent with the
20 marketing direction that Glidewell followed with this
21 product; correct?
22      A.  Correct.

Page 182

1      Q.  And this is, looks like, dated August 2010.
2      Do you see that?
3      A.  I do.
4      Q.  Are you in the picture in the upper right?  It
5 looks like there's a picture of a bunch of Glidewell
6 people.
7      A.  I'm not.  That's the R&D department.
8      Q.  Oh, this is the R&D team.  Okay.
9      A.  But Robin Carden's the huge guy in the back.
10      Q.  I was about to ask that.
11      Okay.  So that's Mr. Carden at the very back.
12      A.  Yes.
13      Q.  He's easy to spot.
14      A.  That picture doesn't do him justice, because
15 it's taken from a ladder 20 feet up in the air.
16      Q.  Okay.  You can set that exhibit aside.
17      A.  Okay.
18      Q.  Let me ask you some -- have you go back in time
19 to 2009 or even before.
20      So what's your understanding for how well known
21 the terms "brux," "bruxer" and "bruxism" were in the
22 dental dentistry.

Page 183

1      A.  The terms "brux," "bruxism"...
2      Q.  And "bruxer."
3      A.  And "bruxer"?
4      Q.  Yeah.  And let's go back to when you were at
5 the University of the Pacific, when you were in dental
6 school.  I mean, did those terms come up, you know,
7 during your dentist education?
8      A.  Yes.
9      Q.  In what context would they have come up?
10      A.  In diagnosis and treatment planning.  In the
11 talk of occlusion, classes like occlusion where you're
12 talking about how the teeth come together.
13      Q.  And are all three of those terms, terms that
14 would have come up, "brux," "bruxer" and "bruxism"?
15      A.  Yes.
16      Q.  And based on your education and knowledge,
17 what's your definition of "bruxism"?
18      A.  "Bruxism" I would define as a parafunctional or
19 an abnormal wearing of the teeth through muscle activity
20 in the patient.
21      Q.  So "muscle activity" would mean grinding or
22 clenching?

Page 184

1      A.  Bruxism, yeah, tends to refer to grinding more
2 than clenching, but muscle activity is responsible for
3 both of them.
4      Q.  Is bruxism something that -- the people
5 afflicted with bruxism, they grind their teeth without
6 even being aware of it?
7      A.  That's correct.
8      Q.  How common is it in the population, do you
9 know?
10      A.  It's hard to say.  I've seen numbers saying
11 50 to 60 percent, but they always lump in the clenchers
12 and grinders.  So I haven't seen one that is strictly
13 based on bruxism, but I've seen 50 to 60 for the
14 combination of the two, the clenchers and the grinders,
15 who show different patterns on their teeth by how they
16 wear.
17      Q.  So clenchers have one pattern; grinders have
18 another?
19      A.  Yes.
20      Q.  I'm sorry.  Combining those two is what
21 percentage?
22      A.  50 to 60 are the estimates that I've heard.

Page 185

Pages 182 to 185

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-87-

| | |
|---|---|
| 1   Q.  50 to 60 percent? | 1   other companies off the top of my head where I've seen |
| 2   A.  Yeah. | 2   them do that. |
| 3   Q.  So is the estimate that 50 to 60 percent of the | 3   Q.  Would it surprise you to hear that other |
| 4   population suffers from bruxism or... | 4   companies are using the term "bruxer" to refer to |
| 5   A.  Or clenching. | 5   somebody afflicted with bruxism? |
| 6   Q.  Or clenching. | 6   A.  Like what kind of company? |
| 7      Does anybody, you know, split out what | 7   Q.  Companies who provide goods or services in the |
| 8   percentage suffers from bruxism without clenching? | 8   dental industry. |
| 9   A.  I have not seen that. | 9   A.  No, it would not surprise me. |
| 10  Q.  You haven't seen that?  Okay. | 10  Q.  In other words, Glidewell is talking about its |
| 11     How about the term just "brux"?  I mean, you're | 11  product being ideal for bruxers.  It wouldn't surprise |
| 12  also aware of the term "brux"; correct? | 12  you that there's other companies out there -- |
| 13  A.  Yeah, but that's the least common of the three. | 13  A.  Right. |
| 14  I mean, it's just used as a verb, "Does she brux?" or | 14  Q.  -- saying, "Our product is good for bruxers" -- |
| 15  something like that. | 15  A.  Correct. |
| 16  Q.  To brux? | 16  Q.  -- or something like that? |
| 17  A.  Yeah. | 17  A.  Correct. |
| 18  Q.  And then "bruxer" is a noun; correct? | 18  Q.  How about -- have you heard the phrase "bruxer |
| 19  A.  Yes. | 19  crown" used together?  And I'm spelling it b-r-u-x-e-r, |
| 20  Q.  What's your definition of "bruxer"? | 20  space, "crown."  Have you ever seen that phrase used? |
| 21  A.  Someone who suffers from bruxism. | 21  A.  No. |
| 22  Q.  And for a population of dentists, they'll be | 22  Q.  So you haven't used -- I mean, does Glidewell |
| Page 186 | Page 188 |
| 1   aware of bruxism and the term "bruxer"; correct?  In the | 1   ever use that phrase? |
| 2   United States? | 2   A.  B-r-u-x-e-r "crown"? |
| 3   A.  Yes, they've heard those words. | 3   Q.  Correct.  Correct. |
| 4   Q.  In fact, that's one reason Glidewell's using it | 4   A.  No.  I don't know how you would even use it in |
| 5   in its marketing materials is because the target | 5   a sentence. |
| 6   audience is dental professionals who will recognize the | 6   Q.  Well, a bruxer crown -- b-r-u-x-e-r "crown" as |
| 7   term; correct? | 7   a crown for bruxers.  You haven't seen that usage? |
| 8   A.  That's part of what makes the name memorable. | 8   A.  No.  Nor clencher crown. |
| 9   Q.  And you're familiar with the term "bruxer" | 9   Q.  Okay. |
| 10  being used by others other than Glidewell; correct? | 10  A.  Or perio crown. |
| 11  A.  BruxZir with a Z? | 11  Q.  What was the last one? |
| 12  Q.  I'm sorry.  Now I've got to clarify. | 12  A.  Perio crown for somebody with -- you know, that |
| 13     "Bruxer," b-r-u-x-e-r, that term is used, | 13  needed it for periodontal splinting or something like |
| 14  you know, throughout the dentistry to refer to somebody | 14  that. |
| 15  who has bruxism; correct? | 15  Q.  Okay. |
| 16  A.  Correct. | 16     MR. JANKOWSKI:  Dr. DiTolla, I'm going to hand |
| 17  Q.  And you've seen the term "bruxer," b-r-u-x-e-r, | 17  you a document previously marked as Exhibit 27.  This is |
| 18  you know, in written publications of other companies | 18  a document produced in this case bearing Production |
| 19  referring to people who are afflicted with bruxism; | 19  Nos. KDA-002350.  It is a three-page document, and it |
| 20  correct? | 20  has a reference to Oral Arts Dental Laboratories on it. |
| 21  A.  Not other companies, but in dental journal, | 21     (Whereupon, Exhibit 27 was marked |
| 22  articles written by dentists.  I can't think of any | 22      for identification.) |
| Page 187 | Page 189 |

