Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

JAMES R. GLIDEWELL DENTAL          )
CERAMICS, INC. dba GLIDEWELL       )
LABORATORIES,                      )
                                   )
                                   )  Case No.
Plaintiff/Counter-Defendant,       )  SACV11-01309-DOC
                                   )  (ANx)
        vs.                        )
                                   )
Keating Dental Arts, INC.,         )
                                   )
                                   )
Defendant/Counter-Plaintiff.       )
_____ )


DEPOSITION OF ROBIN BARTOLO

TAKEN TUESDAY, OCTOBER 23, 2012

IRVINE, CALIFORNIA




Reported by Lisa Moskowitz, CSR No. 10816, RPR, CLR


_____

DIGITAL EVIDENCE GROUP
1726 M Street NW, Suite 1010
Washington, DC  20036
(202) 232-0646

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5
-103-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

1   DEPOSITION OF ROBIN BARTOLO, TAKEN ON
2   BEHALF OF DEFENDANT/COUNTER-PLAINTIFF, AT
3   9:40 A.M., TUESDAY, OCTOBER 23, 2012 AT 2040 MAIN
4   STREET, 14TH FLOOR, IRVINE, CALIFORNIA, BEFORE
5   LISA MOSKOWITZ, CSR 10816, RPR, CLR.
6
7   APPEARANCES OF COUNSEL
8   FOR THE PLAINTIFF/COUNTER-DEFENDANT:
9   LAW OFFICES OF LEONARD TACHNER
10   BY:  LEONARD TACHNER
11   17961 SKY PARK CIRCLE, SUITE 38-E
12   IRVINE, CALIFORNIA  92614-6364
13   (949) 752-8525
     ltachner@aol.com
14
15   FOR THE DEFENDANT/COUNTER-PLAINTIFF:
     KNOBBE, MARTENS, OLSON & BEAR, LLP
16   BY:  DAVID G. JANKOWSKI, PH.D.
     2040 MAIN STREET, 14TH FLOOR
17   IRVINE, CALIFORNIA  92614
     (949) 760-0404
18   david.jankowski@kmob.com
19
20
21
22
                                      Page 2

1   E X H I B I T S  (Cont'd)
2   NO.      PAGE    DESCRIPTION
3   Bartolo      97   Glidewell Authorized BruxZir
4   Exhibit 99        Solid Zirconia Laboratories
5                     Website
6   Bartolo      99   Glidewell Introducing
7   Exhibit 100       www.BruxZir.com Website
8   Bartolo     105   BruxZir.  A New Option for
9   Exhibit 101       Virtually Unbreakable
                      Restorations Flier
10   Bartolo     108   BruxZir Solid Zirconia
11   Exhibit 102       Business Integration Program
                      Flier
12   Bartolo     111   BruxZir Solid Zirconia Crowns
     Exhibit 103       & Bridges Flier
13   Bartolo     116   BruxZir Virtually Unbreakable
14   Exhibit 104       Flier
     Bartolo     127   BruxZir Portfolio, dated
15   Exhibit 105       January 26-27, 2012
     Bartolo     131   The Digital Dental Lab, dated
16   Exhibit 106       January 26-27, 2012
     Bartolo     144   E-mail from Keith Allred,
17   Exhibit 107       dated 4/29/11
18   Bartolo     145   E-mail Chain from Keith
     Exhibit 108       Allred, dated 2/14/11
19   Bartolo     149   E-mail from Keith Allred,
20   Exhibit 109       dated 4/18/11
21   Bartolo     152   E-mail Chain from Keith
22   Exhibit 110       Allred, dated 4/25/11
                                      Page 4

1         I N D E X
2   DEPONENT
3   EXAMINATION                        PAGE
4   ROBIN BARTOLO
5      BY MR. JANKOWSKI         6
6      BY MR. TACHNER          178
7
8         E X H I B I T S
9   NO.      PAGE   DESCRIPTION
10   Bartolo       9   Keating Dental Arts First
11   Exhibit 92        Amended Notice of Deposition
12               of Robin Bartolo, dated
               10/16/12
13   Bartolo      86   Glidewell BruxZir Solid
14   Exhibit 93        Zirconia Website
15   Bartolo      86   Glidewell Prismatik Clinical
     Exhibit 94        Zirconia Website
16   Bartolo      86   Glidewell Lava Crowns &
17   Exhibit 95        Bridges Website
18   Bartolo      91   Glidewell IPS e.max & Empress
     Exhibit 96        Website
19   Bartolo      92   Glidewell BruxZir Milling
20   Exhibit 97        Blanks Website
21   Bartolo      96   Glidewell BruxZir Mill
     Exhibit 98        Website
22
                                      Page 3

1   E X H I B I T S  (Cont'd)
2   NO.      PAGE    DESCRIPTION
3   Bartolo     165   Printout of Dental Lab
4   Exhibit 111       Network Forum
5   Bartolo     171   Printout of Dental Lab
6   Exhibit 112       Network Forum
7   Bartolo     173   Printout of Dental Lab
8   Exhibit 113       Network Forum
9   Bartolo     176   BruxZir Laboratory Summit
10   Exhibit 114
11
12
13
14         EXHIBITS REFERENCED
15   NO.      PAGE    DESCRIPTION
16   Exhibit 10     154   Authorized BruxZir Labs
17   Exhibit 29     155   Letter from Robin Bartolo,
18                   dated 8/9/11
19   Exhibit 36     24   Glidewell Organization Chart
20
21
22
                                      Page 5

Pages  2  to  5

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-104-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

| | |
|---|---|
| 1    ROBIN BARTOLO, | 1   question before you begin your answer because the |
| 2    having been first duly sworn, | 2   court reporter has a hard time capturing what |
| 3    was examined and testified as follows: | 3   we're saying if we're speaking over one another. |
| 4 | 4    Is that fair? |
| 5    EXAMINATION | 5    A. Yes. |
| 6  BY MR. JANKOWSKI: | 6    Q. If I ask a question that's unclear, let |
| 7    Q. Good morning, my name is David Jankowski. | 7   me know. If you do not ask for clarification, |
| 8  I'm an attorney representing Keating Dental Arts, | 8   I'll assume that you understand what I am asking. |
| 9  the defendant in this lawsuit. | 9    Is that fair? |
| 10    Please state your full name for the | 10    A. Yes. |
| 11  record. | 11    Q. From time to time, your attorney, |
| 12    A. Robin Bartolo, B-a-r-t-o-l-o. | 12   Mr. Tachner, may be making spoken objections. |
| 13    Q. And Glidewell Labs is your current | 13   Unless your attorney instructs you not to answer a |
| 14  employer; correct? | 14   question, you must still answer my question. |
| 15    A. That is correct. | 15    Do you understand that? |
| 16    Q. What is your current title? | 16    A. Yes. |
| 17    A. Sales manager for Glidewell Direct. | 17    Q. If you'd like to take a break at any |
| 18    Q. Have you ever been deposed before? | 18   time, say so and we'll take a break at the next |
| 19    A. I have not. | 19   convenient stopping point. Okay? |
| 20    Q. Let me go through some ground rules to | 20    A. Okay. |
| 21  familiarize you with what's going to happen today. | 21    Q. I do request we not take a break when a |
| 22  If you have any questions, please go ahead and ask | 22   question is pending. We'll take breaks after |
| Page 6 | Page 8 |
| 1  and we'll get them worked out. | 1   questions have been answered. Okay? |
| 2    Do you understand the oath that the court | 2    A. Fair. |
| 3  reporter just administered to you? | 3    Q. Are you taking any prescription |
| 4    A. Yes. | 4   medication or other drugs? |
| 5    Q. Although this deposition is being taken | 5    A. No. |
| 6  in a conference room in the law offices of Knobbe, | 6    Q. Is there any reason you can't give |
| 7  Martens in Irvine, California, it has the same | 7   truthful testimony here today? |
| 8  force and effect as if you were testifying in a | 8    A. No. |
| 9  court of law before a jury and a judge. | 9    MR. JANKOWSKI: I'll have the court |
| 10    Do you understand that? | 10   reporter mark, I believe we're up to Exhibit 92, a |
| 11    A. Yes. | 11   document entitled "Keating Dental Arts First |
| 12    Q. I'm going to be asking you questions, and | 12   Amended Notice of Deposition of Robin Bartolo." |
| 13  you're going to be providing answers to my | 13    (Bartolo Exhibit No. 92 was marked |
| 14  questions. You must answer truthfully. | 14    for identification.) |
| 15    Do you understand? | 15  BY MR. JANKOWSKI: |
| 16    A. Yes. | 16    Q. Mr. Bartolo, would you just briefly look |
| 17    Q. This deposition is being recorded by a | 17   at Exhibit 92. |
| 18  court reporter; so please answer with spoken words | 18    Have you seen this document before? |
| 19  rather than a nod or another nonverbal response; | 19    A. I have not. |
| 20  so she can type your spoken answer. Okay? | 20    Q. But you do understand you're testifying |
| 21    A. Okay. | 21   today in response to a deposition in a lawsuit |
| 22    Q. Please wait until I've completed a | 22   involving Glidewell Labs and Keating Dental Arts? |
| Page 7 | Page 9 |

Pages 6 to 9

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-105-

| | |
|---|---|
| 1   A. Yes. | 1   Q. And you wanted to refresh your -- |
| 2   Q. Okay. Did you talk to anyone to prepare | 2   A. Refresh my memory. It goes back a while. |
| 3 for today's deposition? | 3   Q. Okay. In reviewing it, was it the way |
| 4   A. Yes. | 4 you remembered it? |
| 5   Q. Who did you speak with? | 5   A. Yes. |
| 6   A. Leonard. | 6   Q. Okay. Let's go over your background a |
| 7   Q. And did you speak to anybody other | 7 little bit. What's your educational background |
| 8 than -- let me first ask you: When did you speak | 8 after leaving high school? |
| 9 with Mr. Tachner? | 9   A. I have a bachelor of science in dental |
| 10   A. Yesterday. | 10 technology and marketing from the University of |
| 11   Q. For how long did you speak with him? | 11 Illinois. SIU, Southern Illinois University. |
| 12   A. 20 minutes. | 12   Q. I'm sorry. What degree was it? |
| 13   Q. Did you speak with anybody other than | 13   A. Bachelor of science. |
| 14 Mr. Tachner? | 14   Q. In what major? |
| 15   A. No. | 15   A. Marketing. |
| 16   Q. So you haven't spoken to Mr. Shuck -- let | 16   Q. Did you also throw a dental aspect in |
| 17 me ask you a separate question. Have you spoken | 17 there? |
| 18 to Mr. Shuck since he had his deposition taken in | 18   A. Yeah, my associate's was in dental |
| 19 this case? | 19 technology. |
| 20   A. On this matter, no. | 20   Q. Are those two separate degrees, a |
| 21   Q. How about on the matter of his own | 21 bachelor of science in marketing and an associates |
| 22 deposition? | 22 degree in dental technology? |
| Page 10 | Page 12 |
| 1   A. No. | 1   A. Correct. |
| 2   Q. Okay. How about Mr. Carden? | 2   Q. What years were those degrees conferred |
| 3   A. No. | 3 on you? |
| 4   Q. Have you spoken to Mr. or Dr. DiTolla? | 4   A. Graduated in 1985. |
| 5   A. No. | 5   Q. Were both degrees conferred |
| 6   Q. So you haven't spoken to anybody about | 6 simultaneously? |
| 7 the depositions they've given in this case? | 7   A. No, the associates was first and then the |
| 8   A. I have not. | 8 bachelor's. |
| 9   Q. Okay. And did you review any documents | 9   Q. Okay. What year did you get the |
| 10 in preparation for your deposition today? | 10 associate's degree? |
| 11   A. Yes. | 11   A. '83. |
| 12   Q. What documents did you review? | 12   Q. And both of those degrees were from |
| 13   A. The e-mail I sent to Mr. Keating. | 13 Southern Illinois University? |
| 14   Q. Okay. Any other documents? | 14   A. Correct. |
| 15   A. No. | 15   Q. Any other education after high school? |
| 16   Q. That's the only one? | 16   A. No. |
| 17   A. Yes. | 17   Q. When you graduated with your degree in |
| 18   Q. What was your purpose for reviewing that | 18 marketing in 1985, what did you do in terms of |
| 19 document? | 19 employment after that? |
| 20   A. It's the one I wrote suggesting that we | 20   A. I worked for Rosiello Dental Laboratory. |
| 21 could work something out. I figured it would come | 21   Q. Can you spell that? |
| 22 up today. | 22   A. Yes. R-o-s-i-e-l-l-o, Rosiello Dental |
| Page 11 | Page 13 |

Pages 10 to 13

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5

-106-

| | |
|---|---|
| 1 Laboratory. | 1    A. It was a traditional porcelain stacked |
| 2    Q. It's a dental laboratory; so it would | 2 over metal coping; so it's the traditional not |
| 3 fabricate crowns and bridges and all that? | 3 considered outdated technique, but it was a |
| 4    A. Correct. | 4 layered porcelain build-up. |
| 5    Q. Where is it located? | 5    Q. It's a technique that's not really done |
| 6    A. Monrovia, California. | 6 much today? |
| 7    Q. And you began working there in 1985? | 7    A. It's still done, but it's not as common. |
| 8    A. Yes. | 8    Q. Was zirconia one of the materials that |
| 9    Q. And for how long did you work there? | 9 was sold by Vident? |
| 10    A. One year. | 10    A. No, not at the time. |
| 11    Q. And where did you go after leaving | 11    Q. No zirconia at that time? |
| 12 Rosiello? | 12    A. No. |
| 13    A. Vident, V-i-d-e-n-t.  They're located in | 13    Q. And how about the product Lava? |
| 14 Brea, California. | 14    A. It's not VITA's. |
| 15    Q. That's also a dental laboratory? | 15    Q. It's a competitor product, isn't it? |
| 16    A. No.  This is a company that represented | 16    A. Yes. |
| 17 the VITA porcelain company.  So I sold porcelain | 17    Q. And what was your title when you were at |
| 18 mainly, dental porcelain. | 18 Vident? |
| 19    Q. Okay.  So it would be selling porcelain | 19    A. Sales representative, then regional sales |
| 20 to dental laboratories; correct? | 20 manager. |
| 21    A. Yes. | 21    Q. And was, at that time, Glidewell |
| 22    Q. What kind of -- first of all, over what | 22 Laboratories one of your customers? |
| Page 14 | Page 16 |
| 1 time frame did you work at Vident? | 1    A. Yes. |
| 2    A. 15 years. | 2    Q. When did you first start working with |
| 3    Q. So from 1986 to 2001? | 3 Glidewell Laboratories as a customer? |
| 4    A. Well, 2000.  14 years. | 4    A. Probably right away.  So a good-sized |
| 5    Q. And what types of porcelain were sold by | 5 laboratory in my territory; so I would have worked |
| 6 Vident?  Is it Vident or Vident? | 6 with Glidewell Laboratory probably in 1986. |
| 7    A. Vident. | 7    Q. And approximately how many different |
| 8    Q. What kind of porcelain did Vident sell? | 8 dental laboratories were you dealing with |
| 9    A. The VITA line of porcelains from Germany. | 9 personally? |
| 10 We were the sole distributor of that product here | 10    A. Hundreds.  I had multiple states; so it's |
| 11 in the U.S. | 11 a lot of customers. |
| 12    Q. So there's a German parent? | 12    Q. What states were you responsible for? |
| 13    A. Yes.  VITA. | 13    A. As a sales rep? |
| 14    Q. How is that spelled? | 14    Q. As a sales rep. |
| 15    A. V-I-T-A. | 15    A. California, Nevada, Arizona, Hawaii, |
| 16    Q. V-I-T-A? | 16 Colorado. |
| 17    A. Correct. | 17    Q. And then when you were regional sales |
| 18    Q. Did Vident sell any ceramic dental | 18 manager, did your territory expand? |
| 19 materials? | 19    A. Yes, basically covered the western half |
| 20    A. Yes.  Porcelain is a ceramic material. | 20 of the U.S. |
| 21    Q. Okay.  What kind of materials were sold | 21    Q. And at that point, how many dental labs |
| 22 while you were there? | 22 were included in the western half of the United |
| Page 15 | Page 17 |

a556e01e-d30e-4159-ae5d-cfa61863a702
**EXHIBIT 5**
-107-

1  States?  Do you know?
2      A.  Thousands.
3      Q.  You said they're based in Brea,
4  California?
5      A.  Correct.
6      Q.  Are they still in business today?
7      A.  Yes, they are.
8      Q.  And in 2001, when you left Vident -- or
9  2000, I'm sorry, when you left Vident, what did
10  you do next?
11      A.  I went to Sybron Dental Specialties.
12      Q.  S-y-b-r-o-n?
13      A.  Correct.
14      Q.  What is Sybron Dental Specialties?
15      A.  Sybron was a dental company that had
16  several divisions, and I worked for the Kerr
17  Corporation.
18      Q.  Spelled K-e-r-r?
19      A.  R-r, yes.
20      Q.  So is Kerr Corporation a subsidiary of
21  Sybron?
22      A.  Yes.

Page 18

1  connection which was very strong internationally.
2  It was a different model.  We were working through
3  dealers.
4      Q.  When you say "jewelry," do you mean that
5  in the normal sense, jewelry?
6      A.  Yes.  Casting a gold crown and casting a
7  gold ring, the steps are very similar.  Just the
8  quantities are different.
9      Q.  So it wasn't strictly dental products?
10      A.  Correct.
11      Q.  Okay.  And so then from 2000 to 2005
12  since you were responsible for sales outside the
13  U.S., you would not have been dealing with
14  Glidewell at that time.  Is that fair?
15      A.  It's fair, but occasionally I might have
16  run into somebody at a convention.  I would still
17  help out.  I was based here in California.  Even
18  though my responsibilities were outside, I would
19  still be involved.
20      Q.  Like in an informal --
21      A.  Yes, helping out.
22      Q.  Okay.  And so was the Kerr Corporation

Page 20

1      Q.  So your employer, though, was Sybron or
2  was it Kerr?
3      A.  I guess Kerr.
4      Q.  And over which years did you work at
5  Kerr?
6      A.  2000 to 2005.
7      Q.  And what was your title at Kerr?
8      A.  Global sales manager.
9      Q.  Based on the title, you were responsible
10  for sales everywhere for Kerr; is that correct?
11      A.  Everywhere except the United States.
12      Q.  Okay.
13      A.  It just happened to be that way.
14      Q.  So global means outside the U.S. and
15  somebody else at Kerr was responsible for U.S.
16  sales?
17      A.  Correct.
18      Q.  Okay.  And can you briefly describe what
19  are the types of dental products that Kerr sold?
20      A.  Dental waxes, some equipment to handle
21  the wax.  It was a fairly small line, but as part
22  of that product line, there was also a jewelry

Page 19

1  then selling jewelry or selling equipment?
2      A.  No, just the raw materials and equipment.
3      Q.  The raw materials wouldn't be including
4  gold, for example?
5      A.  No, no.  Just the casting powders.  That
6  was the main line.
7      Q.  They would buy Kerr's casting powders and
8  use it to make gold products?
9      A.  Correct.
10      Q.  Where was your office when you were
11  working at Kerr?
12      A.  That was in Orange, California.  1717
13  Collins Avenue.
14      Q.  And when you left Kerr in 2005, what did
15  you do next?
16      A.  Went to the Gemological Institute of
17  America based in Carlsbad, California.
18      Q.  And what was your title there?
19      A.  Director of sales and marketing.
20      Q.  So the Gemological Institute of America
21  does not have any dental application, does it?
22      A.  None whatsoever.

