Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES R. GLIDEWELL DENTAL | ) |
| CERAMICS, INC. Dba GLIDEWELL | ) |
| LABORATORIES, | ) |
| | ) |
| | ) Case No. |
| Plaintiff/Counter-Defendant, | ) SACV11-01309-DOC |
| | ) (ANx) |
| vs. | ) |
| | ) |
| Keating Dental Arts, INC., | ) |
| | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| _____ | ) |

DEPOSITION OF KEITH ALLRED

TAKEN THURSDAY, OCTOBER 25, 2012

IRVINE, CALIFORNIA

Reported by Lisa Moskowitz, CSR No. 10816, RPR, CLR

----------------------------------------------------

DIGITAL EVIDENCE GROUP

1726 M Street, NW, Suite 1010

Washington, DC  20036

(202) 232-0646

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-151-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

| | |
|---|---|
| 1 DEPOSITION OF KEITH ALLRED, TAKEN ON | |
| 2 BEHALF OF DEFENDANT/COUNTER-PLAINTIFF, AT | |
| 3 9:40 A.M., THURSDAY, OCTOBER 25, 2012, AT | |
| 4 2040 MAIN STREET, 14TH FLOOR, IRVINE, CALIFORNIA, | |
| 5 BEFORE LISA MOSKOWITZ, CSR 10816, RPR, CLR. | |

6

7  APPEARANCES OF COUNSEL

8  FOR THE PLAINTIFF/COUNTER-DEFENDANT:

9    LEONARD TACHNER PLC

10   BY:  LEONARD TACHNER

11   17961 SKY PARK CIRCLE, SUITE 38-E

     IRVINE, CALIFORNIA  92614-6364

12   (949) 752-8525

     ltachner@aol.com

13

14  FOR THE DEFENDANT/COUNTER-PLAINTIFF:

     KNOBBE, MARTENS, OLSON & BEAR, LLP

15   BY: DAVID G. JANKOWSKI, PH.D.

     2040 MAIN STREET, 14TH FLOOR

16   IRVINE, CALIFORNIA  92614

     (949) 760-0404

17   david.jankowski@kmob.com

18

19

20

21

22

Page 2

---

**E X H I B I T S (Cont'd)**

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Allred Exhibit 126 | 153 | Trademark Status and Document Retrieval |
| Allred Exhibit 127 | 156 | Justia Trademark Search |
| Allred Exhibit 128 | 160 | Trademark Opposition, dated 2/3/12 |
| Allred Exhibit 129 | 164 | Trademark Opposition, dated 11/18/11 |
| Allred Exhibit 130 | 168 | Letter of Protest Memorandum, dated 12/2/10 |
| Allred Exhibit 131 | 172 | Bruxgard Patent Registration |
| Allred Exhibit 132 | 172 | Brux-eze Patent Registration |
| Allred Exhibit 133 | 172 | Bruxcare Patent Registration |
| Allred Exhibit 134 | 172 | Brux-eze Patent Registration |
| Allred Exhibit 135 | 172 | Dr. Brux Patent Registration |
| Allred Exhibit 136 | 172 | Brux-Checker Patent Registration |
| Allred Exhibit 137 | 172 | Bruxcure Trademark Search |
| Allred Exhibit 138 | 172 | Brux XXX Trademark Search |

Page 4

---

**I N D E X**

DEPONENT

| EXAMINATION | | PAGE |
|---|---|---|
| KEITH ALLRED | | |
| BY MR. JANKOWSKI | | 7 |

**E X H I B I T S**

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Allred Exhibit 118 | 43 | Consolidated Financial Statements Years Ended December 31, 2010 and 2009 |
| Allred Exhibit 119 | 43 | Consolidated Financial Statements Years Ended December 31, 2011 and 2010 |
| Allred Exhibit 120 | 87 | Product List |
| Allred Exhibit 121 | 91 | Invoice List |
| Allred Exhibit 122 | 110 | BruxZir Patent Certificate |
| Allred Exhibit 123 | 114 | Report on the Filing or Determination of an Action Regarding a Patent or Trademark, dated 8/30/11 |
| Allred Exhibit 124 | 133 | Trademark Status and Document Retrieval |
| Allred Exhibit 125 | 147 | Trademark/Service Mark Application, Principal Register, dated 5/27/11 |

Page 3

---

**E X H I B I T S (Cont'd)**

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| Allred Exhibit 139 | 183 | KDZ Bruxer Ad |
| Allred Exhibit 140 | 185 | Letter to Thomas Gourde, dated 5/31/11 |
| Allred Exhibit 141 | 214 | Notice of Complaint E-mail, dated 5/16/11 |
| Allred Exhibit 142 | 226 | Notice of Trademark Infringement E-mail, dated 2/14/11 |
| Allred Exhibit 143 | 233 | E-mail Chain with R-dent, dated 5/26/11 |
| Allred Exhibit 144 | 236 | E-mail Chain with Authentic Labs, dated 4/25/11 |
| Allred Exhibit 145 | 239 | E-mail Chain with Assured Dental Lab, dated 4/18/11 |
| Allred Exhibit 146 | 244 | Notice of Trademark Infringement E-mail, dated 5/17/11 |
| Allred Exhibit 147 | 246 | E-mail Chain with Showcase Dental, dated 1/11/12 |
| Allred Exhibit 148 | 251 | Notice of Trademark Infringement E-mail, dated 3/6/12 |
| Allred Exhibit 149 | 254 | E-mail Chain with Dominion, dated 8/7/12 |
| Allred Exhibit 150 | 257 | E-mail Chain with Dental Dentopia, dated 8/31/12 |

Page 5

Pages  2  to  5

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-152-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1          E X H I B I T S (Cont'd)
2   NO.          PAGE     DESCRIPTION
    Allred      261   Notice of Trademark
3   Exhibit 151          Infringement E-mail, dated
                         9/26/12
4
5
6
7          EXHIBITS REFERENCED
8   NO.          PAGE   DESCRIPTION
9   Exhibit 2       11   Corrected Notice of
                         Deposition, dated 9/11/12
10  Exhibit 29      187  Letter from Robin Bartolo,
11                       dated 8/9/11
12  Exhibit 37      59   BruxZir Sales Records
13  Exhibit 40      71   List of Account Numbers
14  Exhibit 93      264  Glidewell BruxZir Solid
15                       Zirconia Website
16  Exhibit 97      265  Glidewell BruxZir Milling
                         Blanks Website
17  Exhibit 98      266  Glidewell BruxZir Mill
18                       Website
19  Exhibit 99      267  Glidewell Authorized BruxZir
                         Solid Zirconia Laboratories
20                       Website
21
22
                                        Page  6

1          KEITH ALLRED,
2       having been first duly sworn,
3    was examined and testified as follows:
4
5          EXAMINATION
6   BY MR. JANKOWSKI:
7       Q.  Good morning.  My name, again, is David
8   Jankowski.  I'm an attorney representing Keating
9   Dental Arts, the defendant in this lawsuit.
10          Could you please state your name for the
11  record?
12      A.  Keith Allred.
13      Q.  And Glidewell Laboratories is your
14  current employer; correct?
15      A.  Yes.
16      Q.  What's your current title?
17      A.  Director of professional services.  Also
18  the in-house attorney.
19      Q.  And so professional services is a way of
20  referring to legal services?
21      A.  No.  It would be something I could use if
22  I was communicating with anyone about any matter
                                        Page  7

1   that didn't have anything specifically to do with,
2   for instance, making a crown, some kind of
3   business matter.  But not necessarily a legal
4   matter.
5       Q.  Okay.  Is your title also general
6   counsel?
7       A.  Yes.
8       Q.  Okay.  Do you have any other titles other
9   than director of professional services and general
10  counsel?
11      A.  I'm the secretary.
12      Q.  Any other titles?
13      A.  No.
14      Q.  Have you ever been deposed before?
15      A.  No.
16      Q.  Let me go over a few ground rules about
17  the deposition process here and help us understand
18  what's going to happen today.
19          First of all, do you understand the oath
20  that the court reporter just administered to you?
21      A.  Yes.
22      Q.  Although this deposition is being taken
                                        Page  8

1   in a conference room in the law offices of Knobbe,
2   Martens, Olson & Bear in Irvine, California, it
3   has the same force and effect as if you were
4   testifying in a court of law before a judge.
5          Do you understand that?
6       A.  Yes.
7       Q.  I'm going to be asking you questions, and
8   you are going to be providing answers to my
9   questions.  You must answer truthfully.
10          Do you understand that?
11      A.  Yes.
12      Q.  This deposition is being recorded by the
13  court reporter.  She can only record actual words;
14  so please answer with spoken words rather than a
15  nod or other nonverbal response.
16          Do you understand?
17      A.  Thumbs up don't work.
18      Q.  Correct.
19          Please wait until I've completed a
20  question before you begin your answer because the
21  court reporter cannot capture what we say if we
22  talk over one another.  Okay?
                                        Page  9

e6da25e8-8aba-4d68-964c-5de55b761039
                                                    EXHIBIT 6
                                                       -153-

1    A. Okay.

2    Q. If I ask a question and it is unclear to

3   you in some way, please let me know and I'll try

4   to address it. If you do not ask for

5   clarification, I will assume that you understand

6   what I am asking.

7       Do you understand?

8    A. Yes.

9    Q. From time to time, your attorney,

10  Mr. Tachner, may be stating objections, for the

11  record. Unless he instructs you not to answer a

12  question, you must still answer my question.

13      Do you understand that?

14   A. Yes.

15   Q. If you would like to take a break at any

16  time during the deposition, simply say so and

17  we'll take a break at the next convenient stopping

18  point.

19      Is that fine?

20   A. That's good.

21   Q. I do request we not take breaks while a

22  question is pending.

                                           Page 10

---

1    A. Okay.

2    Q. Are you taking any prescription

3   medication or other drugs that may impair your

4   ability to testify truthfully today?

5    A. No.

6    Q. Is there any reason you can't give

7   truthful testimony here today?

8    A. No reason.

9    Q. Okay. Let me just put in front of you

10  what has been previously marked as Exhibit 2.

11  I'll have you take a quick look at that document.

12      Mr. Allred, have you seen this document

13  before?

14   A. Corrected notice of deposition?

15   Q. Correct.

16   A. Is this for the person most

17  knowledgeable?

18   Q. Well, basically. It's a deposition

19  pursuant to Federal Rule of Civil Procedure

20  30(b)(6). So it's a deposition of Glidewell, the

21  entity, and Glidewell designates one or more

22  persons to provide testimony on the topics.

                                           Page 11

---

1    A. I understand that, yes.

2    Q. And, in fact, you're aware that Mr. Jim

3   Shuck gave testimony on some of these topics a few

4   weeks ago; correct?

5    A. Yes.

6    Q. And you're here to testify today to also

7   help us out here understand information associated

8   with these topics.

9       You're familiar with that?

10   A. Yes.

11   Q. Okay. And you know what? I was going to

12  do this later, but let's go over your background a

13  little bit before we get into this.

14      You're an attorney; correct?

15   A. Yes.

16   Q. Can you briefly describe what is your

17  educational background?

18   A. I went to San Diego State University and

19  the University of San Diego.

20   Q. And so you got your undergraduate degree

21  at San Diego State?

22   A. Yes.

                                           Page 12

---

1    Q. And what was your major?

2    A. Finance and business law and a master's

3   degree in business administration.

4    Q. So you have two separate degrees from San

5   Diego State, a bachelor's and an MBA?

6    A. Yes.

7    Q. And what year did you receive your

8   bachelor's degree?

9    A. '72.

10   Q. The early 1970s?

11   A. Yes.

12   Q. And then do you recall what year you

13  received your MBA?

14   A. Ultimately, I will. Let me see. I'm

15  going to go '77. It strikes me as right.

16   Q. You didn't go straight through and get an

17  MBA right after your undergraduate degree?

18   A. Not immediately. I didn't just go to

19  school full-time either.

20   Q. Okay. When did you start studying at San

21  Diego State?

22   A. 1969.

                                           Page 13

Pages 10 to 13

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-154-

1    Q.  When did you receive your law degree from
2  University of San Diego?
3    A.  It was December of '81, I believe, is
4  when it would be on their records or February of
5  '82, something like that.  I remember the bar in
6  February of '82.  I know that.
7    Q.  Now, JD degrees aren't normally conferred
8  in December time of year.  Were you on a different
9  program?
10    A.  I'm not quite sure.  It seems like I got
11  it in '81, but I get continual communications from
12  them, and it seems like I'm under the heading of
13  '82.  I'm not quite sure how they figure that.
14    Q.  When did you start studying law at
15  University of San Diego?
16    A.  1979 in their evening program.
17    Q.  Okay.
18    A.  I was employed full-time.
19    Q.  Where were you employed at that time?
20    A.  General Dynamics at that time.
21    Q.  I actually used to work at General
22  Dynamics down in San Diego.

Page 14

1    A.  I worked in Kearny Mesa.
2    Q.  That was while I was in college.
3    What was your position at General
4  Dynamics?
5    A.  Master scheduler.
6    Q.  What time period did you work at General
7  Dynamics?
8    A.  Let's see, I guess that was till -- well,
9  before '79.  I don't know exactly when and until
10  about '81 or so.
11    Q.  So about three years?
12    A.  Yeah.
13    Q.  And did you work somewhere before General
14  Dynamics?
15    A.  Yes.
16    Q.  Where did you work before General
17  Dynamics?
18    A.  Immediately before that, I think it would
19  be Pacific Telephone.  Downtown San Diego.
20    Q.  What was your position at Pacific
21  Telephone?
22    A.  It was a statistical clerk in the

Page 15

1  division office there.
2    Q.  What does a statistical clerk do?
3    A.  It's kind of hard to describe, but it was
4  pretty much keeping performance statistics on all
5  the central offices of California.
6    Q.  And so statistics on financial
7  performance?
8    A.  Not really, no.  It's performance
9  statistics of the machinery and equipment and the
10  services provided.
11    Q.  Okay.
12    A.  More of an electronic thing.
13    Q.  Okay.  And over what time period did you
14  work at Pacific Telephone?
15    A.  I think that was a couple years.
16    Q.  So you started there in the mid-'70s?
17    A.  Yeah.
18    Q.  And did you work somewhere before Pacific
19  Telephone?
20    A.  I did, yeah.
21    Q.  Where did you work?
22    A.  I worked at La Jolla Village apartments.

Page 16

1    Q.  What did you do there?
2    A.  I was an assistant manager.
3    Q.  And do you recall what time period that
4  you worked at La Jolla Village apartments?
5    A.  I think I started about 1971.  I'm not
6  sure exactly.
7    Q.  So that's while you were still in
8  college?
9    A.  Yeah, it's what I was doing during the
10  days and nights.  It was kind of a flexible
11  schedule.  Mainly it was nighttime but maybe one
12  or two days during the week during the day.
13    Q.  And so you graduated from San Diego State
14  with a degree, I think you said, in business
15  finance?
16    A.  It's called finance and business law.
17  That's the name of the degree.
18    Q.  Finance and business law.  Okay.  And
19  so -- and the job you had at La Jolla Village
20  apartments was not related to the finance side of
21  it, was it?
22    A.  No, it was property management.

Page 17

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-155-

1    Q. And you went straight from La Jolla
2  Village apartments to Pacific Telephone?
3    A. Uh-huh.
4    Q. And straight from Pacific Telephone to
5  General Dynamics?
6    A. Yes.
7    Q. That gets us up to about 1981. Where did
8  you work after General Dynamics?
9    A. I had some part-time jobs because I
10  switched over to full-time daytime in the law
11  school. So I had a lot of different things.
12  Accountemps would be one of them.
13    Q. When after General Dynamics did you first
14  have full-time employment with somebody?
15    A. That would be -- well, I did work
16  full-time as a temporary basis even though it was
17  through -- temporary was really contractors. So
18  there was several of those. You mean for a
19  company to actually employ me as an employee?
20    Q. Correct.
21    A. I think that would probably be Coltene.
22    Q. Can you spell that?

Page 18

1    A. I guess about 1989 or maybe '88. I'm not
2  quite sure.
3    Q. And when your employment at Coltene,
4  Inc., ended, where did you go from there?
5    A. I opened up my own law practice.
6    Q. Where was your law practice located?
7    A. I was just out of my own home.
8    Q. What city?
9    A. In Cardiff, California.
10    Q. And so that would have been in 1990?
11    A. Yeah.
12    Q. What kind of law did you practice?
13    A. Condominium law.
14    Q. Why did you transition from Coltene,
15  Inc., to your own law practice at that time?
16    A. Well, it worked out pretty good. That
17  business sold in a way. Actually it was the
18  reverse way around. Coltene purchased Whaledent
19  and Whaledent sells through dealers, and they
20  eliminated the company that was essentially
21  selling direct, and so it was a chance to start
22  something new during the depression.

Page 20

1    A. C-o-l-t-e-n-e, Coltene, Inc.
2    Q. And what's the business of Coltene, Inc.?
3    A. They were in the business of
4  manufacturing dental materials, primarily
5  impression material at the time I started there is
6  what they were known for. They're a Swiss
7  company, and they were selling direct in the
8  United States; so it was something new for them.
9    Q. What was your position at Coltene, Inc.?
10    A. I was the controller.
11    Q. And what year did you begin working at
12  Coltene?
13    A. 1985.
14    Q. And how long did you work at Coltene,
15  Inc.?
16    A. Till 1990.
17    Q. And you were the controller that whole
18  time?
19    A. No, at the end, I was the president of
20  that company.
21    Q. And when did your title change to
22  president?

Page 19

1    Q. How long were you working as your own law
2  practice?
3    A. Until 1996.
4    Q. And that whole time you were practicing
5  condominium law?
6    A. Well, it's one of my specialties, but
7  there was also property law. I handled a divorce,
8  brought a lawsuit, this and that, quite a few
9  different things.
10    Q. I asked you earlier if you've ever been
11  deposed. I guess I should ask you have you taken
12  depositions of witnesses?
13    A. Yeah.
14    Q. How many depositions have you taken?
15    A. I would say I've only taken one. I've
16  participated in more than one, but I remember
17  asking questions in one.
18    Q. And the other ones you were defending
19  witnesses?
20    A. I was there with -- representing a
21  company as the company's attorney that had hired
22  an attorney to do something or another. I don't

Page 21

Pages 18 to 21

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-156-

1  know that we were defendant or plaintiff.  I'd
2  have to think about that.
3      Q.  But you were participating in the
4  deposition?
5      A.  Yes.
6      Q.  Okay.  How many depositions have you
7  participated in?
8      A.  Oh, probably more than five.
9      Q.  Okay.  Was that back in this time frame
10 in the 1990s?
11     A.  No, I would say since '96.  I was never
12 part of any depositions prior to working for the
13 company I work for now.
14     Q.  Okay.  So as part of your law practice
15 between 1990 and '96, you weren't involved in
16 depositions then?
17     A.  No.
18     Q.  So you mentioned condominium law,
19 property law, family law.  Any other areas of law
20 that you practiced?
21     A.  Well, I guess I can list them all as part
22 of that.  Condominium law, for instance, is

Page 22

1  that from the very beginning, though, I've been an
2  attorney there from the very beginning.
3      Q.  Okay.  So at least at some point you took
4  on the title general counsel?
5      A.  Yeah, definitely at some point.
6      Q.  How about secretary?  When did you take
7  on that title?
8      A.  I think that was probably about six years
9  ago.
10     Q.  So roughly 2006?
11     A.  Uh-huh.
12     MR. TACHNER:  Yes?  You have to mouth the
13 word.
14     THE WITNESS:  Yes.
15 BY MR. JANKOWSKI:
16     Q.  Excuse me.  How is it that you first
17 developed a working relationship with Glidewell
18 Laboratories?
19     A.  I think the first thing I ever did
20 professionally for Glidewell Laboratories was
21 filing a trademark.
22     Q.  And when was that?

Page 24

1  handling liens.  I've actually filed foreclosure
2  on properties, contract matters.  I was also a
3  realtor.  I had a broker's license.
4      Q.  And what did you do in 1996 when you --
5  well, let me ask you:  In 1996, did you stop that
6  law practice?
7      A.  Yes.
8      Q.  And what happened at that point?
9      A.  Well, I was hired on a full-time basis as
10 director of professional services.
11     Q.  By Glidewell?
12     A.  Yes.
13     Q.  Okay.  And so you've been working
14 consistently from 1996 until today at Glidewell as
15 the director of professional services?
16     A.  Yes.
17     Q.  Okay.
18     A.  And before that, I did a few things for
19 them too.  Filed a trademark.
20     Q.  Okay.  Has your title been general
21 counsel the whole time as well?
22     A.  I don't know that it's really been called

Page 23

1      A.  Well, it would have been before '96.
2      Q.  You don't recall the year, though?
3      A.  I don't recall it, but it would be easy
4  to see because I could look up the trademark.
5      Q.  What was the trademark in?
6      A.  Playsafe was the name.
7      Q.  P-l-a-y-s-a-f-e?
8      A.  Uh-huh.
9      Q.  Is that all as one word?
10     A.  Yeah.
11     Q.  Okay.  Now, you hadn't been practicing
12 trademark law prior to that; is that correct?
13     A.  That's true.
14     Q.  So how is it you came to be asked by
15 Glidewell to file a trademark application?
16     A.  Just a well-rounded individual.
17     Q.  But how did they find you to do this
18 particular task?
19     A.  Well, I know the person that works there
20 in the marketing department.
21     Q.  Is that Mr. Shuck?
22     A.  Yes.

Page 25

Pages 22 to 25

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1      Q.  So you had a preexisting relationship
2   with Mr. Shuck that predated the filing of this
3   trademark application?
4      A.  Yes.  We worked at Coltene together.
5      Q.  So when you were working at Coltene
6   between 1985 and 1990, Mr. Shuck was one of the
7   people you were working with?
8      A.  Yeah, for.  He was the president of the
9   company then.
10      Q.  So you became president of Coltene in or
11   around 1988 or '89?
12      A.  Yes.
13      Q.  Did you replace Mr. Shuck as president?
14      A.  Yes, he left.
15      Q.  Where did he go from there?
16      A.  PTC, I think.
17      Q.  Is that an acronym or what was PTC?
18      A.  It stands for something.
19      Q.  That's the name of the company?
20      A.  Yes.
21      Q.  And that's a dental company of some type?
22      A.  Yeah, it is.

Page 26

1   advertising and marketing; is that right?
2      A.  Sales and marketing.
3      Q.  Sales and marketing.
4      A.  Uh-huh.
5      Q.  Right.  Okay.
6      Were there any other projects that
7   Glidewell gave you to work on prior to you
8   beginning employment there in 1996?
9      A.  I think there might have been another
10   trademark.
11      Q.  Do you recall what the trademark was?
12      A.  If it was before that I was actually
13   employed there, it would be Silent Nite.  That's
14   N-i-t-e.  Silent Nite.
15      Q.  What goods or services was the mark
16   Silent Nite being used by Glidewell for?
17      A.  It's a mandibular device, and it's for
18   the treatment of snoring and mild to moderate
19   sleep apnea.
20      Q.  I think I understand the name.
21      How about Playsafe?  What kind of goods
22   or services is that mark associated with?

Page 28

1      Q.  What do they make or sell?
2      A.  They were in the business of selling
3   training, and I think they also had a line of
4   artificial teeth from a manufacturer in Europe.
5      Q.  Okay.  So basically what happened at some
6   point prior to 1996 was you received a phone call
7   or some kind of communication from Mr. Shuck
8   asking you to file a trademark on behalf of
9   Glidewell; is that right?
10      A.  That's correct.
11      Q.  Okay.  Had you been working with
12   Mr. Shuck in a professional capacity, a business
13   capacity, prior to joining Glidewell after he left
14   Coltene?
15      A.  No.
16      Q.  Do you know when Mr. Shuck joined
17   Glidewell?
18      A.  I don't.
19      Q.  Okay.  But it was before you?
20      A.  Long time before.  I think he's worked
21   there more than 20 years.
22      Q.  And Mr. Shuck is the vice president of

Page 27

1      A.  That is a custom fabricated mouth guard.
2      Q.  Would that be a mouth guard for use by
3   athletes?
4      A.  Yes.
5      Q.  I think I understand that name as well.
6      Are there any other trademarks that you
7   filed for Glidewell before beginning employment
8   there in 1996?
9      A.  I'm not even sure the Silent Nite was
10   before.  I think it was No. 2.
11      Q.  Okay.
12      A.  If one comes to me, I'll let you know,
13   but I can't recall right now.
14      Q.  Okay.
15      A.  There may have been one before, Capture
16   possibly.  I'm not sure where they fall in the
17   timeline.
18      Q.  How many trademarks have you filed for
19   Glidewell?
20      A.  Maybe more than 10.
21      Q.  Okay.  Can you name for me the ones you
22   recall?

Page 29

Pages 26 to 29

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-158-

10/25/2012        James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.        Keith Allred

1      A. Oh, sure. Well, the three I've
2   mentioned.
3      Q. What was the last one you said?
4      A. Capture.
5      Q. Capture. Okay. What kind of product or
6   services is Capture?
7      A. That is polyvinyl impression material.
8   Dental impression material.
9      Q. Okay. What's another one?
10      A. I'll give you a tongue twister. Occlusal
11   Glass. I don't know that it was fourth in line,
12   but it's always been easy to remember for me.
13      Q. Occlusal Glass?
14      A. Occlusal Glass.
15      Q. It sounds scary to have glass in your
16   mouth.
17      Can you think of the others? What are
18   the others?
19      A. Oh, sure. Center Press. Simply Natural
20   Dentures. Inclusive. That's more recent.
21   Chairside. I think there's about three more I
22   can't think of.
                                        Page 30

1      Q. Okay. We're up to eight. That's a
2   pretty good number.
3      Does Glidewell also rely on attorneys
4   other than you to file trademarks?
5      A. No.
6      Q. One trademark, I guess, at issue is going
7   to be BruxZir, correct? That's the reason we're
8   sitting here today.
9      A. Yes.
10      Q. So we can add that to the list as well?
11      A. Definitely.
12      Q. The way I've been referring to
13   Glidewell's mark just as a shorthand just so I can
14   say it in a way that I think everybody can
15   understand it and without having me to spell it
16   out each time is I call it BruxZir with a Z. When
17   I say BruxZir with a Z, I mean Glidewell's mark.
18   Specifically, I mean B-r-u-x-z-i-r.
19      A. Okay.
20      Q. When I say that, that's what I'll be
21   referring to.
22      A. Okay.
                                        Page 31

1      Q. So BruxZir is one of the marks you filed
2   for them?
3      A. Yes.
4      Q. And, in fact, there's at least two
5   filings for BruxZir; correct? Separate trademark
6   applications that have been filed?
7      A. Well, there's one in Class 10, and
8   there's one in Class 5. Is that what you mean?
9      Q. That's right.
10      A. That's in the United States.
11      Q. Right, right. I'm just asking about the
12   United States.
13      When you say Class 10, what's Class 10?
14      A. That would cover, for instance, a
15   custom-made crown or bridge or inlay or onlay.
16      Q. How about Class 5?
17      A. That would be a material like, in our
18   situation, BruxZir block.
19      Q. I think just yesterday I was questioning
20   Mr. Bartolo, and I've also questioned Mr. Carden.
21   It seems like the material that's sold by
22   Glidewell is referred to as blanks. Have you
                                        Page 32

1   heard it referred to that way?
2      A. Yes.
3      Q. So that's what Class 5 is referring to,
4   the blanks material; correct?
5      A. Yes.
6      Q. Okay.
7      A. And colorants too.
8      Q. So Class 5 would include the colorants?
9      A. Yes.
10      Q. Now, there's also, at least the mark
11   BruxZir has been used by Glidewell for a number of
12   other offerings for sale as well; correct? Like
13   milling machines, for example?
14      A. Yes.
15      Q. That won't fall under a Class 10 or
16   Class 5; correct?
17      A. That's correct.
18      Q. Is there a filing for BruxZir for
19   anything other than Class 10 and Class 5?
20      A. Not yet.
21      Q. Okay. Chairside, by the way, I think is
22   the name of an internal publication of Glidewell;
                                        Page 33

                                        Pages 30 to 33

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-159-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1    right?
2         A. That's true.
3         Q. Do you recall what class the mark Simply
4    Natural Dentures is associated with?
5         A. What product is it for?
6         Q. Right.
7         A. That was for a denture.  They were
8    partial.  It would be Simply Natural Dentures.
9         Q. Does it have -- like I said, Class 5 and
10   Class 10 for BruxZir --
11        A. That would be Class 10.
12        Q. That's Class 10.
13        A. Another mark would be BioTemps.
14        Q. And what's BioTemps?
15        A. That is a custom-made provisional
16   restoration.
17        Q. Does that mean a restoration that's
18   designed to not be permanent?
19        A. Correct.
20        Q. Is that also in Class 10?
21        A. Yes.
22        Q. How about Occlusal Glass?  What class

Page 34

1         A. Well, it's Prismatik Thin Press, and it's
2    Prismatik NETPRESS.
3         Q. Right.  Netpress.  Okay.
4            What is the Prismatik NETPRESS product?
5         A. That is a block of ceramic that's used to
6    make either all ceramic or pressed to metal
7    ceramic crowns and bridges.
8         Q. That's zirconia, in fact; correct?
9         A. No, it's ceramic.  It's glass.
10        Q. This particular one is not zirconia?
11        A. No, it's not.
12        Q. There is a Prismatik zirconia, I think,
13   associated with Glidewell's products as well;
14   correct?
15        A. Well, the company is Prismatik
16   Dentalcraft, Inc., and it makes zirconia blocks.
17   So it does have the Prismatik -- well, clinical
18   zirconia.  I believe we have a trademark on that.
19   But that was a product we had, Prismatik clinical
20   zirconia.
21        Q. Right.  Sometimes called Prismatik CZ?
22        A. And sometimes called Prismatik CZ,

Page 36

1    would that be associated with?
2         A. That would be Class 10.
3         Q. What product was that?
4         A. That was a crown.  It was made by fusing
5    glass over a metal coping, and it was a particular
6    type of metal coping, and it was a particular type
7    of glass.
8         Q. How about Center Press?  What kind of
9    product is that?
10        A. It was going to be.  It's nothing we ever
11   actually marketed.  It was going to be a
12   nonprecious metal coping system made with powdered
13   metal.
14        Q. I take it that would be in Class 5?
15        A. That would be in Class 5.  We also have
16   the mark Prismatik NETPRESS, and that's Prismatik
17   with a K.
18        Q. So it's P-r-i-s-m-a-t-i-k?
19        A. Yes.  And we also have Prismatik
20   something press.  Thin press.
21        Q. I'm sorry.  The first Prismatik press
22   was -- can you repeat the name of that?

