Lynda J. Zadra-Symes (SBN 156,511)
Lynda.Zadra-Symes@kmob.com
Jeffrey L. Van Hoosear(SBN : 147,751)
Jeffrey.VanHoosear@kmob.com
David G. Jankowski (SBN 205,634)
David.iankowski@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Defendant/Counter-Plaintiff,
KEATING DENTAL ARTS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES R. GLIDEWELL DENTAL CEAMICS, INC. dba GLIDEWELL LABORATORIES,<br><br>Plaintiff,<br><br>v.<br><br>KEATING DENTAL ARTS, INC.<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Civil Action No. SACV11-01309-DOC(ANx)<br><br>**DEFENDANT'S EXPERT LORI BOATRIGHT'S REBUTTAL REPORT TO THE REPORT OF DAVID J. FRANKLYN**<br><br>Honorable David O. Carter |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

-4-

## I.  PROFESSIONAL AND EDUCATIONAL BACKGROUND

1.     I am the Chair of the Trademark Practice Group at the intellectual property law firm BLAKELY SOKOLOFF TAYLOR & ZAFMAN, LLP ("BSTZ" or "Firm").  The Trademark Group, based in Los Angeles, handles all trademark-related work for the Firm's six office (Los Angeles, Silicon Valley, Orange County, Portland, Seattle, and Denver).  I joined BSTZ in 1988 and became a partner of the Firm in 1993.  After working to develop the trademark practice, I founded the Trademark Practice Group for the Firm in 1996; I have served as Chair of the Trademark Practice Group since that time.

2.     I practice all aspects of trademarks and unfair competition law, including trademark-related matters such as publicity rights, emerging issues surrounding social media and advertising.  My practice focuses primarily on branding-related transactional work and client counseling, with trademark protection at its root.  I provide advice and offer strategic guidance during mark selection and clearance, during filing and prosecution (domestic and international), and offer counsel as to overall protection strategies.  I handle analysis, growth and management of domestic and international trademark portfolios, prepare IP contracts, and conduct/manage due diligence matters.  I actively engage in enforcement actions, from demand stage through negotiation and settlement; I represent clients in proceedings at the Trademark Trial and Appeal Board ("TTAB") and in Federal Court.

3.     While working at BSTZ, I have filed and prosecuted well over 2,000 U.S. applications for registration.  The U.S. Trademark online database reflects that I am the identified Attorney of Record for 2,079 trademark applications – however, I do file and prosecute applications on behalf of clients who choose to have in-house counsel identified on the site; additionally, for several years, senior BSTZ attorney were identified despite that I directed, filed,

**EXHIBIT A**
-5-

and prosecuted applications.  Although I do not keep close records, I would estimate the number of applications filed/prosecuted to be roughly 2,500 – 3,000 applications.  Additionally, I have been Attorney of Record in over 100 TTAB proceedings (ex parte appeals, oppositions and cancellation proceedings). I have been hired as an expert in trademark law for a number of cases and have been deposed but none reached trial.  They include *Optimal Pets, Inc. v. Nutri-Vet, LLC et al.*, EDCV 08-1795 SGL (C.D. Cal. 2008); *Artists Management Group, LLC v. Advantage Marketing Group, Inc.*, CV-01-4890 (C.D. Cal. 2001); and *SG Services, Inc. v. God's Girls, LLC*, CV01526 (OR-Portland 2005); *SG Services, Inc. v. God's Girls, LLC*, 2:08-CV-01873-ODW-JWJ (C.D. Cal. 2008)

4.      Prior to joining BSTZ, I was a Trademark Examining Attorney at the U.S. Patent & Trademark Office ("USPTO") from January 1987 through November 1988.  I received formal training from the USPTO by way of lectures, readings and assignments; I worked closely with a supervisory attorney for the first six months of my employment and progressed such that I timely received "Full Signatory Authority" to act as an independent Trademark Examining Attorney.

5.      As an Examining Attorney, I examined over 2,500 trademark applications for registration and handled the prosecution of each application ("cases") from examination through registration/abandonment.  In that capacity, I reviewed trademark and service mark applications for suitability for trademark registration – including, without limitation, I conducted trademark and service mark searches for likelihood of confusion determinations, conducted review of available information on issues of meaning/nature (whether marks were descriptive/generic, were primarily merely surnames, or were geographically descriptive, for example), examined the applications for  administrative issues ("informalities") and for substantive issues which mandated issuance of "refusal

-2-

to register." As part of my duties, I prepared and issued formal Office Actions following examination and determination (with accompanying legal authority/explanation), evaluated "Responses to Office Action" filed on behalf of Applicants, and in appropriate instances, issued "final refusal to register" (with accompanying legal authority/explanation).  Additionally, I prepared and managed appeals and conducted oral argument at Trademark Trial and Appeal Board (TTAB).

6.    As an Examining Attorney I received the highest rating offered during annual review for both years of service and was noted as having surpassed the productivity requirement (based on numbers of cases successfully examined) while receiving an "Excellent" rating for substantive content – referred to as being at "110% Goal".  I was selected for "TTAB assignment" (a coveted position) by the then-members of the TTAB and interlocutory attorneys.

7.    In addition to the formal training, informal training as to the U.S. Trademark Office "viewpoint" on subjective issues continued throughout my tenure (and continues today) in that Examining Attorneys discuss with one another the difficult or "gray area" matters and all were keen to meet the Case Review procedures within each Law Office or the several additional levels of review by Managers and Division Directors.

8.    Given the subjective nature of such issues as "descriptiveness" and as to "borderline" likelihood of confusion determinations, Examining Attorneys come to see determinations with some uniformity, particularly since many TTAB members previously worked as Trademark Examining Attorney ranks, and the TTAB opinions were regularly distributed and discussed.  Working as an Examining Attorney, attending legal lecture series, reading/assisting in formulation of "Examination Guides," and daily review/study of the Trademark Manual of Examining Procedure ("TMEP") all contributes to one's

**EXHIBIT A**

understanding of the U.S. Trademark Office's practices and procedures, the nuances of examination, and a keen understanding of "registrability."

9.     Even now, I am in contact with U.S. Trademark Office Examining Attorneys with whom I worked, and I have hired at eight former Trademark Examining Attorney to work within the BSTZ Trademark Practice Group, as recently as three years ago, such that the understanding of the "Examining Attorney's viewpoint" remains current within the Group.

10.     Prior to beginning work as a Trademark Examining Attorney, I worked for over a year at the Law Office of Fred Kugler whose office was adjacent to building which then-housed the U.S. Trademark Office.  A sole practitioner who had at one point been the Acting Director for the Trademark Office, Mr. Kugler offered training in all manners of trademark search issues.  I conducted trademark searches (through the "old school" hand review of "shoes" at the U.S.P.T.O. Trademark Library), updated in-house common law sources; analyzed full national searches from vendors (such as Thomson & Thomson) for corporate clients and provided counsel to law firms, conducted "use" investigations, and wrote trademark availability opinions.

11.     I graduated from the University of Missouri School of Law in 1984 where I was named a Director of the Board of Advocates and received the Top Prize in Advocacy following winning the school-wide competition both my second and third years (which allowed me to represent the University of Missouri at the Regional National Moot Court tournaments).  After spending a year in a general litigation firm, I have practiced strictly in the area of trademark law since 1985, some twenty-seven years.  From my tenure at the U.S. Trademark Office, a significant portion of my practice has been in trademark protection and prosecution – the London-based World Trademark Review in their "Top 1000 Trademark Attorneys Around the World" identified me as a notable U.S. attorney, specifically in the area of "Trademark Prosecution and

-4-

Strategy."   Over the course of my career, I have conducted thousands of clearance searches, conducted thousands of web searches on the issue of descriptiveness, and filed 2,500 – 3,000 U.S. trademark/service mark applications and prosecuted most through natural conclusion (registration or abandonment).

