Page 1

THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


JAMES R. GLIDEWELL DENTAL CERAMICS,      )

INC., DBA GLIDEWELL LABORATORIES,        )

                                         )

        PLAINTIFF/COUNTER-DEFENDANT,  )CASE NO.

                                      )SACV11-01309-DOC

              v.                      )(ANx)

                                         )

KEATING DENTAL ARTS, INC.,               )

                                         )

        DEFENDANT/COUNTER-PLAINTIFF.  )

_____  )


VIDEOTAPED DEPOSITION OF DAVID J. FRANKLYN

TAKEN FRIDAY, OCTOBER 12, 2012

IRVINE, CALIFORNIA


Reported by Audra E. Cramer, CSR No. 9901


_____

DIGITAL EVIDENCE GROUP

1726 M Street NW, Suite 1010

Washington, DC  20036

(202) 232-0646

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-380-

10/12/2012   James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

---

1  VIDEOTAPED DEPOSITION OF DAVID J. FRANKLYN, TAKEN ON
2  BEHALF OF THE DEFENDANT/COUNTER-PLAINTIFF, AT 9:40 A.M.
3  FRIDAY, OCTOBER 12, 2012, AT 2040 MAIN STREET, IRVINE,
4  CALIFORNIA, BEFORE AUDRA E. CRAMER, CSR NO. 9901,
5  PURSUANT TO NOTICE.
6
7  APPEARANCES OF COUNSEL
8  FOR PLAINTIFF/COUNTER-DEFENDANT:
9     LEONARD TACHNER PLC
10    BY: LEONARD TACHNER, ESQUIRE
11    17961 SKY PARK CIRCLE
      SUITE 38-E
12    IRVINE, CALIFORNIA 92614-6364
      (949) 752-8525
13    ltachner@aol.com
14
FOR DEFENDANT/COUNTER-PLAINTIFF:
15    KNOBBE MARTENS OLSON & BEAR LLP
      BY: LYNDA ZADRA-SYMES, ESQUIRE
16       RUSTIN MANGUM, ESQUIRE
17    2040 MAIN STREET
      14TH FLOOR
18    IRVINE, CALIFORNIA 92614
      (949) 760-0404
19    ljs@kmob.com
      rustin.mangum@kmob.com
20
21 ALSO PRESENT:
22    CHUCK GOSWITZ, VIDEOGRAPHER
                              Page 2

---

1  I N D E X
WITNESS
2  DAVID J. FRANKLYN
3
EXAMINATION              PAGE
4  MS. ZADRA-SYMES           6
   (P.M. SESSION)         104
5
6  E X H I B I T S
   NO.   PAGE     DESCRIPTION
   Exhibit 71  7     CV OF DAVID J. FRANKLYN
7  Exhibit 15  35    BRUXZIR/GLIDEWELL LAB COLOR
                     BROCHURE
8  Exhibit 72  41    EXPERT REPORT OF DAVID J.
                     FRANKLYN
9  Exhibit 73  61    TWO-PAGE WEB PRINTOUT FOR
10                   BRUXER CROWN
   Exhibit 74  61    TWO-PAGE WEB PRINTOUT FOR
11                   BRUXER CROWN
12 Exhibit 75  77    BRUXER DOC KDA-002445
13 Exhibit 76  79    DOCUMENT KDA-002444 AND
14                   DOCUMENT KDA-002799 THRU
15                   KDA-002800
16 Exhibit 77  91    TWO-PAGE CROWN AND BRIDGE
17                   WEB PRINTOUT
18 Exhibit 78  104   EXCERPT FROM JOURNAL OF
19                   ORAL REHABILITATION
20                   KDA-002152 THRU 160
21 Exhibit 79  107   CRANIO ARTICLE FROM OCTOBER
22                   1999 KDA-002106 THRU 118
                              Page 3

---

1  EXHIBITS (CONTINUED)
   NO.   PAGE     DESCRIPTION
2  Exhibit 80 109    ARTICLE FROM INTERNATIONAL
                     JOURNAL OF BEHAVIORAL
3                    MEDICINE KDA-001648 THRU
                     652
4  Exhibit 81 111    EXCERPT FROM JOURNAL OF
                     OROFACIAL PAIN KDA-002048
5                    THRU KDA-002062
   Exhibit 82 112    BRUXISM ARTICLE KDA-001657
6                    THRU 001661
   Exhibit 83 113    BRUXISM ARTICLE KDA-001738
7                    THRU 742
   Exhibit 84 114    KDA-002078 THRU 086
8  Exhibit 46 116    MINNESOTA R FORM KDA-002832
                     THRU 833
9  Exhibit 85 117    WEB ARTICLE "THE METAL-FREE
10                   PRACTICE SCAM"
11 Exhibit 86 121    TWO-PAGE WEB PRINTOUT
12                   "PROVEN WINNERS"
13 Exhibit 87 122    THREE-PAGE WEB PRINTOUT
14                   "ASK DR. CHRISTENSEN"
15 Exhibit 88 136    ONE-PAGE PRINTOUT "ZIRA
16                   FULL-CONTOUR ZIRCONIA"
17 Exhibit 89 139    TWO-PAGE TESS PRINTOUT
18                   "SUNTECH FULL ZIRCONIA"
19 Exhibit 90 147    TWO-PAGE "ZERISBRUX"
20                   AD/PRINTOUT
21 Exhibit 91 147    METAL-FREE RESTORATION
22                   GUIDE KDA-002172 THRU 173
                              Page 4

---

1     IRVINE, CALIFORNIA;
2        FRIDAY, OCTOBER 12, 2012, 9:40 a.m.
3
4        THE VIDEOGRAPHER:  Good morning.  This is Tape
5  No. 1 of the videotaped deposition of David Franklyn,
6  taken by Defendants in the matter of James R. Glidewell
7  Dental Ceramics, Inc. v. Keating Dental Arts, Inc., in
8  the United States District Court for the Central
9  District of California, Southern Division, Case
10 No. SACV11-01309-DOC.
11       This deposition is being held at 2040 Main
12 Street, 14th Floor, in Irvine, California.  Today's date
13 is Friday, October 12, 2012.  The time on the video
14 screen is 9:40 a.m.
15       My name is Chuck Goswitz.  The court reporter
16 is Audra Cramer.  We are both with Digital Evidence
17 Group.
18       Will counsel please introduce themselves for
19 the record.
20       MS. ZADRA-SYMES:  Linda Zadra-Symes and
21 Rustin Mangum for the Defendant Keating Dental Arts.
22       MR. TACHNER:  Leonard Tachner for the Plaintiff
                              Page 5

Pages 2 to 5

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**
-381-

10/12/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

1    Glidewell Laboratories.
2          THE VIDEOGRAPHER:  Thank you.
3          Will the court reporter please swear in the
4    witness.
5
6          DAVID J. FRANKLYN,
7          having been first duly sworn, was
8          examined and testified as follows:
9
10          EXAMINATION
11   BY MS. ZADRA-SYMES:
12   Q.  Good morning.
13   A.  Good morning.
14   Q.  The first question I have for you is, have you
15   ever been deposed before?
16   A.  I have.
17   Q.  How many times?
18   A.  More than 10, less than 20.  Probably 12,
19   14 times, something like that.
20   Q.  Okay.  I don't believe you listed 10
21   depositions in your resume.
22   A.  I can supplement it for you.
                                        Page 6

1    Q.  That would be great.
2    A.  Okay.  In the Herbalife case, the fifth one
3    down, I was deposed.  In the Allergan case I was
4    deposed.  In the Belvedere vodka case I was deposed.
5          Going to the next page, ION Media Networks, I
6    believe I was deposed.  Hard Rock Cafe case I was
7    deposed.  Dioptics Medical Products I was deposed.
8    Bad Boy case I was deposed.  The Cuties case, which is
9    near the end, the Roll group, I was deposed and
10   testified in arbitration.
11          And I think that's it.  How many does that come
12   to?
13          MR. TACHNER:  Eight.
14          MS. ZADRA-SYMES:  Eight.
15          THE WITNESS:  Okay.
16   BY MS. ZADRA-SYMES:
17   Q.  So other than that one arbitration, have you
18   ever testified at trial?
19   A.  No.
20   Q.  What was the nature of your representation for
21   King of Thai noodles?
22   A.  Worked on trademark licensing agreements.
                                        Page 8

1    Q.  Okay.  So let's start with that then.  So which
2    cases have you testified in?
3    A.  Well, do you have an extra copy of my CV that I
4    could look at?
5    Q.  Yeah.
6    A.  Thank you.
7          MS. ZADRA-SYMES:  Oh, I marked on the one --
8          THE WITNESS:  Shall we switch?
9          MS. ZADRA-SYMES:  Yeah, actually, can I take
10   this off and stick it on this one?
11          I just handed you what the court reporter has
12   marked as Exhibit 71.
13          (Whereupon, Exhibit 71 was marked
14          for identification.)
15          THE WITNESS:  Yes, okay.  Going through, if you
16   look at my page 2 and page 3 of my CV, there's a
17   representative list of clients, and I believe all or
18   most of the cases in which I've testified either by
19   deposition or trial would be listed here.  So let's just
20   go through those, and I'll give you an indication.
21          Would that be okay?
22   BY MS. ZADRA-SYMES:
                                        Page 7

1    Q.  So these are not all expert witness clients?
2    A.  Correct.  Some are consulting clients.
3    Q.  Do you understand that you are here today in
4    connection with cases pending in the Central District of
5    California?
6    A.  I do.
7    Q.  And you have actually prepared a report in
8    connection that case; is that correct?
9    A.  I have.
10   Q.  Who have you spoken with at Glidewell
11   Laboratories regarding your report?
12   A.  Mr. Jim Shuck.
13   Q.  Anybody else?
14   A.  No.
15   Q.  Have you discussed your report with any
16   dentists?
17   A.  No.
18   Q.  Have you discussed any research for your report
19   with any dentists?
20   A.  No.
21   Q.  Have you discussed any research for your report
22   with any dental labs?
                                        Page 9

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
EXHIBIT 153
-382-

| | |
|---|---|
| 1   A.  No. | 1   industry? |
| 2   Q.  Turning to your resume, Exhibit 71, your | 2   A.  Prior to this case, no. |
| 3   undergraduate degree was obtained in what year? | 3   Q.  And everything you have read is listed in your |
| 4   A.  1983. | 4   report? |
| 5   Q.  And what was the undergraduate degree in? | 5   A.  I believe so. |
| 6   A.  Philosophy, religion and history. | 6   Q.  Have you ever been deposed in a case that |
| 7   Q.  Do you have any science education? | 7   involves the dental industry? |
| 8   A.  No -- well, I took some classes. | 8   A.  I don't think so.  No. |
| 9   Q.  In the undergraduate degree? | 9   Q.  Have you ever been a consultant for a client in |
| 10  A.  Yeah. | 10  the dental industry? |
| 11  Q.  And what subjects would those be? | 11  A.  No. |
| 12  A.  I don't recall exactly.  You're talking about | 12  Q.  Have you ever acted as legal counsel for a |
| 13  1979 to 1983.  But as part of the two-year general | 13  client in the dental industry? |
| 14  requirements, there was some science and some math, yes. | 14  A.  No. |
| 15  Q.  Okay.  So any science education since that | 15  Q.  So I take it, then, you've never filed a |
| 16  time? | 16  trademark for a client in the dental industry? |
| 17  A.  No. | 17  A.  Correct. |
| 18  Q.  Then you obtained your law degree from the | 18  Q.  How many trademarks have you filed in the last |
| 19  University of Michigan in 1990. | 19  10 years? |
| 20  A.  Yes. | 20  A.  I don't file trademarks, but I've consulted |
| 21  Q.  Did you work at all between 1983 and 1990? | 21  with companies in proceedings before the PTO. |
| 22  A.  Yes. | 22  Q.  And what do you mean by that? |
| Page 10 | Page 12 |

| | |
|---|---|
| 1   Q.  And what type of work did you have -- | 1   A.  Well, I've consulted with companies in |
| 2   A.  I was a high school teacher educating students | 2   selection of marks and also in office actions and how to |
| 3   at a Catholic high school in Los Angeles. | 3   respond to office actions.  I've consulted with clients |
| 4   Q.  And what did you teach? | 4   with inter partes proceedings.  I have a client now that |
| 5   A.  History and literature. | 5   has finished an inter partes proceeding in the PTO |
| 6   Q.  Have you ever taught any science classes? | 6   involving genericism, and I've consulted with them |
| 7   A.  No. | 7   extensively.  And other priority issues, other issues |
| 8   Q.  Have you ever written any articles in | 8   related to oppositions and cancellations. |
| 9   connection with a science subject? | 9   Q.  And you mentioned one case.  I assume by |
| 10  A.  No. | 10  "inter partes in the PTO," you mean an opposition or |
| 11  Q.  Have you ever written any articles focused on | 11  cancellation for the trademark? |
| 12  the dental industry? | 12  A.  An opposition, trial and appeal board. |
| 13  A.  No. | 13     I'm sorry.  I'll -- |
| 14  Q.  Have you ever read any articles focused on the | 14  Q.  But it's an opposition -- |
| 15  dental industry? | 15  A.  -- wait till you finish. |
| 16  A.  Yes. | 16  Q.  It's an opposition before the -- |
| 17  Q.  Okay.  What have you read? | 17  A.  Yes. |
| 18  A.  Well, the articles that are listed in my | 18  Q.  -- trademark trial and appeal board? |
| 19  report.  I'd have to look at my report.  In preparation | 19  A.  Uh-huh. |
| 20  for here. | 20  Q.  What's the name of the mark? |
| 21  Q.  So other than what's listed in your report, | 21  A.  Paveway, P-a-v-e-w-a-y. |
| 22  you've never read any articles related to the dental | 22  Q.  And who is your client in that case? |
| Page 11 | Page 13 |

Pages  10  to  13

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-383-

1    A.   Raytheon.
2    Q.   Have you consulted with any other clients
3  involving genericness in the trademark trial and appeal
4  board?
5    A.   Let me look.
6        It came up in a case against Google wherein
7  somebody was alleging that "Google" had become generic
8  because people say, "I'm going to Google somebody," even
9  if they mean on Yahoo.
10   Q.   So which case was that?
11   A.   That was -- I'm trying to see if it's on here
12 or if the client's on here.  I'll have to go back and
13 look and see if it's on here.  There is a case, Silvers,
14 against Google, but I don't think it came up in that
15 case.  It came up in a different case where the
16 plaintiff's mark was googlegear.com.
17   Q.   Who was your client in that case?
18   A.   googlegear.com.
19       Other than that, I'm just looking at these to
20 see if any of these involved genericness either at the
21 PTO or in litigation.  I'd have to kind of go -- well,
22 Botox.  Botox' mark was claimed to be generic.  I gave

Page 14

of the fact that the patent lawyers who got the plant
2  patents used, at least on some occasions, the client's
3  mark, Prima, as a varietal name in the plant patent
4  applications.  The argument was made -- when they went
5  and sued somebody, the defendant said, "Well, your mark
6  is generic," and that was litigated.
7    Q.   Where was that litigated?
8    A.   I think in the -- well, I got involved in the
9  case after that, but the underlying genericness issue
10 was litigated, I think, in the Central District in
11 federal court here in California.
12   Q.   And who was your client in that case?
13   A.   My client is still, as we speak, Gerawan Farms,
14 who's listed here, who's the owner of the Prima mark.
15       I'm just looking through here to see if any of
16 these other ones involved genericness.
17       Well, as I sit here today, that's my best
18 recollection of the cases that I've been involved in
19 that have involved -- that have included a genericness
20 issue.
21   Q.   Okay.  So the Herbalife case that you were
22 deposed in, what was the issue in that case?

Page 16

1  some consulting advice on that.
2    Q.   Who was your client in that case?
3    A.   The owner of the Botox mark, Allergan.
4        The Maui pineapple case involved a genericness
5  issue for a particular subtype of pineapple that they
6  had developed that was called Hawaiian Gold, and
7  somebody else was calling the pineapple Hawaii Gold, and
8  there was an argument that "Hawaiian Gold" was generic
9  for a genetically bred, new type of pineapple.
10       Let's see what else here.  I think -- let's
11 see.
12       Pizza Man might have involved a claim of
13 genericness.  I'd have to go back and look and see.
14       Well, the cookie at issue in the Big Island
15 Candies case was alleged to be a generic shape of a
16 shortbread cookie and implied generic trade dress.
17   Q.   Who was your client in that case?
18   A.   Big Island Candies, as I recall.
19       Gerawan Farms, the very last case on the list,
20 is a case in which there has been significant litigation
21 over whether Prima as a brand for fruit, certain kinds
22 of peaches, genetically modified, is generic by virtue

Page 15

1    A.   The issue in that case was whether Herbalife
2  was -- well, there were a lot of issues.  But Herbalife
3  was in litigation with Adidas over the use of the
4  three-leaf Herbalife logo, which Adidas alleged was
5  confusingly similar to its three-leaf logo.  The parties
6  had had a contract, and at one point in time they agreed
7  to sort of stay out of each other's territory, products
8  and services types.
9        Then subsequent to that, Herbalife became the
10 sponsor for the L.A. Galaxy soccer team, and in
11 conjunction with that, its three-leaf logo was at some
12 point displayed on the chests of the soccer players as
13 they were running around.  Adidas said that violates the
14 contract, and -- so that's like Count 1 of the
15 complaint, and Count 2 is you're causing a likelihood of
16 confusion.  People are going to think that it's ours.
17   Q.   Where was that case pending?
18   A.   It was here in Los Angeles, federal court.
19   Q.   And then the Belvedere vodka case you were
20 deposed in?
21   A.   Yes?
22   Q.   What was the main issue in that case?

Page 17

Pages 14 to 17

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-384-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

1   A.  That case is still going on right now.  The
2   main issue is whether Reed Smith in New York, trademark
3   lawyers, committed malpractice in a variety of advice --
4   pieces of advice that they gave to then licensee of
5   the Belvedere vodka trademark during a time when it was
6   being purchased -- the license was being purchased by
7   Moët Hennessy in Paris.
8        The advice had to do -- without violating any
9   sort of confidentiality issues -- with whether they
10  could get out of the license or they could challenge the
11  attempt by the licensor, which was a winery in Napa
12  which had prior rights in the Belvedere mark for wine --
13  whether they could challenge the attempted licensing of
14  it in a collateral market for gin.  And a series of
15  events took place which ended up costing the parties
16  a lot of money because of the advice that was given.
17  Q.  And that's pending in Central District of
18  California.
19  A.  No.  That case, the Belvedere vodka case, is in
20  state court in New York City, I believe, yeah.
21  Q.  And then you mentioned that you were deposed in
22  ION Media Networks.

