1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING


JAMES R. GLIDEWELL DENTAL
CERAMICS, INC.,
                    Plaintiff,

vs.                                  SACV-11-1309-DOC

KEATING DENTAL ARTS, INC.,
                    Defendant.
----------------------------


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Hearing on Motions

Santa Ana, California

Friday, December 21, 2012


SHARON A. SEFFENS, RPR
United States District Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA
(714) 543-0870


SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3   PHILIP J. GRAVES
     GREER N. SHAW
 4   SNELL & WILMER LLP
     350 South Grand Avenue, Suite 300
 5   Los Angeles, CA  90071
     (213) 929-2500
 6

 7   FOR THE DEFENDANT:

 8   LYNDA J. ZADRA-SYMES
     DAVID G. JANKOWSKI
 9   KNOBBE MARTENS OLSON & BEAR LLP
     2040 Main Street, 14th Floor
10   Irvine, CA  92614
     (949) 760-0404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SANTA ANA, CALIFORNIA; FRIDAY, DECEMBER 21, 2012; 4:30 P.M.
 2            THE COURT:  Counsel, let me start off because I
 3   started off inartfully before.  Here are some initial
 4   feelings and concerns about Docket No. 84.  Docket 84 is
 5   Defendant's Motion for Summary Judgment as to No
 6   Infringement of Glidewell's Registered Trademark.  Is that
 7   correct?  Why don't you check your docket numbers and make
 8   certain.
 9            MR. GRAVES:  That's correct.
10            THE COURT:  Tentatively, I'm prepared concerning
11   Defendant's Motion for Summary Judgment as to no
12   infringement to grant that motion.
13            I think that the defendant has shown that the
14   plaintiff has failed to establish at least one element of
15   the trademark infringement, namely, that there is a
16   likelihood of confusion between the parties' marks.
17            The Court is well-aware that the Ninth Circuit
18   considers eight factors to determine the likelihood of
19   confusion between the parties' marks:  (1) strength of the
20   plaintiff's mark; (2) proximity of the goods; (3) similarity
21   of the marks; (4) evidence of actual confusion; (5)
22   marketing channels used; (6) type of goods and the degree of
23   care likely to be exercised by the purchaser; (7)
24   defendant's intent in selecting the mark; and (8) likelihood
25   of expansion of the product lines.
```

1          Here, tentatively, I feel the plaintiff has a

2     relatively weak mark, and I am inclined to find that it's

3     suggestive; also, that the defendant's mark is substantially

4     not similar, particularly considering the relatively

5     sophisticated customer base.  And that's dentists who know

6     the products well.

7          Tentatively, plaintiff's mark, "BruxZir," is a

8     composite of bruxer (the common term for someone who grinds

9     his teeth) and zirconia (the material used to manufacture

10    it).  It suggests the product:  a zirconia crown made for

11    bruxers.

12         Second, defendant's mark, "KDZ Bruxer," taken as a

13    whole, is not similar.  While both feature the root "brux,"

14    (also featured in many similar products related to

15    tooth-grinding and bruxism), defendant's mark prominently

16    features at the beginning of the mark a series of

17    identifying initials that have nothing to do with

18    plaintiff's mark.  Also, KDZ is in much larger type than the

19    word "Bruxer" in the logo in which the mark generally

20    appears.)

21         While some of the Sleekcraft factors (the factors

22    used to determine likelihood of confusion) do weigh in favor

23    of confusion, they are far outweighed by the fundamental

24    difference between these marks.

25         For example, the fact that the products associated

1   with the marks are the same (dental crowns), and are

2   marketed in the same channels as competitors, does weigh in

3   favor of likelihood of confusion.

4            However, overall, the Sleekcraft factors

5   tentatively show there is no genuine dispute of material

6   fact that infringement has occurred.

7            Those are thoughts and subject to argument here

8   today.

9            Concerning the Motion for Summary Judgment

10  canceling plaintiff's registration (Docket No. 83), I'm

11  inclined to deny that motion.

12           My initial thoughts were that plaintiff's mark is

13  federally registered and entitled to a strong presumption of

14  validity.

15           The mark, "BruxZir," is clearly not generic as

16  alleged by the defendant.

17           I believe that it is suggestive, as the composite

18  includes pieces of the words "Bruxer" and "Zirconia,"

19  suggesting a dental crown made of zirconia that treats

20  bruxism.  It does not describe the product, as a degree of

21  imagination is needed in order to arrive at the product.

22           I tentatively feel Keating has not presented facts

23  sufficient to establish, as a matter of law, that the mark

24  "BruxZir" is not entitled to trademark protection.

25           Concerning the third motion that you have brought

1  before the Court -- it's Plaintiff's Motion for Summary

2  Judgment as to Trademark Misuse, Unfair Competition, Unclean

3  Hands, Fair Use, and Estoppel, which would be Docket No.

4  79 -- I am inclined to grant it in part and deny it in part.

5           First, I'm inclined to grant Plaintiff's Motion

6  for Partial Summary Judgment on Defendant's Third

7  Counterclaim for Misuse of Trademark.

8           Misuse of trademark I don't feel is an independent

9  cause of action, as plaintiff correctly points out.  It is,

10 at best, an affirmative defense.

11          Second, I'm inclined to grant Plaintiff's Motion

12 for Partial Summary Judgment on Defendant's Second

13 Counterclaim for Unfair Competition under the UCL and

14 California common law.

15          Regarding the statutory claim, I think plaintiff

16 correctly points out that the defendant does not have

17 standing to assert this claim, and it has not pled or shown

18 facts establishing economic injury caused by the alleged

19 unfair business practices.

20          Defendant only presents evidence alleging economic

21 injury caused by the present litigation.  Plaintiff's

22 litigation cannot be considered unfair business practices

23 under the UCL.

24          There is a litigation privilege under the UCL in

25 California immunizing litigants from UCL suits based on

1  litigation.

2          Similarly, under federal Noerr-Pennington

3  doctrine, those who petition the government for redress by

4  litigating claims are generally immune from liability for

5  bringing such litigation.  This is not a sham litigation

6  that would fall under the exception to the Noerr-Pennington

7  immunity.

8          Regarding the common law claim, defendant does not

9  oppose the portion of plaintiff's motion that seeks

10 dismissal of defendant's unfair competition claim under

11 California common law.  I looked at defendant's opposition

12 for that proposition.

13         Third, because the Court is finding tentatively

14 that defendant is entitled to summary judgment on the issue

15 of trademark infringement, the portions of this motion

16 related to defendant's affirmative defenses -- unclean

17 hands, classic fair use, and estoppel -- appears to this

18 Court to be moot.

19         The fourth motion you brought, Plaintiff's Motion

20 for Partial Summary Judgment as to Trademark Infringement,

21 which is Docket No. 89, I'm inclined to deny that motion.

22 Because the Court may find that defendant is entitled to

23 summary judgment on the issue of trademark infringement, I

24 don't think the Plaintiff's Cross-Motion for Summary

25 Judgment must necessarily be denied.

```
1            Finally, the last motion, which is a Motion for
2    Partial Summary Judgment as to Defendant's Invalidity
3    Defense, I think should be denied as moot.
4            Similarly, because I find that the plaintiff is
5    entitled to summary judgment that it has not infringed on
6    plaintiff's mark, this motion concerning defendant's
7    invalidity defense, which I did not rely on in coming to
8    these tentative thoughts, is moot.
9            That's a pretty far-ranging synopsis of some
10   initial thoughts I've got, but that's why you are here for
11   argument.  Don't be concerned about the time.  I don't care
12   who starts.  You are going to have two rounds.  You are
13   certainly welcome to more than 30 or 45 minutes.
14           MR. GRAVE:  Thank you, Your Honor.  As counsel for
15   the plaintiff, I believe it's appropriate that we go first.
16           THE COURT:  Sure.
17           MR. GRAVES:  Before we start, we have some
18   demonstrative exhibits.
19           THE COURT:  I am not going to look at those and
20   take notes also.  In other words, you can put those up on
21   the screen.  You can use the elmo if you would like to.  You
22   are more than welcome to, but what I don't find helpful to
23   me in argument is peering down at documents and then paying
24   attention to your argument.  So if you want to use elmo,
25   that way I can see them on the screen.  After your
```

1    presentation, just leave them with me.

2              MR. GRAVES:  Thank you, Your Honor.

3              So, Your Honor, I will address the infringement

4    motions.

5              THE COURT:  I want you to refer to them by docket

6    number.

7              MR. GRAVES:  That will be Docket No. 84.  We will

8    submit on the papers with respect to Docket No. 89.  That's

9    our infringement motion.  So I will be addressing in

10   particular Defendant's Motion for Summary Judgment of

11   Noninfringement, Docket 84.  I will also be addressing to

12   the extent necessary any issues regarding the misuse motion.

13   Unfortunately, I don't have that docket number handy.

14             THE COURT:  Just a minute.

15             (Pause in proceedings.)

16             MR. JANKOWSKI:  Seventy-nine.

17             MR. GRAVES:  Thank you.

18             THE COURT:  So you are going to address 84 and 79?

19             MR. GRAVES:  That's correct.

20             THE COURT:  Who is going to address the others?

21             MR. GRAVES:  My colleague, Mr. Shaw.

22             THE COURT:  Mr. Shaw, you are going to address 88,

23   is that correct, and 83?

24             MR. SHAW:  83 and -- is it 88, the invalidity

25   defense?  I'm sorry.  I don't have it in my notes here.

1          THE COURT:  It's 82.

2          Okay, counsel, 84.

3          MR. GRAVES:  The Court has indicated as I

4   understand it the primary concerns it has with respect to

5   plaintiff's necessary showing on likelihood of confusion

6   relates to the similarity of the marks in light of the type

7   of goods and degree of care that are likely to be exercised

8   by relevant consumers, which here would be dentists.

9          I believe the Court indicated that in the Court's

10  view the "BruxZir" mark is suggestive.  Your Honor, we would

11  agree with that.  We believe the mark is suggestive.

12  However, that does not necessarily mean that it's a weak

13  mark.  There is case authority that indicates that in the

14  absence of any evidence of commercial strength that a

15  suggestive mark while it is always inherently distinctive

16  may in fact be weak for the purpose of likelihood of

17  confusion, but that's not the situation that we have here.

18          Glidewell has submitted a large volume of evidence

19  showing the commercial strength of the "BruxZir" mark.

20  Under the Ninth Circuit case law and Southern District case

21  law that we submitted with our briefing, that is sufficient

22  to convert what would otherwise be potentially a weak mark

23  into a strong mark.  For example, you will find that type of

24  analysis in the Century 21 case, a Ninth Circuit case that

25  we cited and discussed in our briefs.

1              So the fact that the market is suggestive here in

2    light of all of the evidence of commercial strength, which

3    by the way, much of it -- and I would submit most of it --

4    is undisputed -- Your Honor, that evidence consists of --

5    well, for example, the fact that Glidewell has spent

6    approximately $3 million advertising goods under the mark in

7    the last three-and-a-half years is undisputed.  The fact

8    that Glidewell has engaged in an extensive promotional and

9    marketing campaign using direct mail sent quarterly to

10   nearly the entire population of dentists in the United

11   States, again undisputed; the fact that Glidewell has

12   engaged in a consist and pervasive promotional effort in

13   dental industry magazines, at least ten different magazines

14   that are identified in the declaration of James Schuck, who

15   is Glidewell's Vice-President of Sales and Marketing, again

16   undisputed; the fact that Glidewell sends its

17   representatives to dozens of trade shows every year; the

18   fact that Glidewell extensively promotes under its "BruxZir"

19   mark on the internet; the fact that Glidewell promotes its

20   goods under the "BruxZir" mark in videos and training

21   sessions that reaches thousands of dentists every year --

22   all of this is undisputed.

23             There is also undisputed evidence that the goods

24   under the "BruxZir" mark are promoted and sold by a network

25   of approximately 180 BruxZir-authorized labs that buy

1    zirconia milling blanks from Glidewell and color liquid from

2    Glidewell and take that and make BruxZir brand dental crowns

3    and bridges.  These are authorized labs.

4            They use the materials that are provided to them

5    by Glidewell.  They make the BruxZir brand product using

6    instructions for use that are provided to them by Glidewell

7    and are updated routinely.  And all of these different

8    authorized BruxZir labs promote the BruxZir product.  In

9    fact, the vast majority of them promote it through --

10   identifying it as BruxZir with the registered symbol, the

11   "R" in the circle, on their websites.

12           Under 17 USC Section 1055, all of this use by

13   these BruxZir-authorized labs iners to the benefit of

14   Glidewell and further demonstrates and iners to the

15   commercial strength of the "BruxZir" mark.

16           In addition to the evidence which was submitted

17   incidentally by the defendant in its Exhibit 136 -- there

18   are approximately 120 different website printouts from

19   different BruxZir-authorized labs that the defendant

20   submitted -- plaintiff submitted declarations from four.  We

21   could have submitted much more, but we chose to submit four

22   declarations from people who work at these

23   BruxZir-authorized labs explaining how they use the

24   "BruxZir" mark to promote the BruxZir brand goods that they

25   make using the materials that are supplied to them by

1   Glidewell.  All of this goes to further demonstrate the

2   commercial strength of the mark.  It is all undisputed.

3        Your Honor, we have submitted a large amount of

4   evidence from dentists showing that all of these promotional

5   and marketing efforts, which stand on their own -- I mean,

6   if you look at the Century 21 case, for example, and other

7   cases that we cited, you will see that evidence of

8   promotional and marketing expenditures stand alone to

9   demonstrate commercial strength, but we submitted more than

10  that.

11       We submitted declarations from actual dentists,

12  the target population, the relevant consumer universe, for

13  the BruxZir brand goods and for Keating's KDZ Bruxer goods.

14  These dentists say, yes, we are very aware of the "BruxZir"

15  mark.  To us, it identifies a single source of goods.  It

16  identifies the superlative quality for dental crowns and

17  bridges.  We're aware of it.  The BruxZir brand and

18  Glidewell's efforts to promote and market goods under the

19  BruxZir brand has in fact penetrated the relevant consumer

20  market.

21       That's not only in the declarations of various

22  third-party dentists, but it is also in the declaration of

23  Michael De Tolla, who is a dentist at Glidewell.  It's in

24  the declaration of Dr. Goldstein, who is an expert witness.

25  So there is a wealth of evidence showing commercial

1    strength.

2           It's undisputed that the BruxZir brand crowns are

3    the most widely prescribed brand of full contour zirconia

4    crowns in the U.S.  It's undisputed.  It's undisputed that

5    1.2 million BruxZir crowns and bridges worth $120 million

6    have been sold from July 2009 to September 2012, over a span

7    of just three years.  Again all undisputed.  It's undisputed

8    that bruxzir.com has garnered approximately 290,000 unique

9    page views, 78 percent of which are from within the U.S.

10   Your Honor, as a point of reference, the entire population

11   of dentists in the U.S. numbers only approximately 125,000.

12          So as you can see, the marketing and promotional

13   efforts of Glidewell for goods under the BruxZir brand have

14   been phenomenally successful.  The company and the BruxZir

15   brand goods have achieved wide recognition in the industry

16   and a large number of awards.  Again undisputed.  A large

17   number of articles have been written about it.  Again

18   undisputed.

19          In fact, Your Honor, even Keating -- Keating

20   submitted declarations from a number of dentists.  They

21   submitted those declarations of course in support of their

22   efforts to demonstrate that the mark is invalid, but there

23   are some interesting statements that are contained in those

24   declarations.  For example, all of them said that they

25   received calls from Keating employees telling them that

 1   BruxZir is a brand name of another lab.  Even Keating

 2   acknowledges in its communications with dentists, the

 3   relevant population, that BruxZir is a brand name.  A number

 4   of those dentists indicated that they were previously aware

 5   of the BruxZir brand or the "BruxZir" mark used in

 6   connection with dental crowns and bridges from a variety of

 7   different sources.  Here, they were clearly referring to the

 8   BruxZir-authorized labs.  All of that goes to demonstrate

 9   the commercial strength of the mark.

10          We also have evidence that the "BruxZir" mark is

11   relatively unique in its field.  That's in the declaration

12   of Professor Franklyn.

13          So how does that relate to the issue that the

14   Court identified as being of concern?  Well, as I said, in

15   the Century 21 case and others, the Court has acknowledged

16   that evidence of commercial strength can convert what would

17   otherwise be a weak mark for purposes of likelihood of

18   confusion into a strong mark.  Here, for the purpose of this

19   summary judgment motion, the evidence of commercial strength

20   is undisputed.  What that means for the Court's analysis

21   with respect to likelihood of confusion is that this

22   suggestive mark is in fact a strong mark.

23          So let's take a look at the issue concerning the

24   similarity of the marks.  Now, as I understand it, Your

25   Honor, one of the primary causes of concern for the Court is

1  that if you line the two marks up -- Glidewell's "BruxZir"
2  mark stands alone, and Keating's mark has a KDZ in front of
3  Bruxer.  As I understand it, the Court's concern is that the
4  KDZ serves as an independent source identifier that would
5  negate any possibility of confusion.

6           In this case, that is not true, and the evidence
7  does not support that conclusion.  Here is why, Your Honor.
8  Again, if you look at the fact that Glidewell in effect
9  markets its BruxZir brand products not only from Glidewell,
10  the company, but also through its network of nearly 200
11  BruxZir-authorized labs, it is entirely plausible that any
12  dentist who takes a look at, for example, the Keating
13  website or who takes a look at a Keating marketing brochure
14  which says "KDZ Bruxer" and it says "Keating Dental Arts" up
15  in the upper left that that dentist could believe and
16  conclude that Keating was simply another authorized BruxZir
17  lab selling BruxZir product.  In other words, the fact that
18  the dentist knows that they are buying product from Keating
19  is simply irrelevant here because there is a network of 180
20  BruxZir-authorized labs selling BruxZir brand product.

21           It's similar to the situation that you find with
22  car dealerships, for example.  You can have a Larry Green
23  Ford or a Cal Worthington Ford.  The important part of that
24  mark isn't the indicator of who owns that dealership, Larry
25  Green or Cal Worthington.  It's the second part.  It's the

1    Ford.

2           It's a very similar situation here.  Because

3    Glidewell sells through dozens and dozens of third-party

4    dental labs just like Keating, the knowledge on the part of

5    the consumer, the dentist, that they are buying a crown from

6    Keating is relevant because that purchase could still be

7    motivated by confusion as to whether or not what Keating is

8    selling is authorized BruxZir product.

9           So really what the Court needs to look at is not

10   the KDZ, which within the context of the program of

11   authorized BruxZir labs is really irrelevant -- it doesn't

12   stand as a sufficiently independent indication of source --

13   but, rather, at the root word which is "Bruxer" on Keating's

14   part and "BruxZir" with respect to Glidewell's brand.  If

15   you line those up and take a look at them, they are of

16   course very similar.

17          Let's take a look at a couple of the principles

18   that guide us when evaluating similarity of the marks.

19   First, we know from the Official Airline Guides v. Goss case

20   (Ninth Circuit 1993), 6 F.3d 1385, there is a diminished

21   standard of similarity that is applied when comparing marks

22   of closely related goods.  Here it is undisputed that the

23   goods are closely related.  In fact, they are identical

24   goods.  Glidewell sells dental crowns and bridges under the

25   "BruxZir" mark.  Keating sells dental crowns and bridges

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    under its "KDZ Bruxer" mark.  The goods aren't just closely

2    related, but they are identical.  Therefore, a diminished

3    standard of similarity applies.  That's in the Ninth

4    Circuit.

5         Commercial strength further reinforces

6    similarities, commercial strength with respect to the mark.

7    As we have shown here, the facts showing commercial strength

8    for the "BruxZir" mark are undisputed.

9         The Court must also consider how marks appear in

10   the marketplace.  What is particularly relevant here is that

11   the goods don't appear side by side.  Dentists don't go to a

12   supermarket and look at a shelf where you have got boxes of

13   KDZ Bruxer goods and boxes of BruxZir brand goods side by

14   side where they can carefully compare the differences

15   between the two marks.

16        Instead, what you have is at one point a dentist

17   might be in the market for a full contour zirconia crown,

18   and then perhaps a week later or a month later they might

19   again be in the market for a full contour zirconia crown.

20   They are not going to have the two brands sitting side by

21   side.  The differences between the two brands are not going

22   to be in focus in the mind of a consumer when the consumer

23   makes the buying decision.  So that again is a factor that

24   tends to undermine or diminish the significance of

25   differences between the marks and diminish the standard of

1   similarity that is required.

2          So in terms of looking at the marks themselves,

3   there are of course differences as the Court points out.

4   Keating's mark has a KDZ in front of it as we have shown.

5   Here, within the context of these two companies, these marks

6   and these goods, that lacks the significance it might

7   otherwise have.

8          With respect to other aspects of the marks, as the

9   Court can see in the comparison, the marks have similar

10  fonts.  You can compare Plaintiff's Exhibits 3, 8, 12, 17,

11  and 18 to Plaintiff's Exhibit 16 to get an idea of the

12  overall similarities between the marks.  The dominant

13  component of the KDZ mark, which is Bruxer because the KDZ

14  has little, if any, significance as a source identifier for

15  the reasons we have discussed -- the Bruxer component is

16  nearly identical to the "BruxZir" mark for Glidewell.

17         You will also note if you take a look at the

18  exhibits that I referenced and that we submitted with our

19  papers that the backgrounds for the advertisements typically

20  appear fairly similar.  In other words, the marks will

21  appear on ad copy in which there is a smiling woman showing

22  off the dental crown that she just got, or there will be a

23  photo of a dental crown just standing alone.  The

24  backgrounds for the advertising, the context in which the

25  mark is used in the ad copy of the two companies, is very

1    similar.  That again supports a finding of similarity.

2            The Ninth Circuit applies a sight, sound, and

3    meaning -- I don't know if it's a test, but it is guidance

4    with respect to evaluating the similarity of marks.  As we

5    have shown, while there are some differences, there are also

6    significant similarities between the two marks.  The Ninth

7    Circuit has instructed that similarities are to be weighed

8    more heavily than differences.

9            With respect to the sound element, Keating has

10   asserted quite strenuously that BruxZir -- the term "bruxer"

11   and "BruxZir," the mark, are phonetically equivalent.  In

12   fact, two of its dentists, Dr. Nassir in Paragraph 11 of his

13   declaration, and Dr. Stevens in Paragraph 12 of his

14   declaration, make the same statement.  With respect to that

15   issue, Keating has submitted evidence that undermines its

16   own summary judgment motion.  So with respect to the sound

17   component of the sight, sound, and meaning trilogy, that

18   supports in favor of a finding that the marks are similar.

19           With respect to the meaning component, again, this

20   is another set of facts that are undisputed.  It's

21   undisputed that the marks, both "KDZ Bruxer" and the

22   "BruxZir mark," suggest an identical meaning, a crown or

23   bridge that is hard enough to be indicated for use for

24   patients who brux and that is made of zirconia.

25           So there are substantial similarities in terms of

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

21

1    the look of the marks.  The sound when speaking the marks

2    according to Keating is identical.  And the meaning connoted

3    by the two marks it is undisputed is identical.  So,

4    therefore, under the test required by the Ninth Circuit,

5    certainly for purposes of Keating's summary judgment motion,

6    there simply is no basis to find that there is an absence of

7    a genuine issue of fact.

8            We also have direct expert testimony on this

9    point.  That would be the declaration of Dr. Goldstein at

10   paragraph 26 and also at paragraph 19, who stated in his

11   declaration that the similarity in appearance, sound, and

12   meaning between the two marks overcome whatever differences

13   there may be.  Dr. Goldstein speaks from the perspective of

14   a dentist, one who is in the relevant consumer universe.

15           Now, Your Honor, I would like to take just a

16   moment and show you a couple of these slides which I think

17   help to make the point which I think is really critical here

18   regarding the effect or impact of the fact that Glidewell

19   sells product and that BruxZir brand goods are sold not just

20   by Glidewell directly but also by the network of

21   BruxZir-authorized labs, again, labs just like Keating.

22           So here is how --

23           THE COURT:  I'm happy to look at them if you would

24   like me to, but it's hard for me to take notes and --

25           MR. GRAVES:  Your Honor, can you see that?  Is

1    that okay?

2                THE COURT:  Yes.

3                MR. GRAVES:  So here is an ad.  It's a website

4    printout, one of Keating's -- it's Exhibit 136 -- from one

5    of the authorized BruxZir labs.  You see you have the name

6    of the dental lab, Bauer.  Then right underneath you have

7    the ad copy for BruxZir.  What you will notice is that there

8    is no reference at all to Glidewell.  So this dental lab is

9    selling BruxZir brand goods that did in fact fabricate using

10   materials that it obtained from Glidewell with absolutely no

11   reference to Glidewell at all.  That's perfectly appropriate

12   by the way.  There is no requirement in trademark law that

13   the authorized BruxZir lab refer to Glidewell, and there is

14   no requirement that Glidewell force the authorized BruxZir

15   labs to do so.

16                Let's take a look at another one.  Here is another

17   one of the 180 authorized BruxZir labs.  This is Creodont

18   Prosthetics.  Again, what you see here is you have got the

19   BruxZir name, the BruxZir brand, and no reference at all to

20   Glidewell.  So these are just two of the 180 different

21   BruxZir-authorized labs that sell BruxZir brand product.

22   Dentists will call up any of these third-party

23   BruxZir-authorized labs and obtain genuine BruxZir product.

24   So it's entirely plausible that a dentist would do the same

25   with Keating.

1          Your Honor, let's take a look just to drive the

2     point home -- Your Honor, this is an image of a Keating

3     advertisement.  It's Plaintiff's Exhibit 76.  This shows how

4     Keating sells -- or one of the ways in which Keating sells

5     and promotes its KDZ Bruxer product.  You will notice it's

6     actually very similar to the two website printouts from the

7     BruxZir-authorized labs that we just looked at.  You have

8     Keating Dental Arts in the upper left, and then you have the

9     name of the product right underneath.

10          So, again, here it would be perfectly plausible

11     for a dentist to look at this to see this ad copy, and due

12     to the similarities in the marks, among many other

13     factors -- the proximity of the goods, the similarity of the

14     marketing channels, the commercial strength of the "BruxZir"

15     mark -- to plausibly believe at least upon first glance that

16     this is a BruxZir brand product or that there is an

17     affiliation between Keating and Glidewell.

18          Now, Your Honor, there are different types of

19     confusion that are actionable under the Lanham Act.  One

20     type of confusion is when you buy your product you think you

21     are buying product X when really you are buying product Y

22     because of the similarities in the marks.  Here we have

23     copious evidence of actual confusion.  That is the 86

24     prescription forms and the associated call log notes,

25     Exhibit 15, which Glidewell submitted with its brief.