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-88-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

1     THE WITNESS: Okay.
2   BY MR. JANKOWSKI:
3     Q. Dr. DiTolla, I'll just direct your attention to
4   the first page of Exhibit 27, and you'll see there's a
5   reference to a corrective product -- I'm not using the
6   right phrase. What's the right phrase?
7     MR. TACHNER: Restorative?
8   BY MR. JANKOWSKI:
9     Q. A restorative product -- dental product.
10     Do you see that?
11     A. No. Where it says "Recommended Cementation for
12   Zirconia"? What are we...
13     Q. Well, the page as a whole. What's being
14   shown -- what's your understanding of what's been shown
15   on the front page of Exhibit 27?
16     A. It looks like a website for a BruxZir crown or
17   bridge.
18     Q. Right, right.
19     A. Okay.
20     Q. And in this particular one, the very bottom
21   line of -- you know, the description underneath the
22   pictures there says, "Ideal for patients with reduced
                                                  Page 190

1     Q. Are they one of Glidewell's authorized
2   laboratories, do you know?
3     A. I do not. It doesn't appear they are, but I do
4   not.
5     Q. They have a product here that they're calling a
6   Z-Brux crown. Do you see that?
7     A. I do.
8     Q. Looking at the description to the right of the
9   picture of the Z-Brux crown, you see that it refers to
10   it as a solid zirconia crown with no porcelain overlay
11   and that it provides strength and esthetics.
12     Do you see that?
13     A. I do.
14     Q. So this is something which is competing with
15   Glidewell's BruxZir product, B-r-u-x-Z-i-r, crown;
16   correct?
17     A. Correct.
18     Q. And they characterize this product as
19   "indicated as an option for bruxers who have broken down
20   natural teeth or for PFM metal occlusal or full-cast
21   crowns." Do you see that?
22     A. I do.
                                                  Page 192

1   vertical clearance or bruxers."
2     Do you see that?
3     A. I do.
4     Q. So here's an example of the noun "bruxer" being
5   used by this dental lab to refer to somebody who could
6   be using this product; correct?
7     A. Correct.
8     Q. And, as you said, you're not surprised to see
9   that; correct?
10     A. Correct.
11     MR. JANKOWSKI: Dr. DiTolla, I'm going to hand
12   you a document previously marked as Exhibit 28. This is
13   a two-page document associated with Barth Dental Labs.
14   It was produced in this case with Production
15   Nos. KDA-002446 through 2447.
16     (Whereupon, Exhibit 28 was marked
17     for identification.)
18   BY MR. JANKOWSKI:
19     Q. Have you seen this document before?
20     A. I have not.
21     Q. Are you familiar with Barth Dental Labs?
22     A. Only heard the name in passing.
                                                  Page 191

1     Q. So this is another instance of a product like
2   this being indicated for bruxers. Do you see that?
3     A. I do.
4     Q. And, again, that doesn't surprise you because
5   it's a competing product to Glidewell's product;
6   correct?
7     A. No, it doesn't surprise me, because as I sat
8   and thought about it, there are lots of companies who
9   advertise products for bruxers, including people who
10   make occlusal splints and the -- there's a lot of people
11   who are trying to help people with bruxism.
12     MR. JANKOWSKI: Next I'm going to hand you a
13   document that was previously marked as Exhibit 32. This
14   is a two-page document produced in this case bearing
15   Production Nos. KDA-002237 -- I'm sorry. It's a
16   three-page document bearing Production Nos. KDA-002237
17   through 2239, and it's a printout associated with a
18   company China Dental Outsourcing, Inc.
19     (Whereupon, Exhibit 32 was marked
20     for identification.)
21   BY MR. JANKOWSKI:
22     Q. Are you familiar with China Dental Outsourcing,
                                                  Page 193

                                   Pages 190 to 193

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**
-89-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1   Inc.?
2       A.   I am not.
3       Q.   Just looking at Exhibit 32, it appears to be an
4   advertisement for an all-ceramic product which is
5   all-zirconia for bruxers.
6          Do you see that?
7       A.   I do.
8       Q.   So, again, this is another competing product to
9   Glidewell's BruxZir crown; would you agree?
10      A.   I would.
11      Q.   And it's indicated here as being something
12  which can be used with bruxers.  You'd agree with that?
13      A.   I do.
14      Q.   The way they characterize it here is they say
15  "for bruxers and heavy biters," second line down.
16          "Heavy biters," is that a term of art for
17  dentists as well?
18      A.   That is not.
19      Q.   Okay.
20      A.   That's poorly translated English.
21          MR. JANKOWSKI:  Next I'm going to hand you a
22  document previously marked as Exhibit 33.  This is a

Page 194

1   crown made from IPS e.max.
2          Do you see that?
3       A.   Yes.
4       Q.   We were talking a little bit about some of
5   those products this morning; correct?
6       A.   Yes.
7       Q.   Procera and also the IPS e.max.
8          So what's your understanding from reading this
9   what they're referring to when they put here "bruxer
10  crown" with "bruxer" in quotes?
11      A.   I haven't the slightest idea.  I haven't the
12  slightest idea, but I just -- guessing by the other
13  grammatical errors and things that I see on this page,
14  I'm assuming it's more on their end than my end that I
15  don't understand what they're talking about.
16      Q.   So to you a bruxer crown isn't a reference to a
17  crown for bruxers?
18      A.   No.  This is the first time I've ever seen that
19  term used like that or heard it used like that.
20      Q.   In that same line, as you keep going down,
21  you'll see a reference to a full-contour zirconia.
22          Do you see that?

Page 196

1   one-page document produced in this case bearing
2   Production No. KDA-002359 from Assured Dental Lab.
3          (Whereupon, Exhibit 33 was marked
4              for identification.)
5   BY MR. JANKOWSKI:
6       Q.   Are you familiar with Assured Dental Lab?
7       A.   I am not.
8       Q.   This has a description of picking the right
9   metal for a restoration.  Do you see that?
10      A.   I think it says "right metal-free restoration."
11      Q.   Thank you, yes.  "Picking the right metal-free
12  restoration," correct.
13          One of the options what they call a
14  full-contour zirconia.  Do you see that?
15      A.   I do.
16      Q.   So this is another example of a product that's
17  competing with Glidewell's BruxZir crown; correct?
18      A.   Correct.
19      Q.   And looking down, you'll see the bullet point
20  lists.  Down at the bottom there's, it looks like, nine
21  bullet points below the photo.  The fifth bullet point
22  down makes reference to a Procera Zirconia or bruxer

Page 195

1       A.   I can only guess that it's in quotes because
2   they must assume it's the incorrect use of the word.
3       Q.   How about down below, right below it.  Do you
4   see it says "full-contour zirconia"?
5       A.   Yes.
6       Q.   We talked about full-contour, the meaning of
7   that, before.  Would you interpret "full-contour
8   zirconia" there to mean a monolithic --
9       A.   Yes.
10      Q.   -- zirconia crown?
11      A.   Definitely.
12      Q.   Then if you go down to the second bullet point
13  from the bottom, you see, "Patient a grinder or bruxer
14  BruxZir."  Do you see that?
15      A.   Uh-huh.
16      Q.   And it says, "Use IPS e.max, bruxer crown or
17  ultimate restorative."  Do you see that?
18      A.   Yes.
19      Q.   So again you've got that term "bruxer crown."
20  And, again, I mean, do you have an understanding what
21  they mean by that?
22      A.   No.  But Ivoclar will be very interested to see