Page 21

Pages  18  to  21

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-108-

1    Q. So you were kind of getting away from
2  your --
3    A. Completely.
4    Q. -- your background.
5      Was there a particular reason why you
6  were getting away from dental?
7    A. No. It's the connection to the jewelry
8  that opened up a few opportunities. There was
9  something that was intriguing; so I tried
10  something different.
11    Q. What were your products then? Gems?
12    A. No. It was, again, on the equipment
13  side. So we were selling diamond-related products
14  to either assure there was indeed a diamond or to
15  validate the origin. So it was laboratory
16  equipment for the diamond industry, for the most
17  part. Microscopes, things of that nature.
18    Q. So I sense -- you don't have an
19  engineering degree, but you were a salesperson who
20  works on the technical side of these businesses in
21  a sense. Is that fair?
22    A. I certainly don't have an engineering

Page 22

1  degree, but I've been in sales and oftentimes that
2  involves equipment.
3    Q. Okay. And when did you leave the
4  Gemological Institute of America?
5    A. When I started work at Glidewell
6  Laboratories in January, 2009.
7    Q. And why did you leave the Gemological
8  Institute of America to join Glidewell?
9    A. The GIA had a lot of changes in the
10  organization and in their focus, and so it was
11  decided to deemphasize the international effort
12  which I was responsible for. So it was time to
13  look for another opportunity, and I went back to
14  what I knew best, which was the dental industry,
15  dental laboratory industry.
16    Q. And you knew people at Glidewell already
17  from your past. Is that fair?
18    A. Exactly. I knew them many years going
19  back to 1986.
20    Q. So you approached Glidewell --
21    A. Yes.
22    Q. -- about whether or not they had an

Page 23

1  opening?
2    A. Exactly.
3    Q. What was your position when you started
4  at Glidewell?
5    A. Sales manager for Glidewell Direct.
6    Q. Now, was that a position that existed
7  before you joined Glidewell?
8    A. Yes.
9    Q. Who was your predecessor in that
10  position?
11    A. Rozy Setoodegan.
12    Q. That's a mouthful. How do you spell
13  that?
14    A. S-e-t-o-o-d-e-g-a-n. Setoodegan.
15    Q. And let me show you something here. Let
16  me show you an exhibit that's been previously
17  marked as Exhibit 36. I've already asked other
18  Glidewell employees about this document, and
19  everybody seems to agree it's Glidewell's org
20  chart.
21      Have you seen this document before?
22    A. No.

Page 24

1    Q. Okay.
2    A. I mean I've seen a version of this, but I
3  don't believe I've seen this one.
4    Q. Okay. And one question I have -- in
5  fact, I remember when I was asking Dr. DiTolla
6  about it, he was wondering and I'm wondering where
7  Glidewell Direct is on --
8    A. I was going to say where am I?
9    Q. Yeah, I had the same question. I don't
10  think anybody in the room doubts your significance
11  to the company or that you have an important role,
12  but for whatever reason, it's not on this org
13  chart. Where do you think it would be? Is it
14  under Jim Shuck's advertising and marketing
15  direction, or is it its own separate area?
16    A. It used to be under Mr. Shuck.
17    Q. You've seen org charts where it is under
18  Mr. Shuck?
19    A. Yes, when I started, it was that way.
20    Q. Okay.
21    A. So I'm not sure which version this is.
22  It goes to 2011 it looks like.

Page 25

Pages 22 to 25

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-109-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1      Q. Company org charts, sliced and diced
2  different ways.  It may very well be the org chart
3  today, you're on it, and I don't know why -- this
4  was produced it looks like late 2011.  This is
5  just the way it was produced to us.
6      A. Okay.
7      Q. So basically you've seen org charts where
8  you're a box underneath Jim Shuck.
9          Is that fair?
10     A. Yes.
11     Q. Okay.  That's where I would have put you.
12  But you're the one with the knowledge, not me.
13  It's helpful to hear you say that.
14          Glidewell Direct is, in a sense, an
15  aspect of the advertising and marketing efforts of
16  Glidewell.  Is that fair?
17     A. That is.
18     Q. And you don't report to -- I'm just
19  looking at the org chart -- the other people below
20  Mr. Shuck.  I see a Michael Cash, there's
21  Dr. DiTolla, there's a Dwight Brown.
22     A. I do not report to them.

                                   Page 26

1      A. He would report to Dave Casper who
2  reports to Greg Minzenmayer.
3      Q. Casper, C-a-s-p-e-r?
4      A. He's on the list here under Greg
5  Minzenmayer.
6      Q. Oh, yes.  VP sales and business
7  development.
8          So underneath Dave Casper, there could be
9  a box with Tim Torbenson?
10     A. Correct.
11     Q. Okay.  And you report to Tim?
12     A. Yes.
13     Q. Okay.  Actually, that brings up a
14  question for me as well which is sales and
15  business development here is underneath the COO of
16  the company as opposed to the VP of advertising
17  and marketing.  Do you have an understanding for
18  why the org chart is laid out that way?
19     A. I'm not sure, no.
20     Q. So Glidewell Direct -- is David Casper
21  associated with Glidewell Direct as well?
22     A. Yes.

                                   Page 28

1      Q. Do you report to Mr. Shuck?
2      A. No, I don't.
3      Q. Do you report to Mr. Glidewell?
4      A. No, I don't.
5      Q. Who do you report to?
6      A. I report to Tim Torbenson.  He's not on
7  the list either.
8      Q. He's not on there either.
9      A. He's a new addition to the team.
10     Q. What's his title?
11     A. Director of sales and marketing and
12  business development.
13     Q. And his name is Tim?
14     A. Tim.
15     Q. What's his last name?
16     A. Torbenson, T-o-r-b-e-n-s-o-n.
17     Q. He's not on here either.  Okay.
18          Would you expect his box to be underneath
19  Jim Shuck as well?
20     A. Probably not.
21     Q. Would he -- why do you say that?  Where
22  would you expect him to be?

                                   Page 27

1      Q. Is he the highest up person associated
2  with Glidewell Direct?
3      A. Yes.
4      Q. You have employees working under you;
5  correct?
6      A. I do.
7      Q. How many?
8      A. About ten.
9      Q. And what do those employees do?
10     A. There's two types of employees.  There's
11  an in-bound telesales support team that are
12  obviously there to answer the phone and support
13  our customers, and there's also an out-bound
14  effort which is focusing on our in-plant product
15  line.
16     Q. So outbound meaning what?
17     A. Sales.  All sales driven, reaching out to
18  the customer letting them know what's new and
19  different about our product.  More of a sales
20  effort as opposed to a support.
21     Q. And that's specific you said to the
22  implant products?

                                   Page 29

                              Pages 26 to 29

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-110-

1      A.  Correct.
2      Q.  That doesn't apply so much as to, say,
3  the milling blocks and zirconia?
4      A.  No, that's not their focus.
5      Q.  So when you started at Glidewell, was
6  your title the same as it is right now?
7      A.  It is.
8      Q.  Okay.  So you've been the sales manager,
9  then, since January, 2009?
10     A.  Yes.
11     Q.  And Glidewell Direct is run out of Orange
12  County office; correct?
13     A.  It's in Irvine on the Von Karman
14  building.
15     Q.  I think you already testified Glidewell
16  Direct has been around before you joined
17  Glidewell?
18     A.  Yes.
19     Q.  Okay.  Who was it at Glidewell who hired
20  you?
21     A.  Jim Shuck.  I have to think about that,
22  but yeah, I reported to him.

                                    Page 30

1      their customers are dentists; correct?
2      A.  Yes.
3      Q.  And for Glidewell Direct, most of the
4  customers are dental labs; is that correct?
5      A.  That is correct.
6      Q.  Okay.  As you said, you do have some
7  products that can go directly to dentists as well?
8      A.  Yes.
9      Q.  That's like equipment?
10     A.  No, it's impression materials, shade
11  guides, little accessories.  There's some
12  equipment.
13     Q.  The equipment the labs use is different
14  than the equipment the dentists use?
15     A.  Sometimes it's the same, but there's one
16  in particular.  There's a mouth guard machine and
17  both labs and dentists can use that machine.
18     Q.  I think I noticed on Glidewell's website
19  you can click on a tab for dentist -- I think they
20  call it dentist?
21     A.  Yes.
22     Q.  You can click on a tab for laboratories?

                                    Page 32

1      Q.  And how was the job described to you when
2  you were hired?  What were you being hired to do?
3      A.  Manage the sales efforts of the Glidewell
4  Direct group which has two functions:  One, the
5  traditional sales of products like blocks and
6  equipment, and also support the outsourcing
7  options that we offer the laboratories such as
8  milling services.
9      Q.  Of course, one big function of Glidewell
10  is functioning as a dental lab itself; correct?
11     A.  Correct.  That's the lion's share.
12     Q.  That's the lion's share.
13        Is that separate from Glidewell Direct?
14     A.  Yes.
15     Q.  So the dental lab is one aspect, and then
16  Glidewell Direct is a separate aspect?
17     A.  Correct.  The focus is more on the
18  laboratories, but we do sell a few products that a
19  dentist would use as well.  We have nothing to do
20  with the production of crowns.
21     Q.  All right.  And so for the lion's share
22  of Glidewell's work which is being a dental lab,

                                    Page 31

1      A.  Correct.
2      Q.  And it brings up a different suite of
3  services and products?
4      A.  Yes.
5      Q.  Okay.  Has the scope of your
6  responsibility changed since you've been at
7  Glidewell since 2009?
8      A.  It has not.
9      Q.  And so in January, 2009, when you
10  started, what products were being sold to the
11  dental labs by Glidewell Direct at that time?
12     A.  Dental porcelains.  A lot of dental
13  porcelains in different shapes with different
14  types of restorations.  That was pretty much the
15  bulk of it in the beginning.  We sell some
16  equipment, scanners and things of that nature.
17  And, of course, after the launch of the BruxZir
18  blocks, we also sold milling machines.
19     Q.  And the BruxZir blocks, I'm going to ask
20  you about in a little bit -- what I'm going to do
21  when I talk about Glidewell's mark, there's an
22  issue in this case obviously about the trademark

                                    Page 33

                                                Pages 30 to 33

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-111-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1  BruxZir, and you're obviously aware of that. I'm
2  going to refer to that as BruxZir just so that
3  it's clear what I'm referring to. So the BruxZir
4  blocks you were just talking about, these are like
5  the milling pucks that are provided to
6  laboratories; correct?
7      A. That is correct.
8      Q. Okay. And Glidewell was not yet selling
9  BruxZir blocks to laboratories in January, 2009;
10  correct?
11      A. No, they were not.
12      Q. Do you recall when they started?
13      A. That summer. June. It's a guess but in
14  that time frame.
15      Q. Your recollection is summer of 2009?
16      A. Summer of 2009.
17      Q. And I think you also made reference to
18  milling machines associated with the BruxZir
19  blocks; correct?
20      A. Correct.
21      Q. Do you know when Glidewell started
22  selling milling machines associated with that

                                                    Page 34

1      Q. So that's a milling machine you would
2  purchase from somebody else, but you'd make it
3  available?
4      A. Correct.
5      Q. Do you still sell the Inteletek mill
6  today?
7      A. No, we do not.
8      Q. Did you discontinue that when you brought
9  on the BruxZir milling machines?
10      A. Yes.
11      Q. And how about sintering machines for the
12  BruxZir blocks, that's something that's sold by
13  Glidewell today?
14      A. That's correct.
15      Q. And that's sold by Glidewell Direct?
16      A. Yes, it is.
17      Q. Do you know when Glidewell Direct started
18  selling sintering machines for BruxZir blocks?
19      A. Probably before that because we had the
20  Prismatik sintering oven when we sold the
21  Inteletek mills. So that predates my arrival.
22  I'm not exactly sure when we started selling

                                                    Page 36

1  product?
2      A. There was other milling machines that we
3  were selling before, but with the launch of the
4  BruxZir blocks, we also added a new milling
5  machine which was the BruxZir mill.
6      Q. And that also had the same BruxZir name
7  associated with it?
8      A. Yes, correct.
9      Q. Was that milling machine being offered
10  for sale at the same time as the BruxZir blocks
11  were first offered for sale or later?
12      A. It probably came a little later. I'm not
13  exactly sure. It took a little while to develop
14  the product and fine tune it; so there probably
15  would have been a few months delay between the
16  first and the second. There were other machines
17  that could mill our blocks before we had our own.
18      Q. And you sold those machines as well?
19      A. Yeah, we did. It's called an Inteletek
20  mill.
21      Q. How is Inteletek spelled?
22      A. I-n-t-e-l-e-t-e-k. Inteletek.

                                                    Page 35

1  those.
2      Q. How do you spell Prismatik?
3      A. P-r-i-s-m-a-t-i-k.
4      Q. And that was an oven that was already for
5  sale when you started at Glidewell?
6      A. That's correct.
7      Q. That's a product Glidewell would have
8  purchased and then made available?
9      A. Yes.
10      Q. Okay. And does Glidewell sell the
11  Prismatik oven today?
12      A. Yes, it does.
13      Q. So in this case, because I think today
14  Glidewell also sells a BruxZir sintering machine?
15      A. Called a Fast Fire, yes.
16      Q. So there's multiple ovens that are for
17  sale that can be used, for example, with BruxZir
18  block; is that accurate?
19      A. Yes, that is true.
20      Q. So, for example, when you started in
21  January, 2009, one of the things you were a sales
22  manager for was the sale of these Inteletek mills?

                                                    Page 37

                                                    Pages 34 to 37

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-112-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

| | |
|---|---|
| 1    A. Yes. | 1   pressing technique.  There's different |
| 2    Q. And also these Prismatik ovens? | 2   applications depending on where it's going to be |
| 3    A. Yes. | 3   used. |
| 4    Q. Okay.  Now, at some point, I think | 4       Q. So it could be in the form of powder or |
| 5   Glidewell Direct also started selling coloring | 5   in the form of ingots? |
| 6   kits associated with its BruxZir blocks.  Is that | 6       A. Correct. |
| 7   accurate? | 7       Q. Do you recall what in January, 2009, what |
| 8    A. Yes. | 8   are the different types of porcelain that |
| 9    Q. Do you know when Glidewell Direct started | 9   Glidewell Direct was selling? |
| 10   selling those? | 10      A. There's quite a few.  There's thin press |
| 11    A. It would have been at the time of the | 11  porcelain.  There's net press, Prismatik |
| 12   launch of the blocks, the BruxZir coloring | 12  porcelains, but they all fall in that category of |
| 13   liquids.  You can't really have one without the | 13  either being a powder or an ingot. |
| 14   other. | 14      Q. And can the thin press porcelain that |
| 15    Q. Okay.  And was Glidewell selling coloring | 15  you're referring to, is that a porcelain that |
| 16   kits at the time you started maybe not specific to | 16  Glidewell Laboratories was manufacturing? |
| 17   BruxZir but for other products? | 17      A. Thin press, no.  We resold. |
| 18    A. They must have because we sold other | 18      Q. Okay.  So you purchased that and resold |
| 19   blocks.  So there must have been another version | 19  it? |
| 20   of dipping solutions. | 20      A. Correct. |
| 21    Q. And when you started in 2009, do you | 21      Q. How about net press? |
| 22   recall what kind of blocks were sold by Glidewell | 22      A. I believe that's the same. |
| Page 38 | Page 40 |
| 1   at that time? | 1       Q. And Prismatik was also one you purchased |
| 2    A. Those were Prismatik blocks. | 2   and resold? |
| 3    Q. Were there any other kinds? | 3       A. Yes. |
| 4    A. No. | 4       Q. And you mentioned that there was |
| 5    Q. And Prismatik blocks are made of what | 5   Prismatik zirconia, but you're also saying there |
| 6   material? | 6   was Prismatik powder as well? |
| 7    A. It's also made out of zirconia. | 7       A. Uh-huh. |
| 8    Q. Did Glidewell Direct, again, back in | 8       Q. Which was not zirconia? |
| 9   January, 2009, did they sell blocks associated | 9       A. Correct. |
| 10   with materials other than zirconia?  And maybe | 10      Q. And what kind of ceramic was that? |
| 11   blocks isn't the right word, but did they sell | 11      A. Well, at that time, the zirconia was used |
| 12   materials to labs? | 12  as a substructure, and then the technician would |
| 13    A. Yes, but not out of blocks.  We're going | 13  layer the porcelain on top of it; so instead of |
| 14   back to the porcelain powders and ingots for | 14  having a metal substructure, you have a ceramic |
| 15   pressing porcelain. | 15  substructure that was strong enough, and then you |
| 16    Q. And if it's not blocks, what do you call | 16  would build the porcelain on top.  So it was a |
| 17   what is sold when it's a porcelain back in | 17  two-step process. |
| 18   January, 2009? | 18      Q. And is there any -- what word would we |
| 19    A. I guess you'd call it a porcelain jar | 19  use to describe the type of porcelain which was on |
| 20   because they're typically on a little plastic | 20  top? |
| 21   bottle, and it's just ceramic powder that's | 21      A. It's a zirconia-friendly porcelain that's |
| 22   stacked, or it's ingots that are used in the | 22  compatible with the zirconia substructure. |
| Page 39 | Page 41 |

Pages 38 to 41

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-113-

1      Q. Is it like a feldspathic?
2      A. It's a feldspathic structure, yes.
3      Q. There's another product call e.max.  Are
4  you familiar with that?
5      A. Yes.
6      Q. It's an e and a dot and m-a-x?
7      A. Correct.
8      Q. Was Glidewell Direct selling e.max to
9  labs in 2009 when you started?
10     A. No.  We don't sell e.max.
11     Q. I think that is a substance that's used
12  by the dental lab part --
13     A. Absolutely.
14     Q. -- of Glidewell?
15     A. That's a very well known product, and
16  it's growing nicely, yes.
17     Q. But Glidewell Direct doesn't deal with
18  that?
19     A. We don't sell those, no.
20     Q. How about the product Lava?
21     A. We don't sell that.
22     Q. Okay.  So in the summer of 2009,

Page 42

1      A. Well, there's a lot of accessories that
2  go along with that.  Is that what you're asking?
3      Q. Yes.
4      A. There's sintering trays, sintering beads
5  that I used in the sintering oven.  In order to
6  design the cases, you need a 3Shape scanner; so we
7  sell those as well.  So it's a package where you
8  need the CAM and the CAD in order to complete a
9  full BruxZir restoration.
10     Q. And so the 3Shape scanner you're talking
11  about, that's associated with a CAD/CAM process?
12     A. Correct.
13     Q. What equipment is needed for or does
14  Glidewell Direct offer in connection with CAD/CAM?
15     A. It's pretty much the ones we described.
16  So you start with the scanner.  Once you design
17  the case, it's going to be sent to the mill to be
18  milled.  After it's milled, it's going to be
19  colored, and after it's colored, it's going to
20  sintered.  Once it's sintered, it's going to be
21  stained and glazed and sent to the dentist.
22     Q. And so Glidewell Direct provides the

Page 44

1      Glidewell Direct had a suite of new products
2  associated with the name BruxZir.  Is that fair?
3      A. That is fair.
4      Q. And so the products that Glidewell Direct
5  was selling expanded to include these products;
6  correct?
7      A. Yes.
8      Q. Okay.  And that would have included, I
9  think we've already talked about it, milling
10  blocks; correct?
11     A. Yes.
12     Q. And it would have included milling
13  machines?
14     A. Yes.
15     Q. And it would have included sintering
16  ovens?
17     A. Yes.
18     Q. And it would have included coloring kits?
19     A. Correct.
20     Q. Are there any other products you can
21  think of associated with the BruxZir product that
22  was being sold by Glidewell Labs?

Page 43

1  equipment for a lab to buy all that, put it in
2  their dental lab, and now they can buy BruxZir
3  blocks and then create crowns, for example, with
4  them using the equipment?
5      A. Yes.
6      Q. Okay.  Does Glidewell Direct provide,
7  like, a discount if you buy the whole package?
8      A. Not really.  There may be some concession
9  if they buy more than one, but our pricing is
10  pretty attractive as it is.  There's not a whole
11  lot of discounting going on.
12     Q. How have sales been of the milling
13  machines between 2009 and 2012?
14     A. Very good.  It's a great product.
15     Q. They've been increasing every year?
16     A. Yes.
17     Q. And same answer for sintering ovens?
18     A. Yes.  They're all linked.  It's not the
19  only source, but a lot of times people like buying
20  the complete system.
21     Q. But they don't have to buy the complete
22  system; right?