Page 35

1    correct.
2         Q. So Glidewell does have a trademark in
3    that?
4         A. I don't think we have a trademark in
5    that.
6         Q. It's just something that's used as a
7    name?
8         A. That's just a TM.  And also has a 510(k).
9         Q. So Prismatik Net Press and Prismatik Thin
10   Press, these are going to be Class 5 filings; is
11   that correct?
12        A. For trademark, yes.
13        Q. Yes.
14           In other words, it's materials?
15        A. It is.
16        Q. Okay.  And you just mentioned the use of
17   TM.  You understand how in trademark law, there's
18   the circle R concept and the TM concept; correct?
19        A. Yes.
20        Q. Can you tell me your understanding of
21   what those designate?
22        A. Well, I know our circle R trademarks are

Page 37

Pages 34 to 37

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-160-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1  registered with the Patent and Trademark Office.
2      Q. What does TM mean?
3      A. Wouldn't have to use it, I suppose, but
4  that's just put out there for the world the fact
5  that it's something the company uses to identify
6  its goods. When someone sees that, they know who
7  the source of the product is.
8      Q. They know that the word that "TM" is
9  associated with is being associated with the
10 company as a trade name of some kind?
11     A. Correct.
12     Q. What if there's no circle R or no TM?
13 Does that designate anything?
14     A. It would to me if I saw that and I was
15 looking at examples of trademarks to see if other
16 people were using it.
17     Q. In other words, if there's no circle R or
18 no TM, the reader may not interpret that as a
19 trade name at all. Is that fair?
20     A. I think I would not necessarily jump to
21 that conclusion.
22     Q. But they're at least -- if they don't see

Page 38

1      A. That's what mine has.
2      Q. The good news for you is that Mr. Shuck
3  provided testimony on most of these topics, and so
4  we certainly don't need to go through the entire
5  list with you. But there were certain topics
6  where Mr. Shuck didn't have knowledge and topics
7  where he said you were the person who's most
8  knowledgeable on it. So I just want to point
9  those out to you and see what you do know about
10 them.
11     A. Okay.
12     Q. So if you turn actually to topic 8, for
13 example, this is one of the topics that Mr. Shuck
14 basically directed us to talk to you about. If
15 you could just read topic 8 for me.
16     A. Okay. I've read that.
17     Q. I'm going to be asking you questions to
18 get your understanding or knowledge associated
19 with topic 8.
20     A. Okay.
21     Q. And then likewise kind of a similar topic
22 is if you look down at No. 10, "All communications

Page 40

1  a T -- the point of the TM and circle R is to
2  provide notice to the reader; correct?
3      A. Correct.
4      Q. If it's not there, you're at least not
5  getting that notice to the reader?
6      A. That's correct.
7      Q. So let's go back to Exhibit 2 you've got
8  in front of you there. If you turn to the fourth
9  page of the document, you'll see there's a
10 numbered list under "Topics for Examination."
11     Do you see that?
12     A. Well, these pages aren't numbered but --
13     Q. They're not numbered. I apologize.
14     A. What number are we starting at, the
15 number 1, "Topics for Examination"?
16     Q. Correct. You see the page that says
17 "Topics for Examination"?
18     A. I do.
19     Q. You see there's a series of numbered
20 topics, and it actually goes all the way down to
21 No. 21. It spans three pages.
22     Do you see that?

Page 39

1  between Glidewell," and it lists various other
2  parties, certainly at least some of which kind of
3  fall in the category of parties that are using
4  brux in their names, things like that.
5      I'll be asking questions in connection
6  with topic 10.
7      A. No. 10, okay.
8      Q. And then topic 11 which is
9  representations made to the U.S. Patent and
10 Trademark Office regarding basically the trademark
11 application BruxZir.
12     A. Okay.
13     Q. And topic 12, "Any and all instances of
14 actual, apparent or perceived confusion, mistake,
15 deception, or association between the BruxZir mark
16 and the KDZ Bruxer, B-r-u-x-e-r, mark. So I'll
17 ask you questions about that.
18     Topic 13 also gets back to the trademark
19 issue of BruxZir, any searches or studies that
20 Glidewell's done in connection with that.
21     Finally, if you turn the page, you'll see
22 topic 20, which is Glidewell's enforcement of the

Page 41

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-161-

1  BruxZir mark, which I believe Mr. Shuck said you'd
2  have knowledge on that as well.
3       A.  No. 20.
4       Q.  Right.
5       A.  Which sounds a lot like --
6       Q.  Yeah, there's overlap.
7       A.  -- No. 10, I guess.
8       Q.  Exactly.
9       A.  Okay.
10      Q.  The other area that Mr. Shuck was
11  questioned about where he had trouble answering
12  questions was in connection with financial
13  documents that Glidewell had produced in the case,
14  and I believe you've been designated to provide
15  testimony on the financial documents as well.
16      A.  Yes.
17      Q.  In that regard, we have a deposition of
18  Mr. Sasaki noticed for tomorrow, and your counsel
19  and I have spoken about assuming that you have
20  sufficient knowledge of the documents to testify
21  knowledgeably about them, we may not need the
22  deposition tomorrow.

Page 42

1       A.  They both have the year 2010, and it
2  starts at 2009 and ends in 2011.  They are balance
3  sheet and income statements.
4       Q.  In fact, each one presents information
5  for two consecutive years; correct?
6       A.  Correct.
7       Q.  I think what you were just saying was
8  they share the year 2010, one for the first
9  document, that's the later year, and for the
10  second document, that's the earlier year?
11      A.  Correct.
12      Q.  Okay.  And is this a document that you
13  participate in the creation of within Glidewell?
14      A.  It is not.
15      Q.  But can you confirm for me that this is a
16  business record of Glidewell Laboratories that it
17  creates in the ordinary course of business?
18      A.  Yes, and it is audited by a certified
19  public accountant.
20      Q.  And, in fact, this is something that is
21  prepared every year by Glidewell, a document like
22  this is prepared every year?

Page 44

1       A.  Okay.
2       Q.  So we'll see how it goes today.  In that
3  regard, why don't we get to those documents
4  because I think I'll get the court reporter to
5  mark as Exhibit 118 what's entitled, "Consolidated
6  Financial Statements Years Ended December 31,
7  2010, and 2009 for James R. Glidewell, Dental
8  Ceramics, Inc."
9           (Exhibit No. 118 was marked for
10          identification.)
11          MR. JANKOWSKI:  And then I'll have the
12  court reporter also mark as Exhibit 119 the same
13  document except it's for the years ended
14  December 31, 2011 and 2010.
15          (Exhibit No. 119 was marked for
16          identification.)
17  BY MR. JANKOWSKI:
18      Q.  Mr. Allred, if you could briefly look at
19  these exhibits, and have you seen Exhibits 118 and
20  119 before?
21      A.  Yes.
22      Q.  And what are Exhibits 118 and 119?

Page 43

1       A.  That is correct.
2       Q.  And that's been true ever since you've
3  been at Glidewell?
4       A.  That has been true.  Not this firm
5  necessarily.
6       Q.  When you say "this firm," it's --
7       A.  I see it's KSJG.
8       Q.  Right.
9           Which is a CPA firm; correct?
10      A.  Correct.
11      Q.  And what's your understanding of the
12  reason why Glidewell creates these documents?
13      A.  Well, I think it probably would be
14  required to because it does have loans with banks,
15  but then you'd have to have some kind of document
16  to pay your taxes, of course.
17      Q.  So these kind of documents would be used
18  among other things associated with the tax filings
19  of Glidewell; correct?
20      A.  Correct.
21      Q.  Okay.  And if you turn to the page 2 of
22  the document, I think they're -- if you turn to

Page 45

Pages 42 to 45

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-162-

1  page 2 of both documents?
2      A.  Oh, both?
3      Q.  You can turn to both because I think they
4  really follow the same structure.  And it's
5  actually numbered page 2.  It's in a little
6  deeper.  You'll see there's a list of --
7      A.  Oh, I see that.
8      Q.  You'll see on page 2 there's a list of
9  assets.
10      Do you see that?
11      A.  I do.
12      Q.  Okay.  And so this is just a page where
13  Glidewell is setting forth assets of the entity;
14  correct?
15      A.  Correct.  This is a balance sheet.
16      Q.  Right.
17      And as we've been discussing, it's a
18  consolidated balance sheet meaning it's showing
19  two consecutive years?
20      A.  Meaning it's actually comprised of
21  several different companies.
22      Q.  Oh, so consolidated in this context means

Page 46

1  multiple companies are being considered?
2      A.  Correct.
3      Q.  What companies are being considered in
4  this?
5      A.  Would you like a list of companies?
6      Q.  Sure.
7      A.  Okay.  Well, the major player in that
8  whole thing is James R. Glidewell Dental Ceramics,
9  Inc.
10      Q.  Okay.
11      A.  There also would be Prismatik
12  Dentalcraft, Inc.
13      Q.  Is that with a K?
14      A.  Yes.  And Dentalcraft is one word.
15      Q.  What other companies?
16      A.  Riverside Dental Ceramics, Inc.  New West
17  Dental Laboratories, Inc.  Smith Sterling Dental
18  Laboratories.  That's an Inc.  That's a Florida
19  company, and New West is an Arizona company.  The
20  first two are California companies.  And another
21  California company -- did I say Riverside Dental
22  Ceramics?

Page 47

1      Q.  You did.
2      A.  So that would be three.  The first three
3  are California companies.  A Nevada company is Las
4  Vegas Digital Dental, and that's an LLC.  I think
5  I'm kind of messing that up a little bit.  Smith
6  Sterling is actually a fictitious name.  It's a
7  trademark also.  But it's a fictitious name for
8  Dentalium Dental Ceramics, Inc., which is the
9  Florida company.  And that owns LVDDS -- no.  Not
10  LV.  I have to think of the acronym, but it owns a
11  company in Costa Rica.  So that's a Costa Rican
12  company, and Smith Sterling is the fictitious name
13  for that operation.  But that actual company is
14  Dentalium Dental Ceramics, Inc.  So there is also
15  a JRG Dentalium, Inc., and that owns Pacific Edge
16  Dental Laboratories which is also a fictitious
17  name, but it stands for actually a company of that
18  name in Mexico.
19      Q.  And all of these companies are
20  encapsulated in the consolidated balance sheets
21  here?
22      A.  And there's more than that even.  Those

Page 48

1  are the ones I mainly remember because they are
2  indirectly related to dental products.
3      Q.  I see on the page -- it's not numbered
4  but page 1, I guess, which has the independent
5  auditor's report on it signed by the CPA firm, I
6  guess, it mentions James R. Glidewell Dental
7  Ceramics, Inc. and subsidiaries.  The "and
8  subsidiaries" is basically the laundry list you're
9  going through?
10      A.  Correct.  I'm not remembering the name
11  right off, but there's a company, and I think it's
12  an LLC and its asset is a corporate jet, for
13  instance.
14      Q.  So that would be included in here as
15  well?
16      A.  All the companies would be.
17      Q.  Now, on the --
18      A.  There's also a company called IOS that
19  would be part of this.
20      Q.  Okay.  And then on that independent
21  auditor's report, I see there is a board of
22  directors that it references of James R. Glidewell

Page 49

Pages 46 to 49

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-163-

1  Dental Ceramics.
2      Do you see that?
3      A. We're still on this page here, the
4  independent auditor's report?
5      Q. Correct, at the very top.
6         How many directors are there on the board
7  of directors?  Do you know?
8      A. There's one.
9      Q. The board is just one director?
10     A. Yes.
11     Q. Is that Mr. James Glidewell?
12     A. Yes.
13     Q. I bet he's the chair too?
14     A. Chairman of the board and the president
15 of the company and the CEO.
16     Q. Okay.  And you obviously work very
17 closely with Mr. Glidewell; correct?
18     A. I do as much as all his managers do.
19     Q. I wasn't going to put the org chart in
20 front of you.  I've put it in front of so many
21 witnesses I'm tired of seeing it.  Mr. Glidewell
22 is on the top, and there's a number of people
                                        Page 50

1  underneath him like Mr. Shuck and yourself;
2  correct?
3      A. Correct.  3,300 employees the last number
4  I remember.
5      Q. How many employees were there when you
6  started in '96?  Do you recall?
7      A. I don't recall how many, but I think I
8  was like the 700th person hired.  I don't know how
9  many left before that.
10     Q. So it's grown pretty significantly
11 between 1996 and 2012?
12     A. It has.
13     Q. And it's still growing today?
14     A. It is.
15     Q. In fact, even looking at the numbers and
16 the, you know, in the documents Exhibits 118 and
17 119, they show growth from 2009 to 2010 to 2011 of
18 the company as a whole.  Is that accurate?
19     A. That's correct.
20     Q. And if you turn to the last page of
21 Exhibit 118 -- actually go one more page back.
22     A. You mean the very last page?
                                        Page 51

1      Q. Yeah, there you go.  I see there's a
2  note 8 associated with this statement, and it
3  makes a reference to certain litigation arising in
4  the normal course of its business.
5         Do you see that?
6      A. I do.
7      Q. And if you look in the last page of
8  Exhibit 119, you'll see a similar statement is in
9  there as well.  It doesn't identify what the
10 litigation is.
11     A. Oh, I see that, yeah.  Note 8?
12     Q. Right.
13     A. They're both note 8.
14     Q. Right.  Note 8.
15        Is it fair to say that Glidewell is
16 involved in litigation pretty much every year of
17 its existence?
18     A. No, that wouldn't be correct.
19     Q. That would not be correct?  But it was
20 true since 2009?
21     A. Definitely true since 2009.
22     Q. Do you recall what litigation would be
                                        Page 52

1  associated with note 8 in Exhibit 118?
2      A. I do.  It's the only thing that it could
3  have been, and that would have been a lawsuit
4  brought against Glidewell Laboratories by a
5  Pennsylvania doctor named Dr. Dipietro.
6      Q. How is his name spelled?
7      A. Dipietro.  It's her.  D-i-p-i-e-t-r-o.
8      Q. That was the only lawsuit you recall?
9      A. No.  There would be another one.  I'm not
10 exactly sure of the timing, but I'm sure it would
11 have to be somewhere around that period, and it
12 was a lawsuit brought on behalf of a plaintiff Tan
13 Huyen.  It was a labor action.
14     Q. So Tan Huyen was an employee?
15     A. Yes.  It's Huyen.  I think it starts with
16 an H, not the N.
17     Q. Oh, how is that name spelled?
18     A. It's not easy to remember.  I think it's
19 H-u-y-e-n.
20     Q. Do you recall what the resolution of the
21 lawsuit was with employee Huyen?
22     A. I pretty much know everything that's
                                        Page 53

1 happened, and I wouldn't call it a resolution.
2 I'd say it was an ongoing thing.
3     Q. Is it still ongoing today?
4     A. It is.
5     Q. Oh, it is.
6     A. Yes.
7     Q. Okay. How about the lawsuit with -- I
8 can't pronounce the name, but the Pennsylvania --
9     A. Dipietro?
10     Q. Yeah, the Pennsylvania doctor.
11     A. That's an odd one. That was the longest
12 lawsuit in history, I think, for me and it still
13 is not over even though it may actually be when I
14 look back a couple years from now. It's just gone
15 dead.
16     Q. So the lawsuit is still in existence?
17     A. Yes.
18     Q. What's the nature of that lawsuit?
19     A. She had some failed crowns, and she
20 decided that the laboratory somehow had given her
21 some crowns that were going to fail.
22     Q. So some kind of claim of defective

Page 54

1 product?
2     A. Exactly.
3     Q. Okay. Now, Glidewell sells a lot of
4 crowns?
5     A. True.
6     Q. Do you have a sense of how many crowns a
7 year Glidewell sells?
8     A. Yeah. Well, I should back up. I don't
9 know exactly how many crowns, but we think in
10 terms of units.
11     Q. Right.
12     A. And that could be more than crowns. Even
13 a denture could be a unit. So you're looking at
14 about 50,000 a month.
15     Q. So more than half a million units a year;
16 correct?
17     A. Yes.
18     Q. And Glidewell puts a lot of effort into
19 quality control to make sure they're not getting
20 lawsuits like this one from the Pennsylvania
21 doctor.
22     A. Yes. And, in fact, it started as a gripe

Page 55

1 about the specific material that we had used and
2 morphed into a lawsuit against the lab for having
3 made an inferior crown.
4     Q. Are there any other lawsuits you can
5 think of since 2009?
6     A. I don't think there are any others.
7     Q. And Glidewell does not get sued for
8 defective crowns very often. Is that fair?
9     A. Not very often. I would know of every
10 instance, and it's not very often, but there were
11 some when I first started working there. Didn't
12 really have to do with the laboratory. It had to
13 do with the material, manufactured material.
14     Q. Because Glidewell would buy the material
15 from another party and make crowns with it and
16 sell it to dentists; right?
17     A. Correct.
18     Q. What's the material at issue, if you
19 know, in this lawsuit with this Pennsylvania
20 doctor?
21     A. I do know. It was a material from
22 Ivoclar, and it was called d-Sign, which is

Page 56

1 spelled odd. It's a small D and a dash and a
2 capital S-i-g-n. IPS d-Sign. It's a glass.
3     Q. So it would be capital I, capital P,
4 capital S and space, lower case D, hyphen, capital
5 S-i-g-n?
6     A. Correct.
7     Q. That's from Ivoclar?
8     A. Yes. It's a powdered ceramic that's used
9 to overlay a metal coping to make a PFM.
10     Q. As I said, Exhibit 119 has that same
11 note 8 about litigation, and it sounds like the
12 same litigation was still going on. So I guess
13 the notes here in note 8 in the two exhibits in
14 front of you, Exhibit 118 and 119, are referring
15 to the same litigation. Is that fair?
16     A. Yeah.
17     Q. And 119 can include the present
18 litigation?
19     A. I'm trying to think of the dates on that.
20     Q. This lawsuit was filed, I believe, in
21 2011.
22     A. Okay. I guess it would include this one

Page 57

Pages 54 to 57

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-165-

10/25/2012       James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.       Keith Allred

| | |
|---|---|
| 1   too, then. | 1   assemblage that was presented to Mr. Shuck in this |
| 2       Q.  When they're preparing a document like | 2   form, and I'm just presenting it to you in this |
| 3   this, would your office be consulted to contribute | 3   form because it was presented to him in that form. |
| 4   to review language, things -- this refers to | 4   Not that I think they actually go together. |
| 5   litigation.  I assume your office handles -- | 5       A.  Okay. |
| 6   manages internally litigation? | 6       Q.  Let me see if we can learn a little bit |
| 7       A.  I have done that before, and I think I do | 7   about what appears to have been produced here. |
| 8   remember our attorney in Pennsylvania having | 8   The first page labeled GL 227 appears to have |
| 9   written something about that.  I don't remember if | 9   numbers on it for -- well, columns for four years, |
| 10   Leonard had been asked to write anything about | 10   basically 2012 back to 2009. |
| 11   that.  I know that they do get opinions of | 11       Do you see that? |
| 12   attorneys when they do this. | 12       A.  I do. |
| 13       Q.  Now, who works underneath you, if any, | 13       Q.  And it looks like there's dollar amounts |
| 14   within Glidewell -- | 14   there associated with a reference to things being |
| 15       A.  No one. | 15   sent to labs and things being sent to doctors. |
| 16       Q.  In terms of the office of the general | 16       Do you see that? |
| 17   counsel, it's basically you.  Is that fair? | 17       A.  I do. |
| 18       A.  That's correct. | 18       Q.  What's your understanding of what's being |
| 19       Q.  Okay.  Let me put in front of you -- you | 19   shown here?  Can you tell? |
| 20   can put these documents aside. | 20       A.  Based on what I think I'm looking at, I |
| 21       MR. TACHNER:  By the way, David, as soon | 21   would think I know what it's talking about.  And |
| 22   as you decide one way or the other with respect to | 22   it's talking about Prismatik zirconia blanks. |
| Page 58 | Page 60 |

| | |
|---|---|
| 1   Sasaki, would you let us know; so we could tell | 1   Well, it says blocks. |
| 2   him whether he's free tomorrow or has to be here? | 2       Q.  Why do you say Prismatik?  I would think |
| 3       MR. JANKOWSKI:  Right.  And that's why | 3   it's BruxZir blanks. |
| 4   I'm going through these now; so we'll know earlier | 4       A.  That's correct.  Prismatik BruxZir |
| 5   rather than the end of the day. | 5   blanks. |
| 6       MR. TACHNER:  Thank you. | 6       Q.  Oh, so you're using -- so you're using |
| 7   BY MR. JANKOWSKI: | 7   the word Prismatik with the BruxZir product as |
| 8       Q.  I'm going to hand you what has previously | 8   well? |
| 9   been marked as Exhibit 37.  This is from the Shuck | 9       A.  (No verbal response.) |
| 10   deposition.  Mr. Allred, what this appears to be | 10       Q.  Okay.  So -- or I guess another way we |
| 11   to me anyway is an assemblage of documents | 11   can say it is BruxZir zirconia blanks? |
| 12   produced by Glidewell in this case.  You'll see | 12       A.  Correct. |
| 13   how it's got the little numbers at the bottom. | 13       Q.  And, in fact, is the BZ that's referenced |
| 14   The first page as GL 227? | 14   there a shorthand reference to BruxZir? |
| 15       A.  Right.  I see that. | 15       A.  It's got to be. |
| 16       Q.  So that's a production number that | 16       Q.  I've seen that in a lot of these |
| 17   Glidewell or Glidewell's attorney affixed to the | 17   documents.  And I see a reference to blocks and |
| 18   document just to indicate this is a document of | 18   solution which I would interpret as being the |
| 19   Glidewell that's being produced in the case, and | 19   blanks plus some of the ancillary products that go |
| 20   you see it's page 1 of 1.  If you turn to the | 20   along with the blanks such as the coloring and |
| 21   second page you see it's Glidewell 228.  I don't | 21   liquid and the like? |
| 22   think it's one document.  I think it was an | 22       A.  That must be colorants. |
| Page 59 | Page 61 |

Pages  58  to  61

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-166-

1    Q.  Equipment associated with BruxZir such
2  as --
3    A.  Okay.
4    Q.  -- milling machines and sintering ovens?
5    A.  Correct.
6    Q.  And that's what the equipment is referred
7  to?
8    A.  That and it even includes tools.
9    Q.  Okay.  And the first half of GL 227 says
10  "To Labs," which I would interpret as this is a
11  reference to sales to dental laboratories.  Is
12  that accurate?
13    A.  Correct.
14    Q.  And I questioned Mr. Bartolo at length
15  about the Glidewell direct program and the fact
16  that Glidewell sells blanks and also equipment to
17  dental laboratories, the authorized Glidewell
18  Laboratories.  And you're familiar with that;
19  correct?
20    A.  The blanks makes them an authorized
21  dental laboratory if they purchase blanks and make
22  crowns out of it.

Page 62

1    Q.  Right.
2      And the bottom half of GL 227 says "To
3  doctors."  So those, I take it, are references to
4  sales of blocks and solution or equipment to
5  dentists as opposed to dental labs.  Is that
6  accurate?
7    A.  That's correct, but it could be a doctor
8  that owns a lab.
9    Q.  Yeah, in fact, that's probably what this
10  is because it does look like they're selling them
11  blanks.  You're not normally going to sell a
12  dentist a blank unless they have their own ability
13  to fabricate; correct?
14    A.  True.  They would have to have a mill.
15    Q.  That would explain why the numbers in the
16  top half of the document are a lot bigger than the
17  numbers in the bottom because there aren't a lot
18  of dentists buying blanks from Glidewell; correct?
19    A.  That's correct.
20    Q.  There's a lot buying crowns but not the
21  blanks?
22    A.  That's correct.

Page 63

1    Q.  All right.  And do you have an
2  understanding of what the numbers are that are in
3  this page?  Is it just revenue?
4    A.  I am less familiar with this than the
5  later document we provided.  The later document,
6  if they're the same, it would be net sales.  It
7  would be less discounts.
8    Q.  That was actually going to be my next
9  question is I know we have had another document
10  production with more information, and maybe
11  that -- maybe this falls within that in any event.
12  But we'll get to the later document, and that
13  probably answers that question.
14      Okay.  If we turn to the next page, this
15  would be GL 228, this one appears to be a
16  reference to marketing expenses.
17      Do you see that?
18    A.  I do.
19    Q.  This is associated with the BruxZir
20  brand, and you see it's referenced there on the
21  page.
22      Do you see that?

Page 64

1    A.  I do.
2    Q.  This is an area where Mr. Shuck actually
3  has a little more knowledge in this area.  This
4  one I don't think is -- I don't think this
5  information was produced again later -- correct me
6  if I'm wrong -- but I think this is probably the
7  only presentation of marketing expense that we
8  have in this form.
9      Are you familiar with this data?
10    A.  I know what it's talking about.
11    Q.  What is being shown on GL 228?
12    A.  This looks to me like the money that's
13  been spent on these various activities that are in
14  the left-hand column.
15    Q.  This is cumulative from 2009 to 2012?
16    A.  Correct.
17    Q.  And who is it within Glidewell who would
18  be, you know, managing the expenses?  Would that
19  be Mr. Shuck?
20    A.  It would be.
21    Q.  Okay.  If we turn to the next page,
22  there's a plot of BruxZir sales.

Page 65

Pages 62 to 65

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-167-

1    Do you see that?
2    A. I do.
3    Q. And this document looks like it's
4  associated with a Darryl Withrow at the bottom,
5  vice president operations.
6    Do you see that?
7    A. Correct.
8    Q. And you know Mr. Withrow?
9    A. I do.
10    Q. Okay. Do you have an understanding of
11  what's shown on this page?
12    A. This is sales by month. I don't see the
13  years. They're probably there if I look a little
14  closer. It looks like several years, and these
15  dot dot dots I suppose make it clearer.
16    Q. The product started being sold in 2009,
17  correct, the BruxZir?
18    A. Correct.
19    Q. That probably tells us the first month
20  would be June, 2009?
21    A. Correct. That's probably June, 2009, and
22  then you could just count the years down there.

Page 66

1    Q. And this is sales by month. This is just
2  revenue; is that right?
3    A. Correct.
4    Q. And the top line -- the copy we are
5  looking at in this deposition are in black and
6  white; so I don't know if the original would have
7  been in color or otherwise to distinguish the
8  lines better. The top line is the one associated
9  with the label Glidewell BruxZir; correct?
10    A. Correct.
11    Q. And the "All satellite labs BruxZir" is
12  the lower line; correct?
13    A. True.
14    Q. And when it says, "Glidewell BruxZir,"
15  that's referencing dental restorations made out of
16  the BruxZir material; correct?
17    A. That's correct.
18    Q. Okay. And for all satellite labs
19  BruxZir, that's referring to the blanks --
20    A. No, that's the same thing. It's just
21  that that's the other companies. It's called
22  subsidiaries.

Page 68

1    Q. Right.
2    And if that were the case, then this
3  would be showing sales through about June, 2012?
4    A. Can you write on this? Not really?
5    Q. You can, but I don't think you need to.
6    A. Well, I guess you just count up those
7  Decembers there. That would be one year.
8    Q. Right, right. I see -- if you want to
9  write and add -- do you just want to write and add
10  years to the document?
11    A. I was just going to draw a line there to
12  December.
13    Q. Go ahead. That's not a bad idea since it
14  didn't do that.
15    A. This one only goes to June, 2012.
16    Q. Okay. And this document looks like, just
17  based on the document itself, it was produced back
18  in early August.
19    A. That's why it only goes to June.
20    Q. Right.
21    A. The later one we provided you, I think,
22  goes to September.