12.   The BSTZ Trademark Practice Group has been recognized as a "Top Ten" firm in connection with the number of U.S. trademark filings (and first in the Los Angeles area, the nation's second leading market) (source: NameProtect®).  The rank has changed each year but BSTZ is within the Top 25 nationwide  in filing numbers despite not having a significant foreign filing practice (source:  Intellectual Property Today, 2011).

13.   I generally perform a clearance search and a web "meaning" search for every mark for which I file an application and for many marks for which applications are never filed.  Having spent a year working solely in trademark searching, and two years as a U.S. Trademark Examining Attorney, and twenty-seven years practicing trademark law, I am confident of my legal knowledge of U.S. trademark law and of the nature and nuance of trademark prosecution in the United States; too, I am confident in my understanding of and analysis of trademark likelihood of confusion and related infringement determinations.

14.   A true and correct copy of my resume is attached as Exhibit A to this report.

15.   I am being compensated for my work in this matter at my customary rate of $625 per hour for time spent reviewing materials, preparing this report, and testifying at deposition and trial, if necessary.

## II. <u>SUMMARY OF OPINION</u>

16.   I have reviewed relevant documents, including the Expert Report of David J. Franklyn on behalf of Plaintiff/Counter-Defendant James R. Glidewell Dental Ceramics, Inc., DBA Glidewell Laboratories ("Glidewell" or

-5-

**EXHIBIT A**

"Plaintiff"), certain pleadings in *Glidewell v. Defendant Keating Dental Arts, Inc.* ("Keating" or "Defendant"), conducted web reviews of the words BRUXER, BRUXZIR and BRUXISM, conducted U.S. Trademark Office searches including review of prosecution histories of relevant applications/registrations, and reviewed full national (comprehensive) searches of the words BRUXER and BRUXZIR, among other materials as identified herein.

17.    I conducted a review of the alleged mark BRUXZIR and KDZ BRUXER as if I were the Examining Attorney at the U.S.P.T.O., and I examined the prosecution histories of the original registration and the second application to determine what actions were taken by the Examining Attorneys in both cases.  I conducted reviews of third party applications/registrations which included BRUX-formatives in the mark and in the "disclaimers" of such applications/registrations and reviewed the identifications of goods for relevant information.

18.    It is my opinion that (a) Glidewell's alleged mark is generic and/or highly descriptive and is therefore not entitled to registration as a trademark; and (b) there is no likelihood of confusion as between Glidewell's alleged mark BRUXZIR and Keating's use of BRUXER as a generic term (both as it appears on packaging for KDZ Bruxer, in advertising, and as it was presented in application form as KDZ BRUXER to the U.S.P.T.O.).  Before reviewing the factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) there were two "preliminary" considerations, from my perspective which affected the Sleekcraft factors and, ultimately, the determination of a likelihood of confusion.  First, I needed to determine whether Glidewell has any valid trademark rights at all in BRUXZIR, and, if so, what ambit of protection is to be afforded.  The second step related directly to the other side of the equation, namely whether the generic term "bruxer" as used by Keating in the mark KDZ

**EXHIBIT A**
-10-

BRUXER (and by other third parties), can be a valid basis for a claim of infringement.

19.    Ordinarily, the use of a generic term necessary to market a product cannot be the subject of a confusion claim – and for obvious reasons.  Generic terms are necessary for the marketplace; they are words used to connote that which is being sold or the intended user of the product (legal argument to follow).  "Genericide" occurs when perfectly good trademarks are not properly policed such that over time they BECOME the apt name of the goods over time and are used by the relevant public to refer to the product genus, such as ASPIRIN, ESCALATOR, and CELLOPHANE.   During my tenure as an Examining Attorney, I refused registration to the mark RANCH for salad dressing despite the fact that the Applicant owned the mark (and multiple registrations for) HIDDEN VALLEY RANCH without a disclaimer of "Ranch" in such registrations.   Of course, over time, "RANCH" had become the shortened name for their "buttermilk" dressing and the word had lost its trademark significance.  Still, the refusal was valid as I provided clear evidence that RANCH was generic for salad dressing (the refusal was not appealed thus leaving the applicant free to refile).

20.    In this matter, however, "bruxers" have been known for decades by such term – bruxers are those who suffer from bruxism (teeth grinding).  The term "bruxism" originated likely in the early 1900s but first appeared in medical literature in the early 1930s (from Greek *brychein* or *brukhein* to gnash the teeth + ism"; Merriam-Webster Dictionary; Oxford U.S. and British Dictionary).  A search of "bruxer" on the web using the Google search engine shows 32,800 search "results."  The Wikipedia entry (2nd listed) for "bruxism" includes use of "bruxer" to connote a person suffering from bruxism (". . . some bruxers clench and grind front teeth only").   Even limiting the search to "bruxer teeth," the web search resulted in finding 24,800 "hits."

-7-

21.   A search of "bruxer" in the "Google Books" section (searching contents of publications) included irrelevant findings, so the search was then limited to "bruxer" with any of the terms "dental OR sleep OR tmj OR teeth". With this refinement in place, "bruxer" appeared in 1,670 books.

22.   Most of the books revealed are geared for medical/dental professionals, but too, "bruxers" are identified (and described) in a variety of books geared for consumers, such as *A Consumer Guide to Dentistry* by Gordon J. Christensen (2001); *Sleep Disorders for Dummies* (from the well-known *Dummies* series) by Max Hirshkowitz and Patricia B. Smith (2004); *The Oral Report: The Consumer's Common-Sense Guide to Better Dental Care* by Jerry F. and Mary Jane Tainter (1989); *How to Save Your Teeth and Your Money: A Consumer's Guide* by Melvin and Elaine Denholtz (1977); *The UC Berkeley Wellness Self-Care Handbook* by John Edward Swartzberg and Sheldon Margen (1998); *Nothin' Personal Doc, I Hate Dentist – Feel Good Guide to Going to the Dentist* by McHenry Lee, Joleen Jackson and Vicki J. Audette (1999); *Total Health for Men* by Neil Wertheimer (1998); *Symptoms & Solutions – How to Tell When Your Ailments Are Misdiagnosed and What To Do About It* by Jay A. Goldstein (1993); *Refresh Life: Oral Health and Adding Years to Your Life* by Dr. Dan Sindelar (2011).   Additionally, "bruxers" are identified in a relevant fashion in at least one novel, *Call Me Kick!* By John Osander (2002).

23.   Glidewell's own website informs the public that its products are designed "for bruxers" at http://www.glidewelldental.com/dentist/services/all-ceramics-bruxzir.aspx:

> BruxZir® Solid Zirconia is a monolithic zirconia crown, bridge, screw-retained implant crown, inlay or onlay with no porcelain overlay. More brawn than beauty, you'll be impressed by the esthetics of BruxZir when prescribed instead of metal occlusal PFMs   and cast gold restorations. BruxZir, because of its chip-proof durability, **is an ideal solution for**

**EXHIBIT A**

1   **bruxers who have destroyed their natural teeth** or existing dental

2   restorations. (Emphasis added).

3   24.   On its blog devoted to the BRUXZIR product, at

4   http://blog.bruxzir.com/, Glidewell touts:

5   When we launched BruxZir Solid Zirconia crowns & bridges in 2009, our

6   intention was to provide a monolithic zirconia restoration **indicated for**

7   **bruxers and grinders** as an esthetic alternative to posterior metal

8   occlusal PFMs and full-cast metal restorations. The result was a material

9   we said was "More Brawn than Beauty." (Emphasis added).

10   Note:  to verify this was not a 3rd party blog comment, see "Posted by

11   Glidewell Laboratories at 10/28/2011 7:25 AM."

12   25.   The Glidewell site does not only mention "bruxers" in connection

13   with its BRUXZIR product – so too do they identify "bruxers" as ones who

14   could benefit from a "transition" crown before the final crown is ready to be

15   seated. As noted at www.glidewelldental.com/lab/services/transition.aspx:

16   Transition Crowns & Bridges® are a treatment option that fills the void

17   between custom-made temporaries and the final fixed restoration.