                                                    Page 18

1   A.  Yes.
2   Q.  Where was that case pending?
3   A.  That was here in Los Angeles in federal court.
4   That was a case involving the trademark ION, I-O-N, and
5   it was -- I was an expert for the defendant ION Media
6   Networks, which I believe now is out of business, but it
7   was a rather large cable television company.  They were
8   sued by a small company that had prior rights in the
9   word "ion" in a registered trademark for online
10  magazines, and they had a bit of a website where you
11  could get some information about a variety of things.
12      Honestly, it was a linking farm, but one of the
13  things they said they were going to do is stream
14  television online.  So that was the allegation, that
15  there was confusion because ION Media Networks, an
16  offline company, was related to television.
17  Q.  So the main trademark issue was likelihood of
18  confusion?
19  A.  It was likelihood of confusion.  It was -- I
20  think there was some priority issues.  There were issues
21  having to do with the scope of Positive Ions' federal
22  registration for the word "ion," whether they had

                                                    Page 19

1   overstated their description of goods and services.
2   There were a lot of issues, but trademark -- there
3   was -- I do not believe there was a genericness issue in
4   that case.
5   Q.  Okay.  And then you mentioned you were deposed
6   in Hard Rock Cafe.  Where was that case pending?
7   A.  That case was pending here in state court in
8   Los Angeles.
9   Q.  And did that involve a trademark genericness or
10  likelihood of confusion issue?
11  A.  No, I don't think so.
12  Q.  Then you mentioned you were deposed in Diopti;
13  is that right?  CS Medical Products.
14  A.  Dioptic.
15  Q.  Dioptic.
16  A.  Dioptics.
17  Q.  Medical products.
18  A.  Yes.  That -- I think that was in the Northern
19  District of California, uh-huh.  I'd have to go back and
20  look.  That's 10 years ago.  I know I was deposed in
21  San Francisco, but I'm forgetting -- and it was in
22  federal court, either down here or up there.  I just

                                                    Page 20

1   don't recall.
2   Q.  Do you recall whether it involved a genericness
3   issue?
4   A.  No, it involved likelihood of confusion over
5   the mark -- oh, hang on a second -- Encor, E-n-c-o-r,
6   for either -- one party had it for sort of post-cataract
7   surgery sunglasses, and the other party was using it for
8   contact lenses, and there were issues about the strength
9   of the mark and about confusion and about whether the
10  markets were overlapping between the parties, marketing
11  channels.
12  Q.  Okay.  The next case you mentioned is Bad Boy,
13  Inc., that you were deposed in.
14  A.  Yes.
15  Q.  And where was that case pending?
16  A.  Southern District of Florida, I believe.
17  Q.  Was the issue of genericness involved in that
18  case?
19  A.  Oh, goodness.  I'd have to go back and look.
20  The mark is Bad Boy for clothing and for power drinks,
21  and there were issues regarding the validity of the
22  mark, the plaintiff's mark, but I don't believe that the

                                                    Page 21

                                          Pages 18 to 21

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
EXHIBIT 153
-385-

**Page 22**

1  validity issues turned on genericness.
2     Q.  And who was your client, plaintiff or
3  defendant?
4     A.  I was in that case working for the plaintiff.
5     Q.  The next one you mentioned you testified in is
6  the Roll group.
7     A.  Yes.
8     Q.  And where was that case pending?
9     A.  This arbitration was --
10    Q.  I'm sorry.  Arbitration.
11    A.  -- was this summer in Bakersfield, California.
12 I think it was -- I testified in June of this year in
13 Bakersfield.  I was deposed probably in May.  Might be
14 off by a few weeks either way, but, you know, late
15 spring, early summer.
16    Q.  Okay.  And was the issue of genericness
17 discussed in that case?
18    A.  Yes.
19    Q.  Who was your client, the plaintiff or
20 defendant?
21    A.  Well, they had so cross-sued each other for
22 everything, they were both plaintiffs and both

**Page 23**

1  defendants, and I don't remember if -- my client was
2  Paramount Citrus.  The other party was Sun Pacific.
3  Paramount Citrus is owned by the Roll group, which also
4  owns a variety of other companies, such as Fiji water,
5  and they're located here in the L.A. area.  I just don't
6  remember who initiated this particular arbitration,
7  but -- yeah.
8        And the arbitration is completely confidential
9  and sealed, and so I have to be circumspect about how
10 much I say about what's involved.
11    Q.  Okay.  Were you representing the party
12 asserting genericness?
13    A.  Neither party was asserting genericness, but
14 genericness was an issue for which testimony was needed.
15    Q.  And that was the basis of your testimony?
16    A.  Well, my testimony covered many things.
17    Q.  Including genericness?
18    A.  Yes.  But I really can't say more than that.
19 It's not a public document.  There's no public documents
20 on that case.
21    Q.  Have you published any articles focused on the
22 subject of trademark genericness?

**Page 24**

1     A.  I don't think I've published a specific article
2  published on that.  I've published many articles on
3  trademark law.  I've studied trademark genericness quite
4  a bit.  I don't think, if you look at my articles,
5  either pending or published, any of them are focused
6  primarily on the issue of genericness.
7     Q.  Have you published any articles on the issue of
8  trademark likelihood of confusion?
9     A.  I have discussed likelihood of confusion in
10 several of my articles.
11    Q.  Which ones are those?
12    A.  Let me see.  I think -- you don't have on this
13 resume -- on this CV the most recent one that is coming
14 out, which talks about confusion quite a bit.  Let me
15 tell you that one and tell you how you can find it.
16       It's called "Trademarks as Keywords: Much Ado
17 About Something?" and it is forthcoming in the Harvard
18 Journal of Law & Technology in spring of 2013.  It is
19 posted on the Internet on the Social Science Research
20 Network, SSRN.  If you Google my name and that title,
21 it'll come up within three or four hits, and you can
22 read it and download it.  And it discusses likelihood of

**Page 25**

1  confusion on trademarks on the Internet in some detail.
2     Q.  Is there a reason why it wasn't listed on your
3  resume?
4     A.  Yes.  Because at the time I gave this resume to
5  counsel, it hadn't been accepted for publication.  It
6  was subsequently accepted for publication, and it is
7  listed in a sense where I say, third article under
8  Publications, "Empirical Study of Trademarks as
9  Keywords: Confusion, Dilution and Diversion.  Multiscale
10 empirical research under way in Europe and U.S."  Once
11 it matured and became accepted, we changed the title,
12 and that's why it's -- it's referenced here as a
13 research study that was pretty mature, about ready to go
14 out, but now it's a paper.
15    Q.  The title changed, basically.
16    A.  Yes, the title changed.
17    Q.  Have you reviewed Glidewell's marketing
18 materials that have published.  Not on their website,
19 but their actual --
20    A.  I believe I have, yes.
21    Q.  Okay.  We'll go through those.
22       Do you know what a PFM is?

Pages 22 to 25

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**
-386-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1  A.  Yes. | 1   bit down on a piece of nutshell in mole enchiladas in |
| 2  Q.  What is it? | 2   Birmingham, California, and my tooth cracked.  My |
| 3  A.  Give me one second.  Okay? | 3   dentist said, "We're going to shave it down and put on a |
| 4      It is a porcelain-fused-to-metal crown. | 4   crown," and I think it's a zirconia crown.  So I got to |
| 5  Q.  Is that a generic term? | 5   look at it and hold it -- and that was before this |
| 6  A.  I don't know. | 6   litigation -- and see it, and there was a temporary one |
| 7  Q.  Do you know what a full-cast gold crown is? | 7   put in place until the full one could be put in place. |
| 8  A.  I think it's what it sounds like:  It's a | 8       Then after that after, of course, when I got |
| 9  full-cast gold crown. | 9   hired here, I started to have conversations with |
| 10  Q.  Is that a generic term? | 10   Attorney Tachner about the different types of crowns and |
| 11  A.  I don't know.  I haven't given that | 11   educated myself, and to read on the Internet and educate |
| 12  consideration.  I would want to do an awful lot more | 12   myself, and talked to Mr. Shuck, I believe it is, and |
| 13  looking into each of these before giving an opinion on | 13   educated myself.  So I have personal experience and then |
| 14  one of these things. | 14   investigatorial experience about what a crown is. |
| 15  Q.  Have you heard of an all-ceramic crown? | 15  Q.  When did you have your crown fitted? |
| 16  A.  I have, yes. | 16  A.  Two years ago?  Year and a half ago? |
| 17  Q.  Is that a generic term? | 17  Q.  Do you know who manufactured the crown? |
| 18  A.  Yes. | 18  A.  No. |
| 19  Q.  Have you heard of a full zirconia crown? | 19  Q.  Did your dentist tell who you manufactured it? |
| 20  A.  Yes. | 20  A.  No. |
| 21  Q.  Is that a generic term? | 21  Q.  Do you know for a fact that it was a full |
| 22  A.  Well, that's actually something that I've given | 22  zirconia crown? |
| Page 26 | Page 28 |
| 1  consideration to in this litigation, and I think it is, | 1  A.  I remember him using the word "zirconia." |
| 2  yes. | 2  Q.  Do you know if he used "full zirconia"? |
| 3  Q.  Is "full zirconia" a generic term? | 3  A.  I'm not sure. |
| 4  A.  I don't know.  It depends on what it's used | 4  Q.  So you don't know for a fact whether you have a |
| 5  for. | 5  full zirconia crown or not. |
| 6  Q.  If it's used in connection with dental crowns, | 6  A.  I do not. |
| 7  would it be generic? | 7      Can you tell by looking if we stop the tape for |
| 8  A.  I don't know.  I would have to look at it, the | 8  a minute? |
| 9  context and the way in which it's used. | 9  Q.  No.  I don't need to look. |
| 10  Q.  If it's used in connection with dental crowns, | 10  A.  Okay. |
| 11  to describe a dental crown, would it be generic? | 11  Q.  So prior to this case, being retained in |
| 12  A.  It could be, might be. | 12  connection with this case by Glidewell, did you have any |
| 13  Q.  What is a dental crown? | 13  other experience with dental crowns other than your own |
| 14  A.  A dental crown is a piece of man-made material | 14  personal experience? |
| 15  that is sculpted and shaped out of some type of | 15  A.  I think my father has dental crowns, my mother |
| 16  substance, which different substances are used to put | 16  has dental crowns.  Other than that kind of personal |
| 17  basically a cap on a tooth that has been injured in some | 17  experience, no.  No professional experience. |
| 18  way and to crown it so that it can be used as a | 18  Q.  When you say that your mother and father having |
| 19  functional tooth. | 19  a dental crown is personal experience, do you know what |
| 20  Q.  And how do you know that? | 20  type of dental crown they have? |
| 21  A.  Well, I know it from personal experience and | 21  A.  No. |
| 22  from because I have one in my mouth that I got when I | 22  Q.  You don't know whether they were fitted with |
| Page 27 | Page 29 |

Pages 26 to 29

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-387-

| | |
|---|---|
| 1  zirconia crowns or not? | 1  prior to this case? |
| 2     A.  I have never asked them.  I will after today. | 2     A.  No. |
| 3     Q.  What's the primary indication for a zirconia | 3     Q.  Had you had any contact with Glidewell's |
| 4  crown? | 4  directors prior to this case? |
| 5     A.  My understanding is that -- well, do you mean | 5  BY MS. ZADRA-SYMES: |
| 6  full zirconia crown? | 6     Q.  You referenced full zirconia -- you asked me |
| 7     Q.  Any zirconia crown. | 7  the question, actually, did I mean a zirconia crown or |
| 8     A.  My understanding is that zirconia is an | 8  full zirconia crown. |
| 9  extra-strong material and that it should be used and is | 9        What's the difference, as far as you're aware, |
| 10  used when strength is particularly at issue.  And there | 10  between a full zirconia crown and a regular zirconia |
| 11  could be various reasons for that, why a patient might | 11  crown. |
| 12  need a stronger crown than another patient. | 12     A.  Well, it's my understanding that zirconia has |
| 13     Q.  And how do you know that? | 13  been used or historically was used as part of a base for |
| 14     A.  Speaking -- doing investigation in this case on | 14  a crown prior to the development of the technology to |
| 15  the Internet, reading, reading the articles. | 15  the point where it could be used as a full zirconia |
| 16     Q.  Everything that is referred to in your report? | 16  crown.  So a zirconia crown may have been used as a base |
| 17     A.  I believe it's all there.  If -- now they can | 17  at one point in time and then had an overlay of ceramic |
| 18  make a supplemental distribution to you. | 18  material for esthetic reasons, and I guess that would be |
| 19     Q.  Well, if there isn't anything referenced in | 19  not a full zirconia crown, a partial zirconia crown in |
| 20  your report, I'd like you to tell me what it is. | 20  terms of the makeup of the material. |
| 21     A.  I'd have to go back and look. | 21     Q.  Are you familiar with the term "all-zirconia |
| 22     Q.  Okay.  Well, we'll get to your report shortly. | 22  crown"? |
| Page 30 | Page 32 |

| | |
|---|---|
| 1     A.  You're pointing at my CV, by the way.  It's not | 1     A.  Yes. |
| 2  my report. | 2     Q.  How does that different from "full zirconia |
| 3     Q.  Well, I will give you your report shortly. | 3  crown"? |
| 4        When did you first here the term "bruxer"? | 4     A.  I'm not aware that it has a difference. |
| 5     A.  This case. | 5     Q.  Does it differ from "full-contour zirconia |
| 6     Q.  So prior to this case you'd never heard the | 6  crown"? |
| 7  term "bruxer"? | 7     A.  I'm not aware that that has a difference in |
| 8     A.  I'd never heard -- well, I'm not sure if that's | 8  meaning either between "full zirconia" or "full-contour |
| 9  right actually.  At one point I was told by my dentist, | 9  zirconia." |
| 10  a few years ago, prior to the time I got this crown, | 10     Q.  Okay.  So as far as you're aware, "full-contour |
| 11  that I was grinding my teeth my sleep.  I don't recall | 11  zirconia," "full zirconia" and "all-zirconia" are all |
| 12  if he used the term "bruxism" or "bruxer" at the time or | 12  synonym? |
| 13  if he just told me I was at that point a grinder. | 13     A.  That is my understanding. |
| 14     Q.  But as far as you recollect, you had not heard | 14     Q.  Who are the primary market for full zirconia |
| 15  the term -- | 15  crowns? |
| 16     A.  No. | 16     A.  For the crown as the finished product or for |
| 17     Q.  -- "bruxer" before working on this case? | 17  the material that is used to make the crown? |
| 18     A.  That is correct. | 18     Q.  Who does Glidewell sell its crowns too? |
| 19     Q.  Had you heard of the term "bruxism" before | 19     A.  My understanding is that Glidewell sells its |
| 20  working on this case? | 20  crowns to dentists who order them, and it sells its |
| 21     A.  No. | 21  blanks to labs that get orders from dentists. |
| 22     Q.  Have you ever had any contact with Glidewell | 22     Q.  I'm sorry.  What did you call them? |
| Page 31 | Page 33 |

Pages 30 to 33

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-388-

1     Oh, blanks.  Okay.  Blanks of zirconia
2 material?
3     A.  Yes.
4     Q.  How many competitors does Glidewell have?
5     A.  In which market?
6     Q.  For its full zirconia crowns.
7     A.  My understanding is that there are many labs in
8 the United States, small labs that -- although Glidewell
9 appears to be the largest single lab for making crowns,
10 full zirconia crowns, there are many, many small labs
11 that make them.  Some of them are authorized labs that
12 it has a relationship with, and some of them are not.
13     So I think the number of competitors in terms
14 of labs, independent labs, is rather large.  I am not
15 sure of the size, but I am under the understanding that
16 Glidewell makes maybe 5 percent or 10 -- something
17 between 5 and 10 percent of full zirconia crowns in the
18 United States, and therefore, many other labs make the
19 rest.
20     MS. ZADRA-SYMES:  Can we go off the record for
21 just a second, please.
22     THE VIDEOGRAPHER:  Off the record at 10:19 a.m.

Page 34

1     (Recess taken.)
2     THE VIDEOGRAPHER:  Back on the record at
3 10:19 a.m.
4     MS. ZADRA-SYMES:  I'm going to hand you what's
5 previously been marked as Exhibit 15.
6     (Whereupon, Exhibit 15 was marked
7     for identification.)
8 BY MS. ZADRA-SYMES:
9     Q.  Have you seen that before?
10     A.  I believe so.
11     Q.  Since I only have one copy of it as it's a
12 prior exhibit, can you please read the first bullet
13 point under the photographs?
14     A.  Do you mean the photographs on the left side?
15     Q.  Photographs on the left side.
16     A.  The first bullet point says, "Ideal for bruxers
17 who have destroyed natural teeth or previous dental
18 restorations."
19     Q.  Is that a slang use of the term "bruxer"?
20     A.  Well, you know, I am under the impression that
21 it is.
22     Q.  And why is that?

Page 35

1     A.  Because I've been told that it is.
2     Q.  Who told you that?
3     A.  I think Mr. Shuck told me that, that "bruxer"
4 is used slang to refer to a person with bruxism.
5     Q.  So other than Mr. Shuck telling you that, you
6 have no other independent knowledge of it.
7     A.  I've seen it used on the Internet during my
8 Internet searches.  I've seen the word "bruxer" used,
9 apparently to have this meaning.
10     The reason why I pause is because of your use
11 of the word "slang."
12     Q.  Actually, you used it many times in your
13 report, so that's why I'm asking you.  So I'm referring
14 to your use of the word "slang."
15     A.  Well, thank you.  That helps me.
16     You mean by "slang" what I mean by "slang"?
17     Q.  Yes, exactly.
18     A.  Oh, okay.  So do you want me to elaborate on
19 that or not?
20     Q.  I'm asking you if the word bruxer in these
21 Glidewell marketing materials is a slang use of the word
22 "bruxer."