```
 1              By the way, yesterday afternoon Keating filed an
 2   objection to Exhibit 15 objecting that it's hearsay.  We
 3   would submit that that objection was filed far too late, but
 4   in the event that the Court considers it, the objection is
 5   spurious.  This type of evidence, the prescription forms,
 6   lab call notes and so on, fall within the state of mind
 7   exception to the hearsay rule.  That's been held to be the
 8   case by the Ninth Circuit in the Lahodie case.  We cited it
 9   and discussed it.  I can give you that cite.  It's 636 F.3d
10   501 at 509 (Ninth Circuit 2011).  And the Conversive v.
11   Converse Agent case, which is a Central District case also
12   looked at this exact issue and rejected that type of
13   objection.  It appears to be largely rejected by the courts
14   within the Ninth Circuit.
15              In any event, back to the evidence, Plaintiff's
16   Exhibit 15 consists of the prescription forms and call notes
17   which Keating produced showing different dentists who when
18   they ordered product from Keating wrote "BruxZir,"
19   B-r-u-x-Z-i-r, oftentimes with the unique internal
20   capitalization of the "Z" that is contained in the
21   commercial representation of the BruxZir brand, and now
22   Keating has pointed to that evidence as evidence of generic
23   use.  We obviously contend that it is not.
24              For purposes of this summary judgment motion, of
25   course the Court must draw all inferences in favor of the
```

1    nonmoving party, for Glidewell.  Glidewell points to that

2    evidence as evidence of actual confusion on the part of

3    dentists, the relevant consumer population, caused by

4    Keating's use of the "KDZ Bruxer" mark.  You have got

5    dentists actually writing on their prescription form "Send

6    me a BruxZir," B-r-u-x-Z-i-r.

7         That evidence supports an inference of actual

8    confusion regarding what the dentists are buying, whether

9    they know that they are buying a completely separate product

10   that has nothing to do with BruxZir, which seems unlikely

11   given that dentists are requesting that Keating sell them

12   the BruxZir brand crowns or bridges that they are

13   prescribing in these prescription forms, but it can also

14   reflect what is known as initial interest confusion.

15        In the Ninth Circuit, the Second Circuit, and

16   other Circuits, initial interest confusion is shown or

17   exists where a consumer is confused by the similarity of

18   marks at the initial stage of the decisionmaking process for

19   buying a product but then learns of the differences between

20   the products before actually making the purchase.  What the

21   Ninth Circuit in the Brookfield case said was that, you

22   know, that's really a form of trading on the goodwill of the

23   senior user's mark by the junior user.  Even if the consumer

24   figures out by the time they buy the product that what they

25   are buying is not what they initially thought they were

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   going to buy, still the fact that the similarities between

2   the two marks caused them to be confused -- even if only for

3   a brief period of time it was enough to cause them to

4   consider the defendant's good, the junior user's good, when

5   they otherwise might not have, that's a form of trading on

6   the goodwill of the senior mark.  It's actionable under the

7   Lanham Act.

8            It goes all the way back to the 1975

9   Grotrian-Steinweg case in the Second Circuit which involved

10  pianos.  There was a company that sold pianos under the

11  "Grotrian-Steinweg" mark.  The Second Circuit said, well,

12  you know, even if people who buy pianos -- even if they

13  wouldn't be likely -- when they actually buy the piano, if

14  they believe it's a Steinway, still due to the similarities

15  between the two marks, they could easily be initially

16  confused, and as a result of that initial confusion consider

17  buying a Grotrian-Steinweg piano when they otherwise would

18  not have.

19           We would submit that even with Keating's purported

20  policy of calling up dentists and informing them -- the

21  dentists who write "BruxZir" on their prescription form and

22  informing them, hey, we are not BruxZir.  This is KDZ

23  Bruxer.  BruxZir is a trademark of other company.  Do you

24  still want our product, and the dentists say, yes, we do --

25  that that perfectly reflects initial interest.  You have got

1    a dentist saying sell me a BruxZir, and then you have got a

2    Keating employee calling them up saying, hey, we have a

3    different product.  I would submit that it's highly unlikely

4    that there isn't some selling going on when those Keating

5    employees are calling up these dentists.  And then the

6    dentist says, well, okay, I will go forward with the KDZ

7    Bruxer.  That is initial interest confusion, and it is

8    actionable in the Ninth Circuit.

9            I would submit that even if the Court credits

10   Keating's purported evidence of its policy of calling up

11   these dentists that that does not address the evidence in

12   its own prescription form of initial interest confusion.

13   Again, Your Honor, within the context of summary judgment

14   where the Court must draw reasonable inferences in favor of

15   the nonmoving party, Keating has not foreclosed the

16   possibility and, in fact, indeed the probability, of at

17   least initial interest confusion here.

18           Your Honor, I would also like to point out going

19   back to the KDZ argument that there is very little evidence

20   that KDZ is recognized as Keating's house mark.  Now, they

21   assert it in their brief, but all they have is the

22   declaration -- or all they cite to anyway is a declaration

23   from Dr. Campbell who said he recognized KDZ as a house mark

24   in 2009 when he was buying a different KDZ product and a Dr.

25   Stevens who only speaks to his own understanding.

1          If you look at the other evidence they submitted,

2     they submitted a handful of brochures which were

3     authenticated by Mr. Keating.  What you will note if you

4     read his declaration that there is no evidence that any of

5     these brochures were ever distributed to anyone but existing

6     Keating customers.  There is no evidence that this purported

7     house mark has been marketed or promoted to the community of

8     dentists in general.  In fact, Keating admits that it

9     significantly reduced its advertising of the KDZ Bruxer

10    product and brand in December 2011 after only about eight

11    months of launching the product.

12          So here within the context of this case, the fact

13    that dentists could easily believe that they are buying

14    authorized BruxZir product from Keating; the lack of any

15    evidence that KDZ, the purported house mark, had been

16    extensively promoted; there is simply insufficient evidence

17    on which to premise a summary judgment motion entered

18    against Glidewell on the issue of the similarity of the

19    marks.

20          Now, let's return to the -- I know the Court

21    didn't mention -- I believe it didn't mention actual

22    confusion, but I think that's very relevant here.  Actual

23    confusion is one of the eight Sleekcraft factors.  It's not

24    a requirement for a finding of infringement, but where it

25    exists it is considered highly probative of likely

1    confusion.

2         Here, we have really two different buckets of

3    evidence of actual confusion.  First, we have the Nicole

4    Fallon declaration which Glidewell submitted recounting a

5    discussion with Dr. Lee.  Now, what happened there was there

6    was a communication between Dr. Lee's office, Michelle

7    Carlyle, the assistant for Dr. Lee, and Nicole Fallon at

8    Glidewell.  There is some dispute over who called who first,

9    but that's irrelevant.  The fact is that Dr. Lee's office

10   asked for a discount on future Glidewell product.  That was

11   a promotion that was being offered by Glidewell at the time.

12        Ms. Fallon at Glidewell asks Ms. Carlyle to send

13   in the invoice for the Glidewell BruxZir crown that Ms.

14   Carlyle said had previously been purchased.  Well, what Ms.

15   Carlyle, Dr. Lee's assistant, sent to Glidewell was an

16   invoice for a Keating KDZ Bruxer.  So Ms. Fallon at

17   Glidewell then calls up Dr. Lee's office confused.  Why did

18   you send us a Keating invoice?  Well, Dr. Lee gets on the

19   phone, joins in the conversation.  What Dr. Lee, the

20   dentist, said is I believed that KDZ Bruxer and BruxZir were

21   the same thing, you know, reflected her perspective that

22   this was very sneaky on the part of Keating.

23        That evidence isn't being submitted obviously to

24   prove that Keating is sneaky.  What it is being submitted to

25   prove or to show is the state of mind of Dr. Lee.  Dr. Lee

1    was confused by the similarities between the two marks and

2    thought that what was in fact KDZ Bruxer was a BruxZir brand

3    crown.  That's direct evidence of actual confusion.

4         In addition to that, of course we have the 86

5    prescription forms and the associated call log notes, which

6    were submitted by Glidewell.  Now, let's take a look at a

7    couple of those because I think they are very indicative of

8    the fact that confusion here is not just likely, but it has

9    in fact occurred.

10        First, let's take a look at the -- before I do

11   this, of course, some of this product has been marked for

12   "Attorney's Eyes Only," so before I put this up on the

13   screen, I would like to be confirm that that's acceptable.

14        MS. ZADRA-SYMES:  I don't know what it is you are

15   putting up.  Before counsel puts the exhibit up on the

16   screen, may I confer with my client for just one minute?

17        THE COURT:  Yes.

18        (Pause in proceedings.)

19        MS. ZADRA-SYMES:  We would just like to point out

20   we do have an issue between counsel that is ongoing right

21   now regarding disclosure of "Attorney's Eyes Only"

22   information.  We just want to make sure that there are not

23   going to be other disclosures.  If it is just those three

24   documents and the dentist and patient are not going to be

25   identified --

1            THE COURT:  If it's for "Attorney's Eyes Only" --

2    this is taking my time now.  If it's for "Attorney's Eyes

3    Only," then anybody else can wait outside.

4            MR. GRAVES:  Mr. Pritchard has already stepped

5    outside.

6            Is there anyone else you are concerned with?

7            MS. ZADRA-SYMES:  That's fine.

8            THE COURT:  Are you sure?

9            MS. ZADRA-SYMES:  Yes.  Thank you, Your Honor.

10           THE COURT:  Counsel.

11           MR. GRAVES:  So let's take a look at one of these.

12   This is one of the sets of prescription forms and the

13   associated call log that's in Glidewell's Exhibit 15.  What

14   you will see on the left is you have the prescription form,

15   and you will see it's from the Kickaboo Private Health

16   Center.  The physician's named is blocked out.  What you

17   will see on the left is No. 30 and then BruxZir,

18   B-r-u-x-Z-i-r, just like Glidewell's mark.  The No. 30

19   refers to the particular tooth that is involved.

20           So this is a prescription that was sent by the

21   dentist at the Kickaboo Private Health Center to Keating on

22   a Keating prescription form asking for a BruxZir.  This is

23   exactly what a dentist would do to order a BruxZir brand

24   crown from any authorized BruxZir lab.

25           On the right, you have what we have been calling

1   the call log report.  Really it's more than that.  It's an

2   internal Keating document that reflects the goods that were

3   sold and other information about the order.  What you will

4   see under "Instructions" there is a date of October 14,

5   2011, and then that's it.

6          Now, in the call log reports that Keating

7   produced, typically what you see is under "Instructions"

8   there will be a date or maybe two or three dates, and what

9   typically is reflected there is a series of communications

10  between an employee at Keating and the dentist that

11  submitted the prescription form.  Sometimes what you see

12  there are notations made by the Keating employee indicating

13  that he has spoken with the dentist or someone in the

14  dentist's office, has told the dentist or the assistant that

15  BruxZir is a trade name or a proprietary name for someone

16  else, and asking whether they want to go forward with the

17  Keating KDZ Bruxer brand product.  Then oftentimes there is

18  an indication that the dentist wants to proceed.

19         Of course on all of the call logs that Keating

20  produced to us, there is an indication that the dentist

21  wants to ultimately decide to proceed with the Keating

22  product.  But you will see on some of them there are no such

23  instructions.  The reason I am pointing this out to the

24  Court is that Keating submitted a declaration from a Robert

25  Brandon, who states, well, we called every single one of

1    these dentists who submitted a prescription form requesting

2    a BruxZir crown.  We explained to all of them the

3    differences between the product, and they all said that

4    after having this explanation that they wanted to go forward

5    with the Keating product.

6            Well, in fact, Mr. Brandon as we pointed out in

7    our evidentiary objections is incompetent to make that

8    statement, because it's clear if the Court reviews the call

9    log notes in Plaintiff's Exhibit 15 -- you will see there

10   are typically initials.  You'll see them on the next one.  I

11   guess there are some here at the very end of that date and

12   the time tag under "Instructions."  There are typically

13   initials.  Mr. Brandon is on a few, a handful, of these call

14   log reports, but most of them are someone else, so

15   Mr. Brandon wasn't competent to make that statement.  That's

16   not even admissible.

17           In addition, what you see is that in Keating's own

18   evidence there are a number of these dentists who requested

19   a BruxZir crown who do not appear ever to have had any

20   explanation from anyone at Keating concerning any

21   differences between the BruxZir brand crown that they

22   requested plainly on the prescription form and the KDZ

23   Bruxer crown that they were sold.

24           Your Honor, we know that Keating sold them a KDZ

25   Bruxer because that's right here, KDZ Bruxer.  That's what

1    Keating sent them.  What we have is a dentist requesting a

2    BruxZir crown, and what they get is a KDZ Bruxer.  That

3    dentist could easily have believed that what he was getting

4    was a BruxZir product because of the similarities between

5    the two products, and it's evidenced by the fact that that's

6    what he asked for.

7            Let's take a look at another one of these sets of

8    prescription forms and call log notes.  On this one, you

9    will see that there is a fair amount of notations under the

10   "Instructions" heading.  This is a similar scenario.  What

11   we have is a dentist, Dr. Ortiz, who asks for a BruxZir.

12   There we see it.  "Please use BruxZir" on the left.  That's

13   right here.  So what happened?  Well, what we see is that a

14   Keating employee calls Dr. Ortiz's office.  Ultimately what

15   transpires -- if you look at the very bottom of this screen

16   under "Instructions," the difference is explained between

17   KDZ Bruxer and BruxZir.  The doctor says, "Okay to proceed

18   with KDZ Bruxer."

19           Now, that characterization of the discussion

20   between the Keating employee and the doctor is perfectly

21   consistent with the conclusion that what happened here was a

22   sale driven by initial interest confusion.  The doctor asks

23   for a BruxZir crown.  She gets a call from a Keating

24   employee who explains the differences between the product.

25   And I think it's a reasonable inference to draw that this

1    Keating employee would extol the benefits of the KDZ Bruxer

2    product over the BruxZir brand crown, and then the

3    doctor tells him it's okay to proceed with the KDZ Bruxer.

4    That is exactly -- that reflects the poster child for

5    initial interest confusion.

6            Your Honor, here we have another one.  This is

7    just a subset.  There are 18 of these combinations of

8    prescription forms and the call log notes that are contained

9    in Plaintiff's Exhibit 15 that contain language identical or

10   similar to the "Okay to proceed with KDZ Bruxer."  This is a

11   similar situation.  We have a dentist requesting a BruxZir

12   crown, and then over on the right we see:  "Jim spoke with

13   the doctor.  Proceed with us doing the case."  That's

14   interesting language to use.  Again, it's perfectly

15   consistent with a finding of initial interest confusion.  So

16   they sell the KDZ Bruxer.  That's how they fill the order.

17           So what we have here, Your Honor, is a large

18   number of prescription forms where a dentist appears on the

19   face of the prescription to be asking for a BruxZir brand

20   product.  We have Keating trying to explain it away saying

21   that they called and spoke with all of these doctors, but we

22   know from the evidence that that's not true with respect to

23   at least some of these doctors.  They never spoke with them.

24   They just filled the order.  And we know with respect to the

25   doctors that they did speak with that the scenario that