Page 197

Pages 194 to 197

be61b411-147b-43b5-a766-086b5efed110
EXHIBIT 4
-90-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

| | |
|---|---|
| 1   that. No, I have no idea what that means. | 1    A.  Because that's what a BruxZir crown is.  It's |
| 2       Why is it in quotes the first time and not the | 2   misspelled here. |
| 3   second time? | 3    Q.  Even though it's spelled with a lowercase b and |
| 4    Q.  I didn't create the document. | 4   spelled b-r-u-x-e-r? |
| 5    A.  I know. | 5    A.  Yes.  It's spelled with a lowercase and an |
| 6       MR. JANKOWSKI:  I'm going to have the | 6   uppercase on the last exhibit. |
| 7   court reporter mark as the next exhibit No. 45.  This is | 7       Yeah, it's -- that term is not a term that is |
| 8   a three-page document bearing Production Nos. KDA-002770 | 8   recognized or has ever been recognized by dentists, you |
| 9   through 2772, and the document at the top of it has a | 9   know, prior to us coming up with a different spelling of |
| 10   reference to the U.S. Food and Drug Administration. | 10   "bruxer."  So it's clear to me that, yes, they're |
| 11          (Whereupon, Exhibit 45 was marked | 11   referring to one of our BruxZir crowns, either from |
| 12          for identification.) | 12   Glidewell or one of the 180 authorized labs. |
| 13   THE WITNESS:  Uh-huh. | 13    Q.  Now, the writer of this presumably knows what a |
| 14   BY MR. JANKOWSKI: | 14   bruxer is, just using the noun form b-r-u-x-e-r; |
| 15    Q.  Are you familiar with the U.S. Food and Drug | 15   correct? |
| 16   Administration website? | 16    A.  I don't know.  I don't know how these were |
| 17    A.  No. | 17   reported or who's writing it, for that matter. |
| 18    Q.  You are familiar with the U.S. Food and Drug | 18    Q.  Do you have any reason to believe the writer |
| 19   Administration -- | 19   doesn't know what a bruxer is? |
| 20    A.  Yes. | 20    A.  I wouldn't know unless you told me what the |
| 21    Q.  -- as an entity? | 21   occupation of the person who wrote this was. |
| 22       Okay.  Here's a document that appears to be | 22    Q.  Well, are you familiar with the |
|                          Page 198 |                          Page 200 |

| | |
|---|---|
| 1   from the website that includes a -- what's labeled as an | 1   Kerr Corporation? |
| 2   Adverse Event Report associated with Kerr Corporation -- | 2    A.  Yes. |
| 3    A.  Kerr. | 3    Q.  Who's the Kerr Corporation? |
| 4    Q.  -- Kerr Corporation, spelled K-e-r-r, and it | 4    A.  They're a company over here in Orange that |
| 5   looks like a dental device. | 5   makes dental products. |
| 6       Do you see that? | 6    Q.  Okay.  So if this person who's the author of |
| 7    A.  Yes. | 7   this narrative is somebody who's a dental professional, |
| 8    Q.  And the narrative portion, where it says | 8   you'd expect him to know what "bruxer," the noun, |
| 9   "Manufacturer Narrative," says, "The bruxer crown was | 9   b-r-u-x-e-r, is; correct? |
| 10   recemented with a different product without further | 10    A.  It depends.  They have a lot of employees.  You |
| 11   incident, and the patient is doing fine." | 11   could go to our shipping department and find a lot of |
| 12       So here is an example of a reference to the | 12   people who don't know what a BruxZir is. |
| 13   phrase "bruxer crown."  Do you see that? | 13    Q.  So to you the most likely interpretation of |
| 14    A.  I do. | 14   this is that the "bruxer" here is a misspelling of |
| 15    Q.  So what's your understanding of what's being | 15   B-r-u-x-Z-i-r; is that correct? |
| 16   meant here in this narrative? | 16    A.  Yes. |
| 17    A.  That one of our crowns was recemented with a | 17    Q.  Do you see anything else in here that makes you |
| 18   different product without further incident, and the | 18   think that this is a Glidewell product? |
| 19   patient's doing fine, one of our Glidewell BruxZir | 19    A.  No. |
| 20   crowns. | 20    Q.  Now, under "Event Description" it makes a |
| 21    Q.  Why do you think it's a Glidewell BruxZir | 21   reference to two patients experiencing a debonding of |
| 22   crown? | 22   crowns.  Do you see that? |
|                          Page 199 |                          Page 201 |

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2012      202-232-0646

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-91-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1    A.  I do.
2    Q.  With Glidewell's product, is it typically
3    cemented or is it bonded onto the tooth?
4    A.  It can be either one.
5        You know, you're right.  That's how we know
6    this is a full-contour zirconia crown.  Remember when I
7    talked to you about the Ivoclean and how one of the
8    downsides of the BruxZir was the fact that they're --
9    they've been falling off more often than regular crowns
10   because of the contamination off the phosphates in the
11   saliva?  The thing that got us to notice that this was
12   actually happening was doctors calling us with reports
13   like this saying crowns had fallen off multiple times.
14       We usually don't get those calls from doctors,
15   because the falls off and they just put it back on
16   again.  But the crowns were falling off multiple times,
17   and they were continually contaminated with saliva
18   before they were cemented.  So that's finally when we
19   realized we need to start looking around when patients
20   called us -- I mean when doctors called us and said,
21   "These crowns are falling off multiple times."  It was
22   really the first time in dentistry, because it's the

Page 202

1    only restoration that gets contaminated by saliva.
2        So I look at that, and that's interesting to
3    see that it -- two patients experiencing debonding of
4    crowns.  That, to me, is another clue that it's the
5    full-contour zirconia crown here as opposed to just a
6    gold crown, for example.
7    Q.  It could be a full-contour zirconia crown
8    provided by somebody other than Glidewell though;
9    correct?
10   A.  That too.  Yeah, that too.  But to me it just
11   suggests that somebody said the name "BruxZir" and
12   somebody typed in the name "BruxZir" or whatever
13   happened.  To me, that is a misspelling, but yeah, it
14   could have been another full-contour crown by what I was
15   saying.  It's not specific to our full-contour zirconia
16   crowns that they fall off.  It happens to all
17   full-contour zirconia crowns.
18   Q.  I think I asked you this question earlier, but
19   I just want to get back to this question of the use of
20   the BruxZir name.  And we talked about how you were
21   involved, you know, back in mid-2009 about that.
22   A.  Uh-huh.