Page 45

Pages 42 to 45

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5
-114-

1      A. No, they don't. There's other sintering
2  ovens. There's other mills.
3      Q. Now, as a sales manager for Glidewell
4  Direct, what was your role in promoting the
5  BruxZir products that Glidewell Direct started
6  selling in 2009?
7      A. My role was to find new customers that
8  wanted to buy the products from Glidewell
9  Laboratories and offer the BruxZir brand of full
10  contour zirconia restorations to their doctors.
11      Q. Okay. And just to be clear, the
12  customers you're talking about are dental labs;
13  correct?
14      A. Yes.
15      Q. Okay. And how many dental labs buy
16  BruxZir milling blocks today?
17      A. There's about 185 authorized BruxZir
18  laboratories on our list. I say about because it
19  fluctuates. We add a few. Some may come off the
20  list.
21      Q. And adding a few is exactly what your job
22  is; right?

Page 46

1      A. Yes.
2      Q. You're always trying to add more?
3      A. Absolutely.
4      Q. Why do labs come off the list?
5      A. If they no longer purchase the materials
6  from Glidewell Direct, we will remove them from
7  the list.
8      Q. And is there, like, a time frame after a
9  certain amount of time they're not buying the
10  milling blocks they get removed? How does that
11  work?
12      A. There's a review process making sure that
13  the orders are coming in on a regular basis.
14  There's no set number or timeline, but if we
15  notice a sharp decline in the ordering pattern, we
16  will give them a call and ask what is going on.
17  Sometimes it just happens that the timing of the
18  order is such that it appears they have stopped
19  use and they have not, or they placed a large
20  order and still have stock, and other times they
21  may decide to go with a less expensive alternative
22  and they no longer buy the blocks from us. Once

Page 47

1  it's established they're no longer using our
2  product, we will remove them from the BruxZir
3  authorized list.
4      Q. Because I can imagine -- do most labs buy
5  product every month, or how often are they buying
6  it?
7      A. Most labs do. If you have a milling
8  machine, it's a big investment, and you would want
9  to keep that mill busy. It's not uncommon to get
10  regular orders from a BruxZir mill customer.
11      Q. And so what would catch the attention of
12  the review process is if they went several months
13  without buying product?
14      A. No, it would be sooner than that.
15  Typically, they buy every month. You would notice
16  a decline within a month. Certainly before you
17  miss one, but within two months, it would be
18  pretty obvious that they've either switched or
19  doing something else.
20      Q. And who's monitoring to see whether
21  they're buying product or not?
22      A. I monitor it sometimes, and some of my

Page 48

1  colleagues help me out as well because I'm not
2  always there to do the monitoring. Especially the
3  inbound team. They deal with the customer on a
4  regular basis and know them very well, and they're
5  probably the first ones to notice if somebody
6  hasn't placed an order in a while.
7      Q. I'm sorry. I didn't catch who would be
8  the first ones to notice?
9      A. The inbound group.
10      Q. The inbound group. I'm sorry.
11      A. Yes.
12      Q. Okay. How is it they notice? Just by
13  whether they're getting an order?
14      A. Exactly. A good customer will call on a
15  regular basis; so they have a relationship
16  established with our sales representatives --
17  they're not sales representative but inbound
18  customer support team. So it might come to their
19  attention that they haven't heard from a
20  particular customer in a while, but we also run
21  reports just to see what the sales are, and that's
22  another way to track it.

Page 49

Pages 46 to 49

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-115-

10/23/2012        James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.        Robin Bartolo

1     Q.  You can just run a report which is sales
2   by lab, for example?
3     A.  Yes.
4     Q.  And how is it that these dental labs
5   order the milling blocks?  What's the process for
6   ordering it?
7     A.  They call us up, tell us how many blocks
8   they need and what color ingots they need and any
9   other accessories they need.  A simple phone
10  process.  If they'd like, they can do it online as
11  well.  They can place an order through the
12  Internet.  We try to make it as easy and
13  convenient as possible.
14    Q.  And doing it over the Internet, is there,
15  like, an intranet that they have access to?
16    A.  No.  They just place it through D order
17  here.  If you've been to our website, which I
18  guess you have, you can place an order online.  It
19  will come to Glidewell Direct.  We'll fulfill it
20  the normal way, we just don't get a phone call.
21    Q.  I have been to the website.  I do recall
22  seeing places for labs to click.  I guess what I'm
                                        Page 50

1   transferred to an answering machine.  It's quite
2   common for them to pick up the phone as opposed to
3   go to the computer.
4     Q.  Some products like the sintering ovens or
5   milling machines are not repeat purchases
6   typically; right, you buy it for your lab and you
7   have it?
8     A.  Exactly.
9     Q.  And then other ones are being used up and
10  you keep replenishing it?
11    A.  Yes.
12    Q.  That would include the milling blocks, it
13  would include coloring --
14    A.  Liquids.
15    Q.  -- liquids and other things.  So I guess,
16  when they're calling in, they're ordering usually,
17  sometimes anyway, several of those things.  Is
18  that fair?
19    A.  Yes.
20    Q.  Now, you said there was a review process
21  and a decision -- somebody's going to make a
22  decision whether you need to call a lab because,
                                        Page 52

1   wondering is do they log in to, like, a nonpublic
2   area?  Do they go through a portal with username
3   password?
4     A.  To place the order, no, they don't have
5   to do that.
6     Q.  Do you have a sense for how much of the
7   ordering is done over the telephone versus over
8   the Internet?
9     A.  Oh, the lion's share is still done
10  through the telephone.
11    Q.  That surprises me just in the sense that
12  obviously you want the order to be precise, but, I
13  guess, they'll call in and they can give the
14  shades of the milling blocks and the people record
15  it and then process the order?
16    A.  Yeah.  I mean there's also a confident
17  zone of dealing with somebody you know as opposed
18  to the more impersonal Internet aspect.  They know
19  the people they deal with.  They've dealt with
20  them for a long time.  Most of the customers will
21  pick up the phone and they know somebody will
22  answer the phone.  They're not going to be
                                        Page 51

1   say, they're not ordering product at all.  Who's
2   involved in that review process?
3     A.  I'm involved.
4     Q.  Who else?
5     A.  Rozy Setoodegan.
6     Q.  Anybody else?
7     A.  No.
8     Q.  So this decision to remove a lab from a
9   list for not purchasing product, does that have to
10  get escalated any higher, or is it just you and
11  Rozy would be making that decision?
12    A.  It doesn't have to be escalated.
13    Q.  So you and Rozy have -- first of all, is
14  the decision yours or Rozy's decision?
15    A.  It would be mine.
16    Q.  It would be yours.
17        Do you recall how many labs you've
18  removed from the list between 2009 and today?
19    A.  It's a guess.  A few.
20    Q.  Not very many?
21    A.  No.  It's not a very common occurrence.
22  It does happen, but it's not frequent.
                                        Page 53

                                        Pages 50 to 53

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-116-

1    Q. Do you recall any dental labs by name
2  that have been removed from the list?
3    A. No, I don't.
4    Q. I think you said somebody will call them
5  up and talk to them and say, "Why have you stopped
6  buying product"; right?
7    A. Yes.
8    Q. In the instances where these labs have
9  been dropped from the list for not buying product,
10  do you have an understanding of why they stopped
11  buying the product?
12    A. Maybe they want to buy a less expensive
13  product. Maybe they decided to invest in a
14  different system. There's a lot of reasons why
15  they might do so.
16    Q. For those instances that you're talking
17  about, you don't have a recollection as to what
18  the reason was?
19    A. No. Oftentimes it's buying a less
20  expensive product.
21    Q. What's an example of a less expensive
22  zirconia product?

Page 54

1    A. Well, there are zirconias from China that
2  are significantly less expensive than ours.
3  They're also of lower quality, but that's a
4  decision the lab makes.
5    Q. And then I assume in that phone call, an
6  effort is made to keep the lab, you know, in the
7  Glidewell family, so to speak; correct?
8    A. We try.
9    Q. You're in business to be selling
10  products.
11    A. Sure. We want to see if there's anything
12  we can do differently to keep them.
13    Q. Right.
14       Because losing a lab off of the list is
15  losing a customer. You don't want to lose your
16  customers?
17    A. Exactly.
18    Q. Just like any other business?
19    A. Yes. If we can avoid it, we try.
20    Q. Aside from these few instances where
21  these labs have stopped purchasing product, are
22  there any other reasons why labs have been dropped

Page 55

1  from the list of authorized Glidewell Labs?
2    A. Our main focus is on the sales aspect.
3  We do a lot of promoting of the BruxZir brand, and
4  that list benefits from quarterly mailings and a
5  lot of support; so we want to make sure the people
6  that are on the list are indeed providing their
7  customers with the genuine BruxZir materials and
8  are following the correct technique.
9       So if they're not buying the materials or
10  they're not following the technique, those would
11  be reasons to have a conversation with them. And
12  if they opt to not follow those steps, we would
13  then remove them from the list.
14    Q. Now, who is it who looks into whether the
15  techniques are being followed?
16    A. Well, if the results -- well, it's hard
17  to validate, but if they buy blocks and they don't
18  buy liquids, or if there's a discrepancy between
19  one or the other, we want to make sure that they
20  are giving the best possible product as ours has
21  better strengths, better translucency, better
22  aesthetics. We want to make sure our brand is

Page 56

1  protected; so people don't think they're getting
2  one thing and then decide it doesn't look that
3  good when, in fact, they didn't get a BruxZir
4  crown.
5    Q. What I'm asking is, is it your group
6  that's paying attention to the product or the
7  techniques that's being performed by the
8  authorized labs?
9    A. We focus on the sales of those items. If
10  the blocks are not there, it's a clear indication
11  that they're not using our product. But also if
12  the liquids are missing, that would be a red flag
13  that maybe they're not using the full system.
14    Q. Do you have a recollection for when the
15  authorized lab program began?
16    A. I don't have a good timeline but shortly
17  after our launch, we introduced that. At the
18  time, it was a small list basically of our
19  laboratories, but maybe one or two outside
20  laboratories. So it's grown nicely.
21    Q. When you say "after our launch," you mean
22  the launch of the BruxZir suite of products?

Page 57

Pages 54 to 57

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-117-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

| | |
|---|---|
| 1     A. Correct. | 1     A. Correct. |
| 2     Q. Okay. And why did Glidewell begin this | 2     Q. Okay. Do you remember the last time a |
| 3   authorized lab program? | 3   lab was removed from the list? |
| 4     A. Well, we're a sales organization. So | 4     A. No, I don't. |
| 5   while we use a lot of blocks, I don't sell blocks | 5     Q. And I think you said before that a lab |
| 6   to the internal customers; so we're trying to | 6   who's purchasing the milling blocks but not |
| 7   reach out to more customers. So in order to | 7   purchasing the coloring liquids would be an |
| 8   attract them to our line, we offer not only a | 8   example of a lab that might get removed from the |
| 9   great product but also a strong marketing campaign | 9   list; correct? |
| 10  to help promote the laboratory services to their | 10    A. It's a possibility, yes. |
| 11  accounts. So it was a win-win. The customers | 11    Q. Has that ever happened, or are you just |
| 12  benefited, and we enjoyed greater sales. | 12  giving -- |
| 13    Q. Because it's a different business model | 13    A. No, you asked me what other ways could a |
| 14  than just selling them zirconia; correct? | 14  lab be removed. That could be one of them. |
| 15    A. Yes. | 15    Q. Has a lab ever been removed for that |
| 16    Q. And I think, as you just said, one thing | 16  reason? |
| 17  you provide for the labs, I guess, is the | 17    A. No. Typically, they buy the system |
| 18  marketing strength of Glidewell and Glidewell's | 18  that's linked and proven to work. |
| 19  marketing campaign, I think you called it; right? | 19    Q. To your knowledge, has a lab been removed |
| 20    A. Yes. | 20  for any reason other than not purchasing product |
| 21    Q. Okay. What does a lab do to become an | 21  from Glidewell? |
| 22  authorized lab of Glidewell? | 22    A. No. |
| Page 58 | Page 60 |
| 1     A. They need to buy BruxZir blocks on a | 1     Q. So what benefits does a lab get by |
| 2   regular basis, BruxZir coloring liquids on a | 2   becoming an authorized lab of Glidewell? |
| 3   regular basis, and that's how they get into the | 3     A. Well, the first benefit is they get added |
| 4   system. In order to stay, we need to see a steady | 4   to the dedicated BruxZir.com website where their |
| 5   flow of orders. | 5   lab will be listed. The next benefit is that they |
| 6     Q. Do they pay any kind of royalty? | 6   get to participate in the quarterly Rx booklet |
| 7     A. Nope. | 7   campaign which basically happens once a quarter. |
| 8     Q. An authorized lab can still sell zirconia | 8   We reach out to all 120,000 doctors across the |
| 9   crowns made from zirconia purchased elsewhere | 9   U.S. and send them an Rx booklet that lists all |
| 10  other than Glidewell; correct? | 10  the authorized laboratories, encourages them to |
| 11    A. Absolutely. | 11  use our prescription, and send it to one of the |
| 12    Q. Who at Glidewell makes the decision to | 12  laboratories listed on that flyer, and we do |
| 13  add a lab as an authorized lab? | 13  E-blasts. We do letter campaigns. We do a lot of |
| 14    A. I would. | 14  different things to bring the awareness of the |
| 15    Q. So that would be your job? | 15  BruxZir brand and its benefits and what makes it |
| 16    A. Yes. | 16  better. So they participate in all of that at no |
| 17    Q. And if I look in Glidewell's website, for | 17  cost to them. |
| 18  example, I can find a listing of the authorized | 18    Q. And so, again, these are -- these |
| 19  labs; right? | 19  benefits are marketing benefits -- |
| 20    A. Yes. | 20    A. Yes. |
| 21    Q. If a lab is going to get mentioned, it's | 21    Q. -- to the lab. Right. |
| 22  because you've agreed, "Hey, update the list"? | 22       Now, Glidewell benefits when it adds a |
| Page 59 | Page 61 |

Pages 58 to 61

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-118-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1  new lab because now they have another customer for
2  its BruxZir products; correct?
3      A.  Yes.
4      Q.  Okay.  Does Glidewell benefit in any
5  other ways other than obviously they can sell more
6  products if they add more labs?
7      A.  No, that's the main benefit, getting a
8  new customer.  And obviously the more people on
9  the list, the better it is for sales, but also
10  it's better for the brand recognition.  It's not
11  just Glidewell Laboratories offering BruxZir
12  crowns.  It's offered by a large number of
13  laboratories across the country which gives a
14  dentist more choices to get the genuine article.
15      Q.  And when you say "BruxZir crowns" like
16  that, what does that mean to you?  What's a
17  BruxZir crown to you?
18      A.  To me, it's a monolithic restoration made
19  with the BruxZir brand of blocks which are
20  processed and manufactured differently than
21  anybody else's blocks out there.  There are other
22  alternatives.  You can make a crown with another

Page 62

1      A.  Occasionally, but that would be more of a
2  technical question.  They may ask if indeed this
3  is looking the way it should or how can they
4  improve the aesthetics, and we may help them like
5  we talked about before.  We want authorized labs
6  to offer the same product we do and offer the same
7  translucency and same aesthetic benefits.
8      If they have questions about how to
9  improve their output, we will certainly do our
10  best to help them.  But we don't have a monitoring
11  system.
12      Q.  Right.
13      So it's in response to them contacting
14  Glidewell that this would happen?
15      A.  Yes.
16      Q.  Okay.  And who within Glidewell would
17  help them?
18      A.  Usually the R & D team.
19      Q.  So that's the team underneath Robin
20  Carden; right?
21      A.  That is correct.
22      Q.  Is there any kind of, like, level of

Page 64

1  block, but it wouldn't have the same strength or
2  translucency.  We have a superior product, and we
3  promote it as such.
4      Q.  And Glidewell makes its zirconia blocks
5  in-house; correct?
6      A.  We do.
7      Q.  Is that in Irvine?
8      A.  Yes.
9      Q.  Do you know, is it all made in Irvine?
10      A.  All the blocks are made in Irvine, yes.
11      Q.  All the blocks are made in Irvine.
12      To your knowledge, are there any written
13  contracts between Glidewell and the authorized
14  labs?
15      A.  No.
16      Q.  Do Glidewell personnel regularly inspect
17  the premises of the facilities of the authorized
18  labs?
19      A.  We do not.
20      Q.  And do Glidewell personnel review samples
21  of full zirconia dental restorations made by the
22  authorized labs using the BruxZir blocks?

Page 63

1  quality that the authorized labs have to maintain
2  to remain an authorized lab?
3      A.  No, beyond using the technique and the
4  product.  They should get similar results.
5      Q.  And how do you know if they're using the
6  technique or not?
7      A.  For us, it's the use of blocks and the
8  liquid.  Those are the two main ingredients.  It
9  can be milled on a multitude of different
10  machines.  Our main concern is the aesthetic look
11  of the final restoration.  If it's using our block
12  with our liquid, it should be a nice looking
13  restoration.
14      Q.  How the milling is done is left up to the
15  discretion of the lab.  Is that fair?
16      A.  Yes.
17      Q.  And how about the sintering?  That's also
18  left up to the discretion of the lab?
19      A.  No, it has to follow the sintering cycle
20  that's approved.  It has to reach a temperature of
21  1730 degrees Celsius.  So the sintering oven needs
22  to reach that temperature in order to get the full

Page 65

Pages 62 to 65

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-119-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

1   sintering and translucency that's needed.
2       Q. Is there a flexibility in timing, like,
3   how long it's in the oven?
4       A. There's flexibility in how quickly a
5   furnace can reach the temperature, but it needs to
6   spend two hours at that top temperature in order
7   to fully sinter and get the translucency you want
8   to achieve. So some furnaces, like the name
9   suggests, Fast Fire, gets it done faster, but it
10  still spends the same amount of time in the sweet
11  spot, if you will.
12      MR. TACHNER: I would like to caution the
13  witness that we have a confidentiality agreement
14  with the defendants. So if you feel that any of
15  the specifics in regard to your process are
16  confidential, you should let us know; so she can
17  mark the transcript accordingly.
18      THE WITNESS: Okay.
19  BY MR. JANKOWSKI:
20      Q. So the sintering temperature may be
21  secret or isn't secret?
22      A. It's not secret.

Page 66

1   MR. TACHNER: Thank you.
2       THE WITNESS: Thank you, Larry.
3   BY MR. JANKOWSKI:
4       Q. How is the sintering temperature or other
5   aspects of sintering, for example, conveyed to
6   these authorized labs?
7       A. We have technical bulletins, and we have
8   firing cycles that go along with the equipment.
9       Q. And when you say "technical bulletins,"
10  what do you mean by that?
11      A. Well, I mean instructions for use. It's
12  going to have the firing cycles and how to program
13  the furnace and how to reach the temperature and
14  what the heat lamp should be and what the hold
15  time should be and what the cooling time should
16  be. That's what I meant.
17      Q. If a lab approaches Glidewell to buy the
18  BruxZir milling blocks and already has its own
19  sintering oven, then it needs to know what to do;
20  correct?
21      A. Correct.
22      Q. So presumably it asks or maybe without

Page 67

1   being asked, you tell me, Glidewell will then say,
2   "This is what you do" --
3       A. Right. In order to get the best results,
4   you need to follow this firing cycle as closely as
5   possible.
6       Q. Do you know whether it varies with oven
7   to oven, or it's more dependent on the product?
8       A. No. It's just a matter of not rushing
9   it. People have a tendency to want to take things
10  out of the oven before it's cooled down, and that
11  could lead to trouble. It's a matter of following
12  what the parameters are, and if they follow it,
13  the material will sinter correctly.
14      Q. Just like chocolate chip cookies.
15      A. Just about.
16      Q. Everybody wants to eat them before
17  they're totally baked.
18      MR. TACHNER: Do you think this is a good
19  time for a break, David? It's almost 12 o'clock.
20      MR. JANKOWSKI: Absolutely. We can take
21  a break.
22      MR. TACHNER: Thank you. Off the record,

Page 68

1   I guess.
2       MR. JANKOWSKI: Yes, off the record.
3       (Recess taken from 10:52 a.m. to
4       11:08 a.m.)
5   BY MR. JANKOWSKI:
6       Q. Mr. Bartolo, you understand that you're
7   still under oath?
8       A. Yes, I do.
9       Q. Okay. Does Glidewell Labs require its
10  authorized lab to provide Glidewell with any data
11  on the returns or product defects associated with
12  dental restorations that the authorized labs
13  creates with the BruxZir blocks?
14      A. They're not required, no.
15      Q. I'd like to ask you some questions now
16  about the mark BruxZir itself.
17      A. Okay.
18      Q. You're aware that BruxZir is a name that
19  Glidewell created in the year 2009; correct?
20      A. Yes.
21      Q. And obviously we've been talking about
22  how Glidewell associates the name BruxZir with a

Page 69

Pages 66 to 69

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-120-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1    suite of products; correct?
2        A.  Yes.
3        Q.  Okay.  Are you aware that Jim Shuck is
4    the individual who came up with the name BruxZir?
5        A.  Yes.
6        Q.  And were you involved at all in the
7    process of naming the products?
8        A.  No.
9        Q.  You just heard about it after the fact?
10       A.  Right.
11       Q.  And how did you hear about it?
12       A.  I just heard that that's the name that
13   Mr. Shuck came up with, and seemed to be a great
14   name.  I mean I'm aware that other names had been
15   tossed about, but it seemed like that was the best
16   fit.
17       Q.  Were you included on a group of people to
18   consider candidate names or give feedback?
19       A.  No.
20       Q.  Okay.  And I think you said that you have
21   an associate's degree in dental technology;
22   correct?