Page 67

1    Q. Oh, okay. I'm confused then. So you're
2  saying -- the lower line -- the satellite labs,
3  first of all, that's a reference to Glidewell's
4  authorized labs?
5    A. No, that's Glidewell's subsidiaries.
6    Q. Oh, okay. Oh. Oh. So these are sales
7  of crowns by Glidewell's subsidiaries?
8    A. Correct.
9    Q. I see.
10    And these subsidiaries are selling
11  crowns -- is this limited to the U.S.?
12    A. Definitely.
13    Q. And these subsidiaries would be some of
14  the same ones you were referring to earlier
15  associated with the financial statements?
16    A. They are the same ones.
17    Q. Okay. If we turn to the next document --
18  the next document is a little hard to read and, in
19  fact, the next two documents are a little hard to
20  read. One appears to be a two-page document and a
21  12-page document which is kind of in a spreadsheet
22  form.

Page 69

Pages 66 to 69

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1      A. This might look a little better on a
2  spreadsheet.
3      Q. That's what I was going to say was we are
4  going to look at the spreadsheets that were
5  produced later. Is it fair to say that the
6  spreadsheets that were produced to us later
7  include the same information?
8      A. Yes.
9      Q. And that's probably easier to look at
10  those? I have nice printouts of those that I
11  think we can understand a little easier than
12  these. We probably don't need to go through the
13  harder form of presentation. Does that sound fair
14  to you?
15      A. It does.
16      Q. Okay. Good. I like that idea.
17          MR. JANKOWSKI: How you doing? You want
18  to take a little break?
19          MR. TACHNER: Sure.
20          THE WITNESS: I'm doing good.
21          MR. JANKOWSKI: You want to keep going or
22  take a break?

                                    Page 70

1      Q. Exactly. It is. The first one appears
2  to be a three-page document with Glidewell's
3  designation for purposes of producing it, GL 229.
4  Then there's a one-page document, GL 230. Another
5  one-page document, GL 231. Another one-page
6  document, GL 232. Then a two-page document
7  GL 233. Two-page document, GL 234.
8      A. There's a 234 on here? Oh, okay. There
9  it is. They don't have any headings on them at
10  all, do they?
11      Q. They don't appear to.
12      A. Are these in response to particular
13  questions?
14      Q. They were produced in the case, and in
15  the case, Glidewell was asked to produce documents
16  associated with certain areas. The short answer
17  is yes.
18      A. Okay. It might help.
19      Q. Let's just go through the first one, the
20  first single-page document identifies a doctor ID
21  column, a description column, and a date column.
22          Do you see that?

                                    Page 72

1          THE WITNESS: It's up to you guys.
2          MR. JANKOWSKI: Why don't we take a
3  five-minute break.
4          MR. TACHNER: Okay.
5          (Recess taken from 10:58 a.m. to
6          11:11 a.m.)
7  BY MR. JANKOWSKI:
8      Q. Mr. Allred, I'm going to hand you what
9  has been previously marked as Exhibit 40. This is
10  a document that was provided to Mr. Shuck when he
11  was being questioned as Glidewell's designee. If
12  you could just briefly look at Exhibit 40 for me.
13      A. Okay.
14      Q. I'll say this appears to be another
15  example of an assemblage of documents. I don't
16  think it's one document. I think it's a
17  collection of Glidewell documents each of which
18  was produced by Glidewell in the case, but they
19  were all kind of combined together and submitted
20  to Mr. Shuck this way.
21      A. Does it go on like this? Is it more than
22  one document?

                                    Page 71

1      A. I do.
2      Q. And do you know whether Glidewell has a
3  way of identifying -- well, the doctor ID column,
4  is doctor ID something that Glidewell -- does
5  Glidewell use the term "doctor ID"? Does it have
6  a particular meaning that you're aware of?
7      A. It does.
8      Q. What does doctor ID mean?
9      A. Every client of the company has a unique
10  ID number, and the first two digits, I believe,
11  has to do with the company that that doctor is
12  dealing with. So a 10, I believe, is Glidewell
13  Laboratories.
14      Q. Okay. Some of the subsidiaries would
15  have different two digit beginnings?
16      A. That is what I believe is correct.
17      Q. What about the six digit number that
18  follows the two digit number?
19      A. That's all part of the unique number
20  assigned to a particular individual.
21      Q. So that would be a particular --
22      A. Account, I guess you'd say, because an

                                    Page 73

                                    Pages 70 to 73

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-169-

1  account could be more than one doctor.
2      Q.  Sure.
3          And the account in this context is
4  referring to a dentist office typically?
5      A.  Correct.
6      Q.  Okay.  The date column is probably
7  self-explanatory.  It's the date something is
8  happening.  In fact, it's got a time as well;
9  correct?
10     A.  That's correct.
11     Q.  And the middle column has a description
12 in it.  Can you tell by looking at this what is
13 being referenced in the description column?
14     A.  I don't know what that is short for.  I
15 would look at that and see that as part of
16 something bigger.  Doctors requesting something.
17 I have no idea what it is because it doesn't have
18 any more information than that.  It looks like the
19 same account.  All the way down this first row
20 here is this same account.  It just looks like a
21 doctor requesting something day after day.  I
22 don't know what that means.

Page 74

1  what you might think of as an information storage
2  retrieval account management system.  Maybe you're
3  familiar with the old TeleMagic.  That's a way
4  that you record some transaction with an account,
5  a client, and it does record that kind of
6  information, what it was that was discussed, who
7  it was, and the date it was done on.
8      Q.  So, for example, a Glidewell employee is
9  talking on the phone with a dentist and they'll
10 enter something into the computer that
11 memorializes the phone call?
12     A.  Pretty much can count on that with any
13 customer service person.
14     Q.  So these entries are probably by the
15 customer service people?
16     A.  That would be almost every case.
17     Q.  When I was questioning Mr. Bartolo
18 yesterday, he talked about having customer service
19 people working underneath him at Glidewell Direct.
20 Is that probably what this is associated with?
21     A.  It might be specifically Glidewell
22 Direct.

Page 76

1      Q.  If you go down to the second page of the
2  document still on GL 229, I see a prefix 30
3  instead of 10 at the beginning?
4      A.  Correct.
5      Q.  So that's going to be one of the
6  subsidiaries?
7      A.  That's true.
8      Q.  Do you know which subsidiary 30 is?
9      A.  I don't.
10     Q.  But it's one of them?
11     A.  It would be one of them.
12     Q.  And I see some of the descriptions say
13 things like "Confirm ship date information."
14         Do you see that?
15     A.  I do see that.
16     Q.  So this appears like maybe what it is is
17 some sort of log of people within Glidewell who
18 are handling communications with the accounts?
19     A.  I'm pretty sure I know where this
20 information comes from.
21     Q.  Where does it come from?
22     A.  This would be a -- we call it GCM.  It's

Page 75

1      Q.  Or might not because actually there's
2  probably customer service separate from Glidewell
3  Direct as well; correct?
4      A.  That's true.
5      Q.  Okay.  If we turn to the next page which
6  is designated GL 230.
7      A.  Okay.
8      Q.  This is a three-column table with the
9  headings "Product," "Product ID," and "Product for
10 sale date."
11         Do you see that?
12     A.  That helps, yes.
13     Q.  This one I think is a little easier to
14 understand, and we also see the -- if you look
15 under "Product ID," I see BZCLA 1 in the first
16 one.  And to the left, I see BruxZir color liquid
17 shade A1.  This is further confirmation that the
18 BZ seems to be Glidewell's internal designation
19 for BruxZir.  Is that fair?
20     A.  Yes.
21     Q.  Here when it says, "CL," it looks like
22 it's a shorthand for color liquid.

Page 77

Pages 74 to 77

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-170-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1        Would you agree?
2        A. That's a logical deduction.  It could be
3    anything.  Definitely the products are uniquely
4    identified by codes.  That's how they price them
5    in the accounting system.  It's all part of the
6    same system.
7        Q. Right.
8        So that first entry there you can see
9    BZCLA1 corresponds nicely with BruxZir color
10   liquid shade A1?
11       A. That works out good.
12       Q. The last column appears to be providing
13   information on when that particular product was
14   first sold by Glidewell; is that right?
15       A. I see that, yes.
16       Q. If we go down towards the bottom of the
17   column, I see reference to BruxZir milling blanks,
18   12 millimeter, 15 millimeter, 20 millimeter, and
19   25 millimeter.
20       Do you see that?
21       A. I do.
22       Q. You're aware that BruxZir sells milling

                                              Page 78

1    day selling these various products, for example.
2        A. And what was this in response to, the
3    first?
4        Q. I don't know.  I'm speaking generally
5    about why the documents are being produced.
6        A. Okay.
7        Q. If you turn to the next document, GL 231?
8        A. I guess I'm there.
9        Q. On this one, I see a four-column table,
10   and I see on the left a company.
11       Do you see that?
12       A. I do.
13       Q. A customer first name.
14       Do you see that?
15       A. Uh-huh.
16       Q. A customer last name, and a customer ID.
17       Do you see that?
18       A. I do.
19       Q. I think you already testified about this
20   about how the customer ID is referring to a
21   particular account?
22       A. Correct.

                                              Page 80

1    blanks with different sizes; correct?
2        A. Yes.
3        Q. Similarly, this table appears to be
4    giving for each of these various products the
5    first sale date by Glidewell; is that right?
6        A. Definitely the first date that this code
7    was ever used.
8        Q. Okay.  And to answer your earlier
9    question, this is an example where Glidewell was
10   asked to provide information on the first date of
11   sale, and so this is a document that was produced
12   in response to the sets of requests that included
13   that request.
14       A. Okay.
15       Q. To understand why that would be
16   presented.
17       A. Relating to this first page?
18       Q. Or even this first page.  In other words,
19   each of these documents was produced by Glidewell
20   because in the lawsuit, they were asked to provide
21   certain types of information.  One of the types of
22   information that was asked was what was your first

                                              Page 79

1        Q. Is it fair to say this table is just
2    providing more information on these accounts,
3    namely a company name and then an individual name?
4        A. It does look to be laboratories in
5    particular.
6        Q. Right.
7        For these instances here, it is, correct?
8    So the customer ID, the customer might be a dental
9    lab; correct?
10       A. I would say this one they are dental
11   labs.
12       Q. Do you have an understanding for why
13   these particular labs have been identified in this
14   document?
15       A. It looks to me like they are purchasers
16   given the rest of this stuff here of the zirconia
17   blanks.
18       Q. But certainly this is not a comprehensive
19   list of all the dental labs that buy the blanks
20   because there's a lot more than this; correct?
21       A. There's a lot more than that.
22       Q. And do you have a sense for why this

                                              Page 81

                                      Pages 78 to 81

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-171-

1   subset was called on on this particular page?
2       A.  I don't because I don't see a date which
3   you were saying before maybe corresponded to the
4   first purchasers of blanks.  So I don't know why
5   just those few.
6       Q.  All right.  Let's turn to the next
7   document, GL 232.  This is another four-column
8   table that shows model number, serial number, lot
9   number, and product category.
10          Do you see that?
11      A.  I do.
12      Q.  Do you have an understanding for what
13  those headings mean within Glidewell?
14      A.  I would just have to guess.  It doesn't
15  apply to anything on this page.  Nothing having to
16  do with this page.
17      Q.  But what about model -- just the phrase
18  "model number," does that have a meaning within
19  Glidewell, a particular meaning?
20      A.  Not that I am familiar with.
21      Q.  Okay.  How about serial number?
22      A.  I only see that it's used here.

Page 82

1   before, namely a company, a customer first name
2   and a customer last name.  Now those are
3   correlated.  So is it fair to say that this is
4   providing information on not just the for sale
5   date, but who the customer was who purchased the
6   product on that sale date?  Does that look
7   accurate?
8       A.  Definitely looks like it's showing
9   exactly what a laboratory bought on a particular
10  date.
11      Q.  Right.
12          For the various product IDs; correct?
13      A.  Correct.
14      Q.  Okay.  And the customer ID at the far
15  right is going to be the same customer ID
16  information we discussed earlier; correct?
17      A.  That will be a unique number for each
18  account, correct.
19      Q.  If we turn to the next page or next
20  document I showed you, GL 234, this is similar to
21  one of the earlier ones that appears to have that
22  model number, the serial number, lot number,

Page 84

1       Q.  How about lot number?
2       A.  I see that's used here too.
3       Q.  Product category I think is
4   understandable; right?
5       A.  Yeah, that's pretty straightforward.
6       Q.  Okay.  Let's turn to the next document,
7   GL 233.  This is a two-page document.  You know, I
8   think this maybe helps answer my earlier question
9   to you where we saw some of these names of these
10  companies, and we saw first sale information, and
11  you were saying they might be connected, the names
12  and sales, and it looks like GL 233 might do just
13  that; right?  In other words, I see a column, the
14  second column over says, "Product first sale
15  date."
16          Do you see that?
17      A.  I do.
18      Q.  And you've got the product ID on the left
19  which we've already discussed what that is;
20  correct?
21      A.  Correct.
22      Q.  And now we've got the information we saw

Page 83

1   product category and the product.  So, again, this
2   doesn't really have much helpful information on it
3   that I can tell.  Can you make heads or tails of
4   GL 234?
5       A.  It just looks like the type of product
6   that we sell and all of the different ways that it
7   can be purchased, and primarily in this page here
8   seems to be the different shades of coloring
9   liquid.  I see some milling blanks at the bottom
10  and the different sizes.  It looks like there's
11  different sizes of sintering boats.
12      Q.  And, again, you don't have an
13  understanding of what the lot number that's
14  referenced in the third column over?
15      A.  Well, I understand why they use lot
16  numbers.  I don't know exactly when they cut over
17  and maybe put it on this sheet or when they
18  stopped using them on this sheet because they were
19  keeping track of it in some other way.
20      Q.  What does lot number mean to you?
21      A.  That would be something that's kept track
22  of for purposes of quality control and the

Page 85

Pages 82 to 85

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-172-

1  regulatory affairs, some kind of quality
2  assessment program having to do with ISO
3  certification that Prismatik is ISO certified.  So
4  they would have to keep track of that information.
5      Q.  When you say "Prismatik," this is the
6  Prismatik BruxZir --
7      A.  Prismatik Dentalcraft, Inc.
8      Q.  Prismatik Dentalcraft, Inc.  Okay.
9      Actually the lot numbers are only shown
10  for some of these for some reason.  Do you have an
11  understanding for why some of these don't have lot
12  numbers associated with them?
13      A.  What I was just ruminating on, I don't
14  know if they began to be used on this particular
15  program that's printing this and they were kept
16  track of in some other way before, or if now
17  they're kept in some other way and they're no
18  longer kept on this program.  I just know they are
19  kept, and they are done and every single thing
20  that's made and has to be tracked, would have a
21  lot number.
22      Q.  So, for example, the BruxZir milling

Page 86

1  blanks that are listed towards the bottom of this
2  page, GL 234, page 1 of 2, those are going to have
3  lot numbers even though they're not shown on this
4  exhibit?
5      A.  Yes.
6      Q.  Okay.  Let's move on to another exhibit
7  and set that one aside.  In fact, let's get to the
8  newer documents.
9      MR. JANKOWSKI:  I think are we up to
10  Exhibit 120?
11      THE REPORTER:  Correct.
12      MR. JANKOWSKI:  I'll have the court
13  reporter mark as the next Exhibit 120 a nine-page
14  document which is a printout from an Excel
15  spreadsheet that was produced in native format by
16  Glidewell.
17      (Exhibit No. 120 was marked for
18          identification.)
19  BY MR. JANKOWSKI:
20      Q.  Mr. Allred, if you just briefly look at
21  Exhibit 120, do you recognize this exhibit?  Or
22      A.  I recognize what's on the document.  Or

Page 87

1  recognize the words, what they're talking about.
2      Q.  Okay.  And what is being shown in
3  Exhibit 120?
4      A.  It looks like blocks in various sizes
5  made to fit various mills, each of them being
6  identified by a unique ID.
7      Q.  So this correlates the product ID with a
8  description of what the product is?
9      A.  Correct.
10      Q.  As you go down the document, it's not
11  just the milling blocks.  It goes into other
12  products as well; correct, such as coloring
13  liquids and dental restorations?
14      A.  Yeah, blank block, blank block.  This
15  looks like mainly blocks and then finally moves
16  into coloring liquids, correct.
17      Q.  And then moves into dental restorations?
18      A.  Then dental restorations.
19      Q.  And I notice under "Department ID" that
20  the blocks are sold by Glidewell Direct; correct?
21      A.  Well, it was on this first page here.
22  And the second page.

Page 88

1      Q.  Right.  And that's --
2      A.  And the third page.  And part of the
3  fourth page.
4      Q.  And coloring liquids are also sold by
5  Glidewell Direct?
6      A.  Correct.
7      Q.  Okay.  And then if you get to the fourth
8  page when you get to dental restorations, which
9  are now being sold to doctors or dentists, the
10  department changed.  It's not Glidewell Direct
11  anymore.  It's other departments; correct?
12      A.  Correct.
13      Q.  And I see references to a fixed
14  department and a BioTemps department and a gold
15  zirconia and comp department.
16      Do you see that?
17      A.  I do.
18      Q.  And so they're various departments within
19  Glidewell that are responsible for fabricating
20  these dental restorations and selling them to
21  dentists around the country.  Is that accurate?
22      A.  That's true.

Page 89

Pages 86 to 89

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-173-

1    Q.  And that's what's being shown here is
2  which department is responsible for these various
3  products; correct?
4    A.  That is the code that is used for each of
5  these departments when they fabricate that
6  product.  So that's how you would keep track of
7  your sales if you were in the high tech
8  department, all ceramic and you were making a
9  BruxZir zirconia bridge unfinished, for instance.
10    Q.  So every crown or dental restoration
11  that's sold by Glidewell is going to have a
12  particular product ID as shown in Exhibit 120, and
13  it's going to come out of a particular department
14  with a department ID as shown in this exhibit;
15  correct?
16    A.  That's what this is right here.
17    Q.  And so, again, your testimony today is
18  that this is true and accurate business records of
19  Glidewell as produced in this case; correct?
20    A.  That's true.  That's how they keep track
21  of their production.
22    Q.  Okay.  Let me show you -- or excuse me.

Page 90

1    MR. JANKOWSKI:  Let me have the court
2  reporter mark as Exhibit 121 a four-page document.
3      (Exhibit No. 121 was marked for
4      identification.)
5  BY MR. JANKOWSKI:
6    Q.  Exhibit 121, Mr. Allred --
7    A.  Are we done with this one?
8    Q.  We are done with that one.
9    A.  Oh, okay.
10    Q.  Yes, you can set that one aside.
11      Exhibit 121 was also produced by
12  Glidewell at the same time as the previous
13  document, and it was produced in a native format.
14    A.  This was the most recent we provided you?
15    Q.  Correct.
16    A.  I'm familiar with this.
17    Q.  What is shown here in Exhibit 121?
18    A.  This is showing the sales by month
19  beginning in June, 2009, to, I believe, September,
20  2012.  And it's broken apart by -- it was four
21  categories.  I see dental restorations, blocks,
22  coloring liquids.

Page 91

1    Q.  And then equipments if you go down far
2  enough.
3    A.  And then equipments.
4    Q.  Okay.  And so, again, this document would
5  be accurate business records of Glidewell as
6  produced by Glidewell in this case?
7    A.  This is an accurate record produced
8  pursuant to your request for documents.
9    Q.  Right.
10      And the left most column is showing the
11  year of invoicing; correct?
12    A.  That's correct.
13    Q.  And the second column is showing the
14  month where 1 is January and 12 is December and so
15  on?
16    A.  Correct.  It looks like same info there,
17  month and month name.
18    Q.  They give us both ways of presenting the
19  month, and then the product groups are the ones
20  you just mentioned broken out.  Dental
21  restorations which means crowns and the like,
22  blocks which mean the milling blanks, the coloring

Page 92

1  liquids and then equipment are separate categories
2  in this document; correct?
3    A.  Correct.
4    Q.  And then the net sales is shown in the
5  far right column; correct?
6    A.  Correct.
7    Q.  Do you know whether Glidewell maintains
8  information on, you know, cost of goods sold
9  associated with these categories?
10    A.  They would have the ability to get that
11  information if they didn't do it on a regular
12  basis already, for sure.
13    Q.  Associated with that, they could generate
14  gross profits by category as well?
15    A.  That would be something that they could
16  do, for sure.
17    Q.  Okay.
18      MR. JANKOWSKI:  Okay.  Can we go off the
19  record.
20      (Lunch recess taken from 11:40 a.m.
21      to 12:58 p.m.)
22  ///

Page 93

Pages 90 to 93

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-174-

10/25/2012       James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.       Keith Allred

BY MR. JANKOWSKI:

1   Q. Mr. Allred, one of the things that -- we
2   just had our lunch break, and one of the things
3   that happened was we decided to cancel the
4   deposition of Mr. Sasaki, the chief financial
5   officer of Glidewell, based on the testimony
6   you've been giving this morning. And also I had a
7   conversation with your counsel. What I would like
8   you to do is investigate from Glidewell additional
9   financial information along the lines of the
10  spreadsheet with the sales information by month
11  that you were testifying about just before lunch,
12  and in particular, I think what -- basically what
13  we want to know is both net and gross sales of the
14  products. So, you know, like taking into account
15  if you have cost of goods sold information on the
16  categories that correlates with the sales. Like
17  right now the information is just revenue --
18  A. The net sales is only net of discounts;
19  so that is gross sales less any discounts less the
20  cost to make it.
21  Q. Let me ask you this: What I'd like you

Page 94

1   the 2011 calendar year, I think that suffices.
2   A. And you're interested in that for a
3   specific product? Because obviously for all
4   products, that's part of the statements where you
5   look down and you see the net income.
6   Q. Correct.
7   So the products that are identified in
8   the exhibit we were looking at before lunch.
9   A. Well, we had equipment, colorants, dental
10  restorations.
11  Q. Right.
12  A. And one other thing. Blocks.
13  Q. Right.
14  A. So obviously colorants are divided up
15  into many, many different types, and it probably
16  would make sense to, at most, have it for
17  colorants in general. And then crowns could, of
18  course, be many different laboratories we know,
19  and it would probably make sense to just have
20  something in general for the company in general.
21  Otherwise, it looks like a lot of tedious work,
22  and I don't know how much time that would take or

Page 96

1   to investigate is cost of goods sold associated
2   with -- providing the information on cost of goods
3   sold associated with the same sales that are
4   shown --
5   A. I think we can do that in general, but
6   that wouldn't be anything that we would ever know
7   on a unit-by-unit basis which is how all those
8   figures are derived by the individual product code
9   by doctor. There's no way to know what the actual
10  cost of goods sold is for that unit. It would be
11  very easy for a company like I work for to be able
12  to determine what the cost of goods sold was for
13  something, for example, a finished crown of any
14  type.
15  Q. In a sense, that's what I'm asking for.
16  A. It's not anything that exists on a
17  monthly-to-monthly basis necessarily.
18  Q. Well, and you don't need to give it on a
19  month-by-month basis if that's not appropriate.
20  A. Okay.
21  Q. For example, if you've got a cost of
22  goods sold for what the product is generally for

Page 95

1   how difficult it would be.
2   I just know my company could easily know
3   what the cost of goods sold was for a particular
4   item if you have one in mind like, for instance, a
5   mill and even that might be kind of difficult, but
6   I'm sure they could come up with it, something
7   based on an analysis. Some of these things would
8   be a little difficult because it would be
9   difficult to know how much you would put in there
10  if you as a company were actually looking at it
11  from the point of view of some kind of long range
12  plan of building mills, because obviously in the
13  early stages, you have research and engineering
14  and you have things you try and don't work and you
15  replace, and, theoretically, your first unit could
16  cost a million dollars even though the target
17  price could be 60,000.
18  Some of these things would be up to us
19  how we interpreted what your request was. If you
20  made it something as narrow as what, for instance,
21  is the cost of goods sold for a full contour
22  zirconia crown given the fact that you buy the

Page 97

Pages 94 to 97

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-175-

1 block for a certain amount, you could come up with
2 that amount. If you then say how much does it
3 cost to produce a zirconia block of, say, a
4 certain thickness, and I remember seeing 25, for
5 instance, the ones we use, that would give you an
6 idea. But I think if that's all you need, I think
7 that would be pretty easy to do.
8     Q. I understand what you're saying. Why
9 don't you investigate for us the cost of goods
10 sold associated with the BruxZir crown.
11     A. Okay.
12     Q. That product specifically. I mean that's
13 the product that's kind of at issue in this case
14 in terms of Keating sells crowns under the KDZ
15 Bruxer mark and so on.
16     A. Okay.
17     Q. And then let me ask you in Exhibit 121,
18 do you still have that in front of you?
19     A. Is that the last one we looked at?
20     Q. Yes.
21     A. Okay.
22     Q. Where it has net sales on the right-hand

Page 98

1 over 15,000 full contour zirconia crowns every
2 week.
3     Q. Okay. That's helpful. That's the kind
4 of information that -- if you can -- I mean if you
5 can just have somebody generate --
6     A. How about number of units of the crowns
7 per week since 2009 because I think we actually
8 have that. It's something we've actually
9 provided, but we can do it on a separate
10 spreadsheet.
11     Q. Or per month since this is per month?
12     A. Yeah. I think we have it already, in
13 fact.
14     Q. Right.
15     A. We could just maybe redo it again in a
16 format like this, if you'd like it. So we have
17 2009, we have June. This whole sheet would be
18 nothing but full contour zirconia crowns, and in
19 the right-hand column, the net sales would be
20 number of units.
21     Q. Correct.
22     A. Okay. I think that's very doable.

Page 100

1 column, does Glidewell have unit information as
2 well on that?
3     A. Oh, yeah, it would. It would have it all
4 the way down to what the sales would be by the
5 particular laboratory that did it. You saw that
6 code there.
7     Q. Right, right.
8         So here -- another thing I would like to
9 have is a number of units associated with this
10 spreadsheet essentially, the information in this
11 spreadsheet. So each entry has a net sales
12 amount, but I don't know how many of the dental
13 restorations --
14     A. Shall we just agree that we just do that
15 for just the BruxZir crowns?
16     Q. Sure.
17     A. Because that might be a little bit more
18 manageable.
19     Q. Yes, and same for cost of goods sold.
20     A. Do you want it actually broken out by --
21 in some particular way more than just a number?
22 Because I can tell you right now that we're doing

Page 99

1     Q. Can you also do net sales with the crown
2 as well?
3     A. You mean right with it? Sure.
4     Q. Here it says "Dental restorations." That
5 might be something beyond the crown?
6     A. You can divide it up by $99. It's
7 roughly the same number.
8     Q. Has the price been the same the whole
9 time?
10     A. Yes.
11     Q. Do these dental restorations include
12 restorations beyond crowns here?
13     A. No, they're all per unit. It very well
14 could be a bridge, but it still would be by unit.
15     Q. Let me ask you this then; make this
16 spreadsheet just for the crowns. And where --
17 actually, I guess, that's all we -- you're telling
18 me the price has been 99 the whole time?
19     A. Yeah. I'm just giving you a heads-up on
20 what it will be. I already pretty much know what
21 the number would be just by the sales.
22     Q. Make an equivalent to this spreadsheet

Page 101

Pages 98 to 101

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-176-

10/25/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.    Keith Allred

---

1  where it's nothing but the full zirconia crowns?
2      A. Okay.
3      MR. TACHNER:  Do you break it out
4  separate from bridges?
5      THE WITNESS:  No.
6      MR. TACHNER:  Then you can't comply with
7  this request.
8      THE WITNESS:  Yeah, we have them by unit
9  because a bridge is a certain number of units, and
10 that's how they're built.
11     MR. TACHNER:  So if you have a three-unit
12 bridge, it's a $300 item?
13     THE WITNESS:  Yes, it is.  From us.  Of
14 course, from the doctor it's 3,000.
15     MR. TACHNER:  I'm just making sure you
16 agree to something you could do.  That's all.
17 BY MR. JANKOWSKI:
18     Q. And then, in fact, I guess the -- then
19 the units is just going to be -- well, if it's
20 easy, just put the units on the spreadsheet as
21 well.
22     A. Yeah, I'm sure that's how -- this might

Page 102

---

1      A. Okay.  Per unit?
2      Q. Right, per unit with a maximum of four or
3  something.
4      A. That could be different because, say, it
5  was an eight-unit bridge.
6      Q. Yes.  Okay.  So that would be perfect.
7  So it will look like Exhibit 121.  You don't need
8  to replicate the month by number and name.  Other
9  than that, it would be the same except for product
10 group, it's just going to say BruxZir crown?
11     A. Dental restoration, sure.
12     Q. And units and net sales.  Does that sound
13 right?
14     A. Sure.  In fact, I can just write it on
15 here.
16     Q. Don't write it on that because this goes
17 with the court reporter.
18     A. Oh, because that one is already written
19 on.
20     Q. That's okay.  But we'll make a point of
21 that.
22     A. So we only just want the number or the

Page 104

---

1  even come about.  It might have been the number of
2  units times -- minus something and times $99.  I
3  don't know if they actually have separate columns
4  for all that or not.
5      Q. Right.
6      A. That's what the codes are all about.
7  Once you put in the code, you put 1 times that
8  code and you get the dollar amount; so it's built
9  in.  That's what the codes are all about, but they
10 obviously have some discounts or something.  Maybe
11 that's a minus 1 or maybe a minus 10 percent for a
12 coupon; so that's why you end up with the net
13 sales being a little different.  It roughly would
14 be something -- if anything, it would be more
15 units than what it would be by dividing by 99,
16 because if it was cheaper than 99 because someone
17 had a 10 percent discount in every case, it would
18 actually be 10 percent more units than if you
19 divided that by 99.  We're talking about
20 something -- I can tell you the figure would be a
21 certain number if divided by 99 or more.
22     Q. In fact, I've seen $20 off coupons.