18   Whether prescribed for short-term or long-term use, this restorative

19   option offers an inexpensive interim  solution that lasts 10 times longer

20   than traditional lab provisionals. They are often **indicated in**

21   **compromised cases presented by bruxers, periodontal therapy, the**

22   **elderly or seriously ill,** and dental implants.  (Emphasis added).

23   26.   In offerings for restoration, a particular kind of ceramic restoration

24   is likewise advertised for "bruxers"

25   http://www.glidewelldental.com/lab/services/:

26   Biocompatible and corrosion resistant, Captek is reinforced with particles

27   of platinum and  palladium, which provides increased strength and

28   exhibits low plaque retention in clinical testing. Captek is specially

-9-

**EXHIBIT A**

**designed to meet the needed strength for bruxers, long-span bridges, and implants.** (Emphasis added).

27.    As used by Glidewell in videos in which the spelling is unclear to the viewer, BRUXZIR is pronounced by Glidewell as the phonetic equivalent of "bruxer" such that they are indistinguishable. Further, Glidewell uses it as a noun which is evidence of genericness – and likewise Glidewell endorses its use in the plural, further evidence of genericness ("this Bruxzir is 100% zirconia" and "one question I get about Bruxzirs is. . ."  Videos promoting such pronunciations and in the form of generic terms are many; they can be found on Glidewell's site and broadcast on YouTube.  In particular (incomplete) we note to see/listen:

- http://www.youtube.com/watch?v=1FpFVrBSHMY
- http://www.youtube.com/watch?v=_zsOdOxoeNY
- http://www.youtube.com/watch?v=IqrbNy3_OsA&feature=relmfu
- http://www.youtube.com/watch?v=tUpp_DOY4Vw
- http://www.youtube.com/watch?v=qPaoX0zAR-A/

28.    In a Glidewell video (titled "Clinical Case:  The Pursuit of Bruxzir® Esthetics") the narrator, a practicing dentist who appears in many Glidewell videos, says "I always like to show you what you can do with Bruxzir, um, in the anterior – and so  this would be for somebody who is [sic] got a lot of wear on their teeth for example or has broken previous restorations."

29.    It seems as though the narrator is about to reference the patient as a bruxer – certainly he is about to use a noun in that he says "somebody who is. . ." – but then awkwardly finishes that the Bruxzir would be "for someone who is got a lot of wear."  Since Glidewell has adopted the phonetically equivalent Bruxzir as a mark, unlike in print where the spelling is apparent and notable, the speaker must avoid use of "bruxer" – not to do so would have him essentially saying  he would "like to show you what you can do with BRUXER in the

-10-

1    anterior – this would be for somebody who is a bruxer." *See*

2    http://www.youtube.com/watch?v=GzKZbiOXio0.

3         30.    In a Glidewell video for the consumer (titled "Bruxzir® Solid

4    Zirconia Patient Education"), the narrator says:

5         Because Bruxzir restorations have no porcelain overlay, they are more

6         resistant to chipping, cracking, or breaking in the mouth. This makes

7         Bruxzir crowns and bridges ideal for anyone including bruxers and

8         grinders who have broken their natural teeth or porcelain restorations in

9         the past.

10   *See* http://www.youtube.com/watch?v=D4taHSdbP_w (from 0:20 – 0:36 on

11   time stamp).

12        31.    In creating the above transcript, I was doing Glidewell the service

13   of identifying "Bruxzir" where I supposed they wished it to be placed.

14   Otherwise the transcript would read as it sounded:

15        Because bruxer restorations have no porcelain overlay, they are more

16        resistant to  chipping, cracking, or breaking in the mouth. This makes

17        bruxer crowns and bridges  ideal for anyone including bruxers and

18        grinders who have broken their natural teeth or porcelain restorations in

19        the past.

20   *See* http://www.youtube.com/watch?v=D4taHSdbP_w (from 0:20 – 0:36 on

21   time stamp).

22        32.    One can also listen to/watch videos in which third party dental

23   professionals pronounce BRUXZIR and "bruxer" identically in describing

24   Glidewell       products        to        the        public:

25   http://www.youtube.com/watch?v=MXW6WCvV0QQ&feature=related.

26        33.    With the web, we are able to find evidence that was unavailable

27   years ago, such as an independently produced video (unrelated to Glidewell or

28   Keating) by R-Dent Laboratory. In a video entitled "How to Adjust the Bruxzir

                                   -11-

Crown," Bob Hewitt, a self-identified retired dentist of forty years and a technical support employee of R-Dent Labs explains: "Today I'd like to talk to you about adjusting the full contour zirconia crown.  Some      laboratories call it the bruxer crown.  We call it the R-Brux crown."  Note:  "R-Brux crown" is identified as the R-Dent Laboratories mark for its solid-zirconia crown.  The video is found at http://www.youtube.com/watch?v=sTTwU1LDvjU.

34.    Glidewell was able to secure registration (registration should not have been issued – see below – no web search was conducted by the Examining Attorney and no inquiry as to meaning was made) for BRUXZIR despite it being phonetically identical to the generic term for the intended user, bruxer, and despite Glidewell using it generically.

35.    A parallel can be drawn to the "ranch dressing" refusal against Hidden Valley Ranch (HV Food Products) noted previously (application for RANCH was refused registration on the basis of generic/highly descriptive). The refusal was issued/made final in 1988.  A search of the U.S.P.T.O. website revealed that the U.S.P.T.O. first allowed a third party to register a mark in which "RANCH" was included but disclaimed (e.g. GARDEN Ranch Salad Dressing, with a disclaimer of RANCH) occurred in 1989.  Using this purely as an example, had HV Food been granted a registration for "RANCH" it may have empowered HV Food Products to prevent others from using and/or registering product names which include "ranch" as a generic term (e.g. FIESTA Ranch Dressing or FARM KITCHEN Ranch Dressing) – at least until a competitor sought cancellation of the registration on the basis that "Ranch" was so highly descriptive to fail to function as a mark and/or generic.  **It should be noted that this is a hypothetical and that I have no knowledge of any such bad intent on the part of HV Food.**  By 1989, "ranch dressing" was pervasive and had become the genus/apt name for buttermilk salad dressing; every salad dressing company had the right to use the word "ranch" to describe

-12-

**EXHIBIT A**

-16-

their dressing.   Had HV Food been allowed to "corner the market" on the NAME under the pretense of it being a MARK, this would have given HV Food a significant but wrongful competitive advantage akin to manipulating trademark law to work as a patent.   Obviously, no company could have been prevented from *making* or selling ranch dressing but marketing it without being able to say "ranch" would have had serious repercussions – just as Glidewell seeks in this case.

36.    Glidewell should not be the only company allowed to use "bruxer" any more than HV Food should have had "the exclusive" to use "ranch."   The Glidewell website itself is evidence of a dental manufacturer's commercial need to use the word "bruxer" to promote products.    Glidewell's own generic use of the term "bruxer" leads to only one logical conclusion, namely that Glidewell's advertising and marketing needed to use the word, just as its competitors do.

37.    Glidewell's alleged mark BRUXZIR does not have a sufficient ambit of protection as a trademark under U.S. law, if any, to claim infringement by Keating based on Keating's use of the generic word BRUXER.   The word BRUXER has clear meaning in the relevant industry as being one who suffers from bruxism (teeth grinding) as evidenced herein.    Defendant's use of BRUXER identifies the intended user of the goods (a dental crown designed for or successfully used by people with bruxism, i.e. "bruxers").