Page 36

1     A.  My understanding is that it is.
2     Q.  And your basis for that understanding is your
3 discussion with Mr. Shuck?
4     A.  And my investigation on the Internet.
5     Q.  Okay.  And when you saw it on the Internet, did
6 you see it in italics or quotes to indicate that it was
7 a slang term?
8     A.  I don't know that slang terms are always put in
9 italics or quotes.
10     Q.  So if the term is used by dentists in technical
11 scientific journals, would that make it a slang term?
12     A.  It may mean that it's made its way from slang
13 into, you know, a more formal understanding in usage.
14     Q.  Is it your understanding that Mr. Shuck is a
15 dentist?
16     A.  No.
17     Q.  What's your understanding of his professional
18 background?
19     A.  He's, I think, Vice President of Sales for
20 Glidewell.
21     Q.  Do you know if he has any dentist training?
22     A.  I think he talks to dentists in his company all

Page 37

Pages 34 to 37

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

1    the time.
2        Q.  Did you speak to a Dr. Michael DiTolla at all?
3        A.  No.  I spoke with Mr. Shuck about Dr. D.
4        Q.  Have you reviewed any videos in which
5    Dr. DiTolla is promoting the Glidewell products?
6        A.  I'd have to go back and look and see.
7        Q.  But you don't recall if you --
8        A.  I don't recall right as I sit here if I
9    reviewed those particular videos.
10       Q.  Have you seen the term "bruxer" referenced
11   anywhere as a slang term in a dictionary?
12       A.  Well, usually a dictionary wouldn't reference
13   it as a slang term.  It might -- it may or it may not.
14   I would have to look at that.  Usually by the time it's
15   made its way into a dictionary, it's sort of considered
16   not slang anymore.
17       Q.  Are you aware that Glidewell has admitted in
18   this case that the term "bruxer" is a generic termer for
19   a person who suffers from bruxism?
20       A.  You mean have I seen a document that says that?
21       Q.  Are you aware that in this case Glidewell has
22   admitted that the term "bruxer" is a generic term for a
                                              Page 38

1        Q.  And how are they labeled?
2        A.  Well, it's my understanding that it says
3    "BruxZir" on it, like this.
4        Q.  So as it's shown on Exhibit 15?
5        A.  Yes.
6        Q.  So by "BruxZir," you're referring to the term
7    that's in the top left-hand corner of Exhibit 15?
8        A.  Their trademark is pronounced, as I understand
9    it, in Europe brux-ZEER [phonetic], and pronounced by
10   many people in the United States as brux-ZER [phonetic],
11   and occasionally apparently pronounced as BRUX-er
12   [phonetic], with a softer Z.
13       Q.  Is it your understanding that European
14   pronunciation is relevant to a U.S. case?
15       A.  Well, maybe some people in the United States
16   pronounce it brux-ZEER too.
17       Q.  Are you aware of anybody who does?
18       A.  I haven't talked to anybody who pronounces it
19   brux-ZEER in the United States.  When I first saw it,
20   that's how I pronounced it my own head.
21       Q.  But you had no experience in dental industry.
22       A.  That is true.
                                              Page 40

1    person who suffers from bruxism?
2        A.  No.
3        Q.  Are you aware that in this case Glidewell has
4    admitted that the term "to brux" is a verb?
5        A.  Not specifically.
6        Q.  Is it your opinion that the term "bruxer" is
7    not generic for a person who suffers from bruxism?
8        A.  My opinion is that it is descriptive of a
9    person who suffers from bruxism.
10       Q.  So your opinion is it's not generic for a
11   person who suffers from bruxism?
12       A.  It may be.  It may be.
13       Q.  And are you familiar with the term "to brux" as
14   a verb?
15       A.  Yes.
16       Q.  How did you become familiar with that?
17       A.  In my work on this case.
18       Q.  Have you reviewed any samples of Glidewell's
19   products in connection with this case?
20       A.  Yes.
21       Q.  And what did you review?
22       A.  Crowns and the boxes that they come in.
                                              Page 39

1        Q.  How did Mr. Shuck pronounce it?
2        A.  Brux-ZER.
3        Q.  And how does Dr. DiTolla pronounce it?
4        A.  I'm not sure.
5        Q.  How is it pronounced in Glidewell's marketing
6    videos on Glidewell's websites?
7        A.  I think sometimes it's pronounced brux-ZER, and
8    sometimes it's pronounced BRUX-er.
9        Q.  Is it your position that, in order to be
10   considered generic, a term has to appear in a trademark
11   office application and registration search?
12       A.  No.
13       MS. ZADRA-SYMES:  So can we just take five
14   minutes, and then we'll get straight into your report?
15       THE WITNESS:  Sure.
16       THE VIDEOGRAPHER:  Off the record at 10:28 a.m.
17       (Recess taken.)
18       THE VIDEOGRAPHER:  Back on the record at
19   10:35 a.m.
20       MS. ZADRA-SYMES:  So I'm going to hand you what
21   the court reporter has marked as Exhibit 72.
22       (Whereupon, Exhibit 72 was marked
                                              Page 41

                                    Pages 38 to 41

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
EXHIBIT 153
-390-

10/12/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1     for identification.) | 1    Q.  How long have you been a professor? |
| 2   BY MS. ZADRA-SYMES: | 2    A.  Since 1996. |

**Page 42**

1     for identification.)
2   BY MS. ZADRA-SYMES:
3    Q.  What is that document?
4    A.  "Expert Report of David J. Franklyn."
5    Q.  And do you recognize it?
6    A.  I do.
7    Q.  Is this in fact the report that you have
8 submitted in connection with this case?
9    A.  Yes.
10    Q.  On the signature page, is that your signature?
11    A.  It is.
12    Q.  And it was signed on September 15, 2012?
13    A.  Yes, it was signed on September 15, 2012.  I
14 think that's right.
15    Q.  Now, in the appendix there's a curriculum
16 vitae, or resume.
17    A.  Yes.
18    Q.  Does this have any substantive difference than
19 the one that we already looked at earlier today?
20    A.  I don't know.  I don't think so.  Looks like
21 the only difference is that it's double-spaced.
22    Q.  Just looking at the top of page 22, there's a

**Page 42**

1 paragraph that says, "I have written expert reports,
2 been deposed, drafted briefs, designed surveys and filed
3 trademark applications."
4    I believe you testified earlier that you don't
5 file trademark applications; is that correct?
6    A.  I don't generally file trademark applications.
7 I may have filed a trademark application in the
8 King of Thai noodle case.
9    Q.  Any others?
10    A.  I'd have to go back and look.  I don't think
11 so, but I have advised clients on filing them, sometimes
12 extensively advised them on [inaudible mumbling].
13    Q.  Is there a reason --
14    A.  I think if you search the USPTO database and
15 look for "Franklyn" and see how many trademarks he's
16 filed, I think the only file that's going to come up
17 with my name on it probably is King of Thai noodle.
18    Q.  Is there a reason why you don't file trademark
19 applications?
20    A.  I'm too busy being a professor and occasional
21 expert witness.  I just decided not to go into that
22 business.

**Page 43**

1    Q.  How long have you been a professor?
2    A.  Since 1996.
3    Q.  So since 1996 you haven't had a private client
4 practice as an attorney; is that correct?
5    A.  That's correct.
6    Q.  Now in, paragraph 3 of your report --
7    A.  Yes?
8    Q.  -- you say, "I was retained in this matter by
9 counsel for the Plaintiff, Glidewell Laboratories, to
10 render opinions as to whether (1) Plaintiff's registered
11 mark 'BruxZir' is predominantly seen as a generic name
12 for the service of making solid zirconia dental crowns
13 and bridges or from the material from which those crowns
14 and/or bridges are made by relevant consumers in the
15 relevant markets or submarkets in the United States."
16    And I'll stop there before we get to point
17 No. 2.  Okay?
18    What did you mean by "predominantly"?
19    A.  By a majority of people in the relevant market,
20 and that it predominantly seen as the generic name for
21 this product or service.
22    Q.  Who did you talk to in the relevant market?

**Page 44**

1    A.  I looked at what I told you I did in my
2 report:  on the Internet, I looked at filings of the
3 USPTO, and I talked to Mr. Shuck about the relevant
4 market.
5    Q.  But you didn't talk to anybody in the relevant
6 market?
7    A.  I think Mr. Shuck is in the relevant market.
8    Q.  Other than Mr. Shuck, did you talk to anybody
9 else?
10    A.  No.
11    Q.  In this paragraph you didn't reference the
12 dental crowns themselves.  Were you retained to give an
13 opinion as to whether Plaintiff's registered mark
14 BruxZir is seen as a generic name for the dental crowns
15 themselves?
16    A.  Yes.  I meant that.  When I talk about the
17 service of making them, the material from which they're
18 made and the resulting product.  The service of making
19 them, and then obviously that results in the dental
20 crown itself.
21    Q.  Okay.
22    A.  I did not intend by the use of the phrase

**Page 45**

Pages 42 to 45

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
**EXHIBIT 153**
-391-

**Page 46**

1  "service of making them" to exclude from my opinion the
2  resulting product.
3      Q.  In this Point No. 1 in paragraph 3 you
4  reference the relevant consumers.  Who are the relevant
5  consumers?
6      A.  I believe I state that in a further section of
7  my report.  If you'll give me a moment so that I make
8  sure I revisit that.
9          On page 11 -- would you like me to read it?
10     Q.  No.  I actually -- without looking at your
11 report on page 11, you didn't know who the relevant
12 consumers were?
13     A.  Oh, no, I know who the relevant consumers are.
14     Q.  Okay.
15     A.  I just don't want to be tricked by you.
16     Q.  I don't trick people.
17     A.  No, I can tell.  You're a very honest attorney.
18 But I have done this before, and if I use a word that's
19 slightly than I used later on page 11, somebody will
20 say, possibly, "Well, why did you just say it different
21 than the way you said it on page 11?"  So I asked as a
22 courtesy that I may look at it.

**Page 47**

1      Q.  Of course.
2      Q.  Okay?
3      Q.  Where on page 11 are you looking?
4      A.  Paragraph 11.
5      Q.  And paragraph 11 says, "The relevant consumers
6  for restorations are dentists for Glidewell's fabricated
7  crowns and approved labs for materials."
8      A.  Yes.
9      Q.  Are there any other relevant consumers that are
10 at issue in this case?
11     A.  Well, I suppose it could be the case that the
12 relevant consumers include the end user patients and how
13 they see this mark and if they're exposed to it by
14 dentists who talk to them about it, and if they are
15 exposed to it in a way that has branding significance.
16 But I think that, based on my review of the record and
17 of the other searches that I did, the consumers in the
18 relevant market in the first instance and the primary
19 instance are the dentists, the dental labs -- yeah.
20     Q.  So dentists and dental labs?
21     A.  Yes, uh-huh.
22     Q.  Okay.

**Page 48**

1          (The reporter noted that the
2           witness was writing on the exhibits
3           being marked for the record.)
4      THE WITNESS:  Did I write on it?  Oh, I did, on
5  Exhibit 3.
6          I won't write on your exhibits.  I won't write
7  on your exhibits again.
8      MS. ZADRA-SYMES:  That's okay.  But that is the
9  exhibit now, for the record, that has your handwriting
10 in it.
11     THE WITNESS:  Yes.
12     MS. ZADRA-SYMES:  That's fine.
13 BY MS. ZADRA-SYMES:
14     Q.  Then turning to paragraph 5 of your report, you
15 list documents that you were provided by counsel for
16 Glidewell Laboratories.
17     A.  Yes.
18     Q.  Other than what's listed there, have you
19 reviewed anything else that was provided to you by
20 counsel for Glidewell Laboratories?
21     A.  No, not other than the actual crowns that I
22 looked at.

**Page 49**

1      Q.  And which crowns did you look at?
2      A.  I'd have to go back and look to see which ones
3  they were.  I looked at crowns that Mr. Tachner showed
4  me.
5      Q.  Were they all manufactured by Glidewell?
6      A.  I don't believe so.
7      Q.  Do you know who the other manufacturers were?
8      THE WITNESS:  Was there a crown -- well, I'll
9  have to confirm with him and clarify that, yeah.
10 BY MS. ZADRA-SYMES:
11     Q.  Okay.  Because everything that you reviewed in
12 connection with this report, we're entitled to know
13 about.
14     A.  Of course.
15     Q.  So I'd like to know what brands of products you
16 looked at --
17     A.  I will provide that to you in writing.
18     Q.  Well, for the purposes of this deposition, just
19 tell me in the deposition --
20     A.  Well, of course.  But I need to refresh my
21 recollection.
22     MR. TACHNER:  I could tell you if you'd like so

Pages 46 to 49

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-392-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1   we could just -- | 1     A. Yes? |
| 2      MS. ZADRA-SYMES: No, he needs to testify -- | 2     Q. -- are you referencing conducted by |
| 3      THE WITNESS: I need to say it. | 3   Brendan Way? |
| 4      MS. ZADRA-SYMES: Yeah. | 4     A. Yes. |
| 5      THE WITNESS: Yeah, so why don't do I that | 5     Q. Did anybody else have any involvement in |
| 6   either later today -- | 6   conducting searches for you? |
| 7      MS. ZADRA-SYMES: That would be fine. | 7     A. No. |
| 8      THE WITNESS: -- if we could revisit it on the | 8     Q. Paragraph 6(a) -- well, actually, before that |
| 9   record, make it easier. | 9   question, have you produced all the results of your |
| 10   BY MS. ZADRA-SYMES: | 10   searches in connection with this case to us? |
| 11     Q. So other than those samples and the documents | 11     A. I think so. I believe the answer to that is |
| 12   listed in paragraph 5 here, are there any other | 12   yes, through the -- electronically, uh-huh. |
| 13   materials that you've reviewed that were provided to you | 13     Q. And that would be the electronic production |
| 14   by Glidewell or its counsel? | 14   that we received on Wednesday night this week? |
| 15     A. I don't believe so, but I would want to go | 15     A. Yes. |
| 16   ahead and double-check that as well for you. | 16     Q. Then in 6(a) you say, "I visited and reviewed |
| 17     Q. Okay. Thank you. | 17   the websites of Plaintiff and Defendant on several |
| 18     A. Because I did have a meeting with counsel after | 18   occasions between August 15, 2012, and September 15, |
| 19   I wrote this report, but I don't think that anything we | 19   2012." |
| 20   went over was new that I hadn't seen before, but I would | 20     A. Yes. |
| 21   like to double-check that to be especially accurate for | 21     Q. Have you reviewed them at any other time? |
| 22   you. | 22     A. No. |
|                  Page 50 |                  Page 52 |
| 1     Q. Other than Mr. Shuck and Mr. Tachner, you | 1     Q. When you reviewed the Plaintiff's website did |
| 2   haven't met with anybody else in connection with this | 2   you look at the promotional videos on the website? |
| 3   case; is that correct? | 3     A. Uh-huh. |
| 4     A. Met with anybody else, anywhere? | 4     Q. You did? Okay. |
| 5     Q. In connection with this case. In connection | 5     A. Uh-huh. |
| 6   with your report in this case. | 6     Q. So you remember now doing that? |
| 7     A. Yes, I have. | 7     A. I looked at some of them. I don't remember, |
| 8     Q. Okay. Who else have you met with? | 8   you know, extensively how much I looked at all of the |
| 9     A. My research assistant. | 9   promotional videos. |
| 10     Q. And who is that? | 10     Q. Do you recall looking at promotional videos |
| 11     A. His name is Brendan Way, W-a-y, who helped | 11   where Dr. DiTolla is speaking about the BruxZir product? |
| 12   perform research for me in this case. | 12     A. I told, I think, earlier, that I did remember |
| 13     Q. Anybody else? | 13   looking at that. Didn't I say that, or no? |
| 14     A. No. | 14     Q. I asked you how you pronounced it on -- |
| 15     Q. Then turning to paragraph 6, you say, "In | 15     A. Oh, that I don't recall. Yeah, that I don't |
| 16   addition to reviewing the documents that are listed in | 16   recall. That was a different question. |
| 17   paragraph 5, I conducted or caused to be conducted under | 17     Q. And in paragraph 6(b) you say, "I conducted |
| 18   my supervision the following searches of the USPTO | 18   Internet searches for 'brux,' 'bruxer,' 'bruxism,' |
| 19   databases labs and on the Internet." | 19   'BruxZir,' 'BruxZir crown,' 'bruxing,' 'Zir,' 'zirconia' |
| 20     A. Yes. | 20   and 'solid zirconia' and 'zirconia crown' between |
| 21     Q. So when you reference "caused to be | 21   August 15 and September 15." |
| 22   conducted" -- | 22      Have you produced all those search results to |
|                  Page 51 |                  Page 53 |

Pages 50 to 53

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-393-

1  us?

2      A.  Well, I don't know that I printed out all of

3  the search results of all of these searches.  Anything

4  that I printed out or had my assistant print out, I have

5  produced to you.

6      Q.  And if you didn't print them out, have you

7  referenced them somewhere in the report?

8      A.  I don't know.  I'd have to go back and look.

9  It helped form my general knowledge base and the

10 opinions that I arrived at.

11     Q.  If the websites that you looked at are not

12 referenced in this report, do you have notes of which

13 sites you referenced somewhere?

14     A.  I don't know.  I need to talk to Mr. Way and

15 see if we have further notes of those searches and

16 exactly what we did and which sites we landed on.  We

17 didn't always just print out everything we found, but I

18 would have to go back and look and see if we have notes

19 of that.  I'd be happy to provide them to you.

20     Q.  That would be obviously preferably during a

21 break in the deposition so we can talk about it today.

22     A.  Well, I don't know if he's available today to

Page 54

1      Q.  No, I'm asking if you routinely conduct them.

2      A.  I've conducted TESS searches -- yes.  I don't

3  know.  I mean, not weekly, not monthly, but on on, you

4  know, nontrivial bases or numbers of times I have

5  conducted TESS searches on this -- I was making a

6  statement about one of the reasons that these are done.

7      Q.  But you don't routinely do it?

8      A.  I didn't say that.

9      Q.  Okay.  The question is -- so you do it not on a

10 monthly basis, not on a weekly basis, but not

11 insubstantially or something?  What did you say?

12     A.  I say if I were asked to do -- to determine

13 whether a particular mark is available for registration

14 or has already been registered by another entity, then

15 it would be routine to do a TESS search.

16     Q.  Okay.  But you don't do that on a weekly basis

17 or a monthly basis?

18     A.  Well, that's a different usage than the word

19 "routinely."  That's periodically or frequently.

20     Q.  Well, how often do you do it for that purpose?

21     A.  I don't know.  I do it every so often when this

22 kind of issue comes up in the course of a year and

Page 56

1  have that conversation, but I will try.

2      Q.  In paragraph C you reference the United States

3  patent and trademark TESS searches that you conducted

4  between August 15 and September 15, and then you say,

5  "TESS searches are routinely conducted to determine

6  whether a particular mark is available for registration

7  or has already been registered by another entity."

8      Do you routinely conduct trademark searches for

9  that purpose?

10     A.  I have conducted TESS searches for a lot of

11 purposes?

12     Q.  Do you routinely conduct them to determine

13 whether a particular mark is available for registration

14 or has already been registered by another entity?

15     A.  I have done that.

16     Q.  Do you do it routinely?

17     A.  I don't know what you mean by the word

18 "routinely"?

19     Q.  Well, I'm just using the same word that you

20 used in your report.

21     A.  I said that they are routinely conducted.  I

22 didn't say that they are by me.

Page 55

1  somebody asks me for advice about this.

2      Q.  Okay.  That's all I'm asking.

3      In paragraph 6(c) you say, "I also conducted or

4  caused to be conducted trademark document retrieval

5  (TDR) and/or Google searches where appropriate."

6      Do you see that?

7      A.  Yes.

8      Q.  Who conducted those searches?

9      A.  Either myself or Brendan Way.

10     Q.  And, again, were those produced to us?

11     A.  The results of them where we printed them out

12 were produced to you.

13     Q.  Did Brendan Way have any discussions with

14 dentists in connection with this case?

15     A.  No.

16     Q.  Did Brendan Way have any discussion with dental

17 labs in connection with this case?

18     A.  No.

19     Q.  Did Brendan Way work on this case from the

20 period August 15, 2012, to September 15, 2012?