```
1    played out is perfectly consistent with initial

2    interest confusion.

3              They haven't foreclosed the likelihood of initial

4    interest confusion as shown by the evidence of their own

5    prescription forms.  So, again, within the context of

6    summary judgment, that's more than sufficient to create a

7    genuine issue of fact with respect to the likelihood of

8    confusion even given the differences in the appearance of

9    the marks.

10             Now let's take a look at one more of these, and

11   then I will move on.  This one really stands in a class by

12   itself.  This is a prescription form that was sent to

13   Keating by a Dr. Kopmeier.  It's in very, very small type.

14   What you can see right down here -- again, this is

15   Plaintiff's Exhibit 15 -- is that the doctor requested a

16   BruxZir, B-r-u-x-Z-i-r crown.

17             If you take a look at the call log, what do you

18   see?  Well, you see that a Keating employee contacted the

19   doctor.  The doctor asked for Keating to call.  The Keating

20   employee calls the doctor.  What does the Keating employee

21   write on the form?  He says, "Spoke with doctor.  He would

22   like to use the BruxZir crown."  The doctor would like to

23   use the BruxZir crown, not KDZ Bruxer, but the BruxZir

24   crown.  So what does Keating do?  Keating fills the order

25   with a KDZ Bruxer crown.  This is clear evidence of
```

1   profiting from the confusion of Dr. Kopmeier from Keating's

2   own records.

3          Now, Keating also submitted declarations from a

4   number of dentists, 13 different dentists, out of this

5   universe of 86.  The declarations are all highly similar,

6   but what the Court will note is that the declarations are

7   largely consistent with a finding that these dentists

8   experienced initial interest confusion.  In other words,

9   what these dentists typically say is, well, when I ordered a

10  KDZ Bruxer crown, I wanted to order product from Keating.  I

11  knew I was ordering from Keating.  I didn't want to order

12  from Glidewell, and I didn't think I was ordering from

13  Glidewell.  That's all fine.  This is just a subset of 13 of

14  the 86 instances of actual confusion.  But even within that

15  subset of 13, even if they knew they wanted product from

16  Keating when they ordered it, and they knew they were

17  getting product from Keating, and they didn't want product

18  from Glidewell -- even within that subset of 13, that is

19  consistent with and does not foreclose the possibility of

20  initial interest confusion.

21          So we have a wealth of evidence of actual

22  confusion, actual point of sale confusion by dentists who

23  were not apprised of any differences between the products,

24  and initial interest confusion as well.  We have Dr. Lee,

25  Dr. Kopemeier, actual point of sale confusion.

1           The evidence here is really quite extraordinary.

2     When you place it in comparison with what you typically see

3     in the trademark cases out of the Central District and out

4     of the Ninth Circuit where even a handful -- two, three,

5     four, eight -- of instances of actual confusion are found to

6     support a finding of likelihood of confusion, here we have

7     far more than that.  So I would submit, Your Honor, that

8     that evidence as well forecloses or precludes entry of

9     summary judgment against Glidewell.

10           Your Honor, I will try to get through the rest of

11    it quickly.  The Court has acknowledged -- it's undisputed

12    here that the goods are identical and that the marketing

13    channels are virtually identical.  Those factors of course

14    weigh in fact of Glidewell.

15           With respect to the degree of care, the Court

16    indicated that that was one of the drivers of its concerns

17    regarding possible lack of sufficient similarity between the

18    marks, but degree of care doesn't really help Keating here

19    because, again, so much of the factual underpinnings of the

20    likelihood of confusion are undisputed.  It's undisputed

21    here that the BruxZir crowns and KDZ Bruxer crowns have

22    similar features and are indicated for the same uses.  It's

23    undisputed that many dentists may regard them as

24    interchangeable.  Everything I am telling you that is

25    undisputed is reflected in Keating's statement of genuine

39

1    issues as undisputed.  It's undisputed that the properties

2    in the crowns are highly similar because they are made of

3    the same material.  There is absolutely no evidence that

4    dentists in general exercise a high degree of care in

5    selecting a particular brand of crown.

6              Now, Keating's response is to try this for

7    questioning the professionalism of dentists, and, of course,

8    that's not what we are doing.  What we are pointing out is a

9    lack of evidence that dentists consider the particular brand

10   of crown to be of sufficient import that they are going to

11   focus on the particular brand of the crowns that they are

12   using to a sufficient degree that the differences between

13   the "KDZ Bruxer" and "BruxZir" marks would outweigh the

14   differences in the minds of these dentists who are not

15   seeing them side by side.

16             The only piece of evidence that Keating actually

17   submits in this regard is the declaration of Dr. Eggleston.

18   All he states he is careful in selecting particular dental

19   labs to work with.  A dental lab can fabricate multiple

20   brands of crowns.  That's reflected in their prescription

21   forms that Keating submitted in Exhibit 37.  Many, many

22   dental labs will offer a BruxZir brand crown or any number

23   of different brands.

24             So the fact that you are careful about a

25   particular dental lab doesn't speak to the issue here, which

1    is the degree of care exercised in selecting a full-contour

2    all-zirconia crown.  Given that these crowns definitionally

3    are made of the same material, all zirconia, which typically

4    drives the fundamentality of the crown and the indicated

5    use, they are highly interchangeable.  Therefore, it's a

6    reasonable inference to draw that dentists are not going to

7    exercise and do not exercise a high degree of care in

8    selecting a particular brand of a full contour zirconia

9    crown.  Certainly Keating hasn't submitted the evidence

10   sufficient to foreclose and issue of fact on this point.

11   Keating's own prescription forms are often filled out by

12   their assistants.  In many instances, it's not even the

13   dentist who are filling out the forms.  It's their

14   assistants.

15           Your Honor, we have submitted evidence concerning

16   Keating's intent.  Again, most of it is undisputed.  It's

17   undisputed that Keating selected the KDZ Bruxer name in the

18   spring of 2011.  It's undisputed that by that time Glidewell

19   had spent about $1.75 million promoting goods under the

20   "BruxZir" mark, so Keating must have known of the mark.

21   It's undisputed that Keating when it was in the process of

22   selecting a name commissioned a trademark search report,

23   performed extensive review of plaintiff's journal ads in

24   which Glidewell was massively promoting the BruxZir product,

25   conducted an informal trademark search, and conducted

1   informal surveys of Keating clients.  That's all undisputed.

2   The only reasonable conclusion to draw from that is that

3   Keating knew of the "BruxZir" mark and brand when it

4   selected "KDZ Bruxer."  Under Ninth Circuit authority, that

5   knowledge supports an inference of intent to deceive.  There

6   is absolutely no contrary evidence that has been proffered

7   by Keating here.  None.

8           So, Your Honor, we have walked through the

9   factors.  Just to wrap up on this, while there are

10  differences in the appearance of the marks, the undisputed

11  evidence of commercial strength for the "BruxZir" mark, as

12  well as the fact that the BruxZir brand products are sold

13  through a network of 180 different authorized labs just like

14  Keating, undermines the strength of the fact that they have

15  a "KDZ" preface for the "KDZ Bruxer" mark under which they

16  sell their dental crowns and bridges.

17          Your Honor, we have submitted quite a number of

18  cases -- I believe six to eight cases -- in which the courts

19  have found marks that are not identical but that share a

20  suffix -- here, the suffix really is bruxer for KDZ Bruxer

21  and the entire "BruxZir" mark for Glidewell in which in that

22  scenario the marks have been found to be confusingly

23  similar.  Here, given the lack of the source-identifying

24  significance of KDZ, given the fact that it's undisputed

25  that the meaning of KDZ Bruxer and BruxZir are identical,

1  given the similarities in the appearance, given Keating's

2  position that they are phonetically identical, the

3  similarity factor actually lines up in favor of Glidewell,

4  and at the very least, it is not sufficiently one-sided in

5  Keating's favor to support entry of summary judgment against

6  Glidewell.

7          Your Honor, do you have any questions regarding

8  any aspect of the likelihood of confusion analysis?

9          THE COURT:  Not in the first round.  I'm

10  listening.

11         Check with your counsel and make sure you have

12  covered everything you would like.

13         (Plaintiff's counsel conferring.)

14         MR. GRAVES:  Your Honor, I believe you did

15  indicate that with respect to Docket No. 79, the motion

16  concerning the counterclaims and affirmative defenses, that

17  you are inclined to grant several -- well, grant the motion

18  with respect to Keating's second counterclaim and third

19  counterclaim.  So, of course, Your Honor, we will submit on

20  the papers with respect to those aspects of the motion and

21  reserve the right to offer rebuttal should Keating's counsel

22  choose to argue it.

23         You have indicated that you believe that the

24  affirmative defenses aspect is moot in light of your

25  tentative.  While we of course hope that your final is

1    different from your tentative in that regard, I believe that

2    we will just submit on the papers with respect to the

3    aspects of Exhibit 79 that are directed to the affirmative

4    defenses.

5              THE COURT:  Why don't you consult for just a

6    moment with your colleagues.

7              (Plaintiff's counsel conferring.)

8              MR. GRAVES:  Then of course with respect to

9    Glidewell's Motion for Summary Judgment on Infringement,

10   Docket No. 81, we will submit on the papers with respect to

11   81 and on the argument that I have already made with respect

12   to Keating's motion.

13             Now, Your Honor, there is a second group of

14   motions.  Those are the motions directed to cancellation and

15   validity of the mark.  My colleague, Mr. Shaw, will be

16   addressing those.  So, Your Honor, at the Court's

17   discretion, we can either move right into the discussion

18   concerning that motion, or we could allow Keating's counsel

19   some rebuttal with respect to my argument on infringement.

20             THE COURT:  It's up to you.  Do you want to take

21   this argument and rebut at this time, or do you want to do

22   it all in one setting, and they conclude their total

23   argument?

24             MR. JANKOWSKI:  Why don't we rebut the argument he

25   has made already.

44

1           THE COURT:  Okay.

2           MR. JANKOWSKI:  Thank you, Your Honor.

3           THE COURT:  Counsel.

4           MR. JANKOWSKI:  There are two themes that for me

5   have come out of Glidewell's arguments.  Again, we are

6   talking about Docket 84 here.  This is Keating's motion of

7   infringement or noninfringement.  That is basically ignoring

8   or running away from the word "bruxer," b-r-u-x-e-r, and the

9   significance that it has to the customer population in this

10  case.

11          "Bruxer" itself is a word that is well-known to

12  dentists.  It's taught in dental school.  There is plenty of

13  evidence that has been submitted in this case that it refers

14  to somebody who subconsciously grinds their teeth, a

15  particular type of patient with a particular type of problem

16  that it has.  If you are a dentist, you clearly are aware of

17  the different dental problems that arise and the different

18  classes of patients that you deal with.

19          So you have to start off -- all of the analysis

20  that you do on this motion and in fact on all of the motions

21  I think that are pending before the Court -- of course you

22  have to look at them through the perspective of a dentist.

23  Right off the bat you need to understand the importance of

24  that word "bruxer" to a dentist and the fact that it has

25  special meaning to them.  That theme repeats itself in

1   several Sleekcraft factors.  It shows up in effect and

2   influences a lot of the arguments that Glidewell is making.

3   What Glidewell does in making its arguments it ignores or

4   pretends that dentists don't have a clear understanding of

5   what that word "bruxer" means.

6           The second theme I want to point out for the Court

7   is that Glidewell would talk about evidence, the evidence it

8   has of strength of the mark, the evidence it has of

9   confusion.  The evidence that we are talking about here is

10  evidence that's in the form of a state of mind, what people

11  are thinking about.  So if its evidence of infringement in

12  the form of confusion, it's are the dentists who are the

13  customers at issue here -- are they confused?  What is going

14  on in their minds?  Is the mark strong?

15          Well, the way you answer that question is by

16  finding out what's in the heads of the dentists that are out

17  there.  Glidewell sells its product all over the country, as

18  does Keating, and dentists all over the country are exposed

19  to the marketing materials and to the solicitation of

20  products.  The question really for this Court to answer here

21  is are these dentists around the country likely to be

22  confused by Keating's mark in view of Glidewell's registered

23  mark?

24          Now, when Mr. Graves was talking about evidence,

25  you notice he didn't provide declarations from dentists from

1    around the country, and, in particular, he did not provide

2    anything like survey evidence, which of course was normally

3    done in a case like this.  Glidewell is a massive company.

4    It dwarfs any other dental lab in the country.  The normal

5    approach to show the world that you have a strong mark is to

6    take survey data and establish it through a rigorous proper

7    investigation showing the mark with the right customers.

8              The proper way to be showing that people are

9    confused again can be done through survey evidence.

10   Glidewell has done none of that in this case.  Instead, what

11   they call evidence of confusion is their attorney

12   interpreting a document for you and putting it up on the

13   elmo.  Their evidence of commercial strength is dollar

14   amounts that they have spent.  Now, I would agree that

15   dollar amounts you spend are not an irrelevant question, but

16   they don't get you the whole way.  They don't get you to the

17   question of what's in the minds of dentists.  The question

18   is how was the money spent?  What was marketing material

19   really doing?  Was it getting in the heads of dentist?

20             Now I want to come back to my first theme, which

21   is the significance of the word "bruxer," b-r-u-x-e-r.  The

22   fact that Glidewell has chosen a mark, "BruxZir" -- they

23   chose a mark that is so confusingly similar to a word that

24   dentists associate with a class of patients that it leads to

25   all kinds of complications.  You have all kinds of

 1   ambiguities.  That shows up in multiple places in the

 2   Sleekcraft factors.  Those two themes kind of come together

 3   and create a lot of mischief, if you will, that my

 4   counterpart is using as evidence of confusion.

 5           Now, let's go to key Sleekcraft factors.  I would

 6   like to start off and say that the Court's tentative -- as

 7   you can imagine, I am in agreement with it.  I was listening

 8   carefully as you were reading your tentative, and I agreed

 9   with the things that were in your tentative.  But the one

10   thing I would take issue with was the statement that BruxZir

11   with a "Z" is a suggestive word.  I think it is at least

12   highly descriptive, but aside from that, I think the

13   tentative was spot on.

14           Now, getting to the Sleekcraft factors themselves,

15   your tentative talked a lot about the dissimilarity of the

16   marks.  For this particular case, that's appropriate.  In

17   this case, you have a mark where Keating has a very

18   prominent prefix, KDZ, which is another thing that Glidewell

19   says, well, Your Honor, just ignore that.  In this case, you

20   should be ignoring the KDZ.  It's not providing a

21   source-identifying function.  That is absolutely wrong, Your

22   Honor.  It is a source-identifying function.  The KDZ is

23   something dentists identify as Keating Dental zirconia.

24   They also use the acronym KDA, Keating Dental Arts.  All

25   dentists ordering from them who are seeing their advertising

1    materials see the name "Keating Dental Arts" prominently

2    displayed and see "KDZ" with the zirconia products and

3    understands them.  You don't have to be a highly-trained

4    dentist to see what is going on there.  It's clear.

5          We provided evidence in the case showing that the

6    use of KDZ actually started three years before Glidewell

7    started using their mark that they are asserting in this

8    case.  So this is a situation where dentists have been

9    seeing KDZ associated with Keating longer than they have

10   been seeing BruxZir with a "Z" associated with Glidewell.

11   So, again, it's all the more reason why it makes no sense to

12   be ignoring the KDZ part of the mark.  The Court should not

13   be accepting their invitation to violate the anti-deception

14   rule.

15         Glidewell also ignores or downplays unfairly the

16   distinctive oval that Keating associates with its mark.  The

17   Court is supposed to be assessing similarity based on the

18   mark as used in commerce.  As used in commerce, Keating has

19   in its whole family of KDZ products a distinctive oval that

20   it wraps around the product name.  As you mentioned in your

21   tentative, the most prominent part of the mark is the oval

22   and then the KDZ inside it.  The KDZ is in a large font.

23   The Bruxer is in very small font next to it.  So to ask the

24   Court to ignore the oval and ignore the large KDZ and focus

25   on the tiny Bruxer that is showing is not a reasonable way

1    of interpreting how dentists are going to be looking at the

2    mark is used in commerce.

3              Moving on to the mark itself, Glidewell says it's

4    conceptually strong and commercially strong.  We disagree on

5    both of those, but I want to focus again particularly on the

6    conceptually strong part.  Namely, the fact that they have

7    chosen a mark which is so similar to bruxer, b-r-u-x-e-r, is

8    really -- they have painted themselves into corner.  There

9    is no way they can have broad rights in a mark which is so

10   close to that, at least not on a product that is indicated

11   for bruxers.

12             We provided lots of evidence showing that it's not

13   just that the Bruxer name is associated with dental products

14   generally.  It's not even associated with dental restoration

15   generally.  It's for an all-zirconia crown.  The reason

16   Glidewell developed that claim was because it noted here a

17   more aesthetic alternative to gold for bruxer patients.

18   Glidewell's own dentist, Dr. De Tolla, explain how he would