Page 203

1    Q.  We've also talked about how the BruxZir,
2    B-r-u-x-Z-i-r, name has shown up on milling machines and
3    so on.
4    A.  Right.
5    Q.  Is it fair to say they're not consulting you
6    internally at Glidewell before they use the name on a
7    milling machine or on some other product?  Is that
8    correct?
9    A.  Consulting me?
10   Q.  Correct.
11   A.  Yeah, no, they don't need to consult me for
12   that.
13   Q.  And I think we've already kind of established
14   that that's not really your area.  It's these other --
15   these other products --
16   A.  Right.
17   Q.  -- what's going on with them is not -- that's
18   not -- you're not the person to talk to about that?
19   A.  Correct.
20   Q.  And that includes the use of the mark on those
21   products.  You're not --
22   A.  Correct.

Page 204

1    Q.  -- the person to talk to.  Okay.
2        And we also talked about marketing channels for
3    the mark, for example, the mark being used in various
4    capacities, and we've looked at some exhibits today.
5    But I think we established that other people within the
6    marketing department are the people who are deciding
7    what goes into what marketing channels; is that fair?
8    A.  Yes.
9    Q.  And, again, your job is to be a dentist, to be
10   a clinical practitioner and to use the product and teach
11   the public about the product?
12   A.  Correct.
13   Q.  We did look at the one document with
14   Nicole Fallon sending the sample letter that was
15   addressed to Mr. Shuck.  Let me ask you more generally:
16   From your interactions with the dental community, are
17   you aware of any incidents of confusion between
18   Glidewell's BruxZir name, B-r-u-x-Z-i-r, and
19   Keating Dental Art, Inc.'s use of KDZ Bruxer,
20   B-r-u-x-e-r?
21       Do you have personal knowledge of any incidents
22   of confusion between those two names?

Page 205

Pages 202 to 205

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-92-

1    A.  No.
2    Q.  So that's not something where somebody's coming
3  up to you to talk about that or raise some issue where
4  you're like, "Whoa, that's the wrong thing"?
5    A.  Yeah, no one's ever asked me that question.
6    Q.  Are you involved at all in Glidewell's efforts
7  to enforce its trademarks in BruxZir, B-r-u-x-Z-i-r?
8    A.  No, I'm not.
9    Q.  So you're not involved in identifying potential
10  problems, people to go after --
11    A.  No.
12    Q.  That's other people?
13    A.  That's other -- yeah, that's the legal people.
14    Q.  Do you know who is involved in enforcement?
15      Obviously Mr. Allred is.  Are there people
16  outside of the legal department who he's working with?
17    A.  Within the company?
18    Q.  Right.
19    A.  Not to my knowledge.  I think he's the -- well,
20  there might be one other attorney who I haven't met
21  before who works for us now, but I don't know if he's
22  involved at all in that case.  So I don't -- no, I don't

Page 206

1  see Keith talking to anybody but outside people.
2      MR. JANKOWSKI:  Why don't we take a real short
3  break, and then I just want to bring a laptop over and
4  show Dr. DiTolla the compendium that was produced in the
5  case.
6      Not the whole thing obviously, but I just want
7  to show it and see whether you recognize it and can
8  identify what it is.
9      THE WITNESS:  Okay.  Sure.
10      MR. TACHNER:  So what are you talking about,
11  10 minutes?
12      MR. JANKOWSKI:  Even 5.
13      MR. TACHNER:  Okay.  Sure.
14      THE VIDEOGRAPHER:  Off the record at 3:30 p.m.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  Back on the record
17  at 3:38 p.m.
18  BY MR. JANKOWSKI:
19    Q.  Now, Dr. DiTolla, what I'd like to do next is
20  address with you a topic, which is Glidewell's
21  compendium of videos that it's created associated with
22  its BruxZir product.

Page 207

1    A.  Okay.
2    Q.  First of all, do you understand what I mean
3  when I talk about a compendium.
4    A.  I think you're referring to the DVD that we
5  call the Compendium Edition.
6    Q.  Correct.
7    A.  Okay.
8    Q.  Can you describe for me what the compendium is?
9    A.  I believe it was just a name that we came up
10  with of a bunch of leftover clinical cases that I had
11  where they weren't feature cases, but we decided to take
12  them and put them together on a compilation disc, and
13  someone came up with the name Compendium Edition.
14    Q.  Who's the intended audience of the Compendium
15  Edition.
16    A.  Dentists.
17    Q.  Dentists?
18    A.  Uh-huh.
19    Q.  Okay.  And the Compendium includes an
20  introduction; correct?
21    A.  I haven't seen this in forever.
22    Q.  Okay.  And you don't recall?

Page 208

1    A.  I don't recall, no.
2    Q.  You'll get to see in a moment.
3    A.  Okay.
4    Q.  My understanding is there's an introduction,
5  and then there's a number of videos associated with the
6  Compendium as well.
7    A.  Okay.
8    Q.  What I'd like to do now is just play the
9  introduction and have you watch it --
10    A.  Okay.
11    Q.  -- and just see whether you recognize what
12  you're looking at.  Okay?
13    A.  Okay.
14      (DVD played.)
15  BY MR. JANKOWSKI:
16    Q.  I just want to ask you, do you recognize the
17  video that you were watching?
18    A.  Yes, it was really good.  That speaker you
19  chose was amazing.
20    Q.  I thought you would like that.
21      Do you recognize that as part of the compendium
22  that Glidewell put together?

Page 209

Pages 206 to 209

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-93-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

Page 210

```
 1      A.  Yes.
 2      Q.  And, in fact, that was you in the video;
 3  correct?
 4      A.  That was.
 5      Q.  Did you write the script?
 6      A.  That's without a script.  That's off the top of
 7  my head.
 8      Q.  So you were speaking spontaneously or --
 9      A.  Yes.  Yeah.
10      Q.  "Extemporaneously" is maybe the best word.
11      A.  Yes.
12      Q.  So that was filmed in 2011; correct?
13      A.  I made a reference to year-to-date 2011, so it
14  was -- I don't know when, but it was at some point
15  in 2011.
16      Q.  And that was filmed at Glidewell's facility?
17      A.  Yes.
18      Q.  Does Glidewell have like a little studio for
19  that purpose?
20      A.  That's actually in my little dental office, but
21  there is a studio downstairs where we can shoot as well.
22      Q.  So it's a part of your dental office which you
```

Page 211

```
 1  use for making videos?
 2      A.  It is the dental office.  There just didn't
 3  happen to be a patient in there, so I'm just sitting in
 4  my regular chair next to the patient chair, recording
 5  it.
 6      Q.  And the person filming it is a Glidewell
 7  employee; correct?
 8      A.  Yes.
 9      Q.  And he's a videographer?
10      A.  He is.
11      Q.  Is he the same videographer that tends to film
12  all your videos?
13      A.  He is.
14      Q.  What's his name?
15      A.  James Kwasniewski, K-w-a-s-n-i-e-w-s-k-i.
16      Q.  These Polish names always get you.
17      A.  I know.
18      Q.  In the video you made reference
19  to 145 authorized labs, so I think that's number is up
20  to 180 by now; correct?
21      A.  Something like that, yes.
22      Q.  And in the video you made reference to there
```