                                          Page 70

1    convey strength.
2        It's not limited to those applications,
3    but it certainly worked well with the combination
4    of the Zir for zirconia.  So I think it's a great
5    name.
6        Q.  You recognized that connection when you
7    first saw the name; correct?
8        A.  No, because there were no other products
9    that combined zirconia in that use; so it was
10   clever, but there's a process that leads you
11   there.  Initially, they were looking for a name
12   that was conveying strength.  So it was an
13   interesting combination of those features and the
14   application that it was used for.
15       Q.  The combining of zirconia crown that can
16   be used or -- strike that.
17       A name that's describing a zirconia crown
18   that's strong enough for a bruxer.  Is that fair?
19       A.  Yeah, that's fair.
20       Q.  And in terms of pronunciation, do you
21   think BruxZir and bruxer, a patient suffering from
22   bruxism, are they pronounced the same?

                                          Page 72

1        A.  Yes.
2        Q.  Okay.  So you've been aware of the term
3    "bruxer," as a term for somebody with bruxism
4    going way back to dental -- your associate's
5    degree.  Is that fair?
6        A.  Yes.
7        Q.  When you heard the name BruxZir, what was
8    your thinking on the connection with bruxism,
9    bruxers, or bruxing?
10       A.  Well, the connection is very strong.
11   Here we're promoting a product that's virtually
12   indestructible, and it's known that patients that
13   suffer from bruxism typically will wear whatever
14   restorations they have, if not break them all
15   together.  So now we had a material that's
16   aesthetically pleasing and more so than the
17   alternatives they would have, like cast gold
18   crown or porcelain veneer on a metal occlusal
19   restoration.  So here you had something that
20   looked like a tooth and yet was strong enough to
21   withstand even patients that would brux at night
22   or during the day.  So it was a great name to

                                          Page 71

1        A.  No, they sound similar, but they're not
2    pronounced the same.  You referred to it BruxZir;
3    so it's BruxZir as opposed to bruxer.  I know it's
4    close.
5        Q.  Close but, to you, they're slightly
6    different?
7        A.  Yeah.
8        Q.  How about when you've heard other people
9    at Glidewell pronounce it?  Do they pronounce it
10   bruxer, a bruxism patient, differently than
11   BruxZir?
12       A.  I would say yes.  We're aware of the
13   difference; so we certainly call it by BruxZir.
14   Some people call it BruxZir; so there's different
15   pronunciations, but they don't call it bruxer.
16       Q.  When you say "BruxZir," who pronounces it
17   BruxZir with the emphasis on zir?
18       A.  Different people from different parts of
19   the country.
20       Q.  Anybody at Glidewell?
21       A.  No.
22       Q.  Because I mean the zir is kind of the

                                          Page 73

                                        Pages 70 to 73

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5

-121-

| | |
|---|---|
| 1   first syllable of zirconia; correct? | 1   for its name? |
| 2      A. Yes. | 2      A. No. |
| 3      Q. It's not zeerconia? | 3      Q. Did you participate at all in the |
| 4      A. Some people pronounce it that way, like, | 4   decisions on labeling of Glidewell's product with |
| 5   my name is Bartolo.  There's all kinds of | 5   brand names like BruxZir? |
| 6   combinations. | 6      A. No. |
| 7      Q. And you're aware that Glidewell's been | 7      Q. Who would be doing that?  Is that |
| 8   granted a federal registration in the mark BruxZir | 8   Mr. Shuck? |
| 9   for use with dental products; correct? | 9      A. Mr. Shuck. |
| 10      A. Yes. | 10      Q. Now, you've been identified by Glidewell |
| 11      Q. Okay.  And do you know which dental | 11   as a person with knowledge of facts relating to |
| 12   products Glidewell has a federal registration in | 12   the likelihood of public confusion in this case |
| 13   the mark for BruxZir? | 13   between the two marks that are at issue. |
| 14      A. Which products?  I'm not sure I | 14      A. Right. |
| 15   understand the question beyond the one we're | 15      Q. Are you aware of that? |
| 16   talking about. | 16      A. I wasn't aware that I was, but I'm here |
| 17      Q. We've been talking about a whole suite of | 17   today. |
| 18   products? | 18      Q. Yeah, you're here. |
| 19      A. Right. | 19          So let me ask you:  What knowledge do you |
| 20      Q. Do you understand whether Glidewell has a | 20   have, personal knowledge, do you have of facts |
| 21   registration in the name BruxZir on all of those | 21   relating to the likelihood of public confusion |
| 22   products? | 22   between Glidewell's BruxZir mark and Keating |
| Page 74 | Page 76 |
| 1      A. I would assume.  I don't know this for a | 1   Dental Arts KDZ Bruxer mark? |
| 2   fact that it's tied to the product, and we've | 2      A. It's sounds very similar to our name, and |
| 3   linked the accessories that are used in the | 3   so that leads to confusion.  A doctor that's |
| 4   fabrication of a BruxZir crown and tied it as a | 4   writing a prescription, a bruxer expects to get a |
| 5   suite of packages.  I don't think that the | 5   BruxZir restoration made with the Glidewell |
| 6   trademark applies to the equipment.  I could be | 6   materials.  It can be called many things, but if |
| 7   wrong, but that's my understanding. | 7   it sounds like our product, the doctor's |
| 8      Q. When you say "you don't think the | 8   assumption will be that he's getting a genuine |
| 9   trademark applies to the equipment," what do you | 9   BruxZir.  We've spent a lot of time and money |
| 10   mean? | 10   promoting that to them.  In their mind, that's |
| 11      A. We discussed that other mills can mill a | 11   what they expect to get.  If they're ordering a |
| 12   BruxZir restoration.  It doesn't have to be a | 12   full contour zirconia by a different name, then |
| 13   BruxZir milling system. | 13   they're not expecting ours. |
| 14      Q. But the milling system that Glidewell | 14      Q. So the confusion, in your mind, is |
| 15   sells, they call a BruxZir milling system? | 15   arising because of the similarity and |
| 16      A. Absolutely, yes. | 16   pronunciation between BruxZir and the bruxer in |
| 17      Q. I'm saying do you have an understanding | 17   Keating's mark? |
| 18   as to whether Glidewell has a federal registration | 18      A. Right. |
| 19   in applying the name BruxZir to a milling system? | 19      Q. Are you aware of any examples of people |
| 20      A. I'm not sure I know the answer to that. | 20   being confused between those two marks?  I'm |
| 21      Q. Okay.  Have you participated at all in | 21   asking for your personal knowledge, not that |
| 22   Glidewell's efforts to seek trademark protection | 22   you've heard through the grapevine. |
| Page 75 | Page 77 |

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-122-

1    A. Yes.  I mean doctors expect a BruxZir
2  crown when they request a BruxZir crown, and so if
3  it's called something else that sounds like it,
4  they assume they're getting the Glidewell product.
5  Not everybody checks to see if Keating Dental Arts
6  is on the authorized list.
7    Q. Do you have any experience with customers
8  of Keating Dental Arts being confused?
9    A. Not by name.  I don't know anybody that
10  I've been on the phone with that said, "Oh, I
11  thought so."
12    Q. That's what I'm trying to understand.
13    A. No, I don't have that knowledge.
14    Q. Is there anything else other than the
15  similar sound between the two marks in how BruxZir
16  is pronounced or bruxer as Keating spells it, that
17  that would be creating a likelihood of public
18  confusion?
19    A. Like we talked about earlier, the product
20  is going to be different; therefore, the aesthetic
21  results are going to different.  If in a doctor's
22  mind he's getting a BruxZir crown and the outcome

Page 78

1    testified about?
2    A. Other than that, it's not the same
3  product and the quality is not the same.  So to
4  me, they're two totally different products, but
5  the doctor doesn't recognize that.
6    Q. Why doesn't he recognize that?
7    A. Because all he's seeing in all the
8  publications is all about the Glidewell BruxZir
9  brand.  So they are calling it by their name.
10    Q. What about if it's a customer of Keating
11  Dental Arts who's been buying from Keating for
12  years?  Does that change your thought process?
13    A. Keating didn't offer that until after
14  we've introduced the BruxZir brand.
15    Q. How about the fact that there's a KDZ
16  before the word "bruxer" in Keating's mark?  Does
17  that weigh into your thinking on the likelihood of
18  confusion?
19    A. KDZ bruxer using our blocks, that's fine.
20  You can say it's my laboratory producing BruxZir
21  crowns.  That's not the case.
22    Q. So Bruxer by itself you think describes a

Page 80

1  is not as aesthetically pleasing, it damages our
2  product.  Not only are they confused by the name,
3  but they're getting a lower quality product as a
4  result of it.
5    Q. I'm trying to understand what it is
6  that's going to be leading to the confusion as to
7  source.  What I understand is you're saying
8  somebody is going to think when they see Keating
9  Dental Arts use of KDZ Bruxer, spelled
10  B-r-u-x-e-r, that they're getting something
11  associated with Glidewell Laboratories; correct?
12    A. Yes.
13    Q. I understand your statement that there's
14  similarity in pronunciation of the words, but I'm
15  wondering if there's anything else about the mark
16  that you think can be confusing to people?
17    A. I'm not sure I understand the question.
18  What is it you'd like to know?
19    Q. I'm trying to understand what it is you
20  think will confuse people into thinking that
21  Keating's product is associated with Glidewell.
22  Anything other than the pronunciation that you

Page 79

1  Glidewell product.  Is that accurate?
2    A. BruxZir does, yes.
3    Q. I'm not saying the Z.  I'm saying the way
4  Keating spells it, B-r-u-x-e-r?
5    A. That's a condition that somebody that's
6  grinding their teeth.  That has nothing to do with
7  the product.
8    Q. Right.  And that's what's in Keating's
9  product; correct?
10    A. His mark is riding on the BruxZir brand
11  that's been established in 2009.
12    Q. What's your basis for saying that?
13    A. Nobody else used that terminology before.
14    Q. Well, there are other dental labs that
15  have used brux in their names for crowns for
16  bruxers; correct?
17    A. I'm sure there is.  I'm not aware of
18  them.
19    Q. I think you've even been cc'd on some
20  e-mails from Mr. Allred written to other dental
21  labs.  Do you recall that?
22    A. Yes, because they're now using the

Page 81

Pages 78 to 81

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-123-

1 BruxZir terminology. But before the introduction
2 of BruxZir from Glidewell Laboratories, I'm not
3 aware of any laboratory making that connection and
4 offering a full contour zirconia for that use.
5     Q. Certainly the labs were offering crowns
6 for use with bruxers; correct?
7     A. Not to my knowledge. We were the first
8 to introduce a full monolithic restoration with
9 zirconia.
10    Q. Right. But that wasn't my question.
11 What I'm saying is these dental labs were selling
12 crowns to dentists for use with bruxers?
13    A. Yes, gold crowns, metal occlusals, not
14 full contour zirconia.
15    Q. But they were selling crowns for bruxers?
16    A. Yes, but I'm not aware of them calling
17 them a BruxZir crown. They're a gold crown, a
18 metal occlusal crown.
19    Q. But there's nothing wrong with them
20 describing in their own materials that they have a
21 crown which is, for example, indicated for
22 bruxers; correct?

Page 82

1     A. No, there's no problem with that.
2     Q. All dental labs have to be able to sell
3 crowns for bruxers meaning patients with bruxism;
4 correct?
5     A. Yes.
6     Q. And so in the example of Keating, do you
7 have an understanding as to whether Keating was
8 using KDZ before Glidewell came out with its
9 BruxZir suite of products in 2009?
10    A. I'm not aware of what he called his
11 crowns before.
12    Q. If I tell you that Keating Dental Arts
13 had a crown that it was offering for sale made not
14 entirely of zirconia but partially out of zirconia
15 that it called a KDZ crown, does that affect your
16 thinking at all?
17    A. No. It's not a problem, in my opinion.
18 A KDZ crown, I'm sure he made lots of those.
19    Q. Yeah, it's a bigger seller for them than
20 the KDZ Bruxer crown that's at issue here. So KDZ
21 by itself is not confusing with Glidewell. You'd
22 agree with that?

Page 83

1     A. I do agree with that.
2     Q. Okay. Now, you've also been identified
3 by Glidewell as a person with knowledge of facts
4 relating to the damages resulting from Keating's
5 alleged infringement in this case. Are you aware
6 of that?
7     A. No, I'm not.
8     Q. Since you're here today, let me ask you.
9 What knowledge do you have on the damages to
10 Glidewell resulting from Keating's alleged
11 infringement?
12    A. My only knowledge would deal with the
13 fact if a doctor is sending a restoration under
14 the assumption he's going to receive a BruxZir
15 crown and he's not, it affects my ability to sell
16 that product to the laboratory. We like that
17 doctor to send that case to one of our 185 or so
18 authorized laboratories.
19    Q. Or to Glidewell itself?
20    A. Yes.
21    Q. And but you're not aware of any specific
22 dentist not going to Glidewell or going to a

Page 84

1 Glidewell authorized lab because of the alleged
2 infringement by Keating Dental Arts; correct?
3     A. I can't give you a name of a doctor, no.
4     Q. In fact, Glidewell sales are outstanding
5 over the last year-and-a-half; correct?
6     A. They have been.
7     Q. In fact, they're increasing; correct?
8     A. They've been steady, yes.
9     Q. And the number of authorized labs has
10 grown between, say, May, 2011, and today; correct?
11    A. That's correct.
12    Q. So business is pretty good for Glidewell;
13 correct?
14    A. Business could be better.
15    Q. I'm sorry?
16    A. Business could be better. There's 10,000
17 labs out there. There's only 185 authorized
18 BruxZir labs; so it's still a very small
19 percentage, but yeah, it's been good.
20    Q. I would like to mark some exhibits for
21 you to look at.
22        MR. JANKOWSKI: First, I'll have the

Page 85

Pages 82 to 85

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5
-124-

1  court reporter mark as Exhibit 93 a printout off
2  of the Glidewell website associated with BruxZir
3  Solid Zirconia.
4       (Bartolo Exhibit No. 93 was marked
5       for identification.)
6       MR. JANKOWSKI:  And I'll also have the
7  court reporter mark as Exhibit 94 a printout off
8  the Glidewell website about Prismatik Clinical
9  Zirconia.
10      (Bartolo Exhibit No. 94 was marked
11      for identification.)
12      MR. JANKOWSKI:  And then I'll have the
13  court reporter mark as Exhibit 95 a printout off
14  the Glidewell website for Lava Crowns & Bridges.
15      (Bartolo Exhibit No. 95 was marked
16      for identification.)
17  BY MR. JANKOWSKI:
18      Q.  Mr. Bartolo, if you could just briefly
19  look at Exhibits 93 through 95 for me.  Can you
20  just confirm for me that these do look like
21  accurate copies of information that Glidewell
22  Laboratories provides on its website for these

Page 86

1  three products associated with clicking the
2  laboratory tab on the website?
3      A.  They do.
4      Q.  And I think you've already been
5  testifying about these products, in fact, a little
6  bit; correct?
7      A.  Yes.
8      Q.  And Exhibit 93 is an example of the web
9  page associated with the BruxZir milling blocks,
10  for example, or the solid zirconia associated with
11  the milling blocks; correct?
12      A.  Yes.
13      Q.  And Exhibit 94 is associated with
14  Prismatik, which I think you testified about
15  earlier; correct?
16      A.  Yes.
17      Q.  And so Prismatik was something that was
18  being -- I'm trying to remember.  Did you say it
19  was being sold when you started at Glidewell
20  Direct in 2009; correct?
21      A.  Yes, that's correct.
22      Q.  Okay.  And that's a zirconia product as

Page 87

1  well; right?
2      A.  It is.
3      Q.  And --
4      A.  Zirconia substructure with porcelain
5  overlaid.
6      Q.  That was my next question.  So the
7  Prismatik clinical zirconia is something that's
8  used as a substructure?
9      A.  Yes.
10      Q.  Do you know, can any dental labs make a
11  full contour zirconia crown out of the Prismatik
12  material?
13      A.  They could.  It would be very
14  unaesthetic.
15      Q.  It doesn't look nearly as nice as the
16  BruxZir?
17      A.  It was meant as an understructure that
18  would be overlaid with the aesthetic portion.  The
19  porcelain overlay would be giving the toothlike
20  appearance; so that material would be very white.
21      Q.  And, in fact, one way of looking at it is
22  this is an old form of zirconia that's existed for

Page 88

1  a long time which aesthetically is very poor and
2  BruxZir is Glidewell's newer much more aesthetic
3  version of zirconia.  Is that fair?
4      A.  Well, Prismatik crown was an aesthetic
5  restoration, but it wasn't a full contour
6  restoration; so there is a difference.  We were
7  talking about making the whole crown out of
8  Prismmatik.  You can but that would not be
9  aesthetic.  It's not necessarily old.  It's just
10  it wasn't meant for that application.  It was
11  always meant to be layered.
12      Q.  Right.
13      What I'm talking about is the zirconia
14  itself, right, associated with the Prismatik
15  clinical zirconia, it's not designed to be an
16  aesthetic ceramic solution; correct?
17      A.  It's only to be used as a substructure.
18      Q.  And it would be -- it's ugly --
19      A.  As such, yes.  The substructure is not
20  ugly, but if you made the whole thing out of the
21  substructure material, yes, it would not be
22  aesthetically pleasing.

Page 89

Pages 86 to 89

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-125-

1      Q. It's designed to be used in places in the
2  mouth where you can't see; right?
3      A. No, I'm referring to the substructure.
4  It's going to be overlaid with porcelain.  It's
5  going to look perfectly fine.
6      Q. Because of the porcelain overlay?
7      A. Yes.
8      Q. Whereas with BruxZir you don't need the
9  porcelain overlay to get reasonably good
10  aesthetics?
11      A. That's correct.
12      Q. This zirconia was available before you
13  joined Glidewell in 2009?
14      A. Yes.
15      Q. Looking at Exhibit 95, here's the Lava
16  product I asked you about earlier; correct?
17      A. Yes.
18      Q. This is also a product which is -- is the
19  Lava product itself offered for sale by Glidewell
20  Direct?
21      A. No.
22      Q. This is a reference to dental

Page 90

1  restorations made of the e.max product that we
2  were talking about earlier; correct?
3      A. Yes, it is.
4      Q. And this is an all ceramic system from
5  Ivoclar Vivadent; correct?
6      A. Yes.
7      Q. This was being offered for sale by
8  Glidewell before you joined Glidewell in 2009;
9  correct?
10      A. Yes.
11      Q. And is still available today; correct?
12      A. Yes.
13      Q. And all of these we've been looking at,
14  Exhibits 93 through 96, are, of course, available
15  today?
16      A. Yes.
17      Q. Okay.
18      MR. JANKOWSKI:  I'll have the court
19  reporter mark as Exhibit 97 a printout from
20  Glidewell's website about BruxZir milling blanks.
21      (Bartolo Exhibit No. 97 was marked
22      for identification.)