Page 103

---

1  name of the month.
2      Q. If you want to put in both, you can, but
3  it's redundant, and you don't have to repeat that.
4      And does Glidewell keep track of a
5  profit, a profitability of its products?  Does it
6  have a sense what the profitability is of its
7  BruxZir crowns?
8      A. Sure.
9      Q. That was also information we asked for.
10     A. Profitability?  That would be the profit
11 margin; right?
12     Q. Yeah.  I would also like that to be
13 included.  Is that something that also could be
14 tracked by month?
15     A. I doubt it.  Anything can be put on a
16 monthly basis.
17     Q. I'm not trying to make work for you.
18     A. I'm just saying anyone can come up with
19 numbers.  Those things aren't done on a monthly or
20 a unit-by-unit basis.
21     Q. Okay.
22     A. Because there's costs that aren't paid

Page 105

Pages 102 to 105

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-177-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

---

1  that way.  For our own purposes, obviously not for
2  purposes of litigation, but always keeping track
3  of all costs and they can be spread in any number
4  of ways.  You would obviously be looking at a
5  company like this at what products have the
6  highest profit margin and that might be irrelevant
7  if a product with a low profit margin has a lot
8  more units, but still it's just information like a
9  company I work for would probably keep in some
10  format or another, not on a daily basis but
11  certainly on a yearly basis and probably
12  episodically for planning purposes.  So I know
13  it's something we can derive.  As far as on a
14  monthly basis, all you'd be doing is just finding
15  the figure and however we would at some point in
16  time through some certain date, and then you
17  divide it by the number of units and just spread
18  it.  It is a make work thing, but it wouldn't be a
19  difficult thing obviously.  I just want you to
20  know that's all someone would be doing.  You'd be
21  interpreting my request with me understanding it
22  the way I do and directing it somewhat, and say,

Page 106

---

1  "Yeah, they want to divide it out by unit based on
2  the month because they want to see it by month."
3  They would start first probably determining it
4  based on gross numbers because that's what it
5  would be.  It would be number of costs associated
6  with why not use the most possible?  So if we do
7  15,000 a week, for instance, why not to date?
8  We're talking at least 20 weeks or something.  Why
9  not find out everything it took over a 20-week
10  period to make that many crowns, and from that
11  month on, you can spread it by month or hour.
12      I'm saying just mainly overall, you're
13  not going to get more than a number, it's a real
14  number.  It's what it costs to make a particular
15  type of crown.
16      Q.  I appreciate that explanation and with
17  that in mind, what I'm asking for is if you can
18  gather for me what Glidewell considers the
19  profitability of its BruxZir crown.
20      A.  Okay.
21      Q.  Product.
22      A.  And you'd be talking about gross profit

Page 107

---

1  margin or net?
2      Q.  Both, gross and net.
3      A.  We kind of know the net, only we know
4  that it will probably be more than the financial
5  statement shows because I think the figures will
6  show that it is a higher profit margin than the
7  old-fashioned way.
8      Q.  Okay.  Which would explain why you guys
9  are putting a lot of effort in that area.
10      A.  Well, that definitely works out well for
11  the customer too because that's partly reflected
12  in the price.  So it could be even though it might
13  be more affordable to make, we might be pricing it
14  so attractively that it isn't.  I don't know.  I'd
15  have to look at the numbers.  I'm not quite sure.
16      Q.  It sounds like that's a number that may
17  exist by year for the product?
18      A.  Oh, definitely, yeah.  I'd say it would
19  probably exist over a certain number of units,
20  however many number of units.  The more you take,
21  the more accurate they would be.  All books are
22  done at least on a yearly basis; so I know we can

Page 108

---

1  get a yearly.  I think it's possible -- a yearly
2  would be great actually.
3      Q.  Let's go with yearly.
4      A.  Okay.
5      Q.  That sounds like something that's exists?
6      A.  That would be a very accurate number.
7      Q.  It's something Glidewell already kind of
8  creates in its ordinary course business?
9      A.  And the costs would kind of naturally
10  flow on a year-to-year basis because that's when
11  the calendar year is.
12      Q.  Okay.  I'd appreciate if you can gather
13  that information and then Mr. Tachner can produce
14  that --
15      A.  Okay.
16      Q.  -- to us.  Thank you.
17      A.  So I'll just write on here plus
18  separately.
19      Q.  Right.  That's separate.
20      A.  Net and gross profit margin, and I'll
21  just say BZ.  I might as well go with the code
22  there.

Page 109

---

Pages 106 to 109

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-178-

1    Q.  Mr. Allred, what I'd like to ask you
2  about now is Glidewell's application for its
3  trademark in the mark BruxZir --
4    A.  Okay.
5    Q.  -- that we've been talking about.  And in
6  particular, the mark -- why don't I just put it in
7  front of you here.
8    MR. JANKOWSKI:  We'll have the court
9  reporter mark as Exhibit 122 what was submitted, I
10  believe, as Exhibit A to the complaint in this
11  lawsuit which is from the United States Patent and
12  Trademark Office, and it is a trademark
13  registration in the mark BruxZir.
14        (Exhibit No. 122 was marked for
15        identification.)
16  BY MR. JANKOWSKI:
17    Q.  Mr. Allred, do you recognize Exhibit 122?
18    A.  I do.
19    Q.  This is the registered trademark that's
20  kind of the subject of the lawsuit that brings us
21  here today; correct?
22    A.  Well, it's the Class 10 mark; so that is

Page 110

1    A.  Well, you can see it all there on the web
2  because they have the documentation right there,
3  but I remember it was our crown box, and it was
4  even exemplars of full contour zirconia crowns.  I
5  think the box had the foam pad in it and had the
6  label of the goods on the underside of the lid so
7  that it showed through.  It was a clear plastic
8  lid that crowns were separate laying next to the
9  box is how I think it was.
10    Q.  When you say "exemplars," were there
11  actually crowns?
12    A.  Yes, and they were described in the
13  goods.
14    Q.  So these must have been crowns that were
15  made for actual patients.  They were crowns made
16  to be an exhibit essentially?
17    A.  Yeah, they could have been a patient's
18  crown.  Once you got the file, you can make as
19  many as you want.  It was probably a real crown
20  for somebody maybe.  I don't know.  Some model.
21  It wasn't necessarily a model of a patient.  Maybe
22  it was a model of a model, but it was definitely a

Page 112

1  for the dental restoration, the custom-made dental
2  restoration.
3    Q.  Do you recognize it as something that was
4  attached to the complaint?
5    A.  I recognize it as our trademark document.
6  I don't remember attaching it to the complaint.
7    Q.  Do you see at the bottom where it says
8  Exhibit A?
9    A.  Yes.
10    Q.  And you have a copy of this registration
11  in Glidewell's files; correct?
12    A.  Sure.  You mean the original?  Yeah,
13  sure.
14    Q.  Right.
15        So are you the person who was associated
16  with filing this application with the U.S. Patent
17  and Trademark Office?
18    A.  I filed it.
19    Q.  Okay.  You filed it.
20        In that regard, what materials did you
21  provide to the PTO in connection with filing for
22  this trademark?

Page 111

1  real crown.
2    Q.  And after filing the application, did you
3  have any more actions -- interactions or
4  communications with the trademark office?
5    A.  I don't think so.  I think it just sailed
6  right on through.
7    Q.  So you didn't speak with the trademark
8  examiner?
9    A.  I definitely didn't speak with the
10  trademark examiner.  If there was anything that
11  came up, it would have been in writing, but I
12  don't remember anything ever came up on it.
13    Q.  Okay.  Did you submit -- now, you said
14  you submitted the actual box that the crowns come
15  in; right?
16    A.  Just an image.
17    Q.  Or an image of the box.
18        How were the crowns provided?
19    A.  They were just laying next to it, and
20  everything was photographed on kind of a felt
21  background.
22    Q.  So the physical crowns didn't go to

Page 113

Pages 110 to 113

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-179-

| | |
|---|---|
| 1　Washington, D.C.? | 1　　Q.  Which, again, is consistent with your |
| 2　　A.  No. | 2　recollection that you're the one who filed this |
| 3　　Q.  It was just an image? | 3　particular trademark application; is that correct? |
| 4　　A.  Yeah, all together the box with the label | 4　　A.  Yes. |
| 5　with the crowns laying next to the box. | 5　　Q.  If you turn to the page 1 ahead of that, |
| 6　　Q.  Okay. | 6　2813, you'll see there's information on the |
| 7　　A.  It's not really a box, I guess.  It's a | 7　current owner that shows that the owner is James |
| 8　plastic case in the shape of a tooth.  It has a | 8　R. Glidewell, Dental Ceramics, Inc. |
| 9　foam insert. | 9　　　Do you see that? |
| 10　　　MR. JANKOWSKI:  I'll have the court | 10　　A.  Correct. |
| 11　reporter mark as the next exhibit Exhibit 123 -- | 11　　Q.  And that's accurate; correct? |
| 12　I'm sorry.  A document bearing production Nos. KDA | 12　　A.  That's true.  Dba Glidewell Laboratories. |
| 13　002808 through KDA 002831, and Mr. Allred, this | 13　　Q.  There's a section on goods and services |
| 14　is, as you were suggesting, a printout of | 14　where it describes the goods and services as |
| 15　materials from this trademark application that you | 15　dental bridges, dental caps, dental crowns, dental |
| 16　can access on the web as you said.  I'll ask you | 16　inlays, dental onlays and dental prostheses; |
| 17　questions to see whether you agree with that. | 17　correct? |
| 18　　　THE WITNESS:  Okay. | 18　　A.  That's true.  It's what comes with the |
| 19　　　(Exhibit No. 123 was marked for | 19　010. |
| 20　　　identification.) | 20　　Q.  Which is the Class 10 you talked about |
| 21　BY MR. JANKOWSKI: | 21　earlier? |
| 22　　Q.  If you can just briefly review | 22　　A.  Correct. |
| Page 114 | Page 116 |
| 1　Exhibit 123. | 1　　Q.  So this particular application is about |
| 2　　A.  Am I looking at the same thing again | 2　applying the BruxZir name to the dental |
| 3　here? | 3　restorations, namely, the crowns made of zirconia; |
| 4　　Q.  Some of it looks like it gets replicated. | 4　correct? |
| 5　I'm not sure why that is. | 5　　A.  Specifically out of zirconia, correct. |
| 6　　A.  That's their end, huh? | 6　　Q.  Right, right.  And at the bottom of this |
| 7　　Q.  Could be. | 7　page KDA 2813, there's a printout of the |
| 8　　A.  Oh, here's their search criteria.  It all | 8　prosecution history. |
| 9　looks like something I've seen before. | 9　　　Do you see that? |
| 10　　Q.  Okay.  And if you turn to the page that | 10　　A.  I do. |
| 11　bears production No. 2814, it's a page with not | 11　　Q.  I think you said a moment ago it sailed |
| 12　much on it actually. | 12　through prosecution pretty readily, and that's |
| 13　　A.  Oh, you mean just the signature? | 13　reflected here as well; correct? |
| 14　　Q.  Well, not a signature there but | 14　　A.  I think it looks like three months.  Four |
| 15　there's -- | 15　months.  Three months and a week. |
| 16　　　MR. TACHNER:  Right here. | 16　　Q.  Three months to a week.  That's pretty |
| 17　　　MR. JANKOWSKI:  Right. | 17　fast to sail through, don't you think? |
| 18　　　THE WITNESS:  Oh, I got it, yeah. | 18　　A.  I thought so. |
| 19　BY MR. JANKOWSKI: | 19　　Q.  If you turn to page 215, there's a very |
| 20　　Q.  So there under the correspondence and | 20　big presentation of the mark BruxZir; correct? |
| 21　address, it has your name; correct? | 21　　A.  That's their doing.  They make it that |
| 22　　A.  Correct. | 22　big.  They must have known something. |
| Page 115 | Page 117 |

Pages 114 to 117

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-180-

1    Q.  That's not showing Glidewell's pride in
2  the mark?
3    A.  No, that's the prescience of the USPTO.
4  I'm amazed.
5    Q.  Just to be clear, the mark is in the text
6  BruxZir as opposed to a stylized presentation.
7    A.  Strictly the type.
8    Q.  It doesn't have to be a certain font,
9  doesn't have to be a certain color?
10    A.  True.
11    Q.  Because sometimes you can seek that kind
12  of thing with trademark protection; correct?
13    A.  True.
14    Q.  But here the protection is going to the
15  word?
16    A.  Or the words.
17    Q.  One thing I wanted to ask you is on -- if
18  you turn back to the page KDA 2813, some of the
19  information that gets entered in here has to do
20  with the first use of the mark by Glidewell;
21  correct?
22    A.  Correct.

Page 118

1    Q.  And that's listed here on KDA 2813 about
2  halfway down the page.  Do you see that under
3  "Goods and Services Classification"?
4    A.  I see a date to the right -- oh, yeah, to
5  the right of first use date, correct.
6    Q.  Right, right.
7      So what's your understanding of what is
8  asked for when it says "first use date"?
9    A.  That would be the earliest time it was
10  used in commerce.
11    Q.  That actually leads to one of my
12  follow-up questions which there's also an entry
13  for first used in commerce date.
14      Do you see that?
15    A.  Correct.
16    Q.  So do you have an understanding for what
17  the difference is between a first use date and a
18  first use in commerce date?
19    A.  I don't know unless it means when maybe
20  the goods were first used versus when the mark was
21  first used.  Maybe it would refresh my memory and
22  I'm not remembering.  It seems if there was a

Page 119

1  difference, I probably knew at one time.  Let me
2  see here.
3    Q.  In case the same date is used?
4    A.  It's the same, right.  I know it has
5  nothing to do with the application date.  It's the
6  first use date, first use in commerce date.  I
7  don't know.  You'd have to refresh my recollection
8  to see if I ever knew it.
9    Q.  And what is the, if you recall, what does
10  the date June 6, 2009, represent in being entered
11  here?  What was it that was done then that
12  triggered entry in this application?
13    A.  That would be the first date that the
14  goods were ever sold to a dentist for use in a
15  patient's mouth.
16    Q.  Okay.  By "sold to a dentist," it would
17  mean invoice, an invoice date?
18    A.  Definitely.  A prescription date probably
19  was the week ending of whatever week that was
20  billed out.  I believe where that date would come
21  from.
22    Q.  So you said "prescription date."  What is

Page 120

1  a prescription date?
2    A.  That would be whatever date it was that a
3  doctor had given a prescription for something or
4  was given in lieu of whatever the doctor --
5  whatever he was ordering.  Because I know when
6  these first started, doctors are getting both what
7  they prescribe and also the BruxZir full contour
8  zirconia crown.
9    Q.  The prescription would be for something
10  other than the BruxZir product?
11    A.  I don't know that that's what this is
12  for.  This is the bill date.
13    Q.  So what would the prescription be for
14  that Glidewell would receive that would trigger
15  providing the BruxZir crown?
16    A.  Could have gotten a prescription for a
17  crown that was, for instance, a metal occlusal,
18  otherwise a PFM crown.  And then they would have
19  included that for free to let the doctor see what
20  the difference would be if he chose one over the
21  other for no additional price.  Anything here
22  would have to be invoiced; so it would be

Page 121

Pages 118 to 121

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-181-

1  something someone paid for.  But the very first
2  crowns that went out were done in that way also.
3  This was actually for free.
4      Q.  So if they were done for free, were they
5  providing these free crowns to dentists before
6  this June 6, 2009 date?
7      A.  I don't think so.  I think it was all at
8  the same time.
9      Q.  So this would be reflecting a crown
10 that's sent to a dentist?
11     A.  That would be billed, but there would be
12 a lot of others that were done at the same time
13 that were free.
14     Q.  Oh, I see.  Okay.
15         So the June 6, 2009, date is a billed
16 date for a BruxZir crown that was sold to a
17 dentist?
18     A.  That would be the date that this is, the
19 first time it was ever billed and sold, but at the
20 same time, there were crowns more than were billed
21 that were actually provided for free.
22     Q.  In addition to the ones being sold?

Page 122

1      A.  I don't think so.  I think it all
2  happened during that week.
3      Q.  Right.
4         So the very first dentist who was paying
5  for a crown wasn't doing so because he'd earlier
6  got a free crown, correct, because he's paying for
7  it on June 6.
8      A.  It could have all been in the same week.
9      Q.  Oh, so he got a free crown earlier in the
10 week, and he decided to buy a crown later in the
11 same week?
12     A.  True.
13     Q.  You mentioned advertising.  Do you know
14 when Glidewell began advertising the BruxZir name?
15     A.  I don't know the exact dates.  I know
16 we've probably gone through all that.  You might
17 have even got that from Jim.  I think it was at
18 the same time.  Probably through e-mail blasts.
19     Q.  And do you know if any of those e-mail
20 blasts were before June 6, 2009?
21     A.  No, I don't know.
22     Q.  I'll have you briefly look back at

Page 124

1      A.  Exactly.
2      Q.  The ones that were being sold, were those
3  being sold to dentists who were writing
4  prescriptions out for the BruxZir product?
5      A.  Exactly.
6      Q.  Since this was a new product, how did
7  dentists know to write a prescription for the
8  BruxZir product?
9      A.  Well, in addition to whatever advertising
10 there was, one of the best advertising was what I
11 just described.  It was a situation where perhaps
12 a full contour zirconia crown might be what the
13 doctor would have rather prescribed if he'd
14 known about it.  So he got both and got a chance
15 to try both; so he could see the fit, the look
16 compared to what he actually ordered, and he'd
17 choose one over the other and had no difference in
18 price.  It was strictly a way to point the doctor
19 to a new option.
20     Q.  At this point in June, June 6, 2009, you
21 hadn't yet been providing out the free BruxZir
22 crowns; correct?

Page 123

1  Exhibit 122.  This was the one-page registration.
2  You might have put it underneath the previous
3  exhibit.  You might have put it at the bottom.
4      A.  The trademark?
5      Q.  Yes.
6         So one thing I see on here is there's a
7  reg number, 3739663.
8         Do you see that?
9      A.  Yes.
10     Q.  That's a number associated with this
11 formal registration by the trademark office;
12 correct?
13     A.  Correct.
14     Q.  And there's another number if you look
15 down towards the bottom which is listed as a
16 serial number, 77-761757.
17         Do you see that?
18     A.  I do.
19     Q.  And that's another number associated with
20 the application for trademark; correct?
21     A.  Correct.
22     Q.  Okay.  And this also shows the date on

Page 125

Pages 122 to 125

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-182-

1  which it was filed which was June 17, 2009;
2  correct?
3      A. Correct.
4      Q. Is that consistent with your recollection
5  as to when you filed the trademark application?
6      A. It is.
7      Q. So it was shortly after the first use
8  date that you put in the application; correct?
9      A. True.
10      Q. And the registration itself came out, it
11  looks like, on January 19, 2010. Correct?
12      A. I saw that on here. Is it on here too?
13      Q. It's on Exhibit 22 as well. Underneath
14  the reg number?
15      A. Oh, up here. Correct.
16      Q. And at the very bottom of Exhibit 122,
17  there's a reference to Kevin Corwin as the
18  examining attorney.
19          Do you see that?
20      A. Uh-huh.
21      Q. Does that name ring a bell at all for
22  you?

Page 126

1      A. It doesn't.
2      Q. Which makes sense because you didn't
3  really deal with him?
4      A. I didn't.
5      Q. Okay. And inside Exhibit 123 if you turn
6  to page KDA 2810, inside that document, correct.
7  Turn in about four pages.
8      A. Oh, okay.
9      Q. To 2810. This is another copy of the
10  registration. It's the same as Exhibit 122;
11  correct?
12      A. Yes.
13      Q. It also shows that the class of goods is
14  Class 10 on the formal registration; correct?
15      A. That's correct.
16      Q. Now, if you turn to page 2820 within the
17  same document towards the end, here you see, and I
18  think I heard you mention this earlier when you
19  were looking through the document at the
20  beginning, what is shown at KDA 2820?
21      A. It looks like a search criteria that this
22  examiner was using to see if the mark was taken, I

Page 127

1  suppose.
2      Q. Okay. And you didn't play any role in
3  the searching that the examiner did; correct?
4      A. No.
5      Q. One thing I notice is it doesn't look
6  like the examiner searched for the term "bruxer,"
7  meaning a patient with bruxism; correct?
8  B-r-u-x-e-r.
9      A. I don't see that on there. I see brux
10  with asterisks before and after; so I suppose
11  that's the same way of searching for that.
12      Q. Do you understand the language there? I
13  see where it says "brux," and I see bi and ti and
14  reference to be not dead.
15          Do you know what that means?
16      A. I think so.
17      Q. What does that mean?
18      A. It looks to me like he's looking for the
19  letters b-r-u-x if they occur in the middle or end
20  or anywhere in a trademark and is still alive, I
21  suppose.
22      Q. What's the bi refer to, the bi, ti in

Page 128

1  brackets? Do you see that?
2      A. Yeah. Is that in the goods maybe? I'm
3  not sure. I don't know. What is it?
4      Q. I don't know.
5      A. I'm not going to guess then.
6      Q. No, I don't want you to guess. I'm just
7  wondering if you knew.
8      A. I'm not sure.
9      Q. And you didn't do anything to educate
10  Mr. Corwin about the significance of the word
11  "bruxer" in the dental industry; is that accurate?
12      A. I don't remember ever talking to him.
13      Q. Your normal practice was to fill out
14  trademark applications without interacting with
15  the trademark examiner more than you had to. Is
16  that fair?
17      A. That's true. That's a fact. That's how
18  this went. It's in their system. It really just
19  fell into place.
20      Q. And if you turn to the page KDA 2822; so
21  a few more pages forward in the document or toward
22  the back. I'm sorry.

Page 129

Pages 126 to 129

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-183-

| | |
|---|---|
| 1    A. Towards the back, yeah. | 1    single one, just something that became a focus. |
| 2    Q. Is this a reproduction of the | 2    Q. My understanding is that Mr. Shuck is the |
| 3  illustration you were discussing earlier when you | 3  one who originated the name BruxZir.  Is that |
| 4  said there were actual examples of crowns you had | 4  consistent with your recollection? |
| 5  provided? | 5    A. It is. |
| 6    A. It is. | 6    Q. And he ran the name by various management |
| 7    Q. There you can see the BruxZir brand on | 7  people at Glidewell including Dr. DiTolla; |
| 8  the sticker on the container; correct? | 8  correct? |
| 9    A. True. | 9    A. Dr. DiTolla is the person that he talked |
| 10    Q. Did you do any searching yourself on | 10  to about it who was at a dental show at the time. |
| 11  behalf of Glidewell before you filed this | 11    Q. And he shared the name with an audience |
| 12  application just to see whether BruxZir was a good | 12  of dentists at the time.  Is that your |
| 13  mark to be using? | 13  understanding? |
| 14    A. I did. | 14    A. It is, yeah. |
| 15    Q. And what kind of searching did you do? | 15    Q. Let me show you another exhibit here. |
| 16  Do you recall? | 16    MR. JANKOWSKI:  I'll have the court |
| 17    A. I went to their site, and I looked for | 17  reporter mark as Exhibit 124 a one-page |
| 18  anything that had the word brux in it, and I also | 18  document -- |
| 19  Googled anything there was to find on Google. | 19    THE WITNESS:  Are we done with this one? |
| 20    Q. When you say "in their site," you're | 20  BY MR. JANKOWSKI: |
| 21  talking about the trademark office site? | 21    Q. Yes, you can put that one away. |
| 22    A. Yes. | 22    A one-page document bearing the |
| Page 130 | Page 132 |

| | |
|---|---|
| 1    Q. And you did a Google search for brux as | 1    production number Boatright 000085. |
| 2  well? | 2      (Exhibit No. 124 was marked for |
| 3    A. I did. | 3      identification.) |
| 4    Q. Any other search terms that you looked | 4  BY MR. JANKOWSKI: |
| 5  for other than brux? | 5    Q. Mr. Allred, do you recognize the document |
| 6    A. A lot of different search terms at the | 6  marked as Exhibit 124? |
| 7  time because the name was not established until | 7    A. Is this our serial number here?  I don't |
| 8  this was finally adopted.  So I was doing a lot of | 8  know. |
| 9  different searches on a lot of different names. | 9    Q. Yes, you'll see halfway down you'll see |
| 10    Q. Names that were candidates that you were | 10  the serial number 77761757. |
| 11  considering? | 11    Do you see that? |
| 12    A. Exactly. | 12    A. I see that. |
| 13    Q. Do you recall what candidates existed | 13    Q. If you compare it with Exhibit 122 you'll |
| 14  before you -- before Glidewell decided on BruxZir? | 14  see it's the same serial number. |
| 15    A. I don't.  I just remember the general | 15    A. Same serial number? |
| 16  idea of things that had the word zir in it. | 16    Q. Correct. |
| 17    Q. And so did you do searching on zir, | 17    A. I've never actually seen this page. |
| 18  z-i-r, as well? | 18    Q. Do you recognize this page as a -- do you |
| 19    A. When something looked like it was a | 19  see halfway down the page you see a reference to |
| 20  candidate, like I say, not just thrown out there | 20  the trademark status and document retrieval with |
| 21  because there was maybe 40 or 50 ideas were going | 21  the acronym TSDR? |
| 22  back and forth here and there, but not on every | 22    Do you see that? |
| Page 131 | Page 133 |

Pages 130 to 133

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-184-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1      A. Somewhere in here it will say retrieval?
2      Q. Right. It's about halfway down the page.
3      A. Oh, you mean TSDR?
4      Q. Yes.
5      A. I see that.
6      Q. Do you have a familiarity with what a
7   TSDR is?
8      A. I think it's one of the USPTO subsystems
9   for accessing their data, I think.
10     Q. And have you used that system yourself?
11     A. I probably have if that's the only way to
12  get to certain information I might have looked
13  for. I don't really remember what all is in
14  there. Is that what you would look at to, for
15  instance, pull up a copy of your application?
16     Q. Right. It gives you -- it's a user
17  interface; so you can go on the trademark website
18  and access information.
19     A. I have used it then.
20     Q. In fact, if you look at this printout, is
21  that what it looks like to you is a printout from
22  the USPTO website that's giving you the ability to

Page 134

1   and Trademark Office to prevent the registration
2   of the mark in Class 5? That's what I would guess
3   from looking at this. That's all I would know. I
4   don't know if that's it.
5      Q. Okay. And there's one listed for
6   November 9, 2011, and a second one listed for
7   March 15, 2012.
8      Do you see that?
9      A. I do.
10     Q. Do those dates have any significance to
11  you?
12     A. Well, the fact that this one on the top
13  here is fairly recent, March; so it would have to
14  be something that's happened fairly recently.
15     Q. I'm just asking if you have an
16  understanding for what happened on that date?
17     A. I could confirm if that's something your
18  law firm has done on behalf of the client. If
19  it's on behalf of something Attorney Holland did,
20  I don't know if I remember or not what that would
21  be.
22     Q. Okay. You can put that exhibit down.

Page 136

1   access documents associated with Glidewell's
2   trademark we've been discussing?
3      A. It does. It looks like if I checked the
4   box here for specimen and it says "JPEG," I would
5   get that image there that we looked at earlier.
6      Q. Right.
7      And, in fact, there's entries here that
8   correspond to the filing of the application and
9   the issuance of a registration certificate, a
10  notice of publication, and so on.
11     Do you see that in the bottom half?
12     A. I do.
13     Q. One thing I see is there's two entries
14  there, more recent entries in the chronology
15  that's known in Exhibit 124. It says, "NOS notice
16  of suit incoming."
17     Do you see that?
18     A. I do.
19     Q. Do you have an understanding of what that
20  notice is referring to?
21     A. Is that when Attorney Holland on behalf
22  of the defendant filed something with the Patent

Page 135

1      So this trademark BruxZir associated with
2   the registration at Exhibit 122 registered in
3   January, 2010; correct?
4      A. Yes.
5      Q. And did Glidewell begin doing anything
6   different once it received this registration?
7      A. No.
8      Q. Did it change its marketing materials?
9      A. No.
10     Q. How about the use of a circle R as
11  opposed to a TM? Did it make any changes in that
12  regard?
13     A. When we got the circle R, we started
14  using it.
15     Q. This January, 2010, date, is that
16  associated with when Glidewell would have started
17  using the circle R?
18     A. Yes.
19     Q. On which products did Glidewell begin
20  using the circle R?
21     A. On the full contour zirconia crowns sold
22  to dentists.