38.    Glidewell should not have been granted registration for BRUXZIR (and the Defendant's cancellation action should be successful) because the evidence, including Glidewell's own use, indicates that it is a phonetic equivalent of the generic term "bruxer."   There is no evidence that the mark is pronounced or understood by the relevant consumer in any other way. Videos on Glidewell's own website reveal that Glidewell itself pronounces (and promotes pronunciation) of BRUXZIR as being the same as BRUXER. Had such information been known to the PTO, BRUXZIR would have been denied

**EXHIBIT A**

1   registration.   Under U.S. law, misspellings of words do not extend rights to

2   otherwise unregistrable marks.  Glidewell appears to have relied on the

3   Examiner's ignorance of the relevant consumer marketplace (dentists and dental

4   labs) to secure registration.

5       39.   The PTO should have inquired as to whether BRUXZIR had any

6   meaning in the relevant trade; a proper web search for meaning by the

7   Examining Attorney would have disclosed "bruxer" as having meaning as the

8   intended user of Glidewell's dental crowns.   Had the Examining Attorney

9   learned of this meaning (of "bruxer") either by search, by making the proper

10  inquiry, or by Glidewell volunteering such information, Glidewell's application

11  would then have been refused registration as both "merely descriptive" (initial

12  refusal) and if on the Supplemental Register or under Section 2(f) of the

13  Trademark Act, then "generic" (the TMEP recommends one issue refusals in

14  cases where the mark is so highly descriptive so as to be unable to function as a

15  mark). In my opinion, had the U.S. Trademark Office properly examined the

16  case as stated, no registration would have issued.

17      40.   Glidewell is asserting a monopoly on the word "bruxer" – a word

18  used in the dental field many decades before Glidewell first sought registration.

19  Yet even at the U.S. Trademark Office, a registration dating back to 1989

20  included "bruxism" in the identification of goods ("dental appliances . . . used

21  for the treatment of bruxism and temporomandibular joint dysfunctions") under

22  the mark BRUX-EZE (US Reg. No. 1608966).   Keating claims no right to the

23  word "bruxer" except as the descriptor in its mark as a whole KDZ Bruxer

24  ("bruxer" disclaimed).

25      41.   **"Bruxers" are identified** on the websites of companies which sell

26  zirconia dental crowns (which are more durable and difficult to chip) – not only

27  Keating and Glidewell, but other competitors (disclosed in web search entitled

28  "crowns designed for bruxers" which yielded 96,300 "hits").   The list below is

-14-

**EXHIBIT A**

by no means exhaustive:

a. GPS Dental Lab; (note this company uses the mark BRUX-ART™ and has filed an application for registration;

b. Restorative Dental Arts;

c. Tooth Studio Dental Laboratory; (touts competitive product Diazir in addition to Glidewell's product, for which it comments "The chip proof durability of BruxZir is ideal for bruxers. . .");

d. Cosmetilab Dental Laboratory;

e. Chameleon Fortress;

f. Cosmetic Dentistry of San Antonio – website touts: "At Cosmetic Dentistry of San Antonio we offer the latest in technology including a       patented crown called a "Bruxer" crown (Bruxism is the habitual grinding of teeth,       typically during sleep and a Bruxer is a person who does this.)  This as an all ceramic,       natural looking crown that can be placed on back teeth.";

g. Opalite® All-Zirconia Crowns & Bridges advertisement – touts "Virtually unbreakable, even with severe bruxers"; on the second page indicates "Every practice has sever bruxers and grinders that still want an aesthethic posterior restoration;

h. Second   Opalite®  All   Zirconia   Crowns   and   Bridges advertisement ("Every practice has severe bruxers and grinders that still want an esthetic posterior restoration.");

i. BonaDent Dental Laboratories; ("Perfect for bruxers and grinders, these shear resistant, all-zirconia crowns are designed. . .");

j. Z BRUX CROWNS at Barth Lab; ("Chip resistant quality makes Z-Brux ideal for bruxers.");

**EXHIBIT A**

k. Showcase Dental Laboratories – previously used the name Zir-Bruxer Crown but changed it based on "cease and desist" demand from Glidewell (letter posted on website) – Showcase notes disagreement with Glidewell's position but agrees to change the name in order to concentrate on "customers and their patients, our quality and our customer services." Showcase concludes with "[w]e have hereby changed the name of our product to reflect the same and product make-up: "Full Contour Zirconia"." Apparently, too, Showcase then changes its generic descriptions to the Zirconia products as "ideal" for "bruxing and grinding patents" rather than "bruxers and grinders."

42. A search similar to "crowns designed for bruxers" should have been performed by the Examining Attorney handling the BRUXZIR application. Such a search would have revealed the third party competitors' use of "bruxer" on their websites.. This would have provided the Examining Attorney more than enough "evidence" that "BRUXZIR" as the legal and phonetic equivalent of "BRUXZIR" was generic and/or so highly descriptive to not be able to function as a mark.

43. The third party use noted in the previous paragraph is more than sufficient evidence to justify refusal of registration. In my opinion, the genericness refusal would have been sustained even by reference to the Wikipedia article and results found within the first few pages of the "bruxers teeth" web search. This could include, for example, the LiveStrong Foundation's information about "bruxism" which includes reference to "bruxers" and a "case study" from "The Curious Dentist" about a dentist's approach to a dental matter for a "bruxer" patient. In short, this is an "easy" case to determine and prove for the purpose of sustaining a rejection – "bruxer" has obvious and easily proven meaning and the subject mark is phonetically

-16-

1    equivalent to "bruxer.".

2         44.    The U.S. Trademark Office Examining Attorneys are obligated to

3    follow the Trademark Manual of Examining Procedure (TMEP) when

4    examining applications.  In examining the original application for BRUXZIR,

5    the Examining Attorney should have asked if the mark had any particular

6    meaning in relation to the goods or in the relevant trade or industry – and he or

7    she should have requested additional information about the mark and the goods.

8    See TMEP Section 814 ("Sometimes, it is necessary for the examining attorney

9    to request additional information from an applicant in order to examine the

10   application properly, pursuant to 37 C.F.R. §2.61(b)").  Requesting information

11   in particularly important when questions of descriptiveness/genericness are "in

12   play" – see TMEP Section 1209.02 ("The examining attorney must consider the

13   evidence of record to determine whether a mark is merely descriptive or

14   whether it is suggestive or arbitrary. See In re Noble Co., 225 USPQ 749, 750

15   (TTAB 1985). The examining attorney may request that the applicant submit

16   additional explanation or materials to clarify the meaning of the mark or the

17   nature of the goods or services.").

18        45.    There is a "checklist" currently used by Examining Attorneys

19   which become part of the "record" of the examined case.  For example, in

20   Keating's application for KDZ Bruxer, in which "bruxer" was disclaimed as

21   generic and for which Keating made no claim as to trademark rights therein, the

22   file history shows that "Notation to File" was made on June 30, 2011 following

23   "XSearch Search Summary."  The "XSearch" is the database used by

24   Examining Attorneys to search the PTO records to make a determination as to

25   whether any likelihood of confusion refusals must be made.  The "Notation to

26   File" is indicative that "the checklist" followed by the Examining Attorneys

27   reveals some "activity" – and, in that instance, shows that the Examining

28   Attorney conducted a web search (using the Google® search engine), an

-17-

**EXHIBIT A**

Acronym Finder (because KDZ is the salient portion of the mark, the Examining Attorney needed to know if it had relevant meaning warranting a descriptive/generic refusal).

46.    In the registration file for BRUXZIR, there is no identification of a "Notation to File" and no indication that a web search or any other follow up activity was conducted.

47.    Had the Examining Attorney conducted a web search, he or she would have seen reference to "bruxer" on Glidewell's site when he or she initially examined the application (the specimens of record provided by Glidewell were in the form of a black and white label), it is very likely the application would have been refused even without securing additional information from Glidewell or asking as to relevance in the trade or industry.