21     A.  Yes.

22     Q.  Did he work full-time on this matter during

Page 57

Pages 54 to 57

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-394-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1 that time period? | 1  Q.  And how did Mr. Shuck say it? |
| 2    A.  No. | 2  A.  Brux-ZER and BRUX-er. |
| 3    Q.  So what are his other responsibilities? | 3  Q.  Have you reviewed Mr. Shuck's deposition video? |
| 4    A.  Brendan Way is a former student of mine and a | 4  A.  No. |
| 5 former market research analyst.  Before he became a | 5     Does he say it like you say it? |
| 6 lawyer, he spent five years as a market research | 6  Q.  Well... |
| 7 analyst.  He is now an attorney who does a variety of | 7  A.  You're not testifying? |
| 8 kinds of civil litigation, including trademark law, and | 8  Q.  I'm not testifying. |
| 9 has registered several trademarks and is well trained in | 9  A.  I know. |
| 10 doing searches in the USPTO databases. | 10  Q.  Turning to page 9 -- |
| 11    Q.  So he doesn't work for you full-time? | 11  A.  Yes? |
| 12    A.  No. | 12  Q.  -- paragraph E towards the top of the page. |
| 13    Q.  In paragraph -- it's paragraph 6, but | 13  A.  Uh-huh. |
| 14 subparagraph 4. | 14  Q.  It says you reviewed numerous Web searches to |
| 15    A.  Could you tell me what page you're on, please? | 15 determine whether or not monolithic or solid zirconia |
| 16  Q.  Page 4. | 16 crowns are referred to as BruxZir crowns. |
| 17    A.  Page 4.  Top, middle or bottom? | 17  A.  Yes. |
| 18  Q.  It's No. 4. | 18  Q.  Okay.  We received two Web searches in the |
| 19    A.  Oh, 4, uh-huh, right. | 19 production that was made on Wednesday. |
| 20  Q.  "Our primary TESS search for."  You were | 20  A.  Uh-huh. |
| 21 searching for the term "Zir."  Do you see that? | 21  Q.  Are those the Web searches that you're |
| 22    A.  Yes. | 22 referring to in this paragraph? |
| Page 58 | Page 60 |

| | |
|---|---|
| 1    Q.  It says, "None of the search results are | 1  A.  I'm sorry.  Please state that again. |
| 2 homophones or phonetically similar to 'BruxZir' or | 2     MS. ZADRA-SYMES:  Can you read the question, |
| 3 'bruxer' aside from the Glidewell marks." | 3 please. |
| 4    A.  Yes. | 4       (Record read as follows: |
| 5    Q.  So you were looking for phonetically similar | 5       "Question:  Are those the Web |
| 6 marks to BruxZir and the term "bruxer," b-r-u-x-e-r? | 6       searches that you're referring to in |
| 7    A.  Yes. | 7       this paragraph?") |
| 8    Q.  And, again, in Search No. 5 in the last | 8     THE WITNESS:  Can I see the ones that you're |
| 9 sentence you say, "None of the search results are | 9 referencing? |
| 10 homophones phonetically similar to 'BruxZir' or 'bruxer' | 10     MS. ZADRA-SYMES:  Can you mark that as the next |
| 11 aside from the Glidewell marks." | 11 exhibit number, please. |
| 12    A.  Yes. | 12     Handing you what the court reporter has marked |
| 13    Q.  So "BruxZir" and "bruxer" are phonetically | 13 as Exhibit No. 73. |
| 14 similar; is that correct? | 14       (Whereupon, Exhibit 73 was marked |
| 15    A.  I don't think they're phonetically similar. | 15       for identification.) |
| 16    Q.  You don't think "BruxZir" and "bruxer" are | 16     THE WITNESS:  Yes. |
| 17 phonetically similar? | 17     MS. ZADRA-SYMES:  And let's mark this one |
| 18    A.  Well, the way you're saying them, I think | 18 as 74. |
| 19 intentionally to make them sound phonetically similar, | 19       (Whereupon, Exhibit 74 was marked |
| 20 they could be seen as phonetically similar. | 20       for identification.) |
| 21    Q.  So how do you say them? | 21 |
| 22    A.  Brux-ZER and BRUX-er. | 22 BY MS. ZADRA-SYMES: |
| Page 59 | Page 61 |

Pages 58 to 61

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-395-

10/12/2012    James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

1    Q.   So these are the only Web search report results
2  that we received in the production on Wednesday night.
3  So did you do any other searches?
4    A.   I think we did.  I don't know if we printed
5  them out.  I have to go back and look at those notes
6  that we talked about a moment ago.
7    Q.   And then further down in the same section of
8  the report here on page 9, you said, "When one types the
9  search term 'bruxer crown' into Google, at least as of
10  September 15, the search engine automatically corrects
11  the term to 'bruxzir crown' with a Z."
12    A.   Yes.
13    Q.   With a lowercase b and a lowercase z?
14    A.   Yes, ma'am.
15    Q.   Then you say, "and all but one of the first
16  five pages of results are clearly referring to the
17  Glidewell BruxZir product."
18      Do you see that?
19    A.   Yes, I see that.
20    Q.   We did not receive five pages of results.
21    A.   I see that.  You should.  We will get you the
22  five pages of results.

Page 62

1    Q.   And turning to what we did receive, which is
2  the first search you're referring to where the
3  search engine automatically corrects the search to
4  "bruxzir crown" with a Z, if you look at Exhibit 74 --
5    A.   Yes?
6    Q.   -- that appears to be the search you're
7  referring to.
8    A.   Yes.
9    Q.   On that page, is it correct that they're all
10  referring to the Glidewell product?
11    A.   Let me just go ahead and take another glance at
12  it.
13      Well, I believe Mr. Way clicked on all of them
14  and went to the websites of all of these to verify that
15  they were referring to the Glidewell product.  And based
16  on that, we made this statement.
17    Q.   Okay.  So, according to your report then --
18    A.   Yes?
19    Q.   -- the fourth reference on page 1 of the search
20  report that's in Exhibit 74 --
21    A.   Yes?
22    Q.   -- that references "full zirconia bruxer

Page 63

1  crown," b-r-u-x-e-r crown --
2    A.   Yes?
3    Q.   -- is a Glidewell crown?
4    A.   I would have to go back and look and dig down
5  into this particular website.
6    Q.   So you don't know?
7    A.   Not as I sit here.
8    Q.   Then the next one on the list on Exhibit 74 is
9  Z-Brux crowns.  Do you see that?
10    A.   Yes, I do.
11    Q.   Is it your understanding that Z-Brux crown is a
12  Glidewell product?
13    A.   I need -- this is barthlab.com.  I would want
14  to go back and look at that.
15    Q.   So you don't know?
16    A.   Right.
17    Q.   And then the next one down is Twitter --
18    A.   Well, he says here, "When you force-quote
19  Google to search for a bruxer crown, one of the first
20  search results that come up" -- I'm talking about my
21  report at page 9 -- "is Barth Dental Laboratories, which
22  offers a Z-Brux crown that makes reference to a

Page 64

1  March 2011 article in Dental Economics," and then it's
2  discussed.
3      "However, a Web search for the article notes
4  that Glidewell is the initiator of the solid zirconia
5  tooth restoration," and it's largely about BruxZir.  So
6  I'd have to -- I'd want to go back and do the digging
7  into the website to give you a better answer of this
8  particular one.
9    Q.   Okay.
10    A.   Okay?
11    Q.   And then the next one is Twitter/PittmanLab.
12    A.   Uh-huh.
13    Q.   "Get our custom 'Bruxer,'" B-r-u-x-e-r.
14      Do you see that?
15    A.   Yes.
16    Q.   Is it your opinion that that is a Glidewell
17  product?
18    A.   Again, I would want to double-check.
19    Q.   And then further down the page there's a
20  heading that says "Full Zirconia Crown."
21    A.   Yes.
22    Q.   It's a reference to continentaldental.com, and

Page 65

Pages 62 to 65

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-396-

1  then --
2  A.  Yes, I see that.
3  Q.  Is it your opinion that that's a Glidewell
4  product?
5  A.  I would also need to go back and check that
6  particular website.
7  Q.  And then further down the page --
8  A.  Yes?
9  Q.  -- "Dental Lab Service, Infinity Dental
10  Laboratory."
11     Do you see that?
12  A.  Yes.
13  Q.  It says under there, "We also offer full
14  zirconia or Bruxer" -- B-r-u-x-e-r -- "crowns."
15  A.  I see that.
16  Q.  Is it your opinion that's a Glidewell product?
17  A.  I would want to go back and check.
18  Q.  Okay.  And during the break you will also
19  obtain for us the other pages that you reference in your
20  report that we don't have?
21  A.  I will attempt to do so, if I can get ahold of
22  Mr. Way.

Page 66

1  A.  No.
2  Q.  Okay.  So when you said "he said" in
3  paragraph 9, who were you referring to?
4  A.  I'm referring to myself based on the
5  information that he gave me.
6  Q.  And on page 10 --
7  A.  Yes?
8  Q.  -- in the top paragraph, which is
9  paragraph 6(e), there's a reference to 170 BruxZir,
10  B-r-u-x-Z-i-r, certified labs.
11     Do you see that?
12  A.  Just give me a moment, please.  You're on
13  page 10?
14  Q.  Yes.
15  A.  You're about six lines down?
16  Q.  Yes.
17  A.  Yes, I see that.
18  Q.  Would you like to read it before I ask you a
19  question?
20  A.  Go ahead.
21  Q.  So have you looked at the websites of the 170
22  BruxZir-certified labs?

Page 68

1  Q.  And then also looking at Exhibit No. 74, at the
2  top where it says how many hits were received on that
3  search --
4  A.  Uh-huh?
5  Q.  -- it says there are 50,500 results.
6  A.  You're in Exhibit 74?
7  Q.  Yes.
8  A.  I see that.
9  Q.  Did you or your assistant look at all 50,000
10  results -- or 50,500 results?  Sorry.
11  A.  I think he looked at the several first pages
12  that are mentioned.
13  Q.  And then in Exhibit 73 at the top, the search
14  references 10,500 results.  Do you see that?
15  A.  I do.
16  Q.  Did you or your research assistant look at all
17  those results?
18  A.  He didn't look at all 10,000 results.
19  Q.  What did he look at?
20  A.  I believe the first five pages for each.
21  Q.  So did your research assistant actually write
22  this report?

Page 67

1  A.  I need to double-check on that.
2  Q.  Do you know if Glidewell's labs actually
3  identify themselves as licensees of Glidewell?
4  A.  On their websites?
5  Q.  Yes.
6  A.  I do not know.  I know they identify -- they
7  agree to identify -- to use the BruxZir trademark and
8  some sort of labeling on the product that they make and
9  the box that they put it in.
10  Q.  How do you know that?
11  A.  I was told that by either Mr. Shuck or
12  Mr. Tachner.
13  Q.  Did you see any samples of that?
14  A.  I would have to go back and look at the samples
15  that I referenced earlier before I give you a definitive
16  answer on that.
17  Q.  In the same paragraph you say, "Furthermore,
18  the splash page for Barth Dental Laboratories advertises
19  $40 off your first BruxZir" -- B-r-u-x-Z-i-r -- "crown.
20  One much assume that Barth is either such a new
21  BruxZir" -- B-r-u-x-Z-i-r -- "certified lab that their
22  Web page has numerous typos on it while they come up to

Page 69

Pages 66 to 69

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

10/12/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

```
 1    speed, or they are attempting to free-ride on the
 2    advertising on the network of over 170 BruxZir --
 3    B-r-u-x-Z-i-r -- "certified labs."
 4         A.  Yes?
 5         Q.  Did you check to see whether Barth is a
 6    certified lab of Glidewell?
 7         A.  I think we did, but I don't recall the result
 8    of that investigation at this point in time.  But I can
 9    give you that too.
10         Q.  So is it your opinion that everybody who is
11    using the term B-r-u-x-Z-i-r is attempting to free-ride
12    on Glidewell's B-r-u-x-Z-i-r trademark?
13         A.  If they use the term B-r-u-x-Z-i-r, yes.
14         Q.  Even if it's not used with a capital B or a
15    capital Z.
16         A.  I don't think they should be using it.
17         Q.  Even if it's not with a capital B or a
18    capital Z?
19         A.  Correct.
20         Q.  Okay.
21         A.  Yes, because the word "BruxZir" with a Z-i-r is
22    not the same as the word b-r-u-x-e-r.
                                                   Page 70
```

```
 1    you're asking me general questions, but I'm talking
 2    about a specific example.
 3         Q.  I'm asking you what you mean in this report in
 4    paragraph 10 --
 5         A.  And I think I answered it.  You asked me
 6    whether B-r-u-x-Z-i-r even if the B and the Z are not
 7    capitalized --
 8         Q.  Yes.
 9         A.  -- is potentially free riding on Glidewell's
10    registered trademark, and I said yes, if they're not
11    authorized.
12         Q.  And you don't know if Barth is authorized?
13         A.  I will find out for you.
14         Q.  Okay.  So going back to Exhibit No. 74 --
15         A.  Yes?
16         Q.  -- the fourth reference down says "full
17    zirconia Bruxer crown," B-r-u-x-e-r.
18         A.  Yes.
19         Q.  Is that an attempt to ride on Glidewell's
20    BruxZir name?
21         A.  Not in my opinion.
22         Q.  The next one down Z-Brux crowns, is that an
                                                   Page 72
```

```
 1         Q.  So if they're using it as b-r-u-x-e-r, are they
 2    attempting to free-ride on the B-r-u-x-Z-i-r trademark?
 3         A.  They may be, as in the case of your client
 4    where they do "KDZ Bruxer" as part of their trademark.
 5    But not every use in other contexts where it's not used
 6    as part of the brand name would be an attempt to free
 7    ride.
 8         Q.  Okay.  Sir, are you saying that Glidewell has
 9    exclusive rights over the use of the term "Z" with the
10    term "Brux" in a trademark?
11         A.  No.
12         Q.  What are you saying?
13         A.  I'm saying that I think your client is causing
14    a likelihood of confusion by intentionally putting the
15    word "KDZ" in, in front of the word "Bruxer,"
16    B-r-u-x-e-r.
17         Q.  So it is your opinion, then, that the use of
18    the letter Z in a trademark for a zirconia crown is
19    something that would cause confusion with the Glidewell
20    trademark?
21         A.  That's not what I said.  I said in the context
22    of this case I think that it does.  You know all --
                                                   Page 71
```

```
 1    attempt to ride on Glidewell's BruxZir name?
 2         A.  Well, after that it says "BruxZir" with a
 3    Z-i-r.
 4         Q.  Okay.  I'm referring to just the Z-Brux crowns.
 5    Is that an attempt?
 6         A.  You have to look at the whole thing together.
 7         Q.  The trademark Z-Brux crowns.
 8         A.  Well, how do you know that that's a trademark
 9    for Z-Brux crowns?
10         Q.  If it is a trademark.
11         A.  It doesn't say.
12         Q.  As a hypothetical question, in your
13    professional opinion --
14         A.  Yes?
15         Q.  -- if Z-Brux crowns is a trademark, would this
16    be an attempt to ride on Glidewell's mark?
17         A.  I would have to look at more details of all of
18    the marketing materials, the way it's presented to the
19    relevant public and whether there's a risk of confusion.
20         Q.  So without that, you wouldn't be able to
21    determine it?
22         A.  Without that, I would not wish to give an
                                                   Page 73
```

Pages 70 to 73

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-398-

| | |
|---|---|
| 1    opinion on it in this deposition? | 1    A.  Yes, I do. |
| 2      Q.  For your report, did you review all those | 2      Q.  Would that reference to Bruxer be an attempt to |
| 3    materials of Barth Dental Laboratories? | 3    free-ride on the BruxZir trademark? |
| 4      A.  I -- for Barth Dental Laboratories I said it's | 4      A.  Not necessarily.  Not unless they were |
| 5    either this or that or this or that.  That's what I | 5    attempting to imply that they were an authorized lab of |
| 6    said.  I didn't -- we reviewed the website of Barth | 6    Glidewell.  I think if I were advising them, I would |
| 7    Dental Laboratories.  We looked at it in careful | 7    have told them not to capitalize the B. |
| 8    consideration, yes. | 8      I think there's an argument that they're using |
| 9      Q.  Did you review any other materials of Barth | 9    it in a way that is not meant to be a trademark.  If |
| 10   Dental -- | 10   they're using it in a way that's not meant to be a |
| 11     A.  I don't have -- | 11   trademark, but just a reference to the crown, then |
| 12     Q.  -- laboratories? | 12   that's different than using it as a trademark. |
| 13     A.  -- access to their independent, hard-print | 13     Q.  And on page 10 -- |
| 14   materials. | 14     A.  Yes?  Of my report? |
| 15     Q.  Did you speak to anybody at Barth Dental? | 15     Q.  -- of your report, after the sentence we just |
| 16     A.  No. | 16   referenced, the next sentence says, "Additional hits are |
| 17     Q.  Then the next one on the list is | 17   found for the York Dental Lab BruxZir crown, which |
| 18   Twitter/PittmanLab. | 18   apparently is such a new product, it does not appear on |
| 19     A.  Yes. | 19   York's crown and bridge Rx form certainly available from |
| 20     Q.  It says, "Get Our Custom Bruxer," B-r-u-x-e-r, | 20   the site." |
| 21   and in the summary underneath that it says, "Get our | 21     A.  I've lost you.  Let me find it. |
| 22   custom Bruxer" -- B-r-u-x-e-r -- "bur" -- b-u-r -- | 22     Q.  It's the sentence beginning -- |
| Page 74 | Page 76 |
| 1    "block to aid in all your Bruxer crown" -- B-r-u-x-e-r, | 1      A.  Oh, you're up a little bit higher.  Just one |
| 2    crown. | 2    moment, please. |
| 3      Would that be an attempt to free-ride on the | 3      Okay.  Yes, I see the language. |
| 4    Glidewell trademark? | 4      MS. ZADRA-SYMES:  Okay.  Now, we did not get |
| 5      A.  That alone I don't think is, no. | 5    that hit from your production.  It was not in the search |
| 6      Q.  Then further down the page under the heading | 6    results, but we do have a printout of that page from |
| 7    "Full Zirconia Crown" -- | 7    documents produced by Keating Dental in this case. |
| 8      A.  Yes? | 8      So I'm handing you what the court reporter has |
| 9      Q.  -- would that reference to full zirconia crown | 9    marked as Exhibit 75, which is documents Bates-stamped |
| 10   by Continental Dental Laboratories be an attempt to | 10   KDA-002445 and has been introduced in this case. |
| 11   free-ride on the Glidewell trademark -- I'm sorry -- the | 11     (Whereupon, Exhibit 75 was marked |
| 12   Glidewell BruxZir trademark? | 12     for identification.) |
| 13     A.  Just that?  What, those three words? | 13   BY MS. ZADRA-SYMES: |
| 14     Q.  Yes. | 14     Q.  Is the reference in your report on page 10 to |
| 15     A.  "Full zirconia crown"? | 15   the York Dental Lab BruxZir crown a reference to this |
| 16     Q.  Uh-huh. | 16   crown shown in this document? |
| 17     A.  No. | 17     A.  I am not sure without going back and |
| 18     Q.  And then further down the page, under "Dental | 18   double-checking.  I would want to do that before saying |
| 19   Lab Service, Infinity Dental Laboratory," they state, | 19   yes or no based on just looking at this page. |
| 20   "We also offer full zirconia or 'Bruxer,'" B-r-u-x-e-r | 20     Q.  Looking at the top of this page, it's headed |
| 21   in quotes -- "crowns for a full porcelain crown." | 21   "Bruxer," B-r-u-x-e-r. |
| 22     Do you see that? | 22     Do you see that? |
| Page 75 | Page 77 |