19   talk to Glidewell's engineers, the research and development

20   people, and say get me a white gold crown.  He knows that

21   patients don't like gold in their mouths.  They don't look

22   tooth-like.  So they were working and trying to get a

23   tooth-like crown which is strong like gold, and what they

24   came up with was an all-zirconia crown.  Why did they come

25   up with it?  For their bruxer patients.

 1          Now, that was Glidewell's story, but that story

 2    gets repeated to other dental labs.  In other words, all

 3    dental labs are servicing dentists that have patients who

 4    are bruxers who subconciously grind their teeth.  All

 5    dentists deal with them.  They are a challenge because they

 6    put crowns in these patients, and what do you think happens?

 7    They put a normal crown in.  They may not even know they are

 8    bruxers in the beginning.  The point is what happens is the

 9    crown breaks.  Traditional crowns, for example, a porcelain

10    top crown will make because of the nature of a bruxer.  So

11    what do they do?  If you are a dentist, you are unhappy

12    about that because you now have to replace it.  You have an

13    unhappy patient.  Nobody wants that.

14          Every dental lab in the country -- most of them

15    anyway -- are servicing clients that they want something to

16    treat bruxer patients, and they all learn that there are

17    all-zirconia crowns available for bruxer patients, and they

18    all want the all-zirconia crown to try it out to see if it

19    is really good.  That story has been repeated across the

20    country and in Keating Dental Arts.  Sean Keating heard from

21    his dental patients I need something for my bruxers, and

22    they wanted to start getting the all-zirconia crown.

23          What do you do when you are a producer of goods

24    and services?  You listen to your customers, and you give

25    them what they want.  They wanted all-zirconia crowns for

1    their customers.  He developed all-zirconia crowns for

2    bruxers.  He actually developed it in 2010, and he started

3    selling it to his patients in 2010.  He came up with it as a

4    formal product to be offered and marketed in May 2011, and

5    he came out at that time with three different zirconia

6    products all marketed as KDZ products:  KDZ Ultra, which had

7    been around since 2006 under a different name -- it had the

8    KDZ, but he didn't call it the Ultra until 2011 -- KDZ Max,

9    which is a different material, a composite crown.  It's not

10   an all-zirconia crown, but it has zirconia in it -- and then

11   the all-zirconia which is the bruxer, which he called the

12   "KDZ Bruxer."  So the fact that he chose that name indicates

13   that he is using the word "Bruxer" in a descriptive

14   capacity.  It's a bruxer crown.  It's a crown for bruxers,

15   so he is calling it the KDZ Bruxer.

16            One part of our motion -- I don't think it was

17   mentioned in your tentative.  We have a fair use defense in

18   here as well, and this is where it comes into play as well.

19   Companies are allowed to use descriptive terms in their mark

20   under the fair use doctrine if they are using it not for

21   trademark purposes but, rather, to describe the goods or

22   services that they are working with.  This is a classic

23   example of that.  Mr. Keating chose the name Bruxer because

24   this is a bruxer crown.  It's a crown for bruxers.

25            Glidewell does argue that you don't have to use it

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

52

1    for bruxers.  In fact, dentists use it more broadly than

2    just for bruxers.  That doesn't change the fact that it's a

3    bruxer crown, a crown developed for bruxers, and it's still

4    very popularly used with bruxism.  It's the primary

5    indication.  Glidewell's own marketing material prominently

6    talks about bruxers.  Their own dentists and their own

7    marketing vice-president -- everybody agrees that, yes, this

8    is a crown for bruxers.  That's not in dispute in this case.

9    I will just point out people wear tennis shoes, but they

10   don't just wear them to play tennis, and yet people

11   understand what a tennis shoe is.

12          Now I want to move on very briefly to the evidence

13   of commercial strength that Glidewell is talking about.  I

14   just want to point out that -- you know, one of the things

15   that was mentioned was the testimony from dentists.  I don't

16   want to dwell on the point, but this is a situation that you

17   may recall where an ex parte application was submitted on

18   the last day of discovery in order to extend discovery for

19   two more months.  In that application, Glidewell informed

20   the Court that it had new counsel and that basically more

21   discovery was needed and if you could please give us two

22   more months.  The Court declined to give that.

23          Essentially what in effect has happened is

24   Glidewell has gone along anyway and developed its own

25   evidence effectively after the end of the discovery cutoff

53

1    and submitted ample amounts of it with its papers.  So the

2    dentist declarations, including the declaration from Dr.

3    Goldstein that you heard about earlier -- those were

4    submitted after the close of discovery.  They were not

5    witnesses that Keating ever knew about during the discovery

6    period.  Of course Keating has filed as you have probably

7    seen a lot of evidentiary objections for the Court to take

8    into consideration.  That we think should be eliminating a

9    lot of evidence that the Court should be relying on.

10          Let me next talk about the allegations of actual

11   confusion that Glidewell is making.  It was referred to as

12   being in two buckets.  The first bucket I want to talk about

13   was this incident between Nicole Fallon and this dental lab

14   in Florida, Dr. Lee's lab.  In this particular incident,

15   Keating has received two different versions of what happened

16   in the sense that in an interrogatory response provided

17   during discovery Glidewell informed Keating that Nicole

18   Fallon, a customer service type of employee at Glidewell,

19   had made a random phone call to a customer.  It was part of

20   a pattern presumably.  She was calling customers to offer

21   them discount coupons on the BruxZir with a "Z" product.

22          Based on that telephone call, the person on the

23   other end -- as opposing counsel said, it wasn't Dr. Lee,

24   but it was a staff person in the office who responded and

25   said, well, actually you bought a crown recently in the last

54

1    couple of weeks.  Can we apply the coupon to that?  Nicole

2    said, well, maybe.  Send it over.  So they faxed over what

3    ended up being a Keating Dental Arts invoice for the KDZ

4    Bruxer, and that's what is now being presented as an example

5    of actual confusion.

6            What has since happened after the end of fact

7    discovery is that the story has changed.  It has changed in

8    several ways.  One thing that happened is in discovery we

9    asked them -- we served them a request for production right

10   on time asking for documents relating to this incident, and

11   we were told expressly we have no documents.  Well, now in

12   connection with their motion, Glidewell is now telling a

13   completely different story with Ms. Fallon, including that

14   she now didn't just speak with this staff person but she

15   actually spoke with Dr. Lee herself.

16           Now, they have documents that have appeared even

17   though they presumably were made in April, and they were of

18   course during the discovery period.  They weren't produced

19   until the Friday before they filed their Motion for Summary

20   Judgment.  Now we are told that Nicole Fallon recorded all

21   of her communications on a call log, which was provided with

22   their motion, and her call log includes what are pretty

23   sensational statements such as Dr. Lee characterizing

24   Keating Dental Arts as sneaky for using the name which is so

25   similar to Glidewell's.

55

 1          We object to this evidence because it did come out

 2     late.  Nicole Fallon, by the way, wasn't even identified as

 3     a witness until Glidewell amended their initial disclosure

 4     on October 29, the discovery cutoff.  If you look at the

 5     evidence that existed during discovery, this wasn't an

 6     incident of purchasing confusion at all.  It was confusion

 7     over a coupon offer, and it was initiated by Glidewell, not

 8     by some customer.

 9          Now, the second bucket which Glidewell spent a lot

10     more time on were these prescription forms.  These are the

11     ones where --

12          THE COURT:  The 18 prescription forms?

13          MR. JANKOWSKI:  Correct, and associated call logs.

14     Now, in this situation, I want to point out the dentists who

15     filled out these prescription forms were known to Glidewell

16     during discovery, but they have submitted no declarations

17     from them.  They did not depose them during discovery.

18          I come back to my theme what is in the heads of

19     the dentists?  Are those dentists confused or not?

20     Glidewell could have developed evidence of their being

21     confusion if in fact there was.  The fact is, though,

22     dentists were not confused.  This comes back to the second

23     theme, which is they chose their mark being so close to

24     bruxer.  The reason these dentists are writing "BruxZir"

25     with a "Z" on these prescription forms is because that's the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    way that they think dentists refer to an all-zirconia crown

2    for bruxers.  It's a shorthand.  Doctors are famous for

3    having illegible signatures.  Doctors are also famous for

4    writing things as concisely as possible.  BruxZir is a very

5    concise way to write out all-zirconia crown for bruxers.

6    It's an efficient and economical way to do it.

7              Now, while Glidewell doesn't have any probative

8    testimony of what's inside the heads of any of those

9    dentists, Keating does.  Keating has submitted 13

10   declarations from actual dentists who submitted the exact

11   same type of forms that you saw earlier, and they were asked

12   the question why did you write that?  They were invited to

13   explain.  What they explained was they were writing BruxZir

14   with a "Z" to explain that this was for an all-zirconia

15   crown.  They were not trying to order a brand product.  They

16   weren't using it as a brand.  They were using it

17   descriptively.  Keating Dental Arts has an all-zirconia

18   crown, so it makes sense that they were ordering it from

19   them.

20             So the confusion here is not over a Glidewell as a

21   source or Glidewell as a sponsorship or an affiliation

22   somehow with Keating.  The confusion is over BruxZir spelled

23   with "Zir."  Is that appropriately used as a generic

24   reference to an all-zirconia crown?  Dentists thinks it's

25   okay.  Glidewell obviously does not.  They have got a

1    federal registered mark in it.  They don't want dentists or

2    anybody else for that matter writing that as a generic use

3    for an all-zirconia crown, but that's exactly what is going

4    on, and that's exactly what is reflected in all of these

5    prescription forms.

6            I do want to point out that while there is 87 or

7    something like that forms at issue in the case that's

8    associated with 57 different dentists.  It's not 87

9    different dentists.  Some of those dentists submitted more

10   than one form spelling out an all-zirconia crown by writing

11   BruxZir with a "Z."  So the 13 declarations that Keating

12   provided is about a quarter of all the dentists that were

13   identified in the case as having done this.  Every single

14   one of those dentists said I was not confused.

15           You heard earlier that this was a classic case of

16   initial interest confusion.  As you can imagine, initial

17   interest confusion is getting a situation where -- the word

18   "initial" in that concept is because some customer that

19   doesn't know you or your product comes to you or is

20   interested in your product because they see a name that they

21   think they recognize.  So he gave an example of a name very

22   similar to a famous piano.  So if you have another piano and

23   you give it a confusing and similar name, somebody may show

24   up at your shop to buy a piano, discover that it's not the

25   one they thought, and they might buy it anyway.  They made

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    the trouble of going across town.  That is not at all this

2    situation.

3            The dentists we are talking about here -- almost

4    every single dentist are longtime Keating customers.

5    Dentists work with these labs for years.  As you can

6    imagine, Keating Dental Labs and Glidewell sell lots of

7    crowns.  They don't just sell these all-zirconia ones.  They

8    sell all kinds of things.  They have dentists ordering from

9    them constantly.  Every month they are getting a new order

10   for crowns.  These dentists always have more patients.  They

11   always use more crowns.  These are repeat customers.  They

12   are not being confused by the name of KDZ Bruxer.  They are

13   ordering an all-zirconia crown from the lab they use, their

14   chosen lab, Keating Dental Arts.  It's not the name that is

15   drawing them in.  At least, there is no evidence that it is

16   the name.

17           Glidewell is inviting you to reach an inference on

18   its part that by looking at the documents it should be

19   inferred that that's what these dentists meant.  Opposing

20   counsel is correct that Keating does object to the use of

21   these documents as hearsay to the extent they are being used

22   to show the state of mind of these dentists in that they

23   were confused.

24           One thing I want to point out -- it was brought up

25   that there is a state of mind exception to the hearsay rule,

59

1    and that it is true, and there are cases that have found

2    that.  That doesn't apply here.  The reason it doesn't apply

3    is this.  In the cases that opposing counsel is referring

4    to, there are situations where potential customers have

5    contacted a company because they wanted to buy something,

6    and they truly were confused maybe because of similar marks.

7    They contacted a company wanting to buy a product, but they

8    contacted the wrong company.

9            Courts are willing to take examples of these wrong

10   calls as -- you know, even though -- you can get testimony

11   from an employee that I have gotten 12 calls in the last

12   three months, people thinking I'm a different company.

13   Courts have been willing to let that kind of evidence in

14   because it's not really to prove the truth of the matter.

15   The person itself -- it's the state of mind.  It's the

16   confusion itself.  So the confusion itself is the state of

17   mind.

18           Here, these dentists aren't confused on these

19   forms.  In other words, the state of mind exception doesn't

20   apply here when they are writing "BruxZir" with a "Z."  That

21   doesn't tell you they are confused.  Glidewell argues that

22   that means they are confused, but that's their argument.

23   The document in and of itself standing by itself does not

24   show confusion on their part.

25           Again, when we have talked to a quarter of the

1    dentists that we had time to get to, none of them were

2    confused.  Glidewell has no declarations of anybody saying I

3    was confused, but Glidewell is also not providing any

4    evidence of people calling Glidewell thinking that they deal

5    with the KDZ Bruxer somehow.  Nobody is trying to order the

6    KDZ Bruxer from Glidewell apparently.  Nobody is returning

7    the KDZ Bruxer crowns to Glidewell when there is a problem.

8            Simply put, there is no evidence of actual

9    confusion in this case.  There is a lot of creative arguing

10   going on.  There is a lot of creative interpretation of

11   documents going on, but what's missing is somebody

12   understanding what is inside somebody's head that actually

13   shows a confused dentist.

14           Now, to me what really screams loudly is the very

15   beginning of the presentation that I am responding to here

16   talked about the millions of dollars that have been spent.

17   It was talking about the extensive marketing effort.  It was

18   talking about how dentists are bombarded with e-mail blasts

19   or the internet marketing and things like that.  Despite all

20   this, Glidewell apparently could not find a single dentist

21   anywhere in the country who would give them a declaration

22   about how they were actually confused.  Again, if not a

23   declaration from a dentist, at least survey data is

24   absolutely the type of thing you would expect in a case like

25   this, particularly from a company the size of Glidewell.

1          Then the other thing I want to point out from the

2     arguments you heard a little earlier is a lot of the

3     interpretations that were going on were associated with work

4     orders within Keating Dental Arts.  Basically you were

5     hearing stories about how some of the language used in these

6     work orders were classic examples of initial interest

7     confusion, that here was a dentist who wanted a BruxZir with

8     a "Z" crown but then Keating's employee steered them towards

9     the KDZ Bruxer.

10          What I would ask you to do is look at the

11     documents that counsel showed to you and look at them

12     objectively, not look at them while you are listening to him

13     talking you through his argument.  The fact of the matter is

14     these documents -- the way that these things are worded --

15     these are Keating Dental Arts staff people who are making

16     records of what they are doing.  You can imagine how --

17     those are not documents written by counsel, you know,

18     carefully written wondering about how some attorney is going

19     to interpret them later.  These are people writing things

20     like "Okay to proceed with KDZ Bruxer."  That can be made to

21     sound very nefarious, but it is also more likely just to

22     mean it's okay to proceed with KDZ Bruxer because that's

23     what the dentist wanted.  Again, in fact, all of the

24     evidence in the case points to the fact that that's all

25     these dentists ever wanted and that there is no shred of

1    evidence of initial interest confusion as well.  Again, the

2    evidence shows that most of these dentists that we are

3    talking about were long-time customers of Keating Dental

4    Arts.

5         I want to briefly talk about the degree of care

6    and the intent.  I don't want to spend much time on that,

7    but simply put, starting with intent, this is another

8    example where Glidewell sees bad intent basically through

9    Keating's use of the word "bruxer."  As I started off

10   talking about the big theme, once you realize that "bruxer"

11   is a specialized dental word -- and not just any specialized

12   dental word but the word for the primary user of the

13   crown -- it's a little hard to understand why it's nefarious

14   to use that word for that product.  It's a very strained

15   interpretation.

16        In terms of degree of care, I want you to notice

17   something interesting about Glidewell's argument.  On the

18   one hand, what they are telling you is that Keating is

19   trying to pass off on the good name of Glidewell.  It's

20   trying to say that these dentists really want the BruxZir

21   with a "Z."  For example, on the initial interest confusion

22   argument that they are making, what they are saying is

23   dentists wants BruxZir with a "Z."  They want Glidewell's