Page 212

```
 1  being a million crowns that had been done.
 2          Did you hear that?
 3      A.  Between our lab and the partner laboratories,
 4  yes.
 5      Q.  Right, right.  Do you know what that number has
 6  grown to today?
 7      A.  I don't off the top of my head.
 8      Q.  Okay.
 9      A.  But it's probably doubled, I would assume.
10      Q.  And you also had in there some percentage as to
11  what percentage of the crowns were all-ceramic versus
12  PFMs.  I think you said 27 percent of the crowns were
13  PFMs in that intro.
14          Do you know what that percentage is today?
15      A.  Yeah, it's down to 20 now.
16      Q.  So now it's down to 20 percent of crowns being
17  PFMs.
18      A.  Yes.
19      Q.  And that was a true and correct copy of the
20  video as far as you know; correct?
21          I mean, again, this is the video that was
22  produced to Glidewell in this case, but it looks like an
```

Page 213

```
 1  unaltered, accurate video to you?
 2      A.  Correct.
 3      Q.  You don't see anything -- any reason to think
 4  it was altered or anything?
 5      A.  Not until it just randomly stopped playing.
 6      Q.  Okay.  Right.
 7      A.  I don't know what that was about, but...
 8      Q.  I don't know either, but I think we saw enough
 9  for our purposes here today.
10          Okay.  One question I have for you that I meant
11  to ask you earlier when we were talking about "bruxer,"
12  b-r-u-x-e-r, as a noun.
13      A.  Uh-huh.
14      Q.  Have you ever heard that word used as a noun to
15  refer to a crown?
16      A.  No.
17      Q.  So you've never heard a crown itself referred
18  as a bruxer, b-r-u-x-e-r?
19      A.  No.
20          MR. JANKOWSKI:  Let me show you Tab D.  Let me
21  have the court reporter mark as Exhibit 46 a two-page
22  document, which is a prescription form from Trachsel
```

Pages 210 to 213

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-94-

10/2/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

1   Dental Studio bearing Production Nos. KDA-002832
2   and 2833.
3          (Whereupon, Exhibit 46 was marked
4          for identification.)
5   BY MR. JANKOWSKI:
6      Q.  And, Dr. DiTolla, if you could just briefly
7   look at Exhibit 46.
8          Are you familiar with the Trachsel Dental
9   Studio?
10     A.  I am not.
11     Q.  Okay.  This looks like a prescription form of
12  the type that a dentist office would use to order a
13  crown, for example; correct?
14     A.  Correct.
15     Q.  And if you look on the left side, you'll see
16  there are various products that can be ordered through
17  the prescription form.
18         Do you see that?
19     A.  I do.
20     Q.  And do you see about -- maybe seven entries
21  down I see an "all-zirconia Bruxer," spelled
22  B-r-u-x-e-r.

                                            Page 214

1      Q.  And it says "Porcelain to Zirconia."  So that's
2   one of these bilayer products?
3      A.  Correct.
4          Why am I not seeing that for some reason?
5      Q.  I'm sorry.  "Lava" is the third entry down.
6      A.  Oh, it's in parentheses after it, yes.
7      Q.  And at the very bottom there's references to
8   some gold products.  Do you see that?
9      A.  I do.
10     Q.  Do you know what percentage of patients today
11  get gold?
12     A.  Just over 3 percent.
13     Q.  Just over 3 percent?
14         MR. JANKOWSKI:  I'd like to have the
15  court reporter mark as Exhibit 47 a one-page document
16  bearing Production No. KDA-002758, and it has a
17  reference on it to Dani, spelled D-a-n-i, Dental Studio.
18         (Whereupon, Exhibit 47 was marked
19         for identification.)
20  BY MR. JANKOWSKI:
21     Q.  And, Dr. DiTolla, if you could just briefly
22  look at Exhibit 47.  This appears to be another

                                            Page 216

1      Do you see that?
2      A.  I do.
3      Q.  So this appears to be an instance where the
4   word "bruxer," b-r-u-x-e-r, is being used as a noun as a
5   reference to a crown.  Would you agree with that?
6      A.  Yes.
7      Q.  Do you know whether the references elsewhere on
8   here are also to crowns?
9          For example, the Empress, is that a reference
10  to a crown?  That's the second entry down.
11     A.  Not necessarily.  It could be a crown or a
12  veneer or an inlay or an onlay.
13     Q.  And how about the Procera?  That also could be
14  various things?
15     A.  That could be a crown or a veneer as well.
16     Q.  How about the Mirage Fortress?  Do you know
17  what that is?
18     A.  No, I don't.  I thought that was off the
19  market, but...
20     Q.  And I see the reference to Lava.  I think you
21  were testifying about Lava this morning; correct?
22     A.  Correct.

                                            Page 215

1   prescription form that a dentist would use to order
2   dental restoration products; do you agree?
3      A.  I agree.
4      Q.  Are you familiar with Dani Dental Studio?
5      A.  No.
6      Q.  You'll see on the left side there, there's a
7   number of all-ceramic products that are listed as
8   available.  Do you see that?
9      A.  I do.
10     Q.  I see "e-max," which I would interpret as being
11  a reference to the e.max product we were talking about
12  earlier; would you agree?
13     A.  Correct.  But as you pointed out, it's and
14  e-dot-max, not a hyphen.
15     Q.  If you look down, there's two zirconia products
16  identified with "zirconia" in the name, "Full Zirconia"
17  and then in parentheses "Bruxer."
18         Do you see that?
19     A.  I do.
20     Q.  And then a zirconia crown, in parentheses,
21  "layered."  Do you see that?
22     A.  I do.