Page 92

1  restorations made of Lava being available?
2      A. Yes.
3      Q. Okay.  And Glidewell has been making
4  dental restorations made of Lava since before you
5  joined them; correct?
6      A. Yes.
7      Q. Okay.
8      MR. JANKOWSKI:  I'm going to have the
9  court reporter mark as Exhibit 96 a printout off
10  of Glidewell's website about IPS e.max &
11  IPS Empress products.
12      (Bartolo Exhibit No. 96 was marked
13      for identification.)
14  BY MR. JANKOWSKI:
15      Q. Mr. Bartolo, can you just confirm for me
16  that this does appear to be an accurate
17  reproduction of information presented on
18  Glidewell's website associated with clicking the
19  laboratory tab?
20      A. Yes, it is.
21      Q. Okay.  And I think you testified about
22  this as well.  This is an example of dental

Page 91

1  BY MR. JANKOWSKI:
2      Q. Mr. Bartolo, can you just confirm for me
3  that this appears to be an accurate representation
4  of information on Glidewell's website associated
5  with the BruxZir milling blanks we've been talking
6  about today?
7      A. Yes, it is.
8      Q. And we've also, I think, been referring
9  to these as blocks at times?
10      A. At times, yes.
11      Q. They're essentially the same thing?
12      A. We refer to them as blanks, but they use
13  blocks as well, yes.
14      Q. I believe you said this product would
15  have been offered for sale at -- for the first
16  time after you joined Glidewell later in 2009;
17  correct?
18      A. That's correct.
19      Q. Okay.  What's your recollection of what
20  the state of the BruxZir milling blanks were when
21  you joined Glidewell?  You were aware of this as a
22  product that was up and coming; correct?

Page 93

Pages 90 to 93

a556e01e-d30e-4159-ae5d-cfa61863a702
**EXHIBIT 5**
-126-

1      A. I was aware this was a product that was
2  up and coming, yes.
3      Q. And were you involved in kind of the
4  timing of the release of it?
5      A. No. My role was to sell the product when
6  it was available. I wasn't involved in the timing
7  of that release.
8      Q. Okay. Based on Exhibit 97, it appears
9  that there are different size or shaped milling
10  blanks that are sold depending on what kind of
11  milling machine it's going to be used with. Is
12  that accurate?
13      A. That is correct, yes.
14      Q. It looks like there are some milling
15  blanks sold by Glidewell with a 10-millimeter band
16  machined around the circumference of the disk.
17  Are you aware of that?
18      A. Yes.
19      Q. Those are designed for use with Wieland,
20  i-core, and Origin milling machines; is that
21  correct?
22      A. Correct.

Page 94

1      Q. Glidewell also sells a milling blank with
2  a 6-millimeter plastic band glued around the
3  circumference of the disk designed for use with
4  digital dental milling machines; is that correct?
5      A. That is correct.
6      Q. Then there's a size or shape of a milling
7  blank that's designed to be used with Glidewell's
8  own milling machines, BruxZir milling machines;
9  correct?
10      A. Correct.
11      Q. And other milling machines can also mill
12  those same blanks including Inteletek, Haas, and
13  Rotors milling machines; is that correct?
14      A. That is correct.
15      Q. That is consistent with our previous
16  discussion with how labs can have their own
17  milling machines; right?
18      A. Yes.
19      Q. I think you testified earlier that
20  Glidewell began selling milling machines a little
21  bit later in time after the milling blanks
22  themselves were offered for sale because the

Page 95

1  product was being finalized?
2      A. BruxZir milling machines, yes. The
3  Inteletek was already available.
4      Q. That's right. You testified about the
5  Inteletek milling machines.
6          MR. JANKOWSKI: I'll have the court
7  reporter mark as Exhibit 98 a printout off of
8  Glidewell's website about a BruxZir mill.
9          (Bartolo Exhibit No. 98 was marked
10          for identification.)
11  BY MR. JANKOWSKI:
12      Q. Mr. Bartolo, if you can just confirm for
13  me that this appears to be an accurate
14  presentation of information that's presented on
15  Glidewell's website if you click on the laboratory
16  tab?
17      A. That is correct.
18      Q. And this Exhibit 98 is providing
19  information on the BruxZir mill that we've been
20  talking about today; correct?
21      A. Yes.
22      Q. Okay. And it says right here that this

Page 96

1  mill is custom built at Glidewell's labs in
2  California.
3          Do you see that?
4      A. Yes.
5      Q. Do you have a sense for how many mills
6  BruxZir mills Glidewell sells in a typical month?
7      A. I do.
8      Q. And what's a typical number?
9      A. I'd say a couple a month.
10      Q. A couple a month.
11          Is that number going up with time?
12      A. No, it's pretty steady.
13      Q. It's pretty steady. Okay.
14      A. It's a big investment for most labs.
15          MR. JANKOWSKI: I'll have the court
16  reporter mark as Exhibit 99 a printout off of
17  Glidewell's laboratory website entitled
18  "Authorized BruxZir Solid Zirconia Laboratories."
19          (Bartolo Exhibit No. 99 was marked
20          for identification.)
21  BY MR. JANKOWSKI:
22      Q. Mr. Bartolo, if you can just confirm for

Page 97

Pages 94 to 97

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-127-

10/23/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.    Robin Bartolo

1  me this appears to be an accurate representation
2  of information that's presented on Glidewell's
3  website by clicking on the laboratory tab.
4      A. It is accurate.
5      Q. And this particular page is going through
6  basically providing information for dental labs on
7  why it may be beneficial for them to become an
8  authorized BruxZir lab; correct?
9      A. Yes.
10      Q. And if you turn to the second page of
11  Exhibit 99, you'll see that it says halfway down
12  it says, "Ways to become an authorized BruxZir
13  lab."
14      Do you see that?
15      A. Yes.
16      Q. And I see the first one says, "Buy
17  BruxZir milling blanks."
18      Do you see that?
19      A. Yes.
20      Q. And we've talked about that at length
21  already.
22      A little farther down I see it says,

Page 98

1  "Purchase the BruxZir milling system."
2      Do you see that?
3      A. Yes.
4      Q. Is purchasing the milling system by
5  itself going to be enough to become an authorized
6  BruxZir lab?  I assume you still have to be buying
7  milling blanks; correct?
8      A. Yes, that's correct.  The milling blanks
9  is the key.
10      Q. That's what I thought.
11      MR. JANKOWSKI:  I'd like to have the
12  court reporter mark as Exhibit 100 a printout from
13  the website www.BruxZir.com, and it appears to be
14  an e-mail blast from October, 2009.  This was
15  produced by Glidewell in the case but does not
16  have a production number because it was in the
17  documents that were provided as PDFs.
18      (Bartolo Exhibit No. 100 was marked
19      for identification.)
20  BY MR. JANKOWSKI:
21      Q. Mr. Bartolo, if you look in the upper
22  right corner of this document, you'll see the

Page 99

1  e-mail blast reference with a 2009-2010.
2      Do you see that?
3      A. Yes, I do.
4      Q. The content of this website is -- it
5  appears to be introducing the www.BruxZir.com
6  website.
7      Do you see that?
8      A. Yes.
9      Q. Do you recall Glidewell introducing this
10  new website?
11      A. Yeah.
12      Q. Did that take place in late 2009?
13      A. There may have been another one before
14  that, but that sounds about right.
15      Q. Certainly in the year 2009?
16      A. Yes, definitely.
17      Q. Okay.  This particular website is devoted
18  to the BruxZir product, dental restorations,
19  crowns and bridges; correct?
20      A. Yes.
21      Q. And one thing I notice in this particular
22  page is if you look at the little paragraph there

Page 100

1  you'll see, again, it's talking about things that
2  a dental lab can do to become an authorized
3  BruxZir lab.
4      Do you see that?
5      A. Yes, I do.
6      Q. And it says there are three ways to do
7  this.
8      Do you see that?
9      A. Yes.
10      Q. It says -- the first way it looks like it
11  says, "Purchase the special BruxZir high
12  translucent zirconia blanks."
13      You've already been testifying about
14  that; correct?
15      A. Yes.
16      Q. And another thing it says is, "If you
17  have a 3Shape scanner and 2009 dental designer
18  software, send your 3Shape design file to
19  Glidewell Laboratories."
20      Do you see that?
21      A. Yes, I do.
22      Q. So is that an independent way to become

Page 101

Pages 98 to 101

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-128-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

1    an authorized lab?
2        A. Yes, it is.
3        Q. And would these people be buying the
4    BruxZir milling blanks as well?
5        A. No, they would not. They're sending us
6    the file for us to mill in-house. We send them
7    back a final restoration.
8        Q. Oh, okay. But are these dentists or labs
9    that would be doing this?
10       A. These are labs.
11       Q. These are labs.
12          So these labs are using Glidewell as a
13   lab for them for this product?
14       A. Correct.
15       Q. Okay. So this is another -- this is a
16   category of -- a subcategory, if you will, of
17   authorized labs that may not actually be
18   purchasing the BruxZir blanks; correct?
19       A. That is correct.
20       Q. Okay. Do you have a sense of the -- you
21   said there were approximately 185 authorized labs
22   today?

Page 102

1        A. Yes.
2        Q. Do you have a sense of how many of them
3    would fall into category 2 where they're not
4    purchasing BruxZir milling blanks?
5        A. I don't have an accurate number, but most
6    laboratories on the list are buying blanks. It's
7    a smaller percentage that send it to us.
8        Q. Okay. You just don't know exactly what
9    that percentage is?
10       A. No, I'd have to take a guess.
11       Q. Okay. And then there's a third way
12   that's listed here that says to, "Send your master
13   and opposing model work with pinned, trimmed dyes
14   and a bite registration."
15          Do you see that?
16       A. Yes.
17       Q. So that's another way as well?
18       A. Yes, for people who do not have a 3Shape
19   scanner they can still send us a traditional
20   model. A 3Shape is just a way of digitizing that
21   information and sending it to us over the Internet
22   which speeds up the process and they control the

Page 103

1    design. This way it's just sending a case to us.
2    We will fabricate it to them, and they will mark
3    it up and send it to their dentist.
4        Q. So this 3 is similar to category 2?
5        A. Correct.
6        Q. It's another lab that's not going to be
7    buying the milling blanks, but they're having
8    Glidewell make the actual restorations?
9        A. Yes.
10       Q. Okay. Do you have a sense, as you sit
11   here today, of how many of the authorized labs
12   have what's called the 3Shape scanner and a dental
13   designer software as referenced here?
14       A. It's a very popular system; so most labs
15   have a 3Shape scanner. Only a small lab would not
16   want to invest $30,000 in a scanner.
17       Q. And most labs who are buying milling
18   blanks have their own scanners as well?
19       A. Yes, they would. Yeah, that's a
20   requirement. You need to have a scanner in order
21   to feed that mill.
22       Q. So it would be safe to say that

Page 104

1    90 percent of the labs are buying BruxZir milling
2    blanks -- 90 percent of the authorized labs are
3    buying BruxZir milling blanks from Glidewell?
4        A. As I stated, it's a guess, but it sounds
5    about right. It would be the majority of the labs
6    on that list are buying blanks.
7           MR. JANKOWSKI: I'll have the court
8    reporter mark as Exhibit 101 a document produced
9    by Glidewell in this case, two pages, and it
10   appears to be a marketing document. At the top,
11   it has "BruxZir. A New Option for Virtually
12   Unbreakable Restorations."
13          (Bartolo Exhibit No. 101 was marked
14          for identification.)
15   BY MR. JANKOWSKI:
16       Q. Mr. Bartolo, do you recognize
17   Exhibit 101?
18       A. I do.
19       Q. What is Exhibit 101?
20       A. It's, again, showing people how to send
21   BruxZir restorations, model work, 3Shape design,
22   buying a 3Shape scanner, or buying a mill.

Page 105

Pages 102 to 105

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-129-

1      Q.  Okay.  So, again, these are going to be
2   not dentists dealing with Glidewell but rather
3   labs; correct?
4      A.  Yes.
5      Q.  And on the second page of Exhibit 101
6   towards the bottom it says, "Become an authorized
7   BruxZir lab," then a colon.
8         Do you see that?
9      A.  Yes.
10      Q.  And then it has an option, "Buy BruxZir
11   milling blanks."
12         Do you see that?
13      A.  Right.
14      Q.  That's what we've been discussing;
15   correct?
16      A.  Yes, it is.
17      Q.  And then I see another one, "Purchase the
18   Prismatik clinical zirconia system."
19         Do you see that?
20      A.  Yes, I do.
21      Q.  Is that something new that we haven't
22   been talking about?  What is that?

Page 106

1      A.  No.  Those are the Inteletek machines we
2   discussed that predate the BruxZir mill.
3      Q.  Does that mean you can become an
4   authorized BruxZir lab by buying the -- that
5   milling system?
6      A.  You could.
7      Q.  And do you have to buy the milling blanks
8   as well?
9      A.  Yes.
10      Q.  In this instance, the Nos. 4 and 5 are
11   kind of banded together.  If you're going to be an
12   authorized lab, you're going to be buying the
13   milling blanks and you can also purchase the
14   clinical zirconia system; right?
15      A.  Right.
16      Q.  But the milling blanks are part of what
17   you need to do here?
18      A.  That's correct.  This system is just the
19   precursor to the BruxZir mill.
20      Q.  Okay.  And, again, the BruxZir mill is
21   optional and this Prismatik --
22      A.  Is optional as well.

Page 107

1      Q.  Okay.
2         MR. JANKOWSKI:  I'll have the court
3   reporter mark as Exhibit 102 a multipage document
4   produced by Glidewell in this case.  On the front
5   page it has a title, "BruxZir Solid Zirconia
6   Business Integration Program."
7         (Bartolo Exhibit No. 102 was marked
8         for identification.)
9   BY MR. JANKOWSKI:
10      Q.  Mr. Bartolo, I'll just ask you, do you
11   recognize Exhibit 102?
12      A.  I do.
13      Q.  What is Exhibit 102?
14      A.  It's a promotional piece that talks about
15   the full system from the scanner to the mill to
16   all the accessories needed in the fabrication of
17   BruxZir restorations.  It shows the blocks, the
18   liquids, and accessory items.
19      Q.  What is meant by "business integration
20   program"?
21      A.  In this case, it's a one stop shop.
22   Instead of piecemealing a scanner from one company

Page 108

1   and a mill by another company and the usual
2   challenges of linking all these things together,
3   we're offering a package solution from start to
4   finish.  Everything integrated and proven in our
5   laboratory.  So it's a very easy way to get up and
6   running.
7      Q.  This is a Glidewell Direct promotion;
8   correct?
9      A.  Yes, it is.
10      Q.  In fact, that's listed on the front page;
11   correct?
12      A.  Yes.
13      Q.  Okay.  And I notice if you turn about
14   five pages in, I see a reference to the BruxZir
15   Fast Fire furnace.
16         Do you see that?
17      A.  Yes, I do.
18      Q.  I think you were testifying about that
19   earlier.
20      A.  I did.
21      Q.  And below that there's a BruxZir drying
22   unit as well; correct?

Page 109

Pages 106 to 109

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-130-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

1   A.  Yes.
2   Q.  And there's a BruxZir vacuum chamber?
3   A.  Yes.
4   Q.  And a BruxZir sintering boats and beads;
5   correct?
6   A.  Yes.
7   Q.  If you turn to the next page of
8   Exhibit 102, there's a promotional page on the
9   authorized lab program; correct?
10  A.  Yes.
11  Q.  So this is, again, talking about the
12  marketing benefits of becoming an authorized lab
13  if you're a dental lab; correct?
14  A.  Yes.
15  Q.  Okay.  The first thing it says consistent
16  with that, the message is "for increased market
17  visibility"; correct?
18  A.  Yes.
19  Q.  Because now the dental lab, by signing
20  on, gets the power of Glidewell's marketing to go
21  nationwide and reach a large audience?
22  A.  Exactly.

Page 110

1   Q.  Okay.
2   MR. JANKOWSKI:  I'll have the court
3   reporter mark as Exhibit 103 a four-page document
4   produced by Glidewell in this case.  At the top,
5   it says, "Protocol to mill and sinter BruxZir
6   Solid Zirconia Milling Blanks," and then in
7   parentheses, "beta version with CEREC's inLab
8   System."
9   (Bartolo Exhibit No. 103 was marked
10  for identification.)
11  BY MR. JANKOWSKI:
12  Q.  Mr. Bartolo, do you recognize
13  Exhibit 103?
14  A.  I do.
15  Q.  What is Exhibit 103?
16  A.  It's instructions on how to mill and
17  sinter BruxZir restorations for the CEREC in-lab
18  system.
19  Q.  What is the CEREC in-lab system?
20  A.  It's a different mill.  We make the
21  blocks for the Sirona company, and they sell those
22  blocks through their distribution arm which is

Page 111

1   Patterson.
2   Q.  So the CEREC is a reference to a milling
3   machine?
4   A.  Yes, it is.
5   Q.  So is there a protocol like this which is
6   created by Glidewell for each of the different
7   milling machines that can be worked with it's
8   milling blanks?
9   A.  There is, yes.
10  Q.  And if you turn in three pages, I see
11  there's a page which says, "BruxZir sintering and
12  coloring instructions."
13  Do you see that?
14  A.  Yes.
15  Q.  And it looks like it's providing coloring
16  tips and sintering tips for dental labs that are
17  using the BruxZir milling blanks.  Is that fair?
18  A.  Yes, it is.
19  Q.  And there's also information on staining
20  and glazing as well; correct?
21  A.  Yes, there is.
22  Q.  And I notice that under "Sintering," I

Page 112

1   see there's a ramp up cycle and a ramp down cycle.
2   Do you see that?
3   A.  Yes, I do.
4   Q.  Is this specific to any particular oven
5   or any sintering oven is going to go through these
6   same cycles?
7   A.  Yeah.  Like we talked about earlier, this
8   is the ramp up cycle that would work in most
9   furnaces.  The critical component is the final
10  temperature, 1530 degrees.  The Fast Fire which we
11  also talked about has a plastic heat ramp that at
12  10 degrees most furnaces should be able to handle
13  that.
14  Q.  So with the Fast Fire furnace, the heat
15  rate would actually be higher than what's shown
16  here?
17  A.  Yes, that's correct.  The hold time would
18  stay the same, the final temperature would stay
19  the same.  It would get up to temperature faster.
20  Q.  How about the ramp down cycle?  Does that
21  apply to all sintering ovens?
22  A.  Yeah, it's a matter of going up to a very

Page 113

Pages 110 to 113

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5
-131-

1 high temperature, 1530 degrees. It takes a long
2 time to cool down; so the ramp time down is just
3 to make sure it doesn't stress the material by
4 opening up the door and introducing cold air.
5 It's making sure it gets down to the correct
6 temperature before you open the door.
7     Q. In terms of what the labs are doing, the
8 labs need to follow the instructions or -- the
9 labs need to follow the procedure properly in
10 order to have the product come out properly; is
11 that right? We talked about that earlier?
12     A. Yes.
13     Q. There's also instructions on staining and
14 glazing with firing parameters, and I see a column
15 there labeled "Universal staining glaze."
16     Do you see that?
17     A. Yes, I do.
18     Q. What's your understanding of this little
19 table?
20     A. It's just a reminder that the technique
21 is, as it says on the first line, virtually
22 identical to the PFM method as far as the staining

Page 114

1 page it says, "Training for remote labs and early
2 adopters."
3         (Bartolo Exhibit No. 104 was marked
4         for identification.)
5 BY MR. JANKOWSKI:
6     Q. Mr. Bartolo, do you recognize
7 Exhibit 104?
8     A. I do.
9     Q. What is Exhibit 104?
10     A. It's a training manual for remote labs
11 and early adopters.
12     Q. And what is meant by "remote labs"?
13     A. A Glidewell sister lab.
14     Q. Did you say sister lab?
15     A. Yes.
16     Q. So is that different than an authorized
17 lab?
18     A. It's a Glidewell-owned laboratory.
19     Q. So this is a lab which is a Glidewell
20 facility?
21     A. Yes.
22     Q. Okay. So this is a document which is

Page 116

1 of the restoration is concerned. The firing
2 temperatures are the same. It's a glaze that can
3 be used both on a zirconia restoration and a
4 porcelain-fused-to-metal restoration.
5     Q. What does that mean? What is the PFM
6 method?
7     A. Porcelain fused to metal.
8     Q. I know what PFM stands for although that
9 is helpful. Thank you.
10     So the staining technique is something
11 that's well known, all these dental labs are going
12 to know what the staining technique is for PFM?
13     A. Yes, virtually every crown made in the
14 laboratory is stained and glazed regardless of the
15 material that's used.
16     Q. And, again, I mean it's -- the lab has to
17 follow the procedures properly to make the stain
18 and glaze come out properly; correct?
19     A. Yes.
20     MR. JANKOWSKI: Next I'll have the court
21 reporter mark as Exhibit 104 a multipage document
22 produced by Glidewell in this case. On the front

Page 115

1 telling Glidewell's own in-house people how to
2 perform certain tasks?
3     A. Right.
4     Q. Okay. How many sister labs are there in
5 Glidewell?
6     A. There's eight labs all together.
7     Q. And those are located in different parts
8 of the U.S. and other countries?
9     A. Yes.
10     Q. So this particular document is not
11 associated with Glidewell Direct; correct?
12     A. No. Typically -- the information would
13 come from us, but it applied to both our internal
14 laboratories as well as, as the name indicates,
15 those few labs in the beginning that joined in.
16 It was a small group.
17     Q. That was my next question. Who are the
18 early adopters? What does that mean?
19     A. The first buyers of the complete system.
20     Q. When was that document created?
21     A. I don't see a date, but it would be
22 sometime in 2009 after the release of the BruxZir

Page 117

Pages 114 to 117

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

1   blanks and liquids and the technique we followed
2   at Glidewell Laboratories.
3     Q. So was a document like this provided to
4   Glidewell's authorized labs?
5     A. Yes, the early adopters would be
6   authorized labs. They were the first few.
7     Q. Right.
8      So is there an analogous document to this
9   which is training for Glidewell's authorized labs
10  as the title, for example?
11    A. It would be the same information. This
12  is just an earlier document. This goes right to
13  the beginning. There's been changes since.
14    Q. Let me ask you the question. Referring
15  back to Exhibit 102 for a moment, the business
16  integration program document, who's the audience
17  for that document?
18    A. Dental laboratories.
19    Q. How are they provided with this document?
20    A. We mail it to them.
21    Q. Is it sent only to authorized labs, or is
22  this one sent to more laboratories?