Page 137

Pages 134 to 137

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-185-

1    Q. Any other products?
2    A. No.
3    Q. How about today?  Do you know whether
4  Glidewell applies its circle R product designation
5  to products other than the full contour zirconia
6  crowns?
7    A. I don't believe it does, but I suppose it
8  could since we have the circle R in Europe. It
9  could also apply to blocks, but I don't think we
10  do.
11    Q. Now, you said a circle R in blocks.  So
12  Glidewell has a registration to apply BruxZir to
13  its blocks sold to Europe?
14    A. We have the circle R for that, yes.
15    Q. But I take it the packaging is different
16  for goods going to Europe than it is for goods
17  going to customers in the U.S.; correct?
18    A. I'm not sure about that.  I don't know.
19  It could be a different kind of box they use
20  there.  I'm not sure.
21    Q. So Glidewell might be using the circle
22  R -- BruxZir with a circle R on its packaging of

Page 138

1  milling blanks sent to customers in the United
2  States?
3    A. Not in the United States, no.
4    Q. Okay.  So it's not using the circle R on
5  its packaging for milling blocks being sent to
6  customers in the United States?
7    A. No.
8    Q. How about on its advertising materials?
9    A. No.  TM.
10    Q. Do you monitor that?
11    A. Yeah.  I would say yes.
12    Q. How do you monitor that?
13    A. Well, whenever I become aware of an
14  improper use of the mark, I notice it.
15    Q. And if you notice it, what do you do?
16    A. Well, we only use it the proper way; so
17  whenever I notice it, I make sure it is used the
18  proper way.
19    Q. Who do you talk to about that?
20    A. The best person for me to talk to would
21  be the person who works directly with the people
22  that actually do all the design for all of our

Page 139

1  materials.  So that would be Mike Cash.
2    Q. And he works underneath Mr. Shuck;
3  correct?
4    A. Yes.
5    Q. And how about on Glidewell's website?  Do
6  you monitor how the circle R is used on the
7  website?
8    A. Yes.  I don't go there specifically to
9  see if anyone has changed something in the
10  meantime, but I'm there quite often.
11    Q. If you see a circle R that shouldn't be
12  there, you'll let somebody know about it?
13    A. Definitely.
14    Q. For the website, would that also be
15  something where you say something to Mike Cash?
16    A. Yes, same thing.  That's also the same
17  group that would keep the website up to date.
18    Q. And e-mail blasts be the same answer?
19  You go to Mike Cash?
20    A. If there was a change in an e-mail, if
21  somehow it had been used inappropriately and I had
22  seen that, definitely I would raise the issue with

Page 140

1  Mike Cash.
2    Q. And what about if it's involving
3  materials sold by Glidewell Direct?  Is Mike Cash
4  still the person to talk to?
5    A. Yeah, because that would be a label.
6    Q. So Mike Cash handles Glidewell Direct
7  marketing as well?
8    A. Well, that's for sure, but he would
9  handle all design and printing.
10    Q. Now, Glidewell's -- let me set a
11  foundation here.
12      Glidewell has a relationship with a
13  number of authorized labs who purchase the BruxZir
14  milling blanks; correct?
15    A. That's true.
16    Q. So those dental labs have the right to
17  use the BruxZir name associated with the product
18  they make with the BruxZir milling blanks;
19  correct?
20    A. Our authorized labs are providing the
21  Class 10 goods to dentists.  So they probably will
22  always be using the circle R.

Page 141

Pages 138 to 141

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-186-

1  Q. Right.
2  You anticipated my next question which
3  is:  Do you monitor what the use of the BruxZir
4  name is by Glidewell's 180 or so authorized labs?
5  A. I have to say yes because I know we've
6  had to contact labs now and again.  But it's not
7  anything that we have a program of actually
8  following on any periodic basis.  Just if we do
9  become aware of any improper use, we definitely
10  would do something about it.
11  Q. And the something about it is you'll
12  notify them about the proper usage to follow?
13  A. Definitely.
14  Q. And who will notify the authorized lab or
15  who will contact them?  Is that you personally or
16  somebody else?
17  A. No, that would be someone like Robin
18  Bartolo who has a relationship with them and
19  probably deals with them on a regular basis
20  anyway.
21  Q. Oh, since you raised Mr. Bartolo's name,
22  I just want to confirm something.  In talking

Page 142

1  think we ought to wait or anything.  That's a very
2  responsive company.  I'm sure it was pretty much
3  about the same time.
4  Q. And the instructions to start using a
5  circle R, would that have gone to Mike Cash as
6  well, or would that go to Jim Shuck or someone
7  else?
8  A. Definitely both of them would have been
9  something that would have been probably worthwhile
10  sharing with everyone in the company.  But it
11  wouldn't have necessarily been me sharing it.
12  Probably would have been me telling Jim Shuck
13  about it.
14  Q. And in addition to the marketing done by
15  Mr. Shuck and Mr. Cash, Glidewell also has
16  information being conveyed by Dr. DiTolla as well;
17  correct?
18  A. Information conveyed about?
19  Q. About the BruxZir crowns.
20  A. He is definitely a purveyor of
21  information about anything to do with dentistry,
22  and he promotes that material.

Page 144

1  about these authorized labs, I asked Mr. Bartolo
2  whether there were written agreements between
3  Glidewell and the authorized labs that contained
4  written provisions associated with things like the
5  right to use the trademark.  Mr. Bartolo said he
6  did not believe there were any such written
7  agreements.  Is that your understanding as well?
8  A. That's correct.  There isn't.
9  Q. I was going to say I think you would know
10  better than Mr. Bartolo for sure since it's a
11  legal document, and you being the general counsel.
12  Do you have an understanding for how
13  quickly after the registration was issued by the
14  PTO in January, 2010, that Glidewell started
15  adopting the circle R?
16  A. I could only guess that it was almost
17  immediately.
18  Q. You don't recall?
19  A. I think I do kind of recall telling
20  everybody we got the circle R, and I'm sure it
21  would have been incorporated in anything beyond
22  that.  I don't recall ever having any reason to

Page 143

1  Q. So he lectures to dentists, for example;
2  correct?
3  A. He does.
4  Q. And do you monitor the use of the BruxZir
5  trademark in the materials that are used and
6  developed by Dr. DiTolla?
7  A. Any materials he uses probably are
8  prepared by Glidewell Laboratories under his
9  instruction.
10  Q. I guess what I'm wondering about is do
11  you or does somebody else monitor the marketing
12  materials or I won't even call them marketing
13  materials.  Whatever materials Dr. DiTolla is
14  using when he's lecturing to dentists to see how
15  the BruxZir mark is being used?
16  A. I don't know about the word "monitor,"
17  but I'm very aware of everything that goes out to
18  the public.
19  Q. And how are you aware of it?
20  A. I see it myself just like the public
21  does.  It's right on our website.
22  Q. Does Dr. DiTolla pass it by you or by

Page 145

Pages 142 to 145

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-187-

1  Mr. Shuck or somebody for authorization before he
2  uses the materials?
3      A.  Not for authorization, no.
4      Q.  Does he pass it by you for comments or
5  feedback?
6      A.  Very possibly he could run ideas by
7  anybody.  That's possible.
8      Q.  But that's not like a required procedure
9  before he presents to dentists?
10      A.  Well, he is the director of education; so
11  that is really his responsibility.
12      Q.  Right.  And I questioned him about that.
13  He said the same thing about that.  In fact, he
14  testified that he really makes the videos that
15  he's in.  He's responsible for the content;
16  correct?
17      A.  That's true.  But the resources he's
18  using is Glidewell Laboratories and those people
19  are under Mike Cash.
20      MR. JANKOWSKI:  I'll have the court
21  reporter mark as Exhibit 125 a seven-page document
22  produced by Glidewell in this case with the

Page 146

1  correct?
2      A.  Yes.
3      Q.  This one has a later serial number
4  because it's filed later in time.  I'll just read
5  it off the front page of Exhibit 125.  It
6  appears to be 85332886.
7      Do you see that?
8      A.  I see that.
9      Q.  Okay.  And do you know what date this
10  was -- this application was filed on?
11      A.  If I look on here, I would.
12      Q.  Sure, you can look on there.
13      A.  May 27, 2011.
14      Q.  Okay.  Is that consistent with your
15  recollection of when you filed the application?
16      A.  It doesn't seem like that along ago, does
17  it?  It seems like a lot longer ago.  I guess that
18  is consistent with the facts.
19      Q.  So it was roughly two years after the
20  earlier application; correct?
21      A.  Let's see.  I guess the other one was
22  June, 2009, and this is May, 2011.  So that's

Page 148

1  production No. GL 223.
2      (Exhibit No. 125 was marked for
3      identification.)
4  BY MR. JANKOWSKI:
5      Q.  Mr. Allred, can you just briefly review
6  Exhibit 125 for me, please?
7      A.  Okay.  I know what this would be.  Sure.
8      Q.  What is Exhibit 125?
9      A.  It is a filing here in the United States
10  for the mark under international Class 5.
11      Q.  So this is the other patent
12  application -- I'm sorry, not patent, the other
13  trademark application that we talked about earlier
14  for the name BruxZir.  This one being for the
15  milling blanks; correct?
16      A.  Correct.
17      Q.  And your name appears on this document as
18  the correspondence person who filed the
19  application; correct?
20      A.  That's correct.
21      Q.  Like the other application, this one is
22  seeking protection just in the name BruxZir;

Page 147

1  roughly two years.
2      Q.  Okay.  Is there a particular -- well,
3  first of all, in terms of first use, do you know
4  what date was provided -- that you provided for
5  this application associated with the first use of
6  the mark or first use in commerce of the mark?
7      A.  I'd have to look as far as what the exact
8  date would be.
9      Q.  If you look on page 2 of the document, I
10  think it's listed there.
11      A.  Page 2.  I'm on that page.  Page 2 of 7?
12      Q.  Correct.
13      A.  First use anywhere and first use in
14  commerce are the same, 11/10/2009.
15      Q.  The blanks are first being sold by
16  Glidewell with the BruxZir mark in November of
17  2009.  Is that accurate?
18      A.  Correct.  That makes more sense.  I
19  thought things were much further back.  Very good.
20      Q.  Blanks were already being sold in 2009.
21  They just didn't have the application filed
22  promptly for that?

Page 149

Pages 146 to 149

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-188-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1     A. For the circle R, that's true.
2     Q. Staying on page 2 of this exhibit, the
3  identification of the goods here is for dental
4  ceramics this time; correct?
5     A. That's correct.  That's what the 005
6  class is.
7     Q. Right.
8        And do you have an understanding as to
9  whether this application has issued as a
10  registered mark?
11     A. I do understand.  I know that it hasn't.
12     Q. If you turn to page 7 of Exhibit 125, I
13  see an illustration of a box.
14        Do you see that?
15     A. Last page?
16     Q. Correct.
17     A. Yeah, I see it.
18     Q. Is this what's been produced here as
19  Exhibit 125, is this a complete representation of
20  the patent application -- excuse me, the trademark
21  application you filed with the Patent and
22  Trademark Office?

Page 150

1     A. That's correct.
2     Q. It has a little TM next to it because, of
3  course, you don't have a registration in BruxZir
4  for use with the milling blanks; correct?
5     A. That's correct.  It's still that way.
6     Q. So your understanding is to this day when
7  used in connection with zirconia milling blanks,
8  Glidewell's going to use the TM and not the circle
9  R; is that correct?
10     A. Correct.  My only caveat was in Europe, I
11  suppose, we could still use the circle R, but I
12  don't know if we do.
13     Q. But in the U.S. you would not use the
14  circle R?
15     A. We would not.
16     Q. In this document, Exhibit 125 that was
17  produced by Glidewell, this is kind of a business
18  record of Glidewell's that you have a copy of this
19  application in Glidewell's files; is that correct?
20     A. It is correct.
21     Q. Okay.  This is a true and correct copy of
22  that document from your files?

Page 152

1     A. It is.
2     Q. Okay.  We had the discussion earlier
3  about materials provided.  You didn't provide any
4  additional materials beyond what's shown in this
5  exhibit?
6     A. No additional materials.
7     Q. You haven't had any telephone calls with
8  the examiner in this case either; is that correct?
9     A. I don't remember this being anything
10  other than something that sailed right on through
11  too unless he might have through some writing
12  asked if it was the same company or not.  I'd have
13  to look to see if there was anything like that.
14  Still James R. Glidewell Dental Ceramics, Inc., so
15  I don't know why he would have called, but if
16  there was, it would strictly be that, if we were
17  the owner of the previous mark.  I don't remember
18  getting such a call.
19     Q. And the image that's on the last page of
20  Exhibit 125, that's an example showing the
21  packaging for the zirconia milling blanks using
22  the BruxZir mark; correct?

Page 151

1     A. It is.
2     Q. Okay.
3        MR. JANKOWSKI:  I'll have the court
4  reporter mark as Exhibit 126 a two-page document
5  bearing production Nos. Boatright 83 and Boatright
6  84.
7        (Exhibit No. 126 was marked for
8        identification.)
9        THE WITNESS:  Is Boatright one of your
10  employees that run that off?  Where did that come
11  from?
12  BY MR. JANKOWSKI:
13     Q. Boatright is actually the name of an
14  expert that was retained by Keating Dental Arts
15  for this case just to provide opinions on the
16  practice of examining trademarks in the U.S.
17  Patent and Trademark Office.  So she provided an
18  expert opinion in the case and also produced a
19  number of documents, some of which are these that
20  you're looking at here.
21     A. You mean before he ever filed for his
22  trademark?

Page 153

Pages 150 to 153

e6da25e8-8aba-4d68-964c-5de55b761039
EXHIBIT 6
-189-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

1      Q. No, no, no. This all happened in the
2  last couple weeks.
3      A. Okay.
4      Q. If I have you just look at Exhibit 126,
5  would you agree with me this is another printout
6  like the earlier exhibit we looked at which is a
7  printout off the USPTO website associated with the
8  TSDR system?
9      A. I see that.
10     Q. This one is for the Class 5 application
11 of BruxZir.
12     Do you see that? Do you see the serial
13 number about halfway down the first page?
14     A. Oh, I see that, yeah.
15     Q. Serial number is 85287029.
16     Do you see that?
17     A. I do.
18     MR. TACHNER: Are you stating, David,
19 that it is the same serial number as the one we
20 just looked at?
21     MR. JANKOWSKI: It's not the same serial
22 number, is it?

Page 154

1  associated with the trademark BruxZir.
2      (Exhibit No. 127 was marked for
3      identification.)
4  BY MR. JANKOWSKI:
5      Q. Mr. Allred, I just wanted to show you
6  this. Are you familiar with this particular
7  website which just provides information online
8  about trademarks. It's not the USPTO website, but
9  it's another website that provides information on
10 trademarks.
11     A. It seems like I've seen the Justia name.
12 I don't know that I associated that just with
13 trademarks. I know there are sites for that.
14 Trademarkia I've seen. I don't think I've used
15 the site.
16     Q. On the front page of Exhibit 127, there's
17 a status listed for this particular trademark
18 application.
19     Do you see that?
20     A. What's this thing right here?
21 Opposition? This is Whittaker Brown? Is this
22 from your law office here? Employee named

Page 156

1      MR. TACHNER: It doesn't appear to be.
2      MR. JANKOWSKI: No, it's a different
3  serial number.
4      MR. TACHNER: This appears to be
5  something called Embauer.
6      MR. JANKOWSKI: Right.
7      MR. TACHNER: I don't think this has
8  anything to do with this litigation.
9      MR. JANKOWSKI: Whether or not it has to
10 do with the litigation, I'm not going to ask
11 Mr. Allred about it.
12     MR. TACHNER: Good. Because I don't
13 think he could answer it.
14     MR. JANKOWSKI: You're right. I don't
15 think he'll be able to answer it either.
16     Let me show you another exhibit.
17     MR. TACHNER: But you did mark it?
18     MR. JANKOWSKI: It was marked. We'll
19 move on to another one.
20     I'll have the court reporter mark as
21 Exhibit 127 a printout from the website trademarks
22 Justia.com. It's a six-page printout, and it's

Page 155

1  Whittaker Brown?
2      Q. Where are you reading?
3      A. Right here on the second page.
4  Opposition date. Attorney, it says Keith Allred
5  and employee named Whittaker Brown. I don't know
6  who Whittaker Brown is.
7      Q. I don't know who Whittaker Brown is
8  either. But if you look on the first page, do you
9  see the status listing, "Opposition pending"?
10     A. Yeah.
11     Q. And this is for the serial number which
12 is listed down below there 85332886.
13     Do you see that?
14     A. I see that.
15     Q. This one is Glidewell's trademark
16 application it's referring to; correct?
17     A. For what? Class 5? I see Class 5 here.
18     Q. Right.
19     So this is for Glidewell's Class 5
20 application; correct?
21     A. It looks like it is. Without pulling
22 anything else out of the bottom of this stack, it

Page 157

Pages 154 to 157

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-190-

10/25/2012        James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.        Keith Allred

1  definitely looks like that would be it.
2      Q.  Is this consistent with your
3  understanding that there is an opposition pending
4  to Glidewell's BruxZir mark for Class 5?
5      A.  If this is something that happened fairly
6  recently here?  This is 11/1/2011.  Oh, is
7  this what we already talked about?  This is done
8  by Attorney Holland?
9      Q.  I'm not sure.  If you look down, for
10  example, to -- there's no page numbers on it here,
11  but there's a listing three pages from the back
12  end of the document that lists trademark events at
13  the top.
14      Do you see that?
15      A.  Yeah.
16      Q.  This goes through a chronology starting
17  with the filing of the application in May, 2011.
18      Do you see that?
19      A.  At the very top?
20      Q.  Right.
21      A.  Correct.
22      Q.  And then it goes down to the bottom, and

Page 158

1  you see in December, 2011, it says, "Opposition
2  instituted."
3      Do you see that?
4      A.  Yeah, two down below when it was approved
5  for publication in the official Gazette.
6      Q.  Right.
7      So is that consistent with your
8  application -- excuse me, your understanding of
9  the status of this?
10      A.  It is if this is from Attorney Holland
11  and this is his opposition to having a
12  registration for the mark in Class 5.
13      Q.  You keep mentioning Attorney Holland.
14  What's your understanding as to what Mr. Holland
15  did?
16      A.  My understanding is he was hired by
17  Keating Dental Arts to oppose -- well, as part of
18  his representation.  I guess it was his
19  recommendation or the client or both -- I don't
20  know.  Obviously, I don't know what their
21  misunderstanding is -- to oppose the registration
22  of our trademark in Class 5 as part of their

Page 159

1  defense in this matter against our charge of
2  trademark infringement.  That's my understanding.
3  Of course, the trademark infringement is in
4  Class 10, and this is in Class 5.
5      Q.  Right.
6      MR. JANKOWSKI:  I'll have the court
7  reporter mark as Exhibit 128 a two-page document
8  from the United States Patent and Trademark
9  Office, trademark trial and appeal board, mailed
10  February 3, 2012.
11      (Exhibit No. 128 was marked for
12      identification.)
13  BY MR. JANKOWSKI:
14      Q.  Mr. Allred, do you recognize Exhibit 128?
15      A.  I know what it's about.
16      Q.  What is this about?
17      A.  It looks to me like someone writing on
18  behalf of the trademark office thinks we should
19  have just laid down and let them oppose the
20  registration of the mark in Class 5, and it looks
21  like we didn't see it his way, and it looks like
22  he's telling me I'm really full of it.

Page 160

1      Q.  Do you know whether this particular
2  opposition is associated with Glidewell's Class 5
3  mark, application for a Class 5 mark?
4      A.  I think I should look at it more closely.
5  I just assumed it was.  If it was associated with
6  what we were just talking about earlier, the
7  decision of the defendant to oppose our mark in
8  Class 5, I understand it.  If it's something
9  different than that, I'll have to look at it more
10  closely.
11      Q.  Let me ask you a question which is you're
12  aware that Glidewell is opposing Keating's
13  trademark application for its mark KDZ Bruxer,
14  B-r-u-x-e-r; correct?
15      A.  Of course.  We tried to stop everything
16  before he even infringed it in public.  That was
17  the first thing we did.  We could have stopped
18  there.
19      Q.  So there's at least two opposition
20  proceedings existing between the -- in front of
21  the TPAB now; correct?
22      A.  Oh, okay.  All right.  Is that what this

Page 161

Pages 158 to 161

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-191-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1  is then?
2      Q. I'm just asking you whether you know
3  whether this has to do -- which of those two
4  oppositions this has to do --
5      A. I really don't know. I guess I can look
6  at this real closely and try to figure it out.
7      Q. But you do understand there's oppositions
8  going both ways, Glidewell has an opposition to
9  Keating's pending application and Keating has an
10 opposition in place to Glidewell's pending
11 application for the Class 5 use of the mark;
12 correct?
13     A. Well, yes, but our opposition was to the
14 application by KDA for a confusingly similar mark
15 in Class 10. I don't know if this has anything to
16 do with it or not. I don't know which class this
17 is talking about. I can look at it close. I
18 don't know exactly what it is, but I do understand
19 that we did oppose before the Patent and Trademark
20 Office as soon as we were legally allowed to do
21 the issuance of a trademark in Class 10 of a
22 confusingly similar mark. I do know that after

Page 162

1  that through his earlier attorney representation,
2  they opposed our application for a trademark in a
3  completely different class all together.
4      Q. So Glidewell's opposition is associated
5  with Keating's mark in Class 10?
6      A. Correct.
7      Q. And Keating's opposition is directed at
8  Glidewell's pending application in Class 5;
9  correct?
10     A. Correct.
11     Q. Okay.
12        MR. TACHNER: David, want to take a
13 break? It's about an hour-and-a-half.
14        MR. JANKOWSKI: Sure, we can take a
15 break.
16        MR. TACHNER: Whenever it's convenient.
17        MR. JANKOWSKI: No, this is fine. This
18 is a fine time.
19        (Recess taken from 2:25 p.m. to
20        2:51 p.m.)
21 BY MR. JANKOWSKI:
22     Q. Mr. Allred, I'm going to hand you a

Page 163

1  document the court reporter has marked as
2  Exhibit 129. This is a four-page document from
3  the United States Patent and Trademark Office
4  Patent Trial and Appeal Board associated with
5  Opposition No. 91201389.
6        (Exhibit No. 129 was marked for
7        identification.)
8  BY MR. JANKOWSKI:
9      Q. I'll just ask you do you recognize
10 Exhibit 129?
11     A. November 18, 2011, is when they mailed
12 it. Is this mailed to somebody? Is that how this
13 works?
14     Q. Well, my understanding is yes, that the
15 November 18, 2011, date is the date that the
16 Patent and Trademark Office mailed it.
17     A. Because you don't see any addresses on
18 here or anything. It's hard to tell if this was
19 something sent to me. It wouldn't be as it is.
20 There would have to be a cover letter or
21 something. I could look at it and see what it's
22 all about, if you'd like.

Page 164

1      Q. If you can look at it and see if you
2  recognize it.
3      A. You mean what it's about? It wouldn't
4  necessarily be something I've ever actually seen
5  even though I might know what it's about?
6      Q. Well, no, I think you may have seen it.
7  That's why I'm asking you if you recognize it.
8      A. How would I have received it, I guess, is
9  the thing. Would it be mailed to me? Would it be
10 like this with a cover sheet or something? My
11 address is not on here is what I'm not quite
12 understanding how -- in what form I would have
13 seen it.
14     Q. It's associated with, as you can see at
15 the top there, an opposition proceeding between
16 James R. Glidewell Dental Ceramics and Keating
17 Dental Arts?
18     A. Exactly. I might understand everything
19 this is about. I don't know how I would have
20 received it. I don't know if this come with a
21 cover letter, and I would have opened it up, and
22 this would have been attached, and I would have

Page 165

Pages 162 to 165

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-192-

1  looked at this.  I'm just asking if you knew.
2      Q. I don't know.
3      A. Okay.  I know that "Moreover judicial
4  economy lies in the suspension of the board
5  proceeding because the board has limited
6  jurisdiction."  I am guessing this has to do with
7  our opposition to the application for the mark
8  here, KDZ Bruxer.  If that's the case, that's
9  something I remember we would have opposed that at
10 the earliest opportunity, and that's when it was
11 published in the Gazette.
12     Q. Do you monitor the Gazette to look for
13 marks you think may be a problem?
14     A. I do not.
15     Q. How is it you happened to notice Keating
16 Dental Arts mark as it appeared in the Gazette?
17     A. I didn't notice it in the Gazette.
18     Q. How did you --
19     A. Not initially.
20     Q. Okay.
21     A. You're right.  It was me, and I guess it
22 was rather serendipitously I noticed that this was

Page 166

1  something that had been filed for.  At the
2  earliest opportunity we had, we communicated with
3  the defendant through counsel that we would oppose
4  this mark because it was confusingly similar.  He
5  didn't do anything about it.  All we could do is
6  wait for it to be published in the Gazette.
7      Q. How did you learn about the pending
8  application?
9      A. Doing a trademark search on our own
10 trademark, anything that contained the word brux.
11     Q. When was that search conducted, do you
12 recall?
13     A. It would have been whenever it was we
14 sent a letter to KDA, Inc.'s attorney that we
15 would object to this mark.  I don't know exactly
16 when the date of that letter was.  It is at the
17 same time.  Probably no more than days after I
18 would assume.
19     Q. And is running searches for marks that
20 use "brux," is that something you do periodically?
21     A. I don't really know why I was doing it.
22 I might have been looking for our own mark.  I

Page 167

1  can't tell you why I was searching it.
2      Q. When you say "your own mark," you mean
3  the application for use on the milling blanks?
4      A. Possibly then.  It would have been
5  looking for our mark and checking to see what
6  existed in Class 5.  It could have been about that
7  time.  I don't know.  I'd have to look at the
8  dates.
9      Q. Have you filed any other oppositions to
10 trademark applications that Glidewell deems to be
11 confusingly similar to the BruxZir mark?
12     A. No.
13     Q. Let me hand you a document the court
14 reporter has marketed as Exhibit 130.  It's a
15 letter of protest memorandum dated December 2,
16 2010.  I'll show this to you.
17         (Exhibit No. 130 was marked for
18     identification.)
19         THE WITNESS:  Are we done with this?
20 BY MR. JANKOWSKI:
21     Q. Yes, you can set that aside.
22     A. This is from Katherine Holman to Charles

Page 168

1  Joiner.
2      Q. I think it's from Mr. Joiner to
3  Ms. Holman.  At least it looks that way.
4      A. There you go.  To Holman from Joiner.
5      Q. This document makes reference to a
6  protester who has filed a letter of protest.
7         Do you see that?
8      A. I see the heading here, "Letter of
9  Protest."  Is that what you mean?
10     Q. Right.
11     A. Should I be looking through this or
12 something?
13     Q. No, just look at -- in fact, now that I'm
14 looking at this, let me see your copy of that.  I
15 really only want the front page of that.  I don't
16 know why this is all attached.  Sorry.  A little
17 inelegant.  That's the exhibit.
18         Oh, you know what?  I take that back.
19     A. You do want that?
20     Q. Yeah, I want that.  So just put that and
21 I'll give you that one back.  Now I recognize why
22 it looks that way.  Just keep them together and I

Page 169

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-193-

1  will restaple them.
2      The rest of it looks different, but
3  actually it's printouts that are referenced in the
4  protest is what it is.
5      So, Mr. Allred, this is a letter of
6  protest associated with somebody saying that the
7  mark Brux XXX is merely descriptive of the
8  applicant's identified goods.
9      Do you see that?
10     A. I do see that written right here.
11     Q. Your understanding is Glidewell is not
12  the protester that's referenced here; correct?
13     A. Yeah, I know for sure it has nothing to
14  do with Glidewell Laboratories.
15     Q. If you do look at the pages inside,
16  you'll see what they are are printouts of
17  dictionary definitions, for example, of the word
18  brux, B-r-u-x, and bruxism.
19     Do you see that?
20     A. I see Free Dictionary. I see the word
21  "brux" on there. Right there in between Brutus
22  and something else.

Page 170

---

1      Exhibit 134 is a registration on the
2  principal register for Brux-eze, B-r-u-x-e-z-e.
3      Exhibit 135 is a registration for the
4  mark Dr. Brux, Dr. spelled D-r period.
5      Exhibit 136 is a registration for the
6  mark Brux-Checker, spelled B-r-u-x-C-h-e-c-k-e-r.
7      Exhibit 137 is a printout from the PTO
8  website associated with an application to register
9  the mark Bruxcure, spelled B-r-u-x-c-u-r-e.
10     And Exhibit 138 is a printout from the
11  trademark electronic search system associated with
12  an application for the mark Brux XXX spelled
13  B-r-u-x X-X-X.
14     I'll give you these exhibits and let you
15  look at them.
16     A. Okay.
17     (Exhibit Nos. 131 through 138 were
18     marked for identification.)
19  BY MR. JANKOWSKI:
20     Q. So the question is for you, Mr. Allred,
21  is in the searching that you're saying that you've
22  done, I guess that would be in connection with any

Page 172

---

1      Q. Right.
2      A. I see a brux and then night guard,
3  bruxism, bruxism, brux.
4      Q. Are you familiar with the mark Brux XXX
5  in Exhibit 130?
6      A. No. I'm just curious as to what it even
7  was. Is it a mouth guard of some kind?
8      Q. Well, let's take a look. You can put
9  that at the bottom of your stack, and I'll get a
10  stapler for that.
11     A. Kind of like AAA Plumbing, huh?
12     Q. I'm going to hand you a series of
13  exhibits. These are numbered Exhibits 131 through
14  Exhibit 138. Let me just state, for the record,
15  Exhibit 131 is a registration from the trademark
16  office on the principal register for Bruxgard,
17  B-r-u-x-g-a-r-d.
18     Exhibit 132 is a registration on the
19  principal register for Brux-eze, B-r-u-x-e-z-e.
20     Exhibit 133 is a registration on the
21  principal register for the mark Bruxcare,
22  B-r-u-x-c-a-r-e.