48.    A mark can be held merely descriptive and therefore unregistrable if it identifies the INTENDED USER of the product just as any other "apt name" of key product information renders that word generic in relation to the goods.  The TMEP Section on point reads:

1209.03(i)   Intended Users

A term that identifies a group to whom the applicant directs its goods or services is merely descriptive. See *In re Planalytics, Inc.*, 70 USPQ2d 1453 (TTAB 2004) (GASBUYER merely descriptive of risk management services in the field of pricing and purchasing natural gas); *Hunter Publ'g Co. v. Caulfield Publ'g Ltd.*, 1   USPQ2d 1996 (TTAB 1986) (SYSTEMS USER found merely descriptive of a trade journal directed toward users of large data processing systems; evidence sufficient to establish distinctiveness under §2(f)); *In re Camel Mfg. Co., Inc.*, 222    USPQ 1031 (TTAB 1984) (MOUNTAIN CAMPER held merely descriptive of retail mail-order services in the field of outdoor equipment and apparel).

49.    In addition, the "intended user" can still be the basis for a

**EXHIBIT A**

-22-

genericness refusal. As noted in TMEP Section 1209.01(c)(iii), CERTIFIED MORTGAGE BANKER for "educational services, namely providing qualifying examinations, testing and grading in the field of real estate finance" was held so highly descriptive as to be incapable of functioning as a mark (equivalent to genericness and thus unregistrable under any showing of proof). Similarly, LAWYERS.COM was held generic for "providing an online interactive database featuring information exchange in the fields of law, legal news and legal services."

50.   Examining Attorneys are aware, per TMEP Section 1209.01(c)(i), that there can be more than one generic term for a particular genus of goods or services – here bruxer, bruxing, bruxism as well as zirconia, dental, crown, to name a few, would be generic and would not function as proper marks. That said, also according to TMEP Section 1209.01(c)(i), any term that the relevant public understands to refer to the genus is generic; it is not necessary to show that the relevant public uses the term to refer to the genus – instead, whether the relevant public would understand the term to be generic is the test. TMEP Section 1209.01(c)(i), citing *In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1685 (Fed. Cir. 2009).

51.   On Glidewell's own videos, Glidewell's narrators say both the word "bruxer" and "Bruxzir" without any difference in pronunciation whatsoever. Glidewell promotes Bruxzir as indistinguishable from "bruxer." Moreover, Glidewell uses it as a noun. Proper trademark use requires that in a grammatical context, a trademark is always an adjective to be modified by the generic term. In addition, in its promotional videos, Glidewell itself promotes use of BRUXZIR as a plural noun, suggesting that one could even get "a couple of Bruxzirs put in" – all indicative of generic use. The Examining Attorney should have looked to TMEP Section 1209.03(j), which says:

A slight misspelling of a word will not turn a descriptive or generic word

-19-

into a non-descriptive mark. See *C-Thru Ruler Co. v. Needleman*, 190 USPQ 93 (E.D.    Pa. 1976) (C-THRU held to be the equivalent of "see-through" and, therefore, merely descriptive of transparent rulers and drafting aids); *In re Hubbard Milling Co.*, 6 USPQ2d 1239 (TTAB 1987) (MINERAL-LYX held generic for mineral licks for feeding livestock).

52.    In my opinion, the registration of BRUXZIR should be cancelled on the basis that the mark is generic and/or so highly descriptive that it cannot function as a mark.

53.    I also strongly disagree with Dr. Franklyn's assertions of a likelihood of confusion.  All competitors making and selling sturdy dental crowns and related goods have the right to reference "bruxers" – a distinct intended user and market for their products.  In the KDZ BRUXER trademark application, the word "bruxer" is properly disclaimed as a descriptor.  The Examining Attorney in the KDZ Bruxer application did conduct a search and determined that BRUXZIR and KDZ Bruxer were not in conflict.

54.    Both under the *Sleekcraft* factors of the 9th Circuit, and even under the TMEP from a registration standpoint, the weakness of BRUXZIR cannot be overstated.    Likewise, the only common component between the two is Keaton's disclaimed generic word "bruxer."  "Strength of the mark" is the first factor identified in *Sleekcraft*.  As stated in TMEP Section 1207.01(b)(ix), weak marks are entitled to only narrow protection – even suggesting, as to the most descriptive, the scope of (merely descriptive, on the Supplement Register) protection has been limited to the "substantially identical notation." *In re Hunke & Jochheim*, 185 USPQ 188, 189 (TTAB 1975).

55.    It is my opinion that "BRUXZIR" is generic and/or so highly descriptive as to be incapable of functioning as a mark.  If BRUXZIR is afforded any trademark protection, it should be limited to the exact spelling or

-20-

other misspellings closely resembling it.  However, this would not entitle Glidewell to remove the generic and/or highly descriptive term "bruxer" from the ordinary trade.  Simply stated, one cannot first argue that BRUXZIR is NOT a misspelling to get past genericness/descriptive hurdles, and then use the identical pronunciation of "bruxer" for the basis of stealing the generic "bruxer" from the necessary vernacular of dentists in order to find a likelihood of confusion.

56.    BRUXZIR is not the only mark with the root BRUX- at the U.S. Patent & Trademark Office for the same or closely related goods.  The following are noteworthy:

a. BRUX-CHECKER owned by Scheu-Dental GmbH for "plastic foils for use in dental deep-drawing processes (dental diagnostic); Registered:  2011;

b. BRUXCURE owned by Richard Horian DBA Bruccure for "mouth guards for medical purpose"; Registered:  2011;

c. BRUXGUARD owned by Medtech Products for "dental mouth guards"; Registered:  1999;

d. BRUX-EZE owned by Sentage Corp., for "dental appliances . . . used for the treatment of bruxism and temporomandibular joint dysfunctions"; Registered:  2001;

e. DR. BRUX owned by Quattroti Dentech SRL for variety of dental bite trays, molds, bridges, etc.; Registered:  2010;

57.    Worthy of note, an anonymous "Letter of Protest" was filed against the mark BRUX XXX for mouth guards and other devices for diagnosing and treating "bruxism".  In that Letter of Protest, an anonymous third party informed the U.S. Trademark Office that the Examining Attorney should have refused registration for descriptiveness (or if the design alone could "carry" the mark, to require a disclaimer of "BRUX") so that the owner, Quattroti Dentech, also the

owner of DR. BRUX above, would effectively hold no rights to "brux" as a mark. The application was refused until the disclaimer was issued.

58. Recently abandoned applications include BRUXOMETER, BRUX BUSTER CUSTOM NIGHT GUARD ("Brux" disclaimed), and BRUXQuickSplint, all three of which were abandoned in 2012. Two applications are pending – GPS BruxArt (noted in third-party users previous) and BruxThetix.

59. It is clear that no single user owns broad rights in the root BRUX, if any. Certainly Glidewell's use is further hampered by the fact that the allegedly noteworthy spelling of ZIR clearly stands for zirconia, the same materials used by its competitors.

60. Glidewell's mark (if a mark) is very weak, and the only similarity relates to the "bruxer" portion of Keating's mark (which is disclaimed and in which Keating claims no trademark rights); dentists ordering the product are sophisticated and are not confused (if anything, their alleged confusion stems from Glidewell's adoption of a an alleged mark which is phonetically identical to a generic term that identifies the intended user of the type of products). As with other competitors, Keating wishes to use "bruxer" to identify the intended user – as does Glidewell – and this "intent" is mirrored by Glidewell.

61. With regard to Professor Franklyn's Trademark Office Searches referenced in paragraph 6 of his report, I am unclear as to why such narrow searches were conducted, as such searches, and the results, provide no genuinely useful information.