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-399-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1   A. I do, yes. | 1   will do for you. |
| 2   Q. And underneath it says "Bruxer Solid | 2   Q. On the first page -- |
| 3   Zirconia" -- capital B, capital S, capital Z -- "is a | 3   A. Yes? |
| 4   monolithic solid zirconia restoration with no porcelain | 4   Q. -- there is -- this is an Rx form.  Do you see |
| 5   overlay." | 5   that at the top?  It says -- |
| 6   A. Uh-huh? | 6   A. I do, yes, yes. |
| 7   Q. Is this an attempt to free-ride on the BruxZir | 7   Q. On the first page, in the second column under |
| 8   trademark? | 8   "Cosmetics," there's a reference to Xtreme, with a |
| 9   A. I wouldn't give an opinion about that. | 9   capital X-t-r-e-m-e, Bruxer, B-r-u-x-e-r. |
| 10   Q. So you don't know? | 10   A. Yes, I see that. |
| 11   A. I don't know looking at just this. | 11   Q. And in parentheses "Solid Zirconia."  Do you |
| 12   Q. So when -- | 12   see that? |
| 13   A. Are they using it as a trademark? | 13   A. I do see that, yes. |
| 14   Q. I don't know.  This is their Web page that is | 14   Q. Is that an attempt to free-ride on the |
| 15   referenced in your report. | 15   Glidewell BruxZir trademark. |
| 16   A. Yes, yes.  But I don't see an R.  I don't see | 16   A. It may be.  I would want to look at more of |
| 17   a TM after that. | 17   their information. |
| 18   Q. Okay.  So that would help to indicate if it was | 18   Q. Have you looked at any other information of the |
| 19   being used as a trademark? | 19   Mascola Esthetics Dental Lab? |
| 20   A. It could, yes. | 20   A. We did do some digging here on it, but I'd have |
| 21   Q. Then the next one referenced in your report is | 21   to go back and refresh my recollection about the |
| 22   Mascola Esthetics Dental Lab. | 22   Internet archive that we're referring to. |
| Page 78 | Page 80 |
| 1   A. Yes? | 1   Q. Turning to the next page -- |
| 2   Q. We did not receive anything in the production | 2   A. Yes? |
| 3   you gave us regarding Mascola Esthetics Dental Lab. | 3   Q. -- under the fee schedule -- |
| 4   A. Let me make a note of that too, and if we | 4   A. Yes? |
| 5   printed that out, we will get that to you. | 5   Q. -- there's a reference under "Cosmetics" |
| 6   MS. ZADRA-SYMES:  Can you make that one | 6   slightly more than halfway down. |
| 7   exhibit. | 7   Do you see that? |
| 8   This is actually one exhibit, 76. | 8   A. I do. |
| 9   (Whereupon, Exhibit 76 was marked | 9   Q. It says "Full-Contour Zirconia BruxZir." |
| 10   for identification.) | 10   A. I do. |
| 11   MS. ZADRA-SYMES:  So this is two documents that | 11   Q. Is that an attempt to free-ride on the |
| 12   have been produced in this case.  The first one is | 12   Glidewell BruxZir trademark? |
| 13   Bates-numbered KDA-002444, and then the next pages are | 13   A. It may be. |
| 14   KDA-002799 through KDA-002800. | 14   Q. What was your opinion in this report based on |
| 15   THE WITNESS:  Uh-huh? | 15   when you were referencing the Mascola Esthetics Dental |
| 16   BY MS. ZADRA-SYMES: | 16   Lab?  What were you looking at? |
| 17   Q. Do you see that? | 17   A. We were looking at the Internet archive and |
| 18   A. I do, yeah. | 18   their website, a snapshot of their home page, but |
| 19   Q. Is this the product that's being referenced in | 19   apparently we haven't given you that. |
| 20   your report on page 10 as the Mascola Esthetics Dental | 20   Q. No. |
| 21   Lab? | 21   A. But we will. |
| 22   A. I don't know.  I need to double-check, which I | 22   Q. Did you review any other materials of Mascola |
| Page 79 | Page 81 |

Pages 78 to 81

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-400-

1  Esthetics Dental Lab?
2      A.  None other than what's referenced in this
3  paragraph.
4      Q.  Did you speak to anybody at Mascola Dental
5  Labs?
6      A.  No.
7      THE WITNESS:  Can we take a quick bathroom
8  break?
9      MS. ZADRA-SYMES:  Yes, of course.
10     THE VIDEOGRAPHER:  Off the record at 11:29 a.m.
11 This is the end of Tape 1.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  And we are on the record
14 at 11:35 a.m.  This is the beginning of Tape 2.
15 BY MS. ZADRA-SYMES:
16     Q.  Are you familiar with the ability to pay Google
17 to ensure that a website displays a term higher in
18 search results?
19     A.  Yes.
20     Q.  And did you ask Glidewell if it had done that?
21     A.  No.
22     Q.  Are you familiar with the use of meta tags in a

                                        Page 82

1  make them less important so that people can't get up
2  high in the natural search results, and now they're
3  forced to try to pay Google to get up high.
4      So, I mean, I'm very, very well aware of about
5  these practices, and I haven't investigated that at all
6  in any of those permutations with regard to Glidewell or
7  Keating.
8      Q.  And that would be true for whether they have
9  made paid placements for their own trademark BruxZir or
10 for the term "bruxer," b-r-u-x-e-r?
11     A.  I have not looked into that for either of those
12 terms or "again" for Keating.
13     THE WITNESS:  Has there been discovery in that?
14 BY MS. ZADRA-SYMES:
15     Q.  When is a trademark considered descriptive?
16     A.  When it describes a quality, characteristic or
17 ingredient or use of the product or service in
18 connection -- in which connection it's going to be used
19 as a trademark.
20     Q.  If a trademark is descriptive at the time it's
21 adopted, is it protectable or registerable?
22     Is it registerable?

                                        Page 84

1  Web page to get listed higher in search results?
2      A.  Yes.
3      Q.  Did you ask Glidewell if they had done that?
4      A.  No.
5      Q.  Did your research assistant ask them?
6      A.  No.
7      Q.  And that would be the same for both my prior
8  questions?
9      A.  Yes.
10     I would elaborate just slightly, although the
11 answer is still the same, which is no.  There are many
12 different ways to get higher in Google search results,
13 and -- including by payment, one of which is to buy
14 generic words or common words or related words as search
15 terms.  Another way is to buy your own trademark as a
16 search term.
17     But there are new ways now.  Google is getting
18 very sophisticated and complicated in how it -- like
19 Google shopping.  So paid placement is a big issue.
20     Q.  Uh-huh.
21     A.  And then meta tags are, frankly, less important
22 than they used to be because Google has worked hard to

                                        Page 83

1      A.  A trademark that is merely descriptive is not
2  registerable or protectable at common law, but it can
3  become protectable at common law, and it can become
4  registerable if it acquires trademark significance in
5  the minds of the public.  And that trademark
6  significance is usually referred to with the term of art
7  "secondary meaning."
8      Q.  In the trademark office, how does the trademark
9  office determine if a mark has acquired secondary
10 meaning?
11     A.  Oh, different ways.  You can provide evidence.
12 If there is a office action against the mark on the
13 ground that it's descriptive, they may never actually
14 require secondary action.  If they decide they think
15 linguistically or grammatically based on the materials
16 they've been given that it's suggestive, they may not
17 require any kind of evidence.  But if you have to submit
18 evidence to overcome an objection, for example, you
19 might provide evidence of extensive advertising,
20 longtime use, affidavits, other related evidence to show
21 that it has or is likely to have acquired secondary
22 meaning in the minds of the consuming public.

                                        Page 85

                                        Pages 82 to 85

1    Q.  How much use does the trademark office usually
2  look for in terms of relation?
3    A.  Well, I think that there's a presumption that
4  if a descriptive term has been used for five years, that
5  it would be assumed or presumed that it has secondary
6  meaning.  But that's just a sort of presumption, and
7  marks that have been used for less than that can be
8  found to have acquired secondary meaning.
9    Q.  Turning back to page 11 of your report --
10    A.  Yes?
11    Q.  -- you say in paragraph 8, "A mark is
12  categorized as generic and thus not entitled to legal
13  protection under U.S. trademark law when it is seen by a
14  majority of relevant consumers in the relevant markets
15  as a generic name for a particular service or good" and
16  you cite to the case King-Seeley Thermos Co. v. Aladdin
17  Industries, Inc., which is a Second Circuit case
18  from 1963.
19    A.  Yes.
20    Q.  Is there a reason why you didn't cite a
21  California case?
22    A.  No.

Page 86

1  your client entered the market and what the status of
2  use was in the relevant marketplace at that time.
3    Q.  Do you know when our client entered the market?
4    A.  Yes.  I think it entered the market --
5  Glidewell entered the market, to my knowledge, in June
6  of 2009, and your client entered the market in 2011, the
7  exact month of which is escaping me as we speak.  Part
8  of my confusion about that was that you filed a -- your
9  client filed a I, believe, 1(b) trademark application,
10  which is an intent to use.  So I had to dig around a
11  little bit and think to figure out when their actual
12  first use was.  But it was sometime in 2011.
13    Q.  And your understanding is that Glidewell began
14  marketing its products in June of 2009?
15    A.  Yes.  Under the BruxZir name, June of 2009.
16    Q.  Yes.
17      In paragraph 13, on page 11 --
18    A.  Yes.
19    Q.  -- you say, "The Plaintiff's registered
20  trademark BruxZir is, in my opinion, a suggestive mark
21  because it suggests a particular quality or
22  characteristic of the goods and services Glidewell

Page 88

1    Q.  Are you familiar with the California cases
2  involving genericness in the Ninth Circuit?
3    A.  Yes.
4    Q.  You understand this case is a Ninth Circuit --
5  it's a case pending in California?
6    A.  Yes, yes.  And Ninth Circuit law would govern.
7    Q.  Are you familiar with the "who-are-you/what-
8  are-you" test?
9    A.  Yes.
10    Q.  Why did you not reference that in your report?
11    A.  No particular reason.  I'd be happy to discuss
12  it with you if you want me to now or at trial.
13    Q.  So what is the most recent case in California
14  that applies the "who-are-you/what-are-you" test in the
15  Ninth Circuit?
16    A.  I don't know the most recent case.  I can tell
17  you the Yellow Cab case is important in this case,
18  which holds, among other things, that the time for
19  genericness is the time when the defendant entered the
20  market, not thereafter.
21      So in this case in trying to determine whether
22  the Plaintiff's mark was generic, we'd want to see when

Page 87

1  provides."
2      What quality or characteristic is it
3  suggesting?
4    A.  That zirconia is a good material to use for
5  patients who have teeth damage due to bruxism.
6    Q.  Anything else?
7    A.  Anything else?  Well, it suggests -- no,
8  nothing else.
9    Q.  Does it suggest anything about the intended
10  user?
11    A.  I think I just said that.  I said that it
12  suggests that zirconium is a good product to use for
13  patients who suffer defects that could have occurred
14  from bruxism.
15    Q.  And what are those patients referred to as in
16  the dental industry?
17    A.  Well, I think we went over this, but some of
18  those patients are referred to as bruxers, people who
19  grind.  They're also referred to as grinders.
20    Q.  Turning to paragraph 14 --
21    A.  Yes?
22    Q.  -- you say, "A search of the Internet and of

Page 89

Pages 86 to 89

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-402-

1  the USPTO databases reveals that the generic name for
2  solid zirconia crowns is 'solid zirconia,' 'full-contour
3  zirconia,' 'total zirconia' or 'monolithic zirconia.'"
4      Do you see that?
5  A.  Yes, I see it.
6  Q.  And I believe you referenced earlier that
7  another generic reference that's a synonym of "solid
8  zirconia" and "full-contour zirconia" would also be
9  "all-zirconia"; is that correct?
10  A.  Yes.
11  Q.  And then the example given is a page from the
12  ada.org product guide.
13  A.  Yes.
14  Q.  Do you see that?
15  A.  Yes.
16  Q.  Were there any other printouts that you made
17  for searches dealing with this point?  Because we only
18  received that one page.
19  A.  Oh, I see.  I need to go back and look on that.
20  Let me make a note of that too, because I do say CEG,
21  and I want to make sure that you have a full printout of
22  whatever we saw, if we printed it out, if we printed out

Page 90

1  A.  I see that.
2  Q.  And it says "Vendor, Oral Arts Dental
3  Laboratory, Inc."
4  A.  Yes.
5  Q.  There is no TM or R in a circle after the word
6  "BruxZir."  Do you see that?
7  A.  Yes.
8  Q.  Do you know if Oral Arts Dental Laboratory is
9  an Glidewell-authorized laboratory?
10  A.  I do believe that Mr. Way made that
11  investigation and found out that it is.
12  Q.  From these website pages can you tell --
13  A.  No.  You would have to go further, but he did
14  go further, to my recollection.
15  Q.  And then next one is "BruxZir Solid Zirconia,"
16  again without a TM or an R in a circle, and that one
17  lists Glidewell Laboratories as the vendor.
18      Do you see that?
19  A.  Yes, I do.
20  Q.  Below that, there's another one with "BruxZir
21  Total Zirconia Crowns" --
22  A.  I see that.

Page 92

1  other pages.  As I said before, we didn't necessarily
2  print out every single research result, but we tried to.
3      So let me go back and look at that.
4      MS. ZADRA-SYMES:  I'm handing you what the
5  court reporter has marked as Exhibit 77.
6      (Whereupon, Exhibit 77 was marked
7      for identification.)
8      MS. ZADRA-SYMES:  So, just for the record, we
9  did not receive any printout from you from the ada.org
10  website, so we printed this off.  And you'll see on the
11  bottom of the page on the left-hand side, it does say
12  ada.org/productguide.
13  BY MS. ZADRA-SYMES:
14  Q.  Do you see that?
15  A.  Yes, I do, uh-huh.
16  Q.  It appears to be the exact same reference that
17  you have in your report?
18  A.  Let me look.
19      Yes.
20  Q.  So the first product referenced on the
21  left-hand side of the page says "BruxZir Crowns and
22  Bridges."

Page 91

1  Q.  -- and the vendor is Keller Laboratories.
2  A.  Yes.
3  Q.  Do you know if Keller Laboratories is an
4  authorized Glidewell lab?
5  A.  I believe it is.
6  Q.  Can you tell from this document that it is?
7  A.  No.  I think what you can do is click on their
8  website and see if, when they use it, they put the R
9  after it, the BruxZir.
10  Q.  You mean this links to the website?
11  A.  Or you can just type in another search and find
12  the website.
13  Q.  But do you know if the lab identifies Glidewell
14  as --
15  A.  I don't know as I sit here today.
16  Q.  Okay.  And then still in paragraph 14 on your
17  report --
18  A.  Yes?
19  Q.  -- the last sentence says, "Further
20  investigation suggests that the only individuals who are
21  attempting to refer to an all-zirconia crown or bridge
22  are those that have either a vested interest in

Page 93

Pages 90 to 93

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-403-

**Page 94**

1  free riding on the BruxZir name due to their position as
2  a market leader, or are in fact selling a finished
3  product made from BruxZir materials."
4       First of all, what individuals are you talking
5  about?
6       A.  I think I am talking about the people who use
7  "BruxZir" in this -- in the printouts that we reference.
8       Q.  And how --
9       A.  They're either authorized based on what we were
10  able to tell, or they're using it inappropriately.
11      Q.  When you said "BruxZir," did you mean with a
12  Z-i-r?
13      A.  Of course.
14      Q.  It's not by referencing the term "all-zirconia
15  crown" that they're attempting to free-ride on the --
16      A.  No, no, no, no, no, no, no.  That would be
17  a misunderstanding of what I was trying to convey.  No.
18  The world is free to use the term "all-zirconia crown,"
19  including your client.  It would be very nice, actually,
20  if they'd call it KDA full zirconia crown.
21      Q.  In paragraph 16 --
22      A.  Yes?

**Page 96**

1  out and verbally meet with labs or dentists and
2  verbally -- orally use the word "BruxZir."  They have
3  marketing materials; they have website materials; that
4  most of the advertising materials that Glidewell relies
5  on are visual in nature.
6       Therefore, the visual appearance of the word is
7  significant, and when you are isolating and focusing on
8  Glidewell's mark, how it looks is very important.  And
9  the fact that it has a Z in it is important, and an i,
10  both of which letters -- a capital Z and an i, both of
11  which letters visually distinguish it from the word
12  "bruxer," b-r-u-x-e-r.
13      Q.  So other than Mr. Shuck, did you talk to
14  anybody else about the perception of relevant consumers
15  in the marketplace?
16      A.  Just based on my Internet searches and my PTO
17  searches.
18      Q.  So the answer is no?
19      My question is --
20      A.  Did I talk to anybody --
21      Q.  -- did you talk to anybody --
22      A.  -- individuals --

**Page 95**

1       Q.  -- after referencing the Keating Dental Labs --
2  I guess we should start with paragraph 15.  So if you'd
3  just read paragraph 15 to yourself.
4       A.  Okay.
5       Q.  Then I can ask you a question about
6  paragraph 16.
7       A.  Okay.
8       Yes?
9       Q.  So in paragraph 16 you're saying that the
10  argument made by Keating Dental Lab that the term
11  "BruxZir" is phonetically equivalent to "bruxer,"
12  b-r-u-x-e-r, you're saying that that argument is not
13  consistent with the way Plaintiff's mark 'BruxZir' is
14  used or perceived in the relevant marketplace.
15      Do you see that?
16      A.  Yes.
17      Q.  How many people did you talk to to establish
18  their perception?
19      A.  I looked at -- I talked to Mr. Shuck about
20  people's perception, and one of the things Mr. Shuck
21  told me that I think is very significant is that
22  Glidewell does not have a sales division where people go

**Page 97**

1       Q.  Yes.
2       A.  -- dentists.
3       Q.  Yes.
4       A.  I think you asked me all of those things
5  before.
6       Q.  Well, I'm asking it, but for this question
7  right here.
8       A.  I see.  No, I already answered the question
9  that I didn't talk to dentists or dental labs.
10      Q.  To establish their perception?
11      A.  For any reason.
12      Q.  Did Glidewell give you any discs to review of
13  their marketing materials?
14      A.  As opposed to hard copies?
15      THE WITNESS:  Mr. Tachner, did you?  Yeah.
16      Okay.  Yes.
17  BY MS. ZADRA-SYMES:
18      Q.  Did you review any discs?
19      A.  I reviewed their marketing materials, uh-huh.
20      Q.  So did you review a disc with video recordings
21  on it?
22      A.  I have reviewed video recordings, yes, uh-huh.

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-404-

1    Q.  Are you aware that those materials, the video
2    recordings on the discs, are --
3    A.  Exist?
4    Q.  Well, first of all, one question:  You're aware
5    that they exist; yes?
6    A.  Yes.
7    Q.  Are you aware that they are also sent to
8    dentists?
9    A.  I think so, yeah.  The exact mechanism by which
10   they get to dentists or dental labs, I'm not sure.
11   Q.  And then on the next page of your report,
12   page 13 --
13   A.  Uh-huh?
14   Q.  -- you say at the top, "Under United States
15   trademark law, a mark should be judged based on its
16   sight, sound and meaning (see In Re National Data Corp.,
17   753 F.2d 1056), which is a Federal Circuit case from
18   1985.
19   A.  Yes?
20   Q.  I assume you read that case before you put it
21   in your report?
22   A.  Yes.