24   product.  Glidewell's got the good name.  Glidewell is the

25   high quality one.  That's what they want.  And what Keating

63

1   has done through this clevering name is they are diverting

2   some of these people who want BruxZir with a "Z" over to

3   them, and they are maybe getting some of their business.

4        Yet when it comes to the degree of care Sleekcraft

5   factor, Glidewell changes its story.  Now they say, you know

6   what, these crowns are interchangeable.  These dentists

7   don't care where there get them from.  They are made the

8   same.  They have the same properties.  It's all the same, so

9   they really don't care at all.  Those two arguments are

10  basically 180 degrees apart from each other.

11       Now, finally, what I want to point out is -- one

12  thing that they did not point out also is that Keating

13  Dental Arts' product is about 40 percent higher in price for

14  one of these crowns.  Glidewell makes the argument that

15  dentists really don't care about a 40-percent price

16  difference when they are buying all-zirconia crowns and that

17  they would consider that kind of a price differential

18  inconsequential.

19       I don't think that's likely to be the case for

20  anybody buying much of any product.  If you think about what

21  the cost of a car is or something like that and you raise

22  the price 40 percent, you are in a completely different

23  level of car that you are looking at.  Likewise, that's what

24  is going on here.

25       You may ask yourself the question why does Keating

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Dental Arts have a crown which is 40 percent higher in cost?

2    The answer is because these dentists have relationships with

3    these dental labs.  They go to labs that they trust.  They

4    go to labs that they have confidence in.  They go to labs

5    that they believe are going to help them properly service

6    their patients.  It's a service industry.  The dentists are

7    serving their patients.  Keating Dental Arts is serving its

8    dentist customers.  It's like any other service industry.

9    Quality and attention to the needs of the customers are

10   number one.

11          Keating Dental Arts is much smaller than Glidewell

12   and can provide much more personalized service.  There are

13   lots of advantages of going to a smaller service provider,

14   and you are willing to pay a little bit of a premium for it.

15   That's the way all markets work.  You can go to high volume

16   lower cost things, or you can go to lower volume higher

17   quality of service type companies.  We have that here.  What

18   I want you to understand is that dentists see different labs

19   in a different way.  They don't see Glidewell and Keating

20   Dental Arts and other dental labs as all being

21   interchangeable.  They are not.  It would be like comparing

22   a large retailer that sells on a massive scale to a smaller

23   mom-and-pop type of shop which gives you more personalized

24   attention.

25          Your Honor, that's what I wanted to talk about

1   right now.  If you have any questions at this point for
2   me -- otherwise, that's what I have to say.
3           THE COURT:  Why don't you consult with your
4   co-counsel for just a moment.
5           (Defense counsel conferring.)
6           MR. JANKOWSKI:  Your Honor, the one thing I just
7   want to clarify is my comment about the tentative that I was
8   making.  I was referring to the part of your tentative that
9   was specific to Docket No. 84.  In other words, some of your
10  tentatives are going against Keating, and I wasn't agreeing
11  with those tentatives at this time.
12          THE COURT:  Okay.  Counsel -- well, just a minute.
13  You have a number of other matters to cover I think.  Are
14  you going to be arguing?
15          MR. GRAVES:  Well, I will be responding briefly to
16  Mr. Jankowski and then --
17          THE COURT:  I don't know that you will yet.  I
18  want to hear about 83 and 82.
19          MR. SHAW:  I am going to be addressing 82 and 83.
20          THE COURT:  The lectern is yours.
21          MS. ZADRA-SYMES:  We are willing to submit on the
22  papers on those motions.
23          THE COURT:  83 and 82?
24          MS. ZADRA-SYMES:  Yes.  Just to be clear, it's the
25  motion for cancellation that Keating filed and the motion

 1    that Glidewell filed to dismiss our cancellation petition.

 2              THE COURT:  Which is docket numbers?

 3              MR. SHAW:  82 and 83 I believe, Your Honor.

 4              Your Honor, notwithstanding their submitting on

 5    the papers, I did want to address our motion for summary

 6    judgment on validity.

 7              THE COURT:  This would be a good time.

 8              MR. SHAW:  My colleague, Mr. Graves, would like to

 9    respond to Mr. Jankowski.

10              THE COURT:  Well, this is going to be very brief

11    now.  You have got five minutes.  That's the limit now.

12              MR. GRAVES:  Thank you.

13              THE COURT:  This is rebuttal in terms of hearing

14    it again.

15              MR. GRAVES:  What strikes me with Mr. Jankowski's

16    presentation is that really what we are doing is we are

17    arguing about inferences to be drawn from the evidence.

18    Mr. Jankowski draws certain inferences from the prescription

19    forms and the call logs.  We draw opposing inferences.  On

20    summary judgment of course, those inferences must be drawn

21    in Glidewell's favor.

22              THE COURT:  This is not helpful.  This is

23    rebuttal.  Get into the facts.  I know the law.  This is not

24    helpful.

25              MR. GRAVES:  With respect to the oval, the oval is

1    not always used.  For example, let's return to the slide

2    that we saw a little bit earlier.  You will see that Keating

3    is using its "KDZ Bruxer" mark here.  There is no oval.

4    There is no particular unique text that is used at all.  So

5    while in some instances it does use the oval, in others it

6    doesn't.  I believe we submitted argument in our papers

7    indicating that even when Keating does use the oval, again,

8    that's just one factor to be taken into consideration in

9    evaluating the aspects of the sight, sound, and meaning

10   trilogy for similarity of the marks.

11           Your Honor, particularly here where Keating is

12   making much of the phonetic similarity between KDZ Bruxer

13   and BruxZir, the fact that in some of its uses its mark has

14   an oval, which of course cannot be reflected in the

15   articulation of the mark, it indicates that the oval has

16   even less significance than it otherwise might.

17           Mr. Jankowski referred to kind of a timeline of

18   development suggesting that the BruxZir crown or the KDZ

19   Bruxer for Keating was developed for bruxer patients.

20   However, it's notable that Glidewell has submitted

21   evidence -- this is at Paragraph 11 of the Cohen

22   declaration, paragraph 11 of the Bell declaration --

23   indicating that for those dentists for about 90 percent of

24   the patients for which they use full contour zirconia crowns

25   are not bruxers.  Dr. Toka at Paragraph 11 of his

1   declaration indicated that he will prescribe a full contour

2   zirconia crown such as BruxZir or a KDZ Bruxer regardless of

3   whether his patients suffer from bruxism.

4          So the purported tight link between these two

5   brands of a full contour zirconia crown and bruxism is

6   simply -- it's overly hyped by Keating.  Yes, bruxism is one

7   indication or one pathology for which these full contour

8   zirconia crowns are indicated, but there are many others.

9   For some of these dentists, such as Dr. Cohen and Dr. Bell,

10  the vast majority of the uses don't involve bruxism at all.

11         Mr. Jankowski suggested his client is using Bruxer

12  in a descriptive capacity.  However, that's belied by the

13  fact that Keating filed a trademark application on KDZ

14  Bruxer and alleged in its second amended answer and

15  counterclaim that it is using KDZ Bruxer as a trademark.  In

16  order to constitute fair use, the mark must be used only,

17  solely, in a descriptive capacity.  That's clearly not the

18  case here from Keating's own admissions.

19         Mr. Jankowski tells the Court that the dentists

20  from whom Glidewell submitted declarations and Dr. Goldstein

21  were all disclosed after the close of discovery.  That's

22  simply factually incorrect.  Discovery closed in this case

23  under the Court's scheduling order on October 29.  All of

24  these dentists were identified in an amended disclosure on

25  October 29.  Dr. Goldstein's expert report was provided on

1    October 29.

2         Now, Your Honor, if present counsel had been

3    involved in the case, these witnesses very likely would have

4    been disclosed earlier than they were.  However, the fact

5    remains that they were disclosed prior to the close of

6    discovery, and there was nothing in the scheduling order

7    requiring that expert reports be provided earlier than the

8    close of discovery.  In fact, the scheduling order

9    specifically said all discovery, including expert discovery,

10   will close on the discovery cutoff, which was October 29.

11        So these witnesses were disclosed prior to the

12   close of discovery, and, in addition, Glidewell -- we -- I

13   offered to permit Keating's counsel to depose these people.

14   We offered to make Dr. Goldstein available for deposition.

15   We offered to make Dr. De Tolla available for another

16   deposition.  We offered not to oppose any efforts that they

17   might make to take the depositions of the dentists that we

18   disclosed after the close of discovery.  That offer was

19   rejected.

20        Rule 37(c) requires that in order for evidence to

21   be excluded it's not sufficient just that it be disclosed

22   after a discovery cutoff, which in this case it wasn't, but

23   there in addition must be a showing of prejudice.  Here

24   there is no prejudice.  Keating has articulated no

25   prejudice, and any prejudice that could possibly exist is

1   only from its effort to take tactical advantage of the date

2   of disclosure of these witnesses.  The offer to permit them

3   to be deposed remains open.  Keating could cure any

4   prejudice anytime it wanted.

5          With respect to Ms. Fallon, there aren't two

6   versions.  What happened is certain information regarding

7   Ms. Fallon's conversation with Ms. Carlyle of Dr. Lee's

8   office was disclosed in interrogatory responses.  Ms. Fallon

9   was disclosed as a potential witness weeks, if not months,

10  prior to the close of discovery.  Keating could have deposed

11  her.  They chose not to.  Subsequently, additional specific

12  factual detail was developed and was provided to Keating as

13  soon as it was developed.  The two documents, Exhibits 1 and

14  2, were provided to Keating, produced to Keating, within one

15  day of when counsel obtained them.  We made every effort as

16  soon as we got involved to produce as much information as we

17  possibly could regarding this case that had not already been

18  produced.  Again, there was no prejudice here, none

19  whatsoever.

20         Now, Mr. Jankowski -- it's notable regardless of

21  whether we are talking about 86 instances of confusion

22  reflected in the prescription forms or 57 different dentists

23  who were involved in those instances of confusion, that

24  Keating only submitted declarations from 13.  Keating had

25  months in which to develop that evidence.  Yet they could

1    only find 13.  They only submitted declarations from 13 of

2    those dentists.  Now, Mr. Jankowski points out that that's

3    25 percent of the dentists.  Well, we would point out that

4    75 percent of those dentists are unaccounted for.

5           Well, again, would that be sufficient for the

6    Court to grant our summary judgment against Keating?

7    Probably not, but it's certainly sufficient grounds on which

8    the Court must deny Keating's motion for summary judgment

9    against Glidewell.  Keating has not closed the door on

10   confusion here.  They have gone out and gotten declarations

11   from a subset of dentists who wrote "BruxZir" on the

12   prescription form.  That's not good enough to get summary

13   judgment, particularly, Your Honor, when we have declaration

14   testimony from dentists and from experts such as Dr.

15   Goldstein stating directly that confusion is likely given

16   the similarities in the marks, given the overlap in the

17   marketing channels, and so on.

18          Your Honor, with respect to the state of mind

19   exception to the hearsay rule, Mr. Jankowski's argument

20   assumes the conclusion that he hopes to reach.  The Lahodie

21   case and the Convergent case really established the rule,

22   and we believe, Your Honor, that under those cases which are

23   controlling -- Lahodie is controlling.  It's the Ninth

24   Circuit case.  These prescription forms fall well within the

25   state of mind exception.  They are being proffered to show

72

1   the state of mind of those dentists.  While Mr. Jankowski is

2   certainly free to argue and draw an inference that they are

3   not confused, again, it's a reasonable inference to draw

4   based on the fact that they wrote "BruxZir" on those forms

5   that they were confused.  That's the purpose for which it

6   false well within the state of mind exception.

7            With respect to our argument concerning the degree

8   of care exercised by a dentist in selecting a crown is

9   inconsistent with other aspects of our argument, it's not.

10  Glidewell doesn't need to show that BruxZir brand crowns are

11  the best in the market or even that they are better than

12  Keating's.  All we need to show is that there is evidence

13  sufficient to create a genuine issue of fact that bruxer is

14  recognized as a source identifier, and we have done more

15  than that, Your Honor.

16           With respect to the 40-percent price differential

17  here, it works out to $40.  That's ten cups of Starbucks

18  coffee.  We would submit that with respect to a product, the

19  price of which is going passed through by the dentist to the

20  patient and which is very likely to be paid for by

21  insurance, that that is simply a trivial price differential.

22           With respect to whether dentists trust Keating,

23  again, no evidence in the record.

24           So, Your Honor, unless the Court has any questions

25  regarding any of the subject matter that we have addressed,

1    I will thank the Court and rest.

2              THE COURT:  Thank you.

3              Counsel, you can further respond with about five

4    minutes.

5              MR. JANKOWSKI:  Thank you, Your Honor.

6              Let me go just over a couple of the points that he

7    was making.  He started off by saying what appears to be

8    going on here is there is a battle of inferences over these

9    documents.  That's not what is going on here.  We have

10   inferences on the side of Glidewell.  We have actual

11   evidence in the form of timely submitted declarations from

12   persons with probative knowledge on the issue.  The

13   inferences are really coming in because Glidewell is trying

14   to reach for the result they want from whatever evidence

15   they can find, whatever scrap.  I think the one document

16   that you were asked to look at had the writing in about a

17   six-point font, if that.  They're really straining with

18   everything they can on these documents.

19             Regarding his comments on the oval, as you know,

20   you are required to be looking at how the marks are being

21   used in their entirety.  It doesn't mean the fact that it's

22   occasionally used without an oval means that the oval

23   becomes irrelevant.

24             The next issue that was raised was the fact that

25   there are other applications other than for bruxer patients.

1   That is absolutely true.  There are other patients that can

2   receive these crowns.  In fact, as you can imagine,

3   Glidewell is trying desperately --

4           THE COURT:  I don't understand when you make the

5   choice to use the oval or you don't use the oval.  I don't

6   understand on Keating's part how much is used, when it's

7   used, how the decision is made to include the oval or not.

8           MR. JANKOWSKI:  Your Honor, the oval is the mark.

9           THE COURT:  I don't understand how you decide to

10  use the oval or not.

11          MR. JANKOWSKI:  I understand, Your Honor.

12          THE COURT:  No, you don't because you didn't

13  respond to my question.  You didn't answer it.

14          MR. JANKOWSKI:  The stylized mark -- there are

15  three of them.  Those are used as their stylistic way for

16  referring to the crown, the three different crowns.

17          THE COURT:  How do you decide when to include the

18  oval?

19          MR. JANKOWSKI:  Whenever they want to make a

20  splashy marketing piece, you will use that.

21          THE COURT:  So you don't use it otherwise?

22          MR. JANKOWSKI:  You will use the name "KDZ

23  Bruxer" --

24          THE COURT:  You are not answering my question.

25  This is your last and only chance.

1          MR. JANKOWSKI:  Could you ask it one more time?

2          THE COURT:  I have asked it.  Respond as best you

3    can.

4          MR. JANKOWSKI:  The crown is referred to in words.

5    All these crowns are referred to in words without --

6    including Glidewell's.  Glidewell has their stylized look --

7          THE COURT:  But you pointed out the oval as

8    something that you believed was distinctive.

9          MR. JANKOWSKI:  Yes.

10          THE COURT:  When is it decided to use that?

11          MR. JANKOWSKI:  It's used on the marketing

12    pamphlets.  It's used in the effort to --

13          THE COURT:  You have answered.  Marketing

14    pamphlets, right?

15          MR. JANKOWSKI:  Not just marketing pamphlets.

16          THE COURT:  What else?

17          MR. JANKOWSKI:  Well, the marketing materials

18    generally.  In marketing materials that are put together to

19    be aesthetically pleasing as opposed to just providing

20    information through text, Keating is going to be using the

21    oval as part of it.

22          THE COURT:  Okay.

23          MR. JANKOWSKI:  Your Honor, it was also raised

24    that Keating has admitted that it has used the "bruxer" term

25    in a way other than as a descriptive term.  What opposing

1  counsel is referring to is the fact that it has a trademark

2  registration that it is seeking in KDZ Bruxer, but the fact

3  that it has bruxer in that name in and of itself does not

4  mean it's not a descriptive use.  There are lots of examples

5  of a trademark that have descriptive words within them.

6  Those are mentioned in Keating's brief if you look through

7  there.

8          On the issue of whether the witnesses disclosed on

9  October 29 were timely or not, I will point out the

10 scheduling order not only sets the discovery cutoff as

11 October 29, but it sets the last date for taking

12 depositions, which is basically the previous week.  So all

13 the depositions had to be completed by I believe the 22nd.

14 So disclosing witnesses for the first time after the date

15 the Court has ordered you to take your depositions clearly

16 is problematic.  Even the offers that were made to Keating

17 to allow witnesses to be deposed after the discovery cutoff

18 would be impermissible absent leave of the Court.

19         Then, finally, I just want to point out the price

20 differential of $40, ten cups of Starbucks coffee.  These

21 dentist are buying lots and lots of crowns.  It adds up to a

22 lot of money.  Needless to say, everyone is always concerned

23 with the cost of the product that they are buying.  Dentists

24 do care about the cost they are passing on to their client's

25 insurance notwithstanding.

77