                                            Page 217

Pages  214  to  217

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-95-

```
 1     Q.  And then I believe Lava we already established
 2   was a product that had some zirconia in it as well;
 3   correct?
 4     A.  Yeah, it's a layered zirconia crown.
 5     Q.  So here, this is an instance of Dani Dental
 6   Studio referring to a full zirconia crown as a Bruxer;
 7   wouldn't you agree?
 8     A.  I would agree.
 9          MR. JANKOWSKI:  I'm going to have the
10   court reporter mark as Exhibit 48 a five-page document
11   bearing Production Nos. GL-226, listed as page 1 of 5
12   through page 5 of 5.  The document at its top says
13   "Standard Operating Procedure," and also there's a
14   reference to Prismatik Dentalcraft, Inc.
15              (Whereupon, Exhibit 48 was marked
16               for identification.)
17   BY MR. JANKOWSKI:
18     Q.  Now, Dr. DiTolla, have you ever seen Exhibit 48
19   before?
20     A.  I have not.
21     Q.  Just looking at it, do you have any
22   understanding for what this document is?
                                         Page 218
```

```
 1     A.  Not really.
 2     Q.  Do you know who Prismatik Dentalcraft is?
 3     A.  I do.
 4     Q.  Who are they?
 5     A.  I believe a company that -- manufactures the
 6   BruxZir?  I don't know the exact relationship between us
 7   and them.
 8     Q.  When you say "BruxZir," you mean the milling
 9   pucks?
10     A.  Yes.  Yes, the BruxZir material.
11     Q.  So they would be a supplier of the BruxZir
12   zirconia material?
13     A.  Yeah, I'm guessing, but -- I shouldn't even
14   have commented.  I'm just kind of guessing.  I know that
15   they have something to do with it, but I'm not exactly
16   sure what their relationship is.
17     Q.  Do you recognize any of the names that are
18   listed there with signatures?
19     A.  Three of them I do.
20     Q.  Which three?
21     A.  Grant, Tom and Kathleen.
22     Q.  And who is Grant?
                                         Page 219
```

```
 1     A.  Well, it says "Director of Implant R&D" to the
 2   left of his name.
 3     Q.  Is he a director of implant R&D at Glidewell?
 4     A.  Yes.
 5     Q.  And it lists "Zirconia Manufacturing
 6   Supervisor" next to Tom Valentine's [sic] name.  Is that
 7   his position at Glidewell?
 8     A.  It's Valenti, and yes, that's my understanding
 9   that's his position.
10     Q.  Valenti.  Thank you.
11          And then next to Kathleen's name -- I don't
12   even want to attempt her last name.
13     A.  Dragovich.
14     Q.  Dragovich.
15          Do you know what her title is?
16     A.  It looks to be Manager of RA/QA.
17     Q.  Do you know what RA and QA are?
18     A.  No.  I could take an educated guess, but...
19     Q.  QA might be quality assurance?
20     A.  Right.
21     Q.  And the name above Kathleen's you don't
22   recognize because it's such a scribbled signature;
                                         Page 220
```

```
 1   correct?
 2     A.  Right.
 3     Q.  Okay.  And you weren't involved at all in the
 4   manufacturing of the milled zirconia; is that correct?
 5     A.  No.  It's at another building.
 6     Q.  Who at Glidewell would be able to answer
 7   questions on this topic?
 8     A.  Robin Carden.
 9     Q.  Mr. Carden?
10     A.  Yes.
11          MR. JANKOWSKI:  I'll have the court reporter
12   mark as Exhibit 49 a document, roughly, 15 pages.  I'm
13   estimating.  On the front page it says
14   "Northcoast Research," and it starts off with Production
15   No. GL-188, page 1 of 6, and it ends with GL-189, page 7
16   of 7.
17              (Whereupon, Exhibit 49 was marked
18               for identification.)
19   BY MR. JANKOWSKI:
20     Q.  Dr. DiTolla, have you ever seen Exhibit 49
21   before or any of the parts of it?
22     A.  I've seen this publication before.  I don't
                                         Page 221
```

Pages 218 to 221

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

10/2/2012        James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.        Michael DiTolla

1   know if I've seen this exact issue.
2       Q.   And what is the publication?
3       A.   Northcoast Research.  They're an analyst group
4   for the health care industry.
5       Q.   Do you have an understanding for why this
6   document was produced in the case by Glidewell?
7       A.   No.
8       Q.   Is there somebody at Glidewell who would be
9   monitoring the content of this publication or likely be
10  reading it?
11      A.   Jim Shuck.
12      MR. JANKOWSKI:  I'll have the court reporter
13  mark as Exhibit 50 Glidewell's Initial Disclosures
14  Pursuant to Federal Rules of Civil Procedure 26.  And,
15  Dr. DiTolla, I'll just represent to you, this is a
16  document that was served by Glidewell in the litigation
17  providing information on facts or witnesses associated
18  with the case.
19          (Whereupon, Exhibit 50 was marked
20           for identification.)
21  BY MR. JANKOWSKI:
22      Q.   And if you turn to the second page of the
                                              Page  222

1   knowledge.  It's e-mail from Dennis.  It's time spent
2   with Dennis at lectures.  And the BruxZir product has
3   kind of flipped the dental market around, and it's the
4   number one lecture that the dental societies ask for and
5   that the doctors ask for as well.  And it's been -- as
6   the first person to come to market with it, and it's
7   been something that's been clearly associated with us
8   and our educational pieces and everything we've done in
9   the magazine and...
10      Q.   Now, you said "the number one lecture."  I
11  don't know what you're referring to.  What lecture is
12  that?
13      A.   Oh, I'm just referring to the fact that when
14  dental societies call up and want a lecture, and I say,
15  "What are you guys interested in hearing?" that's what
16  they want to hear about is monolithic restorations.
17  They want to hear about e.max and BruxZir.
18      Q.   So that lecture is not specific to "BruxZir"
19  with a Z though; right?
20          It also includes other products like the e.max
21  product; correct?
22      A.   Correct.
                                              Page  224

1   document, you'll see there's a reference to yourself
2   with an indication that you are a witness with knowledge
3   regarding the strength of the trademark.
4       Do you see that?
5       A.   Uh-huh.
6       Q.   What knowledge do you have -- let me ask you
7   just generally, what knowledge do you have regarding the
8   strength of the trademark?  And the trademark here would
9   be a reference to "BruxZir," B-r-u-x-Z-i-r.
10      A.   I'm not sure I understand the question in
11  regards to strength of the trademark.  That's kind of a
12  legal term that I'm not familiar with it.
13      Q.   Well, let me ask the question this way:  What
14  facts are you aware of that indicate that "BruxZir,"
15  B-r-u-x-Z-i-r, is an indicator of Glidewell as the
16  source of the product to the relevant purchasing
17  population of customers?
18      A.   That "BruxZir" with a Z is identified with
19  Glidewell?
20      Q.   Correct.  What personal knowledge do you have
21  that pertains to that?
22      A.   Oh, well, you said facts.  It is all personal
                                              Page  223

1       Q.   When you're lecturing, are you referring to,
2   you know, full-contour zirconia products generally, or
3   are you referring just to Glidewell's BruxZir products?
4       A.   Everything I show is a Glidewell BruxZir case
5   that was done in the lab, but I use the terms
6   interchangeably for educational purposes.
7       Q.   Use which terms interchangeably?
8       A.   "BruxZir crown" and "full-contour zirconia."  I
9   want to drive it into them and make sure they walk away
10  knowing that it's a solid zirconia crown, in addition to
11  showing them what it looks like.
12      Q.   When you say "BruxZir" and "full-contour
13  zirconia" are used interchangeably, you're saying
14  "BruxZir" with a Z?
15      A.   Yes, "BruxZir" with a Z.
16      Q.   Okay.  And --
17      A.   And the audience knows that.
18      Q.   Okay.
19      A.   And it's not -- and the reason Glidewell's not
20  involved is that I'm able to refer to those 180 labs
21  that we've talked about several times too.
22      Q.   Right.
                                              Page  225

                                    Pages  222 to 225

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-97-

**Page 226**

1    A.  I'm not there trying to say, "Hey, send your
2  stuff to Glidewell."  I'm saying, "Hey, here's e.max.
3  Here's BruxZir.  Here's these new modern restorations.
4  Here's how they can be used, and you don't have to send
5  it to us.  You can send it to your local laboratory, if
6  they're an authorized user" kind of thing.
7    Q.  Now, there are other full-contour zirconias
8  providers --
9    A.  Yes, there are.
10    Q.  And your audience is aware of that as well;
11  correct?
12    A.  They probably are, yeah, if they've been
13  looking through trade journals and things like that.
14    Q.  You say they probably are.  Your lecture
15  doesn't educate them about that; is that correct?
16    A.  I refer to other -- just like I did in the
17  introduction, I said there's probably 11 other kind of
18  generic alternatives.  So, yeah, I always refer to the
19  fact that there are other materials available besides
20  ours.
21    Q.  Do you have any videotapes of this lecture that
22  you've given?  Do you maintain an archive of them?