                             Page 118

1    A. No, it's sent to all labs.
2    Q. So that could go to 2,000 laboratories
3  maybe?
4    A. Yes.
5    Q. So this is part of an effort by Glidewell
6  to get more labs signed up as authorized labs?
7    A. Correct.
8    Q. Okay. And how about Exhibit 103? Who's
9  the audience for Exhibit 103? This is the
10  protocol to mill and sinter BruxZir.
11    A. 103 was for CEREC; correct?
12    Q. Yes.
13    A. That would be for CEREC milling owners.
14    Q. So this would be a subset of authorized
15  labs; is that correct?
16    A. Yes.
17    Q. And those are the authorized labs that
18  you know are using the CEREC system?
19    A. Correct.
20    Q. And how is this provided to them? Do you
21  know?
22    A. Same. Mailed and possibly e-mailed.

                             Page 119

1    Q. Is that handled by Glidewell Direct
2  itself?
3    A. Yes.
4    Q. And same question for 102. It's
5  Glidewell Direct that would be, you know, mailing
6  this thing out to as many as 2,000 labs around the
7  country?
8    A. 102, yes.
9    Q. And now Exhibit 104, the audience for
10  that is Glidewell's sister labs and the early
11  adopters, the very earliest of the authorized
12  labs; correct?
13    A. Yes, that's correct.
14    Q. But then your testimony is there are
15  later versions of this that would be going to the
16  adopters that weren't early. They came later.
17    A. Correct.
18    Q. And it would have the same information?
19    A. A lot of the same information just
20  updated.
21    Q. And I see on Exhibit 104 several pages in
22  there is a page that has sprue technique or wax

                             Page 120

1   technique, sprue spelled s-p-r-u-e.
2     Do you see that?
3    A. I do.
4    Q. What is a sprue technique?
5    A. It's a different method of milling the
6  BruxZir restoration. The sprue technique is the
7  most common. Think of it as an attachment point
8  in the block that's holding the crown in place as
9  opposed to milling half of the block first,
10  pouring wax in that side to hold the restorations
11  in place. You then flip the block and you mill
12  the other side. So those were two techniques that
13  were used at the time, and the wax technique is no
14  longer used today.
15    Q. So the wax technique is now outdated?
16    A. Yes, I would say so.
17    Q. The sprue technique is still being used?
18    A. Yes.
19    Q. And on the same page, I see that the
20  third paragraph down says, "At Glidewell, we use
21  an old ceramic furnace Pro 100 with an open
22  muffle."

                             Page 121

                             Pages 118 to 121

a556e01e-d30e-4159-ae5d-cfa61863a702
**EXHIBIT 5**
-133-

1    Do you see that?
2    A. Yes, I do.
3    Q. What is that a reference to?
4    A. It applies only to the wax technique.
5 You have to soften the wax so that you can remove
6 the restorations.
7    Q. Okay. So this is completely different
8 than a sintering furnace?
9    A. Yes. This is the step prior to the
10 sintering stage. You want to melt the wax so that
11 you can access the restorations which in turn will
12 then be sintered.
13    Q. And then turning to the next page, I
14 think we see the same information we saw before on
15 staining and glazing?
16    A. Yes.
17    Q. And it being referenced as being
18 "Virtually identical to the PFM method."
19    Do you see that?
20    A. Yes, I do.
21    Q. Now, it says "virtually identical." Do
22 you understand what the difference is between the

                                              Page 122

1 staining and glazing for the PFM method and
2 BruxZir?
3    A. I think they're identical, but I'm not
4 sure why they use the word "virtually."
5    Q. The second line down says, "Experience
6 has shown us the need to shade the crown a bit
7 darker than listed on the prescription."
8    Do you see that?
9    A. Yes.
10    Q. Do you have any understanding about that?
11    A. Yes.
12    Q. What's your understanding?
13    A. The optical properties of that version of
14 the material required a little heavier staining to
15 get the desired result. This is -- this goes back
16 to the early adopter instruction. It's the first
17 generation of the BruxZir material. The
18 "virtually identical" may have to deal with the
19 fact you had to stain it a little bit darker, but
20 the firing temperatures and the way you apply it
21 are exactly the same.
22    Q. And you made reference to a first

                                              Page 123

1 generation. How many generations would you say
2 there have been of the BruxZir product?
3    A. It's been a continual progression. The
4 R&D team has worked diligently to improve the
5 translucency. That's the key ingredient that
6 we've all been working towards which now helps us
7 use a BruxZir material not only on the posteriors
8 but also on the anteriors. We've reached an
9 aesthetic level that was acceptable even in the
10 aesthetic zone.
11    Q. Does Glidewell talk about a second
12 generation or third generation or fourth
13 generation?
14    A. No, it's just been an evolution.
15    Q. But certainly the product today in 2012
16 is -- if you purchase the BruxZir milling blanks
17 today, it's a different product than it was when
18 these early adopters would have been getting it in
19 2009; correct?
20    A. Yes, it's far more aesthetic today.
21    Q. More translucent?
22    A. Yes.

                                              Page 124

1    Q. On this same page, I see a reference to
2 tips again just like on the other document?
3    A. Yes.
4    Q. Just, again, giving tips to the lab on
5 how to get the product as good as it can be;
6 correct?
7    A. Yes.
8    Q. I also see a reference at the very bottom
9 it looks like there's a technical support number
10 given, an 888 number; correct?
11    A. Right.
12    Q. And so I think you testified about that
13 earlier as well which is labs can call Glidewell
14 obviously to order product but with any technical
15 questions if they have them?
16    A. Yes, they can.
17    Q. Correct?
18    A. Yes.
19    Q. And that's Glidewell Direct who receives
20 those phone calls; correct?
21    A. Yes.
22    Q. Do you have an understanding of how many

                                              Page 125

                              Pages 122 to 125

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-134-

1  people man the phones for Glidewell Direct?
2      A.  There's four.
3      Q.  Four.
4      Are they customer service?
5      A.  Customer service.  We referred to them
6  earlier as the in-bound group.
7      Q.  Turn to the last page of Exhibit 104.
8  There seems to be a signature Jo, J-o.
9      Do you see that?
10     A.  Yes.
11     Q.  Do you have any idea what that is?
12     A.  I guess Jim Shuck, but it's a guess.
13     Q.  I just didn't know if that was actually
14  like a Glidewell thing or --
15     A.  No.  I'm not sure what that -- that piece
16  doesn't belong back there, I don't think.
17     Q.  Okay.
18     A.  I think it's a blank letterhead.
19     MR. JANKOWSKI:  Next I'll have the court
20  reporter mark as Exhibit 105 what appears to be a
21  PowerPoint presentation on the BruxZir portfolio
22  by Robin Bartolo.

Page 126

1      Q.  Okay.  And that's a gathering of -- the
2  attendees are Glidewell's authorized labs; is that
3  correct?
4      A.  Yes, that's correct.
5      Q.  Do you have a sense for how many of them
6  attend, what percentage?
7      A.  There's room for 40 people in the
8  classroom; so that's the limiting factor, and it
9  was full.
10     Q.  Does that mean it's, like, a first come
11  first serve --
12     A.  It was.
13     Q.  -- of labs to sign up?
14     A.  Yes.
15     Q.  Okay.  And I believe there was also a
16  presentation given in May, 2012; is that correct?
17     A.  That's correct.
18     Q.  Did that also have a capacity of 40?
19     A.  Yes.
20     Q.  Why is there a capacity of 40?  It's just
21  the room where it's done?
22     A.  There's 40 seats.

Page 128

1      (Bartolo Exhibit No. 105 was marked
2      for identification.)
3  BY MR. JANKOWSKI:
4      Q.  Mr. Bartolo, can you just briefly look at
5  Exhibit 105 and let me know if you recognize what
6  it is.
7      A.  I do.
8      Q.  What is Exhibit 105?
9      A.  It's a PowerPoint presentation on the
10  BruxZir portfolio of products.
11     Q.  Was this a presentation that you gave?
12     A.  Yes.
13     Q.  And I see a date on it, January 26 to 27,
14  2002, under the name BruxZir Laboratory Summit.
15     Do you see that?
16     A.  Yes.
17     Q.  And so was this a presentation you gave
18  at Glidewell's Laboratory Summit?
19     A.  Yes.
20     Q.  And the presentation was given in
21  January, 2012?
22     A.  It was.

Page 127

1      Q.  This is a room which is in Glidewell's
2  facility?
3      A.  Yes.
4      Q.  That's here in Irvine?
5      A.  It is.  It's the Glidewell international
6  training center.
7      Q.  Does this appear to be a correct
8  representation of your presentation?
9      A.  Yes, it does.
10     Q.  What was the purpose of your
11  presentation?
12     A.  Well, it's just a recap of, as we
13  discussed, not everybody even had a mill.  So it's an
14  opportunity even to our authorized laboratories to
15  take an opportunity to tell them about the
16  benefits of the mill and the software that's
17  associated with it.  It's just an overview.  Some
18  of the laboratories may need another 3Shape
19  scanner.  They may not have bought the first one
20  from us.  It's an opportunity as they grow to buy
21  that unit from us.  The Fast Fire oven highlighted
22  the faster cycle time down from eight-and-a-half

Page 129

Pages 126 to 129

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5

-135-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

```
 1   hours to five hours.  And then just some of the
 2   accessories that go along with it to complete the
 3   package, liquids, vacuum chamber, drying unit, and
 4   the BruxZir spray glaze.  All the components that
 5   go into making a BruxZir restoration.
 6       Q.  So when it says "BruxZir portfolio," it's
 7   describing basically the suite of products that
 8   Glidewell offers associated with the BruxZir
 9   product; right?
10       A.  Yes.  Yeah.
11       Q.  So one goal is hopefully the labs are
12   going to buy more products from Glidewell; right?
13       A.  Yes, yes.
14       Q.  You're the sales manager of --
15       A.  I am.  That's my title.
16       Q.  It's your job; right?
17       A.  Yes, it is.
18       Q.  All right.  I'll provide you with -- I'll
19   have the court reporter mark as Exhibit 106 --
20       A.  They keep getting bigger.
21       Q.  Yes.  This one's bigger.  I'm not going
22   to have you read the whole thing or even close.
                                          Page 130
```

```
 1   you recall him giving?
 2       A.  It does.
 3       Q.  Okay.  Do you have an understanding of
 4   what the purpose of Mr. Glidewell's presentation
 5   here?
 6       A.  Well, the purpose was to discuss the
 7   trends in our laboratory and in the dental
 8   laboratory in going in a digital fashion and how
 9   this system ties in nicely with the change in the
10   manufacturing techniques used today.  So it was an
11   overview.
12       Q.  And, in fact, there's slides on here that
13   talk a lot about CAD/CAM; correct?
14       A.  Yes.
15       Q.  Is this an effort to try to get the
16   authorized labs on board with using CAD/CAM
17   systems to the extent they're not?
18       A.  Yeah, that would help.  There's also tips
19   on how to grow the business.  Mr. Glidewell's
20   grown his laboratory significantly, and he's just
21   sharing some of his beliefs and knowledge and
22   sharing it with our BruxZir authorized
                                          Page 132
```

```
 1   This one is huge.  I actually have very little to
 2   ask on it.  It's a presentation that also appears
 3   to have been given at the BruxZir Laboratory
 4   Summit in January, 2012 entitled "The Digital
 5   Dental Lab."
 6           (Bartolo Exhibit No. 106 was marked
 7        for identification.)
 8   BY MR. JANKOWSKI:
 9       Q.  This is a very long document,
10   Mr. Bartolo.  I don't need you to read it by any
11   means.  This was produced by Glidewell in this
12   case.  It appears to be a presentation at that
13   same Summit that you were just talking about in
14   connection with Exhibit 105, this presentation
15   being given by Jim Glidewell, the president of
16   Glidewell Laboratories; is that correct?
17       A.  That is correct.
18       Q.  And were you present when he gave this
19   presentation?
20       A.  I was.
21       Q.  Okay.  Does this appear to be a correct,
22   you know, representation of the presentation that
                                          Page 131
```

```
 1   laboratories.
 2       Q.  Right.
 3           And, in fact, the third page of the
 4   document talks about the changing landscape of the
 5   industry; correct?
 6       A.  Yes.
 7       Q.  And the first bullet point says, "Many of
 8   your old laboratory friends will not make the
 9   transition."
10           Do you see that?
11       A.  Yes.
12       Q.  So that's a reference to upgrades and
13   technology?
14       A.  Yes, and the transition to computer-aided
15   design.
16       MR. JANKOWSKI:  Why don't we take just a
17   real short break, like, five minutes, ten minutes.
18           (Recess taken from 12:21 p.m. to
19        12:28 p.m.)
20   BY MR. JANKOWSKI:
21       Q.  Mr. Bartolo, you're involved in some
22   capacity in communicating with companies who may
                                          Page 133
```

Pages 130 to 133

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-136-

1  be infringing in Glidewell's view its trademark
2  BruxZir; correct?
3      A.  That is correct.
4      Q.  What is your role in that process?
5      A.  It usually involves making a phone call
6  and trying to see if that laboratory would like to
7  use the BruxZir product instead of the material
8  they're working with today, or if they don't want
9  to do that, we request that they don't use the
10 BruxZir name in the description of their product.
11     Q.  When you say "the BruxZir name," you
12 don't necessarily mean BruxZir --
13     A.  BruxZir, Zir.
14     Q.  It could also be a name that Glidewell
15 perceives as confusingly similar to its BruxZir
16 name?
17     A.  Yes.
18     Q.  Would it be fair to say that -- well,
19 first of all, Mr. Allred is involved in these
20 communications as well; correct?
21     A.  Yes.
22     Q.  And he will write letters or e-mails to

Page 134

1      A.  I'm usually brought in to at least have a
2  conversation first to see if there's a
3  misunderstanding or a misspelling, an easy
4  correction, it's usually just handled with a phone
5  call, and most of those times those conversations
6  end with a quick correction, or there's a
7  discussion about the benefit of joining the
8  authorized laboratory system that may be unaware
9  to them or that they weren't aware of.  So I
10 usually have the conversation.  If they choose not
11 to make the change to the name or to join in, then
12 Mr. Allred will typically fire off a letter.
13     Q.  And are there phone calls usually before
14 a letter is sent off?  Do you know?
15     A.  Yes.  I'll make the phone call usually
16 before the letter is sent off.  I'm sure it's not
17 always been the case.
18     Q.  So the first communication that a party
19 will receive will typically be a phone call from
20 you?
21     A.  Yes.
22     Q.  And you'll mention the potentially

Page 136

1  parties who are perceived as being -- having a
2  name that might be confused with BruxZir; correct?
3      A.  That is correct.
4      Q.  So is it fair to say Mr. Allred's role is
5  the enforcement person who's addressing the
6  intellectual property and infringement that
7  Glidewell believes may be happening, and you are
8  the business development person who is potentially
9  trying to develop business from this party?
10     A.  Yes.
11     Q.  Do you have any role in trying to find
12 these people out there using potentially
13 confusingly similar marks?
14     A.  No.  It's not my role to find them, but
15 if we notice them in an ad or e-mail or website,
16 we will have that conversation.
17     Q.  And Mr. Allred will write to that party;
18 correct?
19     A.  Yes, typically.
20     Q.  And you'll be brought in -- well, first
21 of all, are you always brought in?  Are you
22 sometimes brought in?  What's your understanding?

Page 135

1  confusing mark to them.  You'll mention
2  Glidewell's mark, and you'll have a conversation
3  about that?
4      A.  Yes.
5      Q.  Okay.  And then you'll explain to them
6  the benefit of being an authorized lab.  Is that
7  fair?
8      A.  Yes.
9      Q.  Do you have an understanding of how many
10 phone calls like this you've made since 2009?
11     A.  It's not that many.  20 maybe.  Again,
12 it's a guess.  I don't have them catalogued.
13     Q.  Do you have a sense for -- let's assume
14 that it's 20 phone calls you've made -- how many
15 have required Mr. Allred to follow up with a
16 letter?
17     A.  I don't know how many letters he's sent.
18 As I stated, I'm not sure that I'm always the
19 first point of contact, but when I am, it's
20 usually because we hope that by having the phone
21 conversation, we can avoid the letter going out.
22 There may be other reasons why Mr. Allred sent the

Page 137

Pages 134 to 137

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-137-

1  letter without me making the phone call, but in
2  the events that I made the phone call, the hope
3  was to work it out over the phone call and take
4  care of it that way.
5      Q. And at least sometimes it sounds like
6  that's worked?
7      A. More often than not it's a simple
8  conversation they weren't aware or they agreed to
9  change it or they'd love to join in. It's either
10 changing the name and call it something else or
11 they join in. It's usually pretty easy.
12     Q. Normally those are the two options,
13 changing the name; so it's not confusingly
14 similar --
15     A. Correct.
16     Q. -- or becoming a BruxZir authorized lab?
17     A. That's their option. If they like the
18 name and want to participate in the advantages we
19 offer, we'd be happy to support that.
20     Q. But in that latter circumstance, they're
21 not maintaining they're name. They're going to
22 use the BruxZir name; correct?

Page 138

1      A. Yes. If it sounds similar to BruxZir,
2  we'll ask them to modify it. If they would like
3  to stick with the BruxZir brand, we ask them to
4  buy the blocks and become part of the lab program.
5      Q. In no instance are they allowed to
6  maintain a name which is confusingly similar in
7  Glidewell's mind to BruxZir?
8      A. Right.
9      Q. Do you recall how long you've been
10 involved in phone calls like this? Does it go all
11 the way back to 2009? Did it start in 2011? Do
12 you recall?
13     A. It goes back to the beginning.
14 Obviously, it's happened more often lately because
15 of the popularity of the brand. When we first
16 started it, nobody was doing it; so the thought
17 was that it was a material that was too white for
18 that application; so there weren't that many
19 people doing it. It certainly grew very quickly;
20 so there were other laboratories that decided they
21 wanted to get into that market.
22     Q. When you say "doing it," what is the

Page 139

1  "it"?
2      A. Making BruxZir crowns, BruxZir
3  restorations out of a full contour zirconia
4  material.
5      Q. So the "it" means a monolithic zirconia
6  dental restoration?
7      A. A BruxZir monolithic restoration, yes.
8      Q. What do you mean by "BruxZir"?
9      A. Nobody had done that before we introduced
10 the BruxZir model of the crown.
11     Q. We're now talking about what a third
12 party is doing.
13     A. Right.
14     Q. What I said is -- before you said nobody
15 was doing it, you said.
16     A. Correct.
17     Q. Now, we're not talking about an
18 authorized lab. This is a lab which is not part
19 of Glidewell's family; correct?
20     A. Okay.
21     Q. That's why you contacted them.
22     A. Right.