Page 171

---

1  of your trademark applications BruxZir, have you
2  encountered the marks that are shown here in
3  Exhibits 131 through Exhibit 138?
4      A. I probably did if it was something back
5  further than, what, June 2009. Some of these look
6  like they were after June, 2009. So obviously I
7  wouldn't have seen it then.
8      Q. But you were also doing searches later it
9  sounds like, for example, when you discovered
10  Keating Dental Arts pending application; is that
11  correct?
12     A. That's true. I didn't see anything in
13  Class 5 in there, but I could look through it
14  again.
15     Q. And right.
16     These particular examples of
17  registrations are from Class 10; correct?
18     A. Yeah, I noticed that.
19     Q. Right.
20     So one thing that's true is there are a
21  lot of marks associated with Class 10 that do use
22  the term "brux" in them. Would you agree?

Page 173

Pages 170 to 173

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-194-

1    A. I would agree, yes.

2    Q. Do you think the names shown in

3  Exhibits 131 to 138, are there any problems with

4  them being confusingly similar with the BruxZir?

5    A. Certainly not confused with a ceramic

6  crown, no.

7    Q. Why do you say they're not?

8    A. A ceramic crown is something a dentist

9  prepares a tooth for, and you get something that

10  fits exactly and cements in place and a patient

11  may have it for the next 40 years.  It's all

12  together different than anything on this page.

13    Q. How about the names themselves?

14    A. Well, the fact that it does start with

15  b-r-u-x?  Theoretically, I suppose, I can hire an

16  attorney's firm and they can send out letters to

17  all these people, but we don't do that.

18    Q. When you say, "we don't do that," what do

19  you mean?

20    A. As a company, we're not really very

21  litigious.

22    Q. But you sent a letter to Mr. Keating?

Page 174

1    A. Of course.

2    Q. Why do you say, of course?

3    A. Because he was marketing purposefully, I

4  think, a confusingly similar mark right on the

5  coat tails of our product.

6    Q. I think we were asking or the issue came

7  up earlier about what Brux XXX was associated

8  with.  If you look on Exhibit 138, this answers

9  the question as to what material -- excuse me,

10  what the goods and services are associated with

11  that application.  Do you want to take a look and

12  you can educate yourself on that.

13    A. I see that.

14    Q. What goods and services is the mark Brux

15  XXX associated with?

16    A. It looks like to me exactly what our

17  comfort bite splints are.  That is a mouth guard.

18  It's for helping people who grind their teeth save

19  their teeth.  They could have expensive dental

20  work that they don't want to destroy or afraid of

21  the damage they might do to their own teeth.

22  That's what a bite splint is for.  It's generally

Page 175

1  made out of plastic.  This may very well be

2  something that's custom fit.  I don't really know

3  if it's prefabricated and supposed to fit

4  everybody and anybody.  I don't know.  I have

5  never really looked into it that close.  I don't

6  know if this would tell me if I did.  I'm not

7  familiar with their product.

8    Q. Now, in the description, it says right on

9  Exhibit 138 for treatment of bruxism.

10    Do you see that?

11    A. Are you talking about under "Goods and

12  services"?

13    Q. Yes.

14    A. I see that.

15    Q. That's not a surprise to you, correct,

16  because you know from working in the dental

17  industry that mouth guards is one of the products

18  that will be used to try to treat people who have

19  bruxism; correct?

20    A. I think it's kind of confusing to use

21  that language.  I understand it if someone does.

22  I think of a mouth guard as something that's

Page 176

1  removable that a person wears in sports to protect

2  their teeth in case they collide with another

3  player, hit in the head with a hockey stick.  I

4  think of this more as a bite splint.  It could

5  be -- I guess that really is one of the marks we

6  have too.  I've never registered it.  Maybe when

7  you go on the USPTO site, it doesn't give more

8  options than this.  I'm not that familiar with it.

9    I do think that is confusing because I

10  think a lot of people think of a mouth guard as

11  something you can even buy prefabricated and just

12  for kids playing football.  The bite splint we

13  make, and I know we make thousands every week,

14  they're custom fit for the particular patient and

15  they're made of plastic and made according to a

16  doctor's prescription, and they're made for a

17  specific purpose and, of course, the doctor is the

18  one prescribing it, but it's for a patient that

19  apparently suffers from grinding and clenching.

20    Q. It's a product for bruxers; correct?

21    A. Absolutely.

22    Q. And Exhibit 138 seems to be trying to

Page 177

Pages 174 to 177

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-195-

10/25/2012        James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.        Keith Allred

1  register a name for a similar product for bruxers;
2  correct?
3       A.  It looks like most of these were that,
4  yes.
5       Q.  Actually, you're anticipating my
6  questions.
7            What's shown here in Exhibits 131
8  through 138 are examples of products all designed
9  for bruxers; wouldn't you agree?
10      A.  Yes, absolutely.
11      Q.  Exhibit 137, for example, is also
12  Bruxcure, and it also says under "Goods and
13  services," mouth guards for medical purposes.
14           Do you see that?
15      A.  I do.  There, again, I see the fact that
16  it says mouth guards, and I think ideally it would
17  say a bite splint or perhaps a mouth protection
18  device or something like that just to avoid
19  confusion.  But I know what they're talking about.
20      Q.  And the name in and of itself is telling
21  you something about the purpose for which the
22  product is being used?
                                    Page 178

1       Q.  Also to treat bruxers; would you agree?
2       A.  I'm guessing, like you say, from the name
3  Bruxgard, but I don't really know.  It could be a
4  mouth guard.  I assume they just have to do it
5  that way.  It must be the only option they have
6  under the way the registration system works here.
7  I'm just guessing at that.
8       Q.  So you don't recall seeing these
9  registrations before?  You think you may have,
10  you're not sure?
11      A.  I'm pretty sure I would have if any of
12  these were prior to June of 2009.  Yeah, 2009,
13  June.  If they were around the time that I would
14  have looked again when we were filing a trademark
15  for the blank, I might have seen them.  I don't
16  know if I did or not, but I wouldn't have been
17  alarmed about it because of the fact of our prior
18  registration being in a different class all
19  together and being so related to what it was our
20  business was.  I should check this out, though.
21  It's on my birthday of this year.
22      Q.  Now, earlier you said that Glidewell's
                                    Page 180

1       A.  That's really all I have to go by.  For
2  instance, this would be very similar for how our
3  goods would be described for the Playsafe mouth
4  guard, but it has nothing to do with bruxism.
5       Q.  And you don't have brux in the name of
6  that product; right?
7       A.  Not at all.
8       Q.  But you do have brux in the name of the
9  BruxZir product, the full contour zirconia crown
10  as it's registered; correct?
11      A.  That is correct.
12      Q.  And that is a product that was developed
13  for bruxers; correct?
14      A.  It really was not developed for bruxers.
15      Q.  Well, Glidewell's marketing materials say
16  it's ideal for bruxers; correct?
17      A.  I think that's good marketing.
18      Q.  Exhibit 131, the first one here,
19  Bruxgard, spelled B-r-u-x-g-a-r-d, is also for
20  dental mouth guards for medical purposes.
21           Do you see that?
22      A.  I do.
                                    Page 179

1  not a litigious company; correct?
2       A.  That's correct.
3       Q.  It sounds like an exception was made for
4  what's going on here with Keating Dental Arts; is
5  that correct?
6       A.  Not exactly.  Any company that did what
7  Keating Dental Arts had done we would have
8  followed the same course.
9       Q.  Okay.  And have you followed the same
10  course with other companies?
11      A.  There's no other company that's done
12  that.  But we would if any other company had.
13      Q.  So the only trademark infringement
14  lawsuit that Glidewell's filed has been against
15  Keating Dental Arts; is that correct?
16      A.  That's correct.
17      Q.  And you made the comment that Keating
18  Dental Arts purposefully was infringing
19  Glidewell's mark; correct?
20      A.  That's correct.
21      Q.  Why do you say "purposefully"?
22      A.  Well, I know that he would have been
                                    Page 181

                                    Pages 178 to 181

e6da25e8-8aba-4d68-964c-5de55b761039
**EXHIBIT 6**
-196-

1  aware of our use of the mark and that he would
2  have copied it in what he did just as others have
3  copied it.
4      Q. Why do you say he copied it?
5      A. It's pretty obvious. It's very
6  confusingly similar to exactly what our mark is.
7      Q. First of all, what's your understanding
8  of what Keating Dental Arts mark is that's at
9  issue in this lawsuit?
10     A. The fact he's using a word that's
11 confusingly similar to our mark and marketing the
12 goods in the same class to the same people.
13     Q. What goods is he marketing?
14     A. Full contour zirconia crowns.
15     Q. And what's he calling them?
16     A. He calls them KDZ Bruxer.
17     Q. So why is KDZ Bruxer confusingly similar
18 to Glidewell's mark?
19     A. Because it looks and sounds very similar.
20     Q. And why do you say it looks similar?
21     A. Easily confused and I think we have
22 examples of that.

Page 182

1      A. I see that.
2      Q. I also see midway through the page
3  they're introducing the all-new KDZ Bruxer written
4  out in two words, KDZ space B-r-u-x-e-r.
5          Do you see that?
6      A. I see that.
7      Q. And it's characterized as full contour
8  zirconia solution available exclusively from
9  Keating Dental Arts.
10         Do you see that?
11     A. I do see that.
12     Q. What is it about this presentation, for
13 example, Exhibit 139 that is, you believe,
14 confusingly similar to Glidewell's mark BruxZir
15 shown in Exhibit 122 spelled B-r-u-x-Z-i-r?
16     A. Obviously because four times on the page
17 he went out of his way to emphasize B-r-u-x.
18     Q. Why do you say he's emphasizing B-r-u-x?
19     A. It says, "All new KDZ Bruxer," "The
20 all-new KDZ Bruxer." Before that, it's
21 "Exclusively from Keating Dental Arts," not KDZ
22 arts. And you come down here, and it says "The

Page 184

1      Q. Why is it obvious to you?
2      A. When I look at it, it looks very similar.
3      Q. All right.
4      MR. JANKOWSKI: Let's have the court
5  reporter mark as Exhibit 139.
6          (Exhibit No. 139 was marked for
7          identification.)
8  BY MR. JANKOWSKI:
9      Q. Exhibit 139 is a copy of Exhibit B to the
10 complaint in this action.
11     Mr. Allred, do you recognize Exhibit 139?
12     A. I recognize it.
13     Q. And because it's attached to the
14 complaint as Exhibit B, I assume this is an
15 example of the use of Keating Dental Arts' mark
16 that Glidewell is concerned about being
17 confusingly similar; is that correct?
18     A. That's correct.
19     Q. And in this document, I see the KDZ
20 Bruxer, the stylized logo at the bottom of the
21 page with the TM next to it.
22         Do you see that?

Page 183

1  KDZ Bruxer" and down there, a stylized logo, KDZ
2  Bruxer. There's not a thing on that page that has
3  anything to do with bruxism other than in his
4  mark. So I think it's obviously purposefully
5  aimed at riding on the coat tail of our mark. We
6  saw it before. We just never had anyone so
7  blatantly and just continue to do it. That's why
8  we had to file a case in U.S. District Court.
9      MR. JANKOWSKI: Let me make another
10 exhibit here. Let me mark as 140 a one-page
11 document which is a letter from Leonard Tachner to
12 Thomas Gourde, dated May 31, 2011. I believe it's
13 attached as Exhibit C to the complaint.
14         (Exhibit No. 140 was marked for
15         identification.)
16     THE WITNESS: Am I done with this?
17     MR. JANKOWSKI: You can set it down if
18 you'd like, but we're not done with that. I just
19 want to set the time frame here that we're talking
20 about.
21     THE WITNESS: Okay.
22 ///

Page 185

Pages 182 to 185

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-197-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

BY MR. JANKOWSKI:
1   Q. You mentioned earlier that Glidewell sent
2   a letter to Keating Dental Arts associated with
3   this. Is this the letter you're referring to
4   marked as Exhibit 140?
5       A. I think it is because this looks well
6   before even our opposition to the mark before the
7   Patent and Trademark Office.
8       Q. And in this letter, Glidewell is
9   providing its position to Keating Dental Arts
10  about the confusingly similar appearance that
11  you're testifying about today; correct?
12      A. That's correct.
13      Q. And so the time frame we're talking about
14  is May, 2011; correct?
15      A. Yes.
16      Q. And it's about that time that you
17  discovered that Keating Dental Arts was using KDZ
18  Bruxer, spelled B-r-u-x-e-r, as a mark; correct?
19      A. No, I think this is probably within days
20  of discovering that he had filed for a trademark.
21      Q. When did you first discover or is there

Page 186

1   an earlier letter you're thinking about?
2       A. If this is the first letter, then this is
3   probably days after I first learned that he had
4   filed for a confusingly similar mark before the
5   Patent and Trademark Office and was subsequently
6   educated that we couldn't do anything about it
7   until it was published in the Gazette. So I know
8   we wouldn't have done anything more than something
9   like this prior to our formal opposition when it
10  was published in the Gazette.
11      Q. Let me provide you with another document.
12  This was previously marked as Exhibit 29.
13      A. Okay.
14      Q. This is a letter dated August 9, 2011,
15  from Robin Bartolo to Shaun, spelled S-h-a-u-n.
16      So Exhibit 29 is also a letter sent from
17  Glidewell to Keating Dental. Is that correct?
18      A. That's correct.
19      Q. It's also associated with the BruxZir
20  mark that Glidewell has; correct?
21      A. That's written right in here. BruxZir
22  coloring liquid and BruxZir instruction manual.

Page 187

1   Q. Right.
2       So both Exhibit 29 and Exhibit 140 are
3   letters that Glidewell sent to Keating Dental Arts
4   basically expressing its position that Keating's
5   mark is confusingly similar to the registered
6   mark. Is that fair?
7       A. That's fair.
8       Q. Now, at that time in 2011, all-zirconia
9   crowns were being used predominantly for bruxers;
10  correct?
11      A. That wouldn't be true.
12      Q. Why do you say that wouldn't be true?
13      A. It's just a fact.
14      Q. What do you base that understanding on?
15      A. Based on the fact that doctors prescribed
16  crowns they thought were what they wanted to use
17  for a patient. A patient wasn't necessarily a
18  bruxer.
19      Q. But you were well aware that the BruxZir
20  product when it was released in 2009 was
21  considered a crown that was not very esthetically
22  pleasing; correct?

Page 188

1       A. That's not correct. The crowns we sold
2   were esthetically pleasing as anything you could
3   get at that time because what you'd compare it to,
4   a solid gold crown and our crowns would be
5   considerably more esthetically pleasing more than
6   a gold crown at least to most people that ended up
7   going with this option. Doctors would have
8   educated patients on their options, and we know
9   just from our business experience that a lot of
10  patients don't want gold crowns in their mouth.
11  So they would prefer this over a gold crown.
12      Q. But the patients that you're talking
13  about who are having to decide between, for
14  example, gold and full contour zirconia are
15  patients who can't have the more esthetic crowns
16  such as crowns with porcelain on top; correct?
17      A. That's not correct. That's probably --
18  more crowns today are prescribed for patients that
19  probably have bruxism that are PFMs than anything
20  else. Certainly not that many gold crowns which
21  would be the optimal solution for a patient that
22  had bruxism.

Page 189

Pages 186 to 189

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-198-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1    Q. Okay. That's a good example. So PFMs
2  are crowns that are more esthetically pleasing
3  than a full contour zirconia crown; correct?
4    A. It's kind of hard to say because PFM
5  means porcelain fused to metal, and there is such
6  a thing as porcelain fused to zirconia, and I
7  don't know that porcelain fused to metal is more
8  attractive than porcelain fused to zirconia. I
9  guess I should argue it's not.
10   Q. First of all, I want to go back to this
11  time frame, back to 2009 to -- mid 2009 to mid
12  2011 time frame. Okay?
13   A. Okay.
14   Q. At that time frame, the full contour
15  zirconia crown was considered something that
16  wasn't that esthetically pleasing. It was not
17  being promoted by Glidewell for heavy use in the
18  anterior region. It was promoted for use in the
19  posterior part of the mouth because it was not as
20  esthetic as other crowns that are available;
21  correct?
22   A. We definitely did not promote it as an

Page 190

1  anterior crown and bridge system at the time and
2  still do have better options for that since that
3  region doesn't have the same type of forces
4  irrespective of whether a person is a bruxer or
5  not, and even bruxers don't necessarily destroy an
6  anterior crown. I'm not an expert on that. I'm
7  not a dentist. Generally, veneers -- I haven't
8  heard them contraindicated for bruxers, and
9  they're generally made of the weakest material
10  there is, and that strictly is the glass.
11   Q. Again, at this time, 2009 to mid 2011
12  time frame, full zirconia crowns would have been
13  promoted by Glidewell and others as an alternative
14  to gold for their bruxer patients. Isn't that
15  true?
16   A. As an alternative to gold. Gold is a
17  premium restoration and dental technicians think
18  that it's the best whether or not they themselves
19  are bruxers. The thing about gold is that it's
20  only the thickness of the metal. It has a lot
21  more applicability than something that's going to
22  have a metal and then a ceramic over it. Even

Page 191

1  then purchasers don't like it, but there's not a
2  whole lot you can do about it unless you sent the
3  work back to the doctor who prepared the teeth,
4  and you wouldn't do that because he's already
5  given you what he wants to build a crown on.
6  So as an option, you could use a full contour
7  zirconia crown because there you have only the
8  thickness of the ceramic, and there is no metal
9  underlying it, and at the same time, it arguably
10  will last as long as gold. So you could call it a
11  gold substitute in a lot of situations where
12  ordinarily you can only use gold.
13   Q. In fact, I've heard testimony --
14   A. I say gold. I should say metal. In
15  other words, you could have a metal crown that was
16  made out of chrome cobalt. It's just that you
17  know what that would look like. It would look
18  like your car bumper.
19   Q. Mr. Friebauer testified yesterday the
20  development of the BruxZir crown was an attempt to
21  give Dr. DiTolla a more tooth-looking gold crown
22  which is what he had always wanted. Are you

Page 192

1  familiar with that?
2    A. That's probably a way of saying it. I
3  think, in my own mind if I heard that, and I would
4  think of maybe the idea behind what those words
5  would be is more in the way of -- I wouldn't say
6  it was a joke. I don't know -- maybe I'll think
7  of the right word for it, but it would be more if
8  you would ask a doctor, "How would you like a
9  white-colored gold crown," and, of course, that
10  would be a joke because "Oh, yeah, sure, do you
11  got it?" Of course, you don't because there's no
12  such thing as a white-colored gold crown.
13        That would be similar to whatever
14  language -- I don't know exactly what you just
15  said. That just kind of reminded me of something
16  that could be said to a doctor if you were giving
17  him an option of a gold crown for this patient, or
18  how many doctors here would like a tooth-colored
19  gold crown? And then I'm sure doctors would maybe
20  go to raise their hand but wouldn't bother
21  because, yeah, sure, that doesn't exist. But then
22  the idea is, "Oh, well, maybe it does." "Here's

Page 193

Pages 190 to 193

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-199-

1  an all ceramic that could be a replacement for
2  your next prescription for a gold crown."
3      Q.  And the truth of the matter is Glidewell
4  is absolutely trying to make the all-zirconia
5  crowns look as much like a tooth as they can?
6      A.  Of course.
7      Q.  And as you said, zirconia, one aspect of
8  it, is in terms of function, it is a lot more like
9  gold than any of the earlier solutions that were
10  more aesthetic.  Is that fair?
11     A.  I don't really -- it may be what you're
12  thinking, and I would agree with that.  But what
13  you're saying, I couldn't agree with it.  I don't
14  know what you mean by "much more like gold."  It's
15  obviously not metal.
16     Q.  More like gold meaning you can use it in
17  applications such as for bruxers where you would
18  use gold.  You can substitute the full contour
19  zirconia.
20     A.  I wouldn't actually agree to that.  You
21  can use a gold crown for anybody.  I have a gold
22  crown, and I'm not a bruxer.

                                         Page 194

1  15,000, say, BruxZirs a week.  How many you think
2  a dentist does a week?  Maybe two a month.  The
3  labs see hundreds of thousands of models of
4  patients.  They have a different appreciation for
5  something that's going to last and its properties
6  than even dentists.  So that's where a dental lab
7  would think a gold crown is the optimum
8  restoration just like the mummy, the Pharaoh.  I
9  mean that's not the way a dentist necessarily
10  thinks.  Maybe they think whatever the patients
11  like.
12     I assume there's a two-way communication,
13  and they're giving the patient the options and
14  there's some kind of informed consent, and they're
15  giving the patient what he wants.  Apparently most
16  patients don't like gold, and it's been that way
17  for a long time.  When it comes to porcelain fused
18  to metal crown, gold is arguably, I would agree, a
19  superior coping material, but that's probably the
20  fewest of all the PFMs is going to be with the
21  precious metal coping.  Most of them will be with
22  a nonprecious metal coping or maybe a semiprecious

                                         Page 196

1      Q.  I'm not saying I'm limiting it to
2  bruxers.  I'm saying any application you can use
3  gold for, you can use the full contour zirconia
4  crown as well and be more aesthetic than the gold.
5      A.  That's true.  You can say the same thing
6  for PFM.
7      Q.  I don't think you can, though; right?
8  There are bruxer patients that will destroy the
9  PFMs that won't destroy the gold; correct?
10     A.  That's not correct.  A bruxer patient
11  will destroy anything, even destroy their car
12  bumper crown.  They'll chew through anything.
13  They destroy their own dentation.  They lose all
14  their teeth.  They destroy their jaws.  They need
15  TMJ.  They need to have their whole faces rebuilt.
16     Q.  But the gold and zirconia solutions are
17  an optimal solution and a better solution for
18  grinders; correct?
19     A.  Maybe to a dental lab.  You'd be
20  surprised how few doctors actually work with gold.
21     Q.  I'm not following what you're saying.
22     A.  Dental labs, they know.  They see.  We do

                                         Page 195

1  metal coping.  Nonprecious would be the strongest,
2  and it could be the thinnest; so that would be an
3  option that probably doctors would consider and
4  suggest to a patient.  Porcelain fused to
5  nonprecious metal, and that's what they've been
6  doing for years and years and years, and that's
7  what they're doing now.
8      Q.  Prior to Glidewell coming out with a
9  BruxZir crown, gold was considered the best
10  solution for bruxers for crowns in the back;
11  correct?
12     A.  I'm just talking between you and me as a
13  person that works for a lab and has an
14  understanding of things that might be idealic.
15  That's all.  There's very few gold crowns
16  prescribed compared to all crowns prescribed in
17  the United States.  A very small number.
18     Q.  You don't have an understanding as to
19  whether dentists in 2009 or 2010 would have been
20  prescribing gold crowns for their bruxer patients?
21     A.  Some would but only doctors who prescribe
22  gold crowns.  Not that many do.

                                         Page 197

                                    Pages 194 to 197

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-200-

1      Q. Why do you say not that many do it?

2      A. It's just the numbers. I don't know why

3   they do or don't.

4      Q. Are you aware that Dr. DiTolla has

5   testified he thinks gold is the best solution for

6   bruxers?

7      A. Sure.

8      Q. At the time Keating Dental Arts was

9   marketing its new KDZ Bruxer crown at that time,

10   gold would have been a popular choice as a crown

11   for bruxers; correct?

12      A. It's not in our numbers.

13      Q. I'm just asking about what dentists

14   prefer in terms of materials used in crowns.

15      A. We would only know by what they

16   prescribe.

17      Q. How do you know what dentists are

18   prescribing?

19      A. Because we get their prescription and we

20   fill the order. That's our business.

21      Q. And how do you know if it's for bruxer

22   patients?

Page 198

before KDA Dental Arts. The same thing goes for

2   everyone, not just KDA Dental Arts, and before

3   that, many labs were using porcelain fused to

4   zirconia crowns and that goes back even further.

5      Q. Are you aware that Mr. Keating testified

6   that he came out with this product to meet the

7   requests of his dentists who wanted a stronger

8   crown that wasn't gold for his bruxer patients?

9      A. I'm not aware of his testimony. I know

10   he did have his deposition taken, but I have no

11   idea what he said.

12      Q. Does that surprise you to hear that?

13      A. It doesn't surprise me that someone would

14   say that.

15      Q. Why do you characterize it that way?

16      A. It just makes sense that someone would

17   say something like that. It sounds like our

18   marketing.

19      Q. Because he's marketing this product to

20   dentists to use with their bruxer patients;

21   correct?

22      A. I don't see him mentioning bruxer

Page 200

1      A. We don't know.

2      Q. Well, then you don't know whether

3   dentists at the time that Keating Dental Arts was

4   marketing its new product in May, 2011, whether

5   dentists were choosing gold as the preference of

6   choice for their bruxer patients; is that correct?

7      A. That's not what I'm saying. What I'm

8   saying is our numbers show that very few doctors

9   prescribe gold crowns. That's all I'm saying.

10      Q. What I'd like you to do is answer my

11   question which is at the time that Keating Dental

12   Arts was coming out with the KDZ Bruxer, at that

13   time, gold was a popular choice as a material to

14   use for bruxer patients who had destroyed other

15   crowns?

16      A. Not based on our numbers. Our numbers

17   show that it is prescribed very infrequently.

18   Period.

19      Q. So your answer is no to that?

20      A. On many levels. He came out with his --

21   you mean he came out with his full contour

22   zirconia crown. Other labs were selling those

Page 199

1   patients in there at all.

2      Q. Well, I see the word "bruxer."

3      A. Only in his mark. It's not in there

4   anyplace else.

5      Q. If I'm a dentist, and I see the word

6   "bruxer," isn't that going to tell me this is for

7   bruxer patients?

8      A. You mean it might suggest to a dentist

9   that if the word "bruxer" is in there, it must be

10   strong enough to even hold up to a bruxing patient

11   and thereby be a ceramic that is very durable?

12   You mean that? Is that what you're saying?

13      Q. No.

14      A. Oh, I don't know what you're saying then.

15      Q. I'm saying I'm a dentist reading this ad,

16   Exhibit 139. I see the word "bruxer" in it.

17      A. Okay.

18      Q. I'm going to think of a patient suffering

19   from bruxism; correct?

20      A. I'm going to think probably a lot of

21   dentists looked at this and thought of what we've

22   been advertising for all of the time before this.