62. Moreover, there are clear misstatements in his report. In Paragraph 6, page 6, Professor Franklyn states that his searches show that "bruxer" or "bruxzir" had not become generic in part because "one would expect for the term 'bruxing' to be observed within the goods and services description for companies that make crown and bridges in relation to a zirconia brown or

-22-

**EXHIBIT A**

-26-

bridge. . ." In private practice, one attempts to secure as broad rights as possible for one's client. To identify (in the description of goods and services) the nature of the exact treatment only reduces the protection for the client. For example, neither Keating nor Glidewell wished to restrict their goods identification in that Glidewell's registration identification reads "dental bridges; dental caps; dental crowns; dental inlays; dental onlays; dental prostheses" while Keating's reads "dental prostheses."

63.     Additionally, while by carefully crafting his searches Professor Franklyn found no evidence that bruxism or its derivative words had meaning specifically for zirconia crowns, he stretches to say "rather they were trademarks for goods related to the treatment of the condition bruxism – namely devices that measure the patient's teeth grinding, mouth guards, and electronic anti-grinding devices. Additionally, none of the trademarks were even remotely phonetically similar to the term 'bruxzir' or 'bruxer' other than 'Bruxometer.'"

64.     Many things are wrong with this comment. In trademark law and registration procedure, all goods which work to measure, diagnose or treat bruxism would be considered "related goods" in the marketplace. Second, Professor Franklyn appears to be admitting that "bruxzir" and "bruxer" are phonetic equivalents, yet does not speak to the grand importance of such admission. In breaking up the searches and not providing a single comprehensive list, he references only five registrations for BRUX- something, which are not owned by Glidewell and which are used on dental products devised for bruxers. Two issued prior to Glidewell's registration, further denting Glidewell's contention of owning broad rights.

65.     In addition, Professor Franklyn's manner of searching appears not to be focused on getting relevant results. I expect that his search for "bruxer crown" which revealed so few results was searched as the "in exact order" format. In replicating his search, I get 25 search results. Several of the

-23-

competitors mentioned previously are listed; Professor Franklyn's dismissal of each bears more careful scrutiny.  He dismissed the Barth Labs' "Z BRUX CROWNS" because it references an article which, according to Franklyn, was "largely about Bruxzir" (Glidewell's expert witness continues the practice of noun usage).  He dismisses York Dental's "Bruxer Crown" as being too new. Yet York sells Glidewell's product and three others, but it uses the "Bruxzir" mark and also states that it is a "Bruxer" and ideal for "bruxers":

> **BruxZir** Solid Zirconia is a monolithic solid zirconia restoration with no porcelain overlay. More brawn than beauty, you'll be impressed by the esthetics of **Bruxer** when        prescribed instead of posterior metal occlusal PFMs and full-cast metal restorations.

> **BruxZir** is virtually chip proof, making it the ideal restoration for bruxers, implant restorations and areas with limited occlusal space. (Emphasis added)

66.     Additionally, Professor Franklyn dismisses R-Dent Dental Lab's "R-Brux Crown" because he found it only on the YouTube video (which I quoted from).  Yet additional information is readily available on the internet, including an article about R-Dent and the "R-Brux Crown" picked up on Business Net, an image of the R-Brux crown and a mention in the R-Dent newsletter from last year as accessed on the R-Dent website.

67.     The Mascola Esthetics Dental lab, according to Professor Franklyn, "uses Cercon Zirconia to make the 'Xtreme Bruxer'" but he dismisses it because "according to the internet archive the page it first appeared May 15, 2011."

68.     First, this is hardly "proof" that Xtreme Bruxer came after Bruxzir, but the importance of "coming after" Glidewell's product is negligible.  Even if correct that Glidewell was instrumental in developing the product, this is not a patent case – this case is about whether Glidewell has the right to prevent Keating from calling its crowns designed for bruxers a "bruxer" in a generic

-24-

and/or descriptive fashion.  The Mascola mark, like the others in this listing, plus the many others mentioned in above sections, should have led Professor Franklyn to conclude that no one "owns" the word bruxer for these or related goods.

69.   The final entry of "non-important" competitors identified by Professor Franklyn is "Showcase Dental" for which he states that "there is no evidence that the product predated the Bruxzir product as a February 2, 2011 snapshot of their homepage shows that the site was still under construction." Again, Professor Franklyn seems to misunderstand the importance of the date (besides his leaps of assumption about them without basis).  This is not a priority race as between two parties in a confusion determination.  The importance is how "bruxer" is viewed by the relevant public, namely, dentists. In any event, the Showcase website clearly shows, as earlier described, the cease and desist letter from Glidewell and Showcase's statement that it wished not to fund such battle.

70.   In response to Professor Franklyn's statements as to the definition of a "generic" mark, while not incorrect per se, this case is not pending in the Second Circuit and several more recent cases on point have been reported since 1963.  While I explained above how a mark identifying "intended users" could be deemed generic, a broader review of what is "generic" or "so highly descriptive as to be unable to function as a mark" are likewise important:

> In determining whether a term is generic, we have often relied upon the "who-are-you/what-are-you" test: "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?'" *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting *1 J. Thomas McCarthy, Trademarks and Unfair Competition* § 12.01 (3d ed. 1992)). Under this test, "if the primary significance of the

-25-

**EXHIBIT A**

trademark is to describe the type of product rather than the producer, the trademark [is] a generic term and [cannot be] a valid trademark." *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 304 (9th Cir. 1979) (emphases added).

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999).

71.    In view of the widespread generic and/or highly descriptive use of "bruxer," and considering that Glidewell itself uses "bruxer" within the explanation paragraphs of "Bruxzir," it is very much a "what are you?" inquiry.

72.    I do not understand Professor Franklyn's assessment in Paragraphs 9-12 of his report in which he advises that the relevant goods/services, consumers, and markets, are the goods/services, consumers and markets of Glidewell's very specific zirconia products.  Certainly Glidewell's products, markets and customers would be AMONG them but not the exclusive composition of relevant goods, services, consumers and markets.  The most important of these inquiries is the customers – identified by Glidewell as dentists, who are sophisticated consumers and are familiar with the term "bruxer" as a generic reference to patients who suffer from bruxism, and understand the term "brux" as a reference to the act of "bruxing" or the condition of "bruxism."  Moreover, as Professor Franklyn agrees, dentists also understand the term "zir" to reference zirconia, commonly used in the manufacture of crowns for bruxers.

73.    I disagree with Professor Franklyn's assessment of BRUXZIR as a suggestive mark.  While he correctly identifies the four categories (the 9th and 2nd Circuit do not disagree), to make the statement that BRUXZIR "suggests some connection between the service of zirconia crown manufacturer for patients who suffer from 'bruxism'" is quite the understatement when Glidewell pronounces BRUXZIR and BRUXER as one and the same.  It does not matter at

-26-

all that not ALL Bruxzir patients are bruxers, as offered by Franklyn.   His analysis in Paragraph 14 appears to say that the genus of actual goods here would be "zirconia crowns" but he is ignoring the law – and common sense.   As described in the TMEP Section 1209.01(c)(ii):

> The expression "generic name for the goods or services" is not limited to noun forms but also includes "generic adjectives," that is, adjectives that refer to a genus, species, category or class of goods or services. *In re Reckitt & Colman, North America Inc.*, 18 USPQ2d 1389 (TTAB 1991) (PERMA PRESS generic for   soil   and   stain   removers   for   use   on permanent press products).

74.     I emphatically disagree with Paragraph 16 of Professor Franklyn's conclusions – namely that "there is no phonetic equivalence because Bruxzir has a distinct Z sound not present in bruxer."   I implore the Court to listen to the Glidewell videos – and, to use common sense, most words with an internal "x" have "z" sounds (e.g. Dictionary.com identifies pronunciation for "Alexander" as "al-ig-zan-der" and "example" as "ig-zam-puhl").