                                            Page 98

1    Q.  So is it you're opinion that that case is
2    saying to determine whether a mark is generic, you have
3    to look at its sight, sound and meaning?
4    A.  I didn't say that.  And, no, it's using the
5    sight, sound and meaning test for confusion, but I think
6    it's appropriate to use it in this case as well for
7    genericism.
8    Q.  Is that standard in genericness cases to use
9    the sight, sound and meaning test for --
10   A.  It can be, uh-huh.
11   Q.  But you're not relying on this case for that
12   proposition?
13   A.  I'm relying on this case as a general citation
14   to what the sight, sound and meaning test is, and then
15   I'm applying that and the principle underlying it to
16   this case, and particularly to the genericness issue in
17   this case.
18   Q.  So you're applying a factor from the likelihood
19   of confusion test to determine whether or not the mark
20   is generic?
21   A.  The factor can be used in determining mark
22   strength and the strength of the Plaintiff's mark in the

                                            Page 99

1    likelihood of confusion test.  And one of the issues in
2    this case is how strong is the Plaintiff's mark and how
3    does it appear, and I think it's appropriate to use this
4    concept of visual presentation of this mark as part of
5    the overall context of determining whether it's generic.
6    Q.  And again you didn't cite any California cases
7    in your report on that point.
8    A.  I would be happy to give them to you -- or you
9    mean Ninth Circuit cases, I think is what you mean.
10   Q.  Well, you didn't cite California either.  This
11   is a Federal Circuit case.  In fact, this case is
12   involving a trademark application in the trademark
13   office --
14   A.  Yes.
15   Q.  -- is that right?
16   A.  Yes.
17   Q.  And then in paragraph 17, you say, "In my
18   searches of the USPTO databases and of the relevant
19   markets on the Internet, I found no use of 'BruxZir' as
20   a slang term by dentists for people who suffer from
21   bruxism."
22   A.  Correct.

                                            Page 100

1    Q.  Did you search for the term b-r-u-x-e-r as a
2    slang term by dentists for people who suffer from
3    bruxism?
4    A.  I'd have to go back and look.
5    Q.  Would it have made any difference to your
6    searching methodology if you were not searching for it
7    as a slang term, but as a term of art in the industry?
8    A.  Let me just think about your question.  Would
9    it have made any difference to my methodology if I were
10   searching for it not as a slang term, but as a term of
11   art in the industry?
12        No.
13   Q.  In paragraph 19 you say that in your searches,
14   which include your USPTO database searches, you found no
15   use of the words "BruxZir" or "bruxer" as a generic name
16   of custom-made solid zirconia crowns or as generic name
17   of the material that is used to make such crowns.
18   A.  I see that.
19   Q.  Is it your opinion that those words would have
20   to be found in trademark office descriptions of goods in
21   order to be considered generic?
22   A.  No.

                                            Page 101

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**
-405-

| | |
|---|---|
| 1  Q. You state in the same paragraph at the end, | 1  (At 1:29 p.m., the deposition of |
| 2  "Instead, the related terms 'brux,' 'bruxism' and | 2  DAVID J. FRANKLYN was reconvened.) |
| 3  'bruxing' have been used predominantly to describe the | 3  THE VIDEOGRAPHER: And we are back on the |
| 4  treatment/prevention of bruxism as a condition via | 4  record at 1:29 p.m. |
| 5  mouth guards, splints, electronic devices, et cetera." | 5  MS. ZADRA-SYMES: Sir, I'm going to hand you |
| 6  A. I see that. | 6  what the court reporter has marked as Exhibit 78. |
| 7  Q. Is that what Glidewell's BruxZir product does? | 7  (Whereupon, Exhibit 78 was marked |
| 8  Does it treat or prevent bruxism? | 8  for identification.) |
| 9  A. It treats teeth that have been injured by | 9  MS. ZADRA-SYMES: It's a document that we have |
| 10  bruxism. It's not a treatment for bruxism in the sense | 10  produced in this case, and it's labeled KDA-002152 |
| 11  I was talking about here, like a mouth guard, where | 11  through 002160. |
| 12  somebody at night puts a mouth guard in so that the | 12  THE WITNESS: Uh-huh. |
| 13  injury to the tooth doesn't occur in the first place. | 13  MS. ZADRA-SYMES: And it is an article taken |
| 14  MR. TACHNER: Are we reaching a natural time | 14  from the Journal of Oral Rehabilitation, which is the |
| 15  for -- | 15  title of a journal. |
| 16  MS. ZADRA-SYMES: Yeah, that's fine. | 16 |
| 17  MR. TACHNER: I mean, it's up to you of course. | 17  EXAMINATION (RESUMED) |
| 18  MS. ZADRA-SYMES: It's fine. It's noon. | 18  BY MS. ZADRA-SYMES: |
| 19  Can we go off the record? | 19  Q. Do you see that? |
| 20  THE VIDEOGRAPHER: Off the record at 12:03 p.m. | 20  A. Yes. |
| 21 | 21  Q. And it is dated February 1995. Do you see |
| 22  (Whereupon, at 12:03 p.m., the | 22  that? |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  deposition of DAVID J. FRANKLYN was | 1  A. I see that. |
| 2  adjourned for noon recess.) | 2  Q. And if you turn to the next page -- |
| 3 | 3  A. What page? The second page? |
| 4 | 4  Q. Actually, the third page. Second page of the |
| 5 | 5  document, third printed page. |
| 6 | 6  A. Okay. |
| 7 | 7  Q. On the bottom it says No. 145. |
| 8 | 8  A. Yes. You mean 154? |
| 9 | 9  Q. No, 145. Sorry -- |
| 10 | 10  MR. TACHNER: The page number. |
| 11 | 11  MS. ZADRA-SYMES: The page number of the actual |
| 12 | 12  article. |
| 13 | 13  THE WITNESS: Oh, 145. You are right, yes. |
| 14 | 14  BY MS. ZADRA-SYMES: |
| 15 | 15  Q. The heading of the document says "Effect of |
| 16 | 16  working-side interferences on mandibular movement in |
| 17 | 17  bruxers and non-bruxers." |
| 18 | 18  Do you see that? |
| 19 | 19  A. Yes. |
| 20 | 20  Q. Am I pronouncing that correctly? |
| 21 | 21  A. Which word? |
| 22 | 22  Q. "Bruxer"? |
| Page 103 | Page 105 |

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-406-

1    A.  The word "bruxer" as it's written?

2    Q.  Yes.

3    A.  Well, you have an English accent.

4    Q.  So why don't we have you read it into the

5    record just to avoid any issue there.

6       Can you read the heading for me, please?

7    A.  I'd be happy to.  "Effect of working-side

8    interferences on mandibular movement in bruxers and

9    non-bruxers."

10   Q.  And then in the summary it says, "The effect of

11   working interference on bruxers and non-bruxers was

12   studied by applying a metal overlay."

13      Do you see that?

14   A.  I do.

15   Q.  Now, this article was published in 1995.  So

16   did you do any research regarding dental literature

17   relating to bruxism?

18   A.  Yes.

19   Q.  And have you read any articles other than what

20   is referenced in your report?

21   A.  No.  I have not read this article.

22   Q.  And other than what is referenced in your

Page 106

1    symptoms of CMD in bruxers classified by the degree of

2    severity."

3    Q.  In the abstract, in the second sentence it

4    says, "211 were classified as bruxers according to the

5    use of a questionnaire and clinical examination."

6       Do you see that?

7    A.  I do.

8    Q.  Then, "147.39 percent presented clinical

9    characteristics of mild bruxers."

10   A.  I see that.

11   Q.  And then the next sentence says, "Severe

12   bruxers presented the lowest degree of jaw opening."

13   A.  I see that.

14   Q.  Do these appear to be slang term use of the

15   term "bruxer" to you?

16   A.  No.

17   Q.  And in Exhibit 78 that we just reviewed --

18   A.  This one?

19   Q.  Yeah.

20   A.  Yes, ma'am?

21   Q.  Does the reference to "bruxer" in that journal

22   appear to be a reference to a slang term to you?

Page 108

1    report --

2    A.  No.

3    Q.  -- you haven't read any other dental

4    literature?

5    A.  I don't believe so.  I'd want to double-check

6    that, but...

7       MS. ZADRA-SYMES:  I'm handing you what the

8    court reporter has marked Exhibit No. 79, and I'm trying

9    to move fast so that you can get out of here quickly.

10      (Whereupon, Exhibit 79 was marked

11          for identification.)

12      MS. ZADRA-SYMES:  This is a document that we

13   produced in this case, Exhibit 79.  It's marked Document

14   No. KDA-002106 through KDA-00218.

15      THE WITNESS:  Yes?

16   BY MS. ZADRA-SYMES:

17   Q.  Did anybody give you this document to read in

18   connection with your report in this case?

19   A.  I don't believe so.

20   Q.  Can you read the heading of the article, which

21   is on the page No. 268?

22   A.  "A clinical study of specific signs and

Page 107

1    A.  Which reference?

2    Q.  Any of the references to "bruxer" or "bruxers."

3    A.  Well, I haven't read the whole thing, but based

4    on the two snippets that you drew my attention to, in

5    the context in which they appear, they appear to be used

6    as clinical terms.

7    Q.  But not slang terms?

8    A.  Correct.  I mean, I think something could be

9    slang and clinical at the same time, but it's a matter

10   of degree as it moves into the language.

11      THE WITNESS:  Are we done with those two?

12      MS. ZADRA-SYMES:  Yes.  I'm going to hand to

13   you what the court reporter has marked as Exhibit 80.

14      (Whereupon, Exhibit 80 was marked

15          for identification.)

16      THE WITNESS:  Yes?

17      MS. ZADRA-SYMES:  It's a document labeled

18   KDA-001648 through KDA-001652, which we have produced to

19   Glidewell in this case.

20   BY MS. ZADRA-SYMES:

21   Q.  Did anybody give you this document to review in

22   connection with your report?

Page 109

Pages 106 to 109

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-407-

1    A.  Not to the best of my recollection.
2       MR. TACHNER:  I think this was served after the
3  report was created, actually.
4       THE WITNESS:  Okay.  Well, we can still get it
5  to me then, can't we?
6       MR. TACHNER:  Yes.
7       THE WITNESS:  Then I will review them.
8  BY MS. ZADRA-SYMES:
9    Q.  The abstract on the top of this page after the
10  word "Purpose" --"
11    A.  Yes.
12    Q.  -- it says, "The aim of the present study was
13  to investigate whether bruxers compared to non-bruxing
14  individuals apply maladaptive coping strategies."
15       Do you see that?
16    A.  Yes.
17    Q.  Is that a slang use of the term "bruxer"?
18    A.  Well, I don't think so because it's in a
19  scientific article.
20    Q.  So, generally, if a term is in a scientific
21  article, you would not consider it a slang term?
22    A.  I would say that as it's used in the article,

Page 110

1  it's not being used as a slang term.
2    Q.  And then the next sentence is, "75 sleep
3  bruxers and 38 non-bruxers were selected by dental
4  examination and tested by a German coping
5  questionnaire."
6       Do you see that?
7    A.  I do.
8    Q.  So, again, that would not be a slang use of the
9  term?
10    A.  It appears to be a clinical use of the term --
11  nonslang, clinical use of the term "bruxers."
12       MS. ZADRA-SYMES:  I'm going to hand you what
13  the court reporter has marked as Exhibit 81, and this is
14  a document labeled KDA-002048 through KDA-002062.
15       (Whereupon, Exhibit 81 was marked
16       for identification.)
17  BY MS. ZADRA-SYMES:
18    Q.  Has anybody given you this document to review
19  in connection with your report in this case?
20    A.  I don't believe so.
21    Q.  Can you read the heading for me, please.
22    A.  You mean the title?

Page 111

1    Q.  The title of the article beginning on page
2  No. 350.
3    A.  Yes.  It reads as follows:  "Comparison of pain
4  and quality of life in bruxers and patients with
5  myofacial pain of the masticatory muscles."
6    Q.  And so your opinion would be that that's a
7  clinical reference to bruxers and not a slang term?
8    A.  Yes.
9       MS. ZADRA-SYMES:  I've handed you what the
10  court reporter has marked as Exhibit 82.  It's document
11  Bates-numbered KDA-001657 through 001661.
12       (Whereupon, Exhibit 82 was marked
13       for identification.)
14       MS. ZADRA-SYMES:  This article is titled, "The
15  effect of bruxism on periodontal sensation in the molar
16  region: A pilot study," and in the middle of the page
17  there's a box headed "Clinical Implications."
18  BY MS. ZADRA-SYMES:
19    Q.  Do you see that?
20    A.  I do.
21    Q.  It says, "Periodontal sensation is different
22  for bruxers relative to non-bruxers, and care should be

Page 112

1  taken when adjusting and correcting occlusal contacts
2  for fixed prostheses."
3       Do you see that?
4    A.  I do.
5    Q.  Is that a slang use of the term "bruxer" or
6  "non-bruxer"?
7    A.  It appears to me to be a clinical use of the
8  term "bruxer" and "non-bruxer."
9       Did we get a date on this document?  July 2007
10  I think I'm seeing.
11    Q.  Yes, there's a reference on the top of page 2.
12  It says July 2007.
13    A.  Yes.
14       THE WITNESS:  Are we done with that?
15       MS. ZADRA-SYMES:  Yes.
16       I've handed you what the court reporter has
17  marked as Exhibit 83, and it's Bates-numbered KDA-001738
18  through KDA-001742.
19       (Whereupon, Exhibit 83 was marked
20       for identification.)
21
22  BY MS. ZADRA-SYMES:

Page 113

Pages 110 to 113

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-408-

1    Q.  Has anybody given you this document to review
2  in connection with your report in this case?
3    A.  I don't believe so.
4    Q.  And the conclusion on the first page --
5    A.  Yes?
6    Q.  -- says, "In this study the occurrence of four
7  clinical signs, posterior or anterior dental attrition,
8  abfractions and occlusal pits, was associated with
9  self-reported bruxers.  It is suggested that, primarily,
10  signs of dental attrition may differentiate
11  self-reported bruxers from non-bruxer subjects."
12      Do you see that?
13    A.  I do.
14    Q.  Is it your opinion that those are not slang
15  usages of the term "bruxer" --
16    A.  Yes.
17    Q.  -- and "non-bruxer"?
18    A.  Yes.
19      MS. ZADRA-SYMES:  So I've just handed you what
20  the court reporter has marked as Exhibit 84, and it's
21  Document No. KDA-002078 through KDA-002086.
22      (Whereupon, Exhibit 84 was marked

Page 114

1      for identification.)
2      THE WITNESS:  Yes?
3  BY MS. ZADRA-SYMES:
4    Q.  Has anybody given you this document to review
5  in connection with your report in this case?
6    A.  Not to my recollection.
7    Q.  Can you read the title of the article, please?
8    A.  "Electromyographic analysis of the masseter and
9  buccinator muscles with the pro-fono facial exerciser
10  use in bruxers."
11    Q.  In the abstract there's a reference to, halfway
12  down, "They were divided into a normal control group, a
13  bruxer control group without device, and then
14  experimental bruxer group who used the device.  The
15  bruxer group showed a greater masseter EMG amplitude
16  when compared to the normal group."
17      Do you see that?
18    A.  I do.
19    Q.  Now, in your opinion, are those references to a
20  slang use of "bruxer" or not?
21    A.  No.
22    Q.  They're not?

Page 115

1    A.  No.
2    Q.  So it's correct that they are not references to
3  a slang use of "bruxer"?
4    A.  That is correct.
5    Q.  Thank you.
6      MS. ZADRA-SYMES:  I just handed you a document
7  which has been previously marked in a prior deposition
8  as Exhibit 46.  It's Document Bates No. KDA-002832
9  through 002833, and it's headed at the top "Minnesota
10  R form."
11      (Whereupon, Exhibit 46 was marked
12      for identification.)
13  BY MS. ZADRA-SYMES:
14    Q.  Do you understand what that means, an R form?
15    A.  Generally.
16    Q.  What does it mean, generally?
17    A.  This is an order form.
18    Q.  Halfway down on the left-hand side, there are
19  some products that can be ordered.  Do you see that?
20    A.  Yes, uh-huh.
21    Q.  There's a reference to an all-zirconia bruxer,
22  b-r-u-x-e-r.

Page 116

1    A.  Yes.
2    Q.  In your opinion, is that an attempt to trade up
3  the Glidewell BruxZir trademark.
4    A.  It may be.
5    Q.  What else would you need to look at to
6  determine that?
7    A.  Any other uses of it by this company.
8    Q.  Have you reviewed any uses by this company of
9  the term "all-zirconia bruxer"?
10    A.  No.
11      MS. ZADRA-SYMES:  Just for the record, that is
12  b-r-u-x-e-r.
13  BY MS. ZADRA-SYMES:
14    Q.  That's correct?
15    A.  Oh, you're asking me?
16    Q.  Yeah.
17    A.  I thought you were telling her.
18      Yes, it is, uh-huh.
19      MS. ZADRA-SYMES:  Exhibit 85 is one of the
20  documents you produced to us.
21
22      (Whereupon, Exhibit 85 was marked

Page 117

Pages 114 to 117

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-409-

| | |
|---|---|
| 1       for identification.) | 1   A.  Okay.  I'm going to read it. |
| 2  BY MS. ZADRA-SYMES: | 2     Okay.  I've read it. |
| 3   Q.  It doesn't have Bates numbers on the bottom, so | 3   Q.  Is there any reference to Glidewell? |
| 4  I just want to make sure you recognize it as a document | 4   A.  No. |
| 5  that you produced to us. | 5   Q.  Do you know if the two labs referenced in the |
| 6   A.  Okay. | 6  paragraph that I directed your attention to are |
| 7   Q.  Do you recognize it? | 7  authorized Glidewell labs? |
| 8   A.  I do. | 8   A.  Not off the top of my head.  I'd have to go |
| 9    MS. ZADRA-SYMES:  Just for the record, the | 9  back and check on the list. |
| 10  title of the document is "The metal-free practice scam." | 10   Q.  Did you check that when you prepared your |
| 11  BY MS. ZADRA-SYMES: | 11  report? |
| 12   Q.  Do you see that? | 12   A.  I don't recall if we checked it with this |
| 13   A.  Yes. | 13  particular document or not.  As you know, we gave you |
| 14   Q.  Is this a document that you reviewed in | 14  three binders of documents with thousands of pages, so |
| 15  connection with preparing your report? | 15  I'd have to go back and look. |
| 16   A.  Yes. | 16   Q.  Actually, we didn't receive binders.  We |
| 17   Q.  On the second page in the second full | 17  just -- |
| 18  paragraph, can you read that for me, please, the | 18   A.  Oh, you just received the drop-box electronic |
| 19  paragraph beginning with "now"? | 19  delivery.  My apologies for stating it that way then. |
| 20   A.  "Now, with the advent of full zirconia crowns | 20    MS. ZADRA-SYMES:  I've handed you what the |
| 21  such as Zir-MAX by Burbank Dental Labs and Opalite by | 21  court reporter has marked as Exhibit 86, which again is |
| 22  Aurum Ceramics Labs, we are getting strength and some | 22  another document that we received from you on the |
| Page 118 | Page 120 |
| 1  beautiful translucency to match some of the all-ceramic | 1  production that we received on Wednesday evening this |
| 2  crowns." | 2  week. |
| 3   Q.  Is the Glidewell BruxZir product referenced | 3    (Whereupon, Exhibit 86 was marked |
| 4  anywhere in this article? | 4    for identification.) |
| 5   A.  I would have to read the whole article to | 5    MS. ZADRA-SYMES:  The first page of the |
| 6  answer that question. | 6  document is titled "Proven winners," and it's a printout |
| 7   Q.  Do you know why you produced this document to | 7  from the website dentaleconomics.com. |
| 8  us? | 8    THE WITNESS:  Yes? |
| 9   A.  I think it came up in response to one of our | 9  BY MS. ZADRA-SYMES: |
| 10  searching or digging down in one of our searches, | 10   Q.  The first paragraph that's numbered, paragraph |
| 11  uh-huh. | 11  No. 1 says "Full zirconia crowns." |
| 12    I should note that the paragraph you had me | 12   A.  Yes. |
| 13  read is using the "full zirconia crowns" as a generic | 13   Q.  And, again, in the middle of that paragraph, it |
| 14  term.  Wouldn't you agree? | 14  says, "The biggest challenge with full zirconia has been |
| 15   Q.  I don't need to testify today. | 15  esthetics, but this has been solved with such full |
| 16   A.  I know you don't, but it is. | 16  zirconia crowns as Zir-MAX (Burbank Dental Lab) and |
| 17   Q.  But the Glidewell product is not mentioned in | 17  Opalite (Aurum Ceramics)." |
| 18  this article, is it? | 18    Do you see that? |
| 19   A.  I would have to look and see. | 19   A.  Yes. |
| 20   Q.  Okay.  Well, take your time? | 20   Q.  Did you review this document in connection with |
| 21   A.  Would you like me to look? | 21  your report? |
| 22   Q.  Yes, please. | 22   A.  I believe so. |
| Page 119 | Page 121 |