```
 1              That's all I have, Your Honor.

 2              THE COURT:  Counsel, let's take about a

 3   five-minute break.

 4              (Recess.)

 5              THE COURT:  Okay, we are back on the record.

 6              Which motions would you like to argue next?

 7              MR. SHAW:  Greer Shaw here representing Glidewell.

 8   I will be addressing Docket 83, which is defendant Keating's

 9   motion to cancel our registration, as well as Docket No. 82,

10   which is plaintiff Glidewell's motion with respect to

11   Keating's validity defenses.

12              Now, Your Honor indicated in your tentative that

13   you were inclined to deny the defendant's motion.  Your

14   Honor thought there's a strong presumption of validity, a

15   strong presumption of distinctiveness due to the

16   registration of the mark, and that it's clear they are not

17   generic.  You also pointed out that the composite mark does

18   not describe the product but merely suggests it and

19   imagination is need.  Of course we agree with all those

20   points for all the reasons stated in our brief.

21              The only reason I am standing up is you indicated

22   that with respect to the plaintiff's motion for summary

23   judgment essentially on validity -- I will use that as a

24   shorthand, but that's what we are asking for, an affirmative

25   finding from Your Honor that the mark is not generic.  You
```

```
1    indicated that that was moot -- or you thought tentatively
2    that it was moot possibly in view of your tentative with
3    respect to noninfringement.
4           We have now heard the arguments from Mr. Graves
5    and Mr. Jankowski on that infringement issue.  I would
6    submit, Your Honor, that the validity issue from Glidewell's
7    perspective is not moot.  We think there is a reasonable
8    probability that Your Honor may submit the infringement
9    issue to the jury in which the validity issue will still be
10   alive even if defendant's motion to cancel our mark is
11   denied.  So what we would like to do is resolve the validity
12   issue now so that it's not going to clutter up the jury
13   trial.
14          As Your Honor noted, there is a strong presumption
15   of validity.  We have a registered mark.  It's undisputed
16   that it's registered.  Ninth Circuit law sets forth quite
17   clearly that the demonstration of strong evidence of
18   validity, a strong presumption of validity, the burden to
19   overcome that particularly on summary judgment is heavy.
20          In addition, because the PTO issued our trademark
21   without any required channel of secondary meaning, the mark
22   not only is presumed to be valid but it's presumed to be
23   inherently distinctive.  That means it's presumed to be at
24   least suggestive.  Of course under Ninth Circuit law, a
25   deference to the PTO classification discusses it because the
```

1    Ninth Circuit has noted -- again, this is under the Sermando
2    case -- the PTO has expertise that the Court doesn't have on
3    trademark examination issues.
4            So, Your Honor, Keating's primary argument with
5    respect to validity -- and I think you have heard it in
6    Mr. Jankowski's presentation with respect to the
7    infringement issue -- it's their view that the mark is
8    generic.  They believe the word "bruxer" is generic.  The
9    fact is it's not.  The evidence shows that it's not.  In
10   fact, there is no evidence to the contrary, and I will walk
11   through that now.
12           Let's start with Keating's admission.  They have
13   already admitted that the mark is not generic.  In fact, in
14   their Petition for Cancellation that was filed with the
15   Trademark Office, they admitted that the mark is
16   descriptive.  To be sure, they also said first that the mark
17   is generic, but then they said it is descriptive.  They say
18   in the brief, well, these are alternative arguments, and one
19   is not an admission against the other.  They cite a Ninth
20   Circuit case for that.  You will see in that case the Court
21   said if you are going to plead in the alternative you have
22   to make clear that's what you are doing.  If you don't make
23   clear you are pleading in the alternative, then one
24   allegation that's inconsistent with the other is an
25   admission.  That's what we have here.  They have already

said to the Patent and Trademark Office that the mark is descriptive and therefore not generic.

In addition, we have an admission from Sean Keating at deposition.  He said that BruxZir is Glidewell's name for the monolithic crown and that the word is not used any other way in the industry.  Now, in their briefs, they try to explain that way and say, well, you are taking that out of context.  The fact is Your Honor can read the transcript and make a judgment, but I think it's really the jury's goal to determine whether that quote has been taken out of context or not, and I don't think it is.  I think he clearly admits that BruxZir is Glidewell's name.  Therefore, it is not generic.

In addition, Mr. Brandon, Keating's general manager, also admitted at deposition that as of May 2011 the "BruxZir" mark was known to be a specific trade name of the product and identified a product made by Glidewell.  Just for the record, I am quoting from in the case of Mr. Keating Docket No. 90-30, which is Exhibit 85, and in the case of Mr. Brandon, it's Docket No. 90-30, Exhibit 84.

As well, Keating internal documents indicate that Keating personnel regard the BruxZir as a, quote, "proprietary" mark.  It's not a generic term.  It's a proprietary name.  Sean Keating, Mr. Brandon, and other Keating employees recognize that.

1          One thing that is very important in this case is

2    the Ninth Circuit case law.  This in the Yellow Cab case

3    where the Ninth Circuit says the crucial date for

4    determining genericness is the time that the accused

5    infringer, the alleged infringer, entered the market with

6    their disputed market.  That's the Ninth Circuit case Yellow

7    Cab, 419 F.3d 925, the crucial date.  Here the crucial date

8    is by their own admission April 2011.  In their answer and

9    counterclaims, they say Keating adopted and began using the

10   "KDZ Bruxer" mark in approximately April 2011.  That's the

11   crucial date under Ninth Circuit law.  So the question then

12   is prior to April 2011 was bruxer generic for zirconia

13   crowns?  Anything that happens afterwards, evidence after

14   April 2011, is not probative of the prior period.

15          Additional points that are significant -- again,

16   Ninth Circuit case laws notes that if the term is not found

17   in a dictionary that supports the conclusion that it's not

18   generic.  Here we have submitted multiple dictionary

19   excerpts to Your Honor.  None of them have a definition for

20   "bruxer" whether it is spelled z-i-r or x-e-r.  None of them

21   have a definition for "bruxer."

22          In addition, Keating has no generical survey.  You

23   heard Mr. Jankowski faulting Glidewell for not having a

24   survey.  I think Your Honor well knows why there's no

25   survey.  We were engaged two days before the close of

1   discovery.  We asked for an additional two months to conduct

2   a survey.  They opposed that.  That's why we don't have

3   survey.  They on the other hand had months to do a generical

4   survey, and they didn't get one.  Either they didn't get

5   one, or they got one and they didn't like the results, and

6   that's why we don't see it.

7          So back to this crucial date issue, again, this is

8   a fundamental problem with their generical case.  None of

9   their evidence speaks to genericness prior to April 2011.  I

10  would encourage Your Honor to scrutinize their evidence.  I

11  will start with Dr. Eggleston's reports.  He submitted not

12  one, not two, but three expert reports, which are completely

13  silent as to the crucial date, completely silent as to

14  April 2011 or May 2011 or any period of time at all.  It

15  doesn't even address the time in issue at all.

16         In addition, Dr. Eggleston relies almost upon a

17  series of unauthenticated hearsay web pages that are either

18  undated or postdate April 2011.  So he is relying on

19  evidence that is not probative of the pertinent time period.

20  Dr. Eggleston also relies upon Glidewell promotional

21  materials, Dr. De Tolla's video, for example.  He said Dr.

22  De Tolla pronounces "BruxZir" and "Bruxer" the same way.  He

23  makes a big deal about this.  The quote -- these are

24  Glidewell promotional videos.  Dr. De Tolla is referring to

25  Glidewell's BruxZir brand crowns and bridges.  He is not

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    referring to generic bruxer crowns.  Dr. De Tolla is on the

2    record saying that in a declaration, and there is no

3    contrary evidence.

4         The law is well-established, both statutory and

5    case law -- and this is from 15 USC 1064.  "A registered

6    mark shall not be deemed to be the generic name of bids or

7    services solely because the mark is also used as a name as

8    or to identify a unique product or service."  That's what we

9    have here.  We have Dr. De Tolla and other Glidewell

10   personnel using the BruxZir brand to refer to Glidewell

11   BruxZir brand crowns and bridges.  That's used in

12   Glidewell's own promotional material cannot possibly render

13   Glidewell's registered trademark generic.

14        The In Re D.C. Connex case, 689 F.2d 1042, stands

15   for a similar proposition, that a product may be called by

16   its given name does not negate its function as a mark or

17   render it generic so long as it is used to identify a

18   product as a single source.  That's exactly the case here.

19   No sensible dentist is going to watch one of Dr. De Tolla's

20   videos or look at Glidewell promotional material and

21   conclude that the word "BruxZir" being used as Glidewell's

22   trademark is anything other than a trademark for Glidewell

23   BruxZir brand crowns and bridges.

24        In addition, Your Honor, Dr. Eggleston relies upon

25   the authorized labs.  You have heard some discussion about

the authorized lab program earlier today.  He says all these
authorized labs out there, 180 or so, are using the
"BruxZir" mark and not saying that is a Glidewell trademark
or that is Glidewell's product.  The fact is, Your Honor, as
Mr. Graves explained, there is no need to do that.  That's
under 15 USC 1055.  The activity of these permitted
authorized labs iner to Glidewell's benefit whether or not
the labs are using the "BruxZir" brand in association with
the Glidewell name.

     Finally, Dr. Eggleston replies upon a series of
prescription forms that have been sent in to Keating.  Some
of the prescription forms you have heard about in the
confusion context, but all of these postdate the relevant
time period.  They all postdate April 2011.  Therefore, they
are not probative at all about the genericness question.

     Moving on to their second expert, Ms. Boatright,
Ms. Boatright is a trademark lawyer.  She is not a dentist.
She is not an academic.  She is a lawyer.  Nevertheless, she
submits a report opining apparently that the mark is generic
or at least descriptive.  It's unclear from her report.  Her
report suffers from many of the infirmities that Dr.
Eggleston's report suffers from.  Most importantly, she is
completely silent as to the crucial date of April 2011.  She
makes no effort to assess genericness as of any point in
time, much less the crucial date.  Again, she relies on the

various promotional materials that I just mentioned in the
context of Dr. Eggleston, the videos and so forth.  She does
not even clearly opine that "bruxer" is generic for a
zirconia crown.  She focuses with quite a good amount of
vigor on the argument that the word "bruxer," b-r-u-x-e-r,
is a generic term for patients that suffer from bruxism.
The fact of the matter is Glidewell is not selling to
patients that suffer from bruxism.  Glidewell is simply
selling zirconia for dental crowns and bridges.

          THE COURT:  Could you move that mic a little
closer to you?

          MR. SHAW:  One of the arguments they make is
because our mark in their view is phonetically similar or
phonetically equivalent to the intended user somehow that
makes it automatically generic.  The fact of the matter is
the law doesn't support that.  I can point you to the Ninth
Circuit case, the Brookfield case, which is 174 F.3d 1036.
The market issue there was movie buffs, all people
interested in movies and information about movies and
entertainment products.  That mark, "Movie Buff," was found
to be suggestive in that case even though the product was
directed to movie buffs.  So just because the product may be
the same as or phonetically equivalent to or similar to the
intended user or consumer of the product does not render it
by law generic or even descriptive.  Again, in that case,

86

1    "Movie Buff" was found to be suggestive.

2             Moving on Your Honor to their evidence, wading

3    through their evidence of purported genericness, we come to

4    the declaration of Carol Fetura.  Carol Fetura is a person

5    who operates a third-party dental lab called Showcase

6    Dental.  She says in her declaration that Showcase is a

7    competitor of both Keating and Glidewell.  Ms. Fetura again

8    is silent about the crucial date.  She doesn't say that

9    bruxer whether spelled Z-i-r or x-e-r is generic at any

10   given point in time.  She said that Showcase Dental used a

11   mark "O-Bruxer" from the end of 2010 to January 2011.  I

12   suppose Keating would you have infer that that is somehow

13   evidence that the mark was generic because that's the mark

14   that Showcase Dental showed.

15            The fact of the matter is the evidence shows

16   Showcase copied the mark from Glidewell.  In fact, she had a

17   cease and desist letter.  Ms. Fetura received a cease and

18   desist letter from general counsel at Glidewell asking her

19   not only to stop using the mark, but copying images for her

20   company's website, images that she had copied from

21   Glidewell, not only the image of the crown but the logo,

22   "BruxZir," B-r-u-x-Z-i-r.  So Showcase Dental copied our

23   image, copied our logo, put it on its website, and received

24   a cease and desist letter.

25            When she got the cease and desist letter -- well,

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    first of all, copying indicates distinctiveness.  Under

2    Ninth Circuit law, that's Vision Sports, 888 F.2d 609.  So

3    you have Showcase Dental who copied our mark, copied our

4    image, copied our logo, put it on its website, and then was

5    asked to stop doing it.  I will get to that later.  She did

6    promptly change the name.

7              They also point in connection with the Fetura

8    declaration to a number of prescription forms similar to the

9    kind of prescription forms that you have seen earlier that

10   had been submitted to Keating.  Again, Your Honor, the

11   crucial date under Ninth Circuit law, the Yellow Cab case,

12   comes into play again because the majority of these

13   prescription forms are on a post-date April 2011.  One of

14   them is undated, and the remainder, the ones that predate

15   the crucial time period, all show that when dentists are

16   ordering crowns from Showcase they are using terms other

17   than BruxZir.  So that evidence actually supports Glidewell.

18   It shows that "bruxer" is not generic as of the relevant

19   time period, April 2011 or before.

20             Again, moving through the evidence, Keating has

21   submitted in connection with summary judgment declarations

22   from 13 dentists.  These 13 dentists say they regard

23   "bruxer" as being a generic term for a zirconia dental

24   crown.  What's notable though, Your Honor, is none of the 13

25   dentists say that they regarded this term as being generic

1    for zirconia dental crowns as of any particular time period,

2    whether April 2011 or before.

3         The best you can conclude from these declarations,

4    because this comes up in the context where they're in a

5    sense explaining away one of these prescription forms where

6    they used our trademark -- they say, well, when I wrote that

7    word "BruxZir," B-r-u-x-Z-i-r, on a prescription form, I

8    wasn't really confused.  It was my using of a generic

9    terminology.  But all of those prescription forms postdate

10   April 2011.  So, again, that evidence is not probative of

11   genericness as of the relevant time period.

12        I have talked about the deficiencies in the

13   evidence from Keating's side.  I would submit Keating has

14   not submitted any evidence that would support a conclusion

15   of genericness.

16        Now let's look at the evidence on the other side.

17   There is affirmativeness evidence of nongenericness.  Again,

18   I have already talked about Mr. Keating's admission and

19   admissions of other Keating personnel.  Even on top of that,

20   Glidewell has submitted declarations from seven dentists

21   across the country who all testify that both before and

22   after April 2011 they knew and their colleagues knew to the

23   extent they talked to their colleagues -- dentists, you

24   know, go to conventions.  They work with each other.  These

25   seven dentists know that the "BruxZir" mark signifies a

1    single source of dental restoration products, Glidewell.

2    It's not a generic term.  They all say they use the word

3    "bruxer" exclusively to refer to a person who suffers from

4    bruxism.  They do not use that term and have never used to

5    refer to zirconia crowns and bridges as a type of category

6    of product.  That's the showing that Keating would have to

7    make in order to establish that this mark is generic.  The

8    seven dentists are affirmative evidence that the mark is not

9    generic and was not regarded as being generic as of the

10   relevant time period.

11          Further, these seven dentists say that there are

12   generic terms for these products that were in use as of

13   April 2011 and are in use now.  These terms are:  zirconia

14   crowns, all-zirconia crowns, monolithic zirconia crowns,

15   full zirconia crowns, and solid zirconia crowns.  These

16   phrases, Your Honor, you see pervasively in the web pages

17   that Keating has submitted.  You see these terms pervasively

18   in the declarations from Keating's own 13 dentists.  You see

19   these term pervasively in the Carol Fetura declaration.  You

20   see these terms pervasively in Dr. Eggleston's declaration.

21   These terms that I just read to you are in fact the generic

22   terms for a zirconia crown, not a bruxer crown.

23          In addition to the seven dentists' declarations,

24   we have expert testimony.  We have the declaration of Dr.

25   Goldstein.  This is one of the most prominent dentists in

1    the country, 55 years of experience in the dental industry.

2    He says, "It is my opinion that dentists do not refer to

3    solid zirconia crowns as bruxers or bruxer crowns.  It is

4    also my opinion that dentists do not understand the word

5    'bruxer' to refer to solid zirconia crowns from any source,

6    but dentists understand the mark 'BruxZir' to identify the

7    source of solid zirconia crowns and the material to make

8    solid zirconia crowns, the crowns supplied by Glidewell."

9            There is similar testimony from Dr. De Tolla,

10   again, a practicing dentist who has over 20 years of

11   experience in the industry.  Your Honor, this is the head of

12   education at Glidewell.  Dr. De Tolla posts his videos

13   online.  He meets thousands of dentist every year at

14   conventions and so forth.  He says in his testimony at

15   Exhibit I, "I have never heard any of the thousands of

16   dentists -- use the term 'bruxer,' b-r-u-x-e-r, to refer to

17   it as a zirconia crown generally.  Rather, when referring

18   generally to a zirconia crown, a dentist will refer to the

19   crown as a zirconia crown."

20           In addition to the dentists Dr. Goldstein and Dr.

21   De Tolla, we have the expert testimony of Professor

22   Franklyn.  He is a trademark academic at the University of

23   San Francisco.  In preparing his declaration -- I mean

24   actually his supplemental report -- he interviewed a number

25   of dentists, including Drs. Cohen, Bell, Luke, Michaels, and

91

1  Newman, as well as Dr. Christiansen and other very prominent

2  dentists in the country, and all of these dentists told him

3  that "bruxer" is not a generic word for a crown.  A bruxer

4  crown is not a generic phrase for a zirconia crown.

5  Instead, dentists use terms like full contour zirconia,

6  all-zirconia crowns, some of the terminology that I

7  mentioned earlier.  So Professor Franklyn opines that the

8  mark "BruxZir" is not generic based among other things on

9  his interview of these dentists, based on his trademark

10  searches, based on other searching activity that he did, as

11  well as his review of the trademark search report

12  commissioned by Keating itself.

13        So, Your Honor, I would submit that there is

14  simply no evidence that would support a conclusion of

15  genericness here.  All of the evidence that was submitted by

16  Keating does not speak to the relevant time period.

17  Evidence of purported genericism of the word at a later date

18  is irrelevant.  Not only it is irrelevant, but it would be

19  confusing and prejudicial for Your Honor to consider it or

20  for it to be admitted at trial because it would leave the

21  fact-finder to determine or access purported genericism as

22  of the incorrect time period.

23        Your Honor, earlier in your tentative you

24  indicated that you thought that the "BruxZir" mark is

25  suggestive.  Of course we agree with that.  We think it is

92

1    suggestive, but I would like to just walk through some of

2    the Ninth Circuit law which I think leads to that and other

3    authority for that conclusion.  The Ninth Circuit has

4    essentially laid out two tasks.  They call them tasks, but

5    they really more considerations.  There is the imagination

6    test, which is the most commonly used under the Ninth

7    Circuit, which asks whether imagination or a mental leap or

8    multi-stage reasoning is required in order to reach a

9    conclusion as to the nature of the product being referenced

10   by the mark, and that comes from the Sermando case.

11          A different Ninth Circuit case, Self-Realization