**Page 227**

1    A.  No, we really don't.  They're all over the
2  country in Holiday Inns and Westins and convention
3  centers, and there's typically nobody there --
4    Q.  Are they videotaped by --
5    A.  -- to tape it.
6    Q.  -- the dental societies?
7    A.  Not really.  That used to be something that
8  happened at the larger meetings.  Videotaping stopped a
9  long time ago and then some audiotapes for a few years
10  after that, but there's not much taping done anymore.
11  They really are trying to get attendees to show up at
12  the meeting so they can tell the exhibitors, "There will
13  be 3,000 dentists here."
14    Q.  Now, separately from the lectures -- or,
15  actually, it could even be in connection with the
16  lectures, is it your testimony that you can tell from
17  your conversations with dentists that the term
18  "BruxZir," B-r-u-x-Z-i-r, is associated with Glidewell
19  as the origin of the good?
20    A.  I'm not sure I understand what "origin of the
21  good" means.
22    Like, for example, if they order it from one of

**Page 228**

1  the 180 partner laboratories, the BruxZir originated
2  from us, but their local laboratory made it.  It's a
3  Glidewell product sold through another laboratory.
4    Q.  Okay.  That's an excellent point.
5    So when a dentist is ordering BruxZir with a Z
6  from an authorized lab, does the dentist know that
7  Glidewell is somehow associated with the product?
8    A.  If they're-- yeah, all the advertisements that
9  we do with it, I don't know how they wouldn't know it's
10  associated with it.  We've created the market for this
11  material, for the full-contour zirconia material.
12    Q.  Do they know it from the prescription form that
13  the dentists use?
14    A.  Actually, some of our partner laboratories do
15  get our prescription.  If you remember that one letter,
16  the Nicole Fallon one, it said there was going to be
17  four Rx slips on there.  So it's an actual prescription
18  slip that's the $20 off coupon, and some of our partner
19  labs get those.  We sent them to the dentist, and the
20  dentist sends it to the partner lab on ours requesting
21  the discount -- on a Glidewell Rx to those partner labs,
22  and the partner labs call and say, "Do we have to honor

**Page 229**

1  this $20 off?"
2    Q.  The $20 coupon is like connected to the
3  prescription form or --
4    A.  Yes.  It is the prescription form.
5    Q.  Oh, okay.
6    A.  They're one and the same.
7    MR. JANKOWSKI:  This will help.  Let me show
8  you what's been previously marked as Exhibit 35.  It's
9  is an assemblage of documents.  It's six pages long, and
10  the last four pages bear Production Nos. KDA-002782,
11  2788, 2784 and 2786.
12    I'm sorry.  It's more than six pages long.
13  It's actually twelve pages long.  It's two-sided.  And
14  it also includes within it --
15    THE WITNESS:  Well, it's really just the front
16  page that we're interested in.  The back is just the
17  terms and warranty.
18    MR. JANKOWSKI:  Right.  There's also a
19  reference to GL-107, a Glidewell-produced document.
20    (Whereupon, Exhibit 35 was marked
21    for identification.)
22

Pages 226 to 229

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-98-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Michael DiTolla

BY MR. JANKOWSKI:

1  Q.  Dr. DiTolla, do you recognize these as
prescription forms associated with Glidewell
Laboratories?
   A.  Yes.
   Q.  And you've seen these before; correct?
   A.  I have.
   Q.  These are made by Glidewell in the ordinary
course of business for use by dentists; correct?
   A.  Yes.  The top two specifically are sent out in
targeted market pieces, and then the rest are just
normal, nondiscounted prescriptions that would go out to
dentists when they needed prescription slips that
weren't part of a promotion for something.  So there's
no discount on this last form.
   Q.  So for these particular prescription forms, to
the extent these are used -- I see "Glidewell
Laboratories" identified on the prescription form at the
upper left.  Do you see that?
   A.  Yes.
   Q.  Do the authorized laboratories get any
prescription forms from dentists for Glidewell's BruxZir

Page 230

1  correctly.
   Q.  And so, so far we've talked about -- you
believe dentists will connect the "BruxZir" with a Z
name to Glidewell based on your lectures and based on
the prescription forms that we've been looking at as
previously marked Exhibit 35; correct?
      Are there other --
   A.  Yeah, even if they use the lab's -- the
authorized lab's own prescription slip, the chances are
they've received this in the mail from us.  They may not
want to use it with us.  They may just still order it
through the lab, but it's a part of establishing that
this is our product as part of the marketing that we do.
   Q.  Because this is sent out to -- why do you think
they have this sent by Glidewell?
      Is this sent to every dentist in the country,
or how do they have this?
   A.  No, it's usually targeted -- these are good
questions for Jim Shuck, but they're usually targeted to
40,000 or 50,000 dentist clusters that might have a
certain -- maybe they tried it once and haven't used it
in the last six months or something like that.  And then

Page 232

1  with a Z product that don't have "Glidewell
Laboratories" on it?
   A.  One more time.
   Q.  Sure.
      Can a dentist order a BruxZir with a Z product
from an authorized laboratory using a prescription form
that doesn't say "Glidewell Laboratories" on it?
   A.  Sure.  From one of the lab's own Rx forms.
   Q.  Because they might have their own forms that
don't say "Glidewell" on them?
   A.  That's correct.
   Q.  Okay.
   A.  It would have the BruxZir name on it, of
course.
   Q.  Uh-huh.  And have you seen the prescription
forms like that from the other laboratories?
   A.  I have not.
   Q.  So you really don't know what it says on it.
   A.  No.  I would assume it would look a lot like
those slips.
   Q.  That we were looking at earlier?
   A.  Yeah, except it would just have it spelled

Page 231

1  there's times where it's blanketed to all, roughly,
80,000 people on the mailing list, I think.
   Q.  But this isn't an area that you're -- that's
Jim Shuck's area, not your area; correct?
   A.  Yes, correct.  And he probably already went
over most of that in his testimony, I'm guessing.
   Q.  Are you aware of other facts for why you
believe dentists associate "BruxZir" with a Z with
Glidewell beyond those that we've talked about already?
   A.  Just the huge number of restorations that we're
doing through our single location, which is equal to the
number of crowns that all the 180 locations are doing
combined.  You know, we're doing 60,000 a month, and
between them all, they're doing about 60,000 a month
too.  So...
   Q.  So right now the restorations that involve the
BruxZir with a Z product, approximately half are done by
Glidewell Labs directly; correct?
   A.  Correct.
   Q.  And the other half are done by the 180 or so
authorized labs.
   A.  Correct.

Page 233

Pages 230 to 233

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**

-99-

10/2/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Michael DiTolla

1    Q.  Is that percentage changing over time?
2    A.  I don't know.  That was accurate last year when
3  I made that.  I actually kind of said that on that
4  introduction, and so it was accurate at some point in
5  mid-2011, and I'm not sure if that's shifted or not.
6    Q.  Do you know who within Glidewell would be
7  keeping track of that information?
8    A.  Jim Shuck.
9    Q.  Jim Shuck?
10       Have you had conversations with dentists
11  personally, just one-on-one, that lead you to believe
12  they associate the "BruxZir" with a Z name with
13  Glidewell?
14    A.  Yes, and it seems like I get a lot of the
15  questions from the industry, you know, about -- by
16  default, that full-contour zirconia crowns because we
17  are so associated with BruxZir.  But, yes, I have
18  conversations with dentists where -- in fact, a lot of
19  them don't know that the authorized labs exist and think
20  that they have to send it out to us.
21    Q.  And on what occasions do you have these
22  conversations?