Page 140

1      Q. And they're making -- and what I'm
2  getting at is they're making a product which is a
3  monolithic zirconia dental restoration; correct?
4      A. Yes.
5      Q. And that's the sphere within which
6  Glidewell is paying attention in terms of the
7  BruxZir mark; correct?
8      A. Correct.
9      Q. And so they have a product, monolithic
10 zirconia but it's not Glidewell's BruxZir
11 zirconia; correct?
12     A. That is correct.
13     Q. So those -- that's the population of
14 parties out there who might get a letter from
15 Mr. Allred or a phone call from you; correct?
16     A. If their naming convention is similar to
17 ours.
18     Q. Do you have a sense for what makes a name
19 confusingly similar to Glidewell's BruxZir?
20     A. It sounds similar.
21     Q. Let me ask this question. Are you
22 involved in that process?

Page 141

Pages 138 to 141

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-138-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

| | |
|---|---|
| 1    A. No, I'm not involved in that process. | 1  to somebody named Daxton. |
| 2    Q. You're brought in by Mr. Allred because | 2       (Bartolo Exhibit No. 107 was marked |
| 3  it's been determined -- | 3       for identification.) |
| 4    A. Yes. | 4  BY MR. JANKOWSKI: |
| 5    Q. -- by somebody that there's a confusingly | 5    Q. This is an excerpt from a document |
| 6  similar name? | 6  Glidewell produced in this case.  It was part of a |
| 7    A. Correct. | 7  large document or series of e-mails.  I took it |
| 8    Q. Do you know who is involved in that | 8  out just to have the one e-mail.  But it's easily |
| 9  process? | 9  identifiable within Glidewell's production if we |
| 10    A. I would guess Mr. Allred and Mr. Shuck, | 10  needed to find it. |
| 11  if they notice it. | 11       Mr. Bartolo, do you recognize Exhibit 107 |
| 12    Q. Anyone else, to your knowledge? | 12  as a communication you've seen? |
| 13    A. Really whoever notices it in a | 13    A. I don't. |
| 14  publication or an e-mail blast or visiting a | 14    Q. The message here -- well, first of all, |
| 15  website. | 15  you do recognize this looks like the type of |
| 16    Q. And -- | 16  communication that Mr. Allred is making with a lab |
| 17    A. But those would be referred to Mr. Allred | 17  who's not an authorized Glidewell lab? |
| 18  for review. | 18    A. Yes, I recognize that, but I don't |
| 19    Q. And do you know if there's anybody who's | 19  recognize this particular instance. |
| 20  monitoring, you know, what dental labs are doing, | 20    Q. Understood. |
| 21  doing searches, looking for confusingly similar | 21       I see one message that Mr. Allred has |
| 22  names? | 22  here is -- I'm just reading from the exhibit.  "If |
| Page 142 | Page 144 |

| | |
|---|---|
| 1    A. I'm not aware of an active search, but we | 1  you'd like to learn about the benefits of becoming |
| 2  all read the trade publications, and that's | 2  an authorized BruxZir, Robin Bartolo would love to |
| 3  typically where the ads are placed. | 3  hear from you." |
| 4    Q. So basically anybody within Glidewell who | 4       Do you see that? |
| 5  sees such a thing knows they should bring it to | 5    A. Yes, I do. |
| 6  the attention of Mr. Allred.  Is that fair? | 6    Q. And that's consistent with what we've |
| 7    A. People at Glidewell Direct would know, | 7  been discussing? |
| 8  yes. | 8    A. Totally consistent. |
| 9    Q. And Mr. Shuck would know? | 9    Q. If there's an issue with a potentially |
| 10    A. Of course. | 10  confusingly similar name, you get involved on the |
| 11    Q. I think I asked you this before, but a | 11  business side to see if they want to become an |
| 12  non-authorized lab certainly can describe a | 12  authorized lab; correct? |
| 13  monolithic zirconia dental restoration in their | 13    A. Yes. |
| 14  advertising as being suitable for bruxers meaning | 14       MR. JANKOWSKI:  Let me hand you what the |
| 15  patients of bruxism; correct? | 15  court reporter has marked as Exhibit 108.  This is |
| 16    A. Yes. | 16  a string of e-mails.  The top one is from |
| 17    Q. It's not every use of the word "bruxer" | 17  Mr. Allred to Rudy@pittmandental.com.  This was |
| 18  that might be problematic; correct? | 18  sent on February 14, 2011. |
| 19    A. Yes. | 19       (Bartolo Exhibit No. 108 was marked |
| 20       MR. JANKOWSKI:  Let me hand you what the | 20       for identification.) |
| 21  court reporter has marked as Exhibit 107.  This is | 21  BY MR. JANKOWSKI: |
| 22  an e-mail sent by Keith Allred on April 29, 2011, | 22    Q. Mr. Bartolo, this particular e-mail it |
| Page 143 | Page 145 |

Pages 142 to 145

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-139-

10/23/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Robin Bartolo

| | |
|---|---|
| 1   looks like you were cc'd on it. | 1         Do you see that? |
| 2         Do you see that? | 2     A. Yes. |
| 3     A. I do. | 3     Q. You can see he's writing both to |
| 4     Q. Do you recall seeing this e-mail? | 4   Mr. Allred and to you.  So here the issue is a |
| 5     A. Yes. | 5   mark R-brux. |
| 6     Q. And Pitman Dental is one of these labs | 6         Do you see that? |
| 7   which is not, at least certainly wasn't at the | 7     A. Yes. |
| 8   time this e-mail was sent by Mr. Allred, was not | 8     Q. And did you personally make any |
| 9   an authorized lab; correct? | 9   assessment as to whether R-brux is confusingly |
| 10     A. That's correct. | 10   similar in your mind to BruxZir? |
| 11     Q. Do you recall having or being part of the | 11     A. I did not. |
| 12   communications with Pitman Dental? | 12     Q. That's not your role? |
| 13     A. No. | 13     A. No. |
| 14     Q. Do you have an understanding for how | 14     Q. Turning to page 60 of 99, I see a |
| 15   Glidewell learned about Pitman Dental using the | 15   communication again that is similar to what we've |
| 16   mark R-brux? | 16   been discussing namely at the bottom there |
| 17     A. No. | 17   Mr. Allred is writing to Mr. Grubb and he states, |
| 18     Q. Did you have a phone call with anybody at | 18   "I let Robin Bartolo know you are interested to |
| 19   Pitman Dental as you discussed? | 19   know more about the milling blanks for BruxZir |
| 20     A. I suspect I had, but I don't recall. | 20   crowns and bridges." |
| 21     Q. Maybe you did, maybe you didn't.  You | 21         Do you see that? |
| 22   don't recall. | 22     A. Yes. |
| Page 146 | Page 148 |

| | |
|---|---|
| 1         Do you know whether Pitman Dental has | 1     Q. Again, that is kind of the goal of you |
| 2   become an authorized Glidewell lab? | 2   being involved that hopefully they'll sign up and |
| 3     A. I don't.  I'd have to look at the list. | 3   start purchasing the BruxZir milling blanks; is |
| 4     Q. I think you already testified to this, | 4   that correct? |
| 5   but you weren't involved in the decision-making | 5     A. That is correct. |
| 6   process deciding whether Pitman Dental's mark was | 6     Q. Okay. |
| 7   confusingly similar; is that correct? | 7         MR. JANKOWSKI:  Next I'd like to hand you |
| 8     A. No, I was not. | 8   what the court reporter has marked as Exhibit 109. |
| 9     Q. If you turn towards the end of -- well, | 9   This is an e-mail from Mr. Allred to |
| 10   it's not actually towards the end. | 10   lab@assuredPDX.com, and it looks like there's a cc |
| 11     A. You want to go to RDent next? | 11   to Robin Bartolo. |
| 12     Q. Exactly. | 12         (Bartolo Exhibit No. 109 was marked |
| 13         There's a reference towards the back to | 13         for identification.) |
| 14   RDent. | 14   BY MR. JANKOWSKI: |
| 15         Do you see that? | 15     Q. Mr. Bartolo do you recall receiving the |
| 16     A. Yes.  What page are you on?  58? | 16   document Exhibit 109? |
| 17     Q. 58. | 17     A. I did.  I got cc'd on it. |
| 18     A. Okay. | 18     Q. Do you recall seeing it? |
| 19     Q. Of 99. | 19     A. Sure. |
| 20         This is another one where here it looks | 20     Q. And if you look at the letter that |
| 21   like now we see who Daxton was from Exhibit 107, | 21   Mr. Allred has put together, in this case, it |
| 22   Daxton Grubb. | 22   looks like the mark at issue that might be |
| Page 147 | Page 149 |

Pages 146 to 149

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-140-

1    potentially confusingly similar is Z-brux.
2      Do you see that?
3      A. Yes.
4      Q. Again, did you make any kind of
5    determination yourself whether Z-Brux is
6    confusingly similar to BruxZir?
7      A. I did not.
8      Q. Turning to the last page of Exhibit 109,
9    the very last paragraph from Mr. Allred -- or at
10    least above "Your prompt attention is
11    appreciated," the last line says, "Additionally,
12    if you wish to be on the list of BruxZir
13    authorized dental laboratories, call Glidewell
14    Direct."
15      Do you see that?
16      A. I do.
17      Q. Saying "call Glidewell Direct" is kind of
18    a way of saying call Robin Bartolo; correct?
19      A. Yes. You can make that statement.
20      Q. You are Glidewell Direct for purposes of
21    this and, in fact, that's probably why you're
22    being cc'd on the e-mail; correct?

Page 150

1      A. Yes.
2      Q. Would you have followed up with a phone
3    call to this person?
4      A. Yeah.
5      Q. Do you recall whether you --
6      A. I suspect that I did make a phone call.
7      Q. Do you recall making a phone call to
8    Assured?
9      A. Who was the person's name that this was
10    sent to?
11      Q. I don't see a name. I see president
12    there.
13      A. Yeah.
14      Q. There is -- Assured Dental Lab is in
15    Portland, Oregon.
16      A. I suspect I made a phone call, whether I
17    talked to the president or someone else, I do not
18    recall.
19      Q. Do you know whether Assured Dental Lab
20    has become an authorized Glidewell dental lab?
21      A. I don't know.
22      Q. You don't know.

Page 151

1      MR. JANKOWSKI: I'm going to hand you
2    another document the court reporter has marked as
3    Exhibit 110. This is some e-mails including Keith
4    Allred associated with a dental lab called
5    Authentic. And on at least one of the e-mails you
6    appear to be cc'd.
7      (Bartolo Exhibit No. 110 was marked
8      for identification.)
9   BY MR. JANKOWSKI:
10      Q. Mr. Bartolo, do you recall seeing
11    communications between Mr. Allred and Authentic
12    Lab as reflected in Exhibit 110?
13      A. Yes.
14      Q. And this is also dated from April, 2011.
15      Do you see that?
16      A. Yes.
17      Q. Does that seem accurate on when you
18    recall seeing these communications?
19      A. It does appear accurate.
20      Q. And here it looks like the potentially
21    confusing mark is just a reference to Brux crowns.
22      Do you see that?

Page 152

1      A. Yes, I do.
2      Q. Again, just for the record, were you
3    involved in any way in deciding whether brux with
4    a capital B-r-u-x crowns was confusingly similar
5    to BruxZir?
6      A. I was not.
7      Q. Did you have phone calls with Authentic
8    Dental lab for the purpose of trying to enlist
9    them as an authorized Glidewell laboratory?
10      A. I believe so, yes.
11      Q. And do you recall how those conversations
12    went? Did they get signed up?
13      A. No, they just changed the name. They've
14    taken the information off their website.
15      Q. So this is an example of a third party
16    changing their name?
17      A. Correct.
18      Q. I think you said -- do you have a sense
19    what percentage of the time the lab who gets a
20    communication from you or Mr. Allred associated
21    with a confusingly or potentially confusingly
22    similar mark signs up as an authorized lab?

Page 153

Pages 150 to 153

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-141-

1    A.  I would guess it's a 50/50.  Half of them
2  change their name and the other half maybe joins
3  in.  Maybe it's a bit optimistic.  Maybe it's not
4  quite as many.  There's not a predominance of one
5  or the other.
6    Q.  And your recollection is this particular
7  lab changed its name?
8    A.  Yes, correct.
9    Q.  Do you know what name they call their
10  full contour zirconia crowns today?
11    A.  I do not.
12    Q.  Are you part of any monitoring of these
13  parties as to what they do after these
14  interactions?
15    A.  No.  If they've changed their name, that
16  satisfies Mr. Allred, and we don't pursue that
17  further.
18    Q.  Let me show you what's previously been
19  marked as Exhibit 10.  It's a printout from the
20  BruxZir.com website.  It appears to be a listing
21  of authorized BruxZir labs.  Can you just confirm
22  for me that that is what this is?

Page 154

1    A.  It is.
2    Q.  Why did you send this letter to
3  Mr. Keating?
4    A.  I was following up on a telephone
5  conversation I had with Mr. Keating about the use
6  of the KDZ Bruxer branding and suggested that he
7  could use the BruxZir brand and join the
8  authorized laboratory list.  I sent him some
9  product; so he could evaluate it and see if he
10  liked the results he got and hoping that if he did
11  see the result, that he would want to join the
12  list of authorized laboratories.
13    Q.  So the BruxZir you're referring to is
14  BruxZir; correct?
15    A.  Correct.
16    Q.  What did Mr. Keating say to you on the
17  phone?  Do you recall?
18    A.  Yeah, I do.  We had a pleasant
19  conversation.  He said he'd evaluate the product
20  when he received it, and he would let me know.
21    Q.  So your phone call was prompted by
22  Keating Dental's use of the mark KDZ Bruxer, on a

Page 156

1    A.  It is.
2    Q.  This is at least at one point in time a
3  listing of the authorized labs we've been talking
4  about today?
5    A.  That's correct.
6    Q.  This list will actually change over time
7  a little bit.  Labs can get added and you
8  testified about how if they stop buying product,
9  they can also be dropped?
10    A.  Right.
11    Q.  Okay.  Next I'd like to show you an
12  exhibit that's been previously marked as
13  Exhibit 29.  This is a letter dated August 9, 2011
14  to -- I believe this is to Sean Keating.  This is,
15  I believe, from you.  In fact, I think you
16  testified you had reviewed one document in
17  preparation for your deposition today.
18    Was this the one document that you
19  reviewed?
20    A.  This is the document.
21    Q.  Okay.  And so is this a letter that you
22  sent to Mr. Keating?

Page 155

1  full zirconia dental restoration; is that correct?
2    A.  It is.
3    Q.  How did Glidewell find out that Keating
4  Dental was using that mark?
5    A.  He placed an ad in one of the trade
6  journals.
7    Q.  And somebody at Glidewell saw it?
8    A.  Right.
9    Q.  Do you know who?
10    A.  I'm guessing.  Mr. Shuck.
11    Q.  And who asked you to call Mr. Keating?
12    A.  Mr. Shuck.
13    Q.  Now, procedurally this seems a little
14  different than the other communications we were
15  looking at in the previous exhibits; right?
16    A.  Right.
17    Q.  What's your understanding as to why you
18  end up writing this follow-up letter, or do you
19  have more follow-up letters like this to parties
20  like this?  In other words, it seems like
21  Mr. Allred is the one communicating mostly?
22    A.  Right.

Page 157

Pages 154 to 157

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-142-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1      Q. Why are you the sender of the letter
2   shown as Exhibit 29?
3      A. I usually follow up conversations with a
4   letter; so it's not that unusual. I was asked to
5   make a phone call and see if I could reach Sean.
6   I did. We had a nice conversation. I sent a
7   follow-up letter. I don't think it's all that
8   unusual.
9      Q. But have you done that with other dental
10  labs that were using marks that Glidewell deemed
11  confusingly similar?
12     A. Yes. I testified to that. I've made
13  phone calls in the past.
14     Q. Not the phone calls. I'm talking about
15  the follow-up letters like Exhibit 29. Do you
16  recall whether you've sent letters like this?
17     A. I'm sure I have, but it's not a common
18  process. So if I'm involved, there's probably an
19  e-mail. They don't always require my attention.
20  The one exhibit you showed earlier showed that the
21  laboratory changed the mark or changed the
22  information on their website or pulled it off.

                                        Page 158

1      There's no need for me to call them.
2      MR. JANKOWSKI: Mr. Tachner, let me just
3   ask if Mr. Bartolo has sent more letters like
4   Exhibit 29 associated with these other dental labs
5   associated with these communications, I'd like
6   them to be produced.
7      MR. TACHNER: Sure.
8      Do you know what he's asking for?
9      THE WITNESS: I guess I'll have to look
10  through some of my files to see if I sent some of
11  these letters. There's not going to be many.
12  BY MR. JANKOWSKI:
13     Q. If you sent them --
14     A. I'll have to look for you.
15     MR. TACHNER: Sure. We'll comply
16  assuming he can find these letters, yes.
17  BY MR. JANKOWSKI:
18     Q. I'm just pointing out from what's been
19  produced to us, this stands out as an unusual
20  letter. We don't have other Robin Bartolo letters
21  being provided to dental labs that have used marks
22  that are potentially confusingly similar to

                                        Page 159

1   BruxZir. We have this one only.
2      A. Right.
3      Q. If there's more --
4      A. No. I was referring to there's maybe
5   e-mails or other things I've communicated with
6   some of these exhibits you brought up. This
7   letter is what it is. It's just a follow-up to a
8   phone call I made to Sean Keating.
9      MR. JANKOWSKI: If that can be
10  investigated --
11     MR. TACHNER: We will. Would you do
12  that?
13     THE WITNESS: Sure.
14  BY MR. JANKOWSKI:
15     Q. One thing I see which is also different
16  in this letter is you testified earlier that
17  people could change their name or they could start
18  buying the product.
19     A. Yes.
20     Q. And here in the final paragraph, this
21  message to Mr. Keating looks a little different
22  than that. Isn't that correct?

                                        Page 160

1      A. I don't see it that way.
2      Q. What it says is and I'll just read it
3   here, "If you cancel your trademark application
4   for KDZ Bruxer and use BruxZir materials and the
5   BruxZir trademark instead, we will not pursue
6   legal action."
7      Do you see that?
8      A. I do.
9      Q. So this one is saying cancel your
10  trademark and use BruxZir materials. Not or. Or
11  am I reading too much into the "and"?
12     A. It's not the intent. This is a follow-up
13  to a detailed conversation when we talked about
14  both options, changing to KDZ anything else or
15  possibly entertaining the notion of joining, and I
16  just summarized the key points. I'm sure you can
17  read into it your point, but it was certainly not
18  the way the conversation went, and it's certainly
19  not what was intended here.
20     Q. Your intent was not to treat Keating
21  Dental Arts any different than any of these other
22  third parties?