Page 201

Pages 198 to 201

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-201-

1    A full contour zirconia crown.  And I'm thinking
2 what went through their minds is what I just
3 described to you.
4    Q.  So I'm a dentist and I went to dental
5 school.  I learned about bruxism.  I learned about
6 bruxers.  I've known about it for decades.  Now I
7 read this, and I'm going to think that Mr. Keating
8 is misspelling Glidewell's trademark?  Is that
9 what you're saying?
10    A.  I think that he probably is trying to
11 ride on the coat tails of a company that spent a
12 lot of money advertising a crown that is
13 confusingly similar to ours.  So I think they
14 probably would be thinking that they would be
15 getting material -- a crown made from a material
16 exactly as ours would be.
17    Q.  Well, right in the middle of Exhibit 139
18 it says, "Exclusively from Keating Dental Arts."
19    A.  Exactly.
20    Q.  Well, if he's confusingly similar to your
21 crown, why is he saying that?
22    A.  I would think that probably that has to

                        Page 202

1    same thing?
2    A.  Trying to ride on the coattails of all
3 the advertising that Glidewell Laboratories has
4 done in introducing it's full contour zirconia
5 crowns.
6    Q.  And when you say, "ride the coat tails,"
7 what does that mean?
8    A.  Well, we put a lot of money into
9 advertising that mark, and it's got a favorable
10 review by a lot of dentists, and when doctors see
11 something like that, they can confuse that with
12 ours because it looks very similar.
13    Q.  Because of the word bruxer?
14    A.  Especially the b-r-u-x.
15    Q.  What about the e-r on the end of b-r-u-x?
16    A.  That would be confusing too.
17    Q.  What about the KDZ part?  That part
18 confusing?
19    A.  Definitely the Z.  Sounds like the
20 zirconia they probably heard about.
21    Q.  It makes sense to have a Z for zirconia
22 because this is Keating Dental Arts full contour

                        Page 204

1    do with the fact that it's all new.  All new.
2 Something like maybe he's making his own material.
3 I don't know.  Do you think?  Is that what it
4 would be?  I don't know.
5    Q.  That's my question for you.  What is it
6 that you think -- what connection between Keating
7 Dental Arts and Glidewell are you thinking is
8 going to be in the minds of dentists when they see
9 Exhibit 139?
10    A.  I'm thinking they see that and it's
11 something they heard of before because they've
12 been advertised to and they've maybe seen reviews
13 about it in dental magazines and so they think
14 this is the product that they heard about, others
15 talking about, maybe other dentists that have used
16 it and liked it.  Maybe they saw something at one
17 of the dental shows they went to for CEU education
18 talking about something that Glidewell
19 Laboratories came out, and I'm pretty sure that's
20 exactly what he's trying to do because we know
21 others have tried to do the same thing.
22    Q.  When you say "the same thing," what's the

                        Page 203

1    zirconia crown; correct?
2    A.  It doesn't seem to me that way.  It seems
3 like it would be more like KDA Bruxer, not KDZ
4 Bruxer.
5    Q.  You're aware that Keating Dental Arts has
6 other zirconia products that are called KDZ;
7 correct?
8    A.  I think that just happened right about
9 the time he started doing this.  I don't know of
10 that ever happening before that.
11    Q.  Well, he had a product called KDZ that
12 was a zirconia product that used KDZ and that was
13 before the KDZ Bruxer, spelled B-r-u-x-e-r, came
14 out.  Are you aware of that?
15    A.  I'm not.
16    Q.  In fact, he was selling it as far back as
17 2006.  Are you aware of that?
18    A.  I'm not.
19    Q.  So the KDZ by itself is not confusingly
20 similar with Glidewell; do you agree?
21    A.  The KDZ has nothing to do with Glidewell
22 anymore than any of the other authorized dental

                        Page 205

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-202-

1    labs that actually sell the BruxZir product. It
2    could be a name of any dental laboratory.
3        Q. And, in fact, I mean when I see KDZ here,
4    it looks to me like Keating Dental Zirconia.
5    Would you agree?
6        A. I guess in hindsight you can make it say
7    anything you want. To me, it's kind of funny that
8    it says that when I've actually seen on his --
9    some of his information he does use KDA for his
10   product.
11       Q. Okay. And KDA is an acronym for Keating
12   Dental Arts; correct?
13       A. That makes more sense to me because we
14   don't have authorized dental labs, and say the
15   name is Keller, and then they all of a sudden they
16   change the two Ls to Zs. They'd say Keller and
17   then they have our brand name. They don't change
18   their name to Keller spelled with two Zs instead
19   of two Ls and then put bruxer after it. It seems
20   like that's what he's done here. Instead of KDA,
21   it's KDZ.
22       Q. So even the KDZ aside from the Bruxer you
                                        Page 206

1    think is suggestive of Glidewell Laboratories?
2        A. I think it could be. If someone
3    remembers the B-r-u-x and the fact it had a Z in
4    it, and they see KDZ Bruxer, I think that can be
5    confusing. In fact, we know there were persons
6    who were confused about the fact they thought he
7    was actually selling our product.
8        Q. What are you referring to? What people?
9        A. Persons that prescribed our crown on his
10   Rx's and used our brand name.
11       Q. How do you know what's been prescribed on
12   his forms?
13       A. They wrote it down in the prescription
14   blank. They wrote our brand name on their
15   prescription form.
16       Q. Now, have you seen this?
17       A. I have.
18       Q. And when did you see this?
19       A. Fairly recently. In the last three
20   months, I'd say.
21       Q. And how did you get those prescription
22   forms?
                                        Page 207

1        A. You provided them to us.
2        MR. TACHNER: There were redacted forms
3    used in my opposition to your motion to amend the
4    answer.
5        MR. JANKOWSKI: They were redacted in --
6    I'm sorry. They were submitted -- they were filed
7    with the court?
8        MR. TACHNER: Yes.
9        MR. JANKOWSKI: In connection with which
10   motion?
11       MR. TACHNER: You filed a motion to amend
12   your answer. We filed an opposition. In that
13   opposition, two redacted forms that the witness is
14   referring to were included, and a copy of that
15   opposition was sent to the client including the
16   witness. Now, that's exactly the way the
17   confidentiality agreement says we can show the
18   court material that you've marked attorneys eyes
19   only, which is to redact the material that caused
20   it to be so marked. We redacted the name of the
21   doctor and the name of the patient.
22       MR. JANKOWSKI: Okay. I just don't
                                        Page 208

1    recall the filing itself or even seeing the
2    filing.
3        MR. TACHNER: You'll have to check it
4    out.
5        MR. JANKOWSKI: It wasn't in connection
6    with the partial summary judgment motion?
7        MR. TACHNER: No.
8        MR. JANKOWSKI: So this is the recent
9    motion?
10       MR. TACHNER: This is your motion.
11       MR. JANKOWSKI: Okay.
12   BY MR. JANKOWSKI:
13       Q. So aside from what you might have seen in
14   the last three months and, again, going back to
15   the time frame May, 2011, when Exhibit 140 was
16   sent to Keating Dental Arts, you hadn't seen any
17   prescription forms of Keating Dental Arts at that
18   time; correct?
19       A. You're talking about now No. 140?
20       Q. Yes. Going back to the time frame of
21   Exhibit 140.
22       A. Okay. At this time, I don't believe that
                                        Page 209

Pages 206 to 209

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-203-

1   he was using this mark in commerce.  I have no
2   knowledge of it if he was.  This was the first
3   time, days before this date I'm pretty sure, that
4   I first became aware of his application for the
5   mark, and that's really all I know at that time is
6   that he had applied for the mark.  I'm not aware
7   of the fact he was actually using it in commerce
8   anyway.
9       Q.  I'll represent for you that Keating
10  Dental Arts has provided information in the case
11  that shows that the KDZ Bruxer was associated with
12  a full zirconia crown and that name was being used
13  at least as early as May, 2011, and perhaps as
14  early as April, 2011.  So with that representation
15  in mind, when this letter was being written or you
16  authorized Exhibit 140 to be sent, you were not
17  aware of incidences of actual confusion between
18  Mr. Keating's products and Glidewell's mark;
19  correct?
20      A.  That's correct.
21      Q.  Now, you're saying other parties have
22  also been riding the coat tails of Glidewell's

Page 210

1   mark; correct?
2       A.  That's true.
3       Q.  Is that also by using the word brux,
4   b-r-u-x?
5       A.  Sometimes that and sometimes b-r-u-x-e-r.
6       Q.  Sometimes bruxer, b-r-u-x-e-r?
7       A.  Yeah.
8       Q.  Now, you would agree that Mr. Keating and
9   these other parties can use the word bruxer in
10  their promotional materials to refer to patients
11  with bruxism; correct?
12      A.  I think that that is something that's
13  permitted.  We don't stop anyone from doing that.
14  That isn't anything he did do here.  I don't think
15  it's great marketing to pigeonhole a product that
16  way, and he probably sees it that way too because
17  it's not mentioned in his advertising anywhere in
18  here, but someone could do that, ideal for
19  bruxers.
20      Q.  In fact, ideal for bruxers is a saying
21  Glidewell uses, correct, in its marketing?
22      A.  I'd have to look at it, but it seems like

Page 211

1   we do talk about that.
2       Q.  It also uses the motto, "More brawn than
3   beauty"; correct?
4       A.  That's true.  That was something early on
5   was decided would be some effective marketing.
6       Q.  And Mr. Keating can refer to his full
7   contour zirconia solution as ideal for bruxers as
8   well; correct?
9       A.  I guess he could.  I don't see his doing
10  that, but I'm sure he could.  Instead it's
11  uncompromising esthetics, outstanding strength,
12  and flawless fit.
13      Q.  It sounds like he's promoting the
14  product, which is understandable; correct?
15      A.  Definitely.
16      Q.  And does he do anything on here that's
17  trying to suggest to the dentists that he's
18  affiliated as an authorized lab of Glidewell
19  Laboratories?
20      A.  He does not have anything on there saying
21  he's an authorized lab, no.
22      Q.  And, in fact, at this time, May, 2011,

Page 212

1   Glidewell had its authorized lab program in place
2   for some time; correct?
3       A.  I don't know how long it had been in
4   place, but we can look into that.
5       Q.  And there were a number of authorized
6   labs, a large number of authorized labs of
7   Glidewell Laboratories by May, 2011, right?
8       A.  For sure, yes.
9       Q.  And those labs would be using BruxZir;
10  correct?
11      A.  That's correct.
12      Q.  Which Mr. Keating is not using; correct?
13      A.  He's not.
14      MR. JANKOWSKI:  Why don't we take a short
15  break.
16      (Recess taken from 3:55 p.m. to
17  4:07 p.m.)
18  BY MR. JANKOWSKI:
19      Q.  I'm going to show you an exhibit that the
20  court reporter has marked as Exhibit 141.  It's a
21  document produced by Glidewell in this case
22  bearing production No. GL 241 from page 25 of 99

Page 213

Pages  210  to  213

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-204-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

1  to 49 of 99. I'll have you take a look at that
2  exhibit.
3          (Exhibit No. 141 was marked for
4  identification.)
5      THE WITNESS: This name looks familiar.
6  BY MR. JANKOWSKI:
7      Q. That's my question actually. Do you
8  recognize -- it's a series of e-mails with
9  correspondence that includes your name on it. I'd
10 like you to tell me if you recognize this.
11     A. I recognize that.
12     Q. And, in fact, we've been discussing today
13 about third parties using marks that might be
14 confusingly similar to Glidewell. Is this similar
15 to correspondence you had with a third party that
16 you believe was using a mark that was confusingly
17 similar to Glidewell's mark?
18     A. Yes.
19     Q. And so this is -- again, this was
20 produced to us this way by Glidewell. This is a
21 true and correct copy of the correspondence you
22 had with this third party?

                                    Page 214

1      Q. I see on page 48 of 99, it looks like
2  you're making a reference to -- first of all, let
3  me just state, for the record, your e-mail is
4  dated January 19, 2011. It's being sent to Fusion
5  Dental Lab Solutions; correct?
6      A. Yes, and I remember that name too because
7  that was the first infringement letter I ever
8  sent, and that's the first infringement letter
9  I -- that's the first active infringement I am
10 aware of, and that is a front for crowns from
11 China, as I subsequently learned.
12     Q. On the page marked page 48 of 99, there's
13 the statement in your communication to Fusion. It
14 says, "Your promotion in Lab Management Today of
15 full solid bruxer, spelled b-r-u-x-e-r, zirconia
16 is using a similar mark where there's an
17 appreciable likelihood of confusion."
18        Do you see that?
19     A. I do.
20     Q. And bruxer is in all bold.
21        Do you see that?
22     A. I do.

                                    Page 216

1      A. Let me see here exactly how this is
2  arranged.
3      Q. It appears that it's, as e-mails often
4  are, the farther back in the document you get, the
5  earlier the communications are because the e-mails
6  get put later on top of earlier.
7      A. Okay. This is my recollection of it, and
8  I would just add that it actually began
9  January 19, and that would have been the first
10 e-mail. I'm not seeing anything else like a
11 picture of anything as an example which might have
12 been on the original. I don't know where it would
13 go if it ever had been there. It seemed like it
14 would have been probably showing up in there as
15 something that didn't print or something. I'm
16 just guessing. I'd have to go back to actually
17 the book that I sent or maybe it shows up later
18 on. I don't know.
19        Usually I put an example of what it is
20 I'm seeing where it looks like they're using the
21 very mark that is confusingly similar to ours. I
22 see I did put in there what the spelling of it is.

                                    Page 215

1      Q. This is an example of the word bruxer
2  being the source of the confusion in your mind;
3  correct?
4      A. Correct.
5      Q. Is it the appearance of the mark at all
6  or is it just the word bruxer, however it appears,
7  however font or color?
8      A. It is just the way that it appears there.
9      Q. Okay. And your interpretation here is,
10 again, that this is confusingly similar to
11 Glidewell's BruxZir mark; correct? This is
12 exactly what this letter is saying; correct?
13     A. That's true.
14     Q. If you turn to page 47 of 99; so move
15 forward one page, we get to see Fusion Dental
16 Lab's response to your letter.
17        Do you see that?
18     A. I do.
19     Q. How did they respond?
20     A. They responded with the fact that the
21 word "brux," they put it in quotes, is a common
22 clinical term for a person with bruxism.

                                    Page 217

                                    Pages  214 to 217

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-205-

1    Q.  Right.
2        Which is a true statement; correct?
3        A.  I think so.  I'm not a doctor, but I
4    think all doctors know what that would mean if
5    they saw that.
6        Q.  Right.
7        And that's all they say.  It's a very
8    short communication they sent; correct?
9        A.  That's true.
10       Q.  And then it looks like you followed up
11   with another communication after that, correct,
12   asking them to cease and desist despite their
13   explanation of what they think the word "bruxer"
14   means in their mark; correct?
15       A.  On the 21st?
16       Q.  Yes.
17       A.  Let me see and go back to this date.
18   5:03 p.m., yeah.  21st.  It looks like the next
19   morning.  Yeah, this looks like the 19th at
20   3:27 p.m., and by the next morning, they're going
21   to see if we're serious, and so I followed up with
22   a further explanation it looks like on the

Page 218

1    following morning.
2        Q.  And then on Friday, the 21st about
3    16 minutes later, they responded again and said
4    that the name of their crown is full solid bruxer
5    zirconia, and they say, "which is the description
6    of the type of crown we offer, a full solid bruxer
7    zirconia crown for bruxers, patient of bruxism.
8    Please read our advertisement precisely."
9        So they don't think they're trying to be
10   similar to Glidewell at all, do they?
11       A.  Naturally, not.  They would like to just
12   keep using that so long as they're allowed to.  Of
13   course, this is as of 2011, and we've already been
14   on the market now since June, 2009, and I don't
15   know how many millions of dollars we've spent.  So
16   sure, they would love it if they could just do
17   that.
18       Q.  But do you think they -- are they somehow
19   trying to copy Glidewell?  Is this innocent
20   infringement or malicious infringement?
21       A.  I don't know if you call it malicious,
22   but it's definitely intentional infringement just

Page 219

1    like you associate with China that they could get
2    away with anything that they do.  I'm surprised
3    they didn't say "made in Switzerland" while they
4    were at it.
5        Q.  If you turn to page 43 of 99, there's a
6    communication that you sent still on January 12.
7    Now it's in the afternoon.  This is in response to
8    them saying, "There's no confusing similarity
9    between the marks."  You state, "It is pronounced
10   the same, isn't it?"
11       Do you see that?
12       A.  I do.
13       Q.  I think you testified to that earlier as
14   well that that's one of the sources of the
15   confusion is the pronunciation; correct?
16       A.  That's a possibility.  You never know how
17   someone is going to pronounce something, of
18   course, but it's definitely giving them an
19   opportunity to say whatever they're going to say
20   next.  I see they say, "No, it's not pronounced
21   the same."  For them, it might not be.  Who knows.
22       Q.  On page 41 of 99, we're up to April 19.

Page 220

1    So this is a little further along in time.  It
2    looks like you were sending additional information
3    to them basically, a little stronger letter.
4        A.  That's correct.
5        Q.  And then I also see if I move forward to
6    page 39 of 99, I see something referencing the
7    notice of a filing of a complaint in U.S. District
8    Court.
9        Do you see that?
10       A.  I do.
11       Q.  So did Glidewell file a lawsuit against
12   Fusion Dental in district court?
13       A.  No.
14       Q.  I'm confused then.  What's been
15   referenced on page 39 of 99?
16       A.  It is a cease and desist letter in the
17   form of a notice of complaint.
18       Q.  This says, "Notice of filing of
19   complaint"?
20       A.  Right.  It says, "Subject, Notice of
21   complaint," and in block letters, "Notice of
22   filing of complaint."

Page 221

Pages 218 to 221

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-206-

1    Q. So you weren't trying to put them on
2  notice that you'd filed a complaint against them?
3    A. They might draw that conclusion from
4  that. I don't know that they knew that it had
5  been filed or hadn't at this point.
6    Q. Well, had you prepared a complaint to
7  file against them?
8    A. No, only this, something that would be --
9  something to get their attention. I especially
10 love the block letters.
11   Q. Right. I see that.
12     And did it get their attention?
13   A. Apparently, it did.
14   Q. And why do you say that?
15   A. They stopped using the infringing mark in
16 their advertising.
17   Q. I guess the communication on page 36 is a
18 repeat, it looks like, of the April 19
19 communication.
20   A. Well, maybe it's part of something that
21 precedes it.
22   Q. I think what it is is some of these

Page 222

1  very beginning here.
2    Q. What I'm inclined to do here --
3    A. I think that is the last one, and I think
4  it's just out of order. I think it might be the
5  last one, and all of these other ones were
6  earlier.
7    Q. Let me mark the exhibit in a way which is
8  going to be less confusing. If it's okay with
9  you, it looks to me like this is just repeating
10 what we just went through up to this
11 communication.
12   A. Yes. I think that would be the last one
13 and these others --
14   Q. That's the last one.
15   A. -- would be January 21.
16   Q. Let me try to rebuild it in that way. So
17 starting on 39.
18     (Discussion off the record.)
19     MR. JANKOWSKI: Let me just state, for
20 the record, then, Exhibit 141 is, for the record,
21 GL 241 from page 39 of 99 through 49 of 99.
22 ///

Page 224

1  communications seem like they're duplicated in the
2  production.
3    A. Maybe something precedes it and has that
4  as a part of it. It looks like the date is
5  January 19, 2011.
6    Q. Right. That's when they start.
7    A. It looks like right after that is
8  attached to it this second notice of trademark
9  infringement.
10   Q. The last communication I'm seeing on here
11 is the all capital letters communication that you
12 sent to Fusion on May 16, 2011.
13     Would you agree?
14   A. Let me see the date of that. That is
15 dated May 16, 2011.
16   Q. Right.
17   A. And these other things are dated --
18   Q. Everything after that seems to be
19 dated --
20   A. This is before that, or it's dated
21 January 21. That might be an attachment to
22 something prior to it. I'd have to go back to the

Page 223

1  BY MR. JANKOWSKI:
2    Q. Okay. Mr. Allred, I think you already
3  testified that -- so the communication you sent on
4  May 16, Notice of Filing of Complaint in U.S.
5  District Court, was successful. They did react,
6  and they changed the name of their product; is
7  that correct?
8    A. I don't know what they changed their name
9  to, but they did stop using the confusingly
10 similar mark.
11   Q. They changed it to a name you were
12 satisfied with?
13   A. Yes.
14   Q. That's why there's no more correspondence
15 on that?
16   A. Yes.
17     (Discussion off the record.)
18 BY MR. JANKOWSKI:
19   Q. So next I'm going to hand you a document
20 which has been marked by the court reporter as
21 Exhibit 142. It is -- it was produced by
22 Glidewell in this case with production Nos. GL 241

Page 225

Pages 222 to 225

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-207-

1  from page 54 of 99 through 57 of 99.
2      (Exhibit No. 142 was marked for
3      identification.)
4  BY MR. JANKOWSKI:
5      Q.  If you can just briefly look at that and
6  tell me if you recognize it.
7      A.  Pittman Dental.  I recognize that.
8      Q.  And, in fact, this is another situation
9  where there's multiple communications, a string of
10 communications.  I guess there's two in this
11 instance; right?  One on February 9, 2011, and one
12 on February 15, 2011?
13     A.  It looks like a notice that is
14 substantially similar to the very first one I ever
15 sent and then beyond that perhaps a response to
16 something they said.
17     Q.  Well, on the front page, it says, "Hello,
18 Rudy.  Thank you for your call and your
19 explanation."
20     It looks like to me like Pittman called
21 you.
22     A.  Okay.

Page 226

1      Q.  Do you have a recollection of that?
2      A.  Maybe if I read what I wrote here, I
3  would remember his call.
4      Q.  Sure.
5      A.  Okay.  I remember this.  But I don't
6  remember his call.
7      Q.  This is another instance of a third party
8  using a confusingly similar mark in the position
9  of Glidewell; correct?
10     A.  From the looks of it, he was calling and
11 must have expressed some kind of feeling about --
12 is there more to this?  Is there any other thing
13 from Pittman anywhere in the file?
14     Q.  I don't believe so.
15     A.  Okay.  So I responded.  It looks like I'm
16 still providing some arguments that might make
17 sense to him as far as why we would want to stop
18 him from using a confusingly similar mark.  It
19 doesn't look like we've necessarily reached an
20 understanding at this point.  So I don't know
21 what -- if there's any further things along here.
22     Q.  And if you look on page 56 of 99, you see

Page 227

1  the letter that you sent.  As I think you just
2  testified, it's very similar to the letter you
3  sent to Fusion Dental; correct?
4      A.  Similar.
5      Q.  Did you have a template letter you were
6  sending --
7      A.  Oh, yeah, you bet.  We have a place in
8  here that would change as far as what the mark was
9  they were using.
10     Q.  On page 56 of 99, you can see that
11 halfway down the page.  In this instance Pittman
12 was using BRUXER in all caps, B-R-U-X-E-R,
13 All-Zirconia Crown; correct?  That was the
14 confusingly similar mark?
15     A.  It looks like from the back.  That's
16 exactly what it looked like.
17     Q.  Here's an example where you did attach a
18 visual on the last page of Exhibit 142, correct,
19 of their mark?
20     A.  It looks like.  I'm not sure if that
21 printed.  I must have printed an image there, it
22 looks like.

Page 228

1      Q.  And you explained to Pittman Dental just
2  as you explained to Fusion how BRUXER was
3  confusing with Glidewell's mark; correct?
4      A.  Yes.
5      Q.  And if you look on the front page of
6  Exhibit 142, you make the same argument again that
7  BruxZir and BRUXER sounds the same; correct?
8      A.  I did write that.
9      Q.  Now, do you know, did Pittman change
10 their name?
11     A.  They did, yes.
12     Q.  I notice that you cc'd Robin Bartolo on
13 this e-mail.
14     Do you see that?
15     A.  I do.
16     Q.  And why are you cc'ing Mr. Bartolo?
17     A.  I don't know.  I'd have to look at this
18 letter right here.
19     Q.  Just to help guide your attention, I
20 think at the top of page 55 of 99 you make
21 reference to Mr. Bartolo's contact information.
22     A.  I see why I cc'd Robin Bartolo on there.

Page 229

Pages 226 to 229

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-208-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

| | |
|---|---|
| 1   Q. Why did you cc him?<br>2   A. It looks to me that that goes along with<br>3 what is at the bottom of this second e-mail that's<br>4 apparently responding to a telephone conversation<br>5 that I had with him.<br>6   Q. Isn't the reason you're cc'ing<br>7 Mr. Bartolo that you want to offer Pittman Dental<br>8 Labs the opportunity to join Glidewell's family of<br>9 authorized labs?<br>10   A. That's what it says here in the last<br>11 paragraph.<br>12   Q. Because since Pittman obviously is<br>13 offering an all-zirconia crown and this is an<br>14 opportunity, you're saying, for them to join<br>15 Glidewell and sell BruxZir crowns; correct?<br>16   A. Well, I don't know what our telephone<br>17 conversation was, but it's obviously a way where<br>18 he can actually promote his services using the<br>19 very trademark that looked to me like he was<br>20 trying to copy. He can use the real trademark.<br>21   Q. Now, do you think he was trying to copy a<br>22 trademark, or was he just using the word "brux" in<br>Page 230 | 1 call and explanation today concerning the use" --<br>2   Q. You don't recall what his explanation<br>3 was?<br>4   A. Pittman. I'm not even sure where they're<br>5 located. Let me see here. Centennial Circle,<br>6 Gainesville, Georgia. It just doesn't ring a<br>7 bell.<br>8   Q. If you look on the first page of<br>9 Exhibit 142 and you go down to the fifth paragraph<br>10 down, it says, "Prior to the promotion of BruxZir<br>11 mark, the use of all-ceramic crowns, even for<br>12 patients with parafunctional problems, was<br>13 counterintuitive."<br>14     Do you see that?<br>15   A. I see that. I see it. It's not very<br>16 artfully worded. It should have said, "Even for<br>17 patients with parafunctional problems was<br>18 counterintuitive for restoration of posterior<br>19 teeth" is probably what I was getting at there.<br>20   Q. Parafunctional problems is a reference to<br>21 bruxism; correct?<br>22   A. That is, yes.<br>Page 232 |
| 1 reference to patients with bruxism?<br>2   A. No. I'm pretty sure he was trying to<br>3 copy something that he realized by then was very<br>4 popular, a name that doctors might -- it might<br>5 resonate with doctors.<br>6   Q. And did Pittman push back and say they<br>7 were not confusingly similar?<br>8   A. I don't see that here. I don't remember<br>9 what he might have said in whatever telephone call<br>10 we had.<br>11   Q. Whatever he said, you responded to it by<br>12 pointing out the similarity in pronunciation;<br>13 right?<br>14   A. I sent another e-mail February 14.<br>15 Almost five days later. He must have called<br>16 sometime after Wednesday, and it looks like it was<br>17 probably Monday, and I probably wrote him back.<br>18 That's all I can guess from this. "Thank you for<br>19 your call." He might have even left a voicemail<br>20 for all I know. It could have been that.<br>21   Q. You don't recall?<br>22   A. Let me see again. "Thank you for your<br>Page 231 | 1   Q. And so --<br>2   A. And even then it probably would have been<br>3 better to say "All-ceramic crowns irrespective of<br>4 patients with parafunctional problems was<br>5 counterintuitive as a material of choice for the<br>6 restoration of posterior teeth," but obviously I<br>7 didn't put it in that many words.<br>8   Q. This is suggestive that the telephone<br>9 call you had with the representative from Pittman<br>10 Dental raised the issue that they were using the<br>11 word "BRUXER," spelled B-R-U-X-E-R, as a reference<br>12 to a patient with bruxism; correct?<br>13   A. Could be. I don't know that this is<br>14 suggesting it, but he could have been raising that<br>15 point, sure.<br>16   Q. Okay. You can set that one aside and let<br>17 me show you what's been marked as Exhibit 143. It<br>18 bears production No. GL 241 page 58 of 99 through<br>19 page 70 of 99.<br>20   A. Okay.<br>21     (Exhibit No. 143 was marked for<br>22     identification.)<br>Page 233 |

Pages 230 to 233

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-209-

10/25/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.     Keith Allred

BY MR. JANKOWSKI:

1  Q. This appears to be a communication with a
2  dental laboratory called R-Dent.
3      Do you recall having an e-mail exchange
4  with them?
5      A. I do.
6      Q. In fact, this is just another example of
7  the same type of exchange you had with Fusion and
8  you had with Pittman; correct?
9      A. It is. I see there's an image there that
10 doesn't come through. Maybe it does later, but
11 other than that, it looks like probably -- the
12 spacing looks like it got changed around a little
13 bit, but that letter looks just like the other
14 letter to Fusion even. I don't see if there's
15 additional facts added. It does have the word
16 R-brux in there.
17     Q. Where are you seeing R-brux? Which page?
18     A. Page 69.
19     Q. Right towards the top; correct.
20     So this is an example where they're not
21 using the entire word "bruxer" but rather just the

Page 234

1  form brux, b-r-u-x; correct?
2      A. That's correct.
3      Q. You're not saying the "R" part is
4  confusingly similar. You're saying the "brux"
5  part is; correct?
6      A. That's correct.
7      Q. It's fair to say that R-Dent disagreed
8  that they should not be allowed to use that name;
9  correct?
10     A. They may have initially.
11     Q. And do you know what happened with
12 R-Dent? Did they change their name?
13     A. They did.
14     Q. Do you know whether they became an
15 authorized lab?
16     A. I don't know if they did or not. It
17 seemed to me at this point in time that's what
18 they were planning on doing.
19     Q. And, in fact, again, I think you offered
20 to put them in communication with Mr. Bartolo;
21 correct?
22     A. Correct. That's how you would become an

Page 235

1  authorized dental laboratory. You'd have to order
2  the blocks. It looks to me like, as far as I knew
3  back then, he had decided to offer the product
4  that would allow him to be a certified laboratory.
5      Q. Which means the BruxZir milling blocks?
6      A. That's right, BruxZir. And he was
7  wanting to know if he could change it after he
8  finished using the prescriptions that he had that
9  already had the confusingly similar mark on it.
10     Q. Okay. You can set that one aside. Thank
11 you.
12     Next I'll show you what the court
13 reporter has marked Exhibit 144, which bears
14 production Nos. GL 241, page 7 of 99 through
15 page 9 of 99.
16     (Exhibit No. 144 was marked for
17     identification.)
18 BY MR. JANKOWSKI:
19     Q. If you can look at that and tell me if
20 you recognize it.
21     A. Authentic.
22     Q. Right. This appears to be an e-mail

Page 236

1  exchange between you and Authentic Dental Lab;
2  correct?
3      A. Correct.
4      Q. And do you recall having an e-mail
5  exchange with Authentic Dental Lab?
6      A. I don't recall that for sure. I don't
7  remember Whitney, but I do recall Authentic.
8      Q. And, in fact, this has another example of
9  the form letter that we talked about earlier;
10 correct?
11     A. It is there, and it looks --
12     Q. They're using the mark brux, B-r-u-x,
13 crowns, which is, in Glidewell's mind, confusingly
14 similar; correct?
15     A. That's true. And I guess there's a copy
16 of that use attached.
17     Q. Right.
18     It shows the Assured Dental Lab website
19 where it was copied from; correct?
20     A. True.
21     Q. And what's your understanding? Did
22 Authentic Dental Lab change its mark in response

Page 237

Pages 234 to 237

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-210-

1  to your communication?
2      A.  Yes, they did.  I think it's almost even
3  false advertising because they talk about
4  authentic zirconia which almost conveys in that
5  context the fact that they made their own blocks
6  because Lava is a brand name of 3M.  And as far as
7  I know, Authentic Dental Lab is a dental lab that
8  is like 15,000 other dental labs, and they don't
9  make the material that they make their zirconia
10 crowns out of.
11     Q.  Do you believe that -- where did
12 Authentic get their zirconia?  Do you know?
13     A.  Maybe Lava.  I don't know.  I don't know
14 if it was any other material.  No clue.  Could
15 have even been our material.  You don't really
16 know -- I guess you do know because they weren't
17 buying our blocks at least from us directly and
18 apparently from this they weren't, or it would
19 probably be on here.
20     Q.  If they were buying from Glidewell
21 Direct, you'd know about that?
22     A.  I'd know about that.