75.     His second argument is that the mark "cannot be judged solely on its phonetic (audible) meaning or connotation" and cites case law that one must look at "sight, sound and meaning".   Unfortunately, he misunderstands the law he cites.   The reference in *In Re National Data* relates to not dissecting a mark relates to likelihood of confusion, not genericness ("[t]he basic principle in determining confusion between marks is that marks must be compared in their entireties . . .").   It a tenet of trademark law in the context of descriptiveness or genericness that if a mark which bears a misspelling AND which is phonetically identical to an otherwise descriptive or generic mark, it is considered a "legal equivalent" and will be treated the same as would the ordinary spelling.   *See In Re State Chemical Manufacturing Co.*, 225 USPQ 687 (TTAB 1985) in which FOM (in the format of "bubble" letters) for carpet shampoo was held to be the

**EXHIBIT A**
-31-

legal equivalent of the word "foam" despite the differences in appearance and spelling.   Referencing prior cases in which marks were deemed the legal equivalents for the generic word, namely TINTZ for tints, ALKOL for alcohol, LITE for light, and SAVON GAS for "save on gas" (at 689), the Board noted that despite Applicant's acknowledgement that it "could not interfere with anyone's right to use 'foam' to describe the foaming characteristic of its rug shampoo" based on a registration for FOM (in bubble letters), the Board refused registration nonetheless, stating the law required it so as to not "place one in a position to make or threaten to make an unwarranted claim of rights based on the presumptive right to exclude another's use which flows from the grant" of a registration." 225 USPQ at 690.

76.    In this case, Glidewell is doing exactly what the Board so carefully guarded against.

77.    Regarding Professor Franklyn's claim that he found "no use of" dentists using "Bruxzir" as a "slang term" and like statements, my response is that it is easy to ask the wrong questions and find no answers.  In Paragraph 18 of his report, he states that even if dentists perceived "Bruxzir as the phonetic equivalent of Bruxzir," that would "not render Bruxzir a generic mark."  First, it seems that the typist misheard the second "bruxer" as "Bruxzir."  Putting that aside, Professor Franklyn again wrongly concludes that "to be rendered generic, it would have to be shown that dentists predominantly view Bruxzir as the name for either the service of making solid zirconia crowns or for the material that is used to make those crowns."  Previous legal citations show this to be incorrect – if Professor Franklyn were correct, then I would be free to register the mark CROWN DESIGNED FOR BRUXERS, BRUXER CROWN, CROWN FOR TEETH GRINDERS and the like.

78.    In Paragraph 19, Professor Franklyn declares that he found "no use of the words "Bruxzir" or "bruxer" as the generic name of either custom-made

EXHIBIT A

solid zirconia crowns or as the generic name of the material that is used to make such crowns" and cites his search of US Trademark Office records. First, the Trademark Office records are wholly inadequate for this purpose as described previously. Second, he again is misusing or misunderstanding what genericness entails. I can attest to having found evidence of numerous third-parties which use "bruxer" to refer to the intended user of the crown regardless of the material from which it is made. I also found evidence of use of "Bruxzir" which used the mark as a noun, made it into a plural to connote more than one unit, and several dental labs and dentists who seemed not to know when to use "Bruxzir" and when to use "bruxer" even when describing Glidewell's product.

79.   I wholly disagree with Paragraph 20 and 21 as stated by Professor Franklyn. Under no viable application of facts to law or law to facts would anyone consider Bruxzir to be "a strong mark". His reference to this being so "from a market penetration perspective" (in addition, he claims, to a linguistic perspective) is nonsensical. I opine, based on the above evidence and my understanding from the many years of practicing trademark law, that BRUXZIR is a generic term (so highly descriptive as to be unable to function as a mark); if it were to have developed any trademark rights (generic marks by their nature cannot "acquire distinctiveness from use and advertising) it would have been narrowly limited to a unique spelling and pronunciation ("Brux-zeer" not unlike the Seinfeld episode "manzier/mansierre"). Glidewell's own pronunciation (which is identical to "bruxer") eliminated any prospect of gaining rights based on acquired distinctiveness/secondary meaning. Likewise, the Professor's accounting of this allegedly "wide recognition" by relevant consumers undoubtedly includes those who choose the new zirconia crowns which are "good for" bruxers, as established by the advertising and web results. Nothing offered by Professor Franklyn suggests that Glidewell has established any secondary meaning.

-29-

80.    In regards to Paragraph 22, and the notion of market strength, his reference to Google® as a mark is dubious – Google is an arbitrary mark. Additionally, Google (the company) faces trademark problems with its Google brand for the reason that it oft-used as a verb ("go Google that for me") and currently faces a federal court suit in which genericide is asserted.  Additionally, it is noted that Professor Franklyn has referenced that in his Google searches that "Bruxzir" would be autocorrected when he attempted to search "bruxer." Note that this is of little consequence as the auto-correct feature is based in part on one's search history (if one searches "Bruxzir" many times it will be "suggested") and possibly on Glidewell's purchase of AdWords.

81.    In Paragraph 24 of his report, Professor Franklyn claims that dentists may be confused as to affiliation "between Bruxzir and KDZ Bruxer" despite their sophistication as customers.  He purposely references "KDZ" as a prefix when it is the salient portion of the mark – of the family of KDZ marks. On Keating's website the left toggle references the bruxer product as "KDZ® Bruxer."  Additionally, Keating own two other "KDZ" mark registrations are listed.  Without reviewing alleged evidence of actual confusion, any alleged confusion most likely relates to Glidewell's attempt to monopolize a necessary and often used generic and/or highly descriptive word, namely bruxer.

82.    In reviewing this case, I draw on all my professional experience from inside and outside the U.S. Trademark Office.  I have respect for Professor Franklyn's academic credentials but note that in conducting an "attorney of record" search at the U.S.P.T.O. database, I can't help but comment that he has prosecuted three applications, only one of which matured to registration and is still active.  This is not to cast aspersions on his knowledge of the law, but I would suggest that the application of law in this instance is the more difficult task.  In my opinion, confusion is unlikely to result between KDZ Bruxer and BRUXZIR – and if there is confusion, it is based on the unusual character of a

-30-

1  mark which is the phonetic equivalent of a common term in dentistry, bruxer.
2  This case appears to be a genuine example of one who wrongly takes a dubious
3  registration and attempts to wrest the generic term from all its competitors.  A
4  trademark is, above all else, an identifier of source, a designation for the public
5  to distinguish one product from the next.  While Professor Franklyn finds fault
6  with Keating's adoption of KDZ Bruxer (inexplicably that even a "Z" in the
7  three letter acronym is somehow indicative of bad intent), the clear bad actor
8  here is, in my opinion, Glidewell, who is waging competitive war against its
9  market challengers by usurping a generic term.  While many companies are now
10  making similar products, Glidewell's intention appears to keep all of them from
11  being able to explain the best possible use for the products, namely that the
12  primary intended users are, indeed, bruxers. Certainly if any company could go
13  without referencing bruxers in advertisements, Glidewell should be doing so at
14  this time to help its case – but it is not.  Bruxers are those in need of zirconia
15  crowns, and dentists want to properly treat such patients.  In many respects, this
16  case is not about trademarks at all - since Glidewell is no longer the only maker
17  of bruxer crowns and is losing market share to competing products.  In my
18  opinion, Glidewell's registration should be cancelled as it is behaving in the
19  exact fashion feared by the U.S. Trademark Office TTAB in *In Re State*
20  *Chemical Manufacturing Co.* cited above.
21  Dated:  October 15, 2012
22
23                                                    _____
                                                      Lori N. Boatright
24
25
26
27
28

-31-

**EXHIBIT A**
-35-

# EXHIBIT A

# LORI N. BOATRIGHT

lori_boatright@bstz.com
(310) 351-9344

## EXPERIENCE

**BLAKELY SOKOLOFF TAYLOR & ZAFMAN LLP**                    Los Angeles, CA
1988 - Present

Chair, Trademark Practice Group, 1996 – Present

Management Committee Member, 2002-2006; 2009-2010

Strategic Planning Committee, Chair, 2001 Present

Partner, 1993 – Present

Associate Attorney, 1988 – 1993

Practice all aspects of trademarks and unfair competition, including publicity rights, emerging issues surrounding social media and advertising.  Focuses significantly on branding-related transactional work and client counseling – including providing advice during selection and clearance, during filing and prosecution (domestic and international), and in providing overall protection strategies.  Branding analysis, growth and management of domestic and international trademark portfolios, enforcing rights in proceedings at TTAB and in Federal Court.