Pages 118 to 121

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-410-

10/12/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

1     Q.  Did you check to see whether those companies
2   were authorized Glidewell labs?
3     A.  Again, I don't recall specifically, although I
4   have a vague recollection that Zir-MAX may not be, in
5   particular, a Glidewell-authorized lab.  I would want to
6   double-check that, but I think it's not, Zir-MAX.
7         I would note again, they're using "full
8   zirconia crowns" as the generic name for these crowns,
9   and they don't seem to feel any need to refer to them as
10  BruxZir crowns.
11    Q.  You haven't looked at their website, have you?
12    A.  Oh, I think we have, yeah.  I meant in this
13  particular document which you're showing me.
14        MS. ZADRA-SYMES:  This again is another
15  document that was produced to us on Wednesday evening.
16        (Whereupon, Exhibit 87 was marked
17          for identification.)
18  BY MS. ZADRA-SYMES:
19    Q.  At the bottom of the page there's a reference
20  to zirconia-based and full-zirconia restorations.
21    A.  Uh-huh.
22    Q.  In the third sentence it says, "They are

                                    Page 122

1   rapidly becoming one of the most used types of
2   tooth-colored indirect restorations for both single and
3   multiple tooth indications.  Because of their high
4   strength, full-zirconia restorations may be cemented
5   with any cement of the practitioner's choice."
6         Do you see that?
7     A.  Yes.
8     Q.  Is there a reference to Glidewell in this
9   document?
10    A.  May I take a moment to look?
11    Q.  Yes, of course.
12    A.  Not that I see.
13        Did you hear my answer?
14    A.  Yes, thank you.
15        Two minutes.  I just have to pull some other
16  documents.  I'm going through them as quickly as I can.
17        THE VIDEOGRAPHER:  Off the record at 1:57 p.m.
18        (Recess taken.)
19        THE VIDEOGRAPHER:  Back on the record
20  at 2:05 p.m.
21
22  BY MS. ZADRA-SYMES:

                                    Page 123

1     Q.  Turning back to your report on page 13,
2   paragraph 16.
3     A.  Give me a moment, please, and I'll find it.
4         Yes.
5     Q.  In the middle of the paragraph you say,
6   "Plaintiff's mark is a composite of the root prefix
7   'brux' and the root prefix 'zir.'  'Brux' is taken from
8   'bruxism,' and 'zir' is taken from 'zirconium.'"
9     A.  Yes.
10    Q.  "Dentists familiar with Plaintiff's services
11  and products would likely predominantly perceive its
12  marks BruxZir as a combination of these two roots 'brux'
13  and 'zir' because it involves the use of solid zirconia
14  to treat the results of teeth that have been ground by
15  bruxism."
16        Do you see that?
17    A.  I do.
18    Q.  Did you do any analysis of how dentists
19  perceive the term "zir," z-i-r?
20    A.  I talked to Mr. Shuck about this, and I talked
21  to him about the history of how this mark was formed and
22  why it is formed the way it is and how the word "zir"

                                    Page 124

1   came to be used in this mark, including in connection
2   with some early meetings with dentists.  I also ran
3   "zir" in a search through the U.S. database to see what
4   it came up in connection with.
5     Q.  And from that you determined that dentists
6   would likely predominantly perceive the mark "BruxZir"
7   as a combination of those two roots; is that correct?
8     A.  Yes.
9     Q.  So your understanding is the reference "zir"
10  will be perceived by dentists as a reference to
11  zirconium?
12    A.  Predominantly.
13    Q.  What is the date in this case for determining
14  when Glidewell's mark is a strong mark in the legal
15  sense?
16    A.  The date for determining whether Glidewell's
17  mark is a strong mark in the legal sense would arguably
18  be the same date as used in determining your client's
19  entry into the market, which is the day for determining
20  whether Glidewell's BruxZir mark was or was not generic
21  at that time.  So I believe that's August 2011.
22    Q.  I believe it's actually May 2011, but we can

                                    Page 125

                              Pages 122 to 125

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-411-

1  check. I'm not testifying.
2      On page 14 of your report --
3      A.  Yes?
4      Q.  -- you say in paragraph 21 toward the end of
5  the paragraph, the last two sentences, "This is not a
6  crowded field in which several companies are using a
7  mark similar to BruxZir to sell similar products or
8  services.  A mark that has relatively unique linguistic
9  recognition in a given field is a strong mark."
10     What's your basis for that?
11     A.  Well, the USPTO's trademark website and Google
12  searches I did are reported earlier in this report, and
13  my discussions with Mr. Shuck to see who besides the
14  Plaintiff and the Defendant in this case use any mark
15  that is similar to "BruxZir" or "bruxer" as a trademark
16  for these two types of products or services, either the
17  making of the crowns, the crowns, or the making of the
18  blank material.
19     Q.  Anything else?
20     A.  No.
21     Q.  What do you mean by "relatively unique
22  linguistic recognition"?

Page 126

1      A.  Well, I mean a mark that is linguistically
2  unique or relatively unique tends to be stronger in it's
3  given field.  For example, Google is the only
4  search engine that sounds like "Google."  If there were
5  13 search engines that sounded like goog-something, then
6  Google wouldn't be relatively linguistically unique in
7  the search engine services market as a mark.
8      So there are other areas where you find marks
9  that are not relatively linguistically unique, where
10  lots of competitors use the same mark or very similar
11  marks to each other to sell very similar products, and
12  in that sense you would say it's not a very unique mark.
13     Q.  Is Google a suggestive mark?
14     A.  Google is a misspelling of the word "googol,"
15  which is a mathematical term that refers to a very large
16  number.  I forgot what the number is, but it's like 10
17  with a hundred zeros after it.  "Google" is probably
18  perceived by the public as arbitrary or even fanciful.
19     Most the time when I ask my students if they
20  know what Google is, they don't even know what it is for
21  the number, and they assume Google just invented this
22  mark.  If that were proven to be the case in a survey in

Page 127

1  a wide-scale sense, then it would be perhaps fanciful.
2  But it's not really fanciful.  It's a word that exists
3  in the English language that was slightly misspelled and
4  then arbitrarily applied to a field which is largely
5  remote from the meaning of the numerical word.
6      Now, an argument could be made, being a
7  professor, that it's a suggestive mark because it
8  suggests -- this is what the founder of Google said in a
9  newspaper interview.  He said, "We picked the mark to
10  suggest the connection between the viewer of the number,
11  which has all these zeros after it, the way the number
12  would appear if it were written out, and the word
13  'googol' that simplifies the number.  And so we were
14  trying to say, we simplify the massive data on the
15  Internet in the way that word simplifies that number,"
16  which is a very tortured and math speak explanation.  To
17  mathematicians I would say it would suggest it; to the
18  general population, I don't think they would have gotten
19  that.
20     Q.  And the question of suggestiveness is
21  determined according to what the relevant consuming
22  public understands?

Page 128

1      A.  Absolutely, yes.  To the perception of the
2  relevant public.
3      Let me just add though, by the way, with
4  genericness --
5      Q.  I haven't asked a question about genericness.
6      A.  Well, shall I wait?
7      Q.  Yes, you shall.
8      A.  Will you ask me?
9      Q.  I asked whether Google was suggestive, and I
10  had a very long answer.  Thank you very much.
11     A.  I apologize for the very long answer.  It's not
12  clear.  I would suspect it's not, but an argument could
13  be made that it is.
14     Q.  Is it your opinion that because Glidewell is a
15  market leader, other companies cannot use a generic term
16  in the names of their products?
17     A.  I don't think I've said that.
18     Q.  So that's not your opinion?
19     A.  What other companies?  What generic terms?  In
20  the names of what products?  The question is entirely
21  nonspecific to this case.
22     Q.  In your report, paragraph 23 --

Page 129

Pages  126 to 129

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-412-

1    A.  Yes?
2    Q.  -- you say, "As stated above, Glidewell is the
3    market leader in the provision of custom-made solid
4    zirconia crowns.  A review of Keating's website reveals
5    that it is in the same market."
6    A.  Yes.
7    Q.  So is it your opinion that because Glidewell is
8    the market leader in the provision of custom-made solid
9    zirconia crowns, Keating cannot use a generic term in
10   the name of its products?
11   A.  I'm not saying that there, and that's not the
12   opinion I'm stating there.  The opinion I'm stating
13   there is that they're in the same market.
14   Q.  Okay.  So is it your opinion that Keating
15   Dental can use a generic term "bruxer" in the name of
16   its product?
17   A.  Oh, "bruxer"?
18   Q.  Which is admittedly a generic term in this
19   case.
20   Q.  Who admitted it?
21   Q.  Glidewell.
22   A.  Well, I would want to look at how it's being

Page 130

1    used and when it's being used.  I didn't admit it in
2    this deposition.
3    Q.  It's an admission in this case that the term
4    "bruxer" is generic for people who suffer from bruxism.
5    A.  Oh, I see.  Well, it's not necessarily being
6    used in a generic sense by Keating, even if it's a
7    generic word.  "Apple" is generic for apples, but when
8    you stick it on a computer company, it's no longer
9    generic.  "Bruxer" could be the generic name of a person
10   who bruxes, but unless Keating is selling those
11   people -- I don't think they have bruxers that you
12   order, you know, you say, "Send me a bruxer" -- then
13   they're not using it as a generic term.
14   Q.  Are they using it descriptively?
15   A.  I think that they're using it suggestively.
16   They can't be using it descriptively because they're
17   using it in their trademark.  For descriptive fair use
18   you don't use it in your trademark.
19   Q.  That's your opinion, that it's not possible to
20   do?
21   A.  That's the law.
22   Q.  Okay.

Page 131

1    A.  The law is that if you want to take advantage
2    of descriptive fair use, you don't use it as a brand
3    name, and Keating is using it as a brand name.
4    Q.  Are you saying that people don't use
5    descriptive terms in their trademarks?
6    A.  One they do, they're no longer considered to be
7    using them descriptively.  They're considered to be
8    using them as source identifiers.
9    Q.  And if somebody disclaims the use of a term in
10   their trademark, would that indicate that it's
11   descriptive?
12   A.  I saw that they disclaimed the use of it, and
13   that -- could be a lot of reasons for that, but that
14   doesn't mean that it's not still part of the composite
15   mark for which they were seeking protection.
16   Q.  So are you saying that when somebody files a
17   trademark application that includes descriptive words,
18   they are necessarily claiming full trademark rights in
19   those descriptive words even if they disclaim them?
20   A.  No.
21   Q.  So it is possible to use a descriptive term in
22   a trademark without it being used in a trademark sense?

Page 132

1    A.  I think it's theoretically possible.  I don't
2    know that Keating is using it in a descriptive sense in
3    its trademark.
4    Q.  But you haven't spoken to any dentist to
5    determine how they perceived that use?
6    A.  We've already established, Ms. Symes, that I
7    have not spoken to any dentists about anything other
8    than my own teeth and my own bruxer crown.
9    MS. ZADRA-SYMES:  Let's just take five minutes.
10   We're getting close to the end, so...
11   THE VIDEOGRAPHER:  Off the record at 2:19 p.m.
12   (Recess taken.)
13   THE VIDEOGRAPHER:  Back on the record at
14   2:26 p.m.
15   BY MS. ZADRA-SYMES:
16   Q.  In connection with your report in this case,
17   have you done any studies to determine how a dentist
18   perceives the letter Z in connection with marks for
19   zirconia crowns?
20   A.  Not other than what I've stated in the report
21   and what I've told you previously.
22   Q.  Okay.  In paragraph 24 of your report --

Page 133

Pages 130 to 133

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
**EXHIBIT 153**
-413-

| | |
|---|---|
| 1  A. Yes? | 1  extra copies of it. I'm just pulling out a couple of |
| 2  Q. -- towards the top of the page, you have a | 2  pages here. It was printed on, according to the report |
| 3  sentence that says, "By adding a Z, the Keating mark | 3  that we received, October 9, 2012. |
| 4  causes a mental association with the Z in Glidewell's | 4       MR. TACHNER: That's probably the date you |
| 5  BruxZir mark." | 5  downloaded it and printed it. |
| 6  A. Yes. | 6       MS. ZADRA-SYMES: It was the date it was given |
| 7  Q. What's your basis for that statement? | 7  to us. |
| 8  A. Well, the Z is a prominent part in the BruxZir | 8       MR. TACHNER: Well, we gave it to you |
| 9  mark. It's capitalized, and it makes a distinct visual | 9  electronically. It wasn't printed. |
| 10  impression on the person who sees it. It's my | 10       MS. ZADRA-SYMES: Oh, I know you gave it to us |
| 11  understanding that Keating's name is -- or was Keating | 11  electronically, but I'm telling you when it was printed. |
| 12  Dental Arts. I would have expected them to call their | 12  We printed it when we received it. |
| 13  product, therefore, if they were seeking to abbreviate | 13       MR. TACHNER: All right. |
| 14  their name, Keating KDA Bruxer, B-r-u-x-e-r, if they | 14       MS. ZADRA-SYMES: I'm trying to find -- there's |
| 15  were going to go down that route, but instead they | 15  no Bates numbers on anything, so I pulled out one of the |
| 16  called it KDZ Bruxer. | 16  marks here from the TESS report, and it's for Zira, |
| 17  Q. So -- | 17  Z-i-r-a, full-contour zirconia. We could maybe make |
| 18  A. It seems to me that once they add the Z to the | 18  that one as an exhibit, and then I will make copies of |
| 19  list of alphabetical symbols that precede the rest of | 19  it afterwards. I'll just show you that one for now. |
| 20  the mark, they attempt to call attention to it in a way | 20       (Whereupon, Exhibit 88 was marked |
| 21  that could very well cause confusion with Glidewell's | 21       for identification.) |
| 22  mark and which could very well trade on the goodwill and | 22       THE WITNESS: Can I look at it? |
| Page 134 | Page 136 |

| | |
|---|---|
| 1  fame of Glidewell's BruxZir mark. | 1       MS. ZADRA-SYMES: Yes, surely. This is it. |
| 2  Q. So when you reference mental association in | 2  We've marked it as Exhibit 88, and again we're all |
| 3  this sentence, you're talking about your own mental | 3  sharing one copy. |
| 4  association? | 4       THE WITNESS: Yes, I'll hold it up like this, |
| 5  A. No, I'm not. | 5  if I can, if you can read it. |
| 6  Q. But you -- | 6  BY MS. ZADRA-SYMES: |
| 7  A. Mental association, as you know, is often | 7  Q. It's Zira, Z-i-r-a, full-contour zirconia, and |
| 8  studied by way of inference in trademark cases, and many | 8  you've previously testified today that "full-contour |
| 9  judges with no survey evidence whatsoever accept | 9  zirconia" is a generic term for crowns that include |
| 10  testimony of and make statements about likely mental | 10  zirconia; is that correct? |
| 11  associations. | 11  A. Yes. |
| 12  Q. But you are aware that there are numerous | 12  Q. Is that generic term referenced anywhere in the |
| 13  trademarks in the dental industry that use a capital | 13  description of goods for that mark? |
| 14  letter Z in connection with a product that includes | 14  A. Well, the word "zirconia" is. |
| 15  zirconia? | 15      I don't believe this is a registered mark. It |
| 16  A. But not with "bruxer" in the trademark that I | 16  says, "Published for opposition." |
| 17  found. I found no other companies besides these two | 17  Q. But the -- |
| 18  that combine "Z" and "bruxer" in any phonetic | 18       MR. TACHNER: It's got a registration number. |
| 19  pronunciation thereof as part of their trademark. | 19       THE WITNESS: Where is the registration number? |
| 20  Q. In the cert report that was produced to us on | 20       MR. TACHNER: On the bottom. |
| 21  Wednesday evening, which appears to be over a thousand | 21       THE WITNESS: Oh, yeah, "Registration Number." |
| 22  pages -- I have a copy in front of me, but I didn't make | 22  I'm sorry. Yes, go ahead. |
| Page 135 | Page 137 |