12   case, 59 F.3d 902, says, "If the mental leap between the

13   word and the product's attribute is not almost

14   instantaneous, then this strongly indicates suggestiveness,

15   not descriptiveness."  Here, Your Honor, the "BruxZir" mark

16   as you indicated in your tentative is a combination of brux

17   and zir.  Brux suggests to dentists that the BruxZir brand

18   products are strong and durable and are suitable in dental

19   applications requiring superior strength and durability,

20   such as treating patients with bruxism.  That is not the

21   only potential application or indication, but that is one of

22   them, and that is one application that is suggested by the

23   word "brux."

24          The second part of the mark, Your Honor, zir,

25   indicates, suggests, to dentists that the products comprise

1    zirconia, a hard and durable material that had been and has

2    been successfully used in dental products.  So dentists see

3    brux, and they see -- those two portions of the mark suggest

4    to them features:  the material of the product, as well as a

5    potential use, treating patients with bruxism.

6            In that regard, the "BruxZir" mark is actually

7    quite similar to other marks that have been found to be

8    suggestive, for example, the "Vericheck" mark.  This is the

9    Vericheck case, 636 F.3d 501.  What was being considered

10   there was vericheck.  Those two words or word portions were

11   put together into a one-word trademark, and that was being

12   used for products and services that would check or verify

13   checking products.  The Court said that that is suggestive.

14   The mark "Vericheck" is suggestive because consumers have to

15   separate the two pieces.  They have to separate veri and

16   check, and then the reason, that veri is short for

17   verification services.

18           That's very similar to what we have here with

19   BruxZir.  The zir is shortened or a portion of the word:

20   zirconia.  Zir suggests that the product is made of

21   zirconia.  It doesn't describe the product.  It doesn't

22   clearly indicate what it is or what it is made of, but it

23   suggests.

24           The Ninth Circuit again in the Sermando case has

25   said if the mark cannot be found in a dictionary or is

1   without a meaning that supports suggestiveness -- here it's

2   undisputed that the word "bruxer" no matter how spelled is

3   not in any dictionary.  The Ninth Circuit in the Sermando

4   case said, "If the accused infringer has to use or does use

5   explanatory language with his infringing mark, then that

6   supports suggestiveness."  That makes sense because if the

7   word "bruxer" really was a generic word for a zirconia crown

8   and bridge or a dental restoration, you wouldn't think that

9   somebody using the word "bruxer" would have to further

10  explain that it's a zirconia crown or bridge for dental

11  restoration.

12          In fact, we see that exact language in Keating's

13  marketing material.  For example, in Keating's advertisement

14  Keating introducing the KDZ Bruxer brand, they state that it

15  is a full contour zirconia restoration.  Well, if bruxer

16  already meant that, then you wouldn't need to say that.

17          So the Ninth Circuit in the Sermando case says,

18  "The accused infringer's use of explanatory language with

19  its mark cuts against the accused infringer's argument that

20  the mark is a well-established, culturally pervasive

21  concept."  That's exactly what we have here.  It's

22  undisputed that Keating includes additional explanatory

23  words and language when they have KDZ Bruxer, and they do

24  that because bruxer is not generic for zirconia products.

25          So that's the imagination test.  The second test

1    under Ninth Circuit law is the competitor's needs test.

2    This focuses on the extent to which a mark is actually

3    needed by competitors to identify their goods or services.

4    Again, from the Sermando case -- I think you see a pattern

5    here.  This is a useful case -- the Ninth Circuit says, "If

6    competitors have a great need to use a mark, the mark is

7    probably descriptive.  On the other hand, if the suggestion

8    made by the mark is so limited and subtle that it is not

9    likely to be needed by a competitor, fails to describe the

10   goods, this tends to indicate that the mark is merely

11   suggestive."

12          So, Your Honor, I would submit and I think the

13   evidence shows there is no real great need for Keating or

14   other competitors to use the word "Bruxer" as their

15   trademark.  I want to make clear that we are not saying --

16   we are not going out and seeing people who are saying this

17   is a full contour zirconia crown that can be used for

18   bruxers.  That is not what is at issue here.  What is at

19   issue is whether they can use a confusingly and similar

20   trademark, "KDZ Bruxer."

21          I talked about Carol Fetura earlier, and I

22   promised you I would return to her, and now this is the

23   time.  Her dental lab, Showcase Dental, was using the

24   ZirBruxer trademark from 2010.  In about January 2012, she

25   got a cease and desist letter from Glidewell saying not only

1    are you using copied images that include our trademark, but

2    you have ZirBruxer, which is confusingly similar to our

3    mark, and we would like you to stop infringing.

4           So what does Carol Fetura do?  She doesn't say,

5    well, I need to use the word bruxer because there is no

6    other way to describe my product.  What she does is say

7    exactly the opposite.  Here is Ms. Fetura's response.  She

8    says, "The name of the crown is not going to change a single

9    part of my customer satisfaction to my product or whether

10   they use my lab or even request this product."  So she is

11   not saying I need to use the word "bruxer" to describe this.

12   Otherwise, nobody is going to know what it is.  She is

13   saying I don't need to call it that because it's not going

14   to make any difference at all.  People are still going to

15   request my product.  They know what it is.

16          So after getting this letter and after saying it

17   doesn't matter what it's called -- and this is in

18   January 2012 -- Showcase announces its name change.  So they

19   changed from ZirBruxer, which was the mark that we alleged

20   was confusingly similar, and they say, "We have hereby

21   changed the name of our product to reflect the shape and

22   product makeup, Full Contour Zirconia."  That's the generic

23   term.  That's the term that you heard me mention before from

24   the expert declarations, full contour zirconia.  That's what

25   this product is.  That's the generic term for this product,

1    not bruxer.

2            There are other examples.  It's not just Showcase

3    Dental.  We talked in our briefs about Drake Dental

4    Laboratories.  Drake uses the mark "Zir-Cast."  They sell

5    full contour zirconia dental crowns similar to the Keating

6    crowns, similar to the Glidewell crowns, under the

7    "Zir-Cast" mark.  Among other descriptions for their

8    product, they recommend -- or state that the product,

9    rather, is recommended for bruxers and grinders among other

10   users.  Glidewell has agreed that that type of usage is

11   permissible.  We're not suing Drake.  We are not saying

12   Zir-Cast is confusingly similar to our "BruxZir" mark.

13           So, again, Your Honor, we are not trying to

14   foreclose competitors' use of the word "bruxer" to describe

15   their products in the description of the product, but that

16   is different and distinct from using the word "bruxer" or

17   some confusing similar variant as a trademark, and that's

18   what Keating is doing here.

19           So for all those reasons, there is no evidence to

20   support genericness.  Both the law and the facts strongly

21   support suggestiveness, and we believe that Your Honor

22   should grant summary judgment in Glidewell's favor finding

23   not only the mark is not generic, but find that it is

24   suggestive.

25           Now, there is a middle ground.  I am sure Your

1    Honor is aware that the mark can be descriptive.  That's

2    somewhere between generic and suggestive.  Ordinarily

3    descriptive marks are not entitled to protection.  However,

4    the law recognizes secondary meaning, which is the

5    phenomenon where the relevant consumers understand that an

6    ordinary descriptive mark is actually a source identifier

7    for a single source.  The law says that consumers do not

8    have to know who the source is.  They just have to

9    understand that there is a single source.  The source can be

10   anonymous.

11        As compared to the suggestive mark, Your Honor,

12   the mark is descriptive if it defines the qualities or

13   characteristics of a product in a straightforward way.  I am

14   just quoting right out of the Sermando case.  "It defines

15   the qualities or characteristics of a product in a

16   straightforward way that requires no exercise of the

17   imagination to be understood."

18        That's clearly not the case here.  BruxZir

19   requires people to separate the two pieces out, reason that

20   that probably indicates what the material of the product is,

21   reason that bruxism is a medical condition, and the product

22   is maybe suitable to treat that medical condition.  That's

23   multi-stage reasoning that it is a suggestive mark, not

24   descriptive.

25        Nevertheless, if Your Honor is inclined to

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    possibly find that the mark is descriptive, we think very

2    strongly against a secondary meaning.  First of all, the

3    fact of the registration creates a presumption of secondary

4    meaning.  I will be candid with Your Honor.  There is at

5    least some lack of clarity in the Ninth Circuit on this due

6    to -- certainly in the Sermando case.  I think the clear and

7    more longer standing principle of law is the Ninth Circuit

8    is the Americana Trading Case.  That's 956 F.2d 1284 from

9    1992 where the Ninth Circuit said, "Registration carries a

10   presumption of secondary meaning."  In that Americana

11   Trading case, the Ninth Circuit went on to say that the

12   party that was challenging the mark bore the burden to

13   demonstrate that there was no secondary meaning.

14          Again, I want to be candid with the Court.  There

15   is a footnote in the Sermando case, Footnote 7, which

16   suggests to the contrary and citing to a Second Circuit

17   case.  I think it's doubtful the Ninth Circuit intended to

18   overrule itself by a footnote, but there is those two

19   competing lines of authority.

20          In any event, no matter who bears the burden, I

21   think there is ample evidence of secondary meaning.  The

22   factors -- the considerations for secondary meaning are set

23   out in various cases, the Yellow Cab, the Philippino Yellow

24   Pages case, which is 198 F.3d 1143.  Among the factors

25   are -- the most commonly cited factors are whether actual

1  purchasers of a product bearing the mark associate the mark

2  with the producer, the degree and manner of advertising

3  under the mark, the length and manner of use of the mark,

4  whether the use of the mark has been exclusive, the mark

5  holder's amount of sales and the number of customers,

6  intentional copying by the infringer, and evidence of actual

7  confusion.

8       You have heard some evidence on some of these

9  factors earlier today.  I am not going to repeat all that

10  evidence.  Suffice it to say, particularly on issues of

11  degree and manner of advertising, length and manner of use,

12  mark holder's amount of sales, number of customers, you

13  heard my colleague Mr. Graves address those issues.  They

14  are largely undisputed, Your Honor.

15       With respect to the copying, you heard Mr. Graves

16  address that as well.  There is at least sufficient evidence

17  to infer that Mr. Keating copied our mark when he came with

18  the "KDZ Bruxer" mark.

19       There is also evidence with respect to the first

20  issue, that in fact customers do associate the "BruxZir"

21  mark with Glidewell.  For example, the declaration of Dr.

22  Donof who is a dentist.  This is Docket No. 90-1, Exhibit A.

23  Dr. Donof states at Paragraph 10, "Since learning about

24  Glidewell Labs' BruxZir brand zirconia crowns and bridges in

25  2009 and through the date of this declaration, I have

1   strongly associated the 'BruxZir' trademark with Glidewell

2   Labs' zirconia crowns and bridges because I have observed

3   that Glidewell has extensively promoted its zirconia crowns

4   and bridges under the 'BruxZir' trademark."

5              So he is saying that he has seen this massive

6   advertising campaign through multiple channels: conventions,

7   websites, direct mails, e-mail blasts and so forth, and that

8   has had an effect.  That has led him to conclude or has

9   cemented in his mind a connection between the "BruxZir" mark

10  and Glidewell.  There is very similar testimony from the

11  other six dentists in the declarations which you will find

12  in the record.

13             With respect to the degree and manner of

14  advertising under the trademark, the evidence is undisputed.

15  Again, I don't want to repeat what Mr. Graves said, but I do

16  want to put a bit of a nuance on it because Ninth Circuit

17  law says that you need to assess secondary meaning as of the

18  time the accused infringer enters the marketplace with its

19  infringing mark.  Again, here that was April 2011.  The

20  numbers that my colleague, Mr. Graves, indicated earlier

21  were up to a later point in time.  I think maybe

22  November 2012.  Nevertheless, if you look at the period up

23  to April 2011, the "BruxZir" mark was introduced in

24  June 2009.  If you look at the period from June '09 to April

25  2011, the numbers are still quite impressive.  Glidewell

1    spent approximately $1.3 million in that period to promote

2    the "BruxZir" brand crowns and bridges.

3          Through that period, it had approximately 95,000

4    page views on its website.  It had started immediately upon

5    introduction of the "BruxZir" mark in June '09 it's regular

6    campaign of quarterly e-mail blasts, direct mailers, press

7    releases, advertisements in dental publications,

8    presentations, trade shows, conventions.  You will see

9    detail about all of these things in the declaration

10   principally of Jim Schuck, who is our VP of Sales and

11   Marketing.  He lists out all the conventions that he and his

12   colleagues have gone to.  He said that at every convention

13   they displayed a "BruxZir" mark in association with

14   Glidewell Lab's name, handout, brochures, signage on the

15   table and so forth, a very extensive effort.  Again, this is

16   all before April 2011.

17         Some other data points with respect to the length

18   and manner of use of the claimed trademark -- again, another

19   one of the secondary meaning considerations -- Glidewell has

20   sold up to the period of April 2011 more than 390,000 units

21   of BruxZir brand dental restorations to over 33,000

22   customers.  Again, up through April 2011, Glidewell had more

23   than $35 million in BruxZir brand dental restoration sales.

24   So even looking at the period just up to April 2011, you see

25   very significant sales figures, a very significant marketing

and promotional campaign effort, and you see from the

testimony of dentists that that campaign has been

successful.

        If you will just give me one moment to make sure I

have covered the points.

        THE COURT:  Why don't you check with your

colleagues also.  Same courtesy.

        (Plaintiff's counsel conferring.)

        MR. SHAW:  There is one final point I would like

to make.  This comes right out of the statute, 15 USC 1064,

subparagraph 3.  It says, "The primary significance of a

registered mark to the relevant public shall be the test for

determining whether the registered mark has become the

generic name of goods or services on or in connection with

which it has been used."

        "Primary significance," those are the words out of

the statute.  So what they need to do is show more than one

or two instances of purported generic use.  One web page

here, one prescription form there -- they need to show that

the primary significance of the word "BruxZir,"

B-r-u-x-Z-i-r, or its purported phonetic equivalent was the

generic term for zirconia crowns and briges among a majority

of the buyer group.  That's what primary significance means.

It means that the majority of their customers or potential

customers regarded that word, "BruxZir," to be generic.

104

1    It's not enough to show a couple of instances here and

2    there.

3              I would submit that when you scrutinize they're

4    evidence particularly in view of the relevant time period of

5    April 2011 they have no evidence that supports a generic

6    use.  At best, they have little odds and ends that are not

7    sufficient on which somebody could say that that is the

8    primary significance or the majority use understanding of

9    this word.

10             Unless the Court has any questions, that's all I

11   have.

12             THE COURT:  Counsel.

13             MS. ZADRA-SYMES:  Your Honor, in the interests of

14   time, we believe all our arguments in response to present

15   counsel's submissions are in our reply brief on our motion,

16   which is in Docket No. 132.

17             The only point I would like to --

18             THE COURT:  I'm not limiting you.  In other words,

19   you have the lectern and have equal courtesy and equal time.

20             MS. ZADRA-SYMES:  Thank you, Your Honor.  Our

21   arguments are addressed in Docket No. 132, which is our

22   reply on our motion.

23             One issue I would like to address is the repeated

24   argument that the timing of the genericness had to be proven

25   as of April 2011.  In fact, Keating -- and we submitted all

1    this in our reply brief.  Keating didn't actually publicly

2    launch its product until May.  The first sales were made in

3    May.  There was an announcement that went out on March 31

4    stating that the new product was coming out to the public.

5    Prior to that it had been in a beta testing form and only

6    sold to Keating's current customers.

7            But there is additional evidence of third-party

8    use that goes up until May 2011, including prescription

9    forms that were written by at least one dentist, Dr. Nassir,

10   in May 2011, and his declaration has been submitted as

11   Docket No. 104.  There are also additional prescription

12   forms that predated May 2011 or very close to that time

13   frame in the Fetura exhibits, which are at Docket No. 96.

14           Then, again, Your Honor, in our reply brief, we

15   listed a lot of evidence on pages seven through nine of the

16   evidence that did exist prior to that time, and that

17   includes lots of generic use of the term "bruxer" in

18   connection with bruxer patients, and that includes packets

19   going back to 1980, dentist journals in the 1990s.  It's a

20   voluminous amount of evidence.  I hesitate to go through it

21   right now, but it's listed in our brief at pages seven

22   through nine.

23           The other point counsel made is that descriptive

24   terms are okay if they are used in text, but you cannot put

25   them into your trademark.  That is not the law.  That's why

1    there several Pepsis.  There is Pepsi Cola, Coca-a-Cola,

2    Shasta Cola.  That's why the Trademark Office has a

3    disclaimer process for people to actually disclaim the

4    descriptive term in a mark.  Just because somebody takes the

5    descriptive term and puts in the mark doesn't make them an

6    infringer.  That's not the law.

7            By analogy, the term -- if somebody used the term

8    "boxzer," b-o-x-z-e-r for boxing gloves and they got a

9    registration for that somehow, they can't go after other

10   people who make boxing gloves because they used the word

11   "boxer," b-o-x-e-r.  That's just not the law.  They don't

12   suddenly become infringers.  They are entitled to name their

13   product as to what they are, to identify them, to compete,

14   and to actually use the name of the intended use in their

15   mark so that people know what it's for.

16           In Keating's example, Your Honor, Keating has

17   actually disclaimed in the Trademark Office -- has actually

18   disclaimed the word "Bruxer" in its mark because it knows

19   it's a descriptive term and that other people are entitled

20   to use it in their trademarks.

21           Your Honor, with regard to the footnote in

22   Sermando regarding the kind of presumption you get from the

23   registration when the secondary meaning evidence has not

24   been given to the trademark examiner, Sermando said that you

25   do not get a presumption of secondary meaning if the

1    examiner has not reviewed any evidence of secondary meaning,

2    and that makes total logical sense because you get the

3    affirmative presumption of inherent distinctiveness, which

4    is what Glidewell has been arguing they have all the time.

5            So in the case that they were relying on, American

6    Trading, the parties actually admitted that the marks are

7    descriptive, so secondary meaning evidence -- it was

8    acknowledged in that case.  In this case, there has been no

9    evidence of secondary meaning presented to the examiner, so

10   the examiner didn't have anything to make a decision as to

11   descriptiveness and secondary meaning when he registered his

12   mark.  It went to registration without any type of evidence

13   submitted.

14           There was one other point that counsel raised

15   about -- claiming that the testimony of Mr. Keating and

16   Mr. Brandon -- I would just like to read to the Court what

17   the witnesses actually said.  Mr. Keating did not admit that

18   Glidewell had a protectable trademark.  What Mr. Keating

19   actually said on the pages cited was, "Doctors have been

20   using the name 'bruxer,' b-r-u-x-e-r, for a strong crown

21   forever, be it gold, be it zirconia.  Now, it's kind of a

22   generic name for an all-full model of the crown.  You can

23   see it on the internet and everything else for bruxer

24   crowns.  I just think it's for grinding patients, a

25   full-contoured monolithic zirconia crown for bruxers."