Page 234

1    A.  Customer service might pass somebody through to
2  me.  At the lectures, people coming up saying, "I want
3  to do some BruxZir crowns with you guys."  Whatever it
4  might be.  I spend a lot of time with dentists out on
5  the road at these lectures.
6    Q.  Why would customer service pass on a call to
7  you?
8       I mean, that's their job, right, is to deal
9  with the customer, so this must be exceptional, right,
10  that they get you involved?
11    A.  Yes, it's not a routine thing where they get me
12  involved.  They'll typically put somebody into my
13  voicemail if they say they know me or they met me at a
14  lecture or I told them to call, but typically they'll
15  forward more of the technical questions that they just
16  can't answer.
17       So customer service has a good working
18  knowledge of the products, but they can't handle a
19  question -- I got an e-mail yesterday or two days ago
20  from a guy saying, "Can I sandblast the inside of my
21  BruxZir crowns prior to cementing them with 50-micron
22  aluminum oxide sandblasting?" and the customer service

Page 235

1  said, "Can you answer this?  I have no idea how to
2  answer it."  So it's usually those, where it's kind of
3  over their head.
4    Q.  So in incidents like this, how do you know that
5  the customer associates "BruxZir" with a Z with
6  Glidewell?
7    A.  They were writing to me at Glidewell asking a
8  question about BruxZir crowns.  I don't know where
9  else -- who else they would write to.
10    Q.  Okay.  So now we're talking about written
11  correspondence.  So you get letters?
12    A.  Yeah, I get e-mails, again, through customer
13  service typically.  But I put my e-mail address up when
14  I go out and lecture, so I get e-mails from dentists.
15       MR. JANKOWSKI:  Mr. Tachner, I'd like a
16  production of these e-mails that he's referring to, the
17  written correspondence that he's saying is an indication
18  of customers writing to him that Glidewell will be
19  relying on to show the connection between BruxZir with
20  a Z and Glidewell as a source of goods.
21       MR. TACHNER:  Okay.  We'll do that.
22       MR. JANKOWSKI:  I think -- I'm done with my

Page 236

1  questions subject to any questioning that Mr. Tachner is
2  going to have.
3       MR. TACHNER:  I have no questions.
4       MR. JANKOWSKI:  Okay.  Then I think we're done
5  for the day.  Thank you very much, Dr. DiTolla.
6       THE WITNESS:  Thank you.  That was relatively
7  painless.
8       MR. JANKOWSKI:  Like a trip to the dentist.
9       (Laughter.)
10       THE VIDEOGRAPHER:  Off the record at 4:17 p.m.
11       (At 4:17 p.m., the deposition of
12       MICHAEL DITOLLA was adjourned.)

Page 237

Pages 234 to 237

be61b411-147b-43b5-a766-086b5efed110

EXHIBIT 4

-100-

1  STATE OF CALIFORNIA          )
2  COUNTY OF LOS ANGELES        ) SS.
3
4        I, AUDRA E. CRAMER, CSR No. 9901, in and for the
   State of California, do hereby certify:
5        That, prior to being examined, the witness named
6  in the foregoing deposition was by me duly sworn to
   testify the truth, the whole truth and nothing but the
7  truth;
         That said deposition was taken down by me in
8  shorthand at the time and place therein named, and
   thereafter reduced to typewriting under my direction,
9  and the same is a true, correct and complete transcript
10 of said proceedings;
11       I further certify that I am not interested in the
12 event of the action.
13       Witness my hand this 15th day of October,
14 2012.
15
16
17
18
19       _____
20       Certified Shorthand
21       Reporter for the
22       State of California
                                        Page  238

1  Michael DiTolla c/o
2  Leonard Tachner PLC
   17961 Sky Park Circle, Suite 38-E
3  Irvine, CA  92614-6364
4
5  Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
6  Date of deposition: October 2, 2012
   Deponent: Michael DiTolla
7
8  Please be advised that the transcript in the above
9  referenced matter is now complete and ready for signature.
10 The deponent may come to this office to sign the transcript,
11 a copy may be purchased for the witness to review and sign,
   or the deponent and/or counsel may waive the option of signing.
12 Please advise us of the option selected.
   Please forward the errata sheet and the original signed
13 signature page to counsel noticing the deposition, noting the applicable
14 time period allowed for such by the governing Rules of Procedure.
15 If you have any questions, please do not hesitate to call our office at
16 (202)-232-0646.
17
18 Sincerely,
19
20 Digital Evidence Group
21 Copyright 2012 Digital Evidence Group
22 Copying is forbidden, including electronically, absent express written consent.
                                        Page  239

1  Digital Evidence Group, L.L.C.
2  1726 M Street NW, Suite 1010
3  Washington, D.C. 20036
4  (202) 232-0646
5
6  SIGNATURE PAGE
7
8
   Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
9  Witness Name: Michael DiTolla
   Deposition Date: October 2, 2012
10
   I do hereby acknowledge that I have read
11 and examined the foregoing pages
   of the transcript of my deposition and that:
12
   (Check appropriate box):
13 ( ) The same is a true, correct and
   complete transcription of the answers given by
14 me to the questions therein recorded.
15 ( ) Except for the changes noted in the
16 attached Errata Sheet, the same is a true,
17 correct and complete transcription of the
18 answers given by me to the questions therein
19 recorded.
20
   _____      _____
21
22 DATE             WITNESS SIGNATURE
                                        Page  240

1  Digital Evidence Group, L.L.C.
2  1726 M Street NW, Suite 1010
3  Washington, D.C. 20036
4  (202) 232-0646
5
6  E R R A T A   S H E E T
7
   Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
8  Witness Name: Michael DiTolla
   Deposition Date: October 2, 2012
10 Page No.    Line No.       Change
11
12
13
14
15
16
17
18
19
20
21 _____      _____
22 Signature               Date
                                        Page  241

                                 Pages  238  to  241

be61b411-147b-43b5-a766-086b5efed110

**EXHIBIT 4**
-101-

Page 238

1    STATE OF CALIFORNIA          )

2    COUNTY OF LOS ANGELES        )   SS.

3

4         I, AUDRA E. CRAMER, CSR No. 9901, in and for the

State of California, do hereby certify:

5         That, prior to being examined, the witness named

6    in the foregoing deposition was by me duly sworn to

testify the truth, the whole truth and nothing but the

7    truth;

          That said deposition was taken down by me in

8    shorthand at the time and place therein named, and

thereafter reduced to typewriting under my direction,

9    and the same is a true, correct and complete transcript

10   of said proceedings;

11        I further certify that I am not interested in the

12   event of the action.

13        Witness my hand this 15th day of October,

14   2012.

15

16

17

18

19   _____

20   Certified Shorthand

21   Reporter for the

22   State of California

**EXHIBIT 4**

-102-