                                        Page 161

                                Pages 158 to 161

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2012      202-232-0646

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-143-

1    A. Not at all.
2    Q. Under that interpretation, the "and" in
3  that first sentence of the final paragraph perhaps
4  a little more accurately could be an "or." Is
5  that a fair way the way you think the letter
6  should be read?
7    A. Sure.
8    Q. Did you have any follow-up communications
9  with Mr. Keating?
10    A. I sent him a follow-up e-mail asking if
11  he had a chance to evaluate the blocks and liquid
12  I sent him.
13    Q. Did Mr. Keating respond to that?
14    A. He did not.
15    Q. And did you have any other communications
16  with Mr. Keating about this?
17    A. No.
18    Q. And, to your knowledge, did Mr. Keating
19  respond to anybody else at Glidewell associated
20  with this issue?
21    A. Not to my knowledge.
22    Q. Now, when you spoke with Mr. Keating, did

Page 162

1    A. I've known Mr. Jackson going back to my
2  days at Vident as a representative, and I know
3  Mr. Jackson in relation to Glidewell Laboratories
4  as an authorized BruxZir laboratory.
5    Q. And, in fact, it's fair to say that
6  Mr. Jackson is not a typical authorized lab owner.
7  Isn't that fair to say?
8    A. In which way?
9    Q. Well, he's closer to Glidewell than most
10  of the authorized labs?
11    A. He's very supportive, yes.
12    Q. And, in fact, Glidewell -- he's kind of a
13  major supporter of Glidewell, almost an extension
14  of Glidewell Direct, isn't he?
15    A. I wouldn't go that far. He's a supporter
16  of the BruxZir brand, and he's enjoyed the benefit
17  of that association with the program, but he's not
18  an extension of Glidewell Direct.
19    Q. Do you know whether he participates in
20  kind of monitoring the use of marks that might be
21  confusingly similar to the BruxZir mark?
22    A. I don't know about monitoring, but we all

Page 164

1  he say to you that he didn't think the mark KDZ
2  Bruxer was confusingly similar to Glidewell's
3  mark?
4    A. I'm sure he did say that. That was his
5  position.
6    Q. Did you provide Glidewell's position
7  which is, I guess, the opposite of his position?
8    A. That's correct.
9    Q. And so you said you sent a follow-up
10  e-mail. Was that the last communication, then,
11  between the two of you?
12    A. That's correct.
13    Q. A few more questions here. Are you
14  familiar with a person associated with an
15  authorized laboratory of Glidewell known as Mark
16  Jackson?
17    A. I do.
18    Q. Who is Mr. Jackson?
19    A. He's the president of Precision Dental
20  Ceramics.
21    Q. And how is it that you know of
22  Mr. Jackson?

Page 163

1  read the same trade journals, and if it comes to
2  his attention, he might bring it to ours.
3    Q. Right.
4       So when you said "we" there, "we" would
5  be Glidewell --
6    A. Glidewell.
7    Q. It also might include Mr. Jackson;
8  correct?
9    A. I was talking about Mr. Jackson. He
10  might notice something.
11    Q. If he noticed it, he would tell
12  Glidewell; right?
13    A. He might, yes.
14       MR. JANKOWSKI: Let me just, on that
15  score, have the court reporter mark as
16  Exhibit 111. This is a printout from the Dental
17  Lab Network which is a forum for dental lab
18  owners, I think, to post on the Internet.
19       (Bartolo Exhibit No. 111 was marked
20       for identification.)
21  BY MR. JANKOWSKI:
22    Q. Mr. Bartolo, you're familiar with the

Page 165

Pages 162 to 165

a556e01e-d30e-4159-ae5d-cfa61863a702

EXHIBIT 5

-144-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

```
 1   Dental Lab Network, which is reflected here in
 2   Exhibit 111; correct?
 3       A. Yes, I am.
 4       Q. Is that a fair characterization that
 5   dental lab owners will go on here and share their
 6   experiences and dental lab issues?
 7       A. Some dental labs will.
 8       Q. Do you know if people for Glidewell post
 9   on here?
10       A. I don't believe we did.
11       Q. Is there a policy to not post on here?
12       A. There's no policy, but we don't.
13       Q. This is a particular series of postings
14   which starts off with somebody asking a question
15   about glazing a BruxZir crown.
16           Do you see that on the front page?
17       A. I do.
18       Q. And as you go down, there's a lot of --
19   have you ever seen this series of posts before?
20       A. I've seen posts. I don't know if it's
21   this one.
22       Q. Are you aware that Mark Jackson's a very
                                            Page 166
```

```
 1   posting -- first of all, he gives what looks like
 2   a technical response about glazing a BruxZir
 3   restoration. He's basically giving the
 4   explanation to review your BruxZir training
 5   materials or ask them from the lab who's milling
 6   your BruxZir for you.
 7           Do you see that?
 8       A. Yes.
 9       Q. Then he says, I'm just reading from his
10   post, "If you are using another zirconia and
11   calling it BruxZir or filling Rx's for BruxZir
12   with another material, you are breaking the law."
13           Do you see that?
14       A. I do.
15       Q. In this aspect, Mr. Jackson's almost
16   acting like an agent for Glidewell. Isn't that
17   correct?
18       A. I don't see it that way. He's made a
19   significant investment in the materials and
20   equipment, and he's protecting that investment.
21       Q. He's certainly being an advocate for
22   Glidewell; correct?
                                            Page 168
```

```
 1   active poster on this?
 2       A. Yes, I'm aware of that, yes.
 3       Q. And if you turn to -- well, the easiest
 4   way to find it, do you see how the posts are
 5   numbered? If you go to post No. 15. It's about
 6   ten pages in, maybe a little less than that.
 7   There appears to be a post from Mark Jackson,
 8   senior member.
 9           Do you see that?
10       A. Not yet.
11       Q. Oh, okay.
12       A. I see numbers -- oh, here. You said post
13   15. Okay. I found it. Yes.
14       Q. Do you see how there's a little
15   indication there that the poster is Mark Jackson?
16       A. Yes.
17       Q. And there's a little picture below?
18       A. Yes.
19       Q. Does that look like the Mark Jackson you
20   know?
21       A. It is the Mark Jackson I know.
22       Q. If you look at what he puts here in this
                                            Page 167
```

```
 1       A. Yes.
 2       Q. And certainly an advocate for Glidewell's
 3   mark BruxZir; correct?
 4       A. Yes.
 5       Q. If you turn to the next page, you'll see
 6   a post number 16 also from Mr. Jackson. He's
 7   responding to a post from another poster, and he
 8   says, I'm just reading again from the document,
 9   "That's because you are trying to make a
10   counterfeit BruxZir crown. If you had the real
11   material, this would not be a problem."
12           So, again, by calling it a counterfeit,
13   this is Mr. Jackson trying to dissuade somebody
14   from using an all zirconia product which is not a
15   Glidewell product; correct?
16       A. Yeah, but I don't know which material
17   he's referring to. As we discussed earlier, if
18   you used a material meant for a framework and
19   tried to make a full contour zirconia, it would
20   not look good at all. So I'm not sure which shiny
21   chalk he's referring to.
22       Q. Why do you suppose he's calling it a
                                            Page 169
```

Pages 166 to 169

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-145-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

1    counterfeit BruxZir crown?
2        A. I don't know.
3        Q. I don't know either. I find that very
4    odd, and because certainly the lab is allowed to
5    use zirconia from a source other than Glidewell;
6    correct?
7        A. They can.
8        Q. It's not counterfeiting to use another
9    source of zirconia; correct?
10       A. It's not. But he asked the question
11   about a BruxZir crown. So if he's not using the
12   BruxZir material, it's not a BruxZir crown. They
13   can call it a full contour Lava crown if they'd
14   like. You can use any material you like. I mean
15   it's hard to read the flow of the thread if we
16   don't know what material he's referencing.
17       Q. I see what you're saying.
18           You're saying the person can be dealing
19   with a non-Glidewell zirconia that they're
20   referring to as BruxZir; correct?
21       A. Correct. Because they're asking how to
22   glaze it and suggesting it doesn't look very
                                                  Page 170

1    aesthetic.
2        Q. Right. I agree with you. It's not easy
3    to follow the thread. It's quite possible that
4    that's exactly right. This is an instance of
5    somebody using BruxZir to talk about somebody
6    else's zirconia?
7        A. Right.
8        MR. JANKOWSKI: Let me have the court
9    reporter mark as Exhibit 112 another printout from
10   the Dental Lab Network. This one with an original
11   date of what appears to be February 15, 2011.
12           (Bartolo Exhibit No. 112 was marked
13           for identification.)
14   BY MR. JANKOWSKI:
15       Q. Mr. Bartolo, if you just look at this,
16   you'll see in this instance what looks like the
17   post No. 1 is now coming from Mark Jackson. If
18   you look on page 2, you see Mr. Jackson's face?
19   This is the same Mr. Jackson; correct?
20       A. It is.
21       Q. If you look at his posting, it's a very
22   lengthy post about what appears to be an
                                                  Page 171

1    improvement by Glidewell Laboratories on making
2    more transparent looking zirconia. Is that fair?
3        A. That is fair.
4        Q. So, again, in this instance, Mr. Jackson
5    is essentially just doing a nice bit of marketing
6    job for Glidewell. Isn't that fair?
7        A. He's a strong supporter of the brand,
8    yes.
9        Q. Do you know whether Glidewell coordinates
10   with Mr. Jackson at all to provide postings like
11   this?
12       A. No, we do not.
13       Q. When you say "we do not," do you know
14   that you do not or you just don't know?
15       A. I do not.
16       Q. You don't know?
17       A. No, I do not coordinate with Mr. Jackson.
18       Q. Do you know whether Mr. Shuck coordinates
19   with Mr. Jackson?
20       A. I don't believe Mr. Shuck does, no.
21       Q. Do you know or you're just speculating?
22       A. We don't tell Mr. Jackson what to write
                                                  Page 172

1    in his posts.
2        Q. To your knowledge, Glidewell doesn't
3    write copy for him to post?
4        A. That, I can answer. We definitely do
5    not.
6        MR. JANKOWSKI: I'll have the court
7    reporter mark as Exhibit 113 another printout from
8    the Dental Lab Network. This one with an original
9    post of September 13, 2012.
10           (Bartolo Exhibit No. 113 was marked
11           for identification.)
12   BY MR. JANKOWSKI:
13       Q. Mr. Bartolo, you agree this is another
14   printout from the Dental Lab Network?
15       A. I do.
16       Q. This one is on a topic called, "BruxZir
17   Staining."
18           Do you see that?
19       A. I do.
20       Q. And the first question is about using
21   Ivoclar universal stain for BruxZir crowns.
22           Do you see that?
                                                  Page 173

                                        Pages 170 to 173

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-146-

1    A. I do.
2    Q. Is that a product which is appropriate to
3 use on Glidewell's BruxZir crowns?
4    A. It is.
5    Q. Somebody's asking about a stain that
6 works well on BruxZir which is, I guess, the kind
7 of question you would expect on a forum like this;
8 correct?
9    A. Uh-huh.
10    Q. The second post appears to be somebody
11 saying, "Paging Mark Jackson."
12    Do you see that?
13    A. I do.
14    Q. That's probably somebody interjecting a
15 little humor because they know Mr. Jackson posts
16 frequently on things associated with Glidewell's
17 BruxZir product; correct?
18    A. Yes.
19    Q. If you get -- if you turn the page, the
20 second page of the document, you'll see, true to
21 form, Mr. Jackson does post in the bottom of the
22 second page, and he starts talking about the
Page 174

1 BruxZir system.
2    Do you see that?
3    A. I do.
4    Q. And he says something here that I think
5 you actually testified to a little bit ago which
6 is he says, "BruxZir system is a system," all
7 caps. "All the parts work together and give great
8 results. Once you start mixing and matching, it's
9 no longer a BruxZir crown. It's a Frankencrown."
10    Do you see that?
11    A. I do.
12    Q. So I think that's his colorful way of
13 saying if you're not buying into the whole system,
14 you may get a product which he's analogizing to
15 Frankenstein, which is not the high quality you
16 want it to be. Is that a fair characterization?
17    A. It is fair.
18    Q. And, again, to the extent Mr. Jackson's
19 posting on here, you believe he's doing this
20 independently of Glidewell; correct?
21    A. Yes.
22    Q. Okay. Now, Mr. Jackson has functioned in
Page 175

1 an educational capacity associated with talking to
2 authorized labs more generally. Is that accurate?
3    A. He was invited to share his experience
4 with the system at that BruxZir Summit, yes.
5    Q. And what's your understanding as to why
6 he was invited to do that?
7    A. He's enjoyed good success with the
8 BruxZir system; so it's nice for them to hear from
9 a fellow user how well it's worked for him.
10    MR. JANKOWSKI: Let me just have the
11 court reporter mark as Exhibit 114 an excerpt of a
12 presentation. Basically, it's associated with a
13 presentation at the Glidewell international
14 technology center. This one is May, 2012. It
15 includes in this what looks to be an agenda, and
16 the front page of the presentation appears to be
17 by Mr. Jackson.
18    (Bartolo Exhibit No. 114 was marked
19    for identification.)
20 BY MR. JANKOWSKI:
21    Q. Mr. Bartolo, is this exactly what you're
22 talking about? He gave a presentation here?
Page 176

1    A. Yeah. He was the opening speaker for
2 15 minutes.
3    Q. He was the opening speaker, and you were
4 the follow-up?
5    A. I was.
6    Q. So you were there for Mr. Jackson's
7 presentation?
8    A. I was.
9    Q. The topic he was presenting on was
10 BruxZir partnering, maximizing the relationship;
11 correct?
12    A. Yes.
13    Q. Again, this shows that he's kind of a
14 special lab or maybe a very devoted authorized
15 lab. Is that fair?
16    A. Yeah, you can call it that. He happens
17 to also be local which helps. There's other labs
18 we could have invited.
19    Q. That's a good question.
20    Have any other authorized labs been
21 invited to give presentations like Mr. Jackson was
22 invited to do?
Page 177

Pages 174 to 177

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**
-147-

1    A.  We've only done two summits.  So it was
2  the first and only time.
3    Q.  Okay.
4    MR. JANKOWSKI:  That's all I have.  I
5  have no further questions.
6    THE WITNESS:  Great.  Thank you.
7    MR. TACHNER:  I have one or two
8  questions.
9    EXAMINATION
10  BY MR. TACHNER:
11    Q.  Mr. Bartolo, earlier you testified that
12  Glidewell Labs has no monitoring system for its
13  approved labs.  Isn't that correct?
14    A.  Monitoring?  Could you repeat that,
15  please?
16    Q.  You said that Glidewell Labs will help
17  answer questions --
18    A.  Yes.
19    Q.  -- of labs, but it has no formal
20  monitoring system.
21    A.  Correct.
22    Q.  So how do you keep track of the quality

Page 178

1  of the crowns that the approved labs make out of
2  BruxZir material?
3    A.  Well, the doctor's going to select the
4  labs they want to work with.  We've promoted the
5  brand.  We've given out samples.  They know what
6  it looks like.  The look and feel of a BruxZir
7  crown is very different from the other brand; so
8  if the doctor doesn't receive that, he's going to
9  change labs and pick a different one.  There's a
10  self-monitoring.  There's an expectation that it's
11  going to be more translucent and aesthetic.  If
12  they don't get that, they'll probably use a
13  different laboratory.
14    Q.  How will you learn of that?
15    A.  Either our salesgirl or the partner lab's
16  salesgirl because they pick up a new account.
17    Q.  Would you learn anything about the lab
18  that didn't produce the proper crown?  In other
19  words, will you get any feedback from the lab that
20  lost the doctor's account?
21    A.  Typically not.  We do get feedback from
22  laboratories wanting to improve the technique, and

Page 179

1  we'll help them the best that we can.
2    Q.  When the doctor cancels his account or
3  stops buying from an approved lab --
4    A.  Are we talking about approved labs?
5    Q.  Yes.
6    A.  Approved lab would give the right
7  product; so there's not going to be an issue.
8  Well, the approved labs using the BruxZir block,
9  the BruxZir liquid following the system; so the
10  outcome should be good.
11    Q.  That's the answer to my question.
12    MR. TACHNER:  Thank you.  No more
13  questions.
14    MR. JANKOWSKI:  I have nothing further.
15    (At 1:20 p.m. the deposition of Robin
16    Bartolo was concluded.)
17
18
19
20
21
22

Page 180

REPORTER'S CERTIFICATE

1
2
3    I, LISA MOSKOWITZ, CSR No. 10816, RPR,
   CLR, in and for the State of California, do hereby
4  certify:
   That, prior to being examined, the witness
5  named in the foregoing deposition was by me duly
   sworn to testify the truth, the whole truth and
6  nothing but the truth;
7    That said deposition was taken down by me
   in shorthand at the time and place therein named
8  and thereafter reduced to typewriting under my
   direction, and the same is true, correct, and
9  complete transcript of said proceedings;
10    I further certify that I am not interested
   in the event of the action.
11
12    Witness my hand this 29th day of October,
13  2012.
14
15
16
17
18    _____
19    Certified Shorthand
20    Reporter for the
21    State of California
22

Page 181

Pages 178 to 181

a556e01e-d30e-4159-ae5d-cfa61863a702
EXHIBIT 5
-148-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

| | |
|---|---|
| 1  Robin Bartolo c/o | 1  Digital Evidence Group, L.L.C. |
| 2  Leonard Tachner PLC | 2  1726 M Street NW, Suite 1010 |
| 3  17961 Sky Park Circle, Suite 38-E | 3  Washington, D.C. 20036 |
| 4  Irvine, CA  92614-6364 | 4  (202) 232-0646 |
| 4 | 5 |
| 5  Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. | |
| 6  Date of deposition: October 23, 2012 | E R R A T A   S H E E T |
|    Deponent: Robin Bartolo | 6 |
| 7 | 7 |
| 8  Please be advised that the transcript in the above | |
| 9  referenced matter is now complete and ready for signature. | Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. |
| 10  The deponent may come to this office to sign the transcript, | 8  Witness Name: Robin Bartolo |
| 11  a copy may be purchased for the witness to review and sign, | 9  Deposition Date: October 23, 2012 |
|    or the deponent and/or counsel may waive the option of signing. | 10   Page No.   Line No.      Change |
| 12  Please advise us of the option selected. | 11 |
|    Please forward the errata sheet and the original signed | 12 |
| 13  signature page to counsel noticing the deposition, noting the applicable | 13 |
| 14  time period allowed for such by the governing Rules of Procedure. | 14 |
| 15  If you have any questions, please do not hesitate to call our office at | 15 |
| 16  (202)-232-0646. | 16 |
| 17 | 17 |
| 18  Sincerely, | 18 |
| 19 | 19 |
| 20  Digital Evidence Group | 20 |
| 21  Copyright 2012 Digital Evidence Group | 21  _____   _____ |
| 22  Copying is forbidden, including electronically, absent express written consent. | 22   Signature              Date |
| **Page  182** | **Page  184** |

| |
|---|
| 1  Digital Evidence Group, L.L.C. |
| 2  1726 M Street NW, Suite 1010 |
| 3  Washington, D.C. 20036 |
| 4  (202) 232-0646 |
| 5 |
| 6  SIGNATURE PAGE |
| 7 |
| 8 |
|    Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. |
| 9  Witness Name: Robin Bartolo |
|    Deposition Date: October 23, 2012 |
| 10 |
|    I do hereby acknowledge that I have read |
| 11  and examined the foregoing pages |
|    of the transcript of my deposition and that: |
| 12 |
|    (Check appropriate box): |
| 13  ( ) The same is a true, correct and |
|    complete transcription of the answers given by |
| 14  me to the questions therein recorded. |
| 15  ( ) Except for the changes noted in the |
| 16  attached Errata Sheet, the same is a true, |
| 17  correct and complete transcription of the |
| 18  answers given by me to the questions therein |
| 19  recorded. |
| 20 |
| 21  _____   _____ |
| 22   DATE          WITNESS SIGNATURE |
| **Page  183** |

**Pages  182  to  184**

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2012      202-232-0646

a556e01e-d30e-4159-ae5d-cfa61863a702

**EXHIBIT 5**

-149-

10/23/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Robin Bartolo

Page 181

1                    REPORTER'S CERTIFICATE

2

3          I, LISA MOSKOWITZ, CSR No. 10816, RPR,

CLR, in and for the State of California, do hereby

4    certify:

          That, prior to being examined, the witness

5    named in the foregoing deposition was by me duly

sworn to testify the truth, the whole truth and

6    nothing but the truth;

7          That said deposition was taken down by me

in shorthand at the time and place therein named

8    and thereafter reduced to typewriting under my

9    direction, and the same is true, correct, and

10   complete transcript of said proceedings;

11         I further certify that I am not interested

12   in the event of the action.

13         Witness my hand this 29th day of October,

14   2012.

15

16

17

18              _____

19              Certified Shorthand

20              Reporter for the

21              State of California

22

**EXHIBIT 5**

-150-