                                    Page 238

1      Q.  On page 8 of 99 on the bottom of your
2  form letter or template, you again offer them that
3  opportunity to join the list of BruxZir authorized
4  dental laboratories; correct?
5      A.  That's true.
6      Q.  You say, "If you wish to be on the list,
7  call Glidewell Direct," which is really
8  Mr. Bartolo; correct?
9      A.  True.
10     Q.  Okay.  You can set that aside.  Thank
11 you.
12         Next I'd like to have you look at what
13 the court reporter has marked as Exhibit 145,
14 bearing production Nos. GL 241, page 4 of 99
15 through page 6 of 99.
16         (Exhibit No. 145 was marked for
17 identification.)
18         THE WITNESS:  Assured Dental Lab.  Just
19 one letter.
20 BY MR. JANKOWSKI:
21     Q.  This one -- it's just one letter you sent
22 to Assured on April 18, 2011; correct?

                                    Page 239

1      A.  It looks like one letter, and it may
2  be . . .
3      Q.  Do you recall writing to Assured Dental
4  Lab?
5      A.  I do.
6      Q.  It looks like on the front page of
7  Exhibit 145 you wrote to them because they had a
8  crown they were calling Zir-Brux.
9      A.  This one's Zir-Brux.
10     Q.  Earlier we had R-brux.
11     A.  Correct.  Now we have Zir-Brux.
12     Q.  Now we have Z-brux; correct?
13     A.  Correct.
14     Q.  Because there's no more communication, do
15 you know what happened with Assured?
16     A.  They stopped using that.  They came up
17 with their own mark.
18     Q.  Do you know whether they responded in any
19 way claiming they wanted to keep using it or
20 should be allowed to keep using it or anything
21 like that?
22     A.  I think that they would like to have used

                                    Page 240

1  it, but then, again, they don't even make these
2  crowns in the United States.  I think they came
3  from Taiwan.  It just wasn't anything we were
4  going to allow, and they saw it our way.
5      Q.  The dental lab is not located in Taiwan;
6  right?
7      A.  No, but their material is.  I remember
8  this lab.  This is a lab that's like a front for
9  foreign-made crowns.  If I remember correctly,
10 that is the same outfit.  I remember Portland,
11 Oregon.  What I'm not quite sure about, I don't
12 know if it's China.  I think it could be either
13 the Philippines or Taiwan.  I don't know for sure
14 that it's China, but it could be from China.  I
15 forget exactly where, but it was outside the
16 country.  Vietnam for all I know, but it was
17 definitely foreign-made crowns.
18     Q.  So not just the zirconia but the crowns
19 themselves were foreign made?
20     A.  I don't know about the zirconia.  I don't
21 know what block it would be.  I don't think anyone
22 would know probably from their advertising that --

                                    Page 241

                        Pages 238 to 241

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-211-

1 certainly that would help if someone was not
2 trying to create confusion, they might actually
3 disclose the fact that they were using a zirconia
4 product that was from someone that the doctor
5 might know, and he could maybe put two and two
6 together. These people never do that just like
7 Keating never did.
8      Q. I'm sorry. Keating never did what?
9      A. Never disclosed the material he was
10 using. When he was doing the advertising, he
11 never said, "KDZ Bruxer made from blocks from 3M."
12      Q. And would that have made a difference in
13 your assessment whether there was a likelihood of
14 confusion?
15      A. Not necessarily. I think it would have
16 showed that at least a dentist would have had a
17 fighting chance of knowing there might be
18 something more to this similarity in the mark than
19 something obvious on its face.
20      Q. Do you think dentists care very deeply
21 about where the zirconia comes from in the full
22 contour --

Page 242

1      A. Some certainly do. I don't know how many
2 dentists, but I know more and more states are
3 actually passing laws requiring dental
4 laboratories to disclose the material they use,
5 where it's made, and not just the crowns if
6 they're made here but even the material that it's
7 made of which you then can tell where that's from
8 also. Some states you have to do that and put it
9 on the invoices that you send the crowns back.
10 It's all in response to fears about stuff from
11 China that's not properly controlled and might
12 have lead in it even.
13      Nothing to do necessarily with zirconia
14 crowns, but definitely is enough of a concern
15 among someone, maybe the public, maybe politicians
16 more than dentists, but it's definitely a growing
17 trend.
18      Q. Next I'll show you a document the court
19 reporter has marked as Exhibit 146, bears
20 production Nos. GL 241 page 16 of 99 through
21 page 19 of 99.
22      ///

Page 243

1      (Exhibit No. 146 was marked for
2      identification.)
3 BY MR. JANKOWSKI:
4      Q. It appears to be a communication with
5 China Dental Outsourcing, Inc.
6      A. I remember that.
7      Q. Do you remember writing to China Dental
8 Outsourcing, Inc.?
9      A. I do.
10      Q. What do you recall about writing to them?
11      A. I remember trying to find out who to
12 write to.
13      Q. It looks like you found somebody.
14      A. Yeah, it looks like I figured it out.
15 Some of these places are pretty well cloaked. It
16 looked like I even would have been able with
17 Google Maps to find a picture of the factory that
18 it was coming from. They look like a pretty big
19 outfit too.
20      Q. On the front page of Exhibit 146, you
21 indicate that their mark was Bruxer, B-r-u-x-e-r,
22 All Zirconia; correct?

Page 244

1      A. True.
2      Q. So, again, the similarity that's of a
3 concern to Glidewell is the use of Bruxer;
4 correct?
5      A. Especially when used as a mark.
6      Q. And I think this is the only
7 communication I saw with this entity. Did they
8 stop using the name?
9      A. They stopped using the name. If this is
10 the only thing you have, then this is the only
11 communication. I thought we got something back
12 from them saying, "Okay, won't do it again," but I
13 don't see that here; so I don't know whether they
14 ever wrote anything back or not, but they did stop
15 using it. They couldn't resist using the word
16 "bruxer" if I remember. I think they changed it.
17 I think they put on their site "good for bruxers."
18      Q. Similar to what Glidewell says, "Ideal
19 for bruxers"?
20      A. Sort of. I don't know if that's even on
21 our site anymore. I'd have to look. I know that
22 was the initial marketing campaign to indicate

Page 245

Pages 242 to 245

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**
-212-

1  something durable even though it was all ceramic.
2      Q.  Okay.  Next I'm going to show you what's
3  been marked as Exhibit 147, bearing production
4  Nos. GL 241, 71 of 99 through 97 of 99.
5          (Exhibit No. 147 was marked for
6          identification.)
7  BY MR. JANKOWSKI:
8      Q.  This appears to be communication with
9  Showcase Dental Laboratories.
10     A.  I remember them.  Sure.  It's getting
11  more recent here.
12     Q.  The first letter here looks like it was
13  written in January, 2012; correct?
14     A.  Yes.
15     Q.  We're getting more recent in time as we
16  go through the exhibits.
17     A.  It looks like January 10 was the first
18  letter.
19     Q.  And looking on the page bearing
20  production No. Page 77 of 99, it looks like their
21  mark that was of a concern to you was Zir-Bruxer
22  Crowns.  Z-i-r-B-r-u-x-e-r Crown; correct?

Page 246

1  last page is you attached the image with the
2  BruxZir at the bottom to show the copyrighted
3  image that they cut and paste into their thing?
4      A.  It says right here.  It's plucked off of
5  something.
6      Q.  In other words, I don't think the image
7  there that has BruxZir on the last page --
8      A.  You know what, that might be right.
9  Maybe it's to show where they got -- I bet that's
10  right.  They plucked the picture -- they erased
11  the name, and they put it with this advertisement
12  for zircon, it looks like.  I can't really read
13  the rest of the print.  The e-mail could have been
14  large, and they could have seen whatever it was.
15  Somewhere or another here I think they also were
16  using a name somewhere, Zir-Bruxer Crown.
17     Q.  Right.
18     A.  I don't know where that shows up on here
19  because it's too small.  I assume it's in that
20  block.
21     Q.  Your letter makes reference to it?
22     A.  Yes.

Page 248

1      A.  That is true, and it looks like they also
2  were pirating an image of the BruxZir crown for
3  their advertising.  Even they took the name even.
4  They didn't even take the name off it.  They
5  actually have our trademark name right next to it.
6      Q.  An image that they -- an image associated
7  with Glidewell that Glidewell used in their
8  materials?
9      A.  Not only that, it's our trademark.  It
10  would have been something probably plucked right
11  from our site or some kind of advertising.  They
12  didn't even change the name.
13     Q.  You're looking on page 97 of 99, the last
14  page?
15     A.  Yes.
16     Q.  I see.
17     A.  It looks like the three crowns is also in
18  their own advertising where they have it next to
19  zircon.  I think this Showcase might also be a
20  showcase for foreign made crowns, possibly from
21  China.
22     Q.  So the image -- the way I interpret this

Page 247

1      Q.  So they must have been using it.
2          If you look on page 76 of 99, they pushed
3  back like Fusion pushed back and Pittman pushed
4  back; correct?  You see how they're now
5  referencing Wikipedia's entry for "bruxism" and
6  the reference to a bruxer as somebody who suffers
7  from bruxism?
8          Do you see that?
9      A.  I see that.
10     Q.  Then as you did with the other dental
11  labs, you wrote back explaining why it's
12  confusingly similar to Glidewell; correct?
13     A.  That's true.
14     Q.  And ultimately do you know what happened
15  with this particular third party?
16     A.  Well, interestingly enough, it's right
17  here, and it's from their website which is part of
18  the package which is, I think, interesting because
19  they actually printed the infringement letter on
20  their site as a way to acknowledge the fact that
21  they used to use a mark that they decided not to
22  use anymore and here's why.  So they printed my

Page 249

Pages 246 to 249

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-213-

1    letter, and they put my name for all posterity.

2      Q.  There it is on the front page of the

3    exhibit.

4      A.  It's the front page of this exhibit.  I

5    think of it more as maybe the back page of their

6    site.  It's not something that was on the -- their

7    website the minute you pull it up, but it was in

8    their website somewhere, and I remember seeing

9    that and thinking, "Oh, that's interesting.

10   That's never happened before."  Maybe someone in

11   some damning way like, "Look what they said," but

12   it seemed to me like they were not too judgmental

13   about the whole thing.  They seemed to acknowledge

14   the fact that it was a mark that was confusingly

15   similar, and they certainly had other options to

16   use, and they decided to do that.

17     Q.  At the bottom of the front page, it looks

18   like they changed their name to Full Contour

19   Zirconia?

20     A.  I'd have to see that on here, but I

21   wouldn't be surprised if that's what you're

22   looking at.  "We have hereby changed the" -- yeah,

Page 250

1    writing to another organization that was selling

2    crowns from China.  My attachment on the back

3    there seems to even have some kind of address from

4    China.

5      Q.  On the front page of the exhibit, in this

6    example, it looks like the lab is using BruxZir as

7    their mark as one of their products; is that

8    correct?

9      A.  That's true.  They're actually using the

10   mark spelled exactly like our own trademark.

11     Q.  And what happened after this?  Do you

12   know?  I don't see any other communications.  Did

13   they change the name?

14     A.  They changed the name.  Let me remember

15   here.  I think -- you know, I don't know what

16   they're doing.  I'd have to go and see if I can

17   even find this site.  I think what this was was

18   something that was given to us by a lab that

19   received it as a promotion because they were being

20   marketed to as a laboratory that makes crowns for

21   laboratories, and they were obviously making the

22   assertion that they were providing our material to

Page 252

1    definitely.  That isn't really much of a mark.

2      Q.  But it certainly --

3      A.  It's acceptable.

4      Q.  Acceptable to Glidewell?

5      A.  Definitely.

6      Q.  You can put that down.

7         Let me show you what's been marked as

8    Exhibit 148, bearing production Nos. 241 pages 1

9    of 99 through 3 of 99.

10     A.  To Sarah Wang.

11     Q.  Right.

12        (Exhibit No. 148 was marked for

13        identification.)

14   BY MR. JANKOWSKI:

15     Q.  This is communication that appears to

16   have been sent in March of 2012 to Sarah Wang?

17     A.  To ADL Dental Lab from the looks of the

18   cc.

19     Q.  Right.  Advanced Dental Laboratory.

20        Does that name ring a bell?

21     A.  China.  If I look into this further,

22   somehow something gave me the clue that I was

Page 251

1    make a crown to other labs, and this lab, whoever

2    gave it to us, would have turned us on to it

3    because that's what it looks like this is because

4    there's a copy on the back of an e-mail

5    communication there.

6      Q.  The one from Sarah Wang?

7      A.  Exactly.  It's from and the subject and

8    the date and it's just addressed to, "Dear

9    Friend."  So that "Dear Friend" was who knows how

10   many dental laboratories in the United States that

11   don't have a mill, and they don't provide this

12   product.  There it is right there.  Their main

13   products that you can get from them are PFMs,

14   FMCs, IPS e.max, and zirconia and BruxZir.  Who

15   knows if they even have IPS e.max.  I assume they

16   do, but we know they didn't have BruxZir.

17     Q.  Okay.  Do you know who forwarded you that

18   e-mail from Sarah Wang?

19     A.  I don't, no.  It was a dental laboratory.

20     Q.  You don't recall which one?

21     A.  I don't remember who it was, but it could

22   have been any of 15,000 dental laboratories.

Page 253

Pages 250 to 253

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-214-

1    Q. But there's not 15,000 who would be
2  likely to be forwarding you e-mails like that;
3  correct?
4    A. Could be. I don't know why not.
5    Q. You think it was Mark Jackson?
6    A. Doubt it. I don't think it was. I think
7  if it was, I'd remember that.
8    Q. Okay. I'll show you what the court
9  reporter's marked as Exhibit 149, bearing
10  production Nos. GL 241, page 50 of 99 through 53
11  of 99.
12        (Exhibit No. 149 was marked for
13        identification.)
14      THE WITNESS: Dominion Milling Center.
15  BY MR. JANKOWSKI:
16    Q. Right.
17      Do you recall that second correspondence
18  to Dominion?
19    A. I do.
20    Q. And this particular correspondence
21  actually attaches some invoices, it looks like,
22  and it looks like they're using a mark which is
                                    Page 254

1    A. Sort of. It hasn't been that long ago.
2  I remember old Dominion.
3    Q. He makes reference to a Bruxzer crown
4  with his spelling B-r-u-x-z-e-r?
5    A. I think I am remembering. This is, I
6  think, if I'm not mistaken, this is a lab where if
7  you were to go on their site, it looked like a
8  family tradition, like, dad was the lab owner or a
9  dentist, and his son or them was a lab guy and his
10  son was a lab guy. This is what I'm remembering
11  now.
12      I thought it was pretty funny that
13  Bruxzer crown has existed for years. Obviously,
14  if anyone would know that that wasn't true, it
15  would be a lab guy. But then he said he would
16  stop using it, it looks like, because I'm saying,
17  "Thank you for your prompt response. We certainly
18  appreciate your understanding." He said they'd
19  gladly change. They changed it to FCZ.
20    Q. Right.
21      He basically says the name is a reference
22  to patients with bruxism, correct, but they'll
                                    Page 256

1  Bruxzer, spelled in a different way which is
2  B-r-u-x-z-e-r; correct?
3    A. It's something they would have been able
4  to tell. Obviously, they did it. If I had the
5  e-mail, I could blow it up, but, boy, that's hard
6  to read. I probably say in the letter; right?
7    Q. You do.
8    A. Okay. Yeah, B-r -- this didn't print out
9  right, and it's probably just the software.
10  Probably should have been in quote marks, but it
11  says B-r-u-x-z-e-r, correct?
12    Q. Yes, I think the --
13    A. In fact, I can see where it says
14  "clients" up there. It changed that hyphen to a
15  question mark too. So wherever you see a question
16  mark, it looks like it should be a quote mark.
17  That's through that whole letter there.
18    Q. And you got an enthusiastic response from
19  Scott on the first page of the exhibit.
20    A. Oh, yeah.
21    Q. "Howdy, Keith," with an exclamation mark.
22      Do you remember getting that response?
                                    Page 255

1  change the name anyway. Do you have any more
2  communications after this?
3    A. No.
4    Q. Next I'll have you look at Exhibit 150,
5  bearing production Nos. GL 241 page 20 of 99
6  through 24 of 99.
7        (Exhibit No. 150 was marked for
8        identification.)
9  BY MR. JANKOWSKI:
10    Q. Appears to be communications with Dental
11  Dentopia or Dentopia Dental Lab.
12    A. That does sound familiar. I think that's
13  fairly recent too.
14    Q. Right.
15      These communications are, looks like, in
16  August, 2012.
17      Do you recall these e-mail exchanges?
18    A. I remember Dentopia.
19    Q. What do you recall about it?
20    A. Let's see if there's anything in
21  particular here that jumps out. I've got
22  something here I've attached. That is ringing a
                                    Page 257

Pages 254 to 257

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-215-

1  bell.  I do remember a little bit more about this.
2  You can't really read that letter too much, but it
3  was evidence of the fact they knew who we were --
4  this is as I remember it -- and had called and
5  asked about buying blanks for use in making
6  crowns.  It seemed to me at the time they
7  obviously knew the owner of the mark, and we knew
8  about that because we had immortalized that in the
9  system there that they had communicated with us.
10    Q.  In this instance based on your letter, it
11  looks like they were using the name Full Zirconia
12  and then in parentheses BruxZir, spelled
13  B-r-u-x-Z-i-r; correct?
14    A.  Correct.
15    Q.  So this is another instance where they
16  were word for word or letter for letter, I should
17  say, using the registered mark of Glidewell;
18  correct?
19    A.  That is true.  I don't know if we can
20  tell from this where exactly they're from.
21      MR. TACHNER:  Virginia.
22      THE WITNESS:  Oh, okay.  As far as their
                                          Page 258

1    A.  I realize that, but you get the companies
2  here locally, but they're actually selling crowns
3  made from other countries.  I don't know if that's
4  their case or not.
5    Q.  Do you know what happened with Dentopia
6  after your correspondence with them on August 31,
7  2012?
8    A.  Well, it looks to me like they decided
9  not to use it from that.  I have to read his
10  letter down below here to verify that, but it
11  looks like they decided to stop using the mark
12  there in their advertising.
13    Q.  Right.
14      What they say is, "BruxZir is a common
15  name in the dental field," and they say, "We
16  attempted to contact Glidewell regarding the use
17  of the term BruxZir before we started the
18  promotion.  We didn't receive any response."
19      Do you see that?
20    A.  I do.
21    Q.  Do you recall them ever communicating
22  with you in the past about the name?
                                          Page 260

1  crowns go.
2  BY MR. JANKOWSKI:
3    Q.  Now --
4    A.  I'm not sure if they're really made in
5  Virginia.  I don't know what I knew back then.  I
6  guess it would be this e-mail communication, if I
7  could read it closer, might tell me something that
8  they were communicating from the United States or
9  a foreign country.  I don't remember -- maybe all
10  this on the bottom.  Company name, there's an --
11  it looks like a dot com address.  "I am a dental
12  laboratory -- I would like to become an
13  authorized," and then they're spelling it the
14  exact same way, BruxZir -- I can't read the rest.
15  It's smeared.
16      I guess they want to know if they become
17  an authorized and then spelling it our way, if
18  they could use the word.  It looks like they just
19  decided to use the word anyway without ever buying
20  our blocks.  I'm not quite sure what country
21  they're from, but it could be the United States.
22    Q.  Well, Dentopia is in Virginia; correct?
                                          Page 259

1    A.  Yes, that was what was attached there.
2  It was evidence of the fact that they queried us,
3  and we replied back.  It was pretty much evidence
4  of the fact what he was saying was not correct.
5  He said that anyway.
6    Q.  To your knowledge, they stopped using the
7  name?
8    A.  To my knowledge, they did.
9    Q.  Let me hand you what's been marked
10  Exhibit 151, bearing production Nos. GL 241, 10 of
11  99 through 15 of 99.
12    A.  Okay.
13      (Exhibit No. 151 was marked for
14      identification.)
15      MR. TACHNER:  Is this the last one?
16      MR. JANKOWSKI:  This is the last one of
17  these, yeah.
18      THE WITNESS:  I'm glad it wasn't that
19  many labs.
20  BY MR. JANKOWSKI:
21    Q.  Mr. Allred, this appears to be a
22  communication in September, 2012, with Barth
                                          Page 261

Pages 258 to 261

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6

-216-

1   Dental Laboratory.
2       Do you recall that?
3       A.  As close in time as it is, I probably
4   will if I look at it closer.  Maybe these
5   attachments will -- something's starting to ring a
6   bell here.  Oh, yes.  This was pretty recent.
7   This was an odd one.
8       Q.  Why do you say that?
9       A.  "Note, your signature image is not the
10  property of Dentistry Today.  It is the property
11  of Assured DL."  If you remember this harkens back
12  to an earlier communication with Assured DL where
13  it showed their use of the mark Z-Brux, and they
14  had a picture of a crown, and if you -- this was
15  on their web, and, in fact, if you tabbed on the
16  image that they were using, it actually went to a
17  Dentistry Today article that talked about the
18  introduction of Z-Brux by Authentic Dental Lab.
19  So I thought that was interesting that they were
20  employing a confusingly similar mark to ours and
21  at the same time were passing off a picture that
22  had been provided by Assured to Dentistry Today

Page 262

1   for their product.
2       And also I think -- I'd have to go
3   through this and refresh my memory anew, but it
4   seemed to me they were misquoting some information
5   from a Dr. Christianson.  I see some stuff.  I see
6   his name.  It's kind of coming back to me.
7   Frankly, we'd have to go through it point by point
8   to find out why I wrote what I wrote.  Whatever it
9   was, they used someone else's picture, they used a
10  confusingly similar mark, and they rewrote
11  someone's review of our material in some way to
12  satisfy their own use of their product.
13      Q.  This seems to be a lot more information
14  than you usually provided with your opening
15  letter; correct?
16      A.  Only because more existed.  Usually it's
17  some kind of use of the mark that we would like to
18  let them know we've seen and that's been brought
19  to our attention, and we'd like them to stop using
20  it.  This particular one just seemed to have more
21  and more the more that you got into it.  So I put
22  every instance of it.

Page 263

1       Q.  And how did Barth Lab respond to this?
2       A.  I don't know that they have.  Maybe
3   that's why I don't remember too well.  I don't
4   know if they've changed their site.  I don't
5   remember looking to see if they changed.  I don't
6   know if they wrote me back.  It's pretty recent
7   and probably something I ought to check up on.
8   September 26, it looks like, 2012.
9       Q.  So you don't recall, as you sit here
10  right now?
11      A.  I don't recall looking to see and
12  noticing they had stopped doing all these things.
13  They may have though.
14      Q.  Very quickly, these aren't new exhibits,
15  but I want to put a couple exhibits --
16      A.  We're done with this one here?
17      Q.  Yes, you can put that one aside.
18      Let me just show you previously marked
19  Exhibit 93.  Here's an example from Glidewell's
20  website that shows the use of the trademark with
21  the circle R; correct?  Do you see that on the
22  website?

Page 264

1       A.  Yes.
2       Q.  And that's, in fact, for a dental
3   restoration made with the all zirconia -- it's an
4   all-zirconia crown basically; correct?
5       A.  Well, bridge looks like here.
6       Q.  Or a bridge.  But it's a dental
7   restoration?
8       A.  Definitely.
9       Q.  Okay.  And I'll then show you previously
10  marked Exhibit 97.  So now here's an example from
11  Glidewell's website.  This is associated now with
12  the dental ceramic; right?  So this would be the
13  product that's associated with the pending
14  application; correct, that's not yet registered?
15      A.  That's true.
16      Q.  Now, it uses a circle R; right?
17      A.  I see that there.
18      Q.  Is that a correct use of the circle R?
19      A.  It wouldn't be by what we do unless this
20  was from Germany or something.  It looks like it's
21  our homepage.  I don't know what date that was or
22  how far back it was.

Page 265

Pages 262 to 265

e6da25e8-8aba-4d68-964c-5de55b761039

**EXHIBIT 6**

-217-

1   Q. This was printed out on October 22.
2   A. I saw that there.
3   Q. This is from Glidewell's own website.
4   A. Oh, okay.  Constantly having to look at
5   this stuff.
6   Q. So you agree that's not a proper use of
7   the circle R?
8   A. No, no, we're not doing it.  We're not
9   doing it for that.
10  Q. What do you mean "you're not doing it"?
11  A. Well, the companies use that all the time
12  when they have a circle R in Europe, and they use
13  their circle R trademark.  We're not doing that.
14  We're just keeping it TM.
15  Q. So it should say TM?
16  A. By the way we're doing it, true, it
17  should be TM on that.
18  Q. Let me show you what's been previously
19  marked Exhibit 98.  This is another printout from
20  Glidewell Laboratories' website.  This is for a
21  BruxZir mill.  I think you testified earlier you
22  don't have a trademark registration pending for

Page 266

1   BruxZir in connection with this type of equipment;
2   correct?
3   A. That would be incorrect too.  That should
4   be a TM.
5   Q. That should be a TM as well.
6      Now finally let me show you what's been
7   labeled previously as Exhibit 99.  This is also
8   printed out from the website associated with
9   authorized BruxZir laboratories.  Take a look at
10  that.  Here we see the use of the circle R again?
11  A. True.
12  Q. Is this the proper use of the circle R?
13  A. I think we have been using it for that
14  because it does stand for providing the
15  all-zirconia crowns which we do have the trademark
16  on.
17  Q. Right.
18     What you're mostly doing with your
19  authorized labs are providing the milling blanks
20  for them to make the crowns themselves?
21  A. That's true.
22  Q. So they're allowed under the agreement

Page 267

1   you have with them to use the BruxZir name --
2   A. True.
3   Q. -- with their crowns; correct?
4   A. That's true just like if they used
5   someone else's material.
6   Q. They can use a circle R with that is your
7   understanding because it's the crowns that they're
8   making that have the BruxZir name on it?
9   A. Exactly.  Just like if they provided an
10  IPS e.max crown or Lava crown, same sort of thing.
11  Q. And that would be -- I'm sorry, the
12  registration is Class 10; correct?
13  A. Correct.
14  Q. Okay.  It's in connection with Class 10
15  that the authorized labs are using the circle R;
16  correct?
17  A. That's true.
18  Q. Okay.  Well, thank you very much,
19  Mr. Allred.  I appreciate your time.  I have no
20  further questions.
21     MR. TACHNER:  I have no questions.
22     MR. JANKOWSKI:  Off the record.

Page 268

1      (At 5:15 p.m. the deposition of Keith
2      Allred was concluded.)

Page 269

Pages 266 to 269

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-218-

10/25/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.      Keith Allred

REPORTER'S CERTIFICATE

I, LISA MOSKOWITZ, CSR No. 10816, RPR, CLR, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and the same is true, correct, and complete transcript of said proceedings;

I further certify that I am not interested in the event of the action.

Witness my hand this 1st day of November, 2012.

_____

Certified Shorthand
Reporter for the
State of California

Page 270

---

Digital Evidence Group, L.L.C.
1726 M Street NW, Suite 1010
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
Witness Name: Keith Allred
Deposition Date: October 25, 2012

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

_____      _____
DATE                    WITNESS SIGNATURE

Page 272

---

Keith Allred c/o
Leonard Tachner PLC
17961 Sky Park Circle, Suite 38-E
Irvine, CA  92614-6364

Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
Date of deposition: October 25, 2012
Deponent: Keith Allred

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected.
Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure.
If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,

Digital Evidence Group
Copyright 2012 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Page 271

---

Digital Evidence Group, L.L.C.
1726 M Street NW, Suite 1010
Washington, D.C. 20036
(202) 232-0646

E R R A T A   S H E E T

Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.
Witness Name: Keith Allred
Deposition Date: October 25, 2012

Page No.   Line No.        Change

_____      _____
Signature                    Date

Page 273

---

Pages  270 to 273

e6da25e8-8aba-4d68-964c-5de55b761039

EXHIBIT 6
-219-

10/25/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.    Keith Allred

Page 270

1                    REPORTER'S CERTIFICATE

2

3          I, LISA MOSKOWITZ, CSR No. 10816, RPR,

4     CLR, in and for the State of California, do hereby

      certify:

5          That, prior to being examined, the witness

      named in the foregoing deposition was by me duly

6     sworn to testify the truth, the whole truth and

      nothing but the truth;

7          That said deposition was taken down by me

      in shorthand at the time and place therein named

8     and thereafter reduced to typewriting under my

9     direction, and the same is true, correct, and

10    complete transcript of said proceedings;

11         I further certify that I am not interested

12    in the event of the action.

13         Witness my hand this 1st day of November,

14    2012.

15

16

17

18

19                          _Lisa Moskowitz_____

20                          Certified Shorthand

21                          Reporter for the

22                          State of California

**EXHIBIT 6**
-220-