**U.S. PATENT AND TRADEMARK OFFICE**                    Arlington, VA
January 1987- November 1988

*Trademark Examining Attorney*

Examine trademark and service mark applications for suitability for trademark registration; review for substantive and administrative legal issues; conduct trademark and service mark searches; prepare legal arguments in formal Office Actions following determination; prepare appeals and conduct oral argument at Trademark Trial and Appeal Board (TTAB); selected for TTAB assignment.

**OFFICES OF FRED KUGLER**                    Arlington, VA
August 1985 – January 1987

Attorney

Conduct and analyze trademark searches; review and analyze comprehensive searches; update in-house common law information; prepare trademark availability opinions.

**EXHIBIT A**

-37-

**CARSON COIL RILEY & MCMILLIN**                              Jefferson City, MO
                                                             August 1984 – July 1985

*Associate Attorney*

Practice in general civil litigation and represent criminal defendants in state court including felonies; lead attorney in dozens of bench trials and one jury trial; second chair in complex litigation; conduct discovery; prepare cases for trial; negotiate disputes in automobile accidents, family law, and general business

**PROFESSOR WILLIAM KNOX**                                   Columbia, MO
    **(LATER U.S. DISTRICT COURT, WESTERN DISTRICT OF MISSOURI)**         1983-84

*Assistant/Legal Clerk*

Conduct legal research; write memos

**STATE PUBLIC DEFENDER, APPELLATE DIVISION**                Columbia, MO
                                                             1982-84

*Law Clerk*

Review trial transcripts and prepare legal argument in support of appeal

**TURNER REID DUNCAN & LOOMER**                              Springfield, MO

*Law Clerk* – Summers 1982, 1983

*Investigator* – 1978 – 1981

## EDUCATION

**UNIVERSITY OF MISSOURI SCHOOL OF LAW**                     Columbia, MO
    J.D., May 1984

Board of Advocates:  Director (1983-4), Member (1982-83)

National Moot Court – Regional Team Fall 1982, Fall 1983

Women's Law Caucus Vice President

Law Class Prize for Advocacy (Deacy Annual Award), 1984

Order of the Barristers

**EXHIBIT A**

**MISSOURI STATE UNIVERSITY**                                        Springfield, MO

B.A., *Summa Cum Laude*, December 1980

Writing Major/Political Science Minor

Regents Academic Scholarship, 1977-1980;

Student Senate, 1977-1980; Writing Prize; Resident Assistant


## LECTURES AND WRITINGS

Featured lecturer on trademark matters at professional, academic and business forums, including:


Santa Clara University School of Law, Summer LLM Program Development for Foreign Scholars and Intellectual Property – Trademark Law; participation in strategy sessions, develop coursework, prepare syllabus in conjunction with tenured faculty/committee to establish program and serve as adjunct faculty, 2010 – (POSTPONED)

Santa Clara, CA


Technology Consortium; Lecturer/Leader – Marketing and Branding, 2004, 2008, 2009

San Francisco, CA

Silicon Valley/San Jose, CA


Beverly Hills Bar Association; Panelist – Legal Updates:  Trademark Law, 2005

Beverly Hills, CA


Entertainment Law Firm Forums; Featured Speaker – Publicity Rights and Trademark Issues, 2005, 2009

Los Angeles, CA


State Bar of Oregon; Featured Speaker – Domain and Cybersquatting Strategies, 2004

Portland, OR

**EXHIBIT A**

*Appeal Practice in Ex Parte cases* (Book Series Chapter); Intellectual Property Course Handbook Series/Trademark Rules and Practice, 2003

Practicing Law Institute; Lecturer/Panelist – Navigating Trademark Trial & Appeal Board Practice, 2003
San Francisco, CA

University of Minnesota School of Law – Oral Argument Presentation following Session of Court of Appeals Federal Circuit, 2001
Minneapolis, MN

U.S. Patent & Trademark Office/Continuing Legal Education, Trademark Trial and Appeal Board Special Series; 2000
Arlington, VA

U.S. Patent & Trademark Office, Special Lecture on Outside Bar Perspectives for Trademark Examining Attorney Corp; 1996
Arlington, VA

U.S. Patent & Trademark Office, Featured Lecturer, Legal Education Series on Trademark Licensing for Trademark Examining Attorney Corp; 1990
Arlington, VA

Beverly Hills Bar Journal, "*The Trademark* Law *Revision Act* of *1988*: A New Era" (with N. Zafman); 1988

## **RECOGNITION**

*World Trademark Review – World's Leading Trademark Professionals)*; 2009 – Present
Special Recognition: *Prosecution and Strategy*

4

**EXHIBIT A**

-40-

*Who's Who: Legal for Trademarks*; 2008 – Present

*Who's Who Executives and Professionals Throughout the World*; 2009 – Present
*Corporate Counsel Guide to California Lawyers and Law Firms*

*NameProtect Trademark Insider® Awards* for *National Top Ten Trademark Practice* and *Best Regional Firm* (multiple years)

## AFFILIATIONS

International Trademark Association; American Bar Association; California Bar Association; Missouri Bar Association

## BAR AND COURT ADMISSIONS

Admitted to California State Bar, May 1989
Admitted to Missouri Bar, August 1984
U.S. District Court, Central and Southern Districts of California; Court of Appeals for the Federal Circuit

## REPRESENTATIVE CLIENTS

Patagonia, Inc.; Brooks Running; Nature Made/Pharmavite; HDMI Licensing; Accuray CyberKnife; Silicon Image, Inc.; Celebrity Clientele (film/television actors, directors, production companies, musicians, comedians, authors, entertainers, and sports figures)

## HIGHLIGHTED PROJECTS

Provided strategic trademark counsel to Intel Corporation for "**INTEL INSIDE**®" branding and marketing launch, 1990-1993;
Provided strategic trademark counsel to Apple Inc. for "***i-***" formative marks and branding initiative; support as to clearance, analysis, branding advice to Senior Attorney, Trademarks, 1998-2001.

**EXHIBIT A**
-41-

## EXPERT WITNESS CASES

Optimal Pets, Inc. v. Nutri-Vet, LLC et al., EDCV 08-1795 SGL (C.D. Cal. 2008)

Artists Management Group, LLC v. Advantage Marketing Group, Inc., CV-01-4890 (C.D. Cal. 2001)

SG Services, Inc. v. God's Girls, LLC, CV01526 (OR-Portland 2005) ; and

SG Services, Inc. v. God's Girls, LLC, 2:08-CV-01873-ODW-JWJ (C.D. Cal. 2008)

**EXHIBIT A**

**PROOF OF SERVICE**

I am a citizen of the United States of America and I am employed in Irvine, California.  I am over the age of 18 and not a party to the within action.  My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.  I am readily familiar with the firm's business practices for the collection and processing of correspondence for mailing, and that mail so processed will be deposited the same day during the ordinary course of business.

On October 15, 2012, I caused the within LORI BOATRIGHT'S EXPERT REBUTTAL REPORT TO THE REPORT OF DAVID J. FRANKLYN to be served on the parties or their counsel shown below, by placing it in a sealed envelope addressed as follows:

*Via Electronic and First Class Mail:*

Leonard Tachner, Esq.
LEONARD TACHNER, A Professional Law Corp.
17961 Sky Park Circle, Suite 38-E
Irvine, CA 92614-6364
Email: ltachner@aol.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 15, 2012 at Irvine, California.

Claire A. Stoneman

14138863
101112

-32-

**EXHIBIT A**

-43-