Pages 134 to 137

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153
-414-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1   So what's your question? | 1    A.  I think so, yes. |
| 2       MS. ZADRA-SYMES:  Can you read it back, please. | 2        I'm not sure I said it in those words.  I said |
| 3       (Record read as follows: | 3   "full zirconia crown" was.  Let me just look at my |
| 4       "Question:  Is that generic term | 4   report before I give you an answer that's not consistent |
| 5       referenced anywhere in the description | 5   with what in fact I did say before. |
| 6       of goods for that mark?") | 6        Would you let me do that for a moment? |
| 7   THE WITNESS:  Part of it is. | 7    Q.  Of course. |
| 8   BY MS. ZADRA-SYMES: | 8    A.  Do you want to repeat your question? |
| 9    Q.  The word "zirconia"? | 9    Q.  The question was, is it your opinion that the |
| 10    A.  Yes. | 10   term "full zirconia" is a generic term in connection |
| 11    Q.  Okay.  Can you pass that back, please. | 11   with dental appliances that include zirconia? |
| 12    A.  Sure. | 12    A.  It may be. |
| 13    Q.  And you'll see on the back page -- | 13    Q.  Okay.  And what I've handed you is one of the |
| 14    A.  Oh, I didn't look at the back page. | 14   pages from your TESS printout, and that is firm mark |
| 15      Yes. | 15   called Suntech full zirconia. |
| 16    Q.  -- that there's a disclaimer. | 16    A.  Yes. |
| 17    A.  I do see that. | 17    Q.  It does not appear to be registered -- |
| 18    Q.  And what does that indicate? | 18    A.  Correct. |
| 19    A.  "No claim is made to the exclusive right to use | 19    Q.  -- but there is a disclaimer on the back -- |
| 20   'full-contour zirconia' apart from the mark as shown." | 20    A.  Yes. |
| 21    Q.  Why is that disclaimer made? | 21    Q.  -- of "full-contour." |
| 22    A.  So that they can't sue somebody else who uses | 22    A.  No. |
| Page 138 | Page 140 |

| | |
|---|---|
| 1   the term "full-contour zirconia." | 1    Q.  Sorry. |
| 2    Q.  So what's the trademark here in this? | 2    A.  "Full zirconia." |
| 3    A.  It's the whole thing. | 3    Q.  "Full zirconia." |
| 4    Q.  Okay. | 4    A.  Would you like me to read it? |
| 5    A.  That disclaimer doesn't take that out of the | 5    Q.  Yes, please. |
| 6   trademark.  It just qualifies their rights. | 6    A.  "No claim is made to the exclusive right to use |
| 7    Q.  It also indicates that other people can use | 7   'full zirconia' apart from the mark as shown." |
| 8   those disclaimed terms in their marks too? | 8    Q.  So that would be an indication that the company |
| 9    A.  Separately, in a nonconfusing way. | 9   is not claiming rights in the words "full zirconia"? |
| 10    Q.  And also in other trademarks? | 10    A.  Standing alone. |
| 11    A.  Yes. | 11    Q.  Standing alone? |
| 12       MS. ZADRA-SYMES:  Here's another one.  I'm | 12    A.  Only in connection with the word "Suntech" |
| 13   going to hand you what the court reporter has marked as | 13   coming before it. |
| 14   Exhibit 89.  It is a printout of the TESS report that | 14    Q.  Yes.  Thank you. |
| 15   you produced to us referencing the Suntech full zirconia | 15        The description of goods in that application, |
| 16   trademark. | 16   does it reference "full zirconia"? |
| 17       (Whereupon, Exhibit 89 was marked | 17    A.  It does not. |
| 18       for identification.) | 18    Q.  Do you know how dentists order dental crowns |
| 19   BY MS. ZADRA-SYMES: | 19   from a dental lab? |
| 20    Q.  And again, you testified earlier today that | 20    A.  They fill out a form, and they check off what |
| 21   "full zirconia" was a generic name; is that correct? | 21   they want.  I suppose it varies from lab to lab.  I've |
| 22   "Full zirconia crown"? | 22   seen some of the forms produced in this litigation by |
| Page 139 | Page 141 |

Pages  138  to  141

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**

-415-

| | |
|---|---|
| 1      your client which indicate how they order. | 1      that inference is reasonable given that evidence; that a |
| 2      Q. Does that form have the Keating Dental | 2      court of law would like at that as prima facia evidence |
| 3      Associates [sic] name at the top? | 3      of actual confusion, or could. |
| 4      A. I believe so. | 4      Q. But if a dentist was aware that the product did |
| 5      Q. We already established that you didn't have any | 5      not come from Glidewell and that the material for making |
| 6      discussions with any dentists, so if a dentist was very | 6      the crown did not come from Glidewell, would they still |
| 7      well aware that it was purchasing a product from Keating | 7      be confused? |
| 8      Dental Associates and not from Glidewell, would that | 8      A. You mean that the material was not real BruxZir |
| 9      indicate that the dentist was confused? | 9      material from Glidewell? |
| 10      A. Is that a hypothetical question? | 10      Q. From Glidewell, exactly. |
| 11      Q. Yes. | 11      A. I would think not. I would think in those |
| 12      Q. If the dentist was aware that it was purchasing | 12      circumstances, they would not be confused. |
| 13      a product from Keating and not from Glidewell, would it | 13      Q. Who are Glidewell's major competitors? |
| 14      indicate that the dentist was confused about what? | 14      A. Well, I think it depends on whether you're |
| 15      Q. About the source of the product it was | 15      talking about for the blanks or for the labs. Let's |
| 16      purchasing. | 16      start with the blanks. Who makes this strength of -- |
| 17      A. It could still indicate confusion as to source. | 17      who makes this strength? I did get this information. I |
| 18      Q. And how would it do that? | 18      specifically asked Mr. Shuck for this information, and |
| 19      A. The dentist might not know that -- well, in my | 19      I'm trying to see if I can remember the names of some of |
| 20      understanding, Keating Dental Arts does not sell blanks; | 20      these competitors. |
| 21      correct? It's correct. They sell finished crowns. If | 21      I think Zir-MAX is a competitor. I think |
| 22      the dentist is looking for a finished crown, he or she | 22      Zir-Cast is a competitor. I think Lava Plus is a |
| Page 142 | Page 144 |

| | |
|---|---|
| 1      could think that Keating is an authorized lab selling | 1      competitor; I think it's made by 3M, and they make the |
| 2      authorized BruxZir material in its crowns. So the mere | 2      blanks, Lava Plus. I think NexxZr, spelled |
| 3      fact that the dentist knows it's dealing with a lab | 3      N-e-x-x-Z-r [sic], may make the blanks as well. |
| 4      doesn't mean that the dentist knows it's not getting a | 4      Those are some of the names I recall being |
| 5      real BruxZir crown. | 5      given on Glidewell competitors for the material. |
| 6      Q. Is it your understanding that the only zirconia | 6      Q. And then for the actual crowns? |
| 7      material available for making full zirconia crowns comes | 7      A. Well, the crowns are almost too numerous to |
| 8      from Glidewell? | 8      mention because the crowns are made by unauthorized -- |
| 9      A. No. | 9      well, independent -- let's just say unassociated, |
| 10      Q. Is it your understanding that the only material | 10      unaffiliated dental labs throughout the United States, |
| 11      for making full zirconia crowns for bruxers comes from | 11      of which there are many. Many, many, many. |
| 12      Glidewell? | 12      It is my understanding that Glidewell is the |
| 13      A. No. There could still be confusion because | 13      largest single lab. I do not know who the second- and |
| 14      they could think it was Glidewell's? | 14      third-largest single labs are for making the crowns. |
| 15      Q. You haven't asked any of them though, have you? | 15      Q. And do you know when the many independent labs |
| 16      A. I've seen evidence in your order forms of them | 16      began making those crowns? |
| 17      writing "BruxZir" with a capital Z, which seems to | 17      A. I don't know the precise dates. I know that -- |
| 18      indicate at least the inference that some of them could | 18      or I've been told that full zirconia crowns were not |
| 19      very well have believed that that was authorized | 19      widely made and sold throughout the United States before |
| 20      Glidewell BruxZir material used. | 20      Glidewell's marketing and promotion of them increased in |
| 21      Q. But you've made that assumption? | 21      the overall sales of them. |
| 22      A. I haven't made that assumption. I have said | 22      Q. So have you determined since June of 2009 how |
| Page 143 | Page 145 |

Pages 142 to 145

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-416-

1  many of these many independent labs began making full
2  zirconia crowns since 2009?
3      A.  I don't have a precise number, no.
4      Q.  Are you aware of any instances where a customer
5  has ordered a KDZ Bruxer product from Glidewell?
6      A.  No, not off the top of my head.  I'm aware of
7  the opposite.  I believe you produced instances of
8  50 orders of BruxZir products from Keating.
9      Q.  That's what you're saying they are, but...
10      A.  Well, it says it on there with a Z.
11      Q.  Then are you aware of any customer making any
12  inquiries with Glidewell to order a KDZ Bruxer product?
13      A.  No.
14      Q.  Are you aware of any instances where a
15  KDZ Bruxer product has been returned to Glidewell?
16      A.  No, I'm not aware of any.
17      MS. ZADRA-SYMES:  If we take another short
18  break, I think we're getting close to done.
19      THE WITNESS:  Okay.
20      THE VIDEOGRAPHER:  Off the record at 2:48 p.m.
21  (Recess taken.)
22      THE VIDEOGRAPHER:  Back on the record

Page 146

1      THE WITNESS:  Yes.
2      MS. ZADRA-SYMES:  At the top it says "CDL
3  Veneers - Products - ZerisBRUX," Z-e-r-i-s-B-R-U-X, and
4  then there's a photograph of a lady towards the middle
5  of the page.  Next to that it says ZerisBRUX with a
6  circle R, and underneath it says "Full-Contour Zirconia
7  Restorations."
8  BY MS. ZADRA-SYMES:
9      Q.  Do you see that?
10      A.  I do.
11      Q.  Are you familiar with this product?
12      A.  No.
13      Q.  Is this an attempt to trade on the Glidewell
14  mark?
15      A.  I don't know.  I haven't done an investigation
16  of this.
17      Q.  Based on what you see on this website printout,
18  would you infer that it is an attempt --
19      A.  They're not using the word "bruxer," and
20  "Zeris" is fairly distinct.  I don't know.  I'm not here
21  to make a trademark analysis of whether Glidewell would
22  have a claim against these people and, if so, what would

Page 148

1  at 2:55 p.m.
2      MS. ZADRA-SYMES:  I handed you what the
3  court reporter has marked as Exhibit 90 and Exhibit 91.
4          (Whereupon, Exhibit 90 was marked
5           for identification.)
6          (Whereupon, Exhibit 91 was marked
7           for identification.)
8      MS. ZADRA-SYMES:  So turning first to
9  Exhibit 90, this is a document that we produced.  It
10  doesn't have a Bates number at the bottom.
11      MR. MANGUM:  We haven't produced it yet.
12      MS. ZADRA-SYMES:  Oh, so it will be produced.
13      THE WITNESS:  It's not yet been produced in
14  this litigation?
15      MS. ZADRA-SYMES:  No, it has not been produced
16  yet.  No.  But it will be.
17      THE WITNESS:  So I'm the first person to see
18  it?
19      MS. ZADRA-SYMES:  You may very well be.
20      THE WITNESS:  I'm honored.
21      MS. ZADRA-SYMES:  It's a printout from
22  www.cdllab.com.

Page 147

1  be the strengths and weaknesses up one side and down the
2  other and all the arguments that could be made by both
3  sides and whether this could create a likelihood of
4  confusion in the relevant marketplace.  I would really
5  have to make a much greater investigation to give you a
6  meaningful opinion.
7      Q.  You do agree that this has a capital Z at the
8  beginning of the mark; is that correct?
9      A.  It does, yes.  I think my testimony earlier was
10  that there was no mark that had "bruxer" and a Z other
11  than your client's and Glidewell's.
12      Q.  But this has a capital Z and the word "brux"?
13      A.  Yes, but not "bruxer."
14      Q.  Okay.
15      A.  Well, "bruxer" is a lot like "BruxZir" in the
16  sense that it's two syllables; this is one syllable.
17      Q.  How many --
18      A.  You know, it's possible that people -- other
19  people trade on other people's goodwill, and that
20  doesn't mean that somehow it absolves your client from
21  liability, nor am I here --
22      Q.  That wasn't my question.

Page 149

Pages 146 to 149

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

EXHIBIT 153

-417-

1     A.   I know that, but nor am I here to give
2   thorough, you know, reviews of the potential trademark
3   claims and defenses of every single thing that you can
4   find with the word "brux" on the Internet.
5     Q.   But you have prepared a report that purports to
6   have done an investigation of the products that are in
7   the marketplace, and this is one of the products in the
8   marketplace, so that's why I put it in front of you.
9     A.   I appreciate that, and I --
10    Q.   Okay.  So we can turn to Exhibit 91 now.
11    A.   Okay.
12    Q.   This is a document that has been produced.
13  It's numbered KDA-002172.
14    A.   Yes.
15    Q.   And there's a reference in two places to a --
16  the first reference, slightly more than halfway down the
17  page, says "Posterior Single Units."
18    A.   Uh-huh.
19    Q.   It says, Use Procera Zirconia or Bruxer crown
20  made from IPS e.max."
21       Do you see that?
22    A.   Yes, I do.

Page 150

1     Q.   Is that a Glidewell-authorized company?
2     A.   I don't know.
3     Q.   And then there's another reference to the same
4   product further down, "Use IPS e.max Bruxer crown."
5     A.   I see that.
6     Q.   Okay.  So in your research regarding the
7   marketplace you didn't come across this product?
8     A.   No.
9     Q.   You mentioned that the only person that you've
10  met with at Glidewell was Jim Shuck?
11    A.   Yes.
12    Q.   How many meetings have you had with Jim Shuck?
13    A.   One.
14    Q.   When was that?
15    A.   Within the last week.
16    Q.   So had you spoken with Mr. Shuck by telephone
17  prior to that meeting?
18    A.   No.
19    Q.   So prior to preparing your report, which was
20  signed on September 15, did you have any discussions
21  with Jim Shuck?
22    A.   I don't think so.  I think I spoke with

Page 151

1   Mr. Tachner, to whom I put several questions that I
2   wanted asked of Mr. Shuck.
3     Q.   So other than speaking with Mr. Tachner, you
4   didn't have any other contact with anybody at Glidewell
5   prior to preparing your report?
6     A.   Correct.
7       MS. ZADRA-SYMES:  I think that I don't have any
8   questions today, but as we've discussed, we reserve the
9   right to continue this deposition because of the
10  apparent missing documents or documents that may be
11  missing that the witness has relied upon for his report,
12  and also because of the volume of the documents that we
13  only received on Wednesday evening despite requests that
14  they be produced earlier and despite the federal rules
15  obligation.
16      MR. TACHNER:  I don't recall ever getting a
17  request that they be produced earlier than Wednesday.
18  The first time you asked for them was when I got an
19  e-mail from either Rustin or David saying, "Please
20  produce these by Wednesday."
21      MS. ZADRA-SYMES:  Because they hadn't been
22  produced pursuant to the obligations under the federal

Page 152

1   rules.  You didn't ask us to produce our expert
2   exhibits; we just did because that's the federal rule
3   obligation.
4       MR. TACHNER:  Your expert's what?
5       MS. ZADRA-SYMES:  Documentation that he relied
6   upon in connection with his report.
7       So with that reservation, I'm going to finish
8   my questions for today.
9       MR. TACHNER:  Okay.  I have no questions.
10      MS. ZADRA-SYMES:  Thank you.
11      THE VIDEOGRAPHER:  All right.  Off the record
12  at 3:02 p.m.
13      (At 3:02 p.m., the deposition of
14      DAVID J. FRANKLYN was adjourned.)
15
16
17
18
19
20
21
22

Page 153

Pages 150 to 153

929bebbb-a3c3-44b6-ad04-a9759a4d58e4
EXHIBIT 153
-418-

10/12/2012      James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

| | |
|---|---|
| 1   STATE OF CALIFORNIA        ) | 1   Digital Evidence Group, L.L.C. |
| 2   COUNTY OF LOS ANGELES     ) SS. | 2   1726 M Street NW, Suite 1010 |
| 3 | 3   Washington, D.C. 20036 |
| 4       I, AUDRA E. CRAMER, CSR No. 9901, in and for the | 4   (202) 232-0646 |
| State of California, do hereby certify: | |
| 5       That, prior to being examined, the witness named | 5 |
| in the foregoing deposition was by me duly sworn to | 6   SIGNATURE PAGE |
| 6   testify the truth, the whole truth and nothing but the | 7 |
| truth; | 8 |
| 7       That said deposition was taken down by me in | Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. |
| shorthand at the time and place therein named, and | 9   Witness Name: David J. Franklyn |
| 8   thereafter reduced to typewriting under my direction, | Deposition Date: October 12, 2012 |
| and the same is a true, correct and complete transcript | 10 |
| 9   of said proceedings; | I do hereby acknowledge that I have read |
| I further certify that I am not interested in the | 11   and examined the foregoing pages |
| 10   event of the action. | of the transcript of my deposition and that: |
| 11       Witness my hand this 31st day of October, | 12 |
| 12   2012. | (Check appropriate box): |
| 13 | 13   ( ) The same is a true, correct and |
| 14 | complete transcription of the answers given by |
| 15 | 14   me to the questions therein recorded. |
| 16 | 15   ( ) Except for the changes noted in the |
| 17              _____ | 16   attached Errata Sheet, the same is a true, |
| 18        Certified Shorthand | 17   correct and complete transcription of the |
| 19        Reporter for the | 18   answers given by me to the questions therein |
| 20        State of California | 19   recorded. |
| 21 | 20 |
| 22 | 21   _____     _____ |
|                                   **Page 154** | 22   DATE          WITNESS SIGNATURE |
| |                                   **Page 156** |
| 1   David J. Franklyn c/o | 1   Digital Evidence Group, L.L.C. |
| 2   Leonard Tachner PLC | 2   1726 M Street NW, Suite 1010 |
| 17961 Sky Park Circle, Suite 38-E | 3   Washington, D.C. 20036 |
| 3   Irvine, CA  92614-6364 | 4   (202) 232-0646 |
| 4 | 5 |
| 5   Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. | E R R A T A   S H E E T |
| 6   Date of deposition: October 12, 2012 | 6 |
| Deponent: David J. Franklyn | 7 |
| 7 | Case: James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc. |
| 8   Please be advised that the transcript in the above | 8   Witness Name: David J. Franklyn |
| 9   referenced matter is now complete and ready for signature. | Deposition Date: October 12, 2012 |
| 10   The deponent may come to this office to sign the transcript, | 9 |
| 11   a copy may be purchased for the witness to review and sign, | 10   Page No.   Line No.       Change |
| or the deponent and/or counsel may waive the option of signing. | 11 |
| 12   Please advise us of the option selected. | 12 |
| Please forward the errata sheet and the original signed | 13 |
| 13   signature page to counsel noticing the deposition, noting the applicable | 14 |
| 14   time period allowed for such by the governing Rules of Procedure. | 15 |
| 15   If you have any questions, please do not hesitate to call our office at | 16 |
| 16   (202)-232-0646. | 17 |
| 17 | 18 |
| 18   Sincerely, | 19 |
| 19 | 20 |
| 20   Digital Evidence Group | 21   _____      _____ |
| 21   Copyright 2012 Digital Evidence Group | 22      Signature            Date |
| 22   Copying is forbidden, including electronically, absent express written consent. | |
|                                   **Page 155** |                                   **Page 157** |

Pages  154  to  157

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**
-419-

10/12/2012     James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.   David J. Franklyn

Page 154

1    STATE OF CALIFORNIA        )

2    COUNTY OF LOS ANGELES      )   SS.

3

4         I, AUDRA E. CRAMER, CSR No. 9901, in and for the
     State of California, do hereby certify:

5         That, prior to being examined, the witness named
     in the foregoing deposition was by me duly sworn to

6    testify the truth, the whole truth and nothing but the
     truth;

7         That said deposition was taken down by me in
     shorthand at the time and place therein named, and

8    thereafter reduced to typewriting under my direction,
     and the same is a true, correct and complete transcript

9    of said proceedings;

          I further certify that I am not interested in the

10   event of the action.

11        Witness my hand this 31st day of October,

12   2012.

13

14

15

16

17   _____

18        Certified Shorthand

19        Reporter for the

20        State of California

21

22

929bebbb-a3c3-44b6-ad04-a9759a4d58e4

**EXHIBIT 153**
-420-