```
 1            So when Mr. Keating stated in his deposition
 2    shortly after that testimony that the word "bruxer" is not
 3    used in any other way in the industry, he was referencing
 4    his responses to the entire line of questioning and not
 5    referring purely to the Glidewell mark.  It was clearly
 6    inconsistent with what they are actually saying.
 7            This is addressed at page 12 of our reply brief.
 8    And the same for Mr. Brandon.  The testimony was
 9    mischaracterized as well on some of the Keating documents.
10    It's all dealt with in our reply brief.
11            There is absolutely no evidence of copying by
12    Keating.  The mark was clearly adopted in good faith.  The
13    suggestion that Keating adopted this mark in bad faith is
14    completely without any merit and without any support
15    whatsoever.
16            Opposing counsel relied repeatedly on declarations
17    from dentists that were obtained by Glidewell and served on
18    us shortly before midnight on the discovery cutoff.  Those
19    witnesses have never been identified at any point during
20    discovery, and as you know, the Court denied the plaintiff's
21    request for three months of additional discovery, but it
22    wasn't appropriate for those depositions to take place.
23            The same goes for Dr. Franklyn, Your Honor, who is
24    actually a law professor.  In his deposition which I
25    personally took, he testified repeatedly that he had no
```

1    experience in the dental industry, had never spoken to the

2    dentists at all in connection with this case.  The only

3    person he spoken to was Jim Schuck, the plaintiff's

4    marketing director, and yet he now comes forward with a

5    declaration served on us on the discovery cutoff in which he

6    purports to suddenly have interviewed ten dentists who were

7    never disclosed to us and now says that -- interviewed the

8    dentists and says now he proposes evidence of the perception

9    of dentists in the marketplace.  So his declaration, his

10   testimony, his rebuttal reports, are all completely

11   inadmissible under Federal Rule 37(c) and also contradict

12   his deposition testimony.

13          Dr. Goldstein, as Mr. Janskowski already has

14   pointed out -- his report was served on the discovery

15   cutoff, well after this Court's deadline for depositions, so

16   we had no opportunity to depose him.

17          With regard to opposing counsel's argument that

18   the fact that we made an alternative argument of mere

19   descriptiveness was somehow an admission is absurd.  I have

20   been practicing 22 years of trademark law.  I have never

21   heard that made.  It's very common to make alternative

22   arguments of descriptiveness and genericness in trademark

23   cases.  I have shown that by all the Ninth Circuit cases

24   that plaintiff's counsel has cited.

25          The only other point I would like to make is there

1   is not one case that has been cited by opposing counsel in

2   which a trademark owner had adopted a mark that was

3   phonetically equivalent, the exact same sounding word, as

4   the intended user of the product, which themselves promote

5   heavily by the use by the intended user.  There is no case

6   they have cited on that point.

7           Again, going back to the boxer analogy -- it's

8   much harder to talk about it when you are dealing with

9   dentist perceptions because none of us our dentists, but if

10  you are talking about boxing gloves, we all know what they

11  are.  If somebody it trying to trademark the word "boxzer,"

12  b-o-x-z-e-r, and then prevent other people from using the

13  word "boxer" on boxing gloves, that's clearly contrary to

14  trademark law.  People have a right to compete.

15          Your Honor, with regard to the remaining arguments

16  by counsel, I address the Court to my reply brief.  Again,

17  it's Docket No. 132.

18          Thank you, Your Honor.

19          THE COURT:  Do you want to check with your

20  co-counsel for just a moment?

21          (Defense counsel conferring.)

22          MS. ZADRA-SYMES:  That's fine, Your Honor.  Thank

23  you.

24          THE COURT:  Counsel.  Now, this is limited.  You

25  have got about five minutes.

1          MR. SHAW:  I understand, Your Honor.  Many points

2     were made that were addressed earlier.  I am not going to

3     retread old ground.  I just want to address a handful of

4     those points.

5          Counsel states that we have not cited any case in

6     which the mark was the same as the intended user.  Well,

7     Your Honor, I talked at length about the movie buff case,

8     the "Movie Buff" trademark.  That's exactly the situation

9     there.  The trademark at issue was "Movie Buff."  The

10    product was information or services directed to people who

11    were movie buffs, people interested in movies, interested in

12    the entertainment industry.  That's exactly what that case

13    was.  The Ninth Circuit found that the "Movie Buff" mark was

14    suggestive, not generic, not descriptive.

15         I would also refer Your Honor to the Entrepreneur

16    case, 279 F.3d 1135 (2002 Ninth Circuit case).  There the

17    mark "Entrepreneur."  It was a magazine title.  In that case

18    the mark was found to be descriptive, not suggestive, not

19    generic either.  There the mark was the intended user,

20    entrepreneurs.  These would be people who would be buying

21    the magazine, the products at issue in that case.  The mark

22    was descriptive, not generic.

23         On the issue of the dates, clearly April 2011 is

24    the admitted date on which Keating began using its mark.

25    This is the date that they had in their answer and

1    counterclaim.  I'm not -- it's simply an admission from

2    Keating.  I will cite you to the docket, Docket 57-1 at page

3    13, lines 11 to 12.

4            Now, counsel also mentioned a press release from

5    Mr. Keating or Keating Dental announcing the introduction of

6    its KDZ Bruxer product.  That press release is Exhibit F to

7    Mr. Keating's declaration, which is Docket No. 95.  That

8    press release is March 31, 2011.  So they issued a press

9    release at the end of March.  They begin using the mark in

10   April.  That's consistent with their answer and

11   counterclaim.

12           The fact that they didn't sell any until May is

13   not the issue.  The issue under Ninth Circuit law is when

14   did the infringer enter the marketplace and begin using the

15   mark?  Clearly, that's April 2011.

16           With respect to the issue of Mr. Keating's

17   testimony, Your Honor, conveniently counsel left off the

18   portion of the transcript that's at issue here.  I will just

19   read it.  It's short.

20           "Q.  Is there a word 'bruxzir'" -- and it's

21   spelled out in the transcript here -- "'b-r-u-x-z-i-r' in

22   the industry?

23               "A.  What's that?

24               "Q.  Is there such a word?

25               "A.  What?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1           "Q.  B-r-u-x-z-i-r.

2           "A.  Is there such a word?  I don't understand the

3  question.  That's Glidewell's name for their monolithic

4  crown.

5           "Q.  Is it used in any other way in the industry?

6           "A.  No."

7           It couldn't be clearer than that.

8           That's all I have, Your Honor.  Thank you.

9           THE COURT:  Counsel.

10          MS. ZADRA-SYMES:  Just to clarify on the press

11 release that opposing counsel referenced, it wasn't a press

12 release.  It was a letter to Glidewell's customers that was

13 announcing that the pricing for the product would be

14 available in May, so it wasn't a press release to the world

15 or anything like that.  That's the only clarification, Your

16 Honor.

17          THE COURT:  Okay.  Counsel, where could you like

18 to go from here?

19          MR. GRAVES:  Well, Your Honor, just to bring the

20 Court up to speed on where we are generally in the case, we

21 have a trial date set for February 26.  The parties just

22 today agreed to conduct a mediation before retired

23 Magistrate Judge Alfonte on January 3.

24          THE COURT:  Regardless, I think that concludes the

25 arguments this evening.

 1          MR. GRAVES:  Yes, it does.

 2          THE COURT:  Why don't you go through your notes.

 3   Sit down for just a second.  I am just giving you a chance

 4   to converse.  I know how hard you have worked on the case.

 5   You can talk to your clients.  You are not stuck in your

 6   seats.  See if there is anything they are concerned about

 7   that they want to impart to you.

 8          (Counsel conferring.)

 9          THE COURT:  Counsel, have you had enough time?

10          MR. GRAVES:  Yes, Your Honor, just one point.

11   Your Honor, taking the point you made earlier today to

12   heart, we believe with respect to the Court's analysis

13   concerning Keating's summary judgment motion that the wisdom

14   of the jury is the most likely vehicle to lead to a just and

15   accurate result.  That's one reason possibly why the Ninth

16   Circuit has said in a number of cases, including Fortune

17   Dynamics which we cite in our brief, that summary judgment

18   in the trademark law context, particularly with respect to

19   issues of the Sleekcraft factors, is highly disfavored.

20          There is certainly a plethora of cases looking at

21   the factual -- similar to what we have here with respect to

22   Keating's motion that find -- both affirming -- well,

23   typically reversing District Courts' entries of summary

24   judgment on behalf of the defendant finding that the

25   evidence that was submitted was sufficient, particularly in

1    this highly factual intensive trademark law context to

2    support a finding of a genuine issue of fact.  So, Your

3    Honor, we would just humbly submit that the wisdom of the

4    jury should be our guide here.  Thank you.

5               THE COURT:  Counsel.

6               MS. ZADRA-SYMES:  Your Honor, thank you.  I have

7    just one final point.  I would just like to read from Docket

8    85, which is our Memorandum of Points and Authorities in

9    Support of Defendant's Motion for Summary Judgment

10   Cancelling Glidewell's Trademark.  It's from an e-mail by

11   Dr. De Tolla, Glidewell's employee dentist, to Mr. Jim

12   Schuck.  It reads, "No other crown has ever been marketed as

13   a crown for bruxers, b-r-u-x-e-r-s.  The name BruxZir,

14   B-r-u-x-Z-i-r, sells the function of the crown and not the

15   asethetics.  It doesn't try to be something that it's not.

16   It's a crown for bruxers.  We have so much aesthetic

17   restorations.  I would prefer to emphasize its physical

18   advantages.  And, yes, what I should use on a grinder?

19   Bruxer is a great answer."

20              Then in his deposition he testified, "I thought it

21   was clever because of the z-i-r for zirconia that the

22   dentist was going to know what was in there."

23              We just would like to draw those facts to the

24   attention of the Court with regard to the validity of

25   Glidewell's mark.  Thank you.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1              THE COURT:  Well, you started to mention that you

2    were going into mediation, so let me talk to you both about

3    that.  Sometimes we try not to cause harm, and I am about to

4    issue in some form motions that can be dispositive of this

5    matter.  They may not be.  I will take that under

6    consideration now.

7              If you really believe in good faith that there is

8    an opportunity for mediation between the two of you, then

9    you need to tell me that because normally when I get to this

10   stage at summary judgment, I have already said to the

11   parties if you are going to mediate, you are going to

12   mediate before you get to this stage.  I hope I told each of

13   you that because I speak to so many counsel I may not have.

14   But usually my mantra is you are to go to mediation before

15   summary judgment.  The reason for that is if you can reach a

16   resolution then you don't put yourself in this position.

17             My problem is I don't want to hold up whatever

18   that eventually ruling would be, and the reason for that is

19   I am carrying 400 cases.  So if I get 200 cases just

20   churning -- well, 100 cases even -- then I have to come back

21   to your matter, and it's not fresh in mind.

22             So when did you two decide you are going to

23   mediation?  You said --

24             MR. GRAVES:  January 3.

25             MS. ZADRA-SYMES:  But, Your Honor, we weren't

1    expecting to have your order before that time.

2         THE COURT:  Okay.  Well, as long as that's the

3    expectation.  I'm not sure you will.  I think you will.  We

4    will try, but I'm not certain we will turn it out with the

5    Christmas and the New Year's holiday that quickly.

6    Hopefully we will.  It just depends on the Med Cap matter we

7    heard today.  We are going to be devoting a lot of resources

8    to that as well.  So we will do our best, but if not, you

9    can of course delay the mediation.  I don't want to do that

10   on the judge's calendar.  It's not fair to them, so we will

11   make every effort.

12        I want to thank you both very much.  I hope you

13   have had enough time to make your points.  Good-night.

14        MR. GRAVES:  We would like to thank you on behalf

15   of our client for spending the time with us today.  We truly

16   appreciate it.

17        THE COURT:  It's absolutely a pleasure.  I

18   appreciate all of you.  You guys go and have a good holiday

19   now.  I am going to just sit and contemplate what you said.

20        (Whereupon, the proceedings were concluded.)

21             *     *     *

22

23

24

25

1

2

3

4

5          C              CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8   Title 28, United States Code, the foregoing is a true and

9   correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14  Date:  January 12, 2012

15

16

17                    /S/ Sharon A. Seffens 1/12/12
    _____
18